**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| STATE OF ILLINOIS, | Case No. <u>3:25-cv-50017</u> |
| and | **COMPLAINT** |
| STATE OF MINNESOTA, | **[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]** |
| Plaintiffs, | |
| v. | |
| DEERE & COMPANY, | |
| Defendant. | |

1.      For decades, Defendant Deere & Company, a manufacturer of large agricultural equipment including tractors and combines, has throttled the ability of farmers and independent repair providers ("IRPs") to repair Deere equipment, leaving farmers wholly reliant upon Deere's network of authorized dealers ("Deere dealers") for many key repairs. Deere's increasingly sophisticated agricultural equipment requires a software tool to diagnose and repair problems that relate to electronic functions, and only Deere has the information and knowledge to create this essential tool. By making this tool available only to Deere dealers, Deere forces farmers to turn to Deere dealers for critical repairs rather than complete the repairs themselves or choose an IRP that may be cheaper, closer, faster, or more trusted. Deere's unlawful business practices have inflated farmers' repair costs and degraded farmers' ability to obtain timely repairs, which is especially critical in times of planting and harvesting.

2.      Plaintiffs Federal Trade Commission ("FTC"), the State of Illinois, and the State of Minnesota petition this Court, pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), Section 16 of the Clayton Act, 15 U.S.C. § 26, the Illinois Antitrust Act, 740 ILCS 10/3(3), and the Minnesota Antitrust Law of 1971, Minn. Stat. Sections 325D.49 to 325D.66, to enter a permanent injunction and other equitable relief against Deere to prevent its unlawful conduct in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), Section 2 of the Sherman Act, 15 U.S.C. § 2, the Illinois Antitrust Act, 740 ILCS 10/3(3), and the Minnesota Antitrust Law, Minn. Stat. Sections 325D.49 to 325D.66, and Minnesota Statutes Section 8.31.

## I.      NATURE OF THE CASE

3.      Deere is the world's leading manufacturer of agricultural equipment like large tractors and combine harvesters, and Deere enjoys a dominant share of large tractor and combine sales in the United States. Deere distributes its equipment and related parts in the United States through a network of authorized Deere dealers that promote and sell equipment and parts and provide repair services to farmers. Deere appoints dealers to act as its authorized dealers, oversees changes to its dealers' ownership and business structures, and has contractual rights to ███████████████████. As part of this contractual relationship, Deere dealers are also required to "actively and aggressively promote" Deere parts.

4.      Durable, reliable, and easily repairable agricultural equipment is critical to American farmers' ability to profitably produce their crops. Planting, spraying, and harvesting are all weather-dependent and time-sensitive processes. When these activities are interrupted by equipment malfunction, farmers must be able to restore their equipment and resume work quickly.

2

5.      Farming is also a seasonal business, with periods of downtime during which farmers can make use of their own labor and know-how to perform maintenance and repair of their agricultural equipment to minimize the risk of equipment malfunction when the equipment is needed most.

6.      For these and other reasons, many farmers have historically developed and relied on their own ability to repair equipment in the field or on the farm. Farmers have also relied historically on local IRPs, which offer competitive advantages compared to Deere dealers, including lower cost, proximity, speed, and/or reliability. And in the past, those farmers who chose to rely on Deere dealers have benefited from the competition those dealers faced from IRPs and the ability of farmers to self-repair.

7.      In recent decades, Deere has increasingly computerized its agricultural equipment, with numerous functions being performed, monitored, and/or regulated by computerized components referred to as "electronic control units" or "ECUs." As a result, repair of Deere equipment is no longer purely mechanical; such repair now commonly requires interacting with onboard equipment software to diagnose a problem and/or to calibrate and reprogram any affected ECUs contained in the equipment or replacement parts. This in turn requires the use of an interactive software tool ("repair tool") that is able to communicate with the equipment's onboard systems to perform diagnosis and repair.

8.      Deere has monopoly power in the market for fully functional repair tools capable of enabling all repairs on Deere agricultural equipment. Only Deere has the requisite information and knowledge to develop a fully functional repair tool for Deere equipment. Deere has developed such a tool, which Deere calls Service ADVISOR™ ("Full-Function Service ADVISOR") and which Deere makes available only to its authorized dealers. Deere has also

developed an inferior repair tool that is not capable of enabling all repairs on Deere agricultural equipment, which Deere calls Customer Service ADVISOR™ and which is now available to farmers and IRPs. This tool lacks many of the key functions necessary to enable comprehensive repair.

9.      Deere also fails to ███████████████████████████████ ████████████████████████████████████, as equipment manufacturers in the automotive and trucking industries do.

10.     Because Deere makes its fully functional repair tool available only to its dealer network, farmers and IRPs are unable to perform certain essential repairs—and thus unable to competitively constrain Deere dealers in the provision of these and other key repair services. Farmers are forced to turn to Deere dealers for repairs that they would do themselves or take to an IRP but for Deere's restrictions.

11.     As a result, Deere has acquired and maintained monopoly power in a relevant market for the provision of repair services that require the use of a fully functional repair tool. Through its limited distribution of the repair tool, Deere controls entry into, and limits output in, the provision of such services. As a consequence, Deere's dealers are able to maintain a 100% market share and charge supracompetitive prices for restricted repairs, and Deere itself reaps additional profits through parts sales. And the effects of Deere's conduct extend beyond the market for restricted repairs. Because farmers and IRPs cannot always know, at the time of equipment malfunction, whether repair will ultimately require dealer involvement, and because farmers sometimes prefer to have all repairs performed by one provider in one trip, Deere's repair restrictions steer additional (non-restricted) repair business away from self-repair and IRPs and into Deere's dealer network.

12.     Deere's restrictions deprive farmers of the use of their own repair labor, deny them access to their preferred repair service provider, prevent them from more reliably planting, spraying, or harvesting crops on a schedule that would allow them to maximize yield, and force them to spend more on repair and parts. Deere dealers charge more for service than IRPs, with one internal Deere analysis identifying ███████████████████████████████. And unlike farmers and IRPs, Deere dealers also almost always use more expensive Deere-branded parts in their repairs.

13.     Deere's restrictions harm farmers and IRPs while enriching Deere and its dealers. As one Deere executive explained: ████████████████████████████████████ ██████████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████ █████████████████████████████████████ ████████████████████████████ ████████████ according to Deere's documents, Deere's parts business accounted for ██% of its total operating profits in FY 2016.

14.     Deere's practices have generated an outpouring of public concern from farmers and IRPs. Aggrieved farmers have mounted an extensive state lobbying campaign in support of "right-to-repair" legislation across the United States, leading to recent legislation in Colorado.

15.     Deere has responded to public outcry regarding its restrictive repair practices with its own intensive lobbying against such "right-to-repair" legislation, accompanied by a series of half measures and unfulfilled commitments.

16. For example, instead of making a fully functional repair tool available to farmers and IRPs, Deere released Customer Service ADVISOR. Deere knew when it released Customer Service ADVISOR that, ███████████████████████████████████████████████████████

███████████████████. One Deere employee candidly explained that ███████████████

███████████████████████████████████:

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

17. With great fanfare, Deere entered into a Memorandum of Understanding ("MOU") with the American Farm Bureau Federation regarding repairability of agricultural equipment. But still, Deere did not make a fully functional repair tool available to farmers or IRPs, claiming that the MOU required only the provision of the degraded Customer Service ADVISOR tool.

18. Deere invoked its release of Customer Service ADVISOR and its MOU with the Farm Bureau to stymie state "right-to-repair" legislation that would otherwise have required Deere to make fully functional repair tools available to customers and IRPs. Deere viewed "right to repair" ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████

19. Deere has also raised unfounded environmental, safety, and intellectual property concerns as a strategy to publicly defend its repair restrictions and to combat state right-to-repair legislative initiatives. Deere's continuing invocation of these concerns is pretextual. For example, Deere employees ████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████ invoke environmental compliance to fight state legislation that would require Deere

to make such tools available. As one Deere dealer candidly explained, ████████████████████

████████████████████████████████████ A Deere employee similarly observed

that ██████████████████████████████████████████████ Like

Deere does elsewhere in the world, and like original equipment manufacturers do in the

automobile and diesel truck industries in the United States, Deere could enable repair by

equipment owners and IRPs without undue risk of violating environmental laws, risking operator

safety, or compromising its intellectual property rights.

20.     In light of the unfair and anticompetitive conduct alleged herein, Plaintiffs seek an

order from this Court (a) enjoining Deere from engaging in such conduct, (b) ordering Deere to

make all repair resources that it makes available to its dealers, including Full-Function Service

ADVISOR and any similar future repair tools, available to agricultural equipment owners and

IRPs on reasonable and nondiscriminatory terms, and (c) ordering such other equitable relief as

the Court may deem appropriate.

## II.     JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over this action pursuant to Section 5(a)

of the FTC Act, 15 U.S.C. § 45(a), 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. § 26, as

well as supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a). This Court's exercise of

supplemental jurisdiction over the state law claims will avoid unnecessary duplication and

multiplicity of actions and will promote the interests of judicial economy, convenience, and

fairness.

22.     This Court has personal jurisdiction over Deere because Deere has the requisite

constitutional contacts with the United States pursuant to 15 U.S.C. § 53(b). This Court also has

personal jurisdiction over Deere because Deere maintains its corporate headquarters in Illinois, does business in Illinois, and has engaged in the illegal conduct alleged herein in Illinois.

23.     Deere's general business practices and the unfair methods of competition alleged herein are activities in or affecting "commerce" within the meaning of Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

24.     Deere is, and at all times relevant herein has been, a corporation, as the term is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

25.     Venue in this district is proper under 15 U.S.C. § 22, Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and 28 U.S.C. §§ 1391(b), (c) and (d). Deere is found, resides, transacts business, and/or has agents in this state and district, and a portion of the affected commerce described herein has been carried out in this state and district.

## III.     THE PARTIES

26.     Plaintiff Federal Trade Commission ("FTC") is an independent administrative agency of the United States government established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 *et seq*., with its principal offices in Washington, D.C. The FTC is vested with authority and responsibility for enforcing, *inter alia*, Section 5 of the FTC Act, 15 U.S.C. § 45, and is authorized under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), to initiate court proceedings to enjoin violations of any law the FTC enforces. This case is proper under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), because the FTC has reason to believe that Deere is violating, or is about to violate, Section 5 of the FTC Act, making it appropriate, efficient, and suitable to file this action in federal court to seek the requested relief.

27.     Plaintiff State of Illinois is a sovereign state. Kwame Raoul is the Attorney General of the State of Illinois, the chief legal officer for the state, and brings this action on behalf of the people of the State of Illinois to protect the state, its general economy, and its

residents from Deere's unlawful business practices. The Illinois Attorney General has authority under federal and state law to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct. The Illinois Attorney General also has authority to seek civil penalties under state law to punish and deter those engaged in unlawful conduct.

28.     Plaintiff State of Minnesota is a sovereign state. Keith Ellison is the Attorney General of the State of Minnesota, the chief legal officer for the state, and brings this action on behalf of the people of the State of Minnesota to protect the state, its general economy, and its residents from Deere's unlawful business practices. The Minnesota Attorney General has authority under federal and state law to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct. The Minnesota Attorney General also has authority to seek civil penalties under state law to punish and deter those engaged in unlawful conduct.

29.     Defendant Deere & Company is a manufacturer of agricultural equipment and other machinery and conducts business throughout the United States and worldwide. Deere is headquartered in Moline, Illinois, with its principal place of business at One John Deere Place, Moline, Illinois, 61265, and is organized and existing under the laws of Delaware. Unless otherwise specified, "Deere" refers to Deere & Company and all corporate predecessors, subsidiaries, successors, and affiliates.

## IV.     THE ECOSYSTEM FOR DEERE EQUIPMENT

30.     Large agricultural equipment, such as tractors and combines, is indispensable to the production of numerous staple crops that are critical to the American food supply, including corn, soybeans, wheat, oats, and barley. Farmers rely on functioning agricultural equipment in order to timely plant, care for, and harvest these crops. As of September 2023, there were at least ▮▮▮▮▮ pieces of Deere agricultural equipment in the United States.

31.     At least four types of products and services are relevant to this Complaint: (1) the agricultural equipment itself; (2) electronic repair tools used to diagnose equipment problems and facilitate repair; (3) repair services for the equipment; and (4) parts used in the course of performing repairs.

### A.     Agricultural Equipment

32.     Deere is the largest manufacturer of agricultural equipment in the United States. Deere organizes its agricultural equipment business into two segments: "Production and Precision Agriculture" (PPA) and "Small Agriculture and Turf." The PPA segment includes tractors with ███████████████ ("Large Tractors") and combine harvesters ("Combines"), among other equipment types. In fiscal year 2023, Deere's PPA segment generated $26.8 billion in net sales globally and $7.0 billion in operating profit.

33.     A new Large Tractor or Combine costs hundreds of thousands of dollars. When properly maintained and repaired, a Large Tractor or Combine can be used for 20 years or longer. Deere estimates that the average lifespan of a Combine is ██ years and considers a machine ████████████████████████████████.

34.     Today, Deere's Large Tractors and Combines rely heavily on electronic components. Many functions that were performed through physical or mechanical means on older models are now—on newer models—performed electronically and controlled through ECUs.

35.     Deere generally does not sell equipment directly to farmers. Rather, Deere distributes its products through a network of authorized dealers, who purchase new equipment from Deere and re-sell the equipment to farmers and other equipment owners. As of March 2023, Deere's dealer network comprised ███ dealer organizations with ████ locations in the United States and Canada.

36.     At all times relevant to this Complaint, Deere possessed monopoly and market power in the sale of Large Tractors and Combines in the United States. Deere's monopoly and market power as to Large Tractors and Combines are shown directly through Deere's ability to raise prices, reduce output, and degrade quality in those markets (including through imposition of the challenged restraints on repairability), and indirectly through Deere's dominant market shares in those markets, as to which the barriers to entry are substantial.

37.     Large Tractors have particular characteristics and uses that differentiate them from other types of agricultural equipment, including Combines and smaller tractors. Large Tractors are generally used to pull or push other agricultural machinery, such as seeding, planting, and tillage equipment. Smaller tractors generally lack the power needed to perform, in a comparable amount of time and with comparable quality, the tasks that are performed using Large Tractors. From the perspective of an equipment owner, smaller tractors and other agricultural equipment are not reasonable substitutes for Large Tractors.

38.     Combines have particular characteristics and uses that differentiate them from other types of agricultural equipment, including tractors. Combines are generally used for the specific purpose of harvesting grain and, as a result, are not used outside of harvest season. From the perspective of an equipment owner, other agricultural equipment is not a reasonable substitute for Combines.

39.     The relevant geographic market for the sale of Large Tractors and Combines is no broader than the United States. Agricultural equipment is largely regulated on a national basis, including by the EPA. In internal documents, Deere ███████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████. Although an equipment owner is not limited to a

local dealer when buying equipment, and equipment purchased in one part of the country may be moved to and used in another part of the country, the costs of transporting large pieces of agricultural equipment limits the area within which equipment owners are willing to purchase equipment.

40.     For each fiscal year from at least 2012 to 2021, Deere's share of Large Tractors sold in the United States exceeded ██%. For each fiscal year from at least 2012 to 2021, Deere's share of Combines sold in the United States ranged between ██% and ██%. These shares exceed ██████████████████████████████████████████████████████████████

41.     Deere describes itself as having ████████████ in large agricultural equipment in the United States, including Large Tractors and Combines. Deere has maintained an internal goal of ████████████████████████████████████████████████████████████████
████████████.

42.     Deere's competitors view Deere ████████████████████████████████████████
████████████████████████████████. Deere's competitors, including CNH Industrial and AGCO Corp., ████████████████████████████████████████
████████████.

43.     Equipment owners cannot switch from Deere agricultural equipment to other manufacturers' equipment without incurring significant costs. These costs and barriers to switching can include the cost of acquiring replacement equipment (often hundreds of thousands of dollars per machine), the cost of learning how to operate new equipment, and the cost of losing data generated by existing Deere equipment. Equipment owners switching only some of their equipment from Deere to other manufacturers also incur the costs of making their "mixed fleets" interoperable.

44.     There are substantial barriers to entry into the Large Tractor and Combine markets. Entry is difficult, costly, and time-consuming. Potential entrants face significant capital, technical, logistical, and regulatory barriers. These barriers include developing manufacturing processes and capabilities, obtaining regulatory approvals, developing distribution networks, the lack of an established reputation, and interoperability issues across "mixed" fleets of agricultural equipment produced by different manufacturers.

**B.      Repair Tools**

45.     Because Deere equipment has become increasingly computerized, software tools capable of interacting with the electronic components of the equipment are increasingly necessary to diagnose and repair Deere agricultural equipment. Deere offers two versions of its electronic repair tool: (1) Full-Function Service ADVISOR, a fully functional repair tool that Deere makes available only to Deere dealers, and (2) a degraded Customer Service ADVISOR, which Deere licenses to equipment owners, IRPs, and others.

46.     Full-Function Service ADVISOR can communicate with agricultural equipment software through a cable or, in some cases, wirelessly. Dealers currently pay Deere ███ ████████████ to license Full-Function Service ADVISOR. Service technicians at Deere dealers rely on Full-Function Service ADVISOR for critical repair tasks: to perform diagnostic tests; to identify and clear error codes (known as "diagnostic trouble codes" or "DTCs") being returned by equipment; to calibrate ECUs; to download from a Deere server and install customized ECU software code (referred to as "payload files"); and to access diagnostic and troubleshooting information on Deere's Case and Contact Management System ("CCMS"), formerly referred to as Dealer Technical Assistance Center ("DTAC").

47.     CCMS/DTAC contains both a repository of established solutions to commonly experienced equipment problems and a "helpdesk" component whereby problems are submitted to Deere engineers, who attempt to resolve them.

48.     Installing payload files, performing tests and calibrations, and accessing CCMS/DTAC are critical to the ability of a repair technician to fully diagnose equipment issues and complete repairs on Deere equipment.

49.     The installation of payload files provided by Deere onto ECUs is sometimes referred to as "reprogramming." Reprogramming is required for repairs that involve replacement of ECUs, including some corresponding sensors and valves (sometimes referred to as "parts pairing"), or reinstallation of an ECU's software (sometimes referred to as ECU "flashing"). Full-Function Service ADVISOR's reprogramming function does not require or enable a dealer technician to modify the software payload received from Deere or access the source code contained therein.

50.     Deere initially launched Customer Service ADVISOR for agricultural equipment in 2017. Customer Service ADVISOR's functionalities are limited compared to Full-Function Service ADVISOR's functionalities. Among other differences, users of Customer Service ADVISOR receive more limited diagnostic information, cannot perform reprogramming of ECUs, and cannot access either CCMS/DTAC solutions or the CCMS/DTAC "helpdesk" feature. As a result, users of Customer Service ADVISOR cannot perform many key repairs that Deere dealers can perform using Full-Function Service ADVISOR.

51.     Deere makes Customer Service ADVISOR available only in one-year increments. Deere currently charges $3,160 for a one-year subscription to Customer Service ADVISOR for agricultural and turf equipment, and $2,560 for a one-year renewal of an existing Customer

Service ADVISOR subscription. One Deere employee observed that ████████████████

████████████████████████████████████████████████████████████

He continued, ████████████████████████████████████████████

████████████████████████████████████████████████████

████

52.     Farmers and IRPs do not consider Customer Service ADVISOR as a reasonable substitute for Full-Function Service ADVISOR due to the degraded functionality of the former.

53.     Several third-party developers, including Bosch, Cojali, and Texa, also offer repair tools that can interoperate to varying degrees with Deere equipment. These third-party developers cannot develop the capabilities to read and clear all of the diagnostic trouble codes on Deere equipment, to reprogram ECUs on Deere equipment, or to access either CCMS/DTAC solutions or the CCMS/DTAC "helpdesk" feature. Deere does not view these third-party repair tools ████████████████████████████████████████████████

████████████████████████.

54.     Farmers and IRPs do not consider third-party repair tools as reasonable substitutes for Full-Function Service ADVISOR due to their limited functionality.

55.     At all times relevant to this Complaint, Deere possessed monopoly and market power with respect to fully functional repair tools capable of enabling all repairs for Deere Large Tractors and Combines ("Fully Functional Repair Tools") in the United States.

56.     Full-Function Service ADVISOR is the only Fully Functional Repair Tool that is currently available in the United States. Only Deere has the requisite information and knowledge to develop a fully functional repair tool for Deere equipment. Other makers of repair tools for agricultural equipment are unable to make a fully functional repair tool capable of repairing

Deere equipment without affirmative assistance from Deere, ███████████████████
███████.

57.     Full-Function Service ADVISOR has particular uses and characteristics that differentiate it from other electronic repair tools for Deere equipment, including Customer Service ADVISOR. Other electronic repair tools cannot be used to reprogram ECUs, complete certain tests and repairs, or access CCMS/DTAC. Other electronic repair tools thus cannot complete a significant number of repairs.

58.     When setting prices for repair tools, Deere does not consider the potential impact of those prices on competition in markets for Large Tractors and Combines.

59.     The relevant geographic market for Fully Functional Repair Tools is at least as broad as the United States. Deere's License Agreement for Full-Function Service ADVISOR asserts that ████████████████████████████████████████████
████████████████████████. Internal Deere documents indicate that Deere's decision making with respect to the availability of Full-Function Service ADVISOR ██
███████████████████████.

60.     Deere is the only supplier of Full-Function Service ADVISOR. Deere thus holds a 100% share of the market for Fully Functional Repair Tools.

61.     Competition in the markets for Large Tractors and Combines does not constrain Deere's harmful behavior in the market for Fully Functional Repair Tools, including because Deere possesses market and monopoly power in the markets for Large Tractors and Combines, because equipment owners face significant switching costs, and because, as described further below, customers have only limited ability to conduct lifecycle pricing.

### C.     Repair Services

62.     Repair services are typically performed by Deere dealers, by equipment owners themselves (known as "DIY" or "self-repair"), or by IRPs.

63.     Deere dealers perform repair services "in shop" at a dealership location or "in the field." As of 2024, hourly rates for service provided by a Deere dealer generally range between $130 to $200 per hour, with dealers' field rates generally higher than shop rates.

64.     When work is performed in shop at a Deere dealer, an equipment owner must spend the time and fuel to transport the equipment to and from the dealership location. When work is performed by a Deere dealer in the field, the dealer generally charges for technician time spent traveling to and from the field location and may also charge a per-mile travel fee. Given these costs, the vast majority of equipment repaired by a Deere dealer organization comes from the local geographic area surrounding the dealer organization's locations—generally within a distance of 30 to 60 miles.

65.     Equipment owners engaged in self-repair also perform service labor on Deere equipment. Some farms have in-house service capabilities, and equipment owners gain the expertise to perform repair services through myriad means, including formal or informal training, prior experience as a service technician at Deere dealers, and other prior technical experience. As an internal Deere analysis explains, ███████████████████████████████ ██████████████████████████████████████.

66.     Finally, IRPs perform service labor on Deere equipment. Many IRPs are former Deere dealer technicians, and others come from other technical backgrounds. Although IRP labor rates vary, they are almost always substantially lower than Deere dealers' rates. A Deere internal analysis identified ████████████████████████████████ ████████████████████████████████████.

67.     Not all repairs are created equal, and repairs can range from something as simple as replacing a battery or filter, to replacing a blade or a sensor, to replacing a transmission or rebuilding an engine. Different repairs require different inputs and incur different total costs. Large Tractors and Combines are the most expensive equipment to repair, and an internal Deere analysis acknowledges that ███████████████████████████████████████ ████████ .

68.     Critically, certain repairs, including those involving reprogramming or engine re-calibration, require the use of a Fully Functional Repair Tool. Provision of these "restricted repairs" for Deere Large Tractors and Combines is a relevant service market in which to assess Deere's conduct. Restricted repair services include a broad cluster of repair services for which competitive conditions are substantially similar. In particular, each type of restricted repair service involves an equipment issue that can be diagnosed and repaired only with a Fully Functional Repair Tool, and thus currently only by Deere dealers. Repair services that do not require a Fully Functional Repair Tool are not included in the relevant service market.

69.     At all times relevant to this Complaint, Deere possessed monopoly and market power with respect to the market for restricted repairs because Deere held the power to exclude competition. By choosing whom to empower with a Fully Functional Repair Tool—only Deere dealers—Deere has excluded other providers of repair services from providing restricted repairs. As a result of Deere's exercise of monopoly power, Deere dealers collectively have a 100% share of restricted repairs.

70.     Relevant geographic markets for assessing the effects of Deere's exclusionary conduct on the sale of repair services include the United States and potentially regional or local submarkets within the United States.

71.     Competition in the markets for Large Tractors and Combines does not constrain Deere's harmful behavior in the market for restricted repair services, including because Deere possesses market and monopoly power in the markets for Large Tractors and Combines, because equipment owners face significant switching costs, and because customers have only limited ability to conduct lifecycle pricing.

72.     Deere's customers cannot calculate lifecycle pricing—that is, fully determine in advance the total cost of ownership over the life of the equipment, which includes the costs of repairs and parts over time—and only some customers make the attempt. Deere does not consistently make the lifecycle pricing information that it has available to customers. Moreover, repairs do not arise consistently or predictably, and the need for repairs (and the extent and cost of repairs needed, including whether a dealer will need to be involved) can vary based on factors, such as weather and field conditions, that cannot be estimated with certainty over the lifespan of a piece of agricultural equipment.

73.     Deere has asserted that even it cannot easily identify the universe of equipment issues (and corresponding DTCs) requiring Full-Function Service ADVISOR, and thus dealer involvement, to resolve. A Deere witness stated that Deere "does not maintain in the ordinary course of business a dictionary or reference guide for whether each DTC can be resolved by the customer without intervention by a John Deere authorized dealer." She further asserted that defining the universe of DTCs requiring dealer involvement would require "a multi-departmental team to manually analyze the DTCs," including, for each equipment model, sixteen hours of effort from "[i]nfrastructure or enterprise engineers [with] expertise in enterprise diagnostic strategy and tools." Equipment owners are even less able to perform this analysis. An examination of DTCs ██████████████ shows that, while some DTCs are

accompanied by a message telling the equipment owner to contact a Deere dealer, this message accompanies only ████████████████████████████████████████████ ████ .

74. As a result, equipment owners faced with a repair face uncertainty as to whether they or an IRP can complete the necessary repairs. An equipment owner may seek an IRP's assistance or attempt self-repair, only to later discover that the repair can be completed only by a Deere dealer. Customers' ability to lifecycle price is further degraded by these difficulties in identifying whether a repair will require Deere dealer intervention.

**D. Repair Parts**

75. Deere sells several lines of repair parts for agricultural equipment in the United States. These include "genuine" or Deere "OE" parts, which are manufactured to the same specifications as parts used in new equipment, remanufactured or "Reman" parts, which are complex components that have been refurbished, and "all-makes" parts that have been reengineered and are built to different specifications, which are marketed by Deere primarily under the A&I brand.

76. Deere offers approximately ████ different OE parts for sale in the United States. Deere OE parts account for approximately ██% of Deere's agricultural equipment parts sales in the United States.

77. In fiscal year 2023, Deere sold ████████ in parts in Deere's geographic Region 4 (consisting of the United States, Canada, Australia, and New Zealand). This volume corresponds to ██% to ██% of all parts sold for Deere agricultural equipment in that region that fiscal year.

78. The remaining ██% to ██% is comprised of non-Deere or "generic" parts used on Deere agricultural equipment, which are often referred to as "aftermarket" or "all-makes" parts.

Deere OE parts are generally priced at a premium to the corresponding generic parts. Generic parts are typically ██% to ██% less expensive than their Deere OE counterparts. Generic parts sellers may use the same manufacturer as Deere, and ████████████████████████████████ ████████████████████.

79.     Deere distributes its OE parts only through its authorized dealers, who resell them to customers, either in the course of providing repair services or in an "over-the-counter" retail transaction. Deere emphasizes ████████████████████████████████████, identifying to dealers ████████████████████████ and explaining that ████████████ ██████████████████████████ Indeed, both Deere and Deere dealers █████████ ████████████████████████████████.

80.     Certain state laws prohibit Deere from requiring that Deere dealers purchase parts exclusively from Deere. The dealership agreement between Deere and its dealers, however, does require Deere dealers to "actively and aggressively promote the sale of Parts and Service" and "maintain . . . inventories of Parts" ████████████████████████████████████ ████████████████. Moreover, Deere has the right to ██████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████.

81.     Deere dealers source the vast majority of parts from Deere. According to surveys and analyses conducted by Deere, dealer ███████ as to parts (also referred to as parts "capture") is approximately ██%. ████████████████████████████████████ ████████████, and Deere's parts capture is significantly higher when its dealers perform repairs compared to other repair channels.

82.     Deere dealers' almost exclusive use of Deere OE parts when performing repairs on Deere equipment stands in sharp contrast to Deere's overall ██% to ██% share of parts for agricultural equipment and in even sharper contrast to equipment owners' and IRPs' usage of Deere parts, which is significantly lower. By one estimate, equipment owners engaging in self-repair of Deere equipment use ███████% Deere OE parts and IRPs repairing Deere equipment use ██████% Deere OE parts.

83.     Deere reaps massive profits from its parts business. ███████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████

84.     Deere dealers also reap massive profits from reselling parts for Deere agricultural equipment. On average, each Deere dealer sells ████████ in Deere parts per year, earning gross margins of ██████████████ and operating margins of █████████████. Deere dealers describe reselling Deere OE parts as a highly lucrative and reliable line of business.

## V.     DEERE IMPOSES UNLAWFUL RESTRICTIONS ON REPAIRS, HARMING COMPETITION FOR REPAIR SERVICES AND INCREASING COSTS TO EQUIPMENT OWNERS

### A.     Deere Computerizes Its Agricultural Equipment, But Does Not Make a Repair Tool Available to Equipment Owners or IRPs

85.     Starting in ███████████, Deere began installing ECUs (sometimes called "controllers") on its Large Tractors and Combines. ECUs are akin to small computers that monitor and control particular functions of agricultural equipment. Today, a Large Tractor or Combine can have upwards of 20 ECUs that monitor and control various functions. As of September 2023, there are more than █████████ pieces of Deere agricultural equipment in the United States and ███████████ ECUs on that equipment.

86.     As Large Tractors and Combines became more computerized during the 21st century, farmers began noticing problems with the repairability of this new equipment. Whereas farmers historically could complete repairs through mechanical means, the digitization of farm equipment necessitated software tools to repair issues related to ECUs.

87.     In or around ▮▮▮, Deere developed Full-Function Service ADVISOR as one such tool for Deere dealers to use to diagnose and repair issues with or observable through agricultural equipment software. Deere's Full-Function Service ADVISOR has become a critical input for repair technicians providing repair services on Deere Large Tractors and Combines. Deere has continuously developed, maintained, and updated Full-Function Service ADVISOR, and has made Full-Function Service ADVISOR available as a resource for its dealers between ▮▮▮ and the present.

88.     Despite having the technology developed and available, at no time has Deere made Full-Function Service ADVISOR or any other fully functional repair tool for Deere agricultural equipment generally available to equipment owners or IRPs in the United States.

89.     As a result, repairs related to ECUs became the exclusive domain of Deere dealers. This includes repairs equivalent to those that farmers historically completed themselves, such as replacing mechanical parts on the machines.

90.     The inability of consumers and independent repair shops to complete repairs related to ECUs has deprived Deere equipment owners of their historical ability to select a repair solution based upon cost, timeliness, and quality. Instead, Deere equipment owners are compelled to seek Deere dealer intervention to complete these repairs, regardless of their preference or of the differences in cost, timeliness, or quality.

**B.** **Deere Identifies Parts as a Business Opportunity and Seeks to** ████████
████ **Using Its Dealer Network in Order to Increase Parts Sales**

91.     During the 2010s, ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██

92.     Deere had long recognized the importance of its parts sales to the company's

profitability. But the parts landscape was evolving, with the ascendance of new generic parts

suppliers and distribution channels threatening Deere's OE parts share. ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

93.     Deere commenced ████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

94.     A key pillar of ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████. Deere's internal documents refer to this strategic objective as ████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██     As one Deere executive explained, ████████████████████████████████

████████████████████████

95. By contrast, an equipment owner or IRP performing a repair is more likely to use non-Deere generic parts. The same Deere executive observed, ███████████████ ████████████████████████████████████████████ A consultant supporting Deere ████████████████████████ (and who later became a Deere executive) observed that ██████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████.

96. Thus, Deere seeks to steer service business away from equipment owners and IRPs and towards its dealer network, so as to generate increased parts revenue and profit. As the consultant noted, ████████████████████████████

97. ██████████████████████████████████████ translates into more profits for Deere and its dealers. By one estimate, increasing Deere dealers' service capture by just ██% to ██% increases profits by $███████ to $█████████████ ███████████████████.

98. One significant way in which Deere ████████████████████████ ██████ is by withholding from equipment owners and IRPs Deere's Full-Function Customer Service ADVISOR repair tool and making available only the degraded Customer Service ADVISOR tool.

**C.    Deere Continues to Unlawfully Withhold a Fully Functional Repair Tool from Equipment Owners and IRPs, While Making Only Partial Solutions Available in the United States**

99. At various times, Deere has made the less capable Customer Service ADVISOR available to equipment owners and IRPs. Despite its clear inferiority, Deere and its dealers have been reluctant to make even this degraded tool available to equipment owners and IRPs due to concerns that enabling repair would disadvantage Deere's and its dealers' businesses.

100. , Deere made an early version of Customer Service ADVISOR available for construction and forestry equipment, but not for its agricultural equipment. According to Deere documents, Deere withheld Customer Service ADVISOR for agricultural equipment ███████████████████████████████████████ ███████████████████████████████████████ ████████████████████████████████.

101. It was not until August 2017 that Deere made Customer Service ADVISOR for agricultural equipment available to equipment owners and IRPs via Deere's dealer network. After ██████████████████████████████████████ ██████████████████████████████████████ ████, Deere in May 2022 made Customer Service ADVISOR available to agricultural equipment owners and IRPs directly via Deere's website.

102. Deere made the less-than-fully functional Customer Service ADVISOR available to agricultural equipment owners and IRPs in an effort to placate so-called "right-to-repair" advocates and thereby avoid legislative or regulatory intervention without relinquishing the commercial advantage that exclusive access to Full-Function Service ADVISOR confers on Deere and its dealer network in parts and repair aftermarkets. Deere viewed such legislative or regulatory intervention as a significant threat because ██████████████████████ ██████████████████████████████████████.

103. In 2018, the Association of Equipment Manufacturers ("AEM"), a trade association of which Deere is a member, issued a statement of principles regarding right to repair ("2018 Statement"). Despite the 2018 Statement, in which AEM committed on behalf of its members "to provide end users with the information and tools needed to maintain, diagnose, and

repair their equipment," Deere still does not make Full-Function Service ADVISOR available to agricultural equipment owners or IRPs.

104.    In 2023, Deere entered into a Memorandum of Understanding with the American Farm Bureau Federation regarding access to repair tools ("2023 MOU"). Despite the 2023 MOU, in which Deere committed to "assure the timely availability, on Fair and Reasonable terms, of Tools, Specialty Tools, Software and Documentation" originating from Deere, Deere still does not make Full-Function Service ADVISOR available to agricultural equipment owners or IRPs.

105.    In 2023, Colorado enacted legislation requiring that agricultural equipment manufacturers make embedded software and repair tools available to equipment owners and IRPs, among other obligations. *See* Colo. Rev. Stat. § 6-1-1503(1). Despite this enacted legislation, Deere has not changed its repair offerings in Colorado: Deere does not make Full-Function Service ADVISOR available to agricultural equipment owners or IRPs in Colorado, and the repair tool it does offer in Colorado—Customer Service ADVISOR—is not different from that offered in other states.

106.    The version of Customer Service ADVISOR that Deere makes available to agricultural equipment owners and IRPs in the United States today still lacks essential functions necessary for repair, including reprogramming, the ability to conduct certain tests and calibrations, and the ability to access either CCMS/DTAC solutions or the CCMS/DTAC "helpdesk" feature. As one Deere employee observed, even with degraded functionality, Customer Service ADVISOR is ███████████████████████

**D.      Deere's Repair Restrictions Benefit Its Dealers and Its Parts Business While Harming IRPs and Equipment Owners**

107.    Because Deere withholds Full-Function Service ADVISOR from equipment owners and IRPs and removes critical features from Customer Service ADVISOR, certain

repairs can be performed only by Deere dealers ("restricted repairs"). Restricted repairs include every repair that requires reprogramming of any ECU, certain tests and calibrations, and any repairs for equipment issues that require access to CCMS/DTAC solutions or the CCMS/DTAC helpdesk function to troubleshoot or diagnose. Restricted repairs are significant in volume. For example, in the 12 months ending June 2023, ████████ reprogramming events were performed on Deere agricultural equipment globally.

108.    Deere's withholding of Full-Function Service ADVISOR from equipment owners and IRPs harms competition in the market for restricted repair services. Deere dealers view IRPs and self-repair as significant competitive threats, and as threats that would increase substantially with the removal of Deere's repair restrictions. One dealer ████████████████████ ████████████████████████████████████:

████████████████████████████████
████████████████████████████████
████████████████████████████████

109.    Because Deere dealers are the only providers of repair services that have access to Full-Function Service ADVISOR and thus can perform restricted repairs, Deere dealers gain a competitive advantage over other providers of repair services. Equipment owners cannot repair their equipment or take their equipment to an IRP when a restricted repair needs to be performed. Equipment owners and IRPs themselves are thus denied the ability to compete for restricted repairs, and Deere dealers perform a greater share of repairs on Deere equipment than they would absent Deere's repair restrictions.

110.    This steering effect is compounded by uncertainty—and Deere's lack of transparency—as to whether a given equipment issue will require a restricted repair. As described above, when equipment owners encounter an issue and are prompted with a DTC code,

28

they often do not know with certainty (and the DTC code does not indicate) whether, for example, repairing the machine will require reprogramming, performing restricted tests or calibrations, or accessing CCMS/DTAC. Some equipment owners therefore bring their equipment to Deere dealers for repairs that do not actually require dealer involvement. Full-Function Service ADVISOR thus confers an incremental competitive advantage on Deere dealers (and Deere) as to repair services and parts beyond those needed for restricted repairs.

111.    This steering effect is also compounded by the fact that multiple repairs are commonly performed in a single visit, and equipment owners value the efficiency of one-stop shopping for repairs. Thus, if *any* restricted repair is (or may be) required for a piece of equipment, Full-Function Service ADVISOR confers an incremental competitive advantage on the dealer (and Deere) as to *all* repair services and parts needed for that equipment.

112.    In addition to being disadvantaged in competing to perform repair services on Deere agricultural equipment, equipment owners also incur additional service costs. Instead of being free to choose to rely on their own capabilities or those of an IRP to complete repairs in the most economical and expeditious manner, equipment owners must pay Deere dealers' substantially higher hourly labor rates, and often are unable to obtain timely dealer service.

113.    The advantage that Deere's repair restrictions confer on Deere dealers inures to Deere's benefit as well. Deere sells more parts and earns more profits than it would otherwise. This is because Deere dealers use a greater proportion of Deere parts in repairs than IRPs or equipment owners.

114.    Deere continues to withhold Full-Function Service ADVISOR from customers and IRPs and to remove key functions from Customer Service ADVISOR. Absent entry of

29

injunctive relief by the Court, Deere is likely to continue to engage in unfair methods of competition that harm the public interest.

### E. The Repair Restrictions Imposed by Deere Are Not Reasonably Necessary to Achieve Any Cognizable Procompetitive Benefits

115. Deere's practices as alleged herein are not reasonably necessary to achieve any cognizable procompetitive benefits. The harm from those practices outweighs any procompetitive benefits, and Deere could reasonably achieve any procompetitive objectives through less restrictive means.

## COUNT I

## MONOPOLIZATION OF RESTRICTED REPAIR SERVICES MARKET ARISING UNDER SECTION 2 OF THE SHERMAN ACT

116. Plaintiffs re-allege and incorporate by reference the allegations in all of the paragraphs above.

117. At all times relevant to this Complaint, Deere has had monopoly power in the United States in the market for restricted repairs for Deere Large Tractors and Combines.

118. Deere has willfully maintained its monopoly power in the market for restricted repairs for Deere Large Tractors and Combines through its course of anticompetitive and exclusionary conduct, including Deere's repair restrictions.

119. Deere's conduct has harmed price and non-price competition and the competitive process.

120. There is no sufficient procompetitive justification for Deere's conduct.

121. Deere's anticompetitive course of conduct constitutes unlawful monopolization of the market for restricted repairs of Deere Large Tractors and Combines in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and an unfair method of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

## UNFAIR METHOD OF COMPETITION
## IN VIOLATION OF SECTION 5 OF THE FTC ACT

122.    Plaintiff FTC re-alleges and incorporates by reference the allegations in all of the paragraphs above.

123.    At all times relevant to this Complaint, Deere has had monopoly power in the United States with respect to Fully Functional Repair Tools.

124.    Deere leverages its monopoly power in the United States with respect to Fully Functional Repair Tools to harm competitive conditions in the market for restricted repairs for Deere Large Tractors and Combines by unfairly disadvantaging equipment owners performing self-repair and IRPs seeking to compete with Deere dealers in the supply of repair services.

125.    Deere derives an economic benefit from the degradation of competitive conditions in the market for restricted repairs for Deere Large Tractors and Combines because that degradation increases Deere's parts sales.

126.    There is no sufficient procompetitive justification for Deere's conduct.

127.    Deere's anticompetitive course of conduct constitutes an unfair method of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT III

## VIOLATIONS OF THE ILLINOIS ANTITRUST ACT

128.    Plaintiff State of Illinois re-alleges and incorporates by reference the allegations in all of the paragraphs above.

129.    Deere's conduct as alleged herein was done with the purpose of maintaining monopoly power over a substantial part of trade or commerce of Illinois in the market for

restricted repairs for Deere Large Tractors and Combines in violation of the Illinois Antitrust Act, 740 ILCS 10/3(3).

130.    Many hundreds of farmers and IRPs in Illinois have purchased Deere's products and related services and have paid supracompetitive prices and otherwise been harmed by the Deere's unlawful conduct.

131.    Plaintiff State of Illinois, under its antitrust enforcement authority in 740 ILCS 10/7, seeks and is entitled to injunctive relief, civil penalties, fees and costs, and any other remedy available for these violations under Sections 7(1), 7(2), and 7(4) of the Illinois Antitrust Act. 740 ILCS 10/1 *et seq.*

## COUNT IV

## VIOLATIONS OF THE MINNESOTA ANTITRUST LAW

132.    Plaintiff State of Minnesota re-alleges and incorporate by reference the allegations above.

133.    Deere's conduct alleged herein was done with the purpose of maintaining monopoly power over repairs for agricultural equipment in violation of Minnesota Statutes section 325D.52.

134.    Many hundreds of farmers and IRPs in Minnesota have purchased Deere's products and related services and have paid supracompetitive prices and otherwise been harmed by the Deere's unlawful conduct.

135.    Plaintiff State of Minnesota, under its authority in Minnesota Statutes Section 8.31 and the Minnesota Antitrust Law, seeks and is entitled to injunctive relief, civil penalties, fees and costs, and any other remedy available for these violations under Minnesota law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs FTC, the State of Illinois, and the State of Minnesota respectfully request that this Court, as authorized by Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), Section 16 of the Clayton Act, 15 U.S.C. § 26, Section 7 of the Illinois Antitrust Act, 740 ILCS 10/1 *et seq.*, the Minnesota Antitrust Law, Minn. Stat. Sections 325D.49 to 325D.66, and as authorized by its own equitable powers, enter final judgment against Deere, declaring, ordering, and adjudging:

1. that Deere's conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2;

2. that Deere's conduct violates Section 5(a) of the FTC Act, 15 U.S.C. § 45(a);

3. that Deere's conduct violates the Illinois Antitrust Act, 740 ILCS 10/3(3);

4. that Deere's conduct violates the Minnesota Antitrust Law, Minn. Stat. Sections 325D.49 to 325D.66;

5. that Deere is permanently enjoined from engaging in its unlawful conduct;

6. that Deere is permanently enjoined from engaging in similar and related conduct, or any conduct with the same or similar purpose and effect; and

7. that Deere is ordered to make available to owners of Deere Large Tractors and Combines and IRPs on reasonable and nondiscriminatory terms Full-Function Service ADVISOR and any other repair resource that Deere makes available to its dealers, so as to enable agricultural equipment owners and IRPs to perform the full range of repairs that a Deere dealer can perform on Deere Large Tractors and Combines, including without limitation access to reprogramming capabilities, the ability to conduct all tests and calibrations, and the ability to access CCMS/DTAC solutions and the CCMS/DTAC "helpdesk" feature and other similar resources;

8.      any preliminary or permanent equitable relief necessary to redress and prevent recurrence of Deere's violations of the law, as alleged herein;

9.      any preliminary or permanent equitable relief necessary to restore fair competition and remedy the harm to competition caused by Deere's violations of the law;

10.     the issuance of civil penalties as sought by Plaintiff State of Illinois and Plaintiff State of Minnesota;

11.     the award to Plaintiff State of Illinois and Plaintiff State of Minnesota of the costs of suit, including reasonable attorneys' fees and costs; and

12.     any additional relief that the Court finds just and proper.


* * *

Dated: January 15, 2025                         Respectfully submitted,

                                                 /s/ Melissa Westman-Cherry
Of Counsel:                                     MELISSA WESTMAN-CHERRY
                                                Federal Trade Commission
HENRY LIU                                       600 Pennsylvania Avenue, N.W.
Director                                        Washington, DC 20580
                                                Telephone: (202) 326-2338
LAURA ALEXANDER                                 Email: mwestman@ftc.gov
Deputy Director
                                                JEFFREY CAO
SHAOUL SUSSMAN                                  JOSEPH M. CONRAD
Associate Director                              LAURA R. HALL
                                                AUSTIN HEYROTH
G. MITCHELL LONDON                              PATRICIA JERJIAN
Counsel to the Director                         CRYSTAL LIU
                                                ALOK NARAHARI
                                                SOPHIA QASIR
Federal Trade Commission                        SUSAN RAITT
Bureau of Competition                           JOHN REN
                                                LAUREN SILLMAN
                                                ETHAN STEVENSON
                                                NINA THANAWALA
                                                ELAN WEINBERGER
                                                Attorneys

                                                GEOFFREY M. GREEN
                                                Assistant Director

                                                JOSEPH R. BAKER
                                                Deputy Assistant Director

                                                Bureau of Competition

                                                *Attorneys for Plaintiff Federal Trade
                                                Commission*

                                                RACHEL F. SIFUENTES
                                                Federal Trade Commission
                                                230 South Dearborn St., Suite 3030
                                                Chicago, IL 60604
                                                Telephone: (312) 960-5617
                                                Email: rsifuentes@ftc.gov

                                                *Local Counsel for Plaintiff Federal Trade
                                                Commission*

FOR PLAINTIFF STATE OF ILLINOIS

KWAME RAOUL
Attorney General

 /s/ *Brian M. Yost*
BRIAN M. YOST
Assistant Attorney General, Antitrust
ELIZABETH L. MAXEINER
Bureau Chief, Antitrust
Office of the Illinois Attorney General
115 S. LaSalle Street
Chicago, IL 60603
Telephone: (872) 276-3598
Email: Brian.yost@ilag.gov
        Elizabeth.maxeiner@ilag.gov

*Attorneys for Plaintiff State of Illinois*

FOR PLAINTIFF STATE OF MINNESOTA

KEITH ELLISON
Attorney General

JAMES CANADAY
Deputy Attorney General

 /s/ *Katherine A. Moerke*
KATHERINE A. MOERKE (pro hac vice
motion forthcoming)
Assistant Attorney General, Antitrust Division
ELIZABETH ODETTE (pro hac vice motion
forthcoming)
Manager, Assistant Attorney General, Antitrust
Division
Office of the Minnesota Attorney General
Suite 1400
445 Minnesota Street
St. Paul, MN 55101
Telephone: (651) 757-1257
Email: katherine.moerke@ag.state.mn.us
        elizabeth.odette@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*