IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, et al. | Case No. 3:25-cv-50017 |
| Plaintiffs, | Hon. Iain D. Johnston |
| v. | |
| DEERE & COMPANY, | |
| Defendant. | |

## DEFENDANT DEERE & COMPANY'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE PLEADINGS

TABLE OF CONTENTS

Page

I.     INTRODUCTION ...................................................................................................1

II.    BACKGROUND ....................................................................................................4

       A.     The Parties .................................................................................................4

       B.     MDL Complaint and Motion for Judgment on the Pleadings Order ......................6

       C.     FTC's and States' Claims ...........................................................................6

III.   LEGAL STANDARD.............................................................................................7

IV.    ARGUMENT ..........................................................................................................8

       A.     The FTC and States Fail to Plead the Elements of Their Section 2 and
              Related State Law Claims ...........................................................................8

              1.     The FTC and States Have Not Pleaded a Plausible Single-Brand
                     Aftermarket Under *Kodak*............................................................8

              2.     Deere Cannot Have Monopoly Power in a Market in Which it
                     Does Not Compete ..............................................................11

              3.     Plaintiffs Fail to Allege Exclusionary Conduct ........................15

                     a.     Plaintiffs Do Not (and Cannot) Assert a Tying Claim..................15

                     b.     Deere's Limited Distribution of Its Repair Tool Is Not
                            Exclusionary Conduct................................................15

                     c.     Amorphous Allegations of an "Anticompetitive Course of
                            Conduct" Are Insufficient to State a Claim ...................19

       B.     The Complaint Does Not Plead a Claim Under Section 5 of the FTC Act ..........21

       C.     The Court Should Dismiss the FTC's Claims Because Section 13(b) of the
              FTC Act Is Unconstitutional................................................24

       D.     The States' Claims Fail for Lack of Article III Standing.......................28

       E.     The States' Civil Penalties Claims Are Time-Barred ...........................29

V.     CONCLUSION.................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Adams v. City of Indianapolis*,
   742 F.3d 720 (7th Cir. 2014) ...................................................................7

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
   592 F.3d 991 (9th Cir. 2010) .................................................................19

*Am. Council of Certified Podiatric Physicians and Surgeons v. Am. Bd. of*
   *Podiatric Surgery, Inc.*,
   323 F.3d 366 (6th Cir. 2003) ...................................................................8

*Aquatherm Industries, Inc. v. Florida Power & Light Co.*,
   145 F.3d 1258 (11th Cir. 1998) ......................................................12, 22

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................................7

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
   472 U.S. 585 (1985)..............................................................................16

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
   591 U.S. 631 (2020)..............................................................................25

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..........................................................................7, 20

*Bowsher v. Synar*,
   478 U.S. 714 (1986)........................................................................25, 26

*Buckley v. Valeo*,
   424 U.S. 1 (1976)............................................................................25, 27

*Deb v. Sirva, Inc.*,
   832 F.3d 800 (7th Cir. 2016) ...................................................................4

*Diedrich v. Ocwen Loan Servicing, LLC*,
   839 F.3d 583 (7th Cir. 2016) ...................................................................7

*Discon, Inc. v. NYNEX Corp.*,
   93 F.3d 1055 (2d Cir. 1996), *vacated on other grounds*, 525 U.S. 128 (1998)................11, 12

*Ducere LLC v. Enbridge (U.S.) Inc.*,
   No. 1:24-cv-01217, 2025 WL 81373 (N.D. Ill. Jan. 13, 2025)................17

*Duke Energy Carolinas, LLC v. NTE Carolinas II*,
   111 F.4th 337 (4th Cir. 2024) ........................................................................20

*Eastman Kodak v. Image Technical Services*,
   504 U.S. 451 (1992).....................................................................2, 9, 10, 17

*Emergency One, Inc. v. Waterous Co., Inc.*,
   23 F. Supp. 2d 959 (E.D. Wis. 1998).............................................................8

*Epic Games, Inc. v. Apple Inc.*,
   559 F. Supp. 3d 898, 1022 (N.D. Cal. 2021) ................................................9

*Frost v. Corp. Comm'n of Okla.*,
   278 U.S. 515 (1929)......................................................................................25

*FTC v. Ind. Fed'n of Dentists*,
   476 U.S. 447 (1986)......................................................................................22

*FTC v. Motion Picture Advert.*,
   344 U.S. 392 (1953)............................................................................3, 21, 22

*FTC v. Walmart Inc.*,
   664 F. Supp. 3d 808 (N.D. Ill. 2023) .....................................................26, 27

*FTC v. Walmart Inc.*,
   No. 24-3174 (7th Cir.) ..................................................................................26

*Goldwasser v. Ameritech Corp.*,
   222 F.3d 390 (7th Cir. 2000) .......................................................................16

*Harrison v. Jefferson Par. Sch. Bd.*,
   78 F.4th 765 (5th Cir. 2023) ...................................................................28, 29

*Humphrey's Ex'r v. U.S.*,
   295 U.S. 602 (1935)................................................................................24, 25

*ICC v. Chatsworth Coop. Mktg. Ass'n*,
   347 F.2d 821 (1965)......................................................................................25

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   680 F. Supp. 3d 919 (N.D. Ill. 2023) .............................................................8

*In re Deere & Co. Repair Servs. Antitrust Litig.*,
   703 F. Supp. 3d 862 (N.D. Ill. 2023) ........................................1, 6, 9, 13

*In re Elevator Antitrust Litig.*,
   502 F.3d 47 (2d Cir. 2007)...........................................................................17

*Intergraph Corp. v. Intel Corp.*,
    195 F.3d 1346 (Fed. Cir. 1999) ....................................................................................12

*L.G. Balfour Co. v. FTC*,
    442 F.2d 1 (7th Cir. 1971) ...........................................................................................13

*LaPeyre v. FTC*,
    366 F.2d 117 (5th Cir. 1966) ......................................................................................23

*Lorain Journal Co. v. United States*,
    342 U.S. 143 (1951) .....................................................................................................23

*McCoy v. Gamesa Tech. Corp.*,
    No. 11 C 592, 2012 WL 245166 (N.D. Ill. Jan. 26, 2012) ..........................................8

*Med. Supply Chain, Inc. v. Gen. Elec. Co.*,
    144 F. App'x 708 (10th Cir. 2005) .............................................................................12

*Missouri ex rel. Koster v. Harris*,
    847 F.3d 646 (9th Cir. 2017) ...............................................................................28, 29

*Mothershed v. Justices of the Sup. Ct.*,
    410 F.3d 602 (9th Cir. 2005) ........................................................................................8

*Mullis v. Arco Petroleum Corp.*,
    502 F.2d 290 (7th Cir. 1974) ......................................................................................13

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) (Gorsuch, J.) ......................................................16, 19

*Off. Airline Guides, Inc. v. FTC*,
    630 F.2d 920 (2d Cir. 1980) ............................................................................14, 22, 23

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009) ...............................................................................................16, 20

*Philips N. Am. LLC v. Glob. Med. Imaging, LLC*,
    No. 21-cv-3615, 2024 WL 4240920 (N.D. Ill. Sept. 19, 2024) ....................................8

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
    104 F.3d 811 (6th Cir. 1997) ........................................................................................9

*Saginaw Cnty. v. STAT Emergency Med. Servs., Inc.*,
    946 F.3d 951 (6th Cir. 2020) ......................................................................................28

*Schor v. Abbott Lab'ys*,
    457 F.3d 608 (7th Cir. 2006) .................................................................................21, 22

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020) ........................................................................................24, 26, 27

*Sharif Pharm., Inc. v. Prime Therapeutics, LLC*,
    950 F.3d 911 (7th Cir. 2020) ...................................................................................13

*Snapp & Son Inc., v. Puerto Rico, ex rel., Barez*,
    458 U.S. 592 (1982) .................................................................................................28

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*,
    376 F.3d 1065 (11th Cir. 2004) ...............................................................................13

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993) .................................................................................................21

*Standard Oil Co. of Cal. v. U.S.*,
    337 U.S. 293 (1949) .................................................................................................13

*Truax v. Corrigan*,
    257 U.S. 312 (1921) .................................................................................................26

*U.S. v. Colgate & Co.*,
    250 U.S. 300 (1919) .................................................................................................16

*U.S. v. Grinnell Corp.*,
    384 U.S. 563 (1996) .........................................................................................8, 11, 14

*U.S. v. Texas*,
    599 U.S. 670 (2023) .................................................................................................25

*Vasquez v. Ind. Univ. Health, Inc.*,
    40 F.4th 582 (7th Cir. 2022) ...................................................................................29

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko LLP*,
    540 U.S. 398 (2004) ..................................................................................... *passim*

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020) .................................................................11, 16, 17, 18

## STATUTES

A.R.S. § 44-1410 ............................................................................................................29

740 ILCS 10/7 ................................................................................................................29

15 U.S.C.
   § 1......................................................................................................................*passim*
   § 2......................................................................................................................*passim*
   § 41............................................................................................................................24
   § 45.....................................................................................................................1, 3, 30
   § 53............................................................................................................................27
   § 53(b)...................................................................................................................24, 25
   § 57............................................................................................................................27

28 U.S.C. § 1292(b)........................................................................................................26

Arizona Uniform State Antitrust Act..................................................................................8

FTC Act....................................................................................................................*passim*

FTC Act
   § 5......................................................................................................................*passim*
   § 13(b).............................................................................................................24, 25, 27, 28

Illinois Antitrust Act........................................................................................................8

MCL § 445.781................................................................................................................29

Minn. Stat. § 325D.64......................................................................................................29

Minnesota Antitrust Act....................................................................................................8

President under the FTC Act.............................................................................................24

Pub. L. No. 75-447, § 4, 52 Stat. 114 (1938)....................................................................27

Pub. L. No. 93-153, § 408(f), 87 Stat. 576, 592 (1973)....................................................25

Sherman Act...........................................................................................................*passim*

Sherman Anti-Trust Act....................................................................................................8

Wis. Stat.
   § 133.03(4)...................................................................................................................29
   § 133.18.......................................................................................................................29

## RULES

Fed. R. Civ. P. 12(b)(6)......................................................................................................7

Fed. R. Civ. P. 12(c)........................................................................................................6, 7

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I .................................................................................................................26

U.S. Const. Article II § 1, cl. 1 .................................................................................................24

## OTHER AUTHORITIES

*Dissenting Statement of Commissioner Andrew Ferguson*, at 2 (Jan. 15, 2025),
    *available at* https://www.ftc.gov/system/files/ftc_gov/pdf/deere-ferguson-
    dissent-final.pdf ........................................................................................................................1

## I.    INTRODUCTION

After watching nearly three years of litigation in the *In re Deere & Company Repair Services Antitrust Litigation* multidistrict litigation ("MDL"), the Federal Trade Commission ("FTC") and five States finally decided that it was time to enter the fray.  They did so just five days before the change of Administration, and over objections raised by the FTC's then-incoming Chair, who said the new suit appeared to be the result of "brazen partisanship" and confirmed that the agency lacked "the evidence to file this Complaint with any real confidence of [its] ultimate chance of success."[1]

Plaintiffs presumably filed their suit in hopes that they could ride on the coattails of MDL Plaintiffs' case.  That might have been a plausible strategy had Plaintiffs brought the same causes of action based on the same conduct allegations as MDL Plaintiffs.  But, that is not what the FTC and States have done.  Instead, and quite tellingly, the FTC and States—with their vast pre-complaint investigatory powers—conducted a lengthy investigation of Deere and ultimately filed a very different complaint.  Unlike MDL Plaintiffs, the FTC and States do not allege any coordinated conduct under Section 1 of the Sherman Act.  They do not allege any conspiracy under Section 2.  And they do not assert a Section 2 "tying" claim.

Instead, these Plaintiffs proceed with two vague federal antitrust claims that hide the ball and have no basis in law.  *First*, they allege an amorphous Section 2 "course of conduct" claim as part of a campaign aimed at lowering the bar for pleading a monopolization claim and eliminating the well-articulated legal requirements that already exist.  *Second*, again relying on a "course of conduct" theory, they allege an FTC Act Section 5 "unfair method of competition" claim that has

---

[1] *Dissenting Statement of Commissioner Andrew Ferguson*, at 2 (Jan. 15, 2025), *available at* https://www.ftc.gov/system/files/ftc_gov/pdf/deere-ferguson-dissent-final.pdf.

no foundation in Seventh Circuit precedent and, in any event, is not well-pleaded.  The Court should reject this transparent strategy.  The Complaint alleges no violation of *existing* antitrust law and should be dismissed:

1.  The Complaint falls far short of alleging the facts necessary to allege a single-brand "restricted repairs" aftermarket under *Eastman Kodak v. Image Technical Services*, 504 U.S. 451 (1992).  Unlike the MDL Complaint, the FTC and States make the explicit admission that Deere's practice of limiting access to its repair tools has been known "[f]or decades."  Amended Compl., ECF 60 ("Complaint" or "AC") ¶ 1.  There can be no lock-in, and no single-brand aftermarket, when customers purchased Deere's equipment with full knowledge of these repair limitations.  But even assuming Plaintiffs pleaded such a market, that would not be sufficient to state a monopolization claim under Section 2 (or the relevant state statutes) given the absence of plausible allegations of monopoly power and exclusionary conduct.  *See* Section IV.A.1.

2.  Plaintiffs ask this Court to do what no court has done in the Sherman Act's 135-year history: hold that a firm can unilaterally monopolize a market in which it does not compete and, thus, has no monopoly power.  The FTC's zero-market-share monopolization theory has no basis in law.  And it would upend the foundational premise of antitrust, which targets exclusionary conduct by those *in* the relevant market.  *See* Section IV.A.2.

3.  Even if Plaintiffs theoretically could overcome these fundamental problems of market definition and monopoly power, they fail to plead any cognizable "exclusionary conduct"—the *sine qua non* of a monopolization claim.  Plaintiffs deliberately do not (because they cannot) plead an unlawful tie as their exclusionary conduct.  *See* Section IV.A.3.a.  And they lack the facts to plead a viable refusal-to-deal claim.  *See* Section IV.A.3.b.  All they are left with is their fanciful theory of monopolization through an undefined "anticompetitive course of

2

conduct" in an attempt to paper over their failure to plead the elements of a claim based on tying, refusal-to-deal, or any other actionable exclusionary conduct. Neither the Seventh Circuit nor any of its district courts have ever found a "course of conduct" to be sufficient to support the weight of a monopolization claim where, as here, the plaintiff is simply missing one or more elements of a cognizable claim, and this Court should not be the first. *See* Section IV.A.3.c.

4. The FTC cannot sidestep these Sherman Act problems by invoking Section 5 of the FTC Act, which was designed to "supplement and bolster" the Sherman Act, not contradict it. *FTC v. Motion Picture Advert.*, 344 U.S. 392, 394-95 (1953). Section 5 does not eliminate the rule that a defendant cannot monopolize a market in which it does not compete and thus has no monopoly power. Nor is Section 5 a license to end-run the limits around refusal-to-deal claims— limits that courts have developed for the express purpose of safeguarding the Sherman Act's policy objectives. Whatever special powers the FTC believes it has under the FTC Act, they cannot save the FTC's case here. *See* Section IV.B.

5. Independent of these substantive legal flaws, the FTC's claims should be dismissed because the it lacks constitutional authority to bring this suit. Congress purported to authorize the FTC to enforce the FTC Act through district court suits for injunctive relief. But that grant of authority is unconstitutional because it vests executive power in an agency that is insulated from the President's removal powers, in violation of Article II and the separation of powers. *See* Section IV.C.

6. For their part, the States run afoul of Article III. They lack standing to pursue their claims, both in their sovereign capacities and under a *parens patriae* theory, because they fail to allege either: (1) any tangible interference with their authority to regulate or enforce their laws; or

(2) any quasi-sovereign interest in this litigation apart from the interests of particular private parties. *See* Section IV.D.

7. Finally, the States' civil penalties claims are time-barred. *See* Section IV.E.

Deere recognizes that there is some overlap between the theories advanced in the MDL Complaint and those alleged here—and that the Court allowed the MDL claims to proceed past the pleadings. But, given the material differences in complaints, this Motion includes arguments that were neither advanced nor addressed in the MDL. The Court's decision in the MDL is thus no obstacle to granting this Motion.

## II. BACKGROUND

### A. The Parties

Plaintiffs are the FTC and the States of Illinois, Arizona, Minnesota, and Wisconsin and the People of Michigan through their respective Attorney Generals. *See* AC ¶¶ 26-31. Defendant Deere manufactures, among other things, "Production and Precision Agriculture" equipment, which includes "Large Tractors" (tractors with at least 180 horsepower) and "Combines" (combine harvesters). *Id.* ¶ 35.[2] Large Tractors "are generally used to pull or push other agricultural machinery, such as seeding, planting, and tillage equipment." *Id.* ¶ 40. Combines "are generally used for the specific purpose of harvesting grain," and are used only in harvest season. *Id.* ¶ 41.

Deere's modern Large Tractors and Combines have electronic control units ("ECUs"), which are essentially "small computers that monitor and control particular functions" of the equipment. *Id.* ¶ 88. ECUs are required to control increasingly complex functions related to, among other things, (1) precision agriculture, including See & Spray™, which identifies and

---

[2] For purposes of this Motion, the Complaint's well-pleaded factual allegations are assumed to be true. *See Deb v. Sirva, Inc.*, 832 F.3d 800, 809 (7th Cir. 2016).

sprays herbicide only on the weeds in a field, and (2) Autonomy, which allows operators to control a tractor remotely. These features allow farmers to be vastly more productive in their operations today than they were even ten years ago.

According to Plaintiffs, repairing Deere equipment commonly requires the use of an interactive software tool ("repair tool")[3] to communicate with the equipment's onboard systems to perform diagnosis and repair. *Id.* ¶ 7. Around 1999, Deere developed Service ADVISOR™, an interactive software tool that diagnoses and repairs Deere equipment. *Id.* ¶ 48. Service technicians use Service ADVISOR to "perform diagnostic tests"; "to identify and clear error codes … being returned by equipment"; "to calibrate ECUs"; "to download from a Deere server and install customized ECU software"; and "to access diagnostic and troubleshooting information on Deere's Case and Contact Management System ('CCMS')." *Id.* ¶ 49.

While Deere sells equipment and parts, the Complaint (correctly) does not allege that Deere itself provides repair services or receives a cut from anyone who does. Instead of using its repair tools to fix its customers' equipment itself, Deere licenses its repair tools to third-party dealers in its authorized network ("Deere dealers"). *Id.* ¶¶ 48-49. Specifically, Deere licenses Service ADVISOR only to Deere dealers. *Id.* ¶¶ 72, 92. Thus, for those repairs that can be diagnosed and made only with Service ADVISOR, equipment owners must visit a Deere dealer. *Id.* ¶ 71. For other repairs, equipment owners may visit an independent repair provider ("IRP") or handle the repairs themselves. *Id.* ¶¶ 68-69. In 2017, Deere started offering Customer Service ADVISOR™

---

[3] Although this Complaint and the MDL Complaint often use the same generic defined terms, they define some of those terms differently. For example, the Complaint here defines "repair tools" as "an interactive software tool," AC ¶ 7, while the MDL Complaint defines "Repair Tools" as "critical software and other Deere and Deere Dealer-controlled information resources," *see* ECF No. 85, Dkt. No. 22-cv-50188, MDL No. 3030 ("MDL Compl.") ¶ 4. For purposes of this Motion, and unless otherwise stated, Deere uses the definitions of terms found in the Complaint here.

to the general public. *Id.* ¶¶ 53, 104. Customer Service ADVISOR allows farmers and IRPs to conduct many, but not all, of the repairs that Service ADVISOR enables. *Id.*

**B.    MDL Complaint and Motion for Judgment on the Pleadings Order**

A group of agricultural crop farms and farmers filed a Consolidated Amended Complaint in the MDL in 2022. *See* ECF No. 85, Dkt. No. 22-cv-50188, MDL No. 3030 ("MDL Complaint"). Like Plaintiffs here, MDL Plaintiffs allege that Deere declines to make its "Repair Tool" (as defined in the MDL Complaint) available to the public. *See* MDL Compl. ¶¶ 4, 14. But the MDL Complaint goes much further than the Complaint here—alleging (among other things) that Deere designs its agricultural equipment to require the use of Deere's Repair Tools, *id.* ¶¶ 4, 79; conspires with Deere dealers to withhold repair software and other know-how from competitors of Deere and Deere dealers, *id.* ¶¶ 10, 32, 53; breaks promises to deliver Repair Tools, *id.* ¶¶ 17-18; spreads misinformation about its repair policies, *id.* ¶¶ 15, 141-54; and aggressively pushes Deere dealers to consolidate, *id.* ¶¶ 25, 102-23. Plaintiffs here make none of those allegations. Also unlike Plaintiffs here, MDL Plaintiffs assert a conspiracy, group boycott, and unlawful tying under Section 1 of the Sherman Act; and monopolization, monopoly leveraging, attempted monopolization, and conspiracy to monopolize under Section 2. *Id.* ¶¶ 203-66.

Deere answered the MDL Complaint and moved for judgment on the pleadings, which MDL Plaintiffs opposed. *See* MDL ECF Nos. 104-05, 110. This Court denied Deere's Rule 12(c) motion in November 2023, and that case moved into discovery. *See In re Deere & Co. Repair Servs. Antitrust Litig.*, 703 F. Supp. 3d 862 (N.D. Ill. 2023) ("MDL JMOP Order").

**C.    FTC's and States' Claims**

Even with the benefit of the blueprint provided by MDL Plaintiffs and the Court's MDL JMOP Order, and after a multiyear pre-suit investigation, the FTC and States took a different tack.

They do not assert any claims based on joint or coordinated conduct—no conspiracy, boycott, or conspiracy to monopolize claims. They also do not assert any monopolization or attempted monopolization claims based on tying or any other familiar category of exclusionary conduct. Instead, Count I alleges that Deere violated Section 2 of the Sherman Act through monopolization of "the market for restricted repairs for Deere Tractors and Combines" by not making its repair tools "available" to others as part of an otherwise undefined "anticompetitive course of conduct." AC ¶¶ 1, 124. Count II alleges that Deere violated Section 5 of the FTC Act by "leverage[ing]" its undefined "anticompetitive course of conduct" and supposed monopoly power over "Fully Functional Repair Tools capable of enabling all repairs for Deere Large Tractors and Combines" as a method of unfair competition in the "market for restricted repairs for Deere Tractors and Combines." *Id.* ¶¶ 58, 127, 130. Counts III through VII, which likewise focus on monopolization of the alleged "market for restricted repairs for Deere Large Tractors and Combines," echo Counts I and II, but are brought under state antitrust law. *Id.* ¶¶ 131-53.

## III. LEGAL STANDARD

A Rule 12(c) motion is governed by the same standards as a Rule 12(b)(6) motion. *See Adams v. City of Indianapolis*, 742 F.3d 720, 727-28 (7th Cir. 2014). To survive a Rule 12(b)(6) motion, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). "Legal conclusions or bare and conclusory allegations are insufficient to state a claim." *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 589 (7th Cir. 2016) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009)).

## IV.     ARGUMENT

### A.     The FTC and States Fail to Plead the Elements of Their Section 2 and Related State Law Claims

A Sherman Act Section 2 claim "has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1996).  As to the second element, a plaintiff must allege that a monopoly is achieved "in large part by unlawful and exclusionary practices."  *Id.* at 576.  The Complaint fails as to both elements.[4]

#### 1.     The FTC and States Have Not Pleaded a Plausible Single-Brand Aftermarket Under *Kodak*

The Court should dismiss the Complaint because it fails to allege a plausible single-brand aftermarket.  The FTC and States assert that Deere has monopolized the "market for restricted repairs for Deere Large Tractors and Combines."  AC ¶ 121.  Deere acknowledges that this Court previously held that the MDL Complaint pleaded facts plausibly alleging a single-brand

---

[4] The same test applies to the States' state law antitrust claims, which fail for the same reasons. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 680 F. Supp. 3d 919, 981 (N.D. Ill. 2023) ("[Plaintiff's state antitrust claims … rise and fall with its Sherman Act claims."); *Philips N. Am. LLC v. Glob. Med. Imaging, LLC*, No. 21-cv-3615, 2024 WL 4240920, at *5 (N.D. Ill. Sept. 19, 2024) ("[C]ourts typically analyze monopoly claims under the Illinois Antitrust Act and the Sherman Act in one fell swoop.  The claims rise and fall together."); *McCoy v. Gamesa Tech. Corp.*, No. 11 C 592, 2012 WL 245166, at *5 n.5 (N.D. Ill. Jan. 26, 2012) ("Courts routinely evaluate antitrust claims under the Minnesota Antitrust Act … by applying federal antitrust law.  Therefore, [the] state and federal antitrust claims rise and fall together."); *Mothershed v. Justices of the Sup. Ct.*, 410 F.3d 602, 609 (9th Cir. 2005) ("The Arizona Uniform State Antitrust Act is interpreted in conformity with the federal antitrust laws.") (internal quotation and alterations omitted); *Am. Council of Certified Podiatric Physicians and Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 323 F.3d 366, 368 (6th Cir. 2003) ("Because the Michigan Anti-Trust statute and Sherman Anti-Trust Act mirror each other, [courts] apply the same analysis to both the federal and state anti-trust claims); *Emergency One, Inc. v. Waterous Co., Inc.*, 23 F. Supp. 2d 959, 970 (E.D. Wis. 1998) ("Wisconsin case law makes clear that federal court decisions construing the Sherman Act control application of Wisconsin antitrust law[.]").

aftermarket for repairs under *Kodak*. *See* MDL MJOP Order, 703 F. Supp. at 890-99.[5] But Plaintiffs here plead far less than MDL Plaintiffs by way of alleged changes in Deere's repair policies[6] or even in equipment owners' lack of knowledge about equipment lifecycle costs.[7] To the contrary, Plaintiffs here—unlike MDL Plaintiffs—repeatedly assert that the practice at the heart of this dispute has persisted "[f]or decades." AC ¶¶ 1, 7. There can be no customer lock-in, and no single-brand aftermarket, when Deere's customers purchased their equipment with full knowledge of Deere repair practices that spanned "decades." *See Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1022 (N.D. Cal. 2021) ("Since 1992, five circuit courts and numerous district courts refused to find a *Kodak*-type single-brand aftermarket where customers had knowledge of the alleged restrictive policies and were not subject to a post-purchase policy change.").

Thus, although the Court held that MDL Plaintiffs sufficiently pleaded a single-brand aftermarket under *Kodak*, the same cannot be said of the Complaint here. A close analysis of the differences between *Kodak* and this case only highlights the shortcomings of this Complaint. Kodak manufactured and sold photocopiers and micrographic equipment, as well as service and replacement parts. *Kodak*, 504 U.S. at 455. The plaintiffs were independent service providers who purchased Kodak parts and competed with Kodak to provide service and parts to Kodak's equipment customers. *Id*. After several years, Kodak implemented a new policy of restricting the sale of its replacement parts to only those equipment buyers who used Kodak service offerings or

---

[5] Respectfully, Deere continues to believe that MDL Plaintiffs do not allege a plausible single-brand aftermarket because, consistent with the express allegations in this Complaint that Deere's practices have been known for decades, MDL Plaintiffs do not allege that Deere hid any policies from customers prior to their equipment purchases or changed pertinent policies after the fact. *See, e.g.*, *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 817-18, 820 (6th Cir. 1997).

[6] *Compare* MDL Compl. ¶¶ 128-40, 144-54, 156 *with* AC ¶¶ 15-17, 53-57.

[7] *Compare* MDL Compl. ¶¶ 141-43, 226 *with* AC ¶¶ 74-77.

repaired their own machines. *Id.* at 458. And Kodak further limited independent service organizations' ("ISOs'") access to Kodak parts through parts suppliers and equipment owners and restricted the availability of used machines. *Id.* Key to *Kodak*'s holding on pleading an aftermarket, the plaintiff ISOs there alleged that Kodak (1) directly participated in the aftermarkets for both parts and services in competition with ISOs; and then (2) introduced policies to shrink ISOs' (its aftermarket competitors') access to previously available parts, which in turn reduced customers' choices in the services aftermarket.

The Complaint here is starkly different. As an initial matter, in *Kodak*, the ISOs sued Kodak for unlawful tying, while the FTC and States do *not*—an obviously intentional choice given that MDL Plaintiffs assert a tying claim that survived dismissal.[8] As to the factual allegations, the FTC and States do *not* allege that Deere (1) directly participates in the repair services aftermarket in competition with IRPs (rather, Deere dealers do). *See* AC ¶ 3. This Complaint (rightly) makes no such allegations, and MDL Plaintiffs elided this fact by alleging in their Section 1 claim that Deere conspired with the Deere dealers who do participate in the repair aftermarket.

Moreover, and again in contrast with the MDL, this Complaint does *not* allege that Deere (2) introduced any policy change to reduce equipment owners' and independent repair providers' access to tools or parts that were previously available. To begin with, the FTC and States affirmatively allege that Deere has limited access to its repair tools for "decades." *Id.* ¶¶ 1, 7. Next, and contrary to the idea that Deere introduced a subsequent policy change restricting access to its repair tools, the Complaint alleges that, in 2017, Deere *opened* access (albeit not to the degree Plaintiffs would like) to its once fully-restricted repair tools through Customer Service ADVISOR,

---

[8] In yet another important distinction, the MDL Complaint alleges that Deere conspired with the Deere dealers who participate in the services aftermarket, MDL Compl. ¶¶ 203-13; Plaintiffs here make no such allegation.

available through Deere's dealer network. *Id.* ¶ 53. And several years later, Deere further increased such access to its previously closed-off repair tools by offering Customer Service ADVISOR via Deere's website. *Id.* In contrast to *Kodak*, Deere has opened—not closed—access to its proprietary repair tools.

Thus, the FTC and States plead facts that preclude this Court from accepting their alleged aftermarket, and their Complaint should be dismissed accordingly. But, assuming *arguendo* that Plaintiffs plead a single-brand aftermarket for "restricted repairs for Deere Large Tractors and Combines," the mere existence an aftermarket is just the first step of pleading an aftermarket monopolization claim. A plaintiff must still allege both that the defendant has monopoly power in the relevant aftermarket and engaged in exclusionary conduct. *See Grinnell*, 384 U.S. at 570-71; *see also Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 451 (7th Cir. 2020). As set forth below, the Complaint does not deliver on monopoly power or exclusionary conduct.

### 2. Deere Cannot Have Monopoly Power in a Market in Which it Does Not Compete

As to monopoly power, Plaintiffs admit that Deere itself does *not* participate in the alleged aftermarket. *See, e.g.*, AC ¶¶ 1, 49, 72 (explaining that Deere dealers, not Deere, provide services in alleged aftermarket). This is crucial, as settled law holds that a firm "cannot monopolize a market in which it does not compete." *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1062 (2d Cir. 1996), *vacated on other grounds*, 525 U.S. 128 (1998).

Courts routinely dismiss monopolization claims on this precise ground. For example, in *Discon*, the plaintiff (a competitor in the market for "removal services" for telephone companies) alleged that several telephone service providers monopolized the market for removal services. *Id*. at 1057-58, 1061. But the providers were only purchasers in the removal services market; they

11

did not "compete[]" in that market. *Id.* at 1062. The Second Circuit thus held that the plaintiff's "claim of monopolization must fail." *Id.*

Likewise, in *Intergraph Corp. v. Intel Corp.*, Intel manufactured computer microprocessors that plaintiff Intergraph used in its computer workstations. 195 F.3d 1346, 1349-50 (Fed. Cir. 1999). Eventually, Intel stopped providing Intergraph with technical assistance and other special benefits, which threatened "Intergraph's position in its own markets." *Id.* at 1350, 1354. As the Federal Circuit explained, even Intergraph's "asserted need" for Intel's business information did "not convert the withholding of that information into an antitrust violation." *Id.* at 1357.

And in *Aquatherm Industries, Inc. v. Florida Power & Light Co.*, the defendant (a large provider of electric power) promoted the use of electric pool-heating pumps to its customers. 145 F.3d 1258, 1260 (11th Cir. 1998). This led the plaintiff (a manufacturer of solar-powered heating systems for pools) to accuse the defendant of monopolizing the pool-heater market. *Id.* at 1260-61. Once again, because the plaintiff did not allege that the defendant power provider "ever *competed* in the pool-heater market," the court dismissed the claim. *Id.* at 1261; *see also Med. Supply Chain, Inc. v. Gen. Elec. Co.*, 144 F. App'x 708, 713 (10th Cir. 2005) (affirming dismissal of monopolization claim against a defendant that did not compete in the relevant market because a firm [can]not … hold monopoly power" in a market where it "do[es] not compete").

This rule accords with the Sherman Act's plain text: "Every person who shall monopolize … any part of [interstate] trade or commerce" faces liability. 15 U.S.C. § 2. As a matter of ordinary meaning, a defendant cannot "monopolize" a market in which it does not even participate and has a *zero percent* market share. *Id.* It therefore stands to reason that the standards for assessing both the "relevant market" and the defendant's "monopoly power" presume the defendant is *in* the market. "Relevant market" means "the 'area of effective competition' within

which *the defendant or defendants operate*." *Mullis v. Arco Petroleum Corp.*, 502 F.2d 290, 295 n.15 (7th Cir. 1974) (quoting *Standard Oil Co. of Cal. v. U.S.*, 337 U.S. 293, 299-300 n.5 (1949)) (emphasis added). A "properly defined" relevant market "excludes other potential suppliers" who do not "offer *defendant's* customers a suitably proximate (in both product and geographic terms) alternative." *Sharif Pharm., Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 917 (7th Cir. 2020) (internal quotation omitted) (emphasis added). And to determine whether a firm has "monopoly power" in a market, courts generally look to "[p]roof of a corporation's share of the market." *L.G. Balfour Co. v. FTC*, 442 F.2d 1, 12 (7th Cir. 1971). This is because a defendant's "substantial percentage share of a market" gives it "the power to preclude entry and advancement and set prices" in that market. *Id.* These principles plainly necessitate a defendant that competes in the alleged relevant market.

To be sure, some courts have held that a firm can be liable for combining or conspiring with a market participant to "monopolize" a market, even if the firm itself is not in that market. *See Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1078 n.10 (11th Cir. 2004) (conspiracy to monopolize need not be "limited solely to market participants so long as the conspiracy also involves a market participant"). That is what MDL Plaintiffs alleged—specifically, that Deere engaged in coordinated conduct with Deere dealers to boycott and monopolize the "Deere Repair Services" market (an allegation Deere vigorously denies). *See* MDL Compl. ¶¶ 214-20, 251-56. Relying on the MDL Complaint's allegation that "Deere has the ultimate control of the Repair Services Market," and quoting *Grinnell*'s formulation of monopoly power as "the power to control prices or exclude competition" from the market, this Court found that MDL Plaintiffs sufficiently alleged monopoly power by "allege[ing] that Deere excludes competition in the Repair Services Market." MDL MJOP, 703 F. Supp. 3d at 911 (citing

*Grinnell*, 384 U.S. at 571).  Put simply, Deere's absence from the repair services market was not dispositive on the monopoly power element because its alleged co-conspirators were present.  By contrast to the MDL Complaint, the Complaint here does *not* allege that Deere competed in the repair services market or conspired with those who do.  It follows that Plaintiffs' antitrust claims here necessarily fail to allege monopoly power in a relevant market, and thus fail to state a Section 2 claim.

Permitting monopolization claims to proceed where the defendant is not alleged to participate in the market *or* conspire with those in the market would dramatically expand the reach of antitrust and have far-reaching and perverse consequences.  A company's decisions in one market—particularly if it has a monopoly in that market—will often have ripple effects across many other markets.  If their lawful actions are considered to create a monopoly in a different market because they "exclude competition" in that market, courts will be put in the position of probing countless everyday business decisions, especially of firms whose decisions may reverberate across innumerable other markets.  This would give courts and regulators "too much power to substitute [their] own business judgment for that of the monopolist in any decision that arguably affects competition in another industry."  *Off. Airline Guides, Inc. v. FTC*, 630 F.2d 920, 927 (2d Cir. 1980).

*Grinnell* offered a definition of monopoly power as the standard for assessing whether a firm has monopolized its *own* market.  *Grinnell* does not open the door to claims that a defendant monopolized a market in which it does not compete.  And because Plaintiffs allege neither that Deere competed in the repair services market, nor that it conspired with anyone to monopolize that market, the Court should dismiss their monopolization claims.

### 3. Plaintiffs Fail to Allege Exclusionary Conduct

Apart from failing to plausibly allege monopoly power in a cognizable relevant market, Plaintiffs also fail to allege exclusionary conduct, which is an independent ground for dismissal.

#### a. Plaintiffs Do Not (and Cannot) Assert a Tying Claim

Unlike MDL Plaintiffs, which plead "tying" no fewer than 17 times (including as foundational to their Section 2 claim), Plaintiffs here chose not to assert tying as the basis for a Section 1 or Section 2 claim. For their part, MDL Plaintiffs assert both Section 1 and Section 2 tying claims, alleging that Deere used the sale of Deere "Tractors" (the MDL tying product) to coerce putative class members into purchasing Deere "Repair Services" (the MDL tied product). *See* MDL Compl. ¶ 225. Here, Plaintiffs write about how Deere allegedly exercises its monopoly power in the "market for fully functional repair tools capable of enabling all repairs on Deere agricultural equipment." AC ¶¶ 8-10. In their next breath, they claim that "[a]s a result," Deere has monopolized the "market for the provision of repair services." *Id.* ¶ 11. But, Plaintiffs do not go so far as to allege an unlawful tie, and in fact studiously avoid uttering the words "tie" or "tying." And, for good reason—Deere does not condition or coerce sales across these two products. Deere does not even participate in Plaintiffs' second alleged aftermarket (restricted repair services). Plaintiffs thus do not—because they cannot—rely on tying conduct to satisfy their exclusionary conduct requirement.

#### b. Deere's Limited Distribution of Its Repair Tool Is Not Exclusionary Conduct

At its heart, Plaintiffs complain about Deere's decision not to provide developers of generic repair tools, farmers, and non-Deere dealers with access to Deere's repair tools. *See* AC ¶¶ 1, 9-11, 16-17, 53, 59, 72, 91, 101, 107-08, 110-11, 117. Yet, as Plaintiffs well know, the Sherman Act generally "does not restrict the long recognized right of [a] trader or manufacturer engaged in

15

an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *U.S. v. Colgate & Co.*, 250 U.S. 300, 307 (1919).  Plaintiffs do not—again, because they cannot—plead facts that would wedge this case into the narrow exception to the general rule that firms do not have an obligation to share their proprietary tools and know-how. Plaintiffs' gesture at a refusal-to-deal claim fails.

*Courts impose a duty to deal only in rare factual circumstances not present here.* Businesses typically "are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009).  This is true even for monopolists.  After all, "[m]onopolists are both expected and permitted to compete like any other firm," *Viamedia*, 951 F.3d at 454, and "[p]art of competing like everyone else is the ability to make decisions about with whom and on what terms one will deal." *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 397 (7th Cir. 2000).  While "the right to refuse to deal with other firms … [is not] unqualified," claims based on such refusals are "[a]t or near the outer boundary of § 2 liability." *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko LLP*, 540 U.S. 398, 408-09 (2004) (citation omitted).  Thus, to pass through "the narrow-eyed needle of [the] refusal to deal doctrine," *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013) (Gorsuch, J.), a plaintiff must plead conduct tracking that in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605-11 (1985).  *See Viamedia*, 951 F.3d at 455-60. In *Aspen Skiing*, the defendant unilaterally terminated a voluntary, pre-existing, and profitable course of dealing with a rival, willingly entered into such deals in markets in which it was not a monopolist, and demonstrated a willingness to forego short-term profits to achieve an anticompetitive end.  472 U.S. at 605-11.

Among the allegations in *Aspen Skiing*, courts regard the first—termination of a prior course of dealing—as the most significant. The failure to plead "a prior, voluntary, and profitable course of dealing" is "all but fatal to" a refusal-to-deal claim. *Ducere LLC v. Enbridge (U.S.) Inc.*, No. 1:24-cv-01217, 2025 WL 81373, at *7 (N.D. Ill. Jan. 13, 2025). The seminal example is *Trinko*, where the Supreme Court held that Verizon was not liable for allegedly providing other firms "deficient" access to its network elements. 540 U.S. at 405. As the Court explained, Verizon's refusal to deal "does not fit within the limited exception recognized in *Aspen Skiing*" because "[t]he complaint does not allege that Verizon voluntarily engaged in a course of dealing" with other firms "or would ever have done so absent statutory compulsion." *Id.* at 409. That through-line explains decisions in this Circuit and elsewhere. *Compare Viamedia*, 951 F.3d at 459, 463 (refusal-to-deal claim survived motion to dismiss because it "closely tracks *Aspen Skiing* and contains the key elements that were missing in *Trinko*," including a sudden course reversal from "a prior course of voluntary conduct"), *with Ducere*, 2025 WL 81373, at *7 (rejecting refusal-to-deal claim because "the fact that Ducere does not and cannot plead the first *Aspen Skiing* factor puts its refusal to deal claim on the thinnest of ice"); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (rejecting refusal-to-deal claim "because plaintiffs do not allege that defendants terminated any prior course of dealing"). It is also consistent with *Kodak*, where, after years of supplying ISOs (its aftermarket competitors) with parts in the aftermarket, Kodak introduced new policies to shrink that access, diminishing customers' choices. 504 U.S. at 458.

**This Complaint plainly does not plead an actionable refusal to deal.** Plaintiffs do not allege that Deere terminated any prior course of dealing. Indeed, Plaintiffs concede the opposite: "at no time" has Deere made Service ADVISOR available beyond its authorized Deere dealers. AC ¶ 91. And since there was no prior course of dealing, Deere could have sacrificed no profits

17

by terminating it. To the contrary, the Complaint alleges that Deere's longstanding refusal to share Service ADVISOR has been *profitable* for the company. *Id.* ¶¶ 100, 116. And, finally, if "restricted repairs for Deere Large Tractors and Combines" really form a single-brand market, as Plaintiffs argue, there would be no "comparable market" with which to compare Deere's conduct. *Viamedia*, 951 F.3d at 457. The allegations in this Complaint look nothing like *Aspen Skiing*, and Plaintiffs do not plead a viable refusal-to-deal claim.

**No duty to deal is warranted here.** There are additional, independent grounds to decline Plaintiffs' invitation to superintend how Deere develops and distributes its Repair Tool. As the Supreme Court recognized, "[n]o court should impose a duty to deal that it cannot explain or adequately and reasonably supervise." *Trinko*, 540 U.S. at 415 (citation omitted). But the "compulsory" dealing Plaintiffs advocate would "require[] the court to assume the day-to-day controls characteristic of a regulatory agency." *Id.* (citation omitted). They urge this Court to order Deere "to make available to [equipment owners] and IRPs on reasonable and nondiscriminatory terms" all repair resources "that Deere makes available to its dealers, so as to enable agricultural equipment owners and IRPs to perform the full range of repairs that a Deere dealer can perform on Deere [equipment]." AC, Prayer for Relief ¶ 10. This includes, "without limitation," guaranteeing "access to reprogramming capabilities, the ability to conduct all tests and calibrations, and the ability to access CCMS/DTAC solutions and the CCMS/DTAC 'helpdesk' feature and other similar resources." *Id.* Granting Plaintiffs' request would embroil the Court in the minutiae of all of Deere's design, engineering, and pricing decisions around high-tech repair tools on the front end, and also "require continuing supervision of a highly detailed decree" on the back end. *See Trinko*, 540 U.S. at 414. These tasks may be fit for the CEO of a tech startup, but they fall well outside the proper writ of an Article III court.

18

Antitrust law is designed to safeguard technological innovation, which would be undermined by forcing Deere to broadly disseminate the tools and resources it has developed on its own time and dime. *See Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 1000 (9th Cir. 2010) ("any dampening of technological innovation would be at cross-purposes with antitrust law"). As the Supreme Court put it, "[c]ompelling" firms "to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive" of firms to innovate. *Trinko*, 540 U.S. at 407-08. Firms will be reluctant to invest in innovation if they must share the fruits of their efforts and risk-taking with others; and others will be tempted to free-ride if antitrust law allows them to. Forced sharing— particularly of proprietary technology and intellectual property—would risk dampening firms' incentive "to innovate, invest, and expand." *Novell*, 731 F.3d at 1073.

At bottom, antitrust law does not impose on Deere any obligation to maximize competitive opportunities for others in any market, much less one in which it does not compete. *See Trinko*, 540 U.S. at 415-16 (the Sherman Act "does not give judges *carte blanche* to insist that a monopolist alter its way of doing business whenever some other approach might yield greater competition"). The forced sharing that Plaintiffs seek would place this Court into the role of a "central planner[], identifying the proper price, quantity, and other terms of dealing—a role for which [courts] are ill suited." *Id*. at 408; *see also Novell*, 731 F.3d at 1073 ("If forced sharing were the order of the day, courts would have to pick and choose the applicable terms and conditions."). The Court should decline the invitation.

### c. Amorphous Allegations of an "Anticompetitive Course of Conduct" Are Insufficient to State a Claim

After deliberately choosing not to plead the elements of a conspiracy, boycott, tying, or refusal-to-deal claim, the FTC and States instead purport to plead "exclusionary conduct" through

a vacuous "anticompetitive course of conduct" theory. AC ¶ 124. Their conclusory "course of conduct" allegations are insufficient as a matter of law for the simple reason that Plaintiffs cannot point to any case that supports what they are trying to do here: plead a *Kodak*-type claim, without actually pleading the elements of that claim. To be clear, unlike MDL Plaintiffs, *see* MDL Compl. ¶ 237(c) (specifically alleging "tying" as a basis for the Section 2 claim), the FTC and States do not allege that the "anticompetitive course of conduct" is based on a *Kodak*-tying theory. Nor do they allege any other form of exclusionary conduct that the Supreme Court or Seventh Circuit has endorsed as a matter of law. Instead, in an attempt to lower the bar for pleading a monopolization claim, they attempt a mishmash of half-allegations without conforming them to existing law so that they can bootstrap themselves into this case without pleading the basic elements of a claim. That is not allowed. *See, e.g.*, *Pac. Bell*, 555 U.S. at 449 (holding that plaintiffs' "price-squeeze claim," which focused on "retail prices — where there [was] no predatory pricing — and the terms of dealing — where there [was] no duty to deal," did not state a claim as a matter of law); *Duke Energy Carolinas, LLC v. NTE Carolinas II*, 111 F.4th 337, 354 (4th Cir. 2024) ("[C]ase law has developed tests for analyzing" certain categories of conduct, like "refusing to deal," and where the alleged conduct falls into "well-defined categories," plaintiff must plead the elements of those claims). This is so for good reason: holding otherwise would allow a plaintiff to evade properly pleading its tying or refusal-to-deal claim simply by slapping a "course of conduct" label on its complaint, thereby forcing the defendant to wade through costly and burdensome discovery without a basic understanding of the precise nature of the plaintiff's legal theory and its elements. *See Twombly*, 550 U.S. at 558-64 (discussing the costs of proceeding to discovery in an antitrust case and importance of a well-pleaded complaint). This Court should reject Plaintiffs' attempt to

impermissibly avoid their pleading obligations through broad brushstroke allegations when the law already is clear on what they must plead.

**B.      The Complaint Does Not Plead a Claim Under Section 5 of the FTC Act**

With no viable Sherman Act claim, the FTC seeks to use Section 5 of the FTC Act to condemn as "unfair" conduct that is permitted under the Sherman Act. *See* AC ¶¶ 124, 130. No court in this Circuit has found that a *lawful* refusal to deal somehow nonetheless violates Section 5 of the FTC Act, and this Court should not be the first.

The FTC's Section 5 claim rests on the same conduct allegations as the Sherman Act Section 2 claim: Deere's decision not to make Service ADVISOR publicly available. But this case does not fit within the narrow exception giving rise to a duty to deal. And because Section 5 is designed to "supplement and bolster" the Sherman Act, not contradict it, *Motion Picture Advert.*, 344 U.S. at 394-95, Section 5 cannot create a duty to deal where the Sherman Act imposes none. Nor does Section 5 eliminate the rule that a defendant can monopolize only a market in which it competes.

The FTC's Section 5 claim also alleges that Deere "leverages its monopoly power in the United States with respect to Fully Functional Repair Tools to harm competitive conditions in the market for restricted repairs for Deere Large Tractors and Combines." AC ¶ 127. While the FTC tacks on the word "leveraging" to describe this conduct, that label adds nothing to the claim. Under the Sherman Act, there is no "free-standing theory of 'monopoly leveraging.'" *Schor v. Abbott Lab'ys*, 457 F.3d 608, 611-13 (7th Cir. 2006). Even for claims denominated as such, a plaintiff must still allege the elements of a Section 2 claim: (1) a "'dangerous probability of success' in monopolizing a second market"; and (2) exclusionary conduct. *Trinko*, 540 U.S. at 415 n.4 (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993)). Deere does not—and

cannot—have a "dangerous probability of success" in monopolizing the alleged restricted repairs market because it does not compete in that market. *See Aquatherm*, 145 F.3d at 1262 (rejecting monopoly-leveraging theory premised on allegations that defendant projected its monopoly "power into a market … in which it [did] not even seek to compete"). And, as explained above, the FTC does not plead any actionable exclusionary conduct: it does not allege the elements of a tying claim, and Deere's decision to not make Service ADVISOR "available" to independent dealers and equipment owners, AC ¶¶ 8, 10, does not give rise to a duty-to-deal claim. As the Seventh Circuit put it, plaintiffs cannot avoid the "intellectual discipline" of well-established tying and refusal-to-deal doctrines by repackaging their theories as "monopoly leveraging." *Schor*, 457 F.3d at 613.

Section 5 is broader than the Sherman Act only in limited respects. For example, the FTC Act reaches not only "existing violations" of the Sherman Act, but also incipient violations—that is, "acts and practices which, when full blown, would violate" the Sherman Act. *Motion Picture Advert.*, 344 U.S. at 394-95 (1953). In addition, Section 5 can "encompass[] not only practices that violate the Sherman Act and the other antitrust laws, but also practices that the Commission determines are against public policy for other reasons." *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454 (1986). But whatever authority these formulations bestow on the FTC, one limit is clear: Section 5 cannot *negate* the Sherman Act's policy aims. The FTC Act "was designed to supplement and bolster" the Sherman Act, not undercut it. *Motion Picture Advert*, 344 U.S. at 394-95.

Consistent with these principles, the Second Circuit rejected a Section 5 claim nearly identical to the FTC's claim here. In *Official Airline Guides*, the defendant had a monopoly in the publication of flight schedules. 630 F.2d at 921. The FTC claimed that the defendant violated

22

Section 5 because it "refus[ed] to publish the connecting schedules of commuter air carriers," thus "handicap[ing]" those commuter airlines from competing with other air carriers. *Id.* at 922. The Second Circuit rejected that claim upon finding that the defendant had no duty to deal with the air carriers. *Id.* at 927-28. The court explained that a contrary holding would conflict with the refusal-to-deal doctrine, which was not "as dead as the Commission would have it." *Id*. at 927. And the FTC could not escape that problem by invoking the policy of the FTC Act. In the Second Circuit's view, imposing a duty to deal on these allegations would have given the FTC "too much power to substitute its own business judgment for that of the monopolist in any decision that arguably affects competition in another industry," and permit the FTC to "delve into … social, political, or personal reasons for a monopolist's refusal to deal." *Id.* (citation omitted).

In so holding, the Second Circuit distinguished the cases the FTC cited for imposing a duty to deal on the ground that the monopolist in each case competed in the relevant market. In *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951), the monopolist was "seeking to preserve its *own* monopoly." *Off. Airline Guides*, 630 F.2d at 925 (emphasis added). Likewise, in *LaPeyre v. FTC*, 366 F.2d 117 (5th Cir. 1966), the monopolist had curtailed competition "in another market in which the monopolist himself was also engaged." *Off. Airline Guides*, 630 F.2d at 926; *see also id.* (distinguishing several other cases on the ground that each involved refusals to deal "resulting in injury to the *defendants'* competitors" (emphasis added)). Because the defendant publisher in *Official Airline Guides* did not participate in the airline market, the Second Circuit held that it had no duty to deal with the air carriers, even if that refusal "affected competition among" them. *Id.* at 926.

So too here: because Deere has no duty to deal under the Sherman Act, it has no such duty under Section 5 of the FTC Act. The Court should dismiss the Section 5 claim.

23

### C. The Court Should Dismiss the FTC's Claims Because Section 13(b) of the FTC Act Is Unconstitutional

There is an independent ground to dismiss the FTC's claims.  The FTC brings this case under Section 13(b) of the FTC Act, which purports to authorize the agency to enforce the FTC Act through district court suits for permanent injunctive relief.  *See* 15 U.S.C. § 53(b).  But Section 13(b) is unconstitutional, and the proper remedy is to dismiss the FTC's claims for lack of enforcement authority.

Under Article II, "the 'executive Power'—all of it—is 'vested in [the] President.'"  *Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020) (citing U.S. Const. Art. II § 1, cl. 1).  The President's executive power includes "appointing, overseeing, and controlling" principal executive officers, which in turn "generally includes the ability to remove" such officers on an "unrestricted" basis.  *Id.* at 213-15.  The FTC is an independent agency whose Commissioners are insulated from removal by the President under the FTC Act.  *See* 15 U.S.C. § 41 (allowing removal only for "inefficiency, neglect of duty, or malfeasance").

In 1935, the Supreme Court upheld the constitutionality of the FTC Act's removal restrictions.  *See Humphrey's Ex'r v. U.S.*, 295 U.S. 602 (1935).  As *Seila Law* emphasized, however, that holding rested on the conclusion that the FTC—"as it existed in 1935"—possessed only "'quasi-legislative or quasi-judicial powers'" and exercised "'no part of the executive power.'"  591 U.S. at 215-16 (quoting *Humphrey's Ex'r*, 295 U.S. at 628).  *Seila Law* also clarified that *Humphrey's Executor* establishes only a narrow exception to Presidential control "for multimember expert agencies that *do not wield substantial executive power*."  591 U.S. at 218 (emphasis added).

The precise circumstance that led *Humphrey's Executor* to its holding—the FTC's lack of substantial executive power—no longer exists.  In 1973, Congress amended Section 13(b) to grant

the FTC the power to enforce the FTC Act by seeking permanent injunctive relief in federal district court. *See* 15 U.S.C. § 53(b) (amended in Pub. L. No. 93-153, § 408(f), 87 Stat. 576, 592 (1973)). This amendment violates Article II because it purported to grant the independent FTC the authority to enforce federal law by suing alleged violators in federal court—a quintessential executive power. *See Buckley v. Valeo*, 424 U.S. 1, 138 (1976) (explaining that the power to bring "civil suits" seeking "injunctive relief" on behalf of the federal government is an executive power that "the Constitution entrusts" to "the President"); *accord U.S. v. Texas*, 599 U.S. 670, 678-79 (2023) (collecting cases illustrating that the power to initiate a lawsuit is within the special province of the executive branch). Adding that executive power to the FTC's arsenal takes this independent agency well beyond the "outermost constitutional limit[]" identified in *Humphrey's Executor*. *Seila Law*, 591 U.S. at 317-18.[9]

The proper remedy for this constitutional violation is to invalidate Section 13(b), not to nullify the FTC Act's removal restrictions, which Deere does not challenge. The applicable rule is that "an unconstitutional statutory amendment 'is a nullity' and 'void' when enacted, and for that reason has no effect on the original statute." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 631 (2020) (plurality op.) (quoting *Frost v. Corp. Comm'n of Okla.*, 278 U.S. 515, 526-27 (1929)); *see Bowsher v. Synar*, 478 U.S. 714, 734-36 (1986). As the Supreme Court made plain in both *Bowsher* and *Barr*, this rule applies even when, as here, the amendment would not be unconstitutional standing alone but is unconstitutional based on its interaction with the existing statutory scheme, such as pre-existing removal restrictions.

---

[9] The Seventh Circuit held in 1965 that the Interstate Commerce Commission could sue for an "injunction" despite being an independent agency, reasoning that "the powers of law enforcement are not wholly assigned to the executive department." *ICC v. Chatsworth Coop. Mktg. Ass'n*, 347 F.2d 821, 822 (1965). That holding, involving a now-defunct agency, does not survive *Seila Law* and *Buckley*.

In *Bowsher*, Congress created the Comptroller General as an officer who assisted Congress in its legislative functions and was removable by Congress, not the President. 478 U.S. at 727-32. Several decades later, Congress purported to grant the Comptroller General executive powers over federal spending. *Id.* at 732-34. As here, this created a constitutional problem because Congress granted executive powers to an officer who could not constitutionally exercise them given the preexisting removal restrictions. *Id.* at 727-34. The parties disputed whether the proper remedy was to nullify the old removal restrictions or invalidate the new executive powers. The Court chose the latter, deeming the newly granted executive powers "invalid[]" and declining to "[r]ecast the Comptroller General as an officer of the Executive Branch" "at this late date." *Id.* at 734-35.

Likewise, in *Barr*, a First Amendment speech case, Congress originally enacted a content-neutral ban on robocalls to cell phones. 591 U.S. at 614. Twenty years later, Congress created a constitutional problem by amending the statute to exempt certain calls regarding the collection of government debt, thus creating a content-based abridgement of speech. *Id.* at 616, 618-21. The parties again disputed whether the proper remedy was to nullify the old restriction on all robocalls or invalidate the new exemption. *Id.* at 623. As in *Bowsher*, the *Barr* plurality decided to "treat[] the original, pre-amendment statute" as valid and to invalidate and sever the amendment so that "the original law stands." *Id.* at 630 (quoting *Truax v. Corrigan*, 257 U.S. 312, 342 (1921)). The same remedial approach is warranted here.

The remedy was a key dispute in *FTC v. Walmart Inc.*, 664 F. Supp. 3d 808 (N.D. Ill. 2023), over which the Seventh Circuit granted an interlocutory appeal under 28 U.S.C. § 1292(b), *see FTC v. Walmart Inc.*, No. 24-3174 (7th Cir.). The district court agreed that "[t]he litigation authority given to the FTC in the 1970s may have taken the Commission's for-cause protections past 'the outermost constitutional limits.'" *Walmart*, 664 F. Supp. 3d at 844 (quoting *Seila Law*

26

*LLC,* 591 U.S. at 218).[10]  But as to the remedy, the court asserted that "the constitutional problem at issue centers on the interaction of the Commissioners' removal protections with the subsequent litigation authority given to the agency, not an unconstitutional amendment to an earlier law." *Id.* at 845.  According to the court, "[t]he real problem here is a potentially unconstitutional limit on the President's removal power," so "[t]he best solution would be to target that limit." *Id.*

Respectfully, the *Walmart* decision gets it backwards.  As explained above, Section 13(b) was an unconstitutional amendment to an earlier law because it unconstitutionally purported to vest executive power in an independent agency.  Thus, just as in *Bowsher* and *Barr*, the proper remedy is to invalidate the amendment, not the pre-existing statute.  That result, is also mandated by the FTC Act's severability clause, which Congress enacted after *Humphrey's Executor* but before Section 13(b).  15 U.S.C. § 57 (Pub. L. No. 75-447, § 4, 52 Stat. 114 (1938)) ("If any provision of [the FTC] Act … is held invalid, the remainder … shall not be affected thereby.").

Moreover, the proper remedy must "limit the solution to the problem." *Barr,* 591 U.S. at 625.  Invalidating Section 13(b) is tailored to the problem Congress created when it enacted Section 13(b).  In contrast, invalidating the removal restrictions would be massively overbroad because it would destroy the agency's independence even with respect to its original, quasi-legislative, quasi-judicial powers, such as agency adjudications.  Indeed, rather than simply restoring the FTC as Congress originally established it (independent but with no executive powers), invalidating the removal restriction would create an FTC that no Congress has ever blessed (non-independent but vested with executive powers).

---

[10] *Walmart* also involved monetary penalties, but that makes no difference.  The "discretionary power to seek judicial relief" to enforce federal law, including through "civil actions" for "injunctions," is executive power, as the Court explained in *Buckley*, 424 U.S. at 111, 137-38.

*Finally*, invalidating the removal restriction would effectively overrule *Humphrey's Executor*, which only the Supreme Court can do. *Humphrey's Executor* is binding precedent that Deere does not challenge here. Nor does Deere challenge the FTC's removal restriction; it instead challenges the FTC's unconstitutional 1973 amendment. Contrary to *Walmart*'s view that the "real problem" is the removal restriction, the real problem is Section 13(b).

This Court should hold that Section 13(b) is unconstitutional and that the FTC, therefore, cannot invoke that provision as authority to bring this action in federal court. All of the FTC's claims should be dismissed.

### D.    The States' Claims Fail for Lack of Article III Standing

The States lack Article III standing both in their sovereign capacities and under a *parens patriae* theory. To plead standing in their sovereign capacities, the States must (but fail to) allege a "tangible interference" with their "authority to regulate or enforce [their] laws." *Harrison v. Jefferson Par. Sch. Bd.*, 78 F.4th 765, 769-74 (5th Cir. 2023) (quoting *Saginaw Cnty. v. STAT Emergency Med. Servs., Inc.*, 946 F.3d 951, 957 (6th Cir. 2020)). The Complaint makes no such allegations. *See* AC ¶¶ 27-31 (alleging only that each State wishes to "protect the state, its general economy, and its residents from Deere's unlawful business practices").

As for *parens patriae* standing, the States must allege a "quasi-sovereign" interest that is "sufficiently concrete" and "apart from the interests of particular private parties." *Snapp & Son Inc., v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 602, 607 (1982); *see also Missouri ex rel. Koster v. Harris*, 847 F.3d 646 (9th Cir. 2017) (affirming dismissal with prejudice where states lacked *parens patriae* standing because they failed to articulate an interest in the litigation apart from that of private party egg farmers). Yet, here, the Complaint focuses on an alleged harms to "many hundreds of farmers and IRPs" in each Plaintiff State, AC ¶¶ 133, 138, 143, 147, 152, with only

vague and general references to protecting each "state, its general economy, and its residents," *id.*

¶¶ 27-31.  The Complaint "contains no specific allegations about the statewide magnitude" of the

harms flowing from Deere's alleged conduct, "or the extent to which they affect more than just an

'identifiable group of individual' [farmers and IRPs]."  *Koster*, 847 F.3d at 652.  Nor does it allege

any interest distinct from those of private parties whose interests are demonstrably and capably

represented in the MDL.  The States' claims should be dismissed.

### E.    The States' Civil Penalties Claims Are Time-Barred

The States' claims for civil penalties under their respective state antitrust laws are

time-barred.  The relevant statutes impose clear limitations periods.  *See* 740 ILCS 10/7 (Illinois:

4 years); A.R.S. §44-1410 (Arizona: 4 years); MCL § 445.781 (Michigan: 4 years); Minn. Stat.

§ 325D.64 (Minnesota: 4 years); Wis. Stat. § 133.18 (Wisconsin: 6 years).  "An antitrust cause of

action accrues and the statute begins to run when a defendant commits an act that injures a

plaintiff's business."  *Vasquez v. Ind. Univ. Health, Inc.*, 40 F.4th 582, 588 (7th Cir. 2022).[11]  The

very first sentence of the Complaint alleges that Deere's challenged conduct has been ongoing "for

decades."  AC ¶ 1.  The Complaint marches through Deere's public-facing and allegedly

monopolistic conduct beginning in the "the late 1980s," *id.* ¶ 88, through development of the

Repair Tool and release of the allegedly inferior Customer Service Advisor in 2017, *see, e.g.*, *id.*

¶¶ 53, 90, 94, 104.  On the face of the Complaint, the States' civil penalties claims accrued long

---

[11] This rule applies in all the States, except Wisconsin, where the cause of action accrues upon "discovery" of the acts causing antitrust injury.  Wis. Stat. § 133.03(4).  The distinction makes no difference here, where Plaintiffs acknowledge that Deere first released the Repair Tool "[i]n or around 1999," and that the tool was the subject of public debate and vocal opposition from "'right-to-repair' advocates" as early as 2018.  *See* AC ¶¶ 90, 105-06.  Given these allegations, Plaintiffs cannot legitimately claim to have only "discovered" Deere's allegedly anticompetitive licensing of the Repair Tool within the last 6 years.

before the expiration of the applicable limitations periods, and they plead no basis for tolling. The civil penalties claims should be dismissed as untimely.

## V.    CONCLUSION

Plaintiffs' Sherman Act Section 2 and parallel state law claims fail because, even if they could plead a single-brand aftermarket (and they cannot), the Complaint admits that Deere does not participate in the allegedly monopolized market. Further, Plaintiffs do not plead any exclusionary conduct: they cannot assert a tying claim, do not allege facts supporting a duty to deal, and cannot escape their pleading obligations by invoking a vague "course of conduct." The FTC's Section 5 claim fails because the Act does not condemn conduct that the Sherman Act permits. In any event, the FTC's claims should be dismissed because it lacks constitutional authority to bring this case at all. For their part, the States lack both Article III and *parens patriae* standing, and their civil penalties claims are time-barred. The Complaint should be dismissed with prejudice.

Dated:  March 17, 2025

Respectfully submitted,

**LATHAM & WATKINS LLP**

By: */s/ Sean M. Berkowitz*

Sean M. Berkowitz (IL Bar No. 6209701)
Gary Feinerman (IL Bar No. 6206906)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: +1.312.876.7700
Facsimile: +1.312.993.9767
Email: sean.berkowitz@lw.com
gary.feinerman@lw.com

Amanda P. Reeves (*pro hac vice*)
Tara D. Elliott (*pro hac vice*)
Ian R. Conner (*pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
Telephone: +1.202.637.2200
Facsimile: +1.202.637.2201
Email: amanda.reeves@lw.com
tara.elliott@lw.com
ian.conner@lw.com

Belinda S Lee (*pro hac vice*)
Meaghan Thomas-Kennedy (*pro hac vice*)
**LATHAM & WATKINS LLP**
505 Montgomery Street
Suite 2000
San Francisco, CA 94111-6538
Telephone: +1.415.391.0600
Facsimile: +1.415.395.8095
Email: belinda.lee@lw.com
meaghan.thomas-kennedy@lw.com

John M. Majoras (*pro hac vice*)
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, DC  20001.2113
Telephone: +1.202.879.3939
Facsimile: +1.202.626.1700
Email: jmmajoras@jonesday.com

Lin W. Kahn (*pro hac vice*)
**JONES DAY**
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: +1.415.626.3939
Facsimile: +1.415.875.5700
Email: lkahn@jonesday.com

Tiffany D. Lipscomb-Jackson (*pro hac vice*)
**JONES DAY**
325 John H. McConnell Boulevard,
Suite 600
Columbus, OH 43215-2673
Telephone: +1.614.469.3939
Facsimile: +1.614.461.4198
Email: tdlipscombjackson@jonesday.com

Corey A. Lee (*pro hac vice*)
**JONES DAY**
North Point
901 Lakeside Ave E
Cleveland, OH 44114-1190
Telephone: +1.216.586.3939
Facsimile: +1.216.579.0212
Email: calee@jonesday.com

Ryan Thomas (*pro hac vice*)
Lauren Miller Forbes (*pro hac vice*)
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, DC  20001.2113
Telephone: +1.202.879.3939
Facsimile: +1.202.626.1700
Email: rcthomas@jonesday.com
lmillerforbes@jonesday.com

*Attorneys for Defendant Deere & Company*