## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, STATE OF ILLINOIS, STATE OF ARIZONA, ATTORNEY GENERAL DANA NESSEL on behalf of THE PEOPLE OF MICHIGAN, STATE OF MINNESOTA, and STATE OF WISCONSIN, | |
| *Plaintiffs*, | Case No.: 3:25-cv-50017 |
| v. | Hon. Iain D. Johnston |
| DEERE & COMPANY, | |
| *Defendant*. | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................................ii

INTRODUCTION ..............................................................................................................1

BACKGROUND ................................................................................................................2

LEGAL STANDARD ........................................................................................................3

ARGUMENT .....................................................................................................................4

I.     The Amended Complaint States a Claim for Monopolization............................4

      A.    Restricted Repair Services for Deere Large Tractors and Combines Comprise a Cognizable Antitrust Market. .....................................4

            1.    The Complaint satisfies the *Kodak* factors. ...................................6

            2.    Deere's market power in the equipment foremarket is sufficient to establish a cognizable aftermarket.............................7

      B.    Deere Has Monopoly Power in the Restricted Repair Services Market. ...............................................................................9

      C.    Deere's Discriminatory Distribution of its Fully Functional Repair Tool is Anticompetitive Conduct. ...........................................13

II.    The Amended Complaint States a Claim Under Section 5 of the FTC Act.......19

      A.    The Complaint Alleges Conduct that Courts Have Recognized as Unfair Under Section 5. ......................................................20

      B.    Deere's Attacks on the FTC's Section 5 Claim Improperly Equate Section 5 with the Sherman Act..............................................22

III.   The FTC Has Authority to Bring this Action......................................................24

IV.   The Amended Complaint States Claims Under State Law. ................................27

      A.    Each State Has Article III Standing. ........................................27

      B.    The Plaintiff States Alleged a Continuing Antitrust Violation, Making Their Claims Timely. ................................................29

CONCLUSION.................................................................................................................30

i

# TABLE OF AUTHORITIES

**Cases**

*Alarm Detection Sys., Inc. v. Orland Fire Prot. Dist.*,
     929 F.3d 865 (7th Cir. 2019) ........................................................................ 16

*Alfred L. Snapp & Son v. Puerto Rico*,
     458 U.S. 592 (1982) ...................................................................................... 27

*Aquatherm Indus., Inc. v. Fla. Power & Light Co.*,
     145 F.3d 1258 (11th Cir. 1998) .................................................................... 12

*Atl. Refining Co. v. FTC*,
     381 U.S. 357 (1965) .................................................................. 19, 20, 21, 22

*Authenticom, Inc. v. CDK Global, LLC*,
     874 F.3d 1019 (7th Cir. 2017) ...................................................................... 17

*Authenticom, Inc. v. CKD Global, LLC*,
     313 F. Supp. 3d 931 (N.D. Ill. 2018) ............................................................ 7

*Barr v. Am. Assoc. of Political Consultants, Inc.*,
     591 U.S. 610 (2020) ................................................................................ 25, 26

*Bhatti v. Fed. Housing Fin. Agency*,
     97 F.4th 556 (8th Cir. 2024) ........................................................................ 26

*Bowsher v. Synar*,
     478 U.S. 714 (1986) ...................................................................................... 25

*Brunswick Corp. v. Riegel Textile Corp.*,
     752 F.2d 261 (7th Cir. 1984) ........................................................................ 10

*Buckley v. Valeo*,
     424 U.S. 1 (1976) .......................................................................................... 25

*Burch v. Goodyear Tire & Rubber Co.*,
     554 F.2d 633 (4th Cir. 1977) ........................................................................ 29

*Calcutt v. FDIC*,
     37 F.4th 293 (6th Cir. 2022) ........................................................................ 26

*Carl Sandburg Vill. Condo. Ass'n No. 1. v. First Condo. Dev. Co.*,
     758 F.2d 203 (7th Cir. 1985) ........................................................................ 12

*CFPB v. Law Offices of Crystal Moroney, P.C.*,
     63 F.4th 174 (2d Cir. 2023) .......................................................................... 26

ii

*City of Madison v. Hyland, Hall & Co.*,
    243 N.W.2d 422 (Wis. 1976) ................................................................................ 28

*Collins v. Yellin*,
    594 U.S. 220 (2021) ............................................................................ 24, 25, 26

*Comm. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*,
    51 F.4th 616 (5th Cir. 2022) .......................................................................... 26

*Digit. Equip. Corp. v. Uniq Digit. Techs. Inc.*,
    73 F.3d 756 (7th Cir. 1996) ............................................................................. 7

*Discon, Inc. v. NYNEX Corp.*,
    93 F.3d 1055, 1057 (2d Cir. 1996) ................................................................ 13

*Duke Energy Carolinas, LLC v. NTE Carolinas II*,
    111 F.4th 337 (4th Cir. 2024) ........................................................................ 14

*E.I. du Pont de Nemours & Co. v. FTC*,
    729 F.2d 128 (2d Cir. 1984) .......................................................................... 23

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) ............................................................................... passim

*Epic Games, Inc. v. Apple Inc.*,
    67 F.4th 946 (9th Cir. 2023) ......................................................................... 4, 7

*Federated Mut. Ins. Co. v. Coyle Mech. Supply Inc.*,
    983 F.3d 307 (7th Cir. 2020) ........................................................................... 3

*Free Enter. Fund v. Public Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010) ....................................................................................... 25

*FTC v. Actavis, Inc.*,
    570 U.S. 136 (2013) ....................................................................................... 19

*FTC v. Ind. Fed'n of Dentists*,
    476 U.S. 447 (1986) ....................................................................................... 19

*FTC v. Motion Picture Advert. Serv. Co., Inc.*,
    344 U.S. 392 (1953) ....................................................................................... 23

*FTC v. Sperry & Hutchinson Co.*,
    405 U.S. 233 (1972) ....................................................................................... 19

*FTC v. Texaco, Inc.*,
    393 U.S. 223 (1968) ........................................................................... 20, 21, 22

*Goodyear Tire & Rubber Co. v. FTC,*
    331 F.2d 394 (7th Cir. 1964) ........................................................ 20

*Gunn v. Cont'l Cas. Co.,*
    968 F.3d 802 (7th Cir. 2020) ......................................................... 4

*Hawaii v. Standard Oil Co.,*
    405 U.S. 251 (1972) ............................................................. 27, 29

*Holloway v. Bristol-Myers Corp.,*
    485 F.2d 986 (D.C. Cir. 1973) ...................................................... 23

*Illinois v. AU Optronics,*
    794 F. Supp. 2d 845 (N.D. Ill. 2011) ............................................... 27

*Illinois v. SDS W. Corp.,*
    640 F. Supp. 2d 1047 (C.D. Ill. 2009) .............................................. 28

*In re Deere & Co. Repair Serv. Antitrust Litig.,*
    703 F. Supp. 3d 862 (N.D. Ill. 2023) .......................................... passim

*In re Gen. Motors Corp.,*
    Dkt. No. 9077, 1982 FTC LEXIS 39 (F.T.C. June 25, 1982) ..................... 20, 21

*In re Grand Caillou Packing Co.,*
    Dkt. 7887, 1964 FTC LEXIS 111 (F.T.C. June 4, 1964) ........................... 22

*In re Ranbaxy Generic Drug Application Antitrust Litig.,*
    573 F. Supp. 3d 459 (D. Mass. 2021) ........................................ 11, 13

*Intergraph Corp. v. Intel Corp.,*
    195 F.3d 1346 (Fed. Cir. 1999) ..................................................... 13

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde,*
    466 U.S. 2 (1984) ..................................................................... 14

*K&R Contractors, LLC v. Keene,*
    86 F.4th 135 (4th Cir. 2023) ......................................................... 26

*Kaufman v. Kijakazi,*
    32 F.4th 843 (9th Cir. 2022) ......................................................... 26

*Klehr v. A.O. Smith Corp.,*
    521 U.S. 179 (1997) ................................................................... 30

*L.G. Balfour Co. v. FTC,*
    442 F.2d 1 (7th Cir. 1971) ....................................................... 11, 23

*Lambrix v. Tesla, Inc.*,
    737 F. Supp. 3d 822 (N.D. Cal. 2024) ........................................................... 5, 8

*LaPeyre v. FTC*,
    366 F.2d 117 (5th Cir. 1966) ...................................................................... 20, 22

*Leachco, Inc. v. Consumer Prod. Safety Comm'n*,
    103 F.4th 748 (10th Cir. 2024) ......................................................................... 26

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
    708 F.2d 1081 (7th Cir. 1983) .......................................................................... 15

*Missouri ex rel. Koster v. Harris*,
    847 F.3d 646 (9th Cir. 2017) ............................................................................ 29

*New York ex rel. Spitzer v. St. Francis Hosp.*,
    94 F. Supp. 2d 399 (S.D.N.Y. 2000) ............................................................... 28

*NLRB v. Starbucks Corp.*,
    125 F.4th 78 (3d Cir. 2024) .............................................................................. 26

*Off. Airline Guides, Inc. v. FTC*,
    630 F.2d 920 (2d Cir. 1980) .......................................................................... 21, 22

*Otter Tail Power Co. v. United States*,
    410 U.S. 366 (1973) .......................................................................................... 18

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009) .......................................................................................... 16

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
    381 F.3d 717 (7th Cir. 2004) .............................................................................. 8

*Rodriguez v. Soc. Sec. Admin.*,
    118 F.4th 1302 (11th Cir. 2024) ....................................................................... 26

*Schor v. Abbott Labs.*,
    457 F.3d 608 (7th Cir. 2006) ............................................................................ 17

*Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*,
    950 F.3d 911 (7th Cir. 2020) ............................................................................ 16

*Siva v. Am. Bd. of Radiology*,
    38 F.4th 569 (7th Cir. 2022) ............................................................................. 14

*State by Humphrey v. Alpine Air Prods., Inc.*,
    490 N.W.2d 888 (Minn. Ct. App. 1992) .......................................................... 28

*Texas v. Google LLC*,
No. 4:20-957, 2025 U.S. Dist. LEXIS 15071 (E.D. Tex. Jan. 28, 2025) .................. 28, 29

*Texas v. Penguin Group (USA) Inc.*,
14 F. Supp. 3d 525 (S.D.N.Y 2014) ....................................................................... 27

*Toys "R" Us, Inc. v. FTC*,
221 F.3d 928 (7th Cir. 2000) ............................................................................ 10, 11

*United States v. Agri Stats, Inc.*,
No. 23-3009, 2024 U.S. Dist. LEXIS 94142 (D. Minn. May 28, 2024) .......................... 29

*United States v. Google LLC*,
No. 1:23-cv-108, 2025 U.S. Dist. LEXIS 74956 (E.D. Va. Apr. 17, 2025) ............... 16, 18

*United States v. Google, LLC*,
747 F. Supp. 3d 1, (D.D.C. 2024) ............................................................................ 6

*United States v. Griffith*,
334 U.S. 100 (1948) ................................................................................ 10, 12, 13

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966) ................................................................................... 4, 5, 10

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) ..................................................................... 4, 9, 14, 15

*Vasquez v. Ind. Univ. Health, Inc.*,
40 F.4th 582 (7th Cir. 2022) ................................................................................. 30

*Verizon Commc'ns v. Law Off. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) .................................................................................... passim

*Viamedia, Inc. v. Comcast Corp.*,
951 F.3d 429 (7th Cir. 2020) ........................................................................... passim

*Wisconsin v. Abbott Labs.*,
341 F. Supp. 2d 1057 (W.D. Wis. 2004) ................................................................ 28

*Xechem, Inc. v. Bristol-Myers Squibb Co.*,
372 F.3d 899 (7th Cir. 2004) ................................................................................ 30

*Z-TEL Commc'ns, Inc. v. SBC Commc'ns, Inc.*,
331 F. Supp. 2d 513 (E.D. Tex. 2004) .................................................................... 15

**Statutes**

15 U.S.C. § 2 ...................................................................................................... 10

15 U.S.C. § 26 ........................................................................................................ 27

15 U.S.C. § 45(a)(1) .............................................................................................. 19

15 U.S.C. § 53 ........................................................................................................ 24

15 U.S.C. § 57 ........................................................................................................ 25

Ill. Antitrust Act, 740 ILCS 10/7(1)–(2), (4) ....................................................... 28

Mich. Antitrust Ref. Act, MCL 445.777 ............................................................... 28

Minn. Stat, M.S.A. § 325D.59 ............................................................................... 28

Unif. State Antitrust Act, A.R.S. § 44-1407 (Arizona) ......................................... 28

Wis. Stat. Ann. § 133.16 ........................................................................................ 28

**Other Authorities**

Erik Hovenkamp, *The Antitrust Duty to Deal in the Age of Big Tech*,
    131 Yale L.J. 1483 (2022) ............................................................................. 18

John Yun, *App Stores, Aftermarkets, & Antitrust*,
    53 Ariz. St. L.J. 1283 (2022) .......................................................................... 8

Jonathan Baker, *Taking the Error Out of Error Cost Analysis*,
    80 Antitrust L.J 1 (2015) ................................................................................ 23

Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW (2024) ................... 8, 10, 30

**Rules**

Fed. R. Civ. P. 8 ...................................................................................................... 4

**Constitutional Provisions**

U.S. Const. art. II, § 2, cl. 2 .................................................................................. 25

## INTRODUCTION

Defendant Deere & Company ("Deere") controls repair aftermarkets for Deere agricultural equipment. Deere abuses and maintains its monopoly power in these markets by denying farmers the tools and information necessary to repair their equipment in a timely and cost-effective manner. Plaintiffs—the Federal Trade Commission ("FTC") and five States ("State Plaintiffs")—seek to enjoin Deere's unlawful and anticompetitive conduct.

The Complaint focuses on simple but flagrant conduct—Deere withholds repair resources from equipment owners (farmers) and independent repair providers, forcing farmers to turn to Deere's exclusive and high-priced dealer network for essential repairs. In a separate pending action, this Court has sustained a Complaint alleging Sherman Act Section 2 claims premised on the same conduct. *In re Deere & Co. Repair Serv. Antitrust Litig.* ("MDL Action"), 703 F. Supp. 3d 862, 911–13 (N.D. Ill. 2023) ("MDL Decision").

Deere's Memorandum in Support of its Motion for Judgment on the Pleadings (ECF No. 110) ("Mem.") strains to distinguish Plaintiffs' allegations from those in the MDL Action. But the distinctions Deere raises are immaterial. Deere once again argues (1) that a post-sale "change in policy" is required to establish a single-brand aftermarket, (2) that Deere cannot monopolize repair services because it does not directly provide such services, and (3) that its discriminatory distribution of repair tools is not anticompetitive conduct. But the Court has rejected these same arguments. *See* MDL Action, ECF No. 105 at 21, 26–28; *Deere*, 703 F. Supp. 3d at 896, 911–13. Deere's second bite at the apple should fare no better than its first. *See infra* Part I.

Deere's challenge to the FTC's Section 5 claim fails not only for those same reasons, but also because Section 5 empowers the FTC to address a broader scope of conduct than the Sherman Act. *See infra* Part II. Deere's constitutional argument is also ineffective. Uniform case law rejects Deere's argument that an unlawful removal restriction renders an agency powerless to

fulfill its statutory mandate. *See infra* Part III. Finally, Deere's arguments regarding the States' claims misunderstand the States' *parens patriae* enforcement interests and the continuing nature of the violations at issue here. *See infra* Part IV.

Deere's Motion should be denied in its entirety.

## BACKGROUND

Large agricultural equipment is indispensable to American farmers' ability to profitably produce crops critical to the nation's food supply. Am. Compl. (ECF No. 61) ("Complaint" or "AC") ¶¶ 33, 40–41. Deere is the largest manufacturer of such equipment in the United States, *id.* ¶ 35, with dominant shares in markets for Large Tractors and Combine harvesters, *id.* ¶¶ 35, 39, 43–45. Deere also manufactures and sells repair parts for its agricultural equipment. *Id.* ¶ 78. Deere distributes its agricultural equipment and related parts through a network of authorized dealers ("Deere dealers") that also offer repair services for Deere equipment. *Id.* ¶¶ 3, 38. Deere dealers compete with Deere equipment owners themselves and with independent repair providers ("IRPs") in the provision of repair services for Deere equipment. *Id.* ¶¶ 6, 68–69.

Agricultural equipment has become increasingly complex over recent decades, with computerized components performing numerous functions. *Id.* ¶ 7. As a result, equipment repair commonly requires the use of software tools ("repair tools") to communicate with the equipment, diagnose problems, and program and calibrate parts. *Id.* ¶¶ 7, 48, 71. Only Deere has the information needed to develop fully functional repair tools for Deere equipment. *Id.* ¶ 59. As a result, Deere has control over—and monopoly power in—the supply of fully functional repair tools capable of enabling all repairs on Deere equipment. *Id.* ¶¶ 58, 63.

Deere has used this monopoly power to distort competition and maintain monopoly power in certain markets for repair services for Deere agricultural equipment. *Id.* ¶ 72. Deere does so by making fully functional repair tools available only to its dealers, and by withholding

such tools from farmers and IRPs. *Id.* ¶¶ 10, 59, 91. Deere thus controls entry into, and limits output in, the provision of restricted repair services. *Id.* ¶ 72. Owners of Deere equipment are forced to turn to a Deere dealer for repairs that they would otherwise do themselves or bring to an IRP. *Id.* ¶¶ 71–72, 112. As a consequence, Deere's dealers maintain a 100 percent market share and charge supracompetitive prices for restricted repairs, and Deere reaps additional profits through parts sales it would not have made if restricted repairs were performed elsewhere. *Id.* ¶¶ 85, 92, 115–16.

Deere's conduct denies farmers the use of their own repair labor and the choice of their preferred repair service provider. *Id.* ¶¶ 93, 112. It results in downtime costs and reduced crop yield by delaying the planting, spraying, and harvesting of crops. *Id.* ¶ 12. And it forces farmers to spend more money on repairs and parts because Deere dealers charge more for service than it would cost farmers to repair their own equipment or go to an IRP, and dealers almost always use more expensive Deere-branded parts in their repairs. *Id.* ¶¶ 69, 84, 112–16.

Farmers cannot discipline Deere by switching to other equipment in response to Deere's repair restrictions because (1) farmers are not able to conduct life-cycle cost analyses when they buy equipment, *id.* ¶¶ 64, 74, 75–77, (2) switching brands would be more costly than paying the supracompetitive repair prices charged by Deere dealers, *id.* ¶¶ 46, 64, 74, and (3) Deere possesses monopoly and market power in the equipment markets, *id.* ¶¶ 39–45, 64, 74.

## LEGAL STANDARD

A Rule 12(c) motion "should not be granted unless it appears beyond doubt that the nonmovant cannot prove facts sufficient to support its position." *Federated Mut. Ins. Co. v. Coyle Mech. Supply Inc.*, 983 F.3d 307, 313 (7th Cir. 2020). As with a motion to dismiss, "the court views all facts and inferences in the light most favorable to the non-moving party." *Id*. "[T]he court determines whether the complaint states a claim that is plausible on its face." *Deere*,

703 F. Supp. 3d at 872. "Specific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Id*. at 873 (citing Fed. R. Civ. P. 8). "It is the defendant's burden to establish the complaint's insufficiency." *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 806 (7th Cir. 2020).

## ARGUMENT

### I.     The Amended Complaint States a Claim for Monopolization.

Monopolization under Section 2 of the Sherman Act requires (1) the possession of monopoly power and (2) the willful acquisition or maintenance of that power. *Verizon Commc'ns v. Law Off. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570–571 (1966)). The second element requires "an assessment of what types of anticompetitive conduct are prohibited," as distinct from procompetitive conduct such as offering customers a superior product or attractive pricing. *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 452 (7th Cir. 2020); *United States v. Microsoft Corp.*, 253 F.3d 34, 68 (D.C. Cir. 2001).

A plaintiff establishes a *prima facie* Section 2 violation by showing monopoly power acquired or maintained through anticompetitive conduct. *Viamedia*, 951 F.3d at 451–52, 460–61. The burden then shifts to the defendant to proffer a non-pretextual procompetitive justification for its conduct, whereupon the plaintiff may either rebut that justification or demonstrate that the harm outweighs any benefit. *Id.* at 463; *Microsoft*, 253 F.3d at 58–59.

### A.     Restricted Repair Services for Deere Large Tractors and Combines Comprise a Cognizable Antitrust Market.

The Complaint alleges antitrust markets for fully functional repair tools and restricted repair services for Deere equipment. These are "aftermarkets" because, from the perspective of consumers, the range of suitable alternatives is constrained by a costly, prior acquisition in a "foremarket." *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 976 (9th Cir. 2023). That is, owners

of malfunctioning Deere equipment require repair services that are specific to Deere equipment. The Complaint's allegations establish that Deere-specific restricted repair services make up a cognizable antitrust market.

Deere's contention that the Complaint fails to allege a plausible aftermarket for restricted repair services asks the Court to deviate from its prior application of *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992). In *Kodak*, the Supreme Court held that a single-brand aftermarket may be considered a separate antitrust market where competition in the equipment foremarket does not discipline the exercise of market power in the aftermarket. *Id.* at 486. The Court looked to the "'commercial realities' faced by consumers," *Id.* at 482 (quoting *Grinnell*, 384 U.S. at 572), rather than adopting "[l]egal presumptions that rest on formalistic distinctions," *Id.* at 466–67. It held that even with a competitive foremarket, market imperfections such as change in policy, unavailability of information, or customer lock-in may support the existence of a single-brand aftermarket. *Deere*, 703 F. Supp. 3d at 898–99.

As the Court has already found, a plaintiff need not allege a post-purchase "change of policy/bait-and-switch" by the defendant to define an aftermarket, particularly where the defendant has market power in the foremarket. 703 F. Supp. 3d at 896, 899. First, it is enough to allege—as the Complaint does—that at the time farmers purchase the foremarket Deere equipment, they lack sufficient information to know the "life-cycle cost" of that equipment before they become locked in. *Id*. at 899; AC ¶¶ 33, 75. Second, as *Kodak* suggests, and as another court recently held in a similar case, a court need not assess *Kodak* factors where the defendant has market power in the foremarket. *Kodak*, 504 U.S. at 465–67, 465 n.10; *Lambrix v. Tesla, Inc.*, 737 F. Supp. 3d 822, 840–41 (N.D. Cal. 2024). Deere's market power in the foremarket is, on its own, sufficient to support the existence of the alleged aftermarket.

1.      **The Complaint satisfies the *Kodak* factors.**

The Complaint's single-brand aftermarket allegations satisfy the *Kodak* factors as applied in the Seventh Circuit and by this Court. Deere's arguments to the contrary reflect an unnecessarily restrictive reading of *Kodak* that the Court has already rejected. The Court recognized two independent bases for finding a single-brand aftermarket: (1) a defendant's aftermarket "change in policy" after the customer has purchased the foremarket product; or (2) a more general "lack of knowledge and availability of information" resulting in the "inability of the customer to determine 'all in cost' or 'life-cycle cost' for the product." *Deere*, 703 F. Supp. 3d at 893.

Deere's efforts to distinguish this case from the MDL Action misinterpret both the law and the Complaint's allegations. First, Deere claims (at 9) that, because it has been restricting repairs for decades, farmers have "full knowledge" of its practices. If this is meant to suggest that farmers have the information required to perform life-cycle cost analyses, Deere improperly misconstrues the Complaint in its favor. The Complaint expressly alleges that equipment owners *lack* the ability to assess life-cycle costs because of Deere's decision to withhold necessary pricing information from customers, the inherent unpredictability of repairs, and the opacity surrounding restricted repairs. AC ¶¶ 75–77. The Complaint alleges that even Deere itself does not have the information to engage in accurate life-cycle cost analyses. *Id.* ¶¶ 76–77. And Deere's alleged half-measures and unfulfilled commitments in response to concerns about equipment repairability further obscure the information needed by farmers. *Id.* ¶¶ 14–18. These allegations regarding the actual inability of farmers to perform lifecycle-cost analyses outweigh Deere's speculation that the longstanding nature of its repair restrictions provides farmers with adequate information. *Cf. United States v. Google, LLC*, 747 F. Supp. 3d 1, 148 (D.D.C. 2024) ("[M]arket realities matter more than what is theoretically possible.").

Next, Deere claims (at 10) that the Complaint fails to allege a "policy change" by Deere, and that such an allegation is needed to satisfy *Kodak*. But, as the Court found in its MDL Decision, a change-in-policy is not required to define an aftermarket. *Deere*, 703 F. Supp. at 898. To be sure, it is one way to show that customers lack sufficient knowledge about life-cycle costs, but "it is not the *exclusive* means of doing so." *Epic*, 67 F.4th at 979 ("Had the district court actually imposed such an absolute change-in-policy requirement, it would have erred."); *see also Deere*, 703 F. Supp. 3d at 898–99 (citing *Authenticom, Inc. v. CKD Global, LLC*, 313 F. Supp. 3d 931, 964 (N.D. Ill. 2018) and *Digit. Equip. Corp. v. Uniq Digit. Techs. Inc.*, 73 F.3d 756, 762 (7th Cir. 1996)). Here, as in the MDL Decision, "the absence of information, combined with not only [foremarket] market power but also with the other *Kodak* concerns . . . is sufficient to state a claim" for a single brand aftermarket. *Deere*, 703 F. Supp. 3d at 899.[1]

### 2. Deere's market power in the equipment foremarket is sufficient to establish a cognizable aftermarket.

In any event, Plaintiffs need not plead the *Kodak* factors because Deere possesses market power in equipment foremarkets. The central issue in *Kodak* was "whether a defendant's *lack of market power* in the [foremarket] precludes . . . the possibility of market power in derivative aftermarkets." *Deere*, 703 F. Supp. 3d at 891 (citing *Kodak*, 504 U.S. at 454). The defendant argued that there could not be "market power in the service and parts market *absent power in the equipment market*." *Kodak*, 504 U.S. at 467 (emphasis added). The Court disagreed, finding that

---

[1] Deere appears to argue that there cannot be a cognizable single-brand aftermarket unless the defendant directly participates in the aftermarket. Deere cites no authority for this argument and it is undercut by *Kodak* itself, which states that the relevant market "is composed of only *those companies* that service Kodak machines." 504 U.S. at 481–82 (emphasis added). The separate question of whether Deere must be a seller in an aftermarket to have monopoly power is addressed in Section I.B.

under some circumstances a seller in a competitive foremarket could exercise market power in an aftermarket. *Id*. at 473–77.

But the factual predicate underlying the *Kodak* decision—a competitive foremarket—is absent here. When a company has market power in the foremarket, consumers "have minimal ability to discipline the company's conduct in aftermarkets, regardless of information costs, switching costs, and general awareness of restrictions." *Tesla*, 737 F. Supp. 3d at 841.[2] Therefore, if the defendant has market power in the foremarket, the central concern of *Kodak* drops away and, with it, the need to consider the *Kodak* factors.[3] *Tesla* is a case with a similar fact pattern: a defendant that possessed market power in an equipment foremarket and allegations of a single-brand aftermarket for repair services. 737 F. Supp. 3d at 841. That court concluded that a *Kodak*-style aftermarket test "only appl[ies] to cases in which defendants do not have market power in the foremarket." *Id*. at 840. It was sufficient that the complaint pled a foremarket in which the defendant had a substantial market share. *Id*. at 841.

Thus, in lieu of the *Kodak* factors, Plaintiffs need only allege "the rough contours" of the foremarket and that "the defendant commands a substantial share of that market." *Deere*, 703 F. Supp. 3d at 889–90 (citing *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 738 (7th Cir. 2004)). The Complaint more than meets this standard, and Deere does not claim otherwise.

---

[2] Deere submitted an earlier decision in the *Tesla* case as supplemental authority in the MDL Action (*see* MDL ECF Nos. 155, 160).

[3] Economic commentary confirms that power in a foremarket can enable market power and anticompetitive conduct in aftermarkets, obviating the need to assess the *Kodak* factors. *See, e.g.*, John Yun, *App Stores, Aftermarkets, & Antitrust*, 53 Ariz. St. L.J. 1283, 1296 (2022) ("Establishing an aftermarket can satisfy this condition in many ways. The most straightforward scenario is when there is already market power in the [fore]market, which implies consumers have limited options—irrespective of the degree of lock-in."); *see also* Areeda & Hovenkamp, ANTITRUST LAW (hereinafter, "ANTITRUST LAW") ¶ 1740f (2024) ("*In the absence of power in [fore]markets* . . . substantial power in secondary markets is both relatively rare and difficult to identify.") (emphasis added).

The Complaint pleads the contours of United States markets for Large Tractors and Combines, AC ¶¶ 40–41, and alleges that Deere possesses monopoly and market power in these markets, *id.* ¶ 39. It supports these allegations with details of Deere's durable high market shares, Deere's price leadership, and substantial barriers to entry. *See* AC ¶¶ 43–47; *see also Microsoft*, 253 F.3d at 51 ("[M]onopoly power may be inferred from a firm's possession of a dominant share of a relevant market that is protected by entry barriers."); *Deere*, 703 F. Supp. 3d at 909 (substantial market shares sufficient to support an inference of market power).

Independently and taken together, the Complaint's allegations of (1) customers' inability to conduct life-cycle cost analyses and (2) Deere's market power in the equipment foremarkets are sufficient to support a plausible single-brand aftermarket.

### B. Deere Has Monopoly Power in the Restricted Repair Services Market.

The Complaint (¶¶ 59, 72) explains that Deere does not directly sell repair services for Deere equipment. Instead, restricted repair services are provided only by Deere's network of franchised dealers—to whom Deere provides the fully functional repair tool. Deere withholds this repair tool from others, creating a barrier to entry in the restricted repair services market.

Once again reprising an argument it made in the MDL Action, Deere claims that it cannot be liable for monopolization of the restricted repair services market because it is not a seller in that market. Mem. at 11. This Court rejected that argument before, and it should do so again here. As the Court correctly held, neither Deere nor alleged co-conspirators of Deere need be "sellers of repair services" for Deere to have monopoly power in that market. *Deere*, 703 F. Supp. 3d at 911–12. Instead, Deere's monopoly power can be established by "showing that Deere could control prices or exclude competition" in the relevant market. *Id.* at 911. The Complaint expressly alleges that Deere can and does exclude competition in the services market by withholding essential repair tools. AC ¶¶ 8–11, 72, 90–92, 110–117.

Section 2 of the Sherman Act is "aimed . . . at the acquisition or retention of effective market control." *United States v. Griffith*, 334 U.S. 100, 107 (1948). This market control, or "monopoly power," is "the power to control prices or exclude competition." *United States v. Grinnell*, 384 U.S. 563, 571 (1966); *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 264–65 (7th Cir. 1984) (ability to exclude competition demonstrates monopoly power). Deere's ability to exclude—and thus market control—is what Plaintiffs allege here. AC ¶¶ 72, 110–117.

Deere argues (at 12–14), without support, that the "ordinary meaning" of monopolize is limited to markets in which the defendant participates. But Section 2 prohibits monopolization of "*any* part of trade or commerce," 15 U.S.C. § 2 (emphasis added), not just the market in which the defendant is a seller. Even the late-nineteenth century Webster's Dictionary, referenced by Senators debating the Sherman Act, defined "to monopolize" as involving "appropriat[ion] *or control*" of the exclusive sale of a good. ANTITRUST LAW ¶ 103a (emphasis added).

Deere next observes that cases defining markets or measuring market power commonly refer to the market in which a defendant operates or to a defendant's market share. Of course, defendants accused of antitrust violations often are participants in the harmed market, and in such cases their own sales, competitors, or market shares can aid in defining a market or establishing market power. But a defendant's own high market share in that market is not the only way to prove market power. Rather, it is indirect evidence of the power to control prices or exclude competition. *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000) (market share "is only a way of estimating market power, which is the ultimate consideration"). Such evidence is immaterial where there is direct evidence of market power. *Id.*; *see also Kodak*, 504 U.S. at 477 (direct evidence of ability to "raise prices and drive out competition" sufficient to infer market power); ANTITRUST LAW ¶ 652c (market share is a "surrogate" for market power and

"[n]othing in the language of the Sherman Act limits its conception of monopoly to large market share").

Thus, Deere's claim that the "standards" used to assess monopoly power "presume the defendant is *in* the market" (at 12) "has things backwards." *Toys "R" Us*, 221 F.3d at 937. As a case cited by Deere explains, a defendant's large market share is probative of monopoly power *because* it confers "the power to preclude entry and advancement." *L.G. Balfour Co. v. FTC*, 442 F.2d 1, 12 (7th Cir. 1971). That "power to preclude entry" is precisely the power that Plaintiffs allege Deere holds and exercises here—and the same power that this Court deemed sufficient in rejecting Deere's participation argument in the MDL Action. 703 F. Supp. 3d at 911 ("The [MDL] Complaint's allegations plausibly establish that Deere is excluding competition; specifically, competition from independent repair shops and Deere's very own customers."); *see also In re Ranbaxy Generic Drug Application Antitrust Litig.*, 573 F. Supp. 3d 459, 470–71 (D. Mass. 2021) (firm that is not a seller in a market may still possess monopoly power where it has "ability to lessen or destroy competition in the relevant market").

Next, Deere (at 6–7) seeks to distinguish this Court's prior ruling by arguing that the Complaint here does not allege a conspiracy between Deere and its dealers. This distinction is meaningless: the Court's MDL Decision did not rely on conspiracy allegations when concluding that Deere had monopoly power in the repair services market. Rather, the Court reasoned, consistent with the analysis above, that Deere held monopoly power because (1) "Deere has the ultimate control of the Repair Services Market" and (2) "Deere excludes competition in the Repair Services Market." *Deere*, 703 F. Supp. 3d at 911.

Even if Deere were correct that Section 2 contains an implicit "participation" requirement, any such requirement is met by Deere's economic interest in and effective control

11

over the restricted repair services market. The Sherman Act condemns a defendant's use of monopoly power in one market to harm competition in a second market. *See, e.g.*, *Griffith*, 334 U.S. at 107–08. The defendant need not be a seller in the second market; the defendant need only have "some form of economic interest" in the at-risk market. *Carl Sandburg Vill. Condo. Ass'n No. 1. v. First Condo. Dev. Co.*, 758 F.2d 203, 208 (7th Cir. 1985) (describing receipt of a commission or rebate from a seller in the at-risk market as a sufficient economic interest and collecting cases). Plaintiffs allege that Deere has an economic interest in restricting repair services, including through benefits to its parts business. AC ¶¶ 84–86, 97–101.

Deere cites several out-of-circuit cases to support its claim that monopolization can only occur where the defendant directly sells the monopolized product or service. Mem. at 11–12. However, in none of the cited cases did the defendant have both effective control over the relevant market and an economic interest in excluding competition, as is alleged here. *Aquatherm Industries, Inc. v. Florida Power & Light Co.*, 145 F.3d 1258 (11th Cir. 1998), is readily distinguishable. In that case, the plaintiff, a manufacturer of solar-powered heating systems for swimming pools, sued a regulated monopoly provider of electric power under the Sherman Act for publishing misleading advertisements regarding the advantages of electric pool-heating pumps. *Id.* at 1260. This alleged conduct was not an exercise of effective control over the pool heater market because it did not harm competition in that market. *Id.* at 1262–63. There is no indication that customers in that market saw higher prices or the exclusion of potential suppliers. *Id.* In contrast, "Deere's alleged conduct excludes competitors at the cost of Deere's customers' choices to perform their own repairs or have a local repair shop perform the repairs." *Deere*, 703 F. Supp. 3d at 913; *see also* AC ¶¶ 10, 48, 53, 60, 110–12.

12

Similarly, the defendants in *Discon* and *Intergraph* both lacked the ability to control the allegedly monopolized market. *See Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1057, 1062 (2d Cir. 1996) (defendant lacked power in the relevant market), *vacated on other grounds*, 525 U.S. 128 (1998); *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1361 (Fed. Cir. 1999) (defendant's conduct not shown to have distorted competition in any market).

Under Section 2, "[i]t is sufficient that a restraint of trade or monopoly results as the consequence of the defendant's conduct or business arrangements." *Griffith*, 334 U.S. at 105; *see also Ranbaxy*, 573 F. Supp. 3d at 470–71 (defendant who does not sell in a market can monopolize it by controlling competition in the market). The presence of effective control of the market *and* an economic interest in the anticompetitive conduct serves as a limiting principle and addresses Deere's policy concern (at 14) regarding extending liability to a defendant that does not sell directly in the relevant market.

### C.  Deere's Discriminatory Distribution of its Fully Functional Repair Tool is Anticompetitive Conduct.

Deere's discriminatory distribution of its fully functional repair tool is anticompetitive conduct proscribed by Section 2 of the Sherman Act, as the Court correctly found in the MDL Decision. 703 F. Supp. 3d at 912–13. In Deere's second attempt at this issue, it claims that Plaintiffs use the wrong labels to describe its conduct, and it seeks to expand the *Trinko* no-duty-to-deal-with-rivals doctrine to encompass dealings with customers. Neither argument has merit.

A monopolist engages in anticompetitive conduct when it impairs the "opportunity to compete in a way that is inconsistent with 'competition on the merits.'" *Viamedia*, 951 F.3d at 452–53 (citation omitted). This includes "the use of monopoly power to foreclose competition, to gain competitive advantage, or to destroy a competitor." *Deere*, 703 F. Supp. 3d at 913 (citing *Kodak*, 504 U.S. at 482–83).

Plaintiffs allege that Deere's discriminatory distribution of its fully functional repair tool is anticompetitive. Rather than permitting competition on the merits in the repair services market, Deere uses its monopoly power over repair tools to compel its customers to turn to Deere dealers for repairs, "regardless of their preference or of the differences in cost, timeliness, or quality." AC ¶ 93. This impairs the ability of equipment owners and IRPs to compete on the merits for repair opportunities. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) ("When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated."). As a result, "equipment owners must pay Deere dealers' substantially higher hourly labor rates, and often are unable to obtain timely dealer service." AC ¶ 115. These allegations of anticompetitive conduct and harmful effects are sufficient to support a Section 2 claim. *Viamedia*, 951 F.3d at 462.

Deere's focus on labels and magic words such as "tying" and "course of conduct" (at 15, 19–20) is misplaced. As this Court correctly held in the MDL Action, "[i]n antitrust law, easy labels do not always supply ready answers," and thus courts "should look at substance over labels." 703 F. Supp. 3d at 903 (citing *Siva v. Am. Bd. of Radiology*, 38 F.4th 569, 572 (7th Cir. 2022)). The Court's conclusion is well founded. *See Trinko*, 540 U.S. at 414 ("'[M]eans of illicit exclusion, like the means of legitimate competition, are myriad.'") (quoting *Microsoft*, 253 F.3d at 58); *Viamedia*, 951 F.3d at 453 ("[A] dominant firm's conduct may be susceptible to more than one court-defined category of anticompetitive conduct."). "Section 2 focuses on anticompetitive conduct, not on court-made subcategories of that conduct," which "cannot always be categorized." *Duke Energy Carolinas, LLC v. NTE Carolinas II*, 111 F.4th 337, 354 (4th Cir. 2024). When conduct does not fit neatly into preordained categories, rigid application of court-made tests is disfavored. *See id.* at 354–55; *Viamedia*, 951 F.3d at 453 (Categorization of conduct

14

"should not cause confusion if we stay focused on the underlying inquiry: the conduct 'must harm the competitive *process* and thereby harm consumers'" (quoting *Microsoft*, 253 F.3d at 58)); *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1144 (7th Cir. 1983) ("[O]ur prime concern is that AT&T used its monopoly power . . . as a lever to impede or destroy competition in other markets. Nothing in this case hinges on which theory one uses to condemn AT&T's conduct.").

The Complaint plainly alleges that Deere has monopoly power in an aftermarket for fully functional repair tools and uses that power to coerce farmers to turn to Deere dealers for repair services, to the detriment of customers and IRPs and to the benefit of Deere and its dealers. AC ¶¶ 8–13. Whether labeled as "tying," "course of conduct," "discriminatory refusal to deal," or simply "monopolization," this is the same conduct and the same harm that the Court already found sufficient to sustain Section 2 claims in the MDL Action. *See* 703 F. Supp. 3d at 890–99, 913 ("Deere's alleged conduct excludes competitors at the cost of Deere's customers' choice to perform their own repairs or have a local repair shop perform the repairs, even when they could perform the repairs faster, better, and cheaper, which is anticompetitive conduct.").

Deere also claims (at 15) that its conduct is akin to a "refusal to deal" that is exempt from scrutiny. But Deere's "refusal to deal" label is misplaced. The Court should decline "to read *Trinko* so as to lessen antitrust liability in contexts other than those addressed in that opinion." *Z-TEL Commc'ns, Inc. v. SBC Commc'ns, Inc.*, 331 F. Supp. 2d 513, 547 (E.D. Tex. 2004). Unlike the line of cases Deere cites, the conduct here involves discriminatory treatment not of rivals, but of customers to whom Deere has already—and voluntarily[4]—sold expensive agricultural

---

[4] The voluntary nature of Deere's dealing with its customers further distinguishes this case from *linkLine* and *Trinko*. *See Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 & n.2

equipment, parts for that equipment, and/or degraded repair tools. "Courts have declined to 'extend[] a refusal-to-deal-with-rivals analysis' to anticompetitive restraints that a monopolist places on its customers, as opposed to its competitors." *United States v. Google LLC*, No. 1:23-cv-108, 2025 U.S. Dist. LEXIS 74956, at *169 (E.D. Va. Apr. 17, 2025) ("*Google II*") (quoting *Chase Mfg. v. Johns Manville Corp.*, 84 F.4th 1157, 1173 (10th Cir. 2023); *see also Viamedia*, 951 F.3d at 472 ("[A] tying claim does not fail as a matter of law simply because it was implemented by refusing to deal with an intermediary.").

There is no authority for treating a refusal to deal with a non-competitor as privileged conduct that is exempt from standard Section 2 review. *See Google II*, 2025 U.S. Dist. LEXIS 74956, at *169. *Trinko*, *linkLine*, and a host of Seventh Circuit decisions applying these cases make clear that the refusal-to-deal doctrine is concerned with imposing a duty to deal with *rivals*, not downstream customers. *See Trinko*, 540 U.S. at 408 ("Under certain circumstances, *a refusal to cooperate with rivals* can constitute anticompetitive conduct and violate § 2.") (emphasis added); *linkLine*, 555 U.S. 438, 448 (2009) (There are "limited circumstances in which *a firm's unilateral refusal to deal with its rivals* can give rise to antitrust liability") (emphasis added); *Viamedia*, 951 F.3d at 482 ("[E]xclusionary conduct" forced out "only *competitor* in the relevant markets") (emphasis added); *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 916 (7th Cir. 2020) ("There are 'limited circumstances' under which a monopolist's *refusal to deal with a competitor* will be illegal anticompetitive conduct.") (quoting *linkLine*, 555 U.S. at 448) (emphasis added); *Alarm Detection Sys., Inc. v. Orland Fire Prot. Dist.*, 929 F.3d 865, 873 (7th Cir. 2019) ("[Plaintiffs' requested relief] would mean demanding that Tyco sublicense its

---

(2009) (defendant's dealing with plaintiffs "arises only from FCC regulations"); *Trinko*, 540 U.S. at 409 (same).

frequencies to its *competitors*. Antitrust law usually frowns upon such duties to deal.") (emphasis added); *Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1025 (7th Cir. 2017) ("Even monopolists are almost never required to assist their *competitors* . . . .") (emphasis added); *Schor v. Abbott Labs.*, 457 F.3d 608, 610 (7th Cir. 2006) ("And antitrust law does not require monopolists to cooperate *with rivals* by selling them products that would help the rivals to compete.") (emphasis added).

Furthermore, discriminatory, ongoing dealings between a monopolist supplier and its customers do not implicate the policy foundations upon which the *Trinko* doctrine was built. *Trinko* identifies policy concerns that support limiting the antitrust duty to deal with rivals: (1) the risk that such a duty would lessen the incentives of monopolists and their rivals to invest; (2) concern that courts are ill-suited to act as "central planners" and dictate "price, quantity, and other terms of dealing;" and (3) the possibility of facilitating collusion among competitors. 540 U.S. at 407–08. The Supreme Court also noted (4) that courts should be wary of imposing antitrust liability in an area where there is already "a regulatory structure designed to deter and remedy anticompetitive harm." *Id*. at 412. None of these apply to the conduct alleged in the Complaint.

As to the first policy concern, Deere incorrectly suggests that denying farmers the fully functional repair tool somehow safeguards technological innovation. Mem. at 19. Deere wrongly focuses upon its own investment incentives, rather than market-wide incentives as *Trinko* requires. 540 U.S. at 407–08 (Imposing a duty to deal "may lessen the incentive for the monopolist, *the rival, or both* to invest") (emphasis added). And when a monopolist uses its monopoly power over an essential input (fully functional repair tools) to confer a competitive advantage in a secondary market (restricted repair services), it *reduces* market-wide investment

17

incentives in the secondary market. *See* Erik Hovenkamp, *The Antitrust Duty to Deal in the Age of Big Tech*, 131 Yale L.J. 1483, 1528 (2022) (antitrust intervention in such cases "would enhance incentives for investment in the secondary-product market"). Withholding a fully functional repair tool disincentivizes farmers and IRPs from investing in repair capabilities because they cannot offer all services. AC ¶ 119. And Deere dealers can invest less because they do not need to compete on the merits to win repair service business. *Id*.

Nor will the remedy here implicate administrability concerns. The Court need not fashion terms of dealing for the repair tool. The terms already exist because Deere licenses the product to authorized Deere dealers. AC ¶ 49. And unlike in *Trinko*, where the relevant product was "deep within the bowels" of the defendant, Deere is "already in the business of providing a service to certain customers . . . and refuse[s] to provide the same service to certain other customers." *Trinko*, 540 U.S. at 410 (citing *Otter Tail Power Co. v. United States*, 410 U.S. 366, at 370–71, 377–78 (1973)). As a result, the Court may order Deere to cease its discrimination—to offer the fully functional repair tool to IRPs and farmers on the same terms it already offers to its dealers.

The risk of horizontal collusion identified in *Trinko* is not present here because Deere would not be required to deal with its rivals—only with its customers. And finally, this case does not implicate the concern expressed in *Trinko* that antitrust enforcement might interfere with—or supplant—an existing regulatory framework that addresses competition. No such framework is alleged or exists here to deter and remedy anticompetitive harm. *See Google II*, 2025 U.S. Dist. LEXIS 74956, at *169 (holding absence of regulatory framework mandating terms of dealing weighed against application of *Trinko* doctrine).

Deere's conduct thus falls outside of the Sherman Act zone of privileged conduct that Deere seeks to invoke. Mem. 15–21. While Deere has asserted procompetitive business

justifications in response to Plaintiffs' prima facie case, such justifications are premature at the pleading stage. *See Viamedia*, 951 F.3d at 460 ("Valid business justifications are relevant only to the rebuttal of a prima facie case of monopolization.").

## II. The Amended Complaint States a Claim Under Section 5 of the FTC Act.

Section 5 of the FTC Act prohibits "[u]nfair methods of competition in or affecting commerce." 15 U.S.C. § 45(a)(1). Conduct that violates the Sherman Act or the Clayton Act also violates Section 5 of the FTC Act. *FTC v. Actavis, Inc.*, 570 U.S. 136, 145 (2013). But unfair methods of competition are "not limited to those likely to have anticompetitive consequences after the manner of the antitrust laws." *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 (1972); *see also FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454 (1986) (unfairness under Section 5 "encompass[es] not only practices that violate the Sherman Act and the other antitrust laws but also practices that . . . are against public policy for other reasons") (citation omitted); *Atl. Refining Co. v. FTC*, 381 U.S. 357, 369–70 (1965) (holding Section 5 claim can "use as a guideline [] recognized violations of the antitrust laws" but need not hew to a "mechanical application" of those doctrines).

Ignoring these well-established principles, Deere argues that Section 2 of the Sherman Act and Section 5 of the FTC Act are coextensive. Deere recasts its Section 2 arguments as the "policy" of the Sherman Act and then asks this Court to treat Section 5 as no broader than the Sherman Act. *See e.g.*, Mem. at 3 (contending that Section 5 cannot "contradict" the Sherman Act); *id* at 22 ("Section 5 cannot *negate* the Sherman Act's policy aims.").

Of course, because the Complaint states a claim under the Sherman Act, *see supra* Part I, it also states a claim under Section 5. But even if the Complaint fell short under the Sherman Act (which it does not), it would still succeed under Section 5. The Complaint's allegations describe conduct the Supreme Court has recognized as an unfair method of competition under Section 5.

19

And Deere's attacks on the claim—largely recycled from its Sherman Act arguments—have even less force in the Section 5 context.

### A. The Complaint Alleges Conduct that Courts Have Recognized as Unfair Under Section 5.

The FTC's claim here directly follows from Supreme Court precedent recognizing as an unfair method of competition (1) the use of economic power in one market (2) to curtail competition in another market (3) in which the defendant has an economic interest. *FTC v. Texaco, Inc.*, 393 U.S. 223, 229–30 (1968) (Section 5 reaches "the utilization of economic power in one market to curtail competition in another"); *Atl. Ref.*, 381 U.S. at 369 (describing such conduct as having the same "central competitive characteristic" as a tying arrangement); *see also LaPeyre v. FTC*, 366 F.2d 117, 121 (5th Cir. 1966) (affirming Section 5 violation for "the utilization of monopoly power in one market resulting in discrimination and the curtailment of competition in another," and concluding that this "approach is consistent with the broad scope of a Section 5 proceeding"); *Goodyear Tire & Rubber Co. v. FTC*, 331 F.2d 394, 395 (7th Cir. 1964) (condemning "use of economic power in one market . . . to destroy competition in another market"), *aff'd sub nom. Atl. Ref.*, 381 U.S. 357; *In re Gen. Motors Corp.*, Dkt. No. 9077, 1982 FTC LEXIS 39, at *200–02 (F.T.C. June 25, 1982) (evaluating whether General Motors unfairly used its monopoly in parts by discriminating in the distribution of those parts).

Here, Deere has monopoly power in the market for fully functional repair tools, uses that power to curtail competition in the repair services market by licensing the tool only to Deere dealers, and thereby benefits through additional parts sales. AC ¶¶ 93–101, 112–16.

First, Deere has the requisite economic power to engage in an unfair method of competition by exerting that power across markets. Deere has monopoly power in fully functional repair tools, which is insulated by barriers to entry. *Id.* ¶ 8 ("Only Deere has the

requisite information and knowledge to develop a fully functional repair tool for Deere equipment."); *see also id.* ¶¶ 43–44. And that power is not disciplined by foremarket competition. *See supra* Part I.A. Deere's power in the fully functional repair tool market exceeds the economic power found sufficient to support a claim in *Atlantic Refining* and *Texaco*. *See Atl. Ref.*, 381 U.S. at 363 n.4, 371 (finding that defendant had "marshaled . . . economic power" over its dealers, despite accounting for only 6.8% share of gasoline sales in certain states); *Texaco*, 393 U.S. at 226, 231 (finding defendant had "dominant economic power" over its dealers, despite supplying only 16.5% of all U.S. gasoline service stations).

Second, Deere has distorted competition in the secondary market (restricted repair services) to the competitive disadvantage of certain service providers in that market. Deere's discriminatory distribution of the fully functional repair tool curtails competition in the market for restricted repair services by entirely excluding both equipment owner self-repair and IRPs. AC ¶¶ 111–112, 115–116; *see also* AC ¶¶ 69, 81. Such discriminatory refusals to deal with customers can be actionable under Section 5. *Off. Airline Guides, Inc. v. FTC*, 630 F.2d 920, 925–28, 927 (2d Cir. 1980) ("*OAG*") (holding discriminatory publication of airline schedules would be actionable where defendant has a "purpose to restrain competition"); *see also Gen. Motors*, 1982 FTC LEXIS 39, at *243–48 (recognizing that discriminatory distribution of crash parts to authorized dealers may violate Section 5). The resulting harm to the competitive vitality of potential repair providers is also cognizable under Section 5. *See Atl. Ref.*, 381 U.S. at 370 (finding violation where disfavored "wholesalers and manufacturers of competing brands . . . were foreclosed" from the affected secondary markets); *Texaco*, 393 U.S. at 229–30 (finding actionable harm where disfavored sellers of secondary products "must overcome . . . the influence of the dominant oil company that has been paid to induce its dealers to buy the

21

recommended brand."); *In re Grand Caillou Packing Co.*, Dkt. 7887, 1964 FTC LEXIS 111, at *109 (F.T.C. June 4, 1964) (finding the "difficulties" of disfavored sellers in the secondary market "were greatly enhanced and, to a large extent, created by the discriminatory peeling rate"), *aff'd in relevant part sub nom. LaPeyre*, 366 F.2d at 121–22.

Lastly, Deere has an economic interest in harming competition in repair markets. That interest is established by Deere's interest in parts sales—a critical piece of Deere's overall profitability. AC ¶¶ 82–86, 94–98. Deere's interest is analogous to those recognized in *Atlantic Refining* and *Texaco*. *Atl. Ref.*, 381 U.S. at 365–66 (defendant received commissions of 7.5% or 10% on sales from favored secondary market manufacturer); *Texaco*, 393 U.S. at 227 (defendant received a 10% commission from favored secondary market manufacturer). Deere's economic interest distinguishes this case from *OAG*. In *OAG*, a publisher of flight schedules allegedly harmed competition in the airline industry by excluding from its publication certain small carriers. 630 F.2d at 922. The FTC's Section 5 claim failed because the defendant publisher did not participate in the airline industry and had no economic interest in distorting competition among airlines. *Id.* at 925 (FTC "did not find . . . 'any purpose to create or maintain a monopoly.'"). Here, in contrast, the Amended Complaint alleges that Deere has such an interest and such a purpose. AC ¶¶ 97–101.

### B. Deere's Attacks on the FTC's Section 5 Claim Improperly Equate Section 5 with the Sherman Act.

Deere asks the Court to reject the FTC's Section 5 claim because the case "does not fit within the narrow exception giving rise to a duty to deal." Mem. at 21. Deere's proposed application of no-duty-to-deal-with-rivals doctrine fails for the reasons discussed in Part I.C above. And as applied to a Section 5 claim, Deere's argument fails for additional reasons. Section 5 is meant to "supplement and bolster" the Sherman Act, *FTC v. Motion Picture Advert. Serv.*

*Co., Inc.*, 344 U.S. 392, 394–95 (1953), in part by filling "interstices" in the Sherman and Clayton Acts, *E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 136 (2d Cir. 1984). *See also L.G. Balfour*, 442 F.2d at 19–20 (holding certain Clayton Act evidentiary requirements not applicable to Section 5). Courts have developed precautionary rules to limit private plaintiffs' recovery under the Sherman Act due to concerns about costly litigation, excessive damages, or difficult line drawing. In contrast, Section 5 empowers the FTC—a body designed to be a subject matter expert without a stake in market outcomes—to carefully examine and seek to enjoin practices that may otherwise escape antitrust scrutiny. The FTC Act thus appropriately gives the FTC "a broad[er] range of flexible enforcement powers" than private plaintiffs, *Holloway v. Bristol-Myers Corp.*, 485 F.2d 986, 997 (D.C. Cir. 1973), and presents lower overdeterrence risk, since a single agency "control[s] [all] matters to be litigated," *id.* at 999, and no damages—let alone treble damages—attach to a violation.

Even if *Trinko* is read broadly for purposes of the Sherman Act, it does not follow that such a rule should apply in the different context of government enforcement of the FTC Act. No-duty-to-deal is a precautionary error-cost rule,[5] aimed in part at avoiding "interminable litigation," under which the benefits of antitrust enforcement must yield to the risk that "false condemnations" in a difficult and complex area might chill procompetitive conduct. *Trinko*, 540 U.S. at 414. This analysis produces a different outcome in the context of a Section 5 claim. *See Holloway*, 485 F.2d at 991–92 (private litigants cannot sue for violations of the FTC Act). For the reasons discussed above, the risks and potential consequences of a "false positive" finding of liability under Section 5 are far less than under the Sherman Act.

---

[5] *See* Jonathan Baker, *Taking the Error Out of Error Cost Analysis*, 80 Antitrust L.J 1, 5–7 (2015).

By contrast, the cost of failing to end Deere's illegal conduct is great. The conduct at issue in *Trinko* occurred in the context of a "regulatory structure designed to deter and remedy anticompetitive harm." 540 U.S. at 412. But there are no such guardrails here. Without an antitrust remedy, Deere can continue withholding its fully functional repair tool to the detriment of farmers and IRPs.

## III.    The FTC Has Authority to Bring this Action.

Deere seeks to escape liability for its monopolizing conduct by attacking the FTC's authority to prosecute this action. Deere contends that the combination of executive power (the FTC's litigating authority) with the removal restrictions in the FTC Act violates the Constitution and that accordingly the FTC lacks statutory authority to enforce federal law in federal court under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b). Mem. at 24–28. The Supreme Court and lower federal courts have repeatedly rejected Deere's argument that an unlawful removal restriction renders an agency powerless to fulfill its statutory mandate. The FTC (but not the State Plaintiffs) takes the position that its Commissioners are removable at will under the Constitution and thus the statutory removal restrictions are unlawful. The Court need not assess the lawfulness of the removal restrictions, however, because Deere has not shown an entitlement to relief regardless of whether FTC Commissioners are removable at will.

The constitutional validity of an agency's exercise of executive powers is determined by whether its officers were duly appointed, not by any unlawful removal restrictions. *See Collins v. Yellin*, 594 U.S. 220, 257–58 & n.23 (2021). In *Collins*, the Supreme Court held that "[s]ettled precedent . . . confirms that the unlawfulness of [a] removal provision does not strip the [executive officer] of the power to undertake the other responsibilities of his office." 594 U.S. at 258 n.23. Instead, it merely renders the *removal provision* unenforceable. Courts addressing removal-restriction challenges like this one consistently refuse to strip executive power from a

duly appointed official, and instead merely hold the removal protections unenforceable. *See Collins*, 594 U.S. at 257–58, and cases cited *infra; see also Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 508–10, 513 (2010) (disclaiming the "editorial freedom" to "restrict the Board's enforcement powers"); *Buckley v. Valeo*, 424 U.S. 1, 109, 135–37 (1976) ("The question . . . is whether, in view of the manner in which a majority of its members are appointed, the Commission may under the Constitution exercise the power conferred upon it."). There is no dispute that the Commissioners who voted to initiate this lawsuit were nominated by the President and confirmed by the Senate in accordance with the Appointments Clause, U.S. Const. art. II, § 2, cl. 2. Accordingly, even if the statutory removal provision shielding FTC Commissioners is unlawful, that does not inhibit the FTC from carrying out its other statutory authorities, such as prosecuting this action.

Deere cites (at 25–26) *Bowsher v. Synar*, 478 U.S. 714 (1986), but that case does not support stripping the FTC of its statutory authority based on an unlawful removal restriction. Indeed, in *Collins* the Supreme Court rejected the exact same argument, emphasizing that the statute at issue in *Bowsher* contained a "fallback" provision expressly prescribing a remedy if the challenged reporting procedures were found invalid. *Collins*, 594 U.S. at 259 ("[T]he [*Bowsher*] Court simply turned to the remedy specifically prescribed by Congress."). Here, in contrast, the FTC Act's separability provision does not direct severance of the grant of executive power, and therefore the ordinary remedy of invalidating removal restrictions controls. *See* 15 U.S.C. § 57. Deere also quotes *Barr v. American Association of Political Consultants, Inc.*, 591 U.S. 610, 625 (2020), for the proposition that "the proper remedy must 'limit the solution to the problem,'" but here the constitutional problem is the removal restrictions, not Section 13(b), which Deere concedes is constitutional "standing alone." Mem. at 25, 27. Moreover, *Barr* involved unequal

25

treatment under the First Amendment, so removal restrictions were not an issue in that case. *See* 591 U.S. at 632. Deere identifies no case in which a court invalidated a grant of executive power while retaining a restriction on removal, and the Court should reject Deere's request to depart from settled law.

As *Collins* described, a plaintiff may obtain relief from an exercise of executive authority by an officer protected by an unlawful removal restriction only if that plaintiff can show that the removal protection itself caused the plaintiff's harm. 594 U.S. at 259–60. For example, relief may be warranted if "the President had attempted to remove a[n officer] but was prevented from doing so by a lower court decision holding that he did not have 'cause' for removal." *Id.* at 259. Following *Collins*, federal courts of appeals consistently have denied challenges to executive actions by officers protected from removal in the absence of any showing that, but for removal protections, the official in question would have been removed and would have been unable to take the challenged action. *See, e.g.*, *NLRB v. Starbucks Corp.*, 125 F.4th 78, 87–89 (3d Cir. 2024); *Bhatti v. Fed. Housing Fin. Agency*, 97 F.4th 556, 560–62 (8th Cir. 2024); *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 756–58 (10th Cir. 2024); *Rodriguez v. Soc. Sec. Admin.*, 118 F.4th 1302, 1314–15 (11th Cir. 2024); *CFPB v. Law Offices of Crystal Moroney, P.C.*, 63 F.4th 174, 179–80 (2d Cir. 2023); *K&R Contractors, LLC v. Keene*, 86 F.4th 135, 148–49 (4th Cir. 2023); *Comm. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 631–33 (5th Cir. 2022), *rev'd on other grounds*, 601 U.S. 416 (2024); *Calcutt v. FDIC*, 37 F.4th 293, 313–17 (6th Cir. 2022), *rev'd on other grounds*, 598 U.S. 623 (2023); *Kaufman v. Kijakazi*, 32 F.4th 843, 849–50 (9th Cir. 2022).

Deere does not argue that FTC Commissioner removal protections are a but-for cause of this litigation, nor could it do so. The January 2025 Commission vote to commence this litigation

occurred during the administration of President Biden. Deere does not assert that President Biden disagreed with the Commission's vote in favor of issuing the Complaint. Nor has Deere claimed that the Commission is now only continuing to litigate with Deere because of removal protections—on the contrary, the sitting President of the United States presently asserts his authority to remove Commissioners at will. Thus, the institution and prosecution of this lawsuit against Deere bear no connection to any Commissioner's protection from removal and Deere's challenge should fail.

## IV. The Amended Complaint States Claims Under State Law.

The Plaintiff States have established *parens patriae* standing under the Clayton Act, 15 U.S.C. § 26 and their respective state statutes, through allegations supporting their quasi-sovereign interest in securing an honest marketplace and redressing injuries to their general economies. *Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 600–601 (1982).

### A. Each State Has Article III Standing.

If a state sues in a *parens patriae* capacity, it may seek injunctive relief under Section 16 of the Clayton Act. *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 260–61 (1972). A state has *parens patriae* standing when a claim implicates a quasi-sovereign interest, such as "the health and well-being—both physical and economic—of its residents in general." *Snapp*, 458 U.S. at 607. The court must also consider indirect effects of the claim on the state to determine if the injury affects "a sufficiently substantial segment of its population." *Id*. This can occur where a claim seeks "to secur[e] an honest marketplace," *Illinois v. AU Optronics*, 794 F. Supp. 2d 845, 850 (N.D. Ill. 2011), or where a claim seeks to redress injury to the "general economies" of the state. *Texas v. Penguin Group (USA) Inc.*, 14 F. Supp. 3d 525, 531–32 (S.D.N.Y 2014) ("Courts have long found that harm to States' economies caused by restraints of trade in violation of the antitrust laws constitute injuries that are cognizable in federal court.").

27

Here, two factors favor the States' standing to pursue their claims. First, each State has enacted an antitrust statute that seeks to "secur[e] an honest marketplace" for its residents, which expresses a quasi-sovereign interest. *E.g., Wisconsin v. Abbott Labs.*, 341 F. Supp. 2d 1057, 1063 (W.D. Wis. 2004) (Wisconsin antitrust law is "specific statutory authority" to pursue injunctive relief "aimed at securing an honest marketplace," giving it interest in action).[6] Moreover, each State "has enacted antitrust laws mirroring the federal antitrust laws for which it sues,"[7] which "counsels in favor of finding that Plaintiff States have parens patriae standing." *E.g., Texas v. Google LLC*, No. 4:20-957, 2025 U.S. Dist. LEXIS 15071, at *58–59 (E.D. Tex. Jan. 28, 2025) ("*Google I*") (applying *Snapp*). Second, each State alleges "threatened loss or damage by a violation of the antitrust laws, to wit, higher prices" which "go[es] beyond allegations" that alone would suffice "to confer standing on the state attorney general to sue on behalf of the state's citizens for injunctive relief." *New York ex rel. Spitzer v. St. Francis Hosp.*, 94 F. Supp. 2d 399, 421 (S.D.N.Y. 2000) (internal citation omitted); AC ¶¶ 133, 138, 143, 147, 152.

In addition, each State alleges that Deere's conduct has harmed its farmers and IRPs, including preventing the former from "maximiz[ing crop] yield." AC ¶¶ 12–13. "Although the number of persons directly harmed may be small relative to [the States'] population[s], the indirect benefits [of the States' enforcement action] accrue[] to the population at large." *Illinois v. SDS W. Corp.*, 640 F. Supp. 2d 1047, 1051 (C.D. Ill. 2009). Each State has an interest in protecting its food supply, which fuels its general economy and the health of its citizenry. *E.g.*,

---

[6] Unif. State Antitrust Act, A.R.S. § 44-1407 (Arizona); Ill. Antitrust Act, 740 ILCS 10/7(1)–(2), (4); Mich. Antitrust Ref. Act, MCL 445.777; Minn. Stat, M.S.A. § 325D.59; Wis. Stat. Ann. § 133.16.
[7] Each Plaintiff State's antitrust laws mirror federal laws. A.R.S § 44-1402; 740 ILCS 10/11; MCL 445.784(2); *State by Humphrey v. Alpine Air Prods., Inc.*, 490 N.W.2d 888, 894 (Minn. Ct. App. 1992), *aff'd*, 500 N.W.2d 788 (Minn. 1993); *City of Madison v. Hyland, Hall & Co.*, 243 N.W.2d 422, 428 (Wis. 1976).

*United States v. Agri Stats, Inc.*, No. 23-3009, 2024 U.S. Dist. LEXIS 94142, at *24–25 (D.

Minn. May 28, 2024) (harm to States' agricultural markets confers *parens patriae* standing).

Accordingly, the Complaint contains the allegations of economic harm required to confer *parens*

*patriae* standing. *See, e.g.*, *Burch v. Goodyear Tire & Rubber Co.*, 554 F.2d 633, 634–35 (4th Cir.

1977) (allegations of injury to general economy of state were sufficient to confer parens patriae

standing in antitrust suit).

　　Deere's reliance on *Missouri ex rel. Koster v. Harris*, 847 F.3d 646 (9th Cir. 2017) is

misplaced. Mem. at 28–29. Instead of only alleging harm to discrete parties like in *Koster*—an

out-of-circuit, non-antitrust case—the Plaintiff States allege harm to the economic well-being of

state residents in the form of higher prices, lower output, and less competition. *Cf. Google I*,

2025 U.S. Dist. LEXIS 15071, at *51–52. It is irrelevant whether those harms overlap with those

represented by the MDL. *Hawaii*, 405 U.S. at 261 ("[T]he United States Government, the

governments of each State, and any individual threatened with injury by an antitrust violation

may all sue for injunctive relief against . . . the same persons for the same [antitrust]

violations.").

　　For the same reasons the States can bring their federal claims, they can bring their state

claims as *parens patriae*. *Google I*, 2025 U.S. Dist. LEXIS 15071, at *60–61.

　　**B.**　　**The Plaintiff States Alleged a Continuing Antitrust Violation, Making Their Claims Timely.**

　　Deere's limitations argument ignores that the States have alleged a continuing antitrust

violation. Moreover, the Seventh Circuit "applie[s] a demanding standard to dismissals on

timeliness grounds at the pleading stage of antitrust cases, asking whether the plaintiff pleads

itself out of court." *Vasquez v. Ind. Univ. Health, Inc.*, 40 F.4th 582, 588 (7th Cir. 2022) (cleaned up). Deere has not met that standard here.[8]

An antitrust claim does not lapse when a defendant's violation continues over time. "[I]n the case of a 'continuing violation,' . . . each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (quoting ANTITRUST LAW ¶ 338b). Under this doctrine, "[t]he period of limitations for antitrust litigation runs from the most recent injury caused by the defendants' activities rather than from the violation's inception." *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 902 (7th Cir. 2004).

Here, Deere's continuing anticompetitive conduct results in various injuries—higher priced repair services, reduced services, and foreclosed business—that restart the statute of limitations. *See id.* The States allege that Deere dealers currently "charge supracompetitive prices for restricted repairs" to farmers, AC ¶ 11, and that Deere continues to deny farmers access to their choice of repair solution, *id.* ¶ 12. Moreover, Deere "continues to withhold" a fully functional repair tool from its customers. *Id.* ¶ 117. Thus, Deere's illegal conduct and its attendant harms are ongoing and each day Deere "improperly prolong[s] [its] monopoly is as much an offense against the Sherman Act as is wrongfully acquiring market power in the first place." *Xechem*, 372 F.3d at 902. Consequently, the States' claims are timely.

## CONCLUSION

The Court should deny Deere's Motion for Judgment on the Pleadings in its entirety.

---

[8] Deere ignores the Court's prior admonition in the MDL Action that "now is not the time" to resolve limitations issues. *Deere*, 703 F. Supp. 3d at 888 n.20.

Dated: April 28, 2025                     Respectfully submitted,

/s/ *Laura R. Hall*
LAURA R. HALL
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
Telephone: (202) 326-3282
Email: lhall1@ftc.gov

JOSEPH R. BAKER
JOSEPH M. CONRAD
GEOFFREY M. GREEN
AUSTIN HEYROTH
PATRICIA JERJIAN
ALOK NARAHARI
SOPHIA QASIR
SUSAN RAITT
MELISSA WESTMAN-CHERRY

*Attorneys for Plaintiff Federal Trade Commission*

FOR PLAINTIFF STATE OF ILLINOIS

KWAME RAOUL
Attorney General
/s/ *Brian M. Yost*

BRIAN M. YOST
Assistant Attorney General, Antitrust
JENNIFER M. CORONEL
Assistant Attorney General, Antitrust
ELIZABETH L. MAXEINER
Bureau Chief, Antitrust
Office of the Illinois Attorney General
115 S. LaSalle Street
Chicago, IL 60603
Telephone: (872) 276-3598
Email: Brian.yost@ilag.gov
Jennifer.coronel@ilag.gov
Elizabeth.maxeiner@ilag.gov

*Attorneys for Plaintiff State of Illinois*

FOR PLAINTIFF STATE OF ARIZONA

KRISTIN K. MAYES
Attorney General
 /s/ *Sarah Pelton*

SARAH PELTON
ROBERT A. BERNHEIM
Office of the Arizona Attorney General
Consumer Protection & Advocacy Section
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-3725
Sarah.Pelton@azag.gov
Robert.Bernheim@azag.gov

*Attorneys for Plaintiff State of Arizona*


FOR PLAINTIFF DANA NESSEL

DANA NESSEL
Attorney General
/s/ *LeAnn D. Scott*

LEANN D. SCOTT
Assistant Attorney General
Corporate Oversight Division
Michigan Department of Attorney General
P.O. Box 30736
Lansing, MI 48909
Telephone: (517) 335-7632
Email: ScottL21@michigan.gov

*Attorney for the People of Michigan*

FOR PLAINTIFF STATE OF MINNESOTA

KEITH ELLISON
Attorney General

JAMES CANADAY
Deputy Attorney General
/s/ *Elizabeth Odette*
ELIZABETH ODETTE
Manager, Assistant Attorney General,
Antitrust Division
KATHERINE A. MOERKE
Assistant Attorney General, Antitrust Division

Office of the Minnesota Attorney General
Suite 1400
445 Minnesota Street
St. Paul, MN 55101
Telephone: (651) 757-1257
Email: katherine.moerke@ag.state.mn.us
elizabeth.odette@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*


FOR PLAINTIFF STATE OF WISCONSIN

JOSHUA KAUL
Attorney General
/s/ *Caitlin M. Madden*

CAITLIN M. MADDEN
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 267-1311
Email: maddencm@doj.state.wi.us

*Attorney for Plaintiff State of Wisconsin*