IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, et al. | Case No. 3:25-cv-50017 |
| Plaintiffs, | Hon. Iain D. Johnston |
| v. | |
| DEERE & COMPANY, | |
| Defendant. | |

## **DEFENDANT DEERE & COMPANY'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE PLEADINGS**

## <u>TABLE OF CONTENTS</u>

**Page**

I.     INTRODUCTION ..................................................................................................1

II.    PLAINTIFFS DO NOT PLAUSIBLY ALLEGE A MONOPOLIZATION
CLAIM...............................................................................................................3

      A.    Plaintiffs' Efforts To Bypass *Kodak's* Requirements Fail.......................3

           1.    Plaintiffs Do Not Allege Either a Policy Change or a Lack of
Information That Satisfies *Kodak* .................................................3

           2.    Plaintiffs' Efforts to Evade *Kodak's* Pleading Requirements Fail..............5

      B.    Deere Cannot Monopolize a Market in Which It Does Not Compete....................6

      C.    Deere's Decision to Limit Distribution of its Repair Tools Does Not
Constitute Anticompetitive Conduct Under Section 2.............................9

III.   PLAINTIFFS DO NOT STATE A CLAIM UNDER SECTION 5 OF THE FTC
ACT...............................................................................................................12

IV.   THE FTC LACKS AUTHORITY TO BRING THIS ACTION .......................................15

V.    THE STATES LACK ARTICLE III STANDING...........................................................17

VI.   THE STATES' CIVIL-PENALTIES CLAIMS ARE TIME-BARRED..........................19

VII.  CONCLUSION.................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C<small>ASES</small>

*Alarm Detection Sys. v. Orland Fire Prot. Dist.,*
    129 F. Supp. 3d 614 (N.D. Ill. 2015) ..................................................................20

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
    472 U.S. 585 (1985).............................................................................................2

*Atlantic Refining Co. v. FTC,*
    381 U.S. 357 (1965)...........................................................................................14

*Barr v. Am. Ass'n of Pol. Consultants, Inc.,*
    591 U.S. 610 (2020)...........................................................................................17

*Burch v. Goodyear Tire & Rubber Co.,*
    554 F.2d 633 (4th Cir. 1977) .............................................................................18

*Carl Sandburg Vill. Condo. Ass'n No. 1 v. First Condo. Dev. Co.,*
    758 F.2d 203 (7th Cir. 1985) ...........................................................................8, 9

*Chase Mfg., Inc. v. Johns Manville Corp.,*
    84 F.4th 1157 (10th Cir. 2023) .........................................................................11

*Collins v. Yellen,*
    594 U.S. 220 (2021)......................................................................................16, 17

*Concord Boat Corp. v. Brunswick Corp.,*
    207 F.3d 1039 (8th Cir. 2000) ..........................................................................19

*Discon, Inc. v. NYNEX Corp.,*
    93 F.3d 1055 (2d Cir. 1996)................................................................................6

*Eastman Kodak v. Image Technical Services,*
    504 U.S. 451 (1992)..............................................................................1, 5, 6, 8

*Epic Games, Inc. v. Apple Inc.,*
    559 F. Supp. 3d 898 (N.D. Cal. 2021) ................................................................5

*Farag v. Health Care Service Corp.,*
    2017 U.S. Dist. LEXIS 103302 (N.D. Ill. July 5, 2017)................................19, 20

*FTC v. Motion Picture Advert. Serv. Co.*,
    344 U.S. 392 (1953)...............................................................................13

*FTC v. Texaco*,
    393 U.S. 223 (1968)...............................................................................14

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
    423 F.3d 374 (3d Cir. 2005)....................................................................5

*Illinois v. AU Optronics*,
    794 F. Supp. 2d 845 (N.D. Ill. 2011) ...................................................18

*In re Deere & Co. Repair Service Antitrust Litig.*,
    703 F. Supp. 3d 862 (N.D. Ill. 2023) ........................................3, 4, 5, 6

*In re Matter of General Motors Corp.*,
    1982 FTC LEXIS 39 (FTC June 25, 1982)...........................................14

*In re Ranbaxy Generic Drug Application Litig.*,
    573 F. Supp. 3d. 459 (D. Mass. 2021) ...................................................8

*Journal Co. v. United States*,
    342 U.S. 143 (1951)...............................................................................11

*L.G. Balfour Co. v. FTC*,
    442 F.2d 1 (7th Cir. 1971) ......................................................................8

*Lambrix v. Tesla, Inc.*,
    737 F. Supp. 3d 922 (N.D. Cal. 2024) ...................................................5

*LaPeyre v. FTC*,
    366 F.2d 117 (5th Cir. 1966) ................................................................13

*Marbury v. Madison*,
    5 U.S. 137 (1803)..................................................................................16

*New York ex rel. Spitzer v. St. Francis Hosp.*,
    94 F. Supp. 2d 399 (S.D.N.Y. 2000)....................................................19

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) ............................................................13

*Off. Airline Guides, Inc. v. FTC*,
    630 F.2d 920 (2d Cir. 1980)...........................................................13, 15

*SaurikIT, LLC v. Apple, Inc.*,
    2023 WL 8946200 (9th Cir. Dec. 28, 2023) ...........................................................20

*Schor v. Abbott Labs.*,
    457 F.3d 608 (7th Cir. 2006) ...................................................................................6

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
    591 U.S. 197 (2020)................................................................................................16

*Slaughter v. Trump*,
    No. 1:25-cv-00909 (D.D.C. Mar. 27, 2025) ..........................................................16

*Texas v. Google LLC*,
    764 F. Supp. 3d 500 (E.D. Tex. 2025)..............................................................17, 18

*Toys "R" Us, Inc. v. FTC*,
    221 F.3d 928 (7th Cir. 2000) ...................................................................................8

*United States v. Agri Stats*,
    2024 U.S. Dist. LEXIS 94142 (D. Minn. May 28, 2024).......................................18

*United States v. Colgate & Co.*,
    250 U.S. 300 (1919)..................................................................................................9

*United States v. Google LLC*,
    2025 WL 1132012 (E.D. Va. Apr. 17, 2025) .................................................10, 11

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966)..................................................................................................7

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*,
    540 U.S. 398 (2004)..............................................................................11, 12, 13, 15

*Wisconsin v. Abbott Laboratories*,
    341 F. Supp. 2d 1057 (W.D. Wis. 2004) ...............................................................17

*Xechem, Inc. v. Bristol-Myers Squibb Co.*,
    372 F.3d 899 (7th Cir. 2004) ...........................................................................19, 20

**STATUTES**

15 U.S.C. § 1 ..................................................................................................................8

15 U.S.C. § 2 ..................................................................................................8, 9, 12, 15

**OTHER AUTHORITIES**

Areeda & Hovenkamp, ANTITRUST LAW (2024) ..............................................................7

Oxford English Dictionary (2d ed. 1989) .....................................................................7

Webster's Dictionary ....................................................................................................7

## I.       INTRODUCTION

Plaintiffs' Opposition confirms that they bring even less to the table than the complaint in the MDL and intentionally plead a different case. Apparently hoping nevertheless to ride the MDL plaintiffs' coattails, Plaintiffs *say* their complaint is "premised on the same conduct" as the MDL and invite the Court to rubberstamp their complaint on this basis. Opp. at 1. In reality, despite having years of pre-complaint discovery, Plaintiffs offer fewer factual allegations and fewer legal theories, and instead stake their case on a single theory that was not present in the MDL: that Deere unilaterally monopolized a market in which it does not compete by refusing to deal with those who do. This theory is novel, conflicts with decades of settled case law, and would require the Court to indulge unprecedented expansions of antitrust doctrine. Plaintiffs' Opposition offers nothing that warrants such a leap.

Plaintiffs confirm that their case rests on defining a single-brand aftermarket for repair services under *Eastman Kodak v. Image Technical Services*, 504 U.S. 451 (1992). Opp. at 4-5. But, unlike the MDL plaintiffs, Plaintiffs do not allege deception or a change in policy, insisting that such allegations are unnecessary. According to Plaintiffs, every firm that has market power in a primary market, or deals in products that are difficult to lifecycle price, is a *de facto* monopolist in the aftermarket for its own goods. *Id.* at 5-9. This theory sweeps far beyond what this Court previously held and what *Kodak* itself could have imagined, which is reason enough to reject it.

For the monopolization claim, Plaintiffs admit that they abandoned the MDL's conspiracy allegations and that Deere does not participate in the relevant market, but assert that none of this should matter. *Id.* at 11. In their view, outsiders can unilaterally monopolize a market by exerting control over it or reaping some economic benefit from it. *Id.* at 11-12. Plaintiffs do not cite a single case adopting such a theory—and every circuit to address the issue has held that firms cannot unilaterally monopolize markets in which they do not compete. This Court should decline

Plaintiffs' invitation to discard the till-now unbroken understanding—supported by the plain meaning of the Sherman Act—that "monopolization" requires firms to be *in* the market.

As for exclusionary conduct, Plaintiffs agree that they are not alleging tying as the MDL plaintiffs did, but only a refusal to deal. Yet, rather than allege any conduct similar to that in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), Plaintiffs attempt to sidestep the limits on the refusal-to-deal doctrine through a sleight of hand. When it comes to alleging monopolization and market power in the repair services market, Plaintiffs insist that Deere has an "economic interest in excluding competition" from farmers and IRPs. Opp. at 12. But when it comes to duty to deal, Plaintiffs assert that farmers and IRPs are Deere's "customers," even though they are indisputably not customers *in the relevant market* (i.e., for repair services). *Id.* at 15. Plaintiffs cannot have it both ways. If Deere has monopolized the repair services market, then the relationship between Deere and the farmers and IRPs is, in effect, one of *rivalry*—meaning Plaintiffs must satisfy *Aspen Skiing* to plausibly allege a duty to deal, which they make no effort to do.

Finally, to hedge the risk that the Court refuses to upend Sherman Act jurisprudence on so many fronts, Plaintiffs ask the Court to bless the same theory under Section 5 of the FTC Act, which Plaintiffs tout as "broader" than the Sherman Act. *Id.* at 1. There is a reason Plaintiffs do not cite a single Section 5 case imposing liability on anything like the facts alleged here. All agree Section 5 is designed to support and bolster the Sherman Act. Section 5 thus cannot be used to upend the careful guardrails courts have placed around doctrines like refusal to deal for the express purpose of safeguarding the policies of antitrust.

Apart from the merits, the suit suffers from other defects as well. The FTC lacks the constitutional authority to bring this suit, the States lack standing to press their claims, and, in all

events, the State's civil-penalty demand is time-barred. Deere thus respectfully requests that the Court grant its Motion for Judgment on the Pleadings and dismiss the complaint with prejudice.

## II. PLAINTIFFS DO NOT PLAUSIBLY ALLEGE A MONOPOLIZATION CLAIM

Plaintiffs' Opposition confirms they neither satisfy *Kodak* nor plead a single-brand aftermarket. Plaintiffs agree that Deere does not compete in the allegedly restrained aftermarket, meaning they cannot establish that Deere has monopolized that market. And Plaintiffs point only to Deere's "discriminatory distribution" of its repair tools to establish anticompetitive conduct, yet they do not claim to satisfy any exception to the refusal-to-deal doctrine. Each of these pleading failures is fatal to their monopolization claim.

### A. Plaintiffs' Efforts To Bypass *Kodak's* Requirements Fail

#### 1. Plaintiffs Do Not Allege Either a Policy Change or a Lack of Information That Satisfies *Kodak*

Plaintiffs do not allege that Deere changed its repair policies, which they admit have been in place for "decades." Opp. at 6-7; *see* Am. Compl. ¶ 1. That is a remarkable concession, given that MDL plaintiffs alleged a change in Deere's aftermarket policies, and that alleged change was central to this Court's conclusion that they had pleaded a single-brand aftermarket under *Kodak*. *See In re Deere & Co. Repair Service Antitrust Litig.*, 703 F. Supp. 3d 862, 898 (N.D. Ill. 2023) ("MDL Order") (finding that a policy change is an "important" factor in an aftermarket analysis under *Kodak*); *id.* at 893-95 (discussing the alleged change in Deere's policies). Instead, Plaintiffs argue that Deere's customers lack knowledge and information regarding the lifecycle costs for their Deere equipment. *See* Opp. at 6. But the Complaint's allegations show the opposite.

In the MDL, the Court indicated that *Kodak* requires a "showing of a lack of consumer awareness regarding aftermarket restrictions." MDL Order at 899. On that understanding, this Court held that MDL plaintiffs sufficiently alleged a relevant aftermarket based on Deere's alleged

3

policy change and their "pages" of allegations "setting forth Deere's alleged history of making various representations that purchasers could repair their own Tractors" when the alleged "reality was that they couldn't." *Id*. at 893-94; *see also id.* at 895. The Court also held that those *same allegations* "taken in totality and in conjunction with [an alleged] lack of knowledge based on unavailability of information sufficiently states a *Kodak*-like claim." *Id.* at 896. The Court concluded that MDL plaintiffs sufficiently alleged "an absence of information that would allow a farmer to know of Deere's monopolistic repair policies" by claiming, with specific examples, that Deere falsely represented that farmers could repair their equipment and supposedly obfuscated the lifecycle cost of repairs. *Id.* at 899.

Plaintiffs' Opposition confirms *they* do not make the same allegations. Plaintiffs admit they do not allege any policy change regarding Deere's aftermarket repair policies. *See* Opp. at 7. Nor do they allege Deere misrepresented customers' ability to repair their own equipment, or ever "committed to mak[ing] comprehensive repair tools, Software, and diagnostics available to the public." MDL Order at 893-93. Instead, they claim the opposite: that Deere has always opposed right-to-repair legislation and consistently refused to make a "fully functional repair tool available to farmers [and] IRPs" because it was not required to do so. Am. Compl. ¶¶ 14-18; *compare id. with* ECF No. 85, Dkt. 22-cv-50188 ("MDL Complaint") ¶¶ 128-54. Plaintiffs allege only that "Deere's customers cannot calculate lifecycle pricing" because it "does not consistently make" that information "available to customers," repairs do not "arise consistently or predictably," and there allegedly is uncertainty as to whether a given repair can be performed by an IRP as opposed to a Deere dealer. Opp. at 6; *compare* Am. Compl. ¶¶ 74-77 *with* MDL Compl. ¶¶ 141-43, 226. Those allegations do not plausibly demonstrate a lack of "awareness regarding [Deere's] aftermarket restrictions," MDL Order at 899, particularly given Plaintiffs' express allegation that

4

Deere's policies have been in place, and unchanged, for "decades." Am. Compl. ¶ 1. *See Harrison Aire, Inc. v. Aerostar Int'l, Inc.,* 423 F.3d 374, 384-85 (3d Cir. 2005) (there could be no relevant aftermarket where the defendant's "aftermarket policy was transparent and known to [the plaintiff] at all relevant times"); *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1022 (N.D. Cal. 2021) (there can be no "*Kodak*-type single-brand aftermarket where customers had knowledge of the alleged restrictive policies and were not subject to a post-purchase policy change").

Tellingly, Plaintiffs relegate to a footnote their response to Deere's argument (Def. MJOP Mem., Dkt. 110 ("Mot.") at 10) that there can be no aftermarket under *Kodak* where the defendant does not participate in the aftermarket. Opp. at 7 n.1. They argue that Deere's lack of participation in the alleged repair services aftermarket is irrelevant. Opp. at 7 n.1. Plaintiffs, however, cite no case finding a single-brand aftermarket where neither the defendant nor any alleged co-conspirators participated in the alleged aftermarket (in *Kodak* itself, Kodak participated in the repair services aftermarket). 504 U.S. at 481-82.

## 2. Plaintiffs' Efforts to Evade *Kodak's* Pleading Requirements Fail

Unable to satisfy *Kodak*, Plaintiffs cite a single out-of-circuit district court decision to argue that *Kodak*'s pleading requirements do not apply if they plead that Deere has market power in the foremarket. *See* Opp. at 7-9 (citing *Lambrix v. Tesla, Inc.*, 737 F. Supp. 3d 922 (N.D. Cal. 2024)). Plaintiffs' argument ignores controlling Seventh Circuit law.

As this Court recognized, the Seventh Circuit has indicated that *Kodak* controls *regardless* of whether the defendant allegedly has market power in the foremarket. *See* MDL Order at 892 ("[T]he Seventh Circuit framed *Kodak's* holding this way: 'What the Supreme Court held is not that firms with market power are forbidden to deal in complementary products, but that they can't do this in ways that take advantage of customers' sunk costs.'") (quoting *Schor v. Abbott Labs.*, 457 F.3d 608, 614 (7th Cir. 2006)). Because there is no "rule against selling products that

complement those in which the defendant has market power," *Kodak* governs even where a firm allegedly has market power in the foremarket. *Schor*, 457 F.3d at 614. Indeed, this Court held that market power in the foremarket is only one of several relevant factors. MDL Order at 899.

Moreover, *Kodak* rejected the type of categorical rule that Plaintiffs advance. There, the Supreme Court refused to adopt Kodak's argument that competition in the foremarket is always sufficient to prevent market power in a related aftermarket. 504 U.S. at 467 (rejecting *Kodak's* "presumption against a finding of market power" in the repair services aftermarket where there was competition in the equipment foremarket). The categorical rule that Plaintiffs urge here—that market power in the foremarket is sufficient to plead market power in an aftermarket, *see* Opp. at 7-9—cannot be squared with *Kodak*. If adopted, that rule would have absurdly far-reaching consequences, as every firm with market power would be a *de facto* monopolist in every aftermarket for its own goods—exactly the opposite of the Seventh Circuit's holding in *Schor*.

### B.  Deere Cannot Monopolize a Market in Which It Does Not Compete

All agree that Deere does not compete in the alleged repair services aftermarket, which alone is sufficient to reject Plaintiffs' monopolization claim. Plaintiffs argue that this Court ruled otherwise in the MDL. Opp. at 9. But, there, space constraints led the parties to "blast through" the argument, which was not in any event case-dispositive due to the horizontal conspiracy alleged by the MDL plaintiffs. MDL Order at 911. Now, with the benefit of fuller briefing, on an issue that would be case-dispositive here, the Court should not feel bound by its prior decision.

Courts have repeatedly rejected the proposition that a firm can "monopolize a market in which it does not compete." *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1062 (2d Cir. 1996), *vacated on other grounds*, 525 U.S. 128 (1998); *see* Mot. at 11-12 (collecting cases). This makes sense because, as a matter of ordinary meaning, a defendant cannot *monopolize* something it does not even sell. Mot. at 12. Plaintiffs disagree, pointing to a nineteenth-century Webster's

6

Dictionary and to Section 2's prohibition on monopolizing "*any* part of trade or commerce." Opp. at 10 (quoting 15 U.S.C. § 2). But the Webster's definition—from which Plaintiffs selectively quote—in fact supports this rule: "to monopolize" means "[t]o purchase or *obtain possession of the whole of*, as a commodity or goods in market, with the view to appropriate or control the exclusive sale of." Areeda & Hovenkamp, ANTITRUST LAW ¶ 103a (2024) (emphasis added). Modern dictionaries are in accord. *See Monopoly*, def. 1a, Oxford English Dictionary (2d ed. 1989) ("the condition of having *no competitor* in the sale of some commodity, or in the exercise of some trade or business") (emphasis added). As for the "any part" language, the issue is not *what part* of commerce is being monopolized, but whether the defendant is monopolizing it. A defendant cannot monopolize—that is, "hav[e] no competitor in" or "obtain possession of the whole of"—a market in which it has zero-percent market share.

Plaintiffs cannot point to a single case holding otherwise. Instead, relying on *United States v. Grinnell Corp.*'s definition of "monopoly power," Plaintiffs argue that Deere has monopolized the repair services market because it supposedly has "the power to control prices or exclude competition" in that market. Opp. at 10. But in *Grinnell*, the defendant not only competed in the relevant market, it had obtained a dominant share of it. 384 U.S. 563, 567, 576 (1966). The Court thus had no occasion to consider whether companies can monopolize markets in which they do not compete, nor is there any hint that the Court had that issue in mind. The only plausible reading of *Grinnell* is that it offered a definition of monopoly power as the standard for assessing whether a firm has monopolized *its own* market. Where a defendant is not in the market, *Grinnell* does not apply.

The additional cases that Plaintiffs cite are likewise inapposite. Opp. at 10-11. In *Toys "R" Us*, *L.G. Balfour*, and *Kodak*, the defendants unquestionably participated in the relevant

7

market. *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 930 (7th Cir. 2000); *L.G. Balfour Co. v. FTC*, 442 F.2d 1, 12 (7th Cir. 1971); *Kodak*, 504 U.S. at 455. And *Ranbaxy* involved a soon-to-be seller in the relevant market—the defendant pharmaceutical company allegedly abused FDA generic drug approval applications to wrongfully acquire exclusivity periods to foreclose would-be competitors in the relevant generics market. *In re Ranbaxy Generic Drug Application Litig.*, 573 F. Supp. 3d 459, 465 (D. Mass. 2021). *Ranbaxy* thus does not support Plaintiffs' novel rule that a defendant can monopolize a market in which it neither competes nor has taken steps to compete.

Plaintiffs alternatively suggest that even if Deere must participate in the repair services market, it need only have "some form of economic interest" in that market. Opp. at 12 (quoting *Carl Sandburg Vill. Condo. Ass'n No. 1 v. First Condo. Dev. Co.*, 758 F.2d 203, 208 (7th Cir. 1985)). But *Sandburg* involved a tying claim under Section 1, as opposed to a monopolization claim under Section 2. 758 F.2d at 206. That distinction matters because Section 1 and Section 2 prohibit different conduct. Whereas Section 2 prohibits "monopoliz[ing]" trade or commerce, Section 1 prohibits agreements "in restraint of trade or commerce." 15 U.S.C. §§ 1, 2. Unlike monopolization, which necessarily implies participation in the market, a firm can plainly enter an agreement to "restrain[] trade" whether or not it is in the affected market. Section 1 tying cases thus have no bearing on the meaning of "monopolization" under Section 2.

Moreover, even if an "economic interest" sufficed, Plaintiffs' allegations fall short. *Sandburg* held that, to establish a Section 1 tying claim, the tying seller must have "some form of economic interest in the sale of the tied product, such as the receipt of a commission or rebate." 758 F.2d at 208. Plaintiffs do not allege that Deere receives any sort of commission or rebate for repair services; instead, Plaintiffs claim only that Deere benefits in yet another market through increased part sales. Am. Compl. ¶¶ 84-86, 97-101. But an "interest in stimulated sales" in some

8

*other* market is not enough to constitute an "economic interest" in the sale of the *tied* product. *Sandburg*, 758 F.2d at 209. Accordingly, even if *Sandburg* were relevant to Section 2 claims, Deere's alleged interest in stimulated sales of *parts* would not establish an economic interest in the market for *repair services*.

In sum, Plaintiffs offer no reason for this Court to be the first to hold that a defendant can monopolize a market in which it has zero-percent market share. Because Deere does not compete in the repair services market, Plaintiffs' Section 2 claim must fail.

### C. Deere's Decision to Limit Distribution of its Repair Tools Does Not Constitute Anticompetitive Conduct Under Section 2

But even if Deere could monopolize a market without participating in it, Plaintiffs' Section 2 claim still fails because Deere has no duty to deal with any players in that market.

Plaintiffs' Opposition makes clear that their allegations of anticompetitive conduct rest solely on Deere's supposed "discriminatory distribution of its fully functional repair tool," *i.e.*, its refusal to deal with farmers and IRPs. *See* Opp. at 13; *see also* Mot. at 15. This is significant, because the Sherman Act generally "does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919). The only exception is where a plaintiff alleges conduct similar to that in *Aspen Skiing Co. See* Mot. 16-17. Yet Plaintiffs do not even cite *Aspen Skiing*, let alone claim that their allegations satisfy its exception. Instead, Plaintiffs stake their case on confining the refusal-to-deal doctrine to refusals to deal with rivals, not customers. Opp. at 15-16.

Even if valid, this rule hardly helps Plaintiffs. The relevant market for their monopolization claim is the market for repair services. Yet Deere has no customers in that market: Deere does not provide repair services or receive a cut from anyone who does. To be sure, farmers are customers

9

of Deere in *other* markets—*e.g.*, tractor markets—but that is irrelevant to whether Deere has a duty to deal *in the repair services market* it has allegedly monopolized. Plaintiffs cite *United States v. Google LLC*, which they characterize as declining to apply the refusal-to-deal doctrine to "customers," but all the customers were customers in the relevant antitrust market. *See* 2025 WL 1132012, *43 (E.D. Va. Apr. 17, 2025) ("*Google II*"). And Plaintiffs cite no case finding a customer relationship in a non-relevant market to have any bearing on the refusal-to-deal doctrine.

The need to play fast and loose in describing Deere's relationships highlights a fundamental contradiction at the heart of Plaintiffs' position. When it comes to market power, Plaintiffs tout Deere's alleged "effective control over" and "economic interest in excluding competition" in the repair services market. Opp. at 12. Under this theory, Deere's relationship with the players in that market (farmers and IRPs) is effectively one of rivalry—Deere is attempting to "exclud[e] competition" from farmers and IRPs in order to advance its own economic interests in that market. But when it comes to duty to deal, Plaintiffs change their tune: farmers and IRPs are now "customers," not rivals, such that the refusal-to-deal doctrine does not apply. Opp. at 15-16. Plaintiffs cannot have it both ways. If their monopolization theory is correct, then the relationship between Deere and the farmers and IRPs is, in effect, one of *rivalry*—putting the refusal-to-deal doctrine squarely in play. And because Plaintiffs do not even attempt to fit their claim within the *Aspen Skiing* exception, they have not plausibly alleged anticompetitive conduct.

But even if indulging the fiction that farmers and IRPs are Deere's customers (nevermind that they are not customers in the alleged relevant market), Plaintiffs have not established that Deere has a duty to deal with them. Plaintiffs rely on *Google II* (Opp. at 16), but that case merely held that *Trinko* does not apply when the defendant refuses to do business with customers who

also do business with a competitor[1] or when the defendant imposes unlawful tying, bundling, or exclusive-dealing arrangements on a customer. 2025 WL 1132012, at *43. Plaintiffs advance no such allegation here. They have not alleged that Deere refuses to sell to customers that purchase from a competitor. Nor have Plaintiffs alleged an unlawful tying, bundling, or exclusive-dealing arrangement.

Plaintiffs also contend that forcing Deere to make its repair tools available to farmers and IRPs "on reasonable and non-discriminatory" terms does not implicate the "policy foundations upon which the *Trinko* doctrine was built." Opp. at 17. Plaintiffs argue that there are no administrability concerns and that the Court would not need to "fashion terms of dealing for the repair tool" because the Court could simply order Deere to offer its repair tools to farmers and IRPs on the "same terms it already offers to its dealers." *Id.* at 18. That is wrong. Plaintiffs' requested relief runs headlong into the *Trinko* problem: compelling Deere to make its repair tools available to farmers and IRPs would force the Court to play the role of central planner. The Court would have to "identif[y] the proper price, quantity, and other terms of dealing," including determining to whom Deere must make its repair tools available, whether the "same terms" that are currently provided to Deere dealers are warranted (or not) for every purchaser, and what those "terms" are—"a role for which [courts] are ill suited." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 408 (2004); *see* Mot. at 18-19.

Forced sharing of Deere's repair tools would also risk dampening innovation, which the antitrust laws are designed to safeguard. *See* Mot. at 19; Opp. at 17-18. A central tenet of *Trinko*

---

[1] *See id.* at *43 (citing *Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157 (10th Cir. 2023) (defendant allegedly refused to sell to distributors that bought from a competitor); *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951) (newspaper allegedly refused to accept advertising from firms that advertised with competing radio station)).

is a belief that innovation is fostered by allowing individual participants to reap the benefits of their own innovation, not by compelling them to "share the source of their advantage." *Trinko*, 540 U.S. at 407-08. All firms will be reluctant to invest in innovation if they must share the fruits of their efforts and risk-taking with others, and others will be tempted to free-ride if antitrust law allows them to do so. *See also* Mot. at 18-19.

Deere has no duty to make its repair tools available to farmers and IRPs. Its decision to limit distribution of its repair tool thus does not qualify as exclusionary conduct.

## III. PLAINTIFFS DO NOT STATE A CLAIM UNDER SECTION 5 OF THE FTC ACT

The FTC's Section 5 claim rests on the exact conduct as the Section 2 claim—Deere's refusal to provide the Repair Tool to anyone who wants it. *See* Opp. 20. The Sherman Act does not impose a duty to deal in this situation. *See supra* Part II.C. And because that conclusion follows from limits expressly designed to safeguard the policies of antitrust, Section 5 cannot be used to impose a duty to deal here without warring with the policies of the Sherman Act.

The FTC does not cite a single case imposing a duty to deal on anything resembling the allegations in this case. Instead, the FTC assures the Court that its Section 5 claim should survive because the FTC Act is generally "broader" than the Sherman Act. Opp. at 19. But whatever daylight may exist, Section 5 cannot be used to *undermine* the policies of the Sherman Act. Yet that is exactly what the FTC demands.

In its motion, Deere explained how courts have cabined refusal-to-deal claims for the express purpose of safeguarding the policy of the antitrust laws. As courts consistently remind, allowing monopolists to choose with whom and on what terms they deal avoids stunting the incentive of monopolists and other firms to innovate, and ensures courts do not play central planner in the market. *See, e.g.*, *Trinko*, 540 U.S. at 407-08; *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013). For this reason, the Supreme Court has confined the refusal-to-deal

12

doctrine to conduct similar to that in *Aspen Skiing*. And since the FTC makes no effort to fit its allegations within that case, its duty-to-deal claim fails and cannot be resurrected under Section 5. Otherwise, rather than "supplement and bolster" the Sherman Act, Section 5 would *undermine* the Act by eliminating the guardrails courts have placed on refusal-to-deal claims. *See FTC v. Motion Picture Advert. Serv. Co.*, 344 U.S. 392, 394-95 (1953).

Unsurprisingly, Plaintiffs have not identified a single case recognizing a Section 5 claim under analogous facts. *See* Opp. at 20-22. On the contrary, the Second Circuit rejected a Section 5 claim nearly identical to Plaintiffs' claim here. *See* Mot. at 22-23. In *Airline Guides*, the defendant, who had a monopoly in the publication of flight schedules, refused to publish the schedules of certain carriers, making it more difficult for those carriers to compete in the airline market. *Off. Airline Guides, Inc. v. FTC*, 630 F.2d 920, 921-922 (2d Cir. 1980). The court declined to impose a duty to deal on the publisher. *Id.* at 927. The court noted that, like Deere, the publisher did not even compete in the market where competition was allegedly constrained, and also distinguished several cases that the FTC relies on here.

The Second Circuit distinguished *LaPeyre v. FTC*, 366 F.2d 117 (5th Cir. 1966), on the ground that the defendant-monopolist had curtailed competition "in another market in which [it] was also engaged." *Airline Guides*, 630 F.2d at 925-26; *see LaPeyre*, 366 F.2d at 118. And the court emphasized that the "elements of coercion" in *Atlantic Refining* and *Texaco* distinguish those decisions from cases involving "mere refusal[s] to deal." *Airline Guides*, 630 F.2d at 927 n.4.

Indeed, the presence of coercion in *Atlantic Refining* and *Texaco* was central to those decisions. In *Atlantic Refining Co. v. FTC*, 381 U.S. 357 (1965), Atlantic agreed to assist Goodyear in selling its products at Atlantic's service stations in return for commission payments, and Atlantic then coerced and threatened its affiliated gas stations to sell Goodyear's products or

13

risk losing their status as affiliates. *Id.* at 366. The Supreme Court recognized that the agreement was not, on its face, "a tying arrangement," but explained that due to Atlantic's coercion, "the effect of the plan was as though Atlantic had agreed with Goodyear to require its dealers to buy Goodyear products and had done so." *Id.* at 369-70; *see also FTC v. Texaco*, 393 U.S. 223, 228-29 (1968) (finding defendant's methods of inducing its dealers to purchase a particular brand were "inherently coercive").

Plaintiffs' claims against Deere look nothing like *LaPeyre*, *Atlantic Refining*, or *Texaco*. Deere does not participate in or receive commissions from the relevant market for repair services, and Plaintiffs do not claim that Deere coerced or threatened anyone, whether its dealers or the farmers and IRPs. Deere simply chooses to provide its Repair Tool only to its authorized dealers. Thus, unlike in *Atlantic Refining*, where the defendant's conduct was directly analogous to conduct that would violate the Sherman Act, Deere's conduct does not remotely resemble an actionable refusal to deal or unlawful tie.[2]

Plaintiffs have little to say in response to *Airline Guides*, pointing only to the court's statement that a monopolist is under no duty to deal "as long as he has no purpose to restrain competition or to enhance or expand his monopoly." 630 F.2d at 927-28; Opp. at 21-22. The court's formulation—restrain competition or enhance monopoly—tracks the language of Section 1 (agreements in "restraint of trade or commerce") and Section 2 ("monopolize any part of the trade or commerce") of the Sherman Act. In other words, the court suggested a defendant could be liable under Section 5 if it had a purpose to violate Section 1 or Section 2. *See* 630 F.2d at 926.

---

[2] Plaintiffs also point to *In re Matter of General Motors Corp.*, 1982 FTC LEXIS 39 (FTC June 25, 1982). But there, the FTC *dismissed* a complaint alleging that General Motors' decision to sell "new crash parts" only to its own dealers violated Section 5. *Id.* at *168; *see also id.* at *157 ("[I]t is still the law that a supplier may choose the customers with whom it will do business.").

14

Here, Plaintiffs do not claim that Deere sought to engage in conduct that violates Section 1, as they do not allege that Deere entered any sort of agreement in restraint of trade. Nor do they plausibly allege that Deere sought to monopolize a market without ever attempting to itself compete in it. And, regardless, such fleeting, unreasoned dicta is too paltry a basis to justify the dramatic and unprecedented expansion of Section 5 that the FTC demands here.

Finally, as a fallback, the FTC argues that *Trinko* and refusal-to-deal precedent do not apply to a Section 5 enforcement action because that doctrine is supposedly a "precautionary error-cost rule" intended to avoid "interminable litigation." Opp. at 23. But *Trinko's* concern that courts should not be the "day-to-day enforcer" of compelled sharing arrangements holds whether the plaintiff is a private party or the FTC. 540 U.S. at 408, 415. And limits on the refusal-to-deal doctrine are not borne from concerns about "limit[ing] private plaintiffs' recovery under the Sherman Act," Opp. at 23, but from policy concerns that would be squarely implicated by imposing a duty to deal on Deere under Section 5. Thus, the policy rationales that doom the Section 2 claim likewise foreclose the FTC's attempt to state a Section 5 claim predicated on the same conduct.

## IV.    THE FTC LACKS AUTHORITY TO BRING THIS ACTION

The FTC's new view (apparently not shared by the States) that FTC "Commissioners are removable at will," and that the removal restrictions in Section 41 of the FTC Act are unconstitutional, *see* Opp. at 24, is irrelevant and does not save the FTC's claims.

Deere does not challenge Section 41's removal restrictions. *See* Mot. at 25. Rather, Deere argues that Congress violated Article II when it amended Section 13(b) to grant the FTC the power to enforce the FTC Act by seeking permanent injunctive relief in federal court because the FTC is an independent agency that lacks executive power. *See id.* at 24-26. And because Section 13(b) was an "unconstitutional statutory amendment" when enacted, the proper remedy is to invalidate

15

Section 13(b), as "an unconstitutional statutory amendment is a nullity and void." *Id.* (quoting *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 631 (2020)).

The FTC does not squarely address Deere's argument regarding Section 13(b). *See* Opp. at 24-27. Instead, the FTC argues that the unlawfulness of Section 41's removal restrictions does not strip the FTC of its enforcement authority and that Deere has not shown that it has been harmed by those restrictions. *See id*. But this does not rebut Deere's argument that Section 13(b) was unconstitutional when enacted.[3]

Because the FTC, under *Humphrey's Executor*, was a valid independent agency *before* Congress unconstitutionally purported to grant it executive powers in Section 13(b), *see* Mot. at 24-25, this case is unlike others where the agency had executive powers from the outset and the removal restrictions at issue were never constitutionally enforceable. *See, e.g.*, *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 230-37 (2020) (holding that the structure of the Consumer Financial Protection Bureau was unconstitutional from the agency's inception). Likewise inapposite is the holding in *Collins v. Yellen*, 594 U.S. 220, 252 (2021), that the agency action at issue could not be set aside unless the challenger showed prejudicial harm from the unconstitutional removal restriction. *See* Opp. at 24-25. Unlike in *Collins*, where the Federal Housing Finance Agency Director lawfully possessed "the authority to carry out the functions of the office" because the removal restriction was unenforceable and severable, *Collins*, 594 U.S. at 258, the FTC's suit here "involve[s] a Government actor's exercise of power that the actor did not

---

[3] The FTC is not the arbiter of the constitutionality of the removal restrictions. *See Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). While the President recently purported to fire two Commissioners, they have sued to enjoin their removal, arguing that the "attempted removals [are] unlawful and ineffective" and are "in direct violation of a century of federal law and Supreme Court precedent." *Slaughter v. Trump*, Case No. 1:25-cv-00909 (D.D.C. Mar. 27, 2025), Dkt. No. 1, at 2-3.

16

lawfully possess," as Congress's attempt in 1973 to vest the FTC with executive litigation powers were "void ab initio," *id.* at 258; *accord Barr*, 591 U.S. at 630 (plurality op.). The FTC's changing views of the removal restrictions thus do not save its enforcement authority.

## V.    THE STATES LACK ARTICLE III STANDING

Plaintiffs' Opposition confirms that the States lack Article III standing to bring their claims in their sovereign capacity or under a *parens patriae* theory. The States do not contest that they lack standing in their sovereign capacities, thus conceding the argument. *See* Mot. at 28; Opp. at 27-29. As for *parens patriae* standing, the States argue that each has enacted an antitrust statute to secure an honest marketplace, and that each has an interest in protecting its food supply, which fuels its economy and the health of its citizens. Opp. at 27-29. Both arguments fail.

*First*, the mere existence of a state antitrust statute is not enough to confer *parens patriae* standing, *see* Opp. at 28, as it would essentially do away with the Article III standing requirement in antitrust cases, for virtually all states have antitrust statutes. None of the States' cited cases hold otherwise. In *Wisconsin v. Abbott Laboratories*, the court did not address whether Wisconsin had *parens patriae* standing, and ultimately held that it lacked subject matter jurisdiction over the State's claims. *See* 341 F. Supp. 2d 1057 (W.D. Wis. 2004). And in *Texas v. Google LLC*, the court's recognition of the states' *parens patriae* standing did not turn on the existence of any state's antitrust statute. *See* 764 F. Supp. 3d 500 (E.D. Tex. 2025). Rather, the court explained that the states provided "detailed and extensive allegations" describing how Google's allegedly anticompetitive conduct "injured the economic well-being of their residents and ha[d] affected substantial segments of their citizenries," and the states sought damages beyond those for the

allegedly aggrieved publishers and advertisers. *Id.* at 518-20.[4] No such allegations appear in Plaintiffs' Amended Complaint.

*Second*, the Amended Complaint does not allege that the States aim to protect their food supplies, economies, or the health of their citizens. The States rely on their allegation that "Deere's restrictions deprive farmers of the use of their own repair labor, deny them access to their preferred repair service provider, prevent them from more reliably planting, spraying, or harvesting crops on a schedule that would allow them to maximize yield," but those allegations say nothing about protecting any state's food supply or the health of its citizens. Opp. at 29 (quoting Am. Compl. ¶¶ 12-13).[5] Instead, the States' allegations only confirm that they seek to vindicate the rights of private parties who are already suing Deere for damages and injunctive relief. *See* Mot. at 28-29.

Likewise, the States allege that farmers and IRPs within their borders paid supracompetitive prices for repair services, but nowhere explain how that conduct harmed anyone else or the States' "general economies." *See, e.g.*, Am. Compl. ¶ 133; *see also id.* ¶¶ 27-31 (alleging in conclusory fashion that each State wishes to "protect" "its general economy"). The States' cases confirm their pleading deficiencies because, in each, the states alleged actual injury to the state economy. *See Burch v. Goodyear Tire & Rubber Co.*, 554 F.2d 633, 634-35 (4th Cir. 1977) (Maryland alleged "injury to the general economy" of the state); *New York ex rel. Spitzer v. St. Francis Hosp.*, 94 F. Supp. 2d 399, 421 (S.D.N.Y. 2000) (holding New York alleged injury to a "sufficiently substantial segment of its population" resulting from hospital's allegedly anticompetitive practices that increased rates paid by insurers, which were passed to policy

---

[4] *Illinois v. AU Optronics*, 794 F. Supp. 2d 845 (N.D. Ill. 2011), s*ee* Opp. at 27, is irrelevant. There, the court held that it lacked diversity jurisdiction because the State of Illinois was a real party in interest. 794 F. Supp. 2d at 856.

[5] *United States v. Agri Stats*, 2024 U.S. Dist. LEXIS 94142, at *25 (D. Minn. May 28, 2024), is inapposite because it does not address whether the plaintiff states had *parens patriae* standing.

holders). There are no comparable, non-conclusory allegations here.

The States fail to allege any "quasi-sovereign" interest that is "sufficiently concrete" and "apart from the interests of particular private parties," and thus lack *parens patriae* standing.

## VI. THE STATES' CIVIL-PENALTIES CLAIMS ARE TIME-BARRED

The States attempt to avoid the limitations periods for their civil-penalties claims by arguing that they allege a "continuing violation," *see* Opp. at 29-30, but they do not plausibly allege any overt act. Under the continuing violation doctrine, the limitations period "for antitrust litigation runs from the most recent injury caused by the defendants' activities rather than from the violation's inception." *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 902 (7th Cir. 2004). The "recent injury" "must be a *new* and *independent act* that is not merely a reaffirmation of a previous act and must inflict new and accumulating injury on the plaintiff." *Farag v. Health Care Service Corp.*, 2017 U.S. Dist. LEXIS 103302, at *26 (N.D. Ill. July 5, 2017) (quotation and citations omitted, emphasis added). Conduct that "simply reflect[s] or implement[s] a prior refusal to deal or acts that are merely unabated inertial consequences (of a single act) do not restart the statute of limitations." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1052 (8th Cir. 2000).

The States allege no "new exclusionary acts" within the limitations period sufficient to restart the statute of limitations. The States point to "higher priced repair services, reduced services, and foreclosed business" within the limitations period, Opp. at 30, but those purported injuries flow from Deere's same "decades" long repair restrictions, so are not new overt acts. *See SaurikIT, LLC v. Apple, Inc.*, 2023 WL 8946200, at *1 (9th Cir. Dec. 28, 2023) (holding that sales of devices with an allegedly unlawful warranty term during the limitations period was not an "overt act" that could restart the limitations period); *Farag*, 2017 U.S. Dist. LEXIS 103302, at *27 ("If the mere charging of a monopoly price constitutes a 'continuing violation' tolling the statute, then

19

we have indefinitely lengthened the statute of limitation on claims of successful monopolization." (quoting ANTITRUST LAW ¶ 320)); *Alarm Detection Sys. v. Orland Fire Prot. Dist.*, 129 F. Supp. 3d 614, 633 (N.D. Ill. 2015) ("acts that simply reflect or implement a prior refusal to deal or acts that are merely inertial consequences (of a single act) do not restart the statute of limitations") (cleaned up); *cf. Xechem,* 372 F.3d at 902 ("The complaint alleges that Bristol–Myers committed *new exclusionary acts*," including "listing the third patent … within the four-year period preceding the complaint," and those "new acts extended the period during which Bristol–Myers held a monopoly, causing additional antitrust injury.") (emphasis added). Because the States plead no new exclusionary act sufficient to restart the limitations period, their claims should be dismissed as time-barred.

## VII.   CONCLUSION

For the foregoing reasons, the Court should grant Deere's motion for judgment on pleadings in its entirety and dismiss Plaintiffs' claims.

Dated:  May 28, 2025

Respectfully submitted,

**JONES DAY**

By: _/s/ Lin W. Kahn_

John M. Majoras (*pro hac vice*)
David Morrell (*pro hac vice forthcoming*)
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, DC  20001.2113
Telephone: +1.202.879.3939
Facsimile: +1.202.626.1700
Email: jmmajoras@jonesday.com
dmorrell@jonesday.com

Lin W. Kahn (*pro hac vice*)
**JONES DAY**
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: +1.415.626.3939
Facsimile: +1.415.875.5700
Email: lkahn@jonesday.com

Tiffany D. Lipscomb-Jackson (*pro hac vice*)
**JONES DAY**
325 John H. McConnell Boulevard,
Suite 600
Columbus, OH 43215-2673
Telephone: +1.614.469.3939
Facsimile: +1.614.461.4198
Email: tdlipscombjackson@jonesday.com

Corey A. Lee (*pro hac vice*)
**JONES DAY**
North Point
901 Lakeside Ave E
Cleveland, OH 44114-1190
Telephone: +1.216.586.3939
Facsimile: +1.216.579.0212
Email: calee@jonesday.com

Ryan Thomas (*pro hac vice*)
Lauren Miller Forbes (*pro hac vice*)
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, DC 20001.2113
Telephone: +1.202.879.3939
Facsimile: +1.202.626.1700
Email: rcthomas@jonesday.com
lmillerforbes@jonesday.com

Sean M. Berkowitz (IL Bar No. 6209701)
Gary Feinerman (IL Bar No. 6206906)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: +1.312.876.7700
Facsimile: +1.312.993.9767
Email: sean.berkowitz@lw.com
gary.feinerman@lw.com

Amanda P. Reeves (*pro hac vice*)
Tara D. Elliott (*pro hac vice*)
Ian R. Conner (*pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
Telephone: +1.202.637.2200
Facsimile: +1.202.637.2201
Email: amanda.reeves@lw.com
tara.elliott@lw.com
ian.conner@lw.com

Belinda S Lee (*pro hac vice*)
Meaghan Thomas-Kennedy (*pro hac vice*)
**LATHAM & WATKINS LLP**
505 Montgomery Street
Suite 2000
San Francisco, CA 94111-6538
Telephone: +1.415.391.0600
Facsimile: +1.415.395.8095
Email: belinda.lee@lw.com
meaghan.thomas-kennedy@lw.com

*Attorneys for Defendant Deere & Company*