IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, et al. | Case No. 3:25-cv-50017 |
| Plaintiffs, | Hon. Iain D. Johnston |
| v. | |
| DEERE & COMPANY, | |
| Defendant. | |

## <u>CITED AUTHORITY FROM ELECTRONIC DATABASES IN SUPPORT OF DEFENDANT DEERE & COMPANY'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE PLEADINGS</u>

1. *Farag v. Health Care Service Corp.,*
   2017 U.S. Dist. LEXIS 103302 (N.D. Ill. July 5, 2017)

2. *In re Matter of General Motors Corp.,*
   1982 FTC LEXIS 39 (FTC June 25, 1982)

3. *SaurikIT, LLC v. Apple, Inc.,*
   2023 WL 8946200 (9th Cir. Dec. 28, 2023)

4. *United States v. Agri Stats,*
   2024 U.S. Dist. LEXIS 94142 (D. Minn. May 28, 2024)

5. *United States v. Google LLC,*
   2025 WL 1132012 (E.D. Va. Apr. 17, 2025)

Exhibit 1

 Cited
As of: May 28, 2025 9:27 PM Z

## *Farag v. Health Care Serv. Corp.*

United States District Court for the Northern District of Illinois, Eastern Division

July 5, 2017, Decided; July 5, 2017, Filed

Case No. 17 C 2547

**Reporter**

2017 U.S. Dist. LEXIS 103302 *; 2017-1 Trade Cas. (CCH) P80,047; 2017 WL 2868999

TAREK FARAG and SOONA FARAG, Plaintiffs, v. HEALTH CARE SERVICE CORPORATION, d/b/a BLUE CROSS BLUE SHIELD OF ILLINOIS and NOVARTIS PHARMACEUTICALS CORPORATION, Defendants.

## Core Terms

patent, antitrust, purchasers, valsartan, BCBSIL, generic, merger, prices, statute of limitations, allegations, copay, supracompetitive, indirect, monopoly, damages, manufacturers, side effect, monopolization, inventors, anti trust law, motion to dismiss, fraudulent, paying, declaratory judgment, Sherman Act, subject-matter, time-barred, brand-name, procured, accrued

**Counsel: [*1]** Tarek Farag, Plaintiff, Pro se, St. Charles, IL.

Soona Farag, Plaintiff, Pro se, St. Charles, IL.

For Health Care Service Corporation, d/b/a Blue Cross Blue Shield of Illinois, Defendant: Michael H. McColl, LEAD ATTORNEY, Foran, Glennon, Palandech Ponzi & Rudloff PC, Chicago, IL.

For Novartis Pharmaceuticals Corporation, Defendant: Jeffrey Mark Wagner, LEAD ATTORNEY, Kaye Scholer, Chicago, IL; Saul P. Morgenstern, LEAD ATTORNEY, Kaye Scholer LLP, New York, NY; Emily Newhouse Dillingham, Arnold & Porter Kaye Scholer LLP, Chicago, IL; Mark Godler, PRO HAC VICE, Arnold & Porter Kaye Scholer LLP, New York, NY.

**Judges:** Harry D. Leinenweber, United States District Judge.

**Opinion by:** Harry D. Leinenweber

## Opinion

## MEMORANDUM OPINION AND ORDER

Before the Court are Motions to Dismiss filed by Defendant Novartis Pharmaceuticals Corporation ("Novartis") [ECF No. 16] and Defendant Health Care Service Corporation d/b/a Blue Cross Blue Shield of Illinois ("BCBSIL") [ECF No. 15]. For the reasons to follow, the Court dismisses Plaintiffs' claims against Novartis with prejudice under *Rule 12(b)(1)* or, alternatively, under *Rule 12(b)(6)*. Absent those federal question claims, the Court declines to hear Plaintiffs' state law claims against BCBSIL or rule on the latter's **[*2]** Motion. Instead, the Court remands the balance of the case to Kane County Circuit Court.

### I. BACKGROUND

Plaintiffs Tarek and Soona Farag (referred to collectively as "Plaintiffs" and individually as "Tarek" or "Soona") have employer-sponsored health insurance coverage through Defendant BCBSIL. (ECF No. 1 at Ex. 1 ("Compl.") ¶ 1.) Tarek has high blood pressure, and his doctors have tried many medications to treat his condition. (*Id.* ¶ 4.) All have caused side effects with the exception of the brand-name drug Diovan, manufactured by Defendant Novartis, which Tarek's doctors "settled on and prescribed for him long before January 2011." (*Ibid.*) For a brief period "[a]round the beginning of 2013," Tarek tried taking the generic form of Diovan (valsartan), but it "caused him serious side effects." (*Id.* ¶ 5.) Unsurprisingly, valsartan had a cheaper copay than Diovan, for which Tarek paid $30.00 until around June 2013 (when BCBSIL increased the copay for Diovan to $50.00). Plaintiffs allege that the overall price of a one-month supply of Diovan was about $207 during 2013, $270 during 2014, $310 during 2015, and about "$400 during 2017." (*Id.* ¶ 25.)

On April 11, 2015, Tarek's doctor prescribed him

twice **[*3]** his usual dose of Diovan. (Compl. ¶ 7.) At some point thereafter, Tarek took medication for numbness in his hands, which caused his blood pressure and heart rate to collapse, leading his doctor to advise that Tarek stop taking Diovan and only add it back into his medication regimen as he recovered. (*Id.* ¶ 8.) On September 19, 2015, Tarek sought to refill his Diovan prescription and expected to pay his usual $50 copay. However, BCBSIL refused to cover it on the same terms it had previously and instead requested "preauthorization" from Tarek's doctor. (*Id.* ¶ 9.) Tarek's doctor completed the required forms, but BCBSIL denied coverage because Tarek had not taken Diovan "for more than 90 days." (*Id.* ¶ 10.) As a result, BCBSIL required that Tarek pay $173.11 instead of $50.00. (*Id.* ¶ 11.) Despite placing several calls to BCBSIL, Tarek was unable to get the company to remedy the situation. (*Id.* ¶¶ 12-13, 15-17.) On these calls, BCBSIL agents typically justified the denial of coverage on the grounds that Diovan is considered "a Step Therapy medication," requires preauthorization, is dispensed in prescriptions that are valid only for one year, must be taken "for the past 90 days to qualify **[*4]** for the copay of $50," and must be precipitated by an attempt to take the generic. (*Id.* ¶ 27.) Tarek continued taking Diovan and paying the higher rate "with accumulated difference of about $700." (*Id.* ¶ 14.)

Proceeding *pro se*, Plaintiffs filed suit against BCBSIL on May 19, 2016 in Kane County Circuit Court. On May 24, 2016, Tarek "was in a very stressful situation due to the ongoing court case and the denial of his proper coverage, which caused his blood pressure to go high and fluctuate in a dangerous way that caused him symptoms of a stroke." (Compl. ¶ 19.) He was rushed to the hospital and, roughly $16,000 later, restored to good health. (*Ibid.*) The Kane County court dismissed the claims in Plaintiffs' original complaint without prejudice, and Plaintiffs then filed an Amended Complaint against BCBSIL on October 5, 2016. BCSBIL moved to dismiss the Amended Complaint, and the court obliged - dismissing two claims with prejudice and two claims without prejudice. On March 1, 2017, Plaintiffs amended again, this time adding Novartis as a defendant. This is the operative Complaint.

On the basis of federal question jurisdiction over patent and antitrust claims that Plaintiffs brought against **[*5]** Novartis, Defendants removed the Complaint to this Court on April 4, 2017. (ECF No. 1 ¶¶ 3-6.) Both Defendants now move to dismiss all counts.

## II. LEGAL STANDARD

When considering a motion to dismiss a complaint, the Court accepts the facts stated in the complaint as true and draws reasonable inferences in favor of the plaintiff. *Newell Operating Co. v. Int'l Union of United Auto., Aerospace, and Agr. Implement Workers of Am., 532 F.3d 583, 587 (7th Cir. 2008).* A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers. *Erickson v. Pardus, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007).*

Although the Federal Rules of Civil Procedure do not require a complaint to include "detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* (internal citations omitted). To survive a *Rule 12(b)(6)* motion, "the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Independent Trust Corp. v. Stewart Info. Servs. Corp., 665 F.3d 930, 934 (7th Cir. 2012)* (internal quotation marks omitted). The plausibility standard, while not akin to a probability requirement, "asks for more than a sheer possibility that a defendant has acted unlawfully." **[*6]** *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (citation omitted). Where a complaint pleads facts that are merely consistent with liability, it "stops short of the line between possibility and plausibility." *Id.* (internal quotation marks omitted).

Standing is an essential component of Article III's case-or-controversy requirement. *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). Rule 12(b)(1)* allows a party to raise by motion a federal court's lack of subject-matter jurisdiction, including a lack of standing. *See, Ret. Police Ass'n v. City of Chicago, 76 F.3d 856, 862 (7th Cir. 1996).* The plaintiff then bears the burden of establishing jurisdiction with competent proof of jurisdictional facts. *Scanlan v. Eisenberg, 669 F.3d 838, 841-42 (7th Cir. 2012).*

## III. ANALYSIS

### A. Novartis

2017 U.S. Dist. LEXIS 103302, *6

Against Novartis, Plaintiffs seek a judgment for at least $18,000, compensatory damages, punitive damages, costs and attorneys' fees. They do not seek injunctive relief. According to Plaintiffs, the inventors listed on Novartis' U.S. Patent No. 6,294,197 ("the '197 patent"), which covers a tablet form of valsartan "mixed with additives by compression," are not the same inventors that Novartis lauded for inventing Diovan, meaning that Novartis committed fraud on the United States Patent and Trademark Office ("the PTO") by listing the wrong inventors on the face of the '197 patent. (Compl. ¶ 30.) Plaintiffs further allege that, because the "generic drug for Diovan" caused Tarek "serious side effects **[*7]** whereas Diovan did not, Novartis defrauded the PTO by seeking protection for a patent that (it knew) flunked the enablement requirement of _35 U.S.C. § 112(a)_. (_Id._ ¶¶ 5, 31.) Plaintiffs claim that - ostensibly through these actions and by emerging from the 1996 merger of "two giants Ciba-Geigy and Sandoz" - Novartis has wrongfully "kept others away from manufacturing or selling Diovan or its generic Valsartan" and "unlawfully monopolize[d] the market for Diovan," allowing it to charge higher prices for Diovan than generic drug manufacturers charge for valsartan. (_Id._ ¶¶ 30, 33.)

Without citing any provision of law authorizing their claims, Plaintiffs bring three counts against Novartis: "fraudulently claiming that Novartis' team is the inventors of Diovan," "fraudulently claiming that it has patent protection for Diovan and monopolizing it," and "violating the antitrust laws and abusing of [_sic_] monopoly power." (Compl. ¶¶ 30-32.) The Court finds these counts best characterized as a _Walker Process_ claim based on fraudulent procurement of the '197 patent and its subsequent unlawful monopolization under _Section 2_ of the Sherman Act, _15 U.S.C. § 2_, plus a claim under _Section 7 of the Clayton Act_, _15 U.S.C. § 18_, challenging the merger that spawned Novartis as "obvious[ly] . . . against **[*8]** the antitrust laws." (Compl. ¶ 33.) (To the extent Plaintiffs might be seeking relief under the _Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/3_, it is preempted inasmuch as it relates to the _Walker Process_ claim. Because there is "simply no theory for proving a _Walker Process_ antitrust violation in this case that would not require a showing of misconduct before the PTO," "federal patent law preempts any state antitrust cause of action premised on [such] conduct before the PTO." _In re Ciprofloxacin Hydrochloride Antitrust Litig., 363 F.Supp.2d 514, 543 (E.D.N.Y. 2005)_; _see also, Semiconductor Energy Lab. Co., Ltd. v. Samsung Elecs. Co., Ltd., 204 F.3d 1368, 1382 (Fed. Cir. 2000)_ (finding preemption where "the wrong alleged and for which state tort damages [were] sought [was] no

more than bad faith misconduct before the PTO"); _accord, In re K-Dur Antitrust Litig., No. 01-1652, 2007 U.S. Dist. LEXIS 100238, 2007 WL 5297755, at *24-25 (D.N.J. Mar. 1, 2007)_.)

Novartis moves to dismiss Plaintiffs' counts against it both on _Rule 12(b)(1)_ subject-matter jurisdiction and _Rule 12(b)(6)_ plausibility grounds. Novartis maintains that the Court does not have jurisdiction to grant Plaintiffs their requested relief because neither Plaintiff has standing to challenge the validity or enforceability of the '197 patent - or any patent Novartis holds on Diovan. In the same vein, Novartis asserts that Plaintiffs lack antitrust standing and that their complaint fails to allege a plausible monopolization violation under federal or state antitrust law. Finally, Novartis contends **[*9]** that Plaintiffs' claim for damages is time-barred.

## 1. Declaratory Judgment of Invalidity or Unenforceability

Article III of the Constitution requires an actual "case" or "controversy" between litigating parties before a court may adjudicate a dispute. A party may bring an action under the _Declaratory Judgment Act_ only if an "actual controversy" exists, "which is the same as an Article III case or controversy." _Arris Group, Inc. v. British Telecomms. PLC, 639 F.3d 1368, 1373 (Fed. Cir. 2011)_ (citations omitted). The party seeking a declaratory judgment must show an Article III case or controversy at the time it filed for declaratory relief. _Id. at 1373_ (citing _King Pharms., Inc. v. Eon Labs., Inc., 616 F.3d 1267, 1282 (Fed. Cir. 2010))_. When the underlying merits of the declaratory judgment action involve issues of conduct before the PTO, Federal Circuit law controls whether an actual controversy exists. _Minnesota Mining & Mfg. Co. v. Norton Co., 929 F.2d 670, 672 (Fed. Cir. 1991)_.

This Court must ask whether "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." _MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 132 n.11, 127 S. Ct. 764, 166 L. Ed. 2d 604 (2007)_. A proper dispute must "admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." _Id. at 127_ (internal quotation marks **[*10]** omitted). "A mere adverse _economic_ interest is insufficient to create declaratory judgment jurisdiction."

2017 U.S. Dist. LEXIS 103302, *10

*Arris, 639 F.3d at 1374-75* (emphasis in original).

Plaintiffs' interest in having the '197 patent declared invalid or unenforceable is adverse to Novartis' interest only in a pure economic sense, and is thus far too attenuated to support jurisdiction under the *Declaratory Judgment Act*. At best, securing such a judgment would merely inhibit Novartis from excluding competitors, thus leading indirectly to a decrease in the price of Diovan for Tarek. Indeed, Federal Circuit law suggests that purchasers of goods covered by a patent who do not compete with the patentee and otherwise face no threat of an action for infringement "cannot challenge [the] patent's validity or enforceability through a declaratory judgment action." *Ritz Camera & Image, LLC v. SanDisk Corp., 700 F.3d 503, 506 (Fed. Cir. 2012)*.

The Court therefore dismisses Plaintiffs' claims to the extent they can be construed as a plea for a declaratory judgment that the '197 patent is invalid or unenforceable as a result of fraud on the PTO.

## 2. Walker Process Antitrust Action

As the Court lacks subject-matter jurisdiction to issue a declaratory judgment, Plaintiffs' claims relying on Novartis' alleged misconduct before the PTO resemble antitrust claims **[*11]** under *Walker Process Equip., Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 174, 86 S. Ct. 347, 15 L. Ed. 2d 247 (1965)* ("[T]he enforcement of a patent procured by fraud on the Patent Office may be violative of *§ 2 of the Sherman Act* provided the other elements necessary to a *§ 2* case are present."). *Walker Process* allows a plaintiff to strip a patent holder of its exemption from the antitrust laws if its patent was procured by fraud. *Id. at 177*. (That a claimant may otherwise lack entitlement to a declaratory judgment remedy does not preclude *Walker Process* relief. *See, Ritz Camera, 700 F.3d at 506*.)

### a. Standing

The Court must first determine whether Plaintiffs have standing to bring a *Walker Process* claim, as each of their counts invokes Novartis' alleged fraudulent conduct in procuring the '197 patent. As a question ancillary to patent matters, antitrust standing turns on regional circuit law. *See, Shuffle Tech Int'l, LLC v. Scientific Games Corp., No. 15 C 3702, 2015 U.S. Dist. LEXIS 138741, 2015 WL 5934834 at \*9 (N.D. Ill. Oct. 12, 2015)*. The Seventh Circuit has not determined whether

end users of patented products who did not purchase them from the patentee have standing to assert a *Walker Process* claim. Courts in the Second, Third, and Ninth Circuits have engaged the issue at some length and, even viewed in the light most favorable to Plaintiffs, they lack standing under those cases to pursue a *Walker Process* claim.

First, Novartis' patent is not "already tarnished" by a finding of inequitable **[*12]** conduct. *In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 691-92 (2d Cir. 2009)* (conferring antitrust standing on purchaser plaintiffs to pursue *Walker Process* claim because the patents at issue were "already unenforceable due to inequitable conduct"). Rather, Plaintiffs are seeking to litigate the inequitable conduct issues in tandem with their *Walker Process* antitrust claim. Thus, Plaintiffs do not fall within *DDAVP's* conferral of standing on *Walker Process* claimants suing on patents found previously to have been procured by fraud.

Nor are Plaintiffs direct purchasers of Diovan from Novartis. *See, e.g., Ritz Camera & Image, LLC v. SanDisk Corp., 772 F.Supp.2d 1100 (N.D. Cal. 2011)* (finding that direct purchasers had standing to bring Sherman Act monopolization claim alleging that manufacturers of flash memory devices enforced fraudulently obtained patents), *aff'd, Ritz Camera, 700 F.3d 503 (Fed. Cir. 2012)*; *Molecular Diag. Labs. v. Hoffmann-La Roche, Inc., 402 F.Supp.2d 276, 282 (D.D.C. 2005)* ("[D]irect purchasers have standing to pursue *Walker Process* claims."). Rather, pharmaceutical companies like Novartis typically provide their manufactured drugs to wholesalers or distributors, who then furnish them to pharmacies, who in turn dispense them to patients like Tarek.

Accordingly, Plaintiffs are *indirect* purchasers with respect to Novartis, and courts confronted with such situations decline to find *Walker Process* standing. *See, e.g., In re K-Dur Antitrust Litig., 2007 U.S. Dist. LEXIS 100238, 2007 WL 5297755, at \*18* ("If this Court were to conclude **[*13]** that *indirect* purchasers had standing to bring *Walker Process* claims, it would turn antitrust policy on its head, and extend antitrust standing to an extraordinary level[.]"); *In re Ciprofloxacin, 363 F.Supp.2d at 542* (holding that non-infringing consumers of patented products complaining of supracompetitive prices have no cause of action to invalidate the patent). Nonetheless, the Federal Circuit in *Ritz Camera* made clear that *Walker Process* standing should be interpreted in light of regional circuit law on antitrust standing. *See, Ritz Camera, 700 F.3d at 506-07*. As

such, the Court examines the question more closely in view of Seventh Circuit law that a private plaintiff, to have antitrust standing, must plausibly allege (1) that it suffered an antitrust injury and (2) that it is an acceptable plaintiff to pursue the alleged antitrust actions. *See,* _Gatt Commc'ns, Inc. v. PMC Assocs., LLC, 711 F.3d 68, 76 (7th Cir. 2013)_.

*1. Antitrust injury*

Plaintiffs fail to allege a cognizable antitrust injury. First, the Complaint clearly states that at least one form of generic valsartan is available on the market. As such, to the extent Novartis has market power, it is not maintaining it by erecting (insurmountable) barriers to generic entry. Second, the gravamen of the Complaint is that Novartis has injured Plaintiffs by charging higher **[*14]** prices (to direct purchasers, indirectly leading to higher copays) than generic manufacturers charge for generic valsartan. Standing alone, this is hardly revelatory and fails to clear the _Twombly_ hurdle: A brand-name drug's higher prices are equally consistent (if not more so) with unilateral exercise of individual market power, which does not violate the antitrust laws. *See,* _Schor v. Abbott Labs., 457 F.3d 608, 610 (7th Cir. 2006)_ ("The price of Norvir cannot violate the Sherman Act: a patent holder is entitled to charge whatever the traffic will bear."); *accord,* _In re Brand Name Prescription Drugs Antitrust Litig., 186 F.3d 781, 786-87 (7th Cir. 1999)_.

Thus, Seventh Circuit law suggests that the harm Plaintiffs complain of is not a cognizable antitrust injury.

*2. Acceptable plaintiff*

The Court finds further that Plaintiffs are not a proper antitrust plaintiff to bring a *Walker Process* claim against Novartis. Although federal courts have devised a panoply of tests to determine whether an injured party is a proper antitrust plaintiff, two bear particular relevance for the analysis here.

First, _Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S. Ct. 2061, 52 L. Ed. 2d 707 (1977)_, limits damages actions under *Section 4 of the Clayton Act* to direct purchasers. _Id. at 735_. As indirect purchasers (who purchased Diovan at pharmacies or through intermediary health plans), Plaintiffs have no cognizable Clayton Act damages claim based on **[*15]** charges that direct purchasers of Diovan may have passed on to them.

(*See,* Section III.A.3.a.1, *infra.*)

Second, and more specific to Sherman Act claims, is the balancing test in _Associated Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters, 459 U.S. 519, 536-45, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)_. There, the Supreme Court crafted a multi-factor "direct injury" barometer of whether the plaintiff is a proper party to bring a private antitrust action. These factors are (1) the causal connection between the violation and the harm; (2) the presence of improper motive; (3) the type of injury and whether it was one Congress sought to redress; (4) the directness of the injury; (5) the speculative nature of damages; and (6) the risk of duplicate recovery and complex damage apportionment. _Loeb Indus., Inc. v. Sumitomo Corp., 306 F.3d 469, 484 (7th Cir. 2002)_ (citing _Associated Gen., 459 U.S. at 537-45_).

As applied to Plaintiffs' Complaint, too many of these factors are left wanting. Plaintiffs do allege in the barest terms possible an improper motive on the part of Novartis with respect to conduct before the PTO, but their allegation of its improper motive ("greed") in charging higher prices for Diovan than generic manufacturers charge for valsartan is of dubious sufficiency - particularly because greed is not an unlawful motive. *See,* _Schor, 457 F.3d at 610_. As mentioned previously, the causal connection is loose, the directness of the **[*16]** injury oblique. Further, the damages are speculative; Plaintiffs cannot with a straight face claim that brand-name drugs should cost the same as generics, meaning that "to obtain damages the plaintiffs would have to separate the price effects of [unlawful monopoly activity] from the price effects of the defendant[']s lawful market power." _Brand Name Prescription Drugs, 186 F.3d at 786_ (citing _Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic, 152 F.3d 588, 593-94 (7th Cir. 1998))_. There also seems a risk of duplicate recovery and complex damages apportionment, because more direct purchasers as well as insurance carriers pay a significant portion of any unlawfully supracompetitive prices that Novartis might be found to charge.

Working within this "direct injury" framework, recent Seventh Circuit cases have found that indirect purchasers lack antitrust standing. For example, where consumers of aluminum-containing products brought an antitrust action against aluminum manufacturers, the court held that such indirect purchasers were not participants in the aluminum market merely "by creating a demand for aluminum." _In re Aluminum Warehousing_

*Antitrust Litig., 833 F.3d 151, 161-62 (7th Cir. 2016)*. Their injuries similarly were not a "necessary step" in carrying out the alleged anti-competitive conspiracy, but instead "down the distribution chain" and "purely incidental," as the alleged scheme would **[*17]** have been just as effective from the defendants' point of view if direct purchasers paid supracompetitive prices without passing that cost on to consumers. *Id. at 162*. The same is true in this case. Plaintiffs cannot claim to be participants in the Diovan market merely because Tarek, by having high blood pressure (and experiencing side effects from valsartan), creates demand for Diovan. Novartis did not need to injure indirect purchasers like Tarek for the alleged monopolization to work; all it requires is for Novartis' *direct* purchasers - namely, drug wholesalers or distributors - to pay monopoly prices, irrespective of whether they would pass that cost on to pharmacies, or pharmacies to ultimate consumers.

Even if they suffered a cognizable antitrust injury, Plaintiffs are unlikely under Seventh Circuit precedent to qualify as proper antitrust plaintiffs, as they have only an indirect nexus to the alleged monopoly.

* * *

Although it appears to be a matter of first impression in this Circuit, the Court holds that *Walker Process* does not confer standing on a party whose only connection to the patentee is as an indirect purchaser of products covered by the patent. Novartis' *Rule 12(b)(1)* Motion is granted in **[*18]** relevant part.

### b. Fraud on the PTO

Even if Plaintiffs do have standing to bring their *Walker Process* count, their Complaint fails to state a claim on which relief can be granted. Showing fraud on the PTO under *Walker Process* requires evidence that: (1) the patent at issue was procured by knowing or willful fraud on the PTO; (2) the defendant was aware of the fraud when enforcing the patent; (3) the defendant clearly intended to deceive the examiner; (4) the patent would not have issued but for the misrepresentation or omission. *See, Nobelpharma AB v. Implant Innovations, Inc., 141 F.3d 1059, 1068-71 (Fed. Cir. 1998)*; *accord, C.R. Bard, Inc. v. M3 Sys., Inc., 157 F.3d 1340, 1364 (Fed. Cir. 1998)*. To state a plausible claim under *Walker Process* that Novartis committed fraud on the PTO, Plaintiffs must therefore adequately allege these elements under Federal Circuit law. *See, Dippin' Dots, Inc. v. Mosey, 476 F.3d 1337, 1346 (Fed. Cir. 2007)*

(citation omitted). In addition, because *Walker Process* claims are fraud claims, Plaintiffs must meet the heightened pleading requirements of *Rule 9(b)*. *Medimmune, Inc. v. Genentech, Inc., 427 F.3d 958, 967 (Fed. Cir. 2005)* ("Like all fraud-based claims, *Walker Process* allegations are subject to the pleading requirements of *Fed. R. Civ. P. 9(b)*."), *rev'd and remanded on other grounds, 549 U.S. 118, 127 S. Ct. 764, 166 L. Ed. 2d 604 (2007)*.

However, Plaintiffs utterly fail to identify any references or statements made to or withheld from the PTO that could plausibly meet the *Walker Process* elements **[*19]** - let alone *Rule 9(b)*'s required specificity. First, Plaintiffs claim that the inventors of the '197 patent were incorrectly named based on an August 24, 2000 Novartis press release naming different individuals as the "inventor of Diovan(R) (valsartan) and his research team." (Compl. at Ex. A2.) Novartis maintains, however, that the much earlier U.S. Patent No. 5,399,578 ("the '578 patent") covers the valsartan *compound* and lists the same inventors referenced in the Novartis press release. Even Plaintiffs admit that the '197 patent does not cover the "invention" of valsartan or Diovan but, on the other hand, is directed to "solid oral dosage [of valsartan] formed by compression methods (Compl. ¶ 32.) Indeed, the '197 patent expressly discloses that "[t]he preparation of valsartan is described in U.S. patent specification No. 5,399,578." ('197 patent at 2:53-55.) (In ruling on a motion to dismiss for failure to state a claim, the Court may consider documents, like the '197 patent, that are referred to in the Complaint, as well as facts readily ascertainable from sources not subject to reasonable dispute, such as the '578 patent. *See, Williamson v. Curran, 714 F.3d 432, 436 (7th Cir. 2013)*; *Ennenga v. Starns, 677 F.3d 766, 773 (7th Cir. 2012)*.) That the individuals identified in the Novartis press release as the inventors of Diovan/valsartan are not listed as inventors of the '197 patent gives rise to no reasonable inference **[*20]** in Plaintiffs' favor.

Second, Plaintiffs nod toward a patent issued to Hoffman-LaRoche, Inc., U.S. Patent No. 5,696,116 ("the '116 patent"), claiming that Novartis knew its press release was false because the '116 patent was the first to disclose valsartan as a compound to treat high blood pressure. The '116 patent application was filed on July 12, 1994, claimed a foreign priority date of July 15, 1993, and issued on December 9, 1997. (Compl. ¶ 20.) However, the '578 patent application disclosing the preparation of a valsartan compound was filed December 29, 1992, claimed a foreign priority date of

February 19, 1990, and was issued March 21, 1995. To the extent the '116 patent is relevant to Plaintiffs' *Walker Process* fraud allegations at all, it offers no support for the allegation that Novartis knew its scientists were not the true inventors of Diovan and somehow committed fraud on the PTO in applying for the '197 patent.

Finally, based on side effects Tarek experienced while taking valsartan that he does not experience while taking Diovan, Plaintiffs allege that Novartis "knew that the patent protection for Diovan was invalid" for failure to meet the enablement requirement. Every patent specification must "contain a written description of the invention, and of the manner and process **[*21]** of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same." *35 U.S.C. § 112(a)*. Yet an individual's experiencing side effects when taking a generic drug but not the associated brand-name drug, standing alone, lends no plausibility to an enablement invalidity argument.

Even assuming that the valsartan Tarek took was manufactured precisely according to the '197 patent's disclosures - something Plaintiffs do not allege - there are far too many independent factors that could explain Tarek's side effects and are exceedingly more plausible than impugning the '197 patent's written description. For example, "the branded version may be produced under better quality control (the rationale for trademarks)" than the generic. *Brand Name Prescription Drugs, 186 F.3d at 787*. For another, varying absorption rates between the generic and the brand-name drug may account for differing side effects. *See, e.g., IMS Health, Inc. v. Sorrell, 630 F.3d 263, 267-68 (2d Cir. 2010)* ("Bioequivalent generic drugs are not necessarily identical to the brand name version, but are required to demonstrate an absorption rate between 80 and 125 percent of the brand-name drug. Variations in absorption rates among branded or **[*22]** generic drugs may cause different reactions, such as side effects."), *aff'd, 564 U.S. 552, 131 S. Ct. 2653, 180 L. Ed. 2d 544 (2011)*. Regardless of whether valsartan side effects bear on the sufficiency of the '197 patent's written description, the first salient question for *Walker Process* purposes would be some knowledge on the part of Novartis concerning the '197 patent's shortcomings during its prosecution - something Plaintiffs do not even allege generally. Thus, the Complaint lacks plausible allegations that the '197 patent fails to meet the enablement requirement or that Novartis did anything unlawful at all in that respect.

Plaintiffs fail to allege any of the required substantive elements of fraud on the PTO - to say nothing of *Rule 9(b)*'s requirement that these allegations be pled with specificity. Absent any other basis for their claim that Novartis made fraudulent statements to the PTO regarding the '197 patent, the Complaint does not implicate any of the required *Walker Process* elements. Plaintiffs' fraud counts against Novartis thus flunk the plausibility standard, and the Court grants Novartis' *Rule 12(b)(6)* Motion in relevant part.

### c. Time-Barred Recovery

As a final basis for dismissal, the Court finds that Plaintiffs' *Walker Process* claim is barred by the statute of limitations. Generally, **[*23]** a federal antitrust claim that accrues more than four years prior to a plaintiff's suit is time-barred. *Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338, 91 S. Ct. 795, 28 L. Ed. 2d 77 (1971)*. While the four-year statute of limitations generally begins running when the allegedly fraudulently procured patent issued, see, *Brunswick Corp. v. Riegel Textile Corp., 752 F.2d 261, 268 (7th Cir. 1984)*, the situation may well be different where a purchaser plaintiff who is not a business competitor of the defendant merely claims to have paid supracompetitive prices for a product covered by the patent. *See, e.g., In re: Evanston Northwestern Healthcare Corp. Antitrust Litig., No. 07 C 4446, 2016 U.S. Dist. LEXIS 122684, 2016 WL 4720014, at *8-9 (N.D. Ill. Sept. 9, 2016)* (citing *Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 295 (2d Cir. 1979)*). In such cases, a cause of action for illegal monopolization under *Section 2* of the Sherman Act may accrue once a purchaser plaintiff actually pays the supracompetitive price. *Berkey, 603 F.2d at 295*.

Under the general rule, Plaintiffs' *Walker Process* claim is unquestionably time-barred. Plaintiffs readily admit that the patent issued on September 25, 2001 (Compl. ¶ 22), meaning that the statute of limitations on their *Walker Process* claim expired on September 25, 2005. They did not file their claims against Novartis until March 1, 2017 - nearly a dozen years late. However, even the more lenient *Berkey* accommodation for purchaser plaintiffs is of no avail here. The Complaint alleges that Tarek's doctor began prescribing Diovan "for him long before January 2011," **[*24]** which he took without interruption until "[a]round the beginning of 2013," when he first tried generic valsartan. (Compl. ¶¶ 4-5.) The only prices Tarek was paying for Diovan (in the form of a copay or, potentially, higher health benefit

plan premiums associated with his Diovan prescriptions) he was paying well before March 1, 2013 - and thus his cause of action accrued before then, barring on statute-of-limitations grounds Plaintiffs' March 1, 2017 *Walker Process* claim against Novartis.

Ostensibly to invoke the discovery rule or fraudulent concealment to toll the statute of limitations, see, *In re Copper Antitrust Litig., 436 F.3d 782, 789 (7th Cir. 2006),* Plaintiffs nakedly assert that they "could not find out how Novartis monopolized Diovan until July 12, 2014." (Compl. ¶ 24.) No detail is provided about what Plaintiffs learned on this date and why they could not reasonably have earlier discovered whatever it was. In fact, many of the allegations in the complaint undercut the notion that there was any concealed or undetectable injury resulting from Novartis' alleged wrongful exclusion of others from the market or extraction from Tarek of "an extremely high price" for Diovan. (Compl. ¶ 30.) For example, the '197 patent application and the August 24, 2000 Novartis **[*25]** press release, both of which form the basis for Plaintiffs' *Walker Process* claim, were matters of public record. Further, Tarek was aware by "the beginning of 2013" of facts undercutting any claim that Novartis had monopolized the relevant market, as he was taking generic valsartan then.

Striding further down the rabbit hole, the Court notes that the *Walker Process* claim would be time-barred even if the discovery rule *did* apply to toll the statute of limitations until Plaintiffs knew or reasonably should have known that the prices paid for Diovan were supracompetitive. Plaintiffs have explicitly defined their injury as their Diovan copays that exceeded those charged for generic valsartan. Yet Plaintiffs allege that "around the beginning of 2013," Tarek tried to use generic valsartan and "[a]t that time" his "copay for Diovan was $30 and BCBS was paying $176.61, while he paid $12.6 for the generic and BCBS paid $0.0." (Compl. ¶ 5.) He thus became aware of the complained-of disparity in price more than four years prior to March 1, 2017 (although BCBSIL later increased his Diovan copay to $50). (It is not reasonable to infer that "the beginning of 2013" encompasses a date after March 1, 2013, **[*26]** and any uncertainty concerning the exact time at which Tarek discovered the disparity in copays flows from Plaintiffs' own imprecise allegations. *See, e.g., Morrison v. Int'l Union Sec., Police, and Fire Professionals of Am., No. 13 C 1146, 2013 U.S. Dist. LEXIS 131686, 2013 WL 5274280, at *4 (D. Md. Sept. 16, 2013)* (granting motion to dismiss with prejudice because the plaintiff's "imprecise allegations" that harassment "occurred [continuously] throughout or

during 2012" did "not satisfy the Court that any breach occurred within" the six-month statute of limitations); *Farbstein v. Hicksville Pub. Library, 323 F.Supp.2d 414, 421 (E.D.N.Y. 2004)* ("Plaintiff refers generally to events that occurred in the four year period prior to initiation of this lawsuit. . . . Thus, these imprecise allegations are ineffective, as framed, to rescue Plaintiff's . . . claims from the [three-year] statute of limitations.").)

For the sake of completeness, the Court notes that the continuing violation exception to the statute of limitations in antitrust actions is of no avail here either. *See, Zenith Radio Corp., 401 U.S. at 338.* That exception allows an antitrust defendant's "overt act" to restart the statute of limitations, which act "'must be a new and independent act that is not merely a reaffirmation of a previous act'" and "'must inflict new and accumulating injury on the plaintiff.'" *Xechem, Inc. v. Bristol-Myers Squibb Co., 274 F.Supp.2d 937, 944-45 (N.D. Ill. 2003)* (quoting *Grand Rapids Plastics, Inc. v. Lakian, 188 F.3d 401, 406 (6th Cir. 1999)).* Plainly, this case does not involve such an overt act. Continuing to **[*27]** charge direct purchasers prices in excess of those charged for generic valsartan is merely reaffirming prior pricing acts, much like the filing of repeated infringement lawsuits that "did nothing more than reaffirm" prior efforts to block the same competitor from the market. *Xechem, 274 F.Supp.2d at 945.* More specifically, price increases are generally not considered overt acts, see, e.g., *Z Techs. Corp. v. Lubrizol Corp., 753 F.3d 594, 600-601 (6th Cir. 2014),* as opposed to, for example, "a series of ongoing meetings to correct a cartel and adjust its prices." Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application,* ¶ 320 (3d ed. 2007) ("If the mere charging of a monopoly price constitutes a 'continuing violation' tolling the statute, then we have indefinitely lengthened the statute of limitation on claims of successful monopolization.") (internal quotation marks and citation omitted). And even if bare price increases were overt acts, Plaintiffs' only specific allegation of a price increase that affected them is BCBSIL's increase of Tarek's copay to $50 "[a]round June 2013" (Compl. ¶ 6), passing on more of the cost of Diovan to consumers. This is not an overt act of Novartis.

For the foregoing reasons, Novartis' *Rule 12(b)(6)* Motion is granted in relevant part.

### 3. **[*28]** Antitrust Violation of *Section 7 of the Clayton Act*

In their third count, Plaintiffs allege that the "December 1996" merger of "two giants Ciba-Geigy and Sandoz," which spawned Novartis, "resulted in a very harmful monopoly and price increase, which is against the antitrust laws." (Compl. ¶¶ 21, 33.) The Court charitably construes this as a claim brought under *Section 4* for a violation of *Section 7 of the Clayton Act*, which is the principal federal antitrust statute concerning mergers and acquisitions, stock purchases, and joint ventures. It prohibits acquisitions, both direct and indirect, the effect of which "may be substantially to lessen competition, or to tend to create a monopoly." *15 U.S.C. § 18*. As with Sherman Act claims, if a party seeks to sue a putative *section 7* violator, it must commence its enforcement action "within four years after the cause of action accrued," or the enforcement action "shall be forever barred." *15 U.S.C. § 15b*. However, for many of the reasons already explored, these allegations fail to state a plausible claim.

### a. Antitrust Standing

#### 1. Proper antitrust plaintiff

With respect to antitrust standing under the *Clayton Act*, Plaintiffs are indirect purchasers of Diovan, and direct purchasers - such as drug wholesalers or **[*29]** distributors - are better situated under *Illinois Brick* to bring a Clayton Act lawsuit. *See, Illinois Brick, 431 U.S. at 737-42* (holding that only overcharged direct purchaser, and not others in chain of manufacture or distribution, is party "injured in his business or property" within meaning of Clayton Act). Although the *Illinois Antitrust Act* appears to permit indirect purchasers to sue for antitrust violations, *740 Ill. Comp. Stat. 10/7(2)* ("No provision of this act shall deny any person who is an indirect purchaser the right to sue for damages.") - potentially making Plaintiffs' proper parties to challenge the Ciba-Geigy/Sandoz merger under state law - the federal pleading standards and statute of limitations otherwise mirror those governing claims under the Illinois Antitrust Act. *See, e.g., 740 Ill. Comp. Stat. 10/7* ("Any action for damages under this subsection is forever barred unless commenced within 4 years after the cause of action accrued."); *id.* at *10/11* ("When the wording of this act is identical or similar to that of a federal antitrust law, the courts of this State shall use the construction of the federal law by the federal courts as a guide in construing this Act."); *Hackman v. Dickerson Realtors, Inc., 520 F.Supp.2d 954, 968 (N.D. Ill. 2007)* ("[T]he pleading requirements of the Sherman Act inform the pleading requirements under the

Illinois **[*30]** Antitrust Act.") (citations omitted); *Laughlin v. Evanston Hosp., 133 Ill. 2d 374, 550 N.E.2d 986, 990, 140 Ill. Dec. 861 (Ill. 1990)* (holding that courts interpret the Illinois Antitrust Act in light of federal antitrust law upon which it is modeled). Thus, all the other deficiencies explored herein leave Plaintiffs high and dry on any cognizable state-law challenge to the merger as well.

#### 2. Antitrust injury

With respect to the antitrust injury necessary for standing, Plaintiffs fail to state a plausible claim that Novartis used its patent monopoly (presumed valid for the Clayton Act claim) unlawfully in the relevant market. Not only does the Complaint admit the existence of at least one generic valsartan manufacturer - and this during times that preceded expiration of the '197 patent by several years - but the mere allegation that Diovan has steadily increased in price is just as consistent (if not more so) with the rights Novartis enjoys by virtue of its immunized patent monopoly. (*See,* Section III.A.2.a.1, *supra.*)

### b. Time-barred Recovery

Moreover, although Clayton Act claims for violation of *Section 7* may accrue later, the four-year statute of limitations generally begins to run as soon as the acquisition takes place. *See, United States v. E.I. du Pont de Nemours & Co., 353 U.S. 586, 598, 77 S. Ct. 872, 1 L. Ed. 2d 1057 (1957)*. As the merger Plaintiffs appear to challenge occurred over twenty years **[*31]** ago, quite clearly the statute of limitations has run under the default rule. For a merger that produced anticompetitive effects only *post*-merger, the statute of limitations begins to run not when the merger transpired, but when the injury occurred. *E.I. du Pont, 353 U.S. at 597-98*. In the words of the Seventh Circuit, "old activity (as in *du Pont*, a stock acquisition preceding the suit by 30 years) is not immunized, if the potential for a reduction in output is created or realized more recently as market conditions change." *U.S. Gypsum Co. v. Ind. Gas Co., 350 F.3d 623, 628 (7th Cir. 2003)*. Yet Plaintiffs' claims are time-barred regardless of the theory invoked to delay accrual.

The Clayton Act's prohibition on anticompetitive acquisitions regulates injuries arising out of "holding as well as obtaining assets," *United States v. ITT Continental Baking Co., 420 U.S. 223, 240, 242, 95 S. Ct. 926, 43 L. Ed. 2d 148 (1975)*, leading many courts to christen the theory for delaying the accrual date for such

injuries the "hold-and-use doctrine." *In re: Evanston, 2016 U.S. Dist. LEXIS 122684, 2016 WL 4720014 at *12* (citations omitted). As such, subsequent anticompetitive acts committed by the merger enterprise may be dated "from the time these events actually transpired and not only from the date of the mergers which made these actions possible." *Julius Nasso Concrete Corp. v. Dic Concrete Corp., 467 F.Supp. 1016, 1023 (S.D.N.Y. 1979)*. However, for the hold-and-use doctrine to apply, a plaintiff must show - and thus must at least plead facts supporting **[*32]** a plausible inference - that the conduct was made possible by the acquisition. *See, e.g., In re: Evanston, 2016 U.S. Dist. LEXIS 122684, 2016 WL 4720014 at *13*; *Julius Nasso, 467 F.Supp. at 1023*. There are no such allegations here, and Ciba-Geigy or Sandoz on their own could have done precisely what Novartis allegedly did - patent a drug and unilaterally institute a steady price increase during the term of the patent monopoly. As distinguished from the situation in, for example, *In re: Evanston* - where health care providers in a certain geographic area merged and then later instituted an alleged supracompetitive pricing policy for services - unilaterally increasing the price of a brand-name drug is within the ambit of a lawful patent monopoly. *See, e.g., Schor, 457 F.3d at 610*; *Brand Name Prescription Drugs, 186 F.3d at 786-87*.

Even if the hold-and-use doctrine applied, Plaintiffs' cause of action would have accrued at the time Novartis instituted its supracompetitive pricing policy. *See, In re: Evanston, 2016 U.S. Dist. LEXIS 122684, 2016 WL 4720014, at *13*. Although Plaintiffs provide data about price increases from 2013 through 2107 - that is, within the window of the four-year statute of limitations - they do not allege that Novartis kept the price of Diovan constant (or only increased it in proportion to, say, the consumer price index) prior to 2013. It is not reasonable to infer that Novartis, after securing its '197 patent monopoly **[*33]** in 2001, waited until 2013 to increase Diovan prices under an allegedly supracompetitive pricing policy enabled by the 1996 merger. As such, even applying the hold-and-use doctrine to Plaintiffs' allegations does not bring their challenge to the merger within the four-year statute of limitations.

Next, Plaintiffs have no recourse here to the continuing violation doctrine, which does not apply to alleged violations of *section 7 of the Clayton Act*. *See, e.g., Z Techs. Corp. v. Lubrizol Corp., 753 F.3d 594, 599, 604-05 (6th Cir. 2014)*; *Midwestern Machinery Co., Inc. v. Northwest Airlines, Inc., 392 F.3d 265, 270-71 (8th Cir. 2004)*; *accord, Shuffle Tech, 2015 U.S. Dist. LEXIS 138741, 2015 WL 5934834, at *13-14*. And even if it did, in the absence of an overt act (*see*, Section III.A.2.c, *supra*), "the doctrine would at best allow [plaintiffs] to reach back to when [they were] first injured by the anticompetitive effects of the merger - that is, when [plaintiffs] paid [defendant's] supracompetitive prices." *In re: Evanston, 2016 U.S. Dist. LEXIS 122684, 2016 WL 4720014, at *14*. Thus, this doctrine cannot do for Plaintiffs' challenge to the Novartis merger what it cannot do for Plaintiffs' *Walker Process* claim.

Similarly, and for the same reasons discussed in Section III.A.2.c, Tarek's taking (and presumably paying a copay) for Diovan "long before January 2011" anesthetizes *Berkey*, which suspends running of the statute of limitations until a purchaser plaintiff pays the supracompetitive price. That clearly **[*34]** happened well before March 1, 2013. And, finally, even in the best case for Plaintiffs, where the discovery rule somehow applies to toll the four-year statute of limitations on their challenge to the merger until they discovered that they were paying a supracompetitive price (which Plaintiffs define with respect to the disparity in copays between Diovan and generic valsartan), their imprecise allegations about the timing of their discovery do not permit an inference that it occurred after March 1, 2013. (*See*, Section III.A.2.c.)

As such, there is no basis on which to find that Plaintiffs timely brought a federal or state antitrust claim challenging the merger.

* * *

Therefore, Novartis' Motion to Dismiss under *Rule 12(b)(6)* is granted to the extent Plaintiffs' claims invoke a *Section 7* violation of the Clayton Act or a comparable theory under the Illinois Antitrust Act.

## B. BCBSIL

Against BCBSIL, Plaintiffs bring counts for "violating the contract," "committing fraud to deny the proper coverage," "committing fraud to provide low quality medications," and "committing fraud to increase the incomes of its managements." (Compl. ¶¶ 26-29.) As best the Court can tell, these claims sound in breach of contract and common-law **[*35]** fraud. Plaintiffs seek compensatory damages, punitive damages, costs, and attorneys' fees.

This case was removed from state court on the basis of Novartis' federal question claims. (*See*, ECF No. 1 ¶ 4

2017 U.S. Dist. LEXIS 103302, *35

("This Court has original jurisdiction in this case under _28 U.S.C. § 1331_."), ¶ 6 ("All Defendants consent to the removal of this matter pursuant to _28 U.S.C. § 1446(b)(2)(A)_.").) Because the Court has dismissed the federal question claims against Novartis that grounded removal, it now searches for independent subject-matter jurisdiction to hear Plaintiffs' state law claims against BCBSIL. Subject-matter jurisdiction is a threshold matter that must be established before resolving issues on the merits. _Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 94-95, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998)_. The Court has an independent obligation to ensure that jurisdiction exists. _DeBartolo v. HealthSouth Corp., 569 F.3d 736, 740 (7th Cir. 2009)_. Because Plaintiffs' claims for fraud and breach of contract do not arise under federal law, subject-matter jurisdiction to hear them can only be grounded in diversity jurisdiction under _28 U.S.C. § 1332_, which requires that plaintiffs and defendants be citizens of different states and that the amount in controversy exceeds $75,000.

Plaintiffs do not allege their own citizenship in their Complaint. As individuals, Plaintiffs are citizens of the state in which they are [*36] domiciled," that is, "the state in which a person intends to live over the long run." _See, Heinen v. Northrop Grumman Corp., 671 F.3d 669, 670 (7th Cir. 2012)_. In their Complaint, Plaintiffs list their address as 33W135 Bonnie Street, Saint Charles, Illinois 60174. They further claim to have health insurance coverage through BCBSIL by virtue of Soona's longtime employment with "School Dist. 33" (Compl. ¶ 1), evidencing an intent to remain in Illinois. _See, e.g., Newell v. O&K Steel Corp., 42 Fed.Appx. 830, 833 (7th Cir. 2002)_ (naming as factors relevant to domicile "current residence," "place of employment," and "location of property"); _24 Hour Fitness USA, Inc. v. Bally Total Fitness Holding Corp., No. 08 C 3853, 2008 U.S. Dist. LEXIS 84374, 2008 WL 4671748, at *3 (N.D. Ill. Oct. 21, 2008)_ (also noting the importance of the "presence of family members"). In view of the mute pleadings, Plaintiffs appear to be domiciled in and citizens of Illinois for purposes of diversity jurisdiction.

In the same vein, Plaintiffs' Complaint does not allege the citizenship of BCBSIL. The Court has little reason to doubt that BCBSIL is an Illinois citizen for purposes of diversity. _See, e.g., Raines v. Health Care Service Corp., No. 86 C 5352, 1988 U.S. Dist. LEXIS 5058, 1988 WL 58591, at *1 (N.D. Ill. May 31, 1988)_ ("Defendant Health Care Service Corporation, a mutual legal reserve company d/b/a Blue Cross Blue Shield of Illinois ('Blue Cross') is a corporation with its principal place of business in Chicago, Illinois."); _Health Care Service Corp. v. Califano, 466 F.Supp. 1190, 1192 n.8 (N.D. Ill. 1979)_ ("In 1975, HCSC was incorporated by the State of Illinois as a non-profit health [*37] care service corporation thus merging the Illinois Blue Cross and Blue Shield plans.") (citation omitted). Similarly, "Blue Cross and Blue Shield Association" is registered as an active Illinois corporation. _See_, Office of the Illinois Secretary of State, _https://www.ilsos.gov/corporatellc/CorporateLlcControlle r_ (visited June 27, 2017). (Such filings are matters of public record and are properly subject to judicial notice. _See, e.g., GE Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1080-81 (7th Cir. 1997)_ (stating that a district court is permitted to take judicial notice of matters of public record); _City of Waukegan v. Bond Safeguard Ins. Co., No. 15 C 3007, 2015 U.S. Dist. LEXIS 151052, 2015 WL 68770106, at *2 (N.D. Ill. Nov. 6, 2015)_ ("With respect to [the defendant's] state of incorporation, the Court takes judicial notice of filings with the Secretary of State. . . ."); _Patten v. Northern Trust Co., 703 F.Supp.2d 799, 803 n.2 (N.D. Ill. 2010)_ (finding it proper to take judicial notice of "matters of public record, such as [regulatory] filings").) Similarly, according to its website, BCBSIL's headquarters are located at 300 East Randolph Street, Chicago, Illinois 60601. _See_, BlueCross BlueShield of Illinois, Contact Us, _https://www.bcbsil.com/employer/contact_us.htm_ (visited June 27, 2017). Thus, BCBSIL appears to be a citizen of Illinois.

Absent diversity, the Court does not appear to have independent subject-matter jurisdiction over Plaintiffs' state-law claims against BCBSIL. As a result, the Court remands the balance of the case to Kane County Circuit Court. [*38] _See, 28 U.S.C. § 1447(c)_ ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."); _see, generally, Adkins v. Illinois Cent. R. Co., 326 F.3d 828 (7th Cir. 2003)_. Alternatively, to the extent the Court may enjoy residual authority to hear the claims based on supplemental jurisdiction - notwithstanding that the federal question anchor is now aweigh - the Court exercises its discretion to remand them. _See, 28 U.S.C. § 1367(c)_ (permitting a district court to decline to exercise supplemental jurisdiction over a claim if it "has dismissed all claims over which the district court has original jurisdiction"); _see, generally, Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988)_; _Groce v. Eli Lilly & Co., 193 F.3d 496 (7th Cir. 1999)_.


IV. **CONCLUSION**

2017 U.S. Dist. LEXIS 103302, *38

For the reasons stated herein, Defendant Novartis' Motion to Dismiss [ECF No. 16] is granted. The claims against Novartis are dismissed with prejudice under *Rule 12(b)(1)* and, alternatively, *Rule 12(b)(6)*. Absent the federal question claims against Novartis that formed the basis for removal, the Court remands the balance of the case to Kane County Circuit Court.

**IT IS SO ORDERED**.

/s/ Harry D. Leinenweber

Harry D. Leinenweber, Judge

United States District Court

Dated: July 5, 2017

---

**End of Document**

Exhibit 2

## 99 F.T.C. 464;  1982 FTC LEXIS 39

Federal Trade Commission

June 25, 1982 ; Complaint, March 22, 1976

DOCKET NO. 9077

**Reporter**
1982 FTC LEXIS 39 *;  99 F.T.C. 464

# In the Matter of GENERAL MOTORS CORPORATION, a corporation.

## Core Terms

dealers, crash, wholesale, sales, manufacturer, repair, prices, discount, warehouses, body shop, stock, wholesaling, franchised, Motors, dealerships, selling, trucks, distribution system, salvage, cases, shops, monopoly power, costs, orders, installation, customers, consumers, estimated, monopolist, bumpers

## Syllabus

On June 25, 1982, the Commission dismissed its complaint charging a major car manufacturer with violating Section 5 of the Federal Trade Commission Act by its use of a selective distribution system for new crash parts for GM automobiles and light trucks.

## Complaint

COMPLANT

The Federal Trade Commission, having reason to believe that General Motors Corporation, a Delaware corporation, has engaged in unfair methods of competition and unfair acts or practices in connection with the distribution of new service crash parts applicable to automobiles and light trucks assembled by General Motors Corporation, in violation of _Section 5_ of the Federal Trade Commission Act, as amended ( _15 U.S.C. 45_ ) and that a proceeding in respect thereof would be in the public interest, issues its complaint, charging as follows:

1.  For the purpose of this complaint, the following definitions shall apply:

(a) _Automobiles_ are self-propelled, four-wheeled vehicles primarily for the transport of persons -- they travel primarily on roads or streets and their seating capacity is **[*2]** for no more than 10 persons.

(b) _Light trucks_ are self-propelled vehicles, other than automobiles, designed to carry a load or freight, having a gross vehicular weight of less than 10,000 pounds, and traveling primarily on roads or streets.

(c) _Service Parts_ or _Replacement Parts_ are new parts used to replace parts assembled as original equipment ( _OE Parts_ ) in new automobiles and light trucks or used to replace service parts previously installed thereon.

(d) _Crash Parts_ refers to any one or all of the following products: fenders, grilles, bumpers, hoods, deck lids, doors, quarter panels, rear end panels, rocker panels, lamp assemblies, wheel opening panels, fender and rear end caps,

tail gates, radiator supports and shrouds, and mouldings, including inner and outer panels and all components of these products as well as all parts necessary to attach the aforesaid to the bodies of automobiles and light trucks.

(e) *Service GM Crash Parts* are service crash parts applicable to automobiles and light trucks assembled by General Motors Corporation, sometimes hereinafter referred to as the *relevant parts.*

(f) *Distribution* refers to the business **[*3]** of *Distributors.* Distributors are firms which either manufacture service crash parts or contract for their manufacture for the purpose of reselling them, principally to franchisees who wholesale or install the parts.

(g) *Wholesalers* are firms which resell service crash parts to installers but which may also install such parts. They neither manufacture service crash parts nor do they contract for their manufacture.

2. Respondent General Motors Corporation (hereinafter "GM") is and at all times relevant herein has been a Delaware corporation; its headquarters are at 3044 W. Grand Boulevard, Detroit, Michigan.

3. GM is now and for many years has been engaged in the manufacture, sale and distribution of a wide variety of products, including automobiles, trucks, buses, diesel locomotives, diesel engines, earth moving equipment, household appliances and automotive parts.

4. In 1972, GM had sales of $30.4 billion, net earnings after taxes of $2.16 billion, and total assets as of December 31, 1972 of $18.3 billion, ranking first in sales and profits and second in assets among the nation's largest industrial corporations. In 1975, GM had sales of $35.7 billion and **[*4]** net earnings after taxes of $1.3 billion.

5. GM is the largest manufacturer of automobiles and light trucks in the United States. Its principal domestic lines include Chevrolet, Pontiac, Oldsmobile, Buick and Cadillac automobiles and light trucks. In 1972, its total domestic sales of automobiles alone amounted to 4,823,827 units, 43% of the U.S. market and 52% of U.S. sales by domestic manufacturers.

6. GM sells and for some time past has sold substantial amounts of crash parts. In 1972, GM's sales of service GM crash parts exceeded $250 million.

7. In the course and conduct of its business, respondent GM is and for some time past has been engaged in selling service GM crash parts throughout various States of the United States, and has caused such parts to be shipped to purchasers in various other states. In so doing, GM is and at all times relevant herein has been engaged in a continuous and substantial course of trade in commerce and has affected commerce as "commerce" is defined in the amended Federal Trade Commission Act.

8. The number of automobile and light truck accidents occurring in the United States increases nearly every year. There were approximately **[*5]** 17 million accidents involving motor vehicles in 1972 alone. A substantial number of the motor vechicles involved in accidents are automobiles and light trucks manufactured by respondent. In 1972, there were 86.4 million automobiles registered in the United States; 41.1 million or approximately 47.6% of these automobiles had been manufactured by GM.

9. Crash parts comprise virtually the entire outer protective cover of an automobile or light truck and include the most frequently crash-damaged parts. While any automobile or light truck part is susceptible to crash damage on occasion, crash parts collectively account for the preponderance of all automobile and light truck parts replaced on account of crash damage. Unlike most other automobile and light truck parts, crash parts are almost always replaced due to crash damage rather than due to maintenance or mechanical failure.

10. All service GM crash parts are and for many years have been produced either by GM or by independent manufacturers for GM. All of the relevant parts are and for many years have been funnelled through GM for distribution. GM has and for some time has had and has intentionally maintained a monopoly **[*6]** and monopoly power over the distribution of these parts.

11.  Unlike many other parts it sells, GM for many years has sold and continues to sell service GM crash parts exclusively to its franchise dealers who are located throughout the United States.  GM's franchise dealers, individually and in concert, have concurred in, and urged upon GM, this policy of selling to them exclusively; and GM has acquiesced in and adopted this policy so as to extend to its franchise dealers, when wholesaling and installing the relevant parts, benefits of GM's monopoly position in the distribution of the relevant parts.  The dealers depend on and have for some time depended on GM as their sole source for new GM automobiles and light trucks and certain replacement parts applicable to GM-made vehicles.  GM owns or has a substantial financial investment in a number of these dealers.  GM franchise dealers either install the relevant parts, wholesale them, or occasionally sell them to consumers.  There are approximately 12,000 GM dealers in the United States, many of whom both wholesale and install the relevant parts.

12.  GM franchise dealers wholesale and for many years have wholesaled service GM **[*7]**  crash parts principally to independent body shops (IBSs).  There are approximately 30,000 IBSs in the United States.  IBSs compete and have competed with GM dealers in installing the relevant parts.  Most of the relevant parts needed by consumers are and for many years have been installed by GM dealers or by IBSs.

13.  Because GM has distributed and sold the relevant parts exclusively to its dealers, IBSs have had to purchase said parts from the dealers and in so doing have frequently paid more for the parts than have competing GM dealers.

14.  GM has refused to sell the relevant parts to its franchise dealers on equal terms.  The dealers receive wholesale incentives on only those relevant parts which fit the lines of new cars the dealers are franchised to sell.  This has effectively precluded many GM dealers from wholesaling additional relevant parts.

15.  Service GM crash parts are not installed in any vehicles other than those which have been assembled by GM.  Furthermore, due to design proliferation by GM, any particular service GM crash part fits only one or at best a few models of GM vehicles.  Thus, in excess of 5,000 different crash parts were designed to fit GM automobiles **[*8]**  and light trucks produced for sale in the U.S. during model years 1968-1972.

16.  Respondent, who has a monopoly in the distribution of service GM crash parts, has engaged for some time, and is continuing to engage, in the following unfair methods of competition and unfair acts or practices, among other:

(a) refusing to sell the relevant parts -- goods which the IBSs are under a commerical compulsion to obtain -- directly to IBSs or to any potential suppliers to IBSs other than GM franchise dealers;

(b) bolstering its monopoly power through, among other things, selling the relevant parts exclusively to its franchise dealers;

(c) adopting a method of distribution which substantially hinders competition in the distribution, wholesaling, and installing of the relevant parts;

(d) combining, agreeing or acting in concert with GM franchise dealers so as to substantially hinder competition in the distribution, wholesaling, and installation of the relevant parts;

(e) discouraging competition in the wholesaling of the relevant parts through utilization of disparate wholesaling incentives;

(f) maintaining a method of distribution which provides GM with an unfair competitive **[*9]**  advantage in the sale to its dealers of parts available from alternate sources; and

(g) disseminating to GM franchise dealers lists which suggest the prices at which the relevant parts should be sold to installers and to members of the consuming public.

17.  The effects of the acts, practices, methods, and power set forth in the preceding paragraph have been and are, among others, to

(a) deter new entrants and raise barriers to entry into wholesaling and installing the relevant parts;

(b) enhance monopoly power and maintain monopoly pricing and inefficiency in the distribution of the relevant parts;

(c) extend monopoly power and its effects in the distribution of the relevant parts to the wholesaling and installation of the relevant parts;

(d) curb efficiencies in the wholesaling of the relevant parts;

(e) lessen competition in wholesaling the relevant parts;

(f) restrain competition between GM dealers and IBSs in installing the relevant parts;

(g) restrain competition among GM dealers in wholesaling the relevant parts;

(h) increase prices to and otherwise disadvantage IBSs in competing with dealer-owned body shops;

(i) decrease the availability of the relevant **[*10]** parts;

(j) decrease competition in the sale to GM dealers of alternate-sourced parts; and

(k) increase prices to and otherwise disadvantage the consuming public.

18. The acts, practices and methods of competition alleged in this complaint, coupled with the monopoly power alleged herein, constitute unfair methods of competition and unfair acts or practices by respondents in violation of Section 5 of the amended Federal Trade Commission Act.

# Counsel

*Appearances*

For the Commission: *Donald K. Tenney, Alan H. Melnicoe* and *Myron L. Dale.*

For the respondent: *Edwin S. Rockefeller, Alan M. Frey, Richard Haddad* and *Charles L. Duffney, Bierbower & Rockefeller,* Washington, D.C., and *Francis H. Dunne,* in-house counsel, Detroit, Mich., for respondent General Motors Corporation. *Jerry S. Cohen, Kohn, Milstein & Cohen,* Washington, D.C., for intervenor National Automobile Dealers Association. *Jonathan T. Howe, Jenner & Block,* Chicago, Ill. and *Donald A. Randall,* in-house counsel, Washington, D.C., for intervenor Automotive Service Councils, Inc.

**Initial Decision:**

INITIAL DECISION

Joseph P. Dufresne, Administrative Law Judge

THE **[*11]** COMPLAINT

1. The Complaint is dated March 22, 1976, and charges that General Motors Corporation (GM) engaged in unfair methods of competition and unfair acts or practices in violation of *Section 5* of the Federal Trade Commission Act (FTCA), as amended ( *15 U.S.C. 45*), in connection with the distribution of "new service crash parts" applicable to automobiles and light trucks assembled by GM (Complaint, Introductory Paragraph).

"Crash parts" are defined therein as:

"... any one or all of the following products: Fenders, grilles, bumpers, hoods, deck lids, doors, quarter panels, rear end panels, rocker panels, lamp assemblies, wheel opening panels, fender and rear end caps, tail gates, radiator

supports and shrouds, and mouldings, including inner and outer panels and all components of these products as well as all parts necessary to attach the aforesaid to the bodies of automobiles and light trucks." (Complaint, P1(d)).

The definitions of "automobiles" and "light trucks" are those generally understood, but are limited, respectively, to autos having seating capacity for no more than 10 persons and trucks having a gross vehicular weight of less than 10,000 **[*12]** pounds (Complaint, PP1(a) and (b)).

2. Paragraphs 11 and 12 of the complaint reflect: that GM sells crash parts exclusively to its approximately 12,000 GM franchise dealers located throughout the United States and that the dealers either (1) install the parts themselves, (2) wholesale them, principally to the approximately 30,000 independent body shop operators (IBSs) in the U.S. who compete with the dealers in installing the parts, or (3) occasionally retail the parts to consumers.

3. One allegation is that IBSs must purchase the parts from their competitors, GM dealers, frequently at prices higher than those paid by the dealers (Complaint, P13). Another is that since GM pays dealers wholesale compensation (explained below) only for crash parts for the brand of GM car the dealer sells (e.g., no wholesale compensation is paid to a Pontiac dealer who sells crash parts for a Buick), many GM dealers are effectively precluded from wholesaling crash parts for brands of GM autos and light trucks for which the dealer is not franchised (Complaint, P14).

4. "Wholesale compensation" is a percentage of the list price GM pays to (or credits to) the dealer on his sales of crash **[*13]** parts to a businessman/repairer of damaged vehicles (i.e., an IBS or another dealer or commercial type purchaser but not to individual members of the public). In other words, wholesale compensation in the context of this case is a payment/rebate by GM to a dealer for performing a wholesaling function to the automotive repair trade (Tr. 2005; CX 7010B). [1]

---

[1] The following abbreviations will be used in this decision:

| Tr. | Transcript followed by the page number. |
| CX | Commission's Exhibit, followed by its number. |
| RX | Respondents' Exhibit, followed by its number. |
| RA and CCA | Respondents' and Commission counsels' Admissions. |
| ALJX | Administrative Law Judge's Exhibit, followed by its number (Note: This device was used to insure that all pages of a document offered by Commission counsel, or that an exhibit the ALJ believed should be identified or included, became a part of the evidentiary record. For example, CX 7000A-G is typical. That exhibit consists of seven pages of a twenty-five (25) page latter dated May 12, 1967, from GM to Commission staff. |

**[*14]**

5.  Wholesale compensation is available to a GM dealer only when he sells parts applicable to the vehicles for which he is franchised (RA 795-799) to purchasers such as an IBS or, with certain limitations, another GM dealer. Wholesale compensation is not paid on sales to an independent wholesaler (CX 7813A-B; Tr. 10266) (CCPF 47).

6.  The wholesale compensation allowance was and is designed to afford car dealers a satisfactory margin of profit on sales to IBSs and to encourage them to make crash parts available to the IBSs at the dealer price. On those parts for which a wholesale compensation allowance is provided, the <u>suggested</u> general trade price is identical to the price the franchised dealer is to pay to GM. <u>If</u> a dealer adheres to the intent of the program, an IBS pays the dealer the same price as the dealer is charged by GM for crash parts used in the dealer's body repair shop. (CX 7010B).

7.  Starting with an allegation that GM has a monopoly in the distribution of GM crash parts, Paragraph 16 charges that GM engaged/engages in the following unfair methods of competition and unfair acts or practices, among others, by:

"(a) refusing to sell the relevant **[*15]** parts - goods which the IBSs are under a commercial compulsion to obtain - directly to IBSs or to any potential suppliers to IBSs other than GM franchise dealers;

(b) bolstering its monopoly power through, among other things, selling the relevant parts exclusively to its franchise dealers (abandoned or dismissed later-see below);

(c) adopting a method of distribution which substantially hinders competition in the distribution, wholesaling, and installing of the relevant parts;

---

|  | Commission counsel declined to offer the complete letter. In that instance, ALJX-7 was used to identify and place the remaining eighteen (18) pages into evidence.) |
| CCPF, CCB and CCRB | Commission counsel's Proposed Findings, Brief and Reply Brief. |
| RPF, RB and RRB | Respondents' Proposed Findings, Brief and Reply Brief. |
| IX | Intervenor NADA's Exhibit, followed by its number. |
| INPF, INB and INRB | Intervenor NADA's Proposed Findings, Brief and Reply Brief. |
| IAPF, IAB and IARB | Intervenor ASC's Proposed Findings, Briefs and Reply Brief. |

(d) combining, agreeing or acting in concert with GM franchise dealers so as to substantially hinder competition in the distribution, wholesaling, and installation of the relevant parts;

(e) discouraging competition in the wholesaling of the relevant parts through utilization of disparate wholesaling incentives;

(f) maintaining a method of distribution which provides GM with an unfair competitive advantage in the sale to its dealers of parts available from alternate sources (abandoned or dismissed later-see below) and;

(g) disseminating to GM franchise dealers lists which suggest the prices at which the relevant parts should be sold to installers and to members of the consuming public (abandoned **[*16]** or dismissed later-see below).

8.   In Paragraph 17 it is alleged that:

"The effects of the acts, practices, methods, and power set forth in the preceding paragraph have been and are, among others, to

(a) deter new entrants and raise barriers to entry into wholesaling and installing the relevant parts;

(b) enhance monopoly power and maintain monopoly pricing and inefficiency in the distribution of the relevant parts;

(c) extend monopoly power and its effects in the distribution of the relevant parts to the wholesaling and installation of the relevant parts;

(d) curb efficiencies in the wholesaling of the relevant parts;

(e) lessen competition in wholesaling the relevant parts;

(f) restrain competition between GM dealers and IBSs in installing the relevant parts;

(g) restrain competition among GM dealers in wholesaling the relevant parts;

(h) increase prices to, and otherwise disadvantage IBSs, in competing with dealer-owned body shops;

(i) decrease the availability of the relevant parts;

(j) decrease competition in the sale to GM dealers of alternate-sourced parts (abandoned or dismissed later-see below) and

(k) increase prices to and otherwise disadvantage **[*17]** the consuming public."

9.   The following order to Cease and Desist was proposed:

"Requiring GM to sell crash parts, through and from whatever facilities it maintains to service its franchise dealers, to all vehicle dealers, independent body shops and independent wholesalers at the same prices, terms and conditions of sale, said prices to be subject to reasonable cost justified quantity discounts and stocking allowances." (Complaint, Notice of Contemplated Relief).

10.   However, in his Reply brief, Commission counsel proposed a different order.  That version includes definitions of "automobiles", "light trucks", "crash parts", "components" of crash parts, "service crash parts", "service GM crash parts," "independent wholesalers", "independent body shops", "functional discounts", "quantity discounts" and non-exclusionary terms or conditions of sale.  Thereafter, Part I of the order calls for an end to GM's use of functional discounts, as defined.  Part II calls for GM to sell its crash parts to all vehicle dealers, independent body shops and independent wholesalers, as defined, at identical prices and on non-discriminatory, non-exclusionary terms except that "... graduated, **[*18]** non-cumulative, cost-justified volume and/or quantity discounts based solely on the sale of service GM crash parts" may be offered.  Part III calls for submittal of a detailed plan to carry out the order no later than 90 days after the order is served on GM.  Part IV calls for: (1) the plan to be put into effect 90 days after

the Commission approves it; (2) notice to all GM customers for crash parts 30 days before a change takes effect and; (3) a notice in Automotive News or similar publication of each such change. Part V calls for an annual report to the Commission for five years on the anniversary of the date this Order becomes final "describing the manner of GM's compliance with parts I and II." (CCRB 132-136).

11. Commission counsel also moved in his Reply Brief (p. 98) for the acceptance of CX 7013A-H, which is a letter dated March 5, 1976 from GM to the Director of the Commission's Bureau of Competition. However, the record for the reception of evidence is closed and I am not convinced that it need be reopened to receive the letter because the subjects in the letter either are addressed elsewhere or would not add critical or important evidence. (Note: Commission Rule **[*19]** 3.51(d) permits reopening the record by the ALJ to receive additional evidence but it is not appropriate in this instance.)

GM's ANSWER

12. GM answered the complaint on June 21, 1976, denying that the Commission had reason to believe that GM had engaged in unfair methods of competition and unfair acts or practices in distributing "new service crash parts", in violation of § 5 of the Federal Trade Commission Act (FTCA), and denying that the proceeding would be in the public interest. To the numbered paragraphs of the complaint, GM:

(1) denied the accuracy and applicability to the proceeding of all definitions in the complaint except the one for "automobiles" (Answer, P1);

(2) admitted manufacturing and selling a wide variety of products, including automobiles and trucks, (Answer, P3);

(3) admitted sales in calendar year 1972 of $30.4 billion with after-tax profits of $2.16 billion, and total assets of $18.3 billion, compared with 1975 sales of $35.7 billion with after tax profits of $1.3 billion (Answer, P4);

(4) admitted being the largest manufacturer of automobiles and light trucks in the U.S., (Answer, P1, 4 and 5);

(5) admitted that in 1972 GM sales of automobile **[*20]** replacement parts including "crash" parts exceeded $250 million (Answer, P6);

(6) admitted that GM engages in commerce and affects commerce (Answer P7);

(7) admitted that of the 86.4 million automobiles in U.S. operation in 1972, approximately 41.1 million had been manufactured by GM or its subsidiaries (Answer, P8);

(8) admitted "[all] service GM crash parts are, and for many years have been produced either by GM or by independent manufacturers for GM,... and have been funnelled through GM for distribution," but denied that it had or has "... intentionally maintained a monopoly and monopoly power over the distribution of these parts." (Answer, P10);

(9) admitted that it sells new GM crash parts exclusively to the approximately 12,000 GM dealers, some of which it owns or in which it has a financial investment, who either install or sell the parts, or do both (Answer, P11);

(10) admitted that any particular new GM crash part may not fit all models of GM vehicles and that in excess of 5,000 different service GM parts fit GM autos and trucks for model years 1968-1972 (Answer, P15).

GM either denied the remaining allegations or stated that it was without knowledge or information **[*21]** sufficient to form a belief regarding their truth.

13. As noted above, on pages 4-5, Commission counsel later abandoned or agreed to the dismissal of paragraphs 16(b), (f) and (g) and 17(j). (See "Order (1) dismissing Paragraphs 16(b) and 17(j) Of The Complaint, and (2) Denying GM Motion For Interim Rulings To Guide Further Hearings" dated September 29, 1978; Tr. 10581).

THE INTERVENORS

14.  The National Automobile Dealers Association (NADA), which had on July 7, 1976, 8,690 members who were GM dealers, was permitted to intervene by order dated January 11, 1977.  Counsel to NADA has participated in the trial by questioning witnesses, calling his own witnesses, offering exhibits, making oral arguments, and submitting proposed findings and briefs.

15.  In addition, the Automobile Service Councils Inc. (ASC) which had over 2,000 independent body shop operators as members on October 3, 1978, was permitted to intervene by order dated October 16, 1978.  Counsel to ASC has participated by filing briefs.

THE HEARINGS

16. Prehearing conferences were held in Washington, D.C. on April 7, July 29, September 22, October 29, and November 23, 1977, and on January 24, 1978 (CCPF,  **[*22]**  p. 1)

17.  Both parties and intervenor NADA exchanged trial briefs in support of their respective positions.  These included legal arguments and lists with copies of proposed exhibits and the names of witnesses with short narrative summaries of expected testimony.

18.  The hearings began in Washington, D.C., on May 15, 1978.  The record for the reception of evidence was closed on May 22, 1979.  In all, there were 82 days on which hearings were held, including an inspection of the GM parts warehouse in Baltimore, Md.  There are approximately 16,285 pages of transcript.  (Note: There are some gaps in pagination due to changes from "routine" to "daily" or from "daily" to "rush" copy e.g., Feb. 2-5, 1979, April 18, 1979.  When such changes occur the reporter must estimate the number of pages required for transcription of notes.  If the estimate is low a gap in pagination results.)

19.  Sixty witnesses testified for the Commission, 21 testified for GM, and 3 testified for NADA (RB 1).  Of these, 24 were IBS witnesses from the following seven trade areas: Buffalo, New York; Mansfield, Ohio; Cleveland, Ohio; New Orleans, Louisiana; St. Louis, Missouri; Spokane, Washington; and Tucson,  **[*23]**  Arizona (ALJX 26). In addition, testimony of two IBS witnesses was stipulated (CCPF 106; RRB 106).

THE STRIKING OF TESTIMONY AND REJECTION OF EXHIBITS

20.  The testimony of four GM witnesses was stricken because counsel for GM declined to observe my order that they were to hand over to Commission counsel pretrial reports of interviews of witnesses.  My "Order Granting Motion of General Motors Corporation for Production of Interview Reports" dated April 10, 1978, called for each side to provide the other with "... all interview reports relied upon in connection with the witness's testimony" one week before a witness testified.  The purposes of the order were to have each side apprise the other, within reason, of testimony to be elicited by Commission counsel in connection with the allegations in the complaint, the defenses of GM, to encourage counsel to execute stiplations, and otherwise to expedite the trial (Tr. 10619-20).  The order was discussed at considerable length at the hearing on September 27, 1978 (Tr. 10581-10629; 10672-10693). Commission counsel made it clear that he had maximally complied with the order (Tr. 10624-25).

21.  On that date, in the course of **[*24]**  the hearing (Tr. 10582) and later in connection with the testimony of GM witnesses Cann on October 2 (Tr. 11119-11179), Mack on October 5 (Tr. 11555-11701), Faulkner on October 6 (Tr. 11718-11817), and Vulbrock on October 17 (Tr. 12280-12354), Commission counsel raised the question as to whether any interview reports existed.

22.  Counsel for GM said that he had no document/interview reports within the purview of the order and that, even if he did, an ALJ lacked authority to compel what the April 10 order required.  Thereafter, Counsel for GM showed me some papers/notes.  After examining them I concluded they were interview reports within the scope of the order.  However, Counsel for GM continued to decline to hand over copies to Commission counsel.  After I made some handwritten marks on them to identify those portions deemed privileged, the reports were returned to counsel for GM.  The "Order Denying Motion for Reconsideration of Order of September 27, 1978, Requiring the Production of Interview Reports" dated October 13, 1978, elaborates on the action taken at the hearing.

23.  The "Order Modifying Order Granting Motion of General Motors Corporation for Production of Interview **[*25]** Reports" dated October 31, 1978, ordered the striking of the testimony of the four GM witnesses.  (See Commission Rule 3.38).  Thereafter, the four documents were placed in a sealed envelope and delivered to the Commission's Secretary so that they may be examined by the Commission upon its review.  (See "Order Re In Camera Documents Delivered to the Commission's Secretary" dated Feb. 14, 1979).

24.  The testimony (Tr. 8750-8787) of a Commission witness whose name and testimony are in camera, at his and Commission counsel's request was stricken as being cumulative (Tr. 8787) (CCRB par. 2).  Parts of the testimony of Commission witness Perschall were stricken for a time because the parts were unreliable, due to their being based on documents prepared by another person, with these foundation documents either not produced at the hearing or not being credible.  However, the testimony was reinstated without objection by counsel for GM after underlying documents were provided.  (See "Order Reinstating Stricken Testimony of Commission Witness Kenneth Perschall" dated May 25, 1979).

25.  In accord with Commission Rule 3.43(g), the rejected exhibits and testimony remain a part **[*26]** of the official record, although they have not been considered in reaching or preparing this Initial Decision.

Bases For The Findings Of Fact

26.  The following findings of fact are based on a review of the allegations made in the complaint, respondent's answers, the documentary evidence, and consideration of the demeanor of the witnesses.

27.  The proposed findings of fact, conclusions, and proposed orders, together with reasons and briefs in support thereof filed by each side and by the intervenors have been given careful consideration.  Many proposed findings have been adopted as submitted or in substance.  To the extent not adopted by this decision in the form proposed or in substance, they are rejected.  Further, any motions not ruled upon are denied.

28.  For convenience, the findings of fact include references to supporting evidentiary items in the record.  Such references are intended to serve as guides to the testimony, evidence, and exhibits supporting the findings of fact.  They do not necessarily represent complete summaries of the evidence considered in arriving at such findings.

FINDINGS OF FACT Background

29.  The Commission investigation of **[*27]**  the distribution and sale of crash parts which, essentially, are fenders, grilles, moldings, etc. began in the mid-1960's.  Operators of IBSs had complained to the Commission that automobile dealers were charging them excessive prices for crash parts, thereby making it difficult to compete with dealers for collision repair business.  The IBSs sought to buy crash parts at the same price that automobile dealers paid for parts used in their own repair shops (ALJX 14M, Supp. to CX 7014).

30.  Prior to September 12, 1967, GM simply provided its dealers with a suggested general trade price to be charged wholesale purchasers of crash parts (CX 7015A).  GM estimates that under that system wholesaling dealers allowed purchasers at wholesale an average discount in excess of 18% from the list price (CX 7015B).

31.  On September 12, 1967, GM proposed a plan to its dealers calling for the payment of an overriding discount of 12% from dealer price to any GM new car dealer on a "qualified wholesale sale" of seventeen (17) categories of crash parts, including: fenders; grilles; bumpers; radiator supports; and body side moldings.  A "qualified wholesale sale" would be the sale and delivery **[*28]**  (less returns and repurchases by the dealer) of such parts to:

 Automotive repair shops, automotive body shops and gasoline service stations which purchase the eligible General Motors parts for the repair, rebuilding or servicing of General Motors vehicles for such purchaser's retail and service customers, except any such purchaser in which the selling dealer, or any stockholder or principal thereof, owns or controls any financial interest (CX 7015C).

32.  In February, 1968, the Commission advised GM that it intended to bring suit to bring about price parity between franchised car dealers and independent body shops (ALJX 14N, Supp. to CX 7014z)

33.  After negotiating with Commission staff and prior to adopting the wholesale compensation plan, GM stated:

General Motors' cost would be increased by the amount of the discount, by the cost of administering the program to insure against fraudulent claims (by GM dealers), and by the costs of the routine paperwork to administer the program.  All of those additional costs would have to be factored into prices for these parts, <u>resulting in significant price increases to the consumer</u> (Emphasis added) (CX 7000E; CCPF 299).

In **[*29]**  other words, it was the judgment of GM's top management that if wholesale compensation were necessary to save the basic structure of GM's distribution system, the overall advantages outweighed the costs of wholesale compensation (ALJX 7 and 8) (RRB 299).

34.  After many discussions with Commission staff, GM and the three other principal U.S. auto makers agreed in the fall of 1968 to implement a wholesale compensation plan (CX 7010D).  As early as November 21, 1966, Commission staff had told GM representatives that the basic reason for the investigation was "... to require General Motors to distribute its captive sheet metal parts [i.e., crash parts] on the same terms as it presently distributes its competitive parts" <u>e.g.</u>, sparkplugs, filters, etc. [RX 26A].

35.  The Commission announced on October 22, 1968, that "the leading automobile manufacturers" had agreed to adopt such a wholesale compensation plan for crash parts "... to help overcome what the Commission considers to have been competitive disadvantages facing independent auto body repair shops." GM put the plan into effect with the introduction of the 1969 models (ALJX 14N, Supp. to CX 7014).

36.  The Plan **[*30]**  did not provide for an allowance when a dealer wholesaled a crash part intended for a light-duty truck or for several passenger car lines, including the Chevrolet Corvette, Vega and Monza, Pontiac Astre, Oldsmobile Starfire, and Buick Opel and Skyhawk.  This was because no imported car manufacturer or distributor was known to make a wholesale compensation allowance available to its dealers and those lines/makes were considered to compete for the most part with imports (CX 7010C).  Approximately 15 different foreign car manufacturers sell new cars in the United States (CCA 43).

37.  GM pointed out that if GM made such an allowance available and the manufacturers of foreign makes did not, one of two things could happen: (1) It could make no change in the dealer net price, in which case GM would have to absorb the cost of a 25 percent allowance on the wholesale portion of its crash parts business in the excepted car lines <u>i.e.</u>, Covette, Vega, Monza etc. which on the basis of 1974 sales at 1974 prices, would cost at least $17 million per year; or (2) GM could increase the price for crash parts, in which case they would cost more than a similar part for a competing import (CX 7010D).  **[*31]**

38.  Under the plan adopted, average wholesale compensation was 23% plus a possible additional 5% Stock Order (PAD) Allowance (described at p. 37) applied to purchases (CX 7018).  On October 1, 1968, GM's prices on the specified parts were increased to enable GM to recover the amount that would be lost from making the increased wholesale compensation payments (CX 7022A).

39.  In a January 31, 1969, GM review (CX 7021A and B) the following were noted:

(1) The Service Section, in collaboration with representatives from each of the five car divisions, established overriding discounts on the categories of parts selected by the Federal Trade Commission;

(2) The discounts ranged from a minimum of 20% on high value top and quarter panels to a maximum of 25% on nine categories of parts priced under $20.00 at the dealer level.  Overriding discounts of 22% and 23% were applied to the remaining categories such as fenders, hoods, and deck lids.  The average overriding discount for all of the parts are estimated to be 23%; however due to some changes in price levels, the actual rate for the five car divisions was 22.4%;

(3) The financial effect on General Motors of adding wholesale **[*32]**  compensation on 10,208 parts in the FTC selected categories was estimated to be slightly over $18,000,000, computed on 1966 volume.  This amount was recovered by increasing dealer prices 1.4%, applicable to all parts including crash type items;

(4) Dealers' gross profit dollars had been reduced 18.4% but the percent of profit increased from 26.9% to 27.4% (CX 7021A);

(5) The amount of decrease in gross profit dollars and percent of profit varied among divisions as illustrated in the following table:

### Gross Profit Amount

| | Millions | | Change | |
| | Old | | New | New vs. Old |
| | $ | $ | % | % |
| Chevrolet | 134.81 | 114.92 | ( 19.89) | (14.8) |
| Pontiac | 157.13 | 118.45 | ( 38.68) | (24.6) |
| Oldsmobile | 147.85 | 112.7 | ( 35.58) | (24.1) |
| Buick | 190.32 | 146.67 | ( 43.65) | (22.9) |
| Cadillac | 192.09 | 178.75 | ( 13.34) | ( 7.0) |
| Total | 822.20 | 671.06 | (151.14) | (18.4) |

### Gross Profit Percent

| | | Change | |
| | Old | New | New vs. Old |
| | % | % | % |
| Chevrolet | 25.9 | 27.3 | 1.4 |
| Pontiac | 28.5 | 27.4 | (1.1) |
| Oldsmobile | 28.5 | 27.6 | (.9) |
| Buick | 27.9 | 27.3 | (.6) |
| Cadillac | 24.5 | 27.2 | 2.7 |
| Total | 26.9 | 7.4 | .5 |

Both Chevrolet and Cadillac were affected to a lesser [*33] degree than the other three divisions because of a difference in the pricing and discount patterns of the old program, whereas under the new program, a uniform pattern applicable to all five car divisions was adopted.

(6) Dealers had been operating in the area of a 25% gross profit on wholesale sales for the previous three years and dealers would show an increase in profit dollars on their retail sales due to increases in parts prices;

(7) Since dealer expenses had been increasing and there was a need to encourage dealers to engage in the wholesaling of crash parts, an increase in the wholesale compensation allowance might be in order. The cost to General Motors was estimated to be approximately $850,000 for each additional percent allowed (CX 7021B).

40. In the fall of 1969, GM's suggested list prices on both replacement and crash parts again were increased. The increases averaged approximately 4%, with no part raised in excess of 6 1/2%. Changes also were made in base discounts to dealers from GM's list prices. It was forecast that the change in the base discount rate would result in a slight reduction in the dealers' average gross margin on retail sales, but that this [*34] would be more than offset by an increase in wholesale compensation. Dealers began to receive a base discount of 40% and a standard

wholesale compensation rate of 25%. Previously the discounts had ranged from 35% to 44% and wholesale compensation rates had varied from 20% to 23%, depending upon the parts groups involved. All part numbers within each compensable parts group were made eligible for wholesale compensation (CX 7023A-B).

41. Generally, each increase in the dealer price due to changes in the rate of wholesale compensation was accompanied by a proportionate increase in the list price of the relevant parts (RA 904, RA 905). This was due to GM's maintaining the dealer price at approximately 40% of the list price (CX 7225C) (CCPF 304).

42. Crash parts were made eligible for both the 5% Stock Order (PAD) Discount and wholesale parts compensation. The object was to assist dealers in greater penetration of the wholesale parts market, both replacement and crash, which was estimated to be approximately six times larger than the total retail parts market. As an example, a carburetor, Group 3.725, having a compensation rate of 12.6% (which indicated that only approximately [*35] 50% of the volume of parts in that group were formerly eligible for wholesale compensation) was made eligible for 25% wholesale compensation in that group (CX 7023A-B).

43. The "General Motors Parts Division Body Shop Price Schedule" (CX 7422A-Z-3) contains a suggested list price and a suggested trade price for the automotive replacement parts GM offers for sale to its dealers (Tr. 2056). The list includes all of the parts which are in the definition of crash parts contained in the complaint in this matter (Tr. 2056). The dealer net price, before other discounts or rebates, is the same as the suggested trade price and is the price GM recommends dealers charge to IBSs and other commercial auto body repairers (Tr. 2059).

44. In 1970, another FTC investigation of the effects of wholesale compensation began (RX 28F). The staff concluded: (1) that wholesale compensation had not achieved price parity between dealers and IBSs (2) that prices to consumers had risen and (3) that there would be an estimated 10% drop in consumer prices if wholesale compensation ended (RX 28G).

45. On March 21, 1972, still another investigation was initiated to look into "... possible monopolization [*36] of crash parts by the auto makers" (RX 28H). There were many discussions within GM regarding ways to resolve the controversy with the FTC (Tr/. 2224). Two objectives were to settle the controversy and to reduce or eliminate wholesale compensation costs (Tr. 2143, 2168) (CX 7253) (RPF 259).

46. On July 11, 1975, a settlement proposal was made to Commission staff under which GM would sell crash parts directly to any IBS at the dealer net price from the 27 field warehouses operated throughout the United States if that proposal would end the investigation. GM acknowledged that the Robinson-Patman Act ( 15 U.S.C. 13) would require that the independent body shop operators be accorded the same prices and services as the dealers (CX 7010E.

47. The proposal called for car dealers to continue to distribute the overwhelming majority of crash parts to independent auto body repair shops and to receive wholesale compensation from GM for doing so. GM did not intend to substitute its 27 warehouse distribution locations for the dealers' 12,000. Rather, the warehouses would be an alternative source when an IBS operator felt that he could not buy the crash part he [*37] needed at a competitive price from a dealer (ALJX 13D, Supp. to CX 7012).

48. Also, in the summer of 1975, the Commission retained Cambridge Management Associates, management consultants, to survey existing warehouse distributors to determine whether they would be interested in selling crash parts. The survey contemplated that the distributors would sell to jobbers, who in turn would sell to the IBSs or to car dealers who chose to buy from them rather than directly from the manufacturer. It was projected that the jobber --an additional link in the distributive chain -- would need an average gross margin of 25%-46% to perform his function (ALJX 14S, Supp. to CX 7014).

49. In October, 1975, the Automotive Warehouse Distributors Association (AWDA) whose membership accounts for the great bulk of independent wholesale parts distributors, advised the Commission that its members were not interested in distribution of sheet metal parts (i.e., crash parts) and that they were not equipped to stock and handle them (ALJX 14T, Supp. to CX 7014). AWDA is a trade association representing approximately 500 of the nation's

1982 FTC LEXIS 39, *37

1000-1500 warehouse distributors (WDs). GM is also a member **[\*38]** of AWDA. WDs sell automotive replacement parts to jobbers who resell them to installers (IX 2; Tr. 2248; 8640-41) (CCPF 322).

50. AWDA opposed IW-IBS access in order to prevent its WD members from facing additional competition (Tr. 12588). The members feared that GM would sell maintenance-type (replacement) parts, as well as crash parts, to independents and that this would place GM in direct competition with WDs for jobber business.If GM sold crash parts only to IBSs, AWDA would not oppose IW-IBS access (Tr. 12591-92; 12664-66). (CCPF 323). A former executive of AWDA testified that changing the distribution system might reduce the availability of crash parts (Tr. 12523-24) (RRB 323).

51. In early October, 1975, GM raised the amount of the wholesale compensation allowance from 25% to 30% (ALJX 13G, Supp. to CX 7012).

52. Later, on February 5, 1976, in another proposal to the Commission, GM said that it would broaden the Wholesale Compensation Plan by paying a dealer an allowance for the sale of eligible crash parts to an IBS for any make of GM car, <u>e.g.,</u> a Pontiac dealer than would be able to obtain wholesale compensation on the sale of Chevrolet, Oldsmobile, Buick **[\*39]** and Cadillac crash parts (ALJX 13G, Supp. to CX 7012). Under this proposal, any of the 12,000 GM dealers would have been able to claim wholesale compensation whenever an eligible crash part, regardless of the make of car it fit, was sold to an IBS (ALJX 13H, Supp. to CX 7012). This proposal was made after GM officials concluded that the July 11, proposal would not be acceptable (ALJX 13B, Supp. to CX 7012).

53. In addition, the proposal called for GM to make crash parts for subcompacts and light duty trucks eligible for wholesale compensation on a trial basis, with the option of changing at the end of six months if GM's principal competitors, including the foreign manufacturers, did not implement a similar plan (ALJX 13I, Supp. to CX 7012).

54. Also in 1976, on March 1, 8, and 12, the Subcommittee For Consumers of the Committee on Commerce of the United States Senate conducted hearings on the cost of automobile crash parts and subsequently published "Automobile Crash Parts", the transcript of the hearings for the use of the Committee on Commerce (ALJX 17). At the hearings the Director of the Commission's Bureau of Competition testified that GM's February, 1976, proposal **[\*40]** was "particularly disappointing" (RX 28J), "totally inadequate" and that the wholesale compensation plan had "raised prices to consumers without achieving its goal of price parity for IBSs" (RX 28K). He also commented that State Farm Mutual Automobile Insurance Company favored requiring the auto makers to sell directly to independent wholesalers (RX 28I-J).

55. Later that month the February proposal by GM was rejected by the Commission and the Complaint was issued. See p. 1.

<u>THE RESPONDENT</u>

56. General Motors Corporation is a Delaware corporation organized on October 13, 1916, with its headquarters at 3044 W. Grand Boulevard, Detroit, Michigan 48202 (Answer, par. 2). GM is the successor to the General Motors Company, which was organized on September 16, 1908 (RX 310R).

57. GM is, and for many years has been, engaged in the manufacture and sale of a wide variety of products, including automobiles, trucks, buses, diesel locomotives, diesel engines, earth moving equipment, household appliances, and automotive parts (Answer, part. 3). The principal makes of automobiles GM manufactures and sells in the United States are: Chevrolets, Pontiacs, Oldsmobiles, Buicks, and **[\*41]** Cadillacs (RA 746 and 748). There is a separate GM division for each of these, with each division franchising dealers to sell its own make of auto (Tr. 1999). Trucks are franchised by the Chevrolet Division and the General Motors Truck and Coach Division (Tr. 1999). A dealer franchised to sell several makes is franchised by each division whose brand he sells (Tr. 2000-2001).

58. GM and its dealers' primary business and interest is in selling cars and trucks (Tr. 9869; 12651) (CCPF 183).

59.  New car customers expect the manufacturer of the car that they buy to see to it that parts and service are available for that car (Tr. 11008).  As a consequence, car manufacturers such as GM must provide the necessary back up stocks of parts (Tr. 11009; 13978-79).  Many other considerations such as the car's styling, size, sticker price, gas mileage, and resale value are at least as important to a prospective car purchaser as the cost of crash parts (Tr. 1382) (CCPF 185).

60.  Accident repair costs are of little, if any, importance to most purchasers buying an automobile since they believe their insurance will cover damage expenses above the deductible amount (CX 7815P) (CCPF 188).  **[*42]**

61.  GM automobiles come in 12 different body sizes.  As many as four car divisions produce unique models of the same body size.  Generally, each body size and each division's model of that body size consist of both unique and common crash parts, e.g., Chevrolet's B-body Impala and Caprice (Tr. 10124-30, 10153-55) (CCPF 13) (RRB 13).

62.  In 1976, GM-manufactured automobiles accounted for 45.5% of total U.S. automobile registrations and GM trucks for 42% of total U.S. truck registrations (CX 7409A, C).

63.  GM also sells various maintenance type automotive replacement parts such as wire and cables, spark plugs, brake shoes, batteries, and carburetors to nondealer resellers who sell to installers, including some GM dealers (RA 757, 758, 761).

64.  The table on the following page shows in greater detail and for more recent years the level of operations of GM (RX 310P and Q):

65.  GM is the largest manufacturer of automobiles and light trucks in the United States (Answer, par. 5).  The only light trucks which GM manufactures and sells in the United States are made under the Chevrolet and GMC names (RA 750).

66.  In 1972, GM sales of automotive replacement parts,  **[*43]**  including "crash parts", as defined in the complaint, exceeded 250 million dollars (Answer, par. 6).

67.  GM engages in a continuous and substantial course of trade in commerce and affects commerce throughout the United States (Answer, par. 7).

CRASH PARTS

68.  All service GM crash parts, as defined in the complaint, are, and for many years have been, produced either by GM or by independent manufacturers for GM.  They are distributed by GM exclusively to its dealers who either wholesale, otherwise resell, or install the parts (Answer, par. 10).  Michael C. Mehan, Executive in charge of GM's U.S. service parts operations, i.e. General Motors Parts Division (GMPD) and AC-Delco Division, testified that the parts enumerated in the complaint are crash parts but did not agree that the definition was all inclusive (Tr. 2009).

69. GM sells most of its crash parts exclusively to approximately 12,000 GM dealers (Answer, par. 11).  However, not all GM dealers have body shops (CCA 61).

70.  As of December 31, 1974, GM owned and operated 23 GM dealerships and had a temporary financial interest in 379 (RA 764).  Some of the 23 and many of the 379 conducted body shop operations **[*44]**  (RA 767 and 769) and many of each category resold crash parts to installers in 1974 (RA 768A, 770A).

71.  There are more than 5,000 different crash parts for GM 1968-72 model year automobiles and trucks (Answer, par. 15).  There are 112 different Chevrolet fenders.  In recent years Chevrolet has sold an average of 4,500 of each different fender in each year.  Since there were approximately 6,500 Chevrolet dealers (as of May 12, 1967), Chevrolet dealers buy an average of less than one fender per year of each different fender (CX 7000D).

72.  All crash parts produced by independent manufacturers for GM are produced from tooling GM owns except for parts for step vans (RA 720).

|  | 1977 | 1972 | 1967 |
|---|---|---|---|
| Net Sales | $54,961,272,516 | $30,436,231,414 | $20,026,252,468 |
| Net Income | $ 3,337,527,231 | $ 2,162,806,765 | $ 1,627,276,076 |
| Dividends on Stock: |  |  |  |
| Preferred | $ 12,928,261 | $ 12,928,270 | $ 12,928,276 |
| Common | $ 1,944,714,370 | $ 1,273,066,301 | $ 1,084,355,349 |
| Net Income Retained For |  |  |  |
| Use In Business: | $ 1,379,884,600 | $ 876,812,194 | $ 529,992,451 |
| Expenditures for Plant and |  |  |  |
| Equipment (Excluding Special |  |  |  |
| Tools) | $ 1,870,930,827 | $ 940,037,584 | $ 912,629,617 |
| Payrolls Worldwide | $15,270,777,726 | $ 8,668,223,736 | $ 5,634,191,663 |
| Average No. of Employees |  |  |  |
| Worldwide | 796,848 | 759,543 | 728,198 |
| Number of Stockholders | 1,245,384 | 1,284,825 | 1,399,113 |
| Cars Manufactured In the U.S. | 5,258,583 | 4,778,124 | 4,581,315 |
|  |  |  | (1968) |
| Trucks & Coaches Manufactured |  |  |  |
| In the U.S. | 1,436,220 | 962,316 | 829,005 |
|  |  |  | (1968) |
| Cars and Trucks Manufactured |  |  |  |
| Outside the U.S. | 2,373,010 | 2,050,085 | 1,676,594 |
|  |  |  | (1968) |

**[*45]**

73.  On eligible parts dealers currently receive a rebate of 30% (wholesale compensation) of the dealer price on qualified sales to wholesale customers, including IBSs (Tr. 2068-70, 10252-54, 10294).

74.  Crash parts as a class are bulky and require considerably more space for storage than replacement parts. They are more easily damaged and harder to handle than the typical replacement part (Tr. 12509-10; 12629-30; 10459-61; RX 51S) (RPF 79).

75.  GM does not pay wholesale compensation on dealer resales of crash parts exclusively used on a brand of automobile the dealer is not franchised to sell, e.g., a Chevrolet dealer selling a crash part for a Pontiac (RA 795-799).

76.GM pays wholesale compensation on resales of eligible crash parts by its dealers; (1) to independent automotive repair shops, body shops, gasoline stations, fleet users (5 car or light truck minimum); (2) to non-GM-dealer new car or truck dealers e.g., Ford, American Motors, British Leyland; (3) on emergency sales to another GM dealer to meet a service customer's needs or to an outlying GM dealer who has been approved as a buyer by the cognizant GM franchising division of GMPD; (4) to independent **[*46]**  used car and truck dealers; (5) federal, state, county, and municipal government agencies.  Sales: (1) to retail customers, (2) to insurance companies for use on a vehicle owned or titled in the name of an insured, (3) to a department of the selling dealer's dealership, or (4) to anyone who purchased eligible parts for resale directly or indirectly to a GM car or truck dealer, are typical of those resales for which wholesale compensation is not to be claimed (RA 801, Attachment A).

77. In order to get his rebate and after he has wholesaled the part, the dealer files a report in which compensation is claimed (Tr. 2006). Wholesale compensation is not to be paid to a dealer for a part used in the dealer's own body shop (Tr. 4753; Tr. 11020) and is to be paid on dealer-to-dealer sales only if an emergency existed or if the sale had prior GM approval (e.g., to an isolated dealer in a remote location) (Tr. 2087-90; CX 7253D) (RPF 34).

78. Wholesale compensation payments require substantial administrative expenses in addition to the cost of the payments. For a GM dealer to obtain wholesale compensation, he must obtain a form from GM, keep track of qualified **[*47]** sales, enter the sales on the form, and send the form to GM. GM must transmit the form to the dealer, receive it back, process it, issue credits, and, on occasion, audit dealers (CX 700E; Tr. 2165-66, 11972-74) (CCPF 307).

79. The added costs of wholesale compensation are not offset by any other benefits, such as the receipt of superior service. GM dealers do not perform any services under the wholesale compensation plan that they did not perform prior to its adoption (Tr. 10231). To receive wholesale compensation on crash parts, GM dealers need not stock, maintain any facilities, deliver, solicit sales, pass out technical bulletins, or do anything else except sell to qualified purchasers (Tr. 2201, 10239-40) (CCPF 309).

80. Except for parts carried over for use as original equipment in successive model years, service GM crash parts typically are inventoried, for 7 to 12 years (RA 864).

81. GM does not rechrome or sell rechromed bumpers, or salvaged/used crash parts (RA 867-869).

82. In 1975, more than 13,000 crash parts were included in GM's wholesale compensation plan (RA 893).

83. When GM increases dealer prices, it usually also increases suggested list **[*48]** prices so that the discount from suggested list to dealer net price remains approximately the same as before the price change (RA 905).

84. GM usually starts production of a 6 to 8 months' supply of crash parts for automobiles and light trucks at least 2 months prior to introducing the new model (RA 913 and 916).

## GENERAL MOTORS DEALERSHIPS

85. The basic policy of GM is and has been to distribute its cars through independently owned and operated dealerships (CX 7029B). There are about 5,000 GM dealers who wholesale GM crash parts (Tr. 10285). There are approximately 7,000 additional who could purchase and wholesale crash parts (RX 2). (RPF 183).

86. As of February 24, 1977, in the United States the various divisions making GM cars had the number of dealers shown: Chevrolet-5992; Pontiac-3239; Oldsmobile-3322; Buick-3025 and; Cadillac-1616 (RX 33B-F).

87. GM at one time owned automobile dealerships in the Manhattan section of New York City but these were phased out in 1976. GM currently owns and operates no automobile dealerships but does own 18 truck dealerships, which are primarily involved in the sale and service of medium and heavy duty trucks (Tr. 9863-64) **[*49]** (RPF 186).

88. To facilitate the opening of dealerships, GM has a Dealer Investment Plan operated by its Motors Holding Division (MHD) (CX 7029C). As of October 31, 1964, of 13,395 dealerships, 306 or 2.3% of the total, were operating under the MHD Plan (CX 7029C).

89. As of December 31, 1977, GM had a financial interest in 345 or 3% of the 11,660 GM dealerships in business (RX 34).

90. MHD dealerships accounted for an estimated 4.3% of total GM dealer wholesale parts sales and an estimated 5.3% of total GM dealer body shop sales (RX 34; RX 38; RX 40) (RPF 187(d)).

91. Under the plan the entrepreneur/dealer provides at least 25% of the capital required and MHD provides the balance. The dealer gets voting stock and is paid a salary. He buys MHD owned stock in the dealership in order to

increase his interest (CX 7029D-E). The dealer-operator conducts the day to day operations (Tr. 9846-47; CX 7029E). However, two MHD representatives sit on the board of directors (CX 7029E). Between 1929 when the plan began and 1964, 1,139 dealers bought their businesses in this way (CX 7029F).

92. The interest of MHD is limited in duration. Between 1970 and 1977, the average **[*50]** length of time during which MHD held financial interests in such dealerships ranged from five years, three months, to six years, seven months (RX 34).

93. MHD financed dealers are free to buy parts from any source they choose and otherwise to operate their dealerships as they see fit. Purchases of parts from GMPD are on the same terms and conditions as those made by other dealers and any resales are made at dealer-chosen prices. Such dealers are audited periodically to determine the status of MHD's investment and to advise the dealers concerning efficiency of their sales and other methods of operation (CX 7029G).

94.Each car manufacturer has the same incentives GM has to distribute crash parts in the most efficient way possible (Tr. 15751-55; 15794-95) (RPF 102). All U.S. auto manufacturers and all foreign automobile companies that have been selling cars in the U.S. since the early 1960's now distribute crash parts basically in the same way (Tr. 2223; Tr. 9870) (RPF 103). But see "Chrysler's Mopar Experience", page 36.

95. The terms of the contract between GM and its various dealers are set forth in a "Dealer Sales and Service Agreement".The agreement usually is executed **[*51]** for GM by the general sales manager of the division responsible for the make of car the dealer sells, another GM official, and a partner or the proprietor of the dealership (RX 228-13). The contract calls for the dealer to "... carry in stock at all times an inventory of Parts and Accessories adequate to meet customer demands and for warranty repairs, special policy adjustments and campaign corrections..." Neither dollar amounts nor number of items to be inventoried is specified in the contract (RX 2-W). The agreement also authorizes GM personnel to examine and audit the books of the dealership (RX 2-Z).

96. GM makes recommendations as to the space which <u>should</u> be devoted to the parts department which are based on the dealer's anticipated monthly sales of cars ("Planning Potential") and Net Dollar Inventory. The following table illustrates this:

| Planning Potential | Sq. Ft. | Net Dollar Inventory | Sq. Ft. |
|---|---|---|---|
| 50 | 1200 | $ 10,000 | 1500 |
| 101-125 | 1700 | 40,000 | 4500 |
| 201-225 | 2200 | 80,000 | 85,00 |
| 301-350 | 3300 | 150,000 | 14000 |

(CX 7234B)

97. GM also recommends a mix of parts inventory on a model year basis which its dealers <u>should</u> have. The optimum **[*52]** pattern per GM calls for the inventory to be broken down as follows:

| Year | % |
|---|---|
| Current Model | 10% |
| 1 Year Old | 20% |
| 2 Years Old | 25% |
| 3 Years Old | 20% |
| 4 Years Old | 15% |
| 5 Years or Older | 10% |

(CX 7245E)

98.   The dealer is required to use and keep up to date a satisfactory uniform accounting system of a type designated by GM and to furnish to GM "... by the tenth of each month, complete and accurate financial and operating statements..." (RX 24).   GM audits some dealers claims under the wholesale compensation plan (RA 806) and reviews the records of all of its dealers (RA 811A).

99.   In wholesaling eligible service GM crash parts a GM dealer can obtain 30% lower prices on parts that are uniquely applicable to the make of automobile he sells than can GM franchise dealers who are franchised to sell other makes (see RA 923A).

100.   GM dealers and IBSs perform most of the body repair work which is done on GM automobiles and light trucks (Tr. 1202).   GM dealers are the principal competitors of IBSs in performing such repairs (RA 774-5; Tr. 1201-02).   IBSs do body work on all makes of vehicles but most GM dealers tend to specialize in repairing the models they sell **[*53]**   (Tr. 1200-01, 9495, 9498) (CCPF 39).

101.   The price GM dealers charge IBSs for new GM crash parts may vary throughout the United States (CCA 55).

GM DEALERS AS PARTS WHOLESALERS

102.   GM dealers are not expected to stock all or even some of the slowest moving crash parts (Tr. 10086-88).   In states where there is an inventory tax, GM dealers do not want these slower-moving parts to sit on their shelves. They prefer to carry faster-moving items (Tr. 6982-83) (RPF 77).

103.    GM dealers need not engage in parts wholesaling or the operation of a body shop (Tr. 9094).   If they wholesale parts, they are not required to stock parts (Tr. 9904-05; 10268).   The dealer determines which parts if any he will stock for any of his operations.   GMPD does not control the inventory practices of GM dealers (Tr. 9049; 9907) (CCPF 36).

104.   Dealers usually do not wholesale crash parts for makes of cars they do not sell (Tr. 2126).   If wholesale compensation were paid on such sales some dealers would enter that field and others would drop out (Tr. 2132).

105.   Each of the crash parts listed in paragraph 1D of the complaint is eligible for wholesale compensation (Tr. 2019).

106.   **[*54]**   A GM dealer is at an automatic 30% price disadvantage in wholesaling non-franchise crash parts, i.e., those for makes he is not franchised to sell (Tr. 10263-64, 10266).   This constitutes a near total entry barrier to such sales (Tr. 14015), as relatively few GM dealers do in fact wholesale crash parts for makes for which they are not franchised (Tr. 2126) (CCPF 255).

107.   It is the position of NADA that elimination of this limitation would benefit IBSs and increase availability of parts to consumers at lower cost by increasing the competition among franchised dealers selling different model vehicles (CX 7327G).   In its February, 1976, settlement proposal GM mentioned that the elimination "would be likely to increase competition" as "all 12,000 GM dealer locations would be able to claim wholesale compensation whenever they sold an eligible crash part... to an independent auto body repair shop" (ALJX 13G,H, Supp. to CX 7012) (CCPF 257).

108.   GM pays wholesale compensation on sales by one GM dealer to another in two situations.   The first is when the purchasing dealer is a so-called "country dealer" -- a "small dealer in an outlying area" (CX 7813B) who, with advance approval **[*55]**  from GM, buys from another GM dealer of the same franchise (CX 7813B; Tr. 2087).   The second situation is sales "on an emergency basis", e.g., when a vehicle is "inoperative" (CX 7813B; Tr. 2087) (CCPF 311).

1982 FTC LEXIS 39, *55

109.  The "great majority" of collision damaged vehicles that are repaired can be driven, however "emergency basis" orders occur frequently, resulting in a considerable number of wholesale compensation payments (Tr. 1576). A purchasing dealer need only state that his purchase is for an emergency for the selling dealer to justify a claim for wholesale compensation (Tr. 10573-74; 11063; 12024-25).

110.  GM dealers consider an "emergency basis" to exist when a damaged vehicle is in the shop of the dealer buying the part, regardless of whether the vehicle to be repaired is in fact inoperative (Tr. 9054-55; 11062-63). Neither the selling dealer nor a GMPD field warehouse has the means of verifying whether a sale of crash parts to another dealer is in fact for an "emergency" (Tr. 10357-58; 12024-25).  Generally, no attempt at verification is made by the selling dealer (Tr. 11063-64).  The purchasing GM dealer alone determines whether there is an emergency (Tr. 2087) (CCPF **[*56]** 312).

111.  Between 1972 and 1976, in auditing the wholesale compensation claims of less than 5% of its approximately 12,000 dealers, GM recovered $1,664,194 in erroneous claims (CX 7229).  Most of this recovery was due to ineligible sales between GM franchise dealers (CX 7230A, B) (CCPF 313) (RRB 313).

112.  GM officials recognize the problem of possible abuse of wholesale compensation on dealer to dealer sales. These officials view wholesale compensation on crash parts as facilitating cheating on the claims and have sought to eliminate payments on sales between GM dealers (CX 7346A).  GM's president has expressed concern over the amount of wholesale compensation claimed on dealer to dealer sales in some areas, and in general over the significant amount paid in total on such dealer to dealer sales (CX 7253D-E, in camera) (CCPF 314).

113.  Inventorying of all crash parts at the dealer level would be uneconomical because sixty-five percent (65%) of GMPD's crash parts sell at a rate of 500 or less each year.  Ninety-six percent (96%) of crash parts have sales of fewer than 5,000 units per year or less than one per dealer (Tr. 10084) (RPF 55).

114.  In the 1976 hearings **[*57]** before the Senate Commerce Committee, a representative of ASC testified that for then current GM models, after the first six months, and for models up to three years old, parts were readily available in a day or two (ALJX 17, pp. 63-64) (RPF 59).

115.  GM dealers have an interest in the repeat purchase of cars and therefore an incentive to insure the availability of parts, even though a particular customer might make his repeat purchase from another dealer (Tr. 15755-56; 10069-70; 8622-23).  GM dealers or their employees testified that their new car sales are affected by the availability of crash parts (Tr. 10475-77; 10820-22; 11841).

116.  In all but a few remote areas of some counties in the United States, there are two or more dealers in each car line in the sale of GM crash parts.  The coverage is such that at least two dealers are within an hour's drive of nearly every populated area in the United States (RX 33A-F) (RPF 65).

117.  Some GM dealers selling crash parts over wide areas offer same-day or next-day service within a radius of several hundred miles and impose no minimum order requirement.  Some absorb freight costs for orders over $200- $300 (frequently medium **[*58]** or average size orders) and accept returns without penalty, including absorbtion of return freight unless the customer is at fault (Tr. 10835-39, 10844; Tr. 10482-84; Tr. 5527-28) (RPF 70).

118.  Approximately five thousand invoices and other evidence of sales issued by 82 GM dealers to the IBS witnesses and the stipulated summaries thereof, indicate that the average price at which these IBSs purchase service GM crash parts was list minus 27% in 1974 and list minus 28% in both 1975 and 1976 (CX 2; CX 5373; Revised CX 5374 - Second Revision CX 5706).  By individual trade area, crash parts were purchased at the following discounts off list for the following years:

### AVERAGE DISCOUNT (%)

| TRADE AREA | 1974 | 1975 | 1976 |
|---|---|---|---|
| Buffalo, N.Y. | | 28 | 29 |

1982 FTC LEXIS 39, *58

**AVERAGE DISCOUNT (%)**

| TRADE AREA | 1974 | 1975 | 1976 |
|---|---|---|---|
| Mansfield, Ohio | | 26 | 27 |
| Cleveland, Ohio | 26 | 28 | 28 |
| New Orleans, La. | 27 | 30 | 29 |
| St. Louis, Mo. | | 27 | 28 |
| Spokane, Wash. | 26 | 25 | 25 |
| Tucson, Ariz. | 28 | 31 | 26 |

(Second Revision CX 5706) (CCPF 107).

119. Dealers generally sell crash parts for which they do not receive wholesale compensation at a price of list less 25% (Tr. 14019 et seq., 14539-40). They buy these parts at "dealer price", which is list **[*59]** less 40%. Thus, for a noncompensable crash part listing for $100, the dealer buys it for $60 and sells it for $75. The gross profit of $15 divided by the $75 selling price gives him a 20% gross profit margin (Tr. 14022-26) (RPF 82).

120. Dealers receive a stock order allowance of 5% of "dealer price" on all orders placed on bi-monthly stock or PAD orders (Tr. 11548-49). When a dealer buys a noncompensable crash part "on the pad", his cost is list less 40% less 5%. For example on a $100 list part, his cost is $60 less 5% of $60 ($3.00) or $57. If he sold the part for $75, his margin would then be $18 ( $75 less $57) divided by $75 or 25% above his cost (RPF 83).

121. If a GM dealer wholesales noncompensated new GM crash parts at suggested trade prices, he realizes a profit margin of 20% and a mark-up of 25%. If the parts were purchased on stock order (PAD), the gross profit margin would increase to 24% and the mark-up to 31.6% (Tr. 15064, 15067-68) (CCPF 51).

122. Complaint counsel's expert witness, Dr. Steven Nelson, estimates that approximately 50% of crash part orders are on the PAD and subject to the 5% stock order allowance (Tr. 14532). By weighting the margins **[*60]** by the percentage of purchases on and off PAD, dealers' gross profit margin on non-compensable crash parts is 22% (RPF 84).

123. Considering wholesale compensation as a reduction in cost rather than as part of the amount realized on the sale of the part, on PAD orders for an eligible crash part dealers pay 40% of list, less wholesale compensation of 30% of "dealer price", less 5% of "dealer price". Thus, for a $100 list part, the dealer's cost becomes $42, i.e., $100 less $40 less $18 for parts not on the PAD, and $3.00 less or $39 for parts on the PAD (RPF 85).

124. Dr. Nelson estimated that compensable crash parts are generally sold by dealers at prices ranging from list less 25% to list less 40% (Tr. 14019). By taking this range of selling prices, dealer margins on compensable crash parts, again with the 50/50 PAD ratio, may be calculated:

| Selling Price | Margin, No Pad | Margin, Pad Order | Margin, 50/50 Pad |
|---|---|---|---|
| List less 25% ( $75) | 44% | 48% | 46% |
| List less 40% ( $60) | 30% | 35% | 32.5% |

(RPF 86)

125. Dr. Nelson testified that approximately 60% of crash parts sold by dealers are compensable and 40% are noncompensable (Tr. 14535 et **[*61]** seq.). Factoring the margins for compensable and noncompensable crash parts in this ratio yields the following dealer gross profit margins for all crash parts wholesaled:

| Selling Price, Noncompensable Parts | Selling Price, Compensable Parts | Calculation | Margin |
|---|---|---|---|
| list less 25% | list less 25% | .6(46%) +.4(22%) | 36.4% |
| list less 25% | list less 40% | .6(32.5%)+.4(22%) | 28.3% |

Therefore, if wholesale compensation is treated as a reduction in the dealer's cost of the part, dealer margins range from 28.3% to 36.4% (RPF 87).

126. Again using the example of a $100 list part, if the dealer stocks the part he would have $60 tied up in it while it is in inventory. After the dealer sells the part, whether it is the same day he purchased it or two years later, he receives, under the example, $78. In terms of the amount of money tied up in inventory, his gross profitability in wholesaling crash parts, and the desirability of wholesaling crash parts in relationship to returns available elsewhere upon the investment of $60, it makes no difference to the dealer whether the purchaser of the part hands him the $78 or whether the purchaser hands him $60 and a third **[*62]** party, GM, hands him $18 in wholesale compensation. In either event, he would have had $60 tied up in the part and would not receive the $78 until the part is sold. Therefore, the question is: "How do dealer gross margins compare with margins of other types of wholesalers?" or "How do dealer gross margins compare with margins of other types of wholesalers who say they would need to sell crash parts profitably?". It is only by treating wholesale compensation as part of the income on the sale of the part, that meaningful comparisons can be made (RPF 88).

127. Finally, again relying on Dr. Nelson's testimony that approximately 60% of crash parts sold by dealers are compensable and 40% are noncompensable (See Finding 125), the following are the dealer gross profit margins for all crash parts wholesaled:

| Selling Price, Noncompensable Parts | Selling Price, Compensable Parts | Calculation | Margin |
|---|---|---|---|
| list less 25% | list less 25% plus comp. | .6(37%)+.4(22%) | 31.0% |
| list less 25% | list less 40% plus comp. | .6(25%)+.4(22%) | 23.8% |

(RPF 92)

128. Dr. Nelson's calculations regarding dealer gross profit margin ranges on crash parts wholesaling are confirmed by actual **[*63]** GM dealer financial data disclosing gross profit margins on dealer total wholesale parts business. Actual data demonstrate gross profit margins ranging from 25.8% in 1972 to 23.8% in 1977 (RX 301) (RPF 93).

129. If GM chose to sell to them, the most likely candidates for entry into wholesaling new GM crash parts are IWs already selling other products such as auto glass, rechromed bumpers, automotive paint, abrasives, body shop supplies, and salvage parts to body shops. Other candidates would be cooperatives formed by body shops (Tr. 13915-22) (CCPF 193) (RRB 193).

130. IWs generally provide at least one, and often more, free same day delivery on the products they currently sell (Tr. 5463, 5475, 5489-90, 7056-58). IWs believe that they could provide this same service in wholesaling new GM crash parts (Tr. 5480; 6414) (CCPF 232).

131. Some GM dealers, including some large wholesalers of crash parts, do not provide delivery service or provide poor delivery service. Others provide excellent service (Tr. 3812-13; 12050-51) (CCPF 232A).

132. Some GM dealer wholesalers of crash parts use a very limited sales force, and have no sales force to call on their crash parts [*64] wholesale accounts (Tr. 3019, 5467). If they have no sales force, orders are solicited and taken by phone (Tr. 2726; 6491) (CCPF 239) (RRB 239).

133. When IWs and GM dealers compete in wholesaling on products such as glass, mufflers or AC-Delco parts GM dealers fare badly in securing such wholesale business or do not attempt to compete with IWs (Tr. 10876) (CCPF 244).

134. IBSs have formed cooperatives which distribute products other than crash parts to their members. For instance Consolidated Automotive Parts, Inc. ("CAPI") is a St. Louis cooperative which has been in existence since 1973 (Tr. 2313). It handles a variety of automotive parts, including sandpaper, paint and crash parts applicable to Porsche, Audi, and Volkswagon automobiles. (Tr. 2314). CAPI marks up these items 15% when reselling them to its members (Tr. 2320). One of the reasons for the founding of CAPI was anticipation that GM crash parts would become available to wholesalers such as CAPI (Tr. 2317, 2469, 2471).

135. Many IWs have warehouses, delivery equipment, and personnel that could be used for the storage and delivery of crash parts. For example, IWs currently operate the same types of delivery [*65] equipment used by GM dealers who deliver crash parts (Tr. 5409, 5464). Additional personnel, warehouse space, and/or vehicles would pose no problem for IWs (Tr. 2323-24, 6414, 6522, 13915-17) (CCPF 202).

136. Many of the items which IWs sell to body shops are bulky. For example, glass is as bulky as fenders. (Tr. 7666, 7671-72). Windshields are stored in large racks similar to those used for large crash parts (Tr. 11167). IWs also inventory heavy and/or bulky items such as 55 gallon drums of thinner and antifreeze, heavy equipment, spray booths, masking paper, rebuilt motors, salvage crash parts, exhaust system parts, and rechromed bumpers (Tr. 3801, 3823, 5460, 6398, 6423, 6472) (CCPF 206).

137. Several IWs who expressed an interest in entering into the wholesaling of GM crash parts currently stock in excess of 10,000 parts numbers. (Tr. 3803, 5459, 11836). For instance, one wholesaler of mechanical parts, paint, and body shop supplies, inventories over 100,000 part numbers, including some items that "turn" only 1 1/2 times a year (Tr. 8846, 8893). Wholesalers of paint and related items and rechromed bumpers may stock 8,000-10,000 parts (Tr. 3803, 5460). Glass wholesalers [*66] stock from 2,000 to 6,000 parts (Tr. 5406, 7671-72). CAPI in St. Louis stocks 30,000 parts (Tr. 2322) (CCPF 212).

138. There is little difference in the average speed of movement between the parts stocked by IWs and large GM dealer wholesalers. (Tr. 12022, 12025, 12042). The turnover of crash parts sold by large GM dealer wholesalers is 3.2 to 5 times per year (Tr. 11893, 12042).

139. Interested IWs would be willing to invest "whatever it takes" to get into crash part wholesaling (Tr. 2322, 3050, 4408). For example, a national wholesaler of rechromed bumpers would be willing to invest $2 1/2 million to $5 million initially to enter crash part wholesaling (Tr. 7800, 7857, 3039); $500,000 to $1 million (Tr. 3039); $250,000 for initial inventory of crash parts applicable to a single GM car line (Tr. 5473a, 5477) (CCPF 215).

140. IWs have several other incentives to enter into the wholesaling of crash parts. Wholesaling such parts complements their current business (Tr. 4402). IWs could spread their overhead and reduce unit costs by combining deliveries and using their existing sales force (Tr. 6403-04, 6515-16, 7694, 8871).

CRASH PARTS AND THEIR MANUFACTURE  [*67]

141. In 1975, GM gross sales of crash parts were in the hundreds of millions of dollars (CX 7407 A in camera). Based on 1977 wholesale compensation payments and a 60% eligibility factor (i.e., the 13,000 parts on which wholesale compensation is paid out of a total of 32,000 crash parts (Tr. 10072)), GM's gross sales of crash parts had increased more than 70% by 1977 (CCPF 46 and 306 - in camera) (CCPF 15).

142. Crash parts are sold to a distinct class of customers, body shops which specialize in the repair of crash-damaged vehicles. These shops generally perform very limited mechanical repairs, doing such work only when it is

accident related. Consequently, body shops' purchases of automotive replacement parts consist almost entirely of crash parts (Tr. 3059-60, 3835) (CCPF 54).

143. While the storage of some crash parts requires special bins, such bins in general are not unique (Tr. 10997), 11046-47). Many such bins are built to handle a particular type of crash part (Tr. 11046-48). Others can be used to store either crash parts or mechanical parts (Tr. 11047) (CCPF 204).

144. Normally GM crash parts will not fit or coordinate with vehicles assembled **[*68]** by companies other than GM, and crash parts applicable to non-GM vehicles will not fit or coordinate with GM vehicles (Tr. 1192-94, 1365-66, 1678) (CCPF 56). Crash parts are not standard and usually may be used only for the vehicle for which they were designed (ALJX 9P - Supp. to CX 7006B).

145. Replacement of parts for reasons other than crash damage, such as rust, is infrequent. Also, unlike replacement mechanical or "functional" parts applicable to GM vehicles, crash parts are seldom installed for purposes of maintenance or due to wear or mechanical failure (Tr. 1361-62, 1675, 2260-61; CX 7226B) (CCPF 58).

146. Crash parts account for approximately 70%, both in units and dollars, of all automotive parts replaced under insurance claims for damage to GM automobiles and light trucks (CX 7405; see also CX 7400A-V, CX 7401A-X and Z-3 to Z-36, CX 7402A-H) (CCPF 59).

147. Some GM crash parts can seldom, if ever, be repaired due to their type of construction. For example, parts made of pot metal, such as fender and rear end caps, parts which are chrome-plated, such as bezels, grilles, moldings, and glass components generally are not repairable (Tr. 2501, 3068, 3837) (CCPF **[*69]** 62). Parts constructed of plastic, fiberglass, and aluminum are very difficult to repair (Tr. 1729-30, 2501-02) (CCPF 64).

148. Dr. George Benston, GM's expert witness, testified that ownership of the dies used in the manufacture of new cars is the decisive, competitive advantage that GM has over other potential manufacturers of crash parts (Tr. 15747) (RPF 180). Usually there exists a single set of dies which produces both original equipment and service parts. The total cost of dies used in the manufacture of crash parts for a particular vehicle varies greatly. It depends upon the number of plastic rather than metal parts, the number of body styles covered and the amount of use obtainable from tooling for prior model vehicles (ALJX 9S, Supp. to CX 7006).

149. A new model normally utilizes substantial tooling from the prior model which may be completely unchanged or modified to create new lines through the use of inserts. The cost of tooling to manufacture crash parts can run to tens of millions of dollars. This cost stems from producing original equipment as well as service and crash parts for repairs. GM estimates that service parts normally account for less than **[*70]** 15% of the total volume of dollars spent on tooling (ALJX 9T, Supp. to CX 7006).

150. Original equipment and repair parts are often produced during the same run. They also may be produced on a separate production run, but within the same plant. For these, setup costs (excluding transportation charges) may run to several thousand dollars depending upon the number of dies required for each part and the complexity involved (e.g., 17 separate dies were required for an outer rear quarter panel on the 1976 Chevrolet Impala) (ALJX 9U, Supp. to CX 7006).

151. No envidence was adduced indicating that GM has impeded entry into the manufacture of parts, including crash parts (ALJX 9, Supp. to CX 7006). Any manufacturer who cares to is free to make GM crash parts (CX 7008).

152. "Total crash parts demand is high,... but with possible exceptions, the demand for each individual part is probably quite modest. The probability that a car will require the replacement of a particular fender or other crash part with a new one during its life-time is not great. One would not, therefore, expect this market to be attractive to potential entrants." (CX 7006E, quoting the Commission's **[*71]** Office of Policy Planning and Evaluation (OPPE), 1975 Semi-Annual Budget Review, Jan. 24, 1975 at p. IW-17).

153. For any one of the thousands of individual GM crash parts, the demand is extremely low -- particularly when compared to the number of car models originally produced. For example, between 1968 and 1975, fenders for Chevrolets alone accounted for about 11% of production. The following table, included in a March, 1976, GM presentation at the Congressional hearing mentioned above (Finding 54) shows this in greater detail:

| Annual | | | | 3926848 |
| Production | 3926836 | 3953693 | 3953694 | Front |
| Calendar Year | Hood | Fender L/H | Fender R/H | Bumper Bar |
| 1968 * | 2,711 | 4,784 | 4,854 | 7,431 |
| 1969 | 17,120 | 25,097 | 25,331 | 39,937 |
| 1970 | 16,141 | 26,371 | 26,559 | 31,048 |
| 1971 | 13,917 | 21,637 | 21,688 | 17,228 |
| 1972 | 10,712 | 17,651 | 18,435 | 11,035 |
| 1973 | 7,296 | 13,397 | 13,675 | 7,149 |
| 1974 | 2,544 | 6,703 | 7,405 | 2,975 |
| 1975 | 755 | 3,614 | 4,211 | 1,675 |
| Total | 71,196 | 119,254 | 122,158 | 118,478 |
| % of | | | | |
| Production | 6.4% | 10.8% | 11.0% | 10.7% |

*

154. These figures illustrate one of the principal reasons why other manufacturers have **[*72]** not entered the business of manufacturing crash parts. The replacement parts represented by the table above were built as demand warranted durin the lifetime of the vehicle. Neither GM nor anyone else could maintain enough warehouse space to economically produce anticipated crash parts needs, such as those involving these four parts, in one production run. Thus, over the years the dies for these units must be set up and the parts produced as inventory needs demand and warehouse space allows. This adds to consumer costs (ALJX 14Z24, Supp. to CX 7014).

155. The relatively low demand for crash parts is only one factor which has discouraged other manufacturers from making them. There also are the tooling costs. There are economies if the dies that are required for most crash parts are used for producing both original equipment and service parts and such economies are greater when original and service parts are produced during the same production run. Some crash parts have little or no year-to-year variation in their design. Thus, parts for several years past can be scheduled along with current original equipment production. For example, the trunk assembly for the Chevrolet **[*73]** Monte Carlo used some of the same tooling for model years 1973 through 1976 (ALJX 14X, Supp. to CX 7014).

156. GM's Fisher Body manufacturing plants retain dies to make sheet metal parts for models six to seven years old -- and in some cases even older. Typically, these dies, which may weigh ten tons and over, are kept in storage yards. The dies are retrieved, steam cleaned, reconditioned -- in some cases partially rebuilt -- and then inserted into presses to run the required supply of service parts. This is an expensive process because much of it is short-run and labor intensive (ALJX 14Y, Supp. to CX 7014).

HOW PARTS ARE DISTRIBUTED BY GM

---

* * (ALJX 14Z24, Supp. to CX 7014).

157.   Parts for GM's vehicles are distributed by General Motors Parts Division (GMPD) and AC-Delco Division. GMPD and AC-Delco are engaged wholly in warehousing, marketing, distributing, and selling parts for GM (Tr. 1994-95).

158.   Some parts, such as spark plugs, shock absorbers, radiators, oil filters, fuel pumps, etc., are sold both by GMPD and AC-Delco.   Sheet metal parts, which generally includes crash parts, _e.g.,_ body frame, chassis parts, interior trim parts, and engine parts are sold exclusively by GMPD (Tr. 2003-04).   **[*74]** Batteries are sold exclusively by AC-Delco (Tr. 2011).

GMPD

159.   GMPD was established to provide GM car dealers with the parts they need for the make of car they sell (Tr. 1995).   GM's profit from distribution of parts had declined due to rises in warehousing and distribution expenses. These had doubled between 1962 and 1968 for the five car divisions (CX 7248B).   The number of service parts needed to serve the market had increased from 132,000 in 1955 to 316,000 in 1968 (CX 7248C).

160.Within GM, GMPD is responsible for assuring the availability of parts to service GM cars.   Aside from batteries, GMPD sells all parts applicable to GM cars (Tr. 10043-45, 10181, 2012) (RPF 17).

161.   From model year 1959 through model year 1970, each car division either manufactured or purchased all crash parts applicable to its make of cars.   As of January 1, 1959, the predecessor of the present GMPD, which at that time was a part of Chevrolet Division, was made responsible for warehousing and distributing service parts to Chevrolet, Oldsmobile, and Pontiac dealers. Both Buick and Cadillac had assumed responsibility for the distribution of their own service parts, and maintained **[*75]** their own field warehousing operations.   Buick and Cadillac field locations were consolidated into GMPD between 1963 and 1966.   However, each car division continued to operate a factory warehouse supplementing the GMPD field distribution centers.   Many slow-moving parts, including some crash parts, could be obtained only from those warehouses (CX 7002F).

162.   GMPD was made a separate division of GM effective March 1, 1969, and began to assume all procurement and warehousing functions, both field and factory.   On September 1, 1970, GMPD became fully responsible for the procurement and warehousing functions.   Initially it was not uncommon for GMPD to obtain current model service parts from Fisher Body Division, although Fisher had itself purchased the parts from an outside supplier.   By the beginning of the 1973 model year the transition to GMPD had been concluded (CX 7002F).

163.   Approximately 65% of the crash parts which GMPD sells are manufactured by allied GM divisions (e.g., Chevrolet, Pontiac, Oldsmobile, Buick, Cadillac, Fisher Body) (CX 7011B).

164.   Before GMPD was formed each GM car division had its own warehouse parts plant (Tr. 2039; CX 7248D).   At such parts **[*76]** plants additional processing was and still is done on the part before shipment to a dealer, _e.g.,_ cleaning, finishing, painting, protective material applied or packaged (Tr. 2039; 10046-47) (RPF 22).

165.   Crash (sheet metal) parts, chassis parts, interior trim parts and engine parts are sold by GM exclusively through GMPD.   In addition, parts with GM applications that are sold through AC-Delco are also sold through GMPD (Tr. 2003, 10068, 10271) (RPF 18).

166.   GMPD employs about 13,000 persons.   The division does not operate manufacturing plants, but buys parts in a finished state from about 2,500 suppliers -- both within General Motors and from outside suppliers (ALJX 14Z-21, Supp. to CX 7014).

167.   GMPD distributes about 300,000 parts.   Of that number, 12,000 are AC-Delco parts with GM applications (Tr. 10271), and about 32,000 are crash parts as defined in the Complaint (Tr. 2209).   The remainder, about 256,000 parts are neither crash parts, nor AC-Delco parts (Tr. 14678, 10178) (RPF 19).   GMPD makes no distinction between crash parts and other parts (Tr. 10062) (RPF 20).

168. Of the 32,000 crash parts, 13,000 are eligible for wholesale compensation (Tr. 10072). **[*77]** These 13,000 account for an estimated 60% of the dollar volume of sales of GM crash parts (Tr. 14535-36 and see RX 311A) (CCPF 46).

169. In 1974-75, GMPD conducted a study of crash parts covering 13,155 separate part numbers. It showed that 23% of the part numbers account for 87% of the sales. The balance, 77% of the total of crash parts, or over 10,000 parts, had sales of less than 700 units a year. The fastest-moving, those with sales of from 600 to 699 units a year, had average dollar sales of less than $5,000 in the twelve months ended May 31, 1975, and an annual rate of inventory turnover of less than 1. Most of the 13,155 part numbers had annual sales of less than 300 units and $2,000 with an annual inventory turnover rate of less than.5. Four percent (4%) of the total, or 537 part numbers had piece sales as high as 5,000 during the year. These sales averaged as high as $40,000 (CX 7006D).

170. GMPD only sells replacement parts to GM passenger car and truck dealers (Tr. 1994). The dealers sell the parts through their own service operation to car owners, to independent body shops, and to other GM dealers (Tr. 1994-95).

171. Currently, GMPD maintains seven factory **[*78]** warehouses ("parts plants") and 36 field warehouses (PDCs). Faster moving parts are shipped to GMPD field warehouses. The slowest moving are held at the parts plants to be shipped directly to GM dealers as ordered (Tr. 2039-40, 10046-47, 10107) (CCPF 17; RPF 24).

172. There are 25 GMPD field warehouses which stock parts for GM automobiles and light trucks (Tr. 10047). These 25 are located in or near major cities of the United States (RX 19C, D). For purposes of placing and receiving orders, the approximately 12,000 GM dealers are assigned to one of the 25 field warehouses, also referred to as PDCs or parts distribution centers (Ans. P11; Tr. 2040, 2046; 10047-48,) (CCPF 18).

173. This channel of distribution is known as the independent aftermarket (Tr. 12537). There are about 1,000 to 1,500 WDs and over 30,000 jobbers (Tr. 12539; 8640-41). Parts sold in the independent aftermarket are replacement parts, that is, parts that tend to wear and are replaced periodically (Tr. 12490; 12614-15). Generally, there are two or more manufacturing sources for each product line (Tr. 12538). Firms in the independent aftermarket carry parts for most makes of cars (Tr. 12538; Tr. 12633) **[*79]** (RPF 15).

174. The car-part PDCs are: ten "Z" PDCs which carry the 12,000 fastest moving parts; nine "M" PDCs which carry the 12,000 "Z" parts plus "M" parts, which are the 25,000 next fastest moving parts; six "MF" or Master Factory PDCs carry the 12,000 "Z" parts, the 25,000 "M" parts, plus the "MF" parts which are the 28,000 next fastest moving parts (Tr. 10048) (RPF 25).

175. Of the 300,000 different parts in the GMPD system, approximately 225,000 or 75% are "F" parts. Of the 32,000 different crash parts, approximately 56% are "F" parts (Tr. 13905). Of the 25 filed warehouses, six are "MF", nine are "M", and ten are "Z" (RX 19A-D; Tr. 10045-46) (CCPF 20).

176. The PDCs sell to the GM dealers (RX 19; Tr. 10043, 10045-46). When a dealer places his order with his assigned PDC, a computer discloses where the part is available and, if necessary, refers the order to the nearest PDC or to a parts plant (Tr. 10090-97, 10099-100) (RPF 29).

177. GMPD's order fill rate, e.g., the percentage of items ordered which are in stock at the point of initial order, was 95% for the 1978 model year (Tr. 10061) (RPF 30). In contrast, a GM delaer rarely can fill an entire order **[*80]** for crash parts from inventory (Tr. 3162, 3272, 5956-57).

178. Most IBS complaints involve low-demand, slow-moving parts (Tr. 1866, 6982-83). GM dealers generally stock the fastmoving "Z" parts which constitute about 8% of all GM part numbers, and these dealers only stock the "Z" parts which are applicable to their franchise line (Tr. 10242-44).

179. Many GM dealers rely on the GMPD warehouses or another dealer as the primary source of stock for crash parts rather than carry their own inventory (Tr. 6520).

180. Parts plants stock the bulk of all parts, including the slowest moving and older parts. In general, the parts plants supply the PDC's, not dealers. However, the dealers are supplied very slow moving parts and some special-order parts from the parts plants. For these slow moving parts, which are stocked principally at the parts plants in Michigan, GM uses air shipment. Dealers normally are supplied from the PDCs. The PDCs receive the parts from parts plants and from manufacturers (Tr. 2040).

181. The following shows the geographical locations of these GMPD facilities:

| Parts Plants (6) | Master PDCs (9) |
|---|---|
| Flint (Complex = | Baltimore |
| Plant 01, 02, 03, | Boston |
| Grand Blanc and | Cincinnati |
| Toledo) | Denver |
| Martinsburg | Jacksonville |
| Drayton Plains | Livonia |
| Pontiac | Los Angeles |
| Lansing | Minneapolis |
| Detroit | Portland |
| Zone PDCs (12) | Master Factory PDCs (6) |
| Buffalo | Atlanta |
| Cleveland | Chicago |
| Houston | Dallas |
| Indianapolis | Englewood (Newark) |
| Kansas City | Oakland |
| Louisville | St. Louis |
| New Orleans | |
| New York | |
| Omaha | |
| Philadelphia | |
| Pittsburgh | |
| Richmond | |

**[*81]**

(ALJX 14Z-22, Supp. to CX 7014)

182. The diagram on the following page shows the system more graphically (RX 19).

AC-DELCO

183. AC-Delco maintains seven field warehouses and stocks 60,000 part numbers consisting of over 30 product lines. These lines include spark plugs, filters, carburetors, fuel pumps, wire and cables, seal beam units, shock absorbers, and ignition parts. AC-Delco sells to approximately 3,000 customers. These consist of WDs who sell to jobbers and occasionally to the customers of jobbers such as independent garages, gasoline stations, and car dealers (Tr. 1995-96, 2003, 2050-51, 2210) (CCPF 10).

184. AC-Delco also sells to national accounts such as Firestone Tire & Rubber Co. and Montgomery Ward & Co. (Tr. 1995). Some WDs make some sales to GM dealers (Tr. 1996), however, GM dealers are not permitted to buy parts directly from AC-Delco (Tr. 2001).

185.  AC-Delco parts are generally items that can be used on both GM and non-GM cars (Tr. 2015-16, 2230-32).Basically they are parts that are required in the maintenance of the car, e.g., spark plugs, filters, shock absorbers, points, condensers, bulbs, headlamps, fuel and water pumps (Tr. 10183).  **[\*82]**

186. With few exceptions, crash parts, as defined in the complaint, are not AC-Delco parts (Tr. 2003-04) (RPF 13).

<u>CHRYSLER'S MOPAR PARTS DISTRIBUTION EXPERIENE</u>

187.  Before the early sixties, Chrysler sold its parts from five or six Chrysler-owned plant warehouses to 10 (in 1963) independently owned Mopar wholesalers who resold the parts to Chrysler dealers and other retailers (RX 21Z-50) (RPF 111).  In the early sixties, Chrysler began phasing out the Mopar wholesalers and replaced them with 13 or 14 Chrysler-owned field warehouses. It also divided its parts into two groups and began selling them in two separate channels.  All parts applicable to Chrysler cars were sold directly to Chrysler dealers. Single source parts, including crash parts, were sold to the dealers exclusively.  Parts not applicable to Chrysler cars were not sold to the dealers. In other words Chrysler switched to a system like GM's (Tr. 8486-88, 8494) (RPF 112).

188.  The system that Chrysler discarded is similar to the one which the order proposed in the Complaint would establish.  Chrysler spent $53 million to change to a system like GM's.  Chrysler has not chosen to switch back.  Chrysler's **[\*83]** choosing not to switch back is significant because as Dr. Benston, GM's economist witness, noted, Chrysler is:

GENERAL MOTORS PARTS DIVISION PARTS AND ACCESSORIES DISTRIBUTION SYSTEM

[SEE EXHIBIT IN ORIGINAL]

"now in a position of selling off assets, of contracting their operations.  The simple thing, it would seem to me, for them to do would be to sell off this whole system, sell off the warehouses, disband the system, go back to the old system and have a better way of serving consumers for their own benefit or saving resources or something else.  They are selling off a lot of things.  They are not selling off their warehouses, they are not shifting to independents, to my knowledge.  I can't think of any better evidence that people who have had previous experience with another system are in a position of wanting to disband some part of their operations, choose not to disband that part of their operations." (Tr. 15818-19) (RPF 119).

189.  The $53 million cost that Chrysler incurred in the 60's is an indication that the costs of changing GM's system would be high.  Inefficiencies created by changing the system would add costs which would be passed on, ultimately, no doubt,  **[\*84]** to the consumer/car owner (Tr. 15734).  There also would be a cost to the car owner if parts became less available (Tr. 15735) (RPF 125).

<u>ORDERING METHODS</u>

190.  There are four principal ways GM dealers order crash parts from GMPD:

1.  The Stock Order (PAD order) is for routine restocking.  Each dealer has an assigned day every two weeks on which he can place his stock order (Tr. 10053; 10461-64).  Parts are shipped within two days of the receipt of the order (Tr. 10053).  Dealers receive a five percent (5%) additional discount on such orders.  This is because such orders enable GMPD to fill large quantities per order at convenient times; however, the saving is not translatable into specific cost savings (Tr. 2078-80; Tr. 10072-74, 10232-34, 10236, 10238-39) (CCPF 22).  GM prepays the freight charges on PAD orders (Tr. 2079).  Neither a minimum inventory nor a minimum dollar amount or number of units need be handled to qualify for the 5% stocking allowance (Tr. 2080).

2.  The Supplemental Stock Order (SSO).  These orders may be placed at any time (Tr. 10054).  Parts ordered in the morning are to be shipped out the next day.  Parts ordered in the afternoon are to be shipped **[\*85]**  on the second day after the day of the order (Tr. 10054, 10108).  No minimum order is required (Tr. 10056, 10357-58).  GM prepays the freight on such orders (Tr. 2081) (CCPF 24).

3.  Car Inoperative Order (CIO).  This order is used when a car is inoperative because of a lack of parts.  GM prepays the freight (Tr. 2081).  A CIO order has priority at GMPD ahead of Stock Orders and Supplementary Stock Orders (Tr. 10056-57).

4.  Very Important Part (VIP).  The VIP order receives top priority, may include a search of all warehouses and going to the manufacturer of the part.  The dealer pays the freight (Tr. 2076-77, 1082-83, 10058-60) 10109-11) (RPF 31).

191.  CIO and VIP orders may be used by any GM dealer at any time, regardless of whether that dealer stocks or not, to obtain service GM crash parts for use in the dealer's own body shop or for resale to IBSs (Tr. 11911-12, 12073-74).  A GM dealer may rely solely on CIO and VIP orders to obtain service GM crash parts (Tr. 12074) (CCPF 228); however, GM imposes a surcharge of two dollars plus 5% of each line item price on such orders (Tr. 10057, 10109-11, 11264-66) (RRB 228).

192.  GM parts specialists hold that a well run parts **[*86]**  department will order parts on the following basis: 80% PAD, 15% SSO, 5% CIO or VIP (CX 7332C).  GM officials have stated that dealers near a field warehouse do not order enough parts on their bi-monthly stock orders (PAD) because they can get the part immediately on a CIO basis.  In short, it simply does "not pay a dealer near a warehouse to stock crash parts" (CX 7332C).

193.  Orders are filled at GMPD warehouses in the sequence of VIP and "will call" first, followed by CIO, SSO, and PAD in that order (CCPF 22-25; Tr. 8009).  GM officials have stated "GMPD needs more PAD and less CIO" and "wholesale compensation is being abused" in that it is being paid to GM dealers with little stocking done in return by the dealers (CX 7355B).

194.SOME WAREHOUSES LIMIT "WILL CALLS" TO CERTAIN HOURS (Tr. 2084-85).  GMPD's Baltimore warehouse, to which 377 GM dealers are assigned, can handle up to 60 dealer "will calls" a day.  This is so even though dealers seldom pick up during evening hours (Tr. 2084-85, 10389-99, 10401, 10411).  The purpose of "will call" orders is to satisfy dealers urgent requirements or, in some instances, to permit direct delivery to a wholesale customer (CX 7238E) **[*87]**  (CCPF 26); however, most GM dealers prefer to receive shipment by common carrier, with freight prepaid by GM (Tr. 10423-25) (RRB 26).

195.  At the Baltimore warehouse, a master PDC, PAD orders account for 46% of the orders, CIOs 30-31%, SSOs 14%, VIPs 1 1/2% and will calls 7% (Tr. 10436-37) (CCPF 28 & 229) (RRB 229).

196.Except for VIP orders and will calls, GMPD generally ships parts to dealers in trucks. Truck shipments occasionally take over 24 hours to reach some dealers, although not those dealers located within the metropolitan area of the warehouse. If the shipment is from a warehouse to which the dealer is not assigned, transit time may exceed two days (Tr. 10097-99; 10408) (CCPF 30).

GM PARTS PRICING AND MONITORING

197.  GM suggests to its dealers a wholesale price of list less 40%, for compensable crash parts and for noncompensable parts list less 25% (Tr. 10071-72, 10253-54) (RPF 35).

198.  GM has not and does not control or monitor: (1) the price dealers charge wholesale customers for crash parts; (2) the territory in which they sell; or (3) the types or classes of customers to which they sell.  GM dealers do not have any exclusive right to wholesale **[*88]**  crash parts in their franchise line in particular territories (Tr. 2090, 10666-67, 11022-25) (RPF 37).

199.  GMPD, in submitting recommended prices for crash parts to the GM officials responsible for the decision, includes comparisons with the prices of similar parts for competing manufacturers' vehicles (Tr. 10291; CX 7228A-H).  Witness Daly, who was employed by Chrysler, also considered competitive manufacturers' prices in pricing Chrysler crash parts (Tr. 8651) (RPF 52).

INSURANCE COMPANIES AND CRASH DAMAGED VEHICLES

200.  Approximately 90% to 95% of all business done by both IBS and Dealer Auto Body Repair Shops ("DBS") is paid for by insurance companies (Tr. 1872, 2399) (INPF 1).  This is not likely to decline due to the growing number of state mandatory insurance laws.  As a consequence, botaining insurance-paid business is crucial to body shops (Tr. 2297, 3857) (CCPF 127).  For almost all purchases of crash parts the real consumers ultimately are insurance companies (Tr. 1872) (INPF 20).

201.  Since 1970, the major casualty insurance companies have substituted in most instances for the two or three appraisal system a system of cost control in obtaining estimates **[*89]**  in connection with their paying for repairs of crash damaged vehicles (Tr. 4309-11).  Under the two or three appraisal system IBS and DBS auto body repair shop personnel make the estimate and arrive at their own prices for insurance-paid business (Tr. 4314) (INPF 2 & 3).  Under the cost control system insurance company appraisers and/or drive-in appraisal centers operated by the insurance company are used to prepare the estimate and arrive at the price.  This gives insurance companies more control over the prices they pay for the repair of crash damaged vehicles (Tr. 4315) (INPF 5 & 6).

202.  Primarily in rural areas, where drive-in claim centers do not exist and on-site appraisals by company or independent appraisers are inconvenient, some companies still operate on a competitive bid system.  Under this system, the customer secures several estimates (usually 2 or 3) from body shops and if he does not have a preference for a particular shop, quality of work considered, the company will then refer him to the body shop with the lowest estimate (Tr. 1575-76, 1682) (CCPF 129).

203.  In writing appraisals for the repair of crash damage, insurance companies: (1) use standard "crash **[*90]** manuals" to determine the time to be allowed to repair the vehicles (Tr. 1439); (2) use the "prevailing" or "going" labor rate in the area (Tr. 1450-51) and; (3) use the "prevailing" or "going" discount in the area on crash parts (Tr. 1451, 1452, 1453).  Normally, these are determined by the insurance companies (Tr. 5169, 2410, 7624) (INPF 6-9).

204.  For claims settled directly with the insured, appraisers for most insurance companies, whether they are at a drive-in claim center or in the field, will normally calculate the estimate using parts discounts extended by body shops in the area (Tr. 1218, 1319) (CCPF 130).

205.  Most insurance companies, including the largest ones such as State Farm, Allstate, Farmers Group, Safeco, Liberty Mutual, Nationwide, and Grange, designate certain body shops as "preferred", "one-stop" or "competitive" (RX 288; Tr. 1219, 4844, 5797).  Such shops generally are those which have agreed in advance with the insurance company to accept jobs at an agreed-upon parts discount and, sometimes, labor rate.  A preferred shop will normally accept the insurance company's estimate without first seeing the vehicle and preparing its own estimate (Tr. 1221,  **[*91]** 1322, 1324) (CCPF 132).

206.  Usually neither an IBS nor DBS will have insurance-related work referred unless the shop management has agreed to do that work both at the "prevailing" labor rate and the "prevailing" discount rate (Tr. 1450-51, 1452, 1453, 1836-41) (INPF 13).

207.  A very sizeable portion (80%) of insurance-paid work on crash damaged vehicles is performed by body shops to which the claimant is referred by the insurance company (Tr. 6862-63).

208.  In St. Louis, Cleveland, and Tucson, virtually all IBSs and DBSs extend a parts discount on insurance work.  In these areas, GM dealers offer a discount of at least 10%, and frequently more, up to as much as 25% on bumpers (Tr. 1843, 8277) (CCPF 138).

209.  In New Orleans, Buffalo, and Spokane, only some IBSs give a 10% parts discount while all GM dealer body shops extend discounts of at least 10%, and as much as 20% to those insurance companies that refer the most business (Tr. 3117-18, 3156, 3651-54, 3657, 7363-64, 7915).  In Mansfield, Ohio, discounts are given by GM dealer and independent body shops only as included in the estimates prepared by adjusters in referral situations.  However, GM dealer body shops successfully **[*92]**  attract most of the insurance business by submitting lower bids (Tr. 6595-96, 6610-11) (CCPF 139).

210.  Failure to match GM dealer discounts results in IBSs losing insurance-paid business to GM dealers (Tr. 1325, 2301-04, 3655, 3660-61) (CCPF 141) (INRB 141).

211.  In some instances, IBSs match the discounts offered by GM dealer shops to obtain insurance company referrals.  If they do, the IBSs get their fair share of referral work (Tr. 6675-76) (CCPF 142).

212.  Some IBSs could not continue in business if they were to meet the discounts GM dealer shops give to insurance companies (Tr. 2851, 3653-54, 4212).  Al's Body and Fender Repair in Spokane, Washington, for example, used to give a 10% discount to insurance companies but soon found it had "too slim a margin" and so couldn't afford to continue it.  Today Al's gives no parts discount but in so doing loses considerable volume.  Because he competes with GM dealers who give 15-20% parts discounts to insurance companies, Al's gets no GM referral work.  Consequently only about 10% of his business is on GM vehicles (Tr. 7363-66) (CCPF 145).

REPAIR OR REPLACE WITH NEW OR USED PARTS

213.  When a motor vehicle is crash [*93]  damaged the owner has several options.  A new replacement part may be installed or the damaged part may be repaired or replaced with a used part.  Some parts may be replaced with a partial panel not manufactured by the new vehicle supplier.  Also, the repair may not be made or, if the damage is extensive, the vehicle may be scrapped.  If it is, additional used parts become available (CX 7006B).

214.  Salvage crash parts are used crash parts obtained from wrecked vehicles (Tr. 1385, 1731).  Salvage yards purchase wrecked GM vehicles, disassemble them and wholesale the salvageable GM crash parts to body shops (Tr. 1908-10, 4415) (CCPF 68).

215.  A survey was conducted by GM in 1974 of thirty-one automobile body repair shops in Fort Wayne, Indiana.  The operators of the shops estimated that in fifty percent of all instances of crash damaged vehicles, original parts were repaired and reused (CX 7006B-C).  The repair rather than replacement of parts on crash-damaged GM vehicles has been decreasing in part due to changes in vehicle construction (Tr. 2501).

216.  Recent year GM automobiles and light trucks contain more and more crash parts made of fiberglass and aluminum to reduce [*94]  weight and thereby meet federal mileage requirements (Tr. 1265-66, 1384, 1729-30) (CCPF 65).  The repair of fiberglass crash parts poses a health hazard and is, therefore, disfavored by body men (Tr. 2501).

217.  Frequently parts are replaced when they could be repaired at lower cost.  This is because:

(1) Owners may insist on new parts -- especially on newer cars -- even though a repaired part would be satisfactory;

(2) Some repair shops work almost exclusively on a high volume basis and can process more jobs by replacing parts than by devoting the time to repairs -- even though the cost saving to insurers and consumers could be substantial;

(3) In some cases, body repair shops do not or cannot employ persons possessing the necessary skills to repair rather than replace;

(4) The insurance adjuster may not have been sufficiently trained to recognize how parts can be repaired and to understand the cost equation of repair versus replacement.  Lacking this practical knowledge, he may be unable to obtain the insured's agreement to repair the part rather than replace it (ALJX 14Z-6, Supp. to CX 7014).

218.  Insurance companies have fostered and continue to foster the installation [*95] of used or salvage parts (Tr. 1764, 1246) (RPF 191).  Allstate recommends used parts whenever possible to avoid total losses (Tr. 1247).  Travelers requires used parts installation, regardless of consumer opposition, whenever possible and economical, including on current models (Tr. 1510-11) (RPF 192).

SALVAGE PARTS

219.  Unlike GM dealers, salvage yards and bumper rechromers tend not to specialize in the sale of parts for only one make of vehicle.  (Tr. 1243-44, 1400) (CCPF 71).

220.  Salvage yard operators and rechromers consider their respective businesses to be separate industries from the wholesaling of new GM crash parts (Tr. 1947) (CCPF 73).

221.  Far more new GM crash parts than salvage GM crash parts and rechromed GM bumpers are used in replacing damaged portions of GM automobiles and light trucks. On claims paid by leading insurance companies for crash parts applicable to GM cars and light trucks, approximately 75%-90% of the dollar amount paid and approximately 85% of the units obtained are for new rather than used GM crash parts (CX 7400H-I, CX 7401A-D, W, CX 7403, CX 7405; Tr. 1243-49, 1399-1400, 1568).

222.  Several of the parts most frequently needed **[*96]**  to repair crash damage, such as exterior moldings, grilles, fender and rear end caps, bumpers, and lamp assemblies are seldom available as salvage. This is due in part to the difficulty of removing them from wrecks and/or the unacceptable condition in which such units are found on wrecked vehicles (Tr. 1392-93, 1938-39).   Other salvage crash parts which seldom are utilized include rocker panels, wheel opening panels, and quarter panels (CX 7400H; CX 7401A-V) (CCPF 79).

223.  In general, salvage crash parts are only available as part of an assembly rather than as individual parts.  In other words, salvage yards generally decline to sell individual crash parts from a front end, rear end or door assembly, preferring to sell the entire unit (Tr. 1240, 1391, 1734-35).  A front end assembly usually includes the front bumper, grille, left and right fenders, hood, lamp assemblies, and moldings.  A rear end assembly usually includes the left and right quarter panels, trunk lid, rear body panel, lamp assemblies, moldings, and rear bumper. A door assembly will usually include the door skin, door hardware, and door inner panel (Tr. 1239-40, 1390-92, 1734-35).

224.  Vehicle owners and **[*97]**  body shop operators strongly prefer new over used crash parts (Tr. 1251-52, 1255). Some body shops use salvage crash parts and rechromed bumpers only when there are no new crash parts available (Tr. 4506-08) (CCPF 86).

225.  Salvage crash parts are often bent, rusted, previously repaired, scratched, or otherwise damaged, and in need of removal of old paint.  The outside storage of salvage crash parts alone results in their deterioration.  Thus, it is frequently necessary to trim salvage crash parts by cutting off unnecessary material and otherwise to expend extensive labor to refurbish them prior to use (Tr. 1396-97, 2267-68) (CCPF 88).

226.  If the price of a salvage crash part approached that of a new crash part, a body shop would buy a new part if it were available (Tr. 2510) (CCPF 93).

227.  The price charged for any given salvage crash part is primarily a matter of supply and demand, the salvage yards' cost of acquiring the part, and the condition of the part.  Consequently, the price of any particular salvage crash part may fluctuate widely.  Prices change frequently and vary from one year to the next.  Due to the condition of the part the price may vary on a salvage **[*98]** yard lot for the same model year.  Unlike GM crash parts there are no set or published prices or price lists for salvage GM crash parts (Tr. 1259-60, 1262, 1925-27, 1945, 1948-49) (CCPF 95).

228.  Almost without exception the price trend over time is exactly the opposite for new crash parts and salvage crash parts.  Prices of new crash parts increase as the vehicles they fit become older, while the prices of salvage crash parts fall rapidly with time (Tr. 1748-49, 2511-12, 2514) (CCPF 97).

229.  As a consequence of consumer preferences and increasing price disparity over time, salvage GM crash parts are utilized less frequently on the most recent GM vehicles.  They are used increasingly as the vehicle becomes older, in part, to avoid "totalling", i.e., not repairing the vehicle.  In contrast, new crash parts are utilized almost entirely on newer models and are used less frequently as the vehicle ages (CX 7401 Z9-Z26, Tr. 1246) (CCPF 100).

230.  State Farm, the world's largest automobile casualty insurer (Tr. 1667), has actively encouraged the use of used parts.  At all times State Farm stresses consideration of used parts, including salvage assemblies and rechromed bumpers **[*99]** (RX 200G, RX 212D, RX 223A).  If it costs less to replace with salvage parts and they are available, State Farm prefers salvage over new (Tr. 1764, 1792).  If there is a substantial cost difference between new and used crash parts, State Farm makes a settlement offer based on used parts, even though consumer preference is for new, and does so even for current and recent models when used parts are available (Tr. 1791) (RPF 194).

231.  Salvage yards have made used GM crash parts more readily available by use of long distance telephone and Telex lines to other yards and published parts locators (e.g., RX 228; RX 236), enabling them to locate and obtain salvage parts on a national basis if they are not stocked locally.  Even current model GM crash parts may be obtained from salvage yards on a 24-hour basis (Tr. 9928-29; RX 138M, RX 273A). The long line system is like a conference call.  It has speakers on which one person may speak to everyone else on the line (Tr. 1927).

232.  Manuals, such as those published by Mitchell's and Hollander, assist salvage operators in determining which parts are interchangeable for which vehicles (Tr. 1964-65) (RPF 200).

233.  The salvage industry **[*100]** has had some success in persuading body shops to use salvage parts (Tr. 1968-69).

234.  Rechromed bumpers also compete with new bumpers, are priced relative to new bumpers, and are easy to install (Tr. 7795-96) (RPF 201).

235.  Availability of salvage GM crash parts may vary by model year.  After the second model year they are more available (CCPF 98) (Tr. 3603, 1386-87).  A salvage yard's most frequent sales are of parts after the second model year.  For example, in 1976, about 91% of witness Arnold's parts sales were for cars older than two years (Tr. 1930-31) (RPF 203).  Those needed for the less popular GM models are seldom in good supply (Tr. 1249-50, 1389-90) (CCPF 80).

236.  The prices of new and salvage GM crash parts are related and new and salvage GM crash parts are competitive with each other (Tr. 1523, 1861).  Usually the list price of salvage parts is expressed as a percentage of the list price of the comparable new part, although the percentage factor may vary with the model year of the vehicle (Tr. 2782, 1950-51).  As new parts prices escalate, the prices of used parts tend to follow (RX 278F, G) (RPF 205).

237.  An Aetna study of repairs paid for indicated **[*101]** that 23.6% (dollars) of GM crash parts purchases were for salvage parts (Tr. 1546).  A similar State Farm survey disclosed that 28.6% (dollars) were for salvage parts (CX 7400; Tr. 1590-91) and a study by Travelers indicated that the figure was approximately 24% (dollars) (Tr. 1493-94, 1497) (RPF 209-11).

238.  Dr. Benston testified that used crash parts are one of several substitutes for new crash parts (Tr. 15748, 15775).  Also, it is stated in an FTC staff memorandum (1973 Annual Planning Report) that new crash parts "are in competition with recycled crash parts and in some cases, with repaired parts" (RX 51L) (RPF 213).

239.  The dollar volume of used automotive parts sold annually is substantial.  In a 1969 study, the U.S. Commerce Department, Business and Defense Services Administration, estimated that nationally the used parts industry provides $4.5 billion in replacement parts annually, about one-third the dollar value of replacement parts consumed by the automotive aftermarket.  (These parts would be valued at $15 billion new.) Half of these used parts are consumed by the repair trade (RX 138G, R).  Mr. Arnold testified that about 40% of this figure would be crash **[*102]** parts ($0.9 billion), and about 63% of those crash parts would be for GM vehicles ( $567 million) (Tr. 1953-54).

240.  GM's Motors Insurance Company subsidiary stresses repair over replacement of damaged crash parts (Tr. 3934) as does GM (ALJX 14Z-3, Z-6 and Z-7, Supp. to CX 7014) (RPF 217).

241.  Of Allstate's total losses, almost fifty percent of damaged GM crash parts are repaired rather than rplaced (Tr. 1265).  State Farm studies indicated that parts are repaired rather than replaced 40% to 50% of the time (Tr. 1730) (RPF 220).

242.  State Farm has calculated that 43% of the damaged parts (units) including bumpers and exterior moldings covered by its policies are repaired rather than replaced (CX 7400H).  Bumpers are replaced by used bumpers 60% of the time in terms of dollar volume of replaced parts (CX 7400L).  By excluding bumpers and exterior moldings from CX 7400H, the extent of repair (units) becomes 58% (RPF 221).

<u>WHY HAVE PRICES OF CRASH PARTS INCREASED?</u>

243.  The upward trend in crash parts prices is not solely due to GM's decisions to raise prices because of factors related to profitability.  For example, on March 12, 1976, the 1972 Chevrolet Chevelle **[*103]** front and rear bumper parts had a combined list price of $146.  The list price of the 1975 Chevelle bumper parts on that date was$417.  Of the total $271 difference, $244 was due to the addition of bumper parts which were required to meet the federal bumper safety standard.  More details are shown in the table following:

GENERAL MOTORS CORPORATION BUMPER PARTS PRICE COMPARISONS CHEVELLE: 1972 VS. 1975 MODEL

| | Parts List Prices | | |
| Bumper Part Description | March 12, 1976 | | |
| | Chev. | Chevelle | Difference |
| | 72 Model | 75 Model | Amount | Percent |
| | $ | $ | $ | % |
| Front Bumper Face Bar | 78.25 | 82.25 | 11.00 | 14.1 |
| Front Bumper Reinforcement | | 101.00 | 101.00 | xx |
| Front Bumper Energy Absorber | | 21.20 | 21.20 | xx |
| Rear Bumper Face Bar | 67.75 | 83.25 | 15.50 | 22.9 |
| Rear Bumper Reinforcement | | 101.00 | 101.00 | xx |
| Rear Bumper Energy Absorber | | 21.20 | 21.20 | xx |
| TOTAL | 146.00 | 416.90 | 270.90 | 185.5 |

(ALJX 14Z17, Supp. to CX 7014)

244.  The bumper reinforcement and energy absorbers required on the 1975 Chevelle were not required on the 1972 model, which accounts for much of the increase in price.  As federal bumper standards become even more stringent in 1979-80, the **[*104]** crash parts costs for bumpers probably will increase further (ALJX 14-H, Supp. to CX 7014).

245.  Between September, 1971, and March of 1976, GM service-part prices increased approximately 37%, while crash parts, taken as a specific category, rose 35%.  During approximately this same period, the price of steel mill products, from which many crash parts are made, rose 58% and GM's average hourly labor costs rose 51%.  The cost of paper products, which figure importantly in the packaging and distribution of service parts rose 67%.  Rail transportation, another significant cost in the parts business, went up 51%.  The composite index of industrial commodities rose 55% (ALJX 14K, Supp. to CX 7014).

246.  In the mid-70's there was an advertising campaign and representations were made by insurance company representatives to a congressional committee holding hearings on the cost of crash parts that the cost of replacing all the parts to completely repair a 1973 Chevrolet could range up to $24,000.  It was not clear that the $24,000 was

for parts and labor. GM responded that individual parts always involve far greater costs than finished consumer goods in unit packaging, stocking, **[*105]** cataloging, inventory expenses, obsolescence, and shipping to provide availability. As with most, if not all, manufactured products, the cost of buying and installing the individual parts of a car one at a time would be significantly higher than the cost of a production-line-assembled new car or product (ALJX 14L, Supp. to CX 7014).

<u>DOES GM's METHOD OF SELLING CRASH PARTS DISCRIMINATE AGAINST IBSs?</u>

247. Most IBSs perform repair work on all makes of cars and light trucks, including foreign-make vehicles. However, due to the large number of GM cars on the road, work done on GM-made vehicles accounts for a significant amount of the potential volume for IBSs and generally for a significant amount of their actual receipts (Tr. 5222-23). Formerly, work on GM vehicles constituted a greater percentage of IBSs' business than it does today (Tr. 2599) (CCPF 123).

248. On purchases of crash parts from GM dealers, IBSs pay an average of approximately list minus 22% on noncompensable and list minus 32% on compensable parts (Tr. 10,520,14521). On non-PAD orders, GM dealers pay list minus 40% and on PAD orders list minus 43% for both compensable and noncompensable crash parts (RX **[*106]** 311A; Tr. 14515-16) (CCPF 43).

249. Dr. Nelson testified that these averages show that there is a 15.7% average price differential between what IBSs and GM dealers pay for new service GM crash parts on the basis of his estimate that 60% of the purchases are of compensated parts and that 50% of the GM dealer purchases were on PAD (Tr. 14536, 14560-62).

250. Dr. Benston testified that a comparison between the total cost incurred by each, not just a comparison between the invoice prices paid, is a way to determine whether IBSs are at a cost disadvantage in competing with GM dealers (Tr. 16109).

251. Dr. Nelson testified that a wholesaling GM dealer would not resell at his cost to buy a part, that a dealer who transfers a part from his warehouse to his own body shop has real world costs allocable to the transfer and needs a minumum gross margin of 20% (translating to 25% mark-up over cost) to stay in business (Tr. 14469, 14920-23) (RPF 126).

252. The time it takes for an IBS to receive a crash part differs widely depending on whether the part is in the inventory of the dealership from which the part was ordered. If it is in inventory, it may be as little as one hour or **[*107]** as much as 24 hours until delivery (Tr. 2381, 2451-52, 4044, 11131-32, 10644-46). If a part is not in the dealer's stock, delivery time depends on whether another local GM dealer has the part, as well as the proximity of the nearest GMPD warehouse. In warehouse cities such as Buffalo, St. Louis, Cleveland, and New Orleans (RX 19C), it may take three days for IBSs to receive parts ordered by the dealer from the local GMPD warehouse (Tr. 4801-02, 7503) (CCPF 114) (RRB 114).

253. The parts departments of GM dealers perform services in wholesaling crash parts to both their own body shops and IBSs. The services performed include ordering, receiving, and maintaining inventory (and obtaining non-stocked parts from other dealers or from GM warehouses), labor in stocking and picking parts from shelves for orders, delivery, order taking and interpretation, billing and record-keeping (Tr. 11018, 11035, 11988-89, 10449-54, 10473-75).

254. Costs associated with the inventorying function include labor to receive, store, pull (remove from stock), and load parts, financial costs for investment in inventory, as well as the cost of facilities to house the parts, insurance, and equipment **[*108]** to store and move them. (RPF 128).

255. There also are costs in servicing IBSs such as billing costs, the costs of extending credit, including credit checks, uncollectable accounts, and money tied up in receivables (Tr. 10846, 10487-88). There are also vehicle and driver expenses for free delivery, and counter service expense (Tr. 11221-22; 10663) (RPF 130).

256.  GM financial studies indicate that the national average of dealers' parts and accessories departments' direct and allocated total expenses is approximately 25% of the purchase price of all parts.  Between the years 1970 and 1975, dealers' parts and accessories departments total expenses ranged from 22.6% to 25.3% of the cost of sales (RX 35; Tr. 11421-22) (RPF 132).

257.  For warranty repairs, where GM pays for the part, GM pays its dealers cost (dealer net) 30%.  This permits the dealer a profit of roughly 5% (Tr. 11430-31) (RPF 133).

258.  NADA studies have disclosed that dealer overhead in parts wholesaling is between 30% and 37.5% of the cost of the parts and that there was a need for GM to increase wholesale compensation (Tr. 8187-88; See also, ALJX 17, p. 95).

259.  Mr. Daly, the former Chrysler official, **[*109]** said that a 25% to 27% margin is required to cover costs of handling crash parts at the wholesale level (Tr. 8667) and that a fair dealer markup over cost would be 25% to 33.3% (Tr. 8684) (RPF 134).

260.  GM dealers generally mark up crash parts sold or transferred to their own body shops at 25% over the cost of the parts.  This is an accounting practice recommended by GM (Tr. 11420-21, 4753).  In contrast to the warranty reimbursement of 30%, the GM recommended transfer price of adding 25% to dealer net for parts moving from the parts to the body shop departments does not include a profit (Tr. 11430-31).  A GM official estimated that 60% to 65% of all GM dealers use the 25% transfer price (Tr. 11424).  Some GM dealers use a 30% markup (list minus 22%).  (Tr. 10491) (RPF 135).

261.  When the average cost of the wholesaling function which dealers perform for themselves, as measured by the GM recommended transfer price (25% of dealer net, no profit), or the warranty reimbursement (30% of dealer net, 5% profit), is added to the average purchase price of the part to the dealer, the total cost of the parts installed by dealers averages from about list less 27% to list less 24%.  These **[*110]** figures are obtained in the following manner.  In order to determine the average purchase price of a part, the allowance must be taken into account.  About 50% of crash part orders are on the PAD (Tr. 14532 et seq.).  With half of the order at dealer net (list less 40%, or 60% of list), the average purchase price is 58.5% of list, i.e., on a $100 part dealer cost will be $60 off PAD and $57 on PAD, the average of these two is $58.50 or 58.5% of list.  When 25% is used as the measure of the dealer's wholesaling cost, the average total cost of the part to the dealer is his average purchase price plus 25% of dealer net (58.5% X 25% = 14.6%.  14.6% + 58.5% = 73.2% of list price) which translates into about list less 27% as the net cost to the dealer for parts he uses in his own body shop. On warranty work, where the reimbursement is 30% of dealer net the net cost to the dealer is 76% of list price which translates into about list less 24%.  (58.5% X.39% = 17.5%.  17.5% + 58.5% = 76.5% of list price).  Without the PAD allowance, the cost to the dealer is from list less 25% to list less 22% (RPF 139).

262.  IBSs do not incur the stocking costs of GM dealers in handling crash **[*111]** parts (Tr. 14016).  IBSs testified that they do not provide for themselves wholesaling services or incur the costs related to them (Tr. 7662-63, 7973-40) (RPF 140).

263.  GM dealers charge IBSs, 25% to 40% off suggested list price for compensable crash parts (Tr. 10847-48, 10664-65).  (RPF 141).

IBSs NUMBERS, SALES VOLUME AND NUMBERS OF EMPLOYEES

264.  IBSs are generally smaller operations than GM dealer body shops, the former often being one or two man shops (CX 7327G; Tr. 4796-97, 4866, 8292) (CCPF 151).

Growth in Numbers - Government Data

265.  For the period 1963 through 1967, U.S. Census Bureau Data show that the number of IBSs (SIC Code 7531) increased by 4,621 (28.5%) (RX 39).  During this period, GM did not pay wholesale compensation on crash parts sales.  Wholesale compensation began in September or October, 1968 (Tr. 2096-97) (RPF 152).

266.  Between 1967 and 1972, the number of IBSs reporting to the U.S. Census Bureau grew by 10,982 (52.7%), while the estimated number of GM dealer body shops declined about 343 (3.6%) (RX 38; RX 39) (RPF 153).

267.  According to U.S. Census Bureau data, the number of non-dealer repair shops, other than body shops **[*112]** (SIC Codes 7534, 7538 and 7539) increased by 24% between 1967 and 1972, a significantly lower growth than that of the IBSs.  These non-dealer repair shops are categorized by the Census Bureau as "General Automotive Repair Shops", and "Other Automotive Repair Shops" (RX 39) (RPF 154).

268.  IRS data showing the numbers of IBS proprietorships and partnerships (but not corporations) indicate a growth between 1967 and 1972 of 51% (RX 314A) and a growth between 1967 and 1976 of 55.3% (RX 318). Between 1967 and 1976, GM body shops declined in number by 4.2% (RX 38) (RPF 155).

Growth in Sales - Government Data

269.  For the period 1963 through 1967, U.S. Census Bureau data show that sales by IBSs grew by $263 million (47%) (RX 39) (RPF 157).

270.  Between 1967 and 1972, sales by IBSs, according to Census data, increased by nearly $952 million or 116%, while GM car dealer body shops' sales, according to GM data, increased by approximately $226 million or 40%. During the same period, according to Census data, non-dealer repair shops, other than body shops, had a sales increase of 62% (RX 38; RX 39) (RPF 158).

271.  According to IRS data, between 1967 and 1976, sales by IBS **[*113]** partnerships and proprietorships grew by 151%.  Unlike the Census data, the IRS data do not include corporations (Tr. 14326).  Over the same period GM body shops' sales grew by 92% (RX 317) (RPF 159).

272.  The growth in sales by IBSs, including corporations, can be estimated by the process of linking the Census data, showing the growth of sales of IBSs (corporations included) over the 1967-1972 period, with the IRS data showing the growth in sales of IBSs (corporations excluded) over the 1972-1976 period (Tr. 16027-34).

273.  Between 1967 and 1972, IBS corporations grew by a higher percentage than IBS partnerships and proprietorships (Tr. 14370).  Assuming that IBS corporations grew by only the same percentage as the IBS partnerships and proprietorships in the period 1972-1976, it is estimated by using the linking process, that IBSs (corporations included) grew in 1967-1976 by 196%, or by more than twice the percentage (92%) that GM dealer body shops grew over the same period (RX 322) (RPF 160).

Dun and Bradstreet Data

274.  Dun and Bradstreet data demonstrate that IBSs have continued to grow in numbers, sales, and employees. From 1972 to 1977 the number of **[*114]** IBSs surveyed by Dun and Bradstreet grew by 53%, or from 11,644 to 17,864.  The number of GM body shops (according to GM data) declined from 9057 to 9001.  Sales receipts for these IBSs grew by 85% or from $894 million to $1.651 billion.  GM dealer body shops' sales (according to GM data) increased by 53%, or from $571 million to $979 million.  According to the Dun and Bradstreet survey, the number of non-dealer repair shops other than IBSs increased in the same period by 20%, a significantly lower growth rate than that of the IBSs.  These non-dealer repair shops also experienced a lower growth in sales when compared to IBSs, 76% compared to 85% for the IBSs.  The number of employees of IBSs also grew between 1972 and 1977 from 49,438 to 80,019 (62%), compared to employment growth in non-dealer repair shops, other than IBSs, from 235,179 to 244,622 (4%) (RX 38, RX 43) (RPF 162).

275.  A Dun and Bradstreet study also reveals that the failure rate for IBSs was 15 per 10,000 in 1977, a decline from 32 per 10,000 in 1972.  Only one of the 23 retail lines of business for which Dun and Bradstreet maintains failure rates in the normal course of business experienced a lower failure rate **[*115]** in 1977.  Motor vehicle franchise dealers had a failure rate of 20 per 10,000 (RX 303A-B; Tr. 12251) (RPF 164).

Telephone Directory Listings

276.  Based on telephone directory (Yellow Page) listings, the number of IBSs in Buffalo, Cleveland, New Orleans, St. Louis, Tucson has grown over a ten-year period.  Between 1967 and 1977, the growth rate was almost 83%.  In St. Louis, the growth rate was in excess of 26%.  In Tucson, the rate was about 105%.  During the ten-year period, the body shop growth rate for these five areas was 38%.  For Spokane, there are no comparable data for 1967, but in the five-year period between 1972 and 1977, there was an increase of over 30% in the number of IBSs (RX 41) (RPF 166).

277.  Based on 1977 Yellow Page listings, more than 72% of the IBSs in Commission counsel's selected areas, excluding Mansfield, Ohio, are located where population has been declining.  From 1970 through 1975, Buffalo lost 1.6% of its population; Cleveland, 4.3%; and St. Louis, 1.7%.  During the same period, the nation's population rose by 4.8%.  The two remaining cities, which showed an increase in population since 1967, and for which ten-year body shop data are available,  **[*116]**  are New Orleans and Tucson.  These cities show an increase in the total number of IBSs of approximately 83% and 105%, respectively, which outstripped the percentage increase in the populations of these areas between 1970 and 1975 (RX 41; RX 42) (RPF 168).

278.  Several witnesses testified that listings in the Yellow Pages are a reliable method of analyzing numbers of IBSs entering or leaving the business (Tr. 4269, 7047) (RPF 167).

Financial Health

279.  Some of the IBSs that grew the most in terms of gross sales declined in profitability, or actually experienced losses (Tr. 4184-85; 4816-20).  Others that grew in terms of gross sales in fact cut back on their number of body repair men, billed fewer hours or repaired fewer vehicles (Tr. 4205, 4207, 4227, 6557-58, 6590-91, 6650-52).

280.  Not only is the apparent profitability of IBSs very low, but the actual return to the owners is even lower than the profit figures indicate due to the owners' low salaries or withdrawals (Tr. 2292-93, 4283-84, 4010-11, 4827, 4831, 4841-42, 4859).

281.  In recent years, as the profitability of collision work has declined, many IBSs have entered into other fields, most of which are **[*117]**  related to collision repair work (Tr. 15250-51), such as towing (Tr. 5692); boat repair (Tr. 6775-76); appraisals (Tr.  4794-95, 4967); salvage pools (Tr. 7039); fiberglass repairs (Tr. 3125); gasoline sales (Tr. 5691-92); office furniture and cabinet repair (Tr. 7041, 9373); design and installation of van interiors (Tr. 7042); salvage vehicle rebuilding (Tr. 5987, 9374); patchwork on rusted out cars (Tr. 4945); mechanical and radiator repair (Tr. 3777); body shop supplies, abrasives and heavy equipment wholesaling (Tr. 6163-64); rust proofing (Tr. 3994); and frame straightening (Tr. 4823-24, 4967, 7095).

282.  In practically all cases, these sideline operations have assumed an increasing share of the IBSs' total volume of business because they are more profitable than collision repair work (Tr. 3681, 4121, 4190, 4967-68).  In some cases, IBS operators have virtually closed down their automobile collision repair operations in favor of these other enterprises (Tr. 4041, 9374) (CPF 169).

283.  Other IBSs concentrate on specialized collision repair work (Tr. 8287-91 (heavy duty trucks and equipment); Tr. 2982 (heavy trucks and buses); Tr. 5569 (heavy equipment; Tr. 7911 (Winnebago **[*118]**  campers); Tr. 9374 (vinyl tops and customizing, trucks and trailers)) (CCPF 171).

284.  Sublet work from dealers constitutes a significant share of the volume of some IBSs (Tr. 5009-10, 7906, 7911-13 IBSs generally are eager to take on any sublet work they can get (Tr. 4858-59; see official notice Tr. 15251-52) (CCPF 174).

285.  If IBSs received price parity in obtaining service GM crash parts, IBS witnesses testified they would: (1) expand and modernize their facilities (Tr. 9376); (2) purchase new and more sophisticated equipment (Tr. 4864); (3) hire additional or more skilled employees (Tr. 3127, 3668); (4) raise their employees' salaries or provide fringe benefits such as paid vacations, uniforms, and hospitalization benefits (Tr. 2860, 7570); (5) complete their repair jobs more quickly (Tr. 9376, 3866, 4864); and (6) provide for consumers such incidental services as free undercoating and car washes (Tr. 3127) (CCPF 297).

286.  Some IBS witnesses testified that their body shops were operating at or very near capacity (Tr. 6120, 3210, 2912 ("runs a full house," has plenty of business); 4048-49, 4121 (80% capacity, in November 1977, already booked through January 1978);  **[*119]**  4882, 4945-46, 5102-03 (90% capacity currently, in 1977 was full); 8344-45, 2632, 2660 (no trouble getting business; could not take on 10-15% more work without improving facilities and adding men); 6259-60, 6319 (had all the work he could handle, had to reject jobs, which went to GM dealers)) (RPF 175).

287.  A number of IBS witnesses testified that they added to their capacity during the 1970's by construction of additional buildings and the addition of expensive equipment (Tr. 3100, 3189, 3208 (added 29 bays in 10 years, 15-20 bays added in 1973 with new building), 2291 (added buildings and equipment, 1973-76), 5096 (invested $40,000 in frame equipment), 5334-35 ($5,000 lift, $12,000 new doors), 3906-07, 3915-16 (equipment and real estate purchased in 1968, 1974 and 1976-77), 7905-06, 4188-89 (1970-new building and frame rack for $20,000)) (RPF 176).

## RELATIONSHIPS BETWEEN GM, ITS DEALERS, AND CRASH PARTS

288.  Dr. Nelson testified that GM is dependent on its dealers' loyalty and good will to sell its major product -- motor vehicles -- and that GM dealers oppose losing their exclusive wholesaling privileges on new service GM crash parts, a major parts item with them on **[*120]**  which they face limited competition (Tr. 14869, 14879).  In confining the distribution of GM crash parts to its dealers, GM dealers are dependent on GM not only for the vehicles they sell, but also for the crash parts to repair such vehicles (Tr. 14833).

289.  Various dealer advisory bodies regularly meet with GM officials.  For the General Motors Dealer Council, GM dealers in each of numerous geographical zones vote within their division (i.e., Chevrolet, Oldsmobile, Pontiac, Buick, Cadillac, and GMC Truck) to elect representatives to Regional Dealer Councils.  The Regional Councils in each division elect a representative to the Divisional National Council.  Each of these six National Councils elects a Chairman from among its membership.  The Councils solicit and receive opinions from dealers regarding GM's policies and meet periodically with GM executives to communicate these views and to make recommendations (CX 7208, CX 7209A-B, CX 7210A-C, CX 7211A-B, CX 7212A-D, CX 7213A-B, CX 7214A-C, CX 7215A-B; Tr. 2070, 3311-17, 3320-21, 3428-31, 4604, 8137-38) (CCPF 278) (RRB 278).

290.  GM also has other dealer advisory bodies such as its President's Committee and its National **[*121]**  Advisory Counsel (Tr. 8139, 3437) (CCPF 279).

291.  GM franchise dealers also are organized to present their views to GM through NADA (Tr. 3422).  About 70% of all GM dealers belong to NADA (Tr. 8212).  NADA has an Industry Relations Committee (IRC) which is composed of new car and truck franchise dealers broken down into "line groups" according to car make.  At present, the IRC is comprised of various groups, one of which is the General Motors Line Group.  IRC, particularly the GM Line Group, is the official voice of NADA's GM dealer members (CPF 268).  The chairman of the GM Line Group is a GM dealer who is appointed by the president of NADA in consultation with the Industry Relations Committee Chairman.In addition to the chairman, the GM Line Group includes each chairman of the six GM Divisional National Councils (Tr. 3316, 3422, 3431-33) (CCPF 280) (RRB 280).

292.  Over the past few years, GM dealers, either individually, through their trade association NADA or through GM's dealer councils, have had numerous discussions, communications, and meetings with GM concerning the Commission's investigation into GM's distribution of new GM crash parts, the system itself, and ideas **[*122]**  to change the system (CX 7301A, Tr. 3462, 3483-84, 3500, 3517, 8062-63, 8068, 8170, 8177-78, see, e.g., CX 7205A, C; CX 7303A-E; CX 7313M-O, CX 7314A-B; CX 7316A-B; CX 7317; CX 7318; CX 7332A-E; CX 7355B) (CCPF 281) (RRB 281).

293.  During many of these discussions, communications, and meetings, GM dealers, directly or through their associations, have repeatedly urged GM not to sell service GM crash parts to other than GM dealers (CX 7301; CX 7341B; CX 7319; CX 7341A-B; CX 7352A-B; Tr. 3361, 4687-89; see Stipulation Tr. 3376) (CCPF 282).

294. For over a year prior to GM's July, 1975, proposal to the Commission, NADA representatives "... debated the crash parts issue with the Federal Trade Commission and General Motors" and "... repeatedly urged General Motors not to sell non-dealers (CX 7314B) (RPF 224).

295. In May, 1975, NADA officials, at a meeting attended by Mr. Estes, GM's president, and other GM officials, indicated their opposition to the opening of GM's warehouses to either IBSs or IWs (Tr. 4687-90; CX 7314) (RPF 225).

296. Mr. Estes, expressed sympathy with NADA's viewpoint, namely, "... that the present system served **[*123]** the consumer properly and that the dealers had made an investment," but also indicated that GM was under considerable pressure and that more was at stake than merely parts distribution (Tr. 4690) (RPF 226). On June 15, 1975, Mr. Pohanka, a GM dealer in the Washington, D.C. area, who at that time was vice-president of NADA urged GM, by telegram to Mr. Estes, not to open its warehouses (Tr. 4668; CX 7314B) (RPF 228).

297. A GM representative called the Executive Director of NADA to inform him that GM was about to extend the July 11, 1975, settlement proposal to the FTC (Tr. 3539) (CCPF 289).

298. Immediately after GM's offer was announced, NADA organized to fight it (Tr. 3564). NADA sent a circular to all NADA members which stated that the GM proposal was a serious threat to dealers and that an increase in wholesale compensation was what was needed (CX 7314A-C). This was followed by a Mailgram to all NADA members urging them to write Mr. Estes, and ask him to withdraw GM's offer (CX 7349B). In response to this request, a large number of letters were sent to GM by its dealers urging withdrawal of the offer (Tr. 4721) (CCPF 290).

299. The July 11, 1975, settlement proposal, **[*124]** among other things, would have led to the direct sale by GM of new GM crash parts at dealer net prices to IBSs (CX 7010; ALJX 11; Tr. 3559) (RPF 229). Mr. Hancock, NADA's president at the time, Mr. Pohanka, the vice-president, and Mr. McCarthy, the chief administrative officer (Tr. 3422), were informed of GM's proposal on the same day that it was made to the Commission (CX 7314B; Tr. 3559-60; CX 7321) (RPF 230).

300. NADA "strongly" opposed GM's offer to open the warehouses to IBSs and expressed its opposition to individual Federal Trade Commissioners and to members of the FTC staff (Tr. 3560-62). NADA also made public its opposition through a press release issued July 25, 1975 (CX 7301A-B; Tr. 3480) (RPF 232).

301. NADA's efforts to convince GM to abandon its proposal to sell directly to IBSs consisted of "argument". Mr. Pohanka testified, "We were very distressed when General Motors made the offer to the Federal Trade Commission that they did. We felt it was not in the best interests of the dealer or the consumer, and told General Motors about that" (Tr. 4717-18). GM informed NADA that it did not intend to withdraw its settlement proposal (CX 7305, Tr. 3563-64). **[*125]**

302. On December 17, 1975, representatives of GM and NADA met to discuss the latest developments regarding GM's crash parts distribution system. Mr. Mehan, speaking for GM, stated that getting independent distributors into crash parts would result in greater costs to consumers and cause great dealer problems (CX 7316A; CX 7324A; Tr. 3524). NADA countered with its Four Point Program which did not include opening GM's warehouses to non-dealers (CX 7316B; Tr. 3525-29). The question, insofar as one attendee noted, and he was the only one so noting, was, "What can GM and dealers do together to keep 'independent distributors' out of crash parts area?" Another attendee disputes the accuracy of the note (Tr. 3519-22; CX 7324B) (CCPF 292) (RRB 292).

303. On February 5, 1976, GM and NADA sent separate settlement proposals to the FTC which were described by one NADA official as "essentially the same". The GM proposal was very similar to NADA's Four Point Program (CX 7353B; compare ALJX 13A-I, Supp. to CX 7012 with CX 7327A-G Point 1). Raising wholesale compensation to 30% had already been adopted by GM prior to the February settlement offer (ALJX 13G, Supp. to CX 7012).

304. As **[*126]** advocated by NADA, GM's proposal did not include the July, 1975, offer to sell crash parts directly to IBSs but did call for wholesale compensation to be paid on crash part sales across franchise lines, i.e., a

1982 FTC LEXIS 39, *126

Chevrolet dealer selling a Pontiac part would be eligible to claim wholesale compensation (ALJX 13G, Supp. to CX 7012) (CCPF 293).

305.  NADA did not ask GM's opinion of the NADA proposal (Tr. 3570-71, Tr. 4768-69) (RPF 243) and NADA had no advance knowledge of the February 5, GM proposal (Tr. 3570-72; Tr. 4768).  (See Finding 52, 303-4).

DISCUSSION

The Relevant Markets

1.  The Product Market

306.  Identification of the relevant product market or submarket is the first step in a monopolization case.  *Brown Shoe Co. v. United States, 370 U.S. 294, 324 (1962)*.  Commission counsel contends that the relevant product market consists of service (new) GM crash parts (CPF 53-59).  GM objects to isolation of crash parts for separate analysis from the rest of the "transportation package" it sells in competition with othr manufacturers, on the ground that doing so ignores the often exercised owner option to repair parts which have been **[*127]**  crash damaged.  GM argues that if crash parts are to be so isolated then used crash parts must be included within the relevant market. (RB 5)

307.  Counsel to GM also argues that in United States v. Aluminum Co. of America [*Alcoa], 148 F.2d 416, 424-25. (2d Cir. 1945)*, Judge Learned Hand reasoned that the company took into account that part of its current production would be salvaged in determining what its output of new aluminum should be.  GM, the argument goes, is merely interested in increasing the sale of new cars and the expected supply of used crash parts is not a factor taken into account in the production of new cars (RB 9)  But Judge Hand's reasoning that the secondary material market for aluminum curbs prices of new aluminum does not mean that in this case both new and used crash parts must be combined in defining the relevant product market.  Even if GM does not take the supply of used crash parts into account in determining what its output of new cars will be, that fact does not obviate existence of a separate and distinct new GM crash parts market.  The precedents reflect that making that determination is accomplished by examining the products **[*128]**  involved and not necessarily by considering how the producers view them.

308.  "Cross-elasticity of demand" was the criterion used to identify the relevant product market in United States v. E.I. du Pont de Nemours & Co., the "cellophane" monopolization case.  *351 U.S. 377 (1955)*. It was stated that "... commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce', monopolization of which may be illegal." *351 U.S. at 395*. In other words, under the cross-elasticity of demand test, if purchasers can substitute the products of one supplier for the products of other suppliers, the products which may be substituted are included in the market for examination.  But that standard proved too restrictive to always be used.

309.  Seven years later, in *Brown Shoe, supra,* after citing Dupont/Cellophane, the Supreme Court said that while there may be broad product markets whose outer boundaries "... are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it...," there also may be "well defined submarkets"  **[*129]**  within the broader market.  *370 U.S. at 325*.

310.  The Court added that relevant submarkets could be identified by "... such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes and specialized vendors." *370 U.S. at 325*.The result was that in Brown Shoe, the markets for men's, women's, and children's shoes were examined because they were economically significant submarkets within the shoe industry.

311.  A few years later in *General Foods Corp. v. F.T.C., 386 F.2d 936, 940 (3rd Cir. 1967)*, cert. denied, 391 U.S. 919 (1968) (which was cited by the *Commission in Borden, Inc. (ReaLemon) 92 F.T.C. 669, 784, n.8 (1978)* and is the Commission's most recent opinion in a monopolization/monopoly power case) the court again made it clear that the existence of some cross-elasiticity of demand or as the Commission put it in Borden/ReaLemon, some degree of interchangeability, does not foreclose the existence **[*130]**  of submarkets identified by Brown Shoe criteria.

312.  There is a detailed discussion of the reasons for the development of the seven criteria test in _Reynolds Metals Co. v. F.T.C., 309 F.2d 223, 226-229 (D.C. Cir. 1962)_, a merger case involving acquisition of a producer and seller having a substantial (33%) market share of the decorative aluminum foil market by a major manufacturer of aluminum.  Also see _L. G. Balfour Co. v. F.T.C., 442 F.2d 1, 11 (7th Cir. 1971)_ and _RSR Corp. v. F.T.C., 1979-1 Trade Cases, P62,450_, p. 76,663-64.

313.  In _United States v. Aluminum Co. of America (Alcoa-Rome), 377 U.S. 271 (1964)_, separate aluminum and copper submarkets were found to exist in the wire and cable industry.  Existence of a separate paper insulated power cable submarket within a stipulated insulated wire and cable line of commerce (market) was found in _United States v. Kennecott Copper Corp. (Kennecott), 231 F.Supp. 95, 98-100 (S.D.N.Y. 1964)_ aff'd per curiam. _381 U.S. 414 (1965)_. In _United States v. Bethlehem Steel Corp., 168 F. Supp. 576, 593-95 (S.D.N.Y. 1958), [*131]_ the iron and steel industry was found to be the relevant broad line of commerce, but ten specific products (e.g., hot rolled sheet, track spikes, electricweld pipe, oil field equipment supplies) were held to be identifiable submarkets as well.

314.  In _United States v. Grinnell Corp., 384 U.S. 563, 572-573 (1966)_ (a leading monopolization/monopoly power case), the Supreme Court said, "... in _§ 2_ cases under the Sherman Act, as in _§ 7_ cases under the Clayton Act [citing Brown Shoe] there may be submarkets that are separate economic entities.  * * * We see no reason to differentiate between 'line' of commerce in the context of the Clayton Act and 'part' of commerce for purposes of the Sherman Act, [citing _United States v. First National Bank & Trust Co., 376 U.S. 665, 667-68 (1964)_, a § 1, Sherman Act case]." Also see _Columbia Broadcasting System v. F.T.C., 414 F.2d 974, 978-79 (7th Cir. 1969)_, cert. denied, _397 U.S. 907 (1970)_.

315.  The consistent thread running through the decisions is that the objective and need is to delineate markets which conform to areas of effective competition **[*132]** and to the realities of competitive practice, regardless of which test is used.  _Balfour, supra, 442 F.2d at 11_. The approaches to identify broad markets and the submarkets contained within them, are described in _Borden Inc./ReaLemon, supra, 92 F.T.C. at 783-84_.

316.  By reference to Brown Shoe indicia and the crosselasticity of demand test in Dupont/Cellophane it is possible to combine crash parts, both new and used, together with the repair of crash damaged portions of a vehicle in a three component, broad relevant market, as counsel to GM suggests.  Examining only such a market would be appropriate in a case in which the focus is solely on the alternative ways in which a crash damaged vehicle might be repaired but that is not our focus here.  Our role is to determine whether there is a substantial anti-competitive effect on any product market affected by the acts or practices alleged to be illegal, i.e., the distribution by GM of new crash parts.

317.  Commission counsel relies on five of the Brown Shoe criteria to separate new and used crash parts into two submarkets: (1) specialized vendors; (2) peculiar **[*133]** characteristics and uses; (3) industry and public recognition; (4) distinct prices; and (5) sensitivity to price changes (CCPF 379-396).

(1) Specialized Vendors

318.  With the exception of a very small number of crash parts, GM is the sole distributor of new GM crash parts and distributes them to its franchised dealers. GM does not sell used GM crash parts (Findings 12(8)(9), 68). These are obtained only from specialized outlets, e.g., salvage yards and bumper rechromers (Finding 214).

(2) Peculiar Characteristics and Uses

319.  The limited availability of used (salvage) crash parts for vehicles less than two years old (Finding 235) and the fact that certain service parts, e.g., exterior moldings, grilles, fenders, bumpers, quarter panels, etc., are seldom available in salvage form (Finding 222) distinguish new from salvage GM crash parts.  In addition, dealers sell new crash parts as individual items, whereas salvage yards most frequently sell their product as part of large assemblies (Finding 223) requiring different types of labor for installation.

320.  As pointed out by Commission counsel (CCPF 387), distinctions in quality have been held to justify **[*134]** treating two products as being in separate markets.  _United States v. Pennzoil, 252 F. Supp. 962, 972-76 (W.D. Pa._

*1965)*. *A. G. Spaulding & Bros., Inc. v. F.T.C., 301 F.2d 585, 599-603 (3rd Cir. 1962)*. The fact that used crash parts are often bent, rusted, irregular, and more difficult to repair (Finding 225) is a peculiar characteristic which justifies new and used crash parts being considered as separate submarkets.

(3) Industry and Public Recognition

321.  Individuals in salvage crash parts and bumper rechroming businesses recognize that these industries are separate from the distribution of new crash parts (Finding 225).  Separate trade associations exist (Findings 14 and 15) which is further evidence that the two industries are distinct.  *Bethlehem Steel, supra, 168 F. Supp. at 594*; *United States v. Citizen Publishing Co., 280 F. Supp. 978, 985 (D. Ariz. 1968)*, aff'd, *394 U.S. 131 (1969)*. In addition, vehicle owners and body shops prefer the use of new crash parts (Finding 224), recognizing that quality distinctions may exist, despite possible insurance company preferences **[*135]** for the use of salvage parts (Findings 230, 240, 218).

(4) Distinct Prices

322.  There is generally at least a 25% price differential between wholesale salvage crash parts and their new counterparts (CCPF 96).  Similar price differences have been considered "strong evidence" of separate markets. *Borden/RealLemon, supra, 92 F.T.C. at 763*, citing Brown Shoe; *Alcoa-Rome, supra, 377 U.S. at 276*; *Reynolds Metals, supra, 309 F.2d at 229*; *Litton Industries, Inc., 82 F.T.C. 793, 997 (1973)*.

(5) Price Sensitivity

323.  There is a lack of mutual price sensitivity between new and used GM crash parts (CPF 41, 94, 94A, 95).  GM uses a list price for parts.  It is distributed nationwide and does not take into account variations in prices for salvage crash parts, marketed on a local level, for which the prices change frequently (CPF 95).

324.  Counsel to GM contends that use of Brown Shoe standards will result in an even broader definition of the product market than Commission counsel advocates in that it would include used GM crash parts (RB 8).  The reasoning of counsel to GM is not **[*136]** persuasive.  It is true that insurance companies, salvage operators, and installers understand that new and used crash parts are both options to be considered in the repair of crash damaged cars (RPF 191-202), but there is still recognition that there are two separate and distinct systems of distribution.

325.  Salvage part prices and the cost to repair rather than replace are taken into account by insurers in arriving at the figure they will pay to have a vehicle fixed.  The prices for salvage parts or for repairs, if there is any connection, normally "follow" rather than "lead" the prices GM establishes for new crash parts but model year of the car also affects the "used" price (Findings 227-8, 236).  The lack of mutual price sensitivity (i.e., one product is price sensitive to another but not vice versa) has been held to be evidence of separate markets.  In *Dean Foods Co., 70 F.T.C. 1146 (1966)*, the Commission found that the price of retail milk moved as the price of wholesale milk moved. However, wholesale milk prices were not sensitive to retail milk prices.  In finding separate markets the Commission stated:

"What is of significant determinative value **[*137]**  in determining the proper scope of a market involving the same product is whether the price sensitivity which does exist is mutual, whether it is generated equally by both sectors or whether, on the other hand, the competitive forces are all generated primarily in one sector."

*70 F.T.C. at 1258* (CCPF 395).  This lack of mutuality is also evidenced by the fact that salvage crash parts are 75% to 90% of list in the first three model years and decline to 25% to 50% of list thereafter (Tr. 1747-48).

326.  Although both types of crash parts are used to repair damaged cars, this does not negate the fact that two separate markets might be found for monopolization purposes.  For example, the Commission adopted the following language in *Borden/RealLemon, supra, 92 F.T.C. at 762*, 832.

"... [Recognizing] that fresh lemons and processed lemon juice are used for many of the same purposes by the public, does not dictate that they must be placed in the same product market where serious, important and economically substantial distinguishing characteristics differentiate the products..."

In that case, fresh lemons and processed/bottled lemon juice were **[*138]** found to be in different product markets because the bottled product had limited use due to its distinctive taste and the additives it contained, whereas fresh lemons were less convenient to use, subject to spoilage, and had a higher cost. This conclusion was reached without resort to the <u>Brown Shoe</u> criteria. *92 F.T.C. at 788*. The differences beween new and used crash parts are equally significant.

327. Counsel to GM suggests that "reasonable interchangeability"/"cross-elasticity" should be the test used to identify the product market here. I do not agree. Two products may have reasonable interchangeability of use or cross-elasticity of demand, but well-defined submarkets still may exist within a broad market, and they may be product markets for antitrust purposes. *Borden/ReaLemon, supra, 92 F.T.C. at 762*, 832.

328. It has often been held that new products may be separated from their used or recycled counterparts in determining the relevant product market. <u>Alcoa,</u> discussed at p. 59. Also see *Avnet, Inc. v. F.T.C., 511 F.2d 70 (7th Cir. 1975)*; *United States v. Paramount Pictures, 334 U.S. 131 (1948)*; **[*139]** <u>RSR Corp.,</u> <u>supra,</u>.

329. Lastly, the fact that not all of the <u>Brown Shoe</u> criteria have been used in defining the relevant market is not significant. There are a number of precedents (<u>e.g.,</u> <u>Alcoa-Rome,</u> <u>Kennecott</u>) for the proposition that not all, or even most, of them need be taken into account. *United States v. Continental Can Co., 378 U.S. 441, 456-57 (1964)*; *General Foods Corp., supra, 386 F.2d at 941*; *Columbia Broadcasting System, supra, 414 F.2d at 979*. The new GM crash parts market is "sufficiently inclusive to be meaningful in terms of trade realities." *Crown Zellerbach Corporation* v. *F.T.C., 296 F.2d 800, 811 (9th Cir. 1961)*, <u>cert.</u> <u>denied,</u> *370 U.S. 937 (1962)*. Consequently, in this case, new GM crash parts comprise the relevant product market.

2. <u>The Geographic Market</u>

330. The geographic market which one must examine in order to determine whether the monopolization alleged is illegal may be identified in much the same way as the product market. In <u>Brown Shoe</u> the Supreme Court said that the "... criteria **[*140]** to be used in determining the appropriate geographic market are essentially similar to those used to determine the relevant product market * * * The geographic market selected must * * * both correspond to the commercial realities of the industry and be economically significant * * * [footnote omitted]. [Although] the geographic market in some instances may encompass the entire Nation, in some other circumstances, it may be as small as a single metropolitan area." *370 U.S. at 336-37*.

331. What is very clear from the precedents is that the geographic market to be examined need not be marked off in metes and bounds. *United States v. Pabst Brewing Co., 384 U.S. 546, 549 (1966)*; <u>du</u> *Pont/Cellophane 351 U.S. at 395*.

332. The geographical effects of alleged violations of the antitrust laws have been considered by the Supreme Court and lower courts with reference to both broad geographic markets and submarkets within the broad area, in basically the same manner as in the case of product markets. *United States v. Kimberly-Clark Corp. 264 F. Supp. 439, 455-56 (N.D.Cal. 1967)*; *Bethlehem Steel Corp., supra, 168 F. Supp. at 601-02.* **[*141]**

333. In *Grinnell, supra, 384 U.S. at 576*, the court said "... the relevant market for determining whether the defendants have monopoly power is not the several local areas which the individual stations serve, but the broader national market that reflects the reality of the way in which they built and conduct their business."

334. Even if GM did not actually sell its crash parts in every state, which is contrary to the evidence in this case, there are numerous precedents to the effect that a national market may exist. See *F.T.C. v. Procter and Gamble Co., 386 U.S. 568, 571-72 (1967)*; *Pabst, supra, 384 U.S. at 549-551*; *A. G. Spaulding, supra, 301 F.2d at 607*;

*Kimberly-Clark, supra, 264 F. Supp. at 454-458*; *British Oxygen Company Limited, et al., 86 F.T.C. 1240, 1346-47 (1975)*.

335.  The nation as a whole most assuredly is significant economically and is the area where the effect of the monopoly/monopoly power on competition is direct and immediate.  The Supreme Court has held this to be an appropriate "section of the country"/"geographic market" insofar **[*142]** as antitrust violations are concerned.  *Philadelphia National Bank, 374 U.S. 321, 357-362 (1963)*. The Commission did the same in *Borden/ReaLemon, supra, 92 F.T.C. at 675*, 832.

336.  In this case the United States as a whole is the relevant geographic market.  This is because new GM crash parts are marketed nationally (Finding 67).  This fact alone warrants considering the nation as the relevant geographic market.  See *Commission Opinion in Beatrice Foods Co., 86 F.T.C. 1, 60 (1975)*.

## ANTITRUST CASE DECISIONS AS PRECEDENTS FOR § 5 FTCA DECISIONS

337.  With regard to the fact that many of the cases cited as precedents have involved charges of several different violations of the antitrust laws or the Federal Trade Commission Act, the standard for outlining the relevant markets is no different whether a case has been brought under the *Sherman, Clayton or Federal Trade Commission Acts. Borden/ReaLemon, supra 92 F.T.C. 784*, citing *Luria Bros. & Co., 62 F.T.C 243, 604 (1963)*, aff'd, *389 F.2d 847 (3rd Cir.)*, cert. denied, *393 U.S. 829 (1968)*; *Columbia Broadcasting, supra, 414 F.2d at 978-79. [*143]*

## MONOPOLIZATION/MONOPOLY POWER

338.  Monopoly power is the power to control prices or to exclude competition.  *American Tobacco Co. v. United States, 328 U.S. 781, 811 (1946)*. It usually can be inferred from possession of a predominant share of the relevant market.  *Grinnell, supra, 384 U.S. at 571*; *Dupont/Cellophane, supra, 351 U.S. at 391*. Having identified the relevant product and geographic markets, the respondent's share of those markets is considered to determine whether the firm's actions constitute monopolization or whether the firm has monopoly power. *Grinnell, supra, 384 U.S. at 571*.

339.  "Size is of course an earmark of monopoly power" *United States v. Griffith, 334 U.S. 100, 107 n.10 (1948)*. GM's size (Finding 65) and the fact that its crash parts are made for GM cars only (Finding 114) make it clear that GM <u>has</u> monopoly power, insofar as new GM crash parts are concerned.

340.  The market share of the relevant (products) in the relevant geographic market, that is the annual sales figure, is used in making this determination.  It has been held **[*144]** that the share probably must be greater than sixty percent in order for monopoly power to exist.  *Alcoa, supra, 148 F.2d at 416*. Alcoa had 90% of the relevant market in virgin aluminum.  *148 F.2d at 424*. Here, GM approaches a 100% share because it supplies practically all of the new GM crash parts which are distributed (Finding 68).

341.  GM is able to (and does) set the prices of the crash parts it sells without any real concern for the near term reactions which dealers or others might have to the increase in price.  No doubt GM has concerns about possible long term effects price changes may have on car buyers' decisions.  There was testimony that competitors' prices for crash parts are noted when price increases are recommended to higher level GM employees who make the decisions on prices (Finding 199).  But there was no persuasive evidence to the effect that the adverse reactions of dealers, other repairers of damaged autos, or consumers are either considered or have a controlling influence on whether an increase should occur when price increases are being decided upon.

342. Thus, GM has a monopoly and monopoly power by virtue of the fact **[*145]** that, except for a very few parts, it is the exclusive source of supply for new GM crash parts.  This provides GM with a dominant market share and a position well insulated, even isolated, from competition for sales of new GM crash parts.

## WERE/ARE GM's PRACTICES AN ABUSE OF MONOPOLY POWER OR ILLEGALLY MONOPOLISTIC?

343.  A finding of a monopoly in the relevant market is not enough to constitute a violation of antitrust law, <u>i.e.</u>, of the Sherman Act ( *15 U.S.C.   § 2*) because having a monopoly or monopoly power as such is not illegal <u>per se</u>. It is

monopolization, attempts to monopolize, and abuses of monopoly power which are prohibited. "According to the court interpretations of this [Sherman Act] statutory language that have been handed down since 1890, Congress' failure to outlaw monopoly as an end result and focus instead on the means by which a monopolist was thought to get there was no accident or oversight: It didn't want to make monopoly illegal; it simply wanted to make sure that, wherever monopoly does appear, it will have been acquired fairly. [Emphasis added]". Mueller, "Entrepreneurial Education," [*146] 2 Antitrust L. and Econ. Rev. 4 (1979). "To monopolize is not simply to possess a monopoly: the word implies some positive drive, apart from sheer competitive skills, its size and power in the market." Neale, The Antitrust Laws of the USA (2nd Edition, 1970) 92, 93.

344. "The Sherman Act was intended to secure equality of opportunity and to protect the public against evils commonly evident to monopolies and those abnormal contracts and combinations which tend directly to suppress the conflict for advantage called competition -- the plan of the contending forces ordinarily engendered by an honest desire for gain. The statute did not forbid or restrain the power to make normal and useful contracts to further trade by resorting to all normal methods, whether by agreement, or otherwise, to accomplish such purpose." *United States v. American Linseed Oil Co., 262 U.S. 371, 388 (1923)* (citations omitted).

345. The acts and practices charged need not in themselves be independently unlawful or predatory to constitute violations of *Section 2*, but merely being a large company with a monopoly share of the relevant product market is not sufficient. [*147] *United States v. Griffith, 334 U.S. 100, 105 (1948)*; *Alcoa, supra 148 F.2d at 431-32*. However, as the Commission said in Borden/ReaLemon, supra, "One point made clear by the Alcoa case is that the conduct of firms with monopoly power is viewed differently from that of firms without such power [Emphasis added]." *92 F.T.C. at 794*.

346. "The existence of monopoly power- 'monopoly in the concrete' *Standard Oil Co. of New Jersey v. United States [221 U.S. 62 (1911)]* does not by itself prove the offense of monopolization.... the offense is the existence of the power to raise prices or exclude competition, 'coupled with the purpose or intent to exercise that power.' The requisite intent for this purpose is not a 'specific' intent to monopolize, but rather a conclusion based on how the monopoly power was acquired, maintained or used." Report Of The Attorney General's National Committee to Study the Antitrust Laws, March 31, 1955, p. 55, citing *Griffith, supra, 334 U.S. at 107*; *American Tobacco, supra, 328 U.S. at 809*.

347. Consequently, for a violation [*148] of the antitrust laws to be found when a firm has a monopolist's share of the relevant markets, or when the firm has monopoly power, the firm must be shown to have conducted its business in such a way that it went beyond the very fine line dividing acceptance of its position and taking actions which would unduly stifle, frustrate or foreclose competition. For example, Alcoa, by expanding existing plants and constructing new facilities with the goals of building ahead of demand and unduly taking the initiative in dealings with purchasers, suppliers, and competitors so as to preempt any diminution of its power was found to be an illegal monopolist under the *Sherman Act. Alcoa, supra, 148 F.2d at 431-32*. Also see *United Shoe Machinery, 110 F. Supp. 295, 341 (D. Mass 1953)*; *Grinnell, supra, 384 U.S. at 576*.

348. Insofar as the Federal Trade Commission Act is concerned, neither an offensive practice nor conduct constituting a violation of the Sherman or Clayton Acts need exist for a violation to be found. The reason is that the Commission is not bound to follow antitrust standards as strictly as the courts must in cases [*149] brought under the *Sherman and Clayton Acts. Fashion Originators' Guild of America, Inc. v. F.T.C., 312 U.S. 457, 466-67 (1941)*; *Sperry & Hutchinson Co. v. F.T.C., 432 F.2d 146, 150 (5th Cir. 1970)* rev'd on other grounds, *405 U.S. 233 (1972)*.

349. Controlling Commission and court precedents tell us that monopolization is illegal: IF (1) the possessor has monopoly power in the relevant market and (2) that power was acquired or is maintained wilfully "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Borden/ReaLemon, supra, 92 F.T.C. at 788*, citing *Grinnell, supra, 384 U.S. at 570-71*.

350. In addition to demonstrating that monopoly power exists, it must be shown that the power was wilfully acquired or maintained. Thus, in Borden/ReaLemon, the wilful nature of Borden's actions was shown by evidence

that the firm took steps to ensure that its "... monopoly position would not be lost or eroded, and engaged in acts and practices designed to frustrate competition." *92 F.T.C. at 792. [*150]* These steps included: (1) spurious product differentiation that enabled it to command a substantial price premium (p. 793); (2) manipulation of this price differential (p. 793); (3) sacrificing somewhat higher prices over the short-run to assure continued monopoly returns over the long haul (p. 795); (4) the use of geographically discriminatory promotional allowances (p. 795-96); (5) demanding a price considerably in excess of that of competing brands in some areas and reducing prices selectively in areas where it wished to suppress emerging competition (p. 797); and (6) selling to competing customers in the same local market at different prices, without cost justification (p. 798-99).

351.  To the same result see Grinnell, where the Court noted that the company: (1) used restrictive agreements to preempt its competitors; 2) used pricing practices to contain its competitors; and (3) acquired competitors in achieving its monopoly position unlawfully. *384 U.S. at 576.*

352.  No practices similar to those in which Borden and Grinnell engaged have been shown to have been used by GM in order to acquire or maintain its monopoly in new GM crash parts.  GM does require **[*151]** suppliers using its dies and inserts to sell their output only to GM (Finding 68), but the evidence does not show that GM takes action to inhibit the production of dies and inserts by others who might wish to make and sell crash parts or that GM seeks to enforce any design patents or common law rights it possesses in that regard.  For example, a witness testified that his firm makes new crash parts for GM's Corvette without interference (Tr. 1895).

353.  Contrary to the position of Commission counsel the facts here are very different from those found in *United States v. General Motors Corporation,* 121 F.2d 376 (7th Cir. 1941) and in *United States v. General Motors Corp., 384 U.S. 127 (1966).*  Counsel to ASC makes the same argument about the latter case (IAB, pp. 12-13).  In the earlier case GM sought to extend its monopoly into another field (i.e., the wholesale and retail financing of GM autos) by conspiring with General Motors Sales Corporation, General Motors Acceptance Corporation, and General Motors Acceptance Corporation of Indiana, Inc. and by coercing dealers to deal with the finance companies. *121 F.2d at 399.* **[*152]** In the latter case GM combined with some of its dealers to stop other dealers from selling cars to discount houses, and policed their activities to insure that they did so.  Justice Fortas found "... a classic conspiracy in restraint of trade: joint collaborative action by dealers, the appellee associations, and General Motors to eliminate a class of competitors by terminating business dealings between them and a minority of Chevrolet dealers and to deprive franchised dealers of their freedom to deal through discounters if they so choose." *384 U.S. at 140.* No such evidence was disclosed in this case.

354.  GM does have an inevitable monopoly in new GM crash parts.  As to these "... some are natural, and others are 'thrust upon' their owners." But, as the Commission cautioned in Borden/ReaLemon:

... where a firm with monopoly power interferes with natural economic forces which would otherwise dissipate its monopoly, the law rightfully condemns it.

*92 F.T.C. at 795.*

355.  The evidence here does not show that GM has interfered with natural economic forces which would otherwise dissipate its monopoly. Thus, insofar as the charges of monopolization/monopoly **[*153]** power over new GM crash parts are concerned GM "... falls within the exception established in favor of those [monopolists] who do not seek but cannot avoid, the control of a market." *Judge Learned Hand in Alcoa, supra, 148 F.2d at 431.*

356.  The teaching of Alcoa is that monopolization may be illegal not because a firm is progressive, but rather because it acted with calculation to head off every attempted entry into the field.  The case is not to be interpreted as penalizing enterprise, instead it declares illegal those monopolies which are maintained by policies intended to discourage, impede or even prevent the rise of new competitors. Attorney General's Committee Report, supra, at 60.  The evidence here does not show that GM has discouraged, impeded or prevented the rise of new competitors in the new GM crash parts market.  The concurring opinion of Commissioner Pitofsky in Borden/ReaLemon, supra, details the law with regard to the maintenance of monopoly power by use of unreasonably exclusionary behavior. *92 F.T.C. at 820-821.*

357.  I am convinced that GM's restricting suppliers using its dies to sales to GM (Finding **[*154]** 68) is not unreasonable.  There is no other showing in this case which persuasively evidences behavior by GM to exclude other manufacturers from the relevant market.

GM's RIGHT TO CHOOSE ITS SYSTEM FOR DISTRIBUTING NEW SERVICE CRASH PARTS

358.  Commission counsel contends that by selling new crash parts only to its franchised dealers, GM is using its monopoly power in violation of the Sherman Act, (or in violation of its spirit, and therefore illegally under § 5 FTCA) because GM forestalls competition by its refusal to deal with other than its franchisees (CCPF 419).  The following language from United States v. Arnold Schwinn & Co. is quoted to support his proposition that a manufacturer must deal with all those who seek to have it do so, when products competitive to the manufacturer's are unavailable.

...  [A] manufacturer of a product other and equivalent brands of which are readily available in the market may select his customers, and for this purpose he may 'franchise' certain dealers to whom alone, he will sell his goods. [Citations omitted].  If the restraint stops at that point -- if nothing more is involved than vertical 'confinement' of the manufacturers' **[*155]**  own sales of the merchandise to selected dealers, and if competitive products are readily available to others, the restriction, on these facts alone would not violate the Sherman Act.

_388 U.S. 365, 376 (1966)._

359.  Taken by itself, this language appears to confer an obligation to deal upon a manufacturer, but when examined in context it is clear that what the Supreme Court was talking about was part of the broad outline of conduct permissible under the Sherman Act.  The statement was meant merely to identify one end of a spectrum, with price fixing, conduct which never is permissible, identifying the other end.

360.  I do not agree that _Schwinn, supra,_ holds that a manufacturer of a product, having a monopoly in the relevant product market, must do business with all willing customers.  In Schwinn, the Supreme Court merely held that the manufacturer imposed vertical restrictions on the resale of its goods by franchisees which constituted illegal restraints of trade.Schwinn's conduct was not a mere refusal to trade with those who were not franchisees.  It imposed territorial limitations on resales by distributors and confined resales by franchisees **[*156]**  and distributors of bicycles to franchised retailers.  _365 U.S. at 370-71._  No such limitations have been shown in this case.  In fact, GM has encouraged dealers to sell to IBSs by having the wholesale compensation plan apply to such sales.

361.  I agree with counsel to GM when he points out that, "Any analysis of the GM system must begin with the recognition that a manufacturer, absent any purpose to monopolize may choose the customers with whom it will deal." (R. Br. 18).  _United States v. Colgate, 250 U.S. 300, 307 (1919)._  _Oreck Corp. v. Whirlpool Corp., 579 F.2d 126 (2nd Cir.),_ cert. denied, 58 L.Ed. 2d 338 (1978); _Schwing Motor Co. v. Hudson Sales Corp., 138 F. Supp. 899 (D. Md.)_ aff'd, per curiam _239 F.2d 176 (4th Cir. 1956),_ cert. denied, 355 U.S. 823 (1957); _Quality Mercury, Inc. v. Ford Motor, Co., 542 F.2d 466 (8th Cir. 1976),_ cert. denied, 433 U.S. 914 (1977).

362.  Further analysis of the system GM uses for distributing new GM crash parts starts from the premise that, absent **[*157]**  a purpose to monopolize or an effect producing an unreasonable restraint on trade, GM may choose its system of distribution.  In other words, it is still the law that a supplier may choose the customers with whom it will do business.

363.  The rationale for the principle as it applies to this case is set forth in _Schwing, 138 F. Supp. at 902._

"Every manufacturer has a natural and complete monopoly of his particular product, especially when sold under his own private brand or trade name.  _Arthur v. Kraft Phenix Cheese Corp., 26 F. Supp. 824, 828_ (D.C. Md. [1937]).If he is engaged in a private business, he is free to exploit his monopoly by selling his product directly to the ultimate consumer or through one or more distributors or dealers, as he may deem most profitable to him.  If he chooses the latter method, he may exercise his own independent discretion as to the parties with whom he will deal.  This is a common law right which the antitrust laws have not destroyed.  [citing _Colgate, supra_; _F.T.C. v. Raymond Bros.-Clark Co., 263 U.S. 565 (1924)_; Times-Picayune, supra; _Great Atlantic & Pacific Tea Co. v. Cream of Wheat Co.,_

*227 F. 46, 49 [*158]* (2d Cir. [1915])].  A refusal to deal becomes illegal only when it produces an unreasonable restraint of trade or a monopoly forbidden by the antitrust laws *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211 [1951]; Lorain Journal Co. v. United States, 342 U.S. 143 [1951]*."

364.  Thus, in the absence of any purpose to create or maintain a monopoly, or effect constituting an unreasonable restraint, it is legal for a manufacturer, engaged in an entirely private business, to exercise his own independent choice of the parties with whom he will deal.  *Colgate, supra, 250 U.S. at 307*. But this right to choose the customers is neither absolute nor exempt from oversight by the government.  And, if the right is exercised with the purpose or effect of monopolizing interstate commerce, or otherwise is unreasonable, such exercise is unlawful.  *Lorain Journal Co., supra, 342 U.S. at 155*.

365.  An individual refusal to deal, or, as here, GM's refusal to sell crash parts to anyone other than a GM dealer, is a circumscribable general right.  If the refusal were accompanied by predatory **[*159]** conduct or agreement with other manufacturers, or if the general right were exercised to impede competition on the basis of price or for a monopolistic purpose, e.g. for market control, the refusal would be illegal.  *Times-Picayune, supra, 345 U.S. at 622-23*. For example, if GM, refused to sell directly to IBSs or IWs in order to influence prices or to maintain or to extend power over the market that would be illegal.  *Banana Distributors, Inc. v. United Fruit Co., 162 F. Supp. 32, 37 (D.C.N.Y. 1958)*. However, there is no evidence of any such conduct or effect in this record.

366.  In the same year that Alcoa was decided, a District Court held in an often cited case that a monopolist had violated the law in that its acts were not directed to any legitimate business venture oriented toward furthering its own business, but were, in fact, a calculated attempt to monopolize government contracts for a certain product.  A refusal to deal, while it may be lawful per se, cannot be used in order to achieve an illegal result.  *United States v. Klearfax Linen Looms, 63 F.Supp. 32, 39 (D.C. Minn. 1945). [*160]* Also see, *Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 375(1927)*, where Kodak illegally sought to move into retailing through use of its monopoly in film by refusing to continue to sell photographic supplies to a retailer at dealers' discounts.

367.  The question to be answered, in the absence of predatory motives and with the presence of legitimate business purposes (such as a better way to distribute new GM crash parts in order to promote the sale of new cars, or to stabilize dealer outlets or to augment profits--GM's motives here), simply is whether the effect of GM's refusal to deal with other than its dealers is substantially adverse to competition.  *Schwinn, supra, 388 U.S. at 375*. The evidence shows that the answer to the question is that the refusal to deal, in itself, is not substantially adverse to competition.

368.  Neither Schwinn nor *Continental TV, Inc. v. G.T.E. Sylvania, 433 U.S. 36 (1977)* (which reversed Schwinn in part), imposes upon GM any duty, absent an intent to monopolize, to deal with all willing customers. These cases are not the only relatively recent expressions **[*161]** of that concept.  For example, in *Venzie Corp. v. United States Mineral Products Co., 521 F.2d 1309 (3rd Cir. 1975)*, the court upheld a refusal to sell to plaintiff the only fireproofing material that would be approved by the city of Philadelphia, which refusal caused the plaintiff to lose a building contract.  The court said,

"To adopt plaintiffs' position would revolutionize the antitrust field.  Every refusal by a franchisor to deal with one not a franchisee would automatically lead to a per se violation of the Sherman Act if the franchisor's product possessed the "desirability to consumers" or "uniqueness" which have been found sufficient to establish the necessary economic power of the tying product....  It would, moreover, amount to a substantial undercutting of the Colgate doctrine validating unilateral refusals to deal in the absence of a monopolistic purpose.  Neither precedent nor policy suggests that such a reordering of the antitrust implications of business behavior is in order." *521 F.2d at 1318*.

369.  An important factor in Venzie was that defendant company made no effort to use the economic power it possessed as the sole **[*162]** manufacturer of the fireproofing material to enter the business of fireproofing application.  *521 F.2d at 1317*. This is also true of Ford's actions in not selling crash parts to a wholesaler, as

described in _FLM Collision Parts v. Ford Motor Co., 543 F.2d 1019 (1976)_. It also is true of GM's actions as shown here.

370. The desirability of not impinging unduly on the freedom to chose customers was expressed by _Judge Hand in Alcoa, supra, 148 F.2d at 427-28_. "... [It] is of the essence of competition that the manufacturer or wholesaler should and does have wide freedom in maintaining the quality of his distribution system." This concept is found in Colgate and in Judge Hand's Alcoa decision. Alcoa is recognized as "... the most eloquent statement of the law of monopolization." _Borden/ReaLemon, supra, 92 F.T.C. at 793_.

371. One might argue, as Commission counsel seems to (CCPF 419), that there are no "other and equivalent brands" of new service GM crash parts available. It sounds plausible due to the fact that such parts are designed for use on GM vehicles only and are almost entirely [*163] manufactured by or for GM. Hence, it is argued that illegal monopolization exists in the refusal to deal directly with IBSs and IWs. But that argument ignores the "natural monopoly" each manufacturer has over its products, which standing alone is not illegal. Further, if followed to its ultimate conclusion, the argument would lead to an assertion that a manufacturer is an illegal monopolist whenever, though free to do so, no one else produces parts to repair the manufacturer's product, regardless of whether it is an auto, camera, refrigerator, radio, TV set, watch or what-have-you. Neither antitrust nor trade regulation law goes that far.

372. There are a number of cases holding that a refusal to deal violates the Sherman Act when the monopolist was or would be in competition with the aggrieved party at some point in the distributive chain. See _Gamco, Inc. v. Providence Fruit and Produce Building, Inc., 194 F.2d 484 (1st Cir.)_, cert. denied, _344 U.S. 817 (1952)_; _United States v. Otter Tail Power Company, 410 U.S. 366 (1973)_; _United States v. Terminal Railroad Association of St. Louis, 224 U.S. 383 (1912), [*164] Associated Press v. United States, 326 U.S. 1 (1945)_; _Kodak, supra_; _Klearfax, supra._ But GM is not in competition with the aggrieved parties here.

373. Complaint counsel contends that GM has a meaningful presence at the wholesaling level through the temporary interest it retains in new dealership franchises financed through its Motors Holding Division (MHD) (CPF 441). I do not agree. This presence is de minimis. The franchisee runs the dealership and the interest GM has is limited in duration to an average of five to six years (RX 34) (RPF 187). Further, only a very small minority of GM dealers are MHD dealers and their number is decreasing. Between 1970 and 1977, the number of such dealerships decreased from 449 to 345 (RX 34). In 1977, the 345 constituted only 3% of the 11,660 GM car dealerships (RX 34; RX 40). MHD dealerships only accounted for an estimated 4.3% of total GM dealer wholesale parts sales and an estimated 5.3% of total GM dealer body shop sales (RX 34; RX 38; RX 40).

374. What the court said of _Ford in FLM, supra_, is true of GM. There is no convincing proof "... that Ford, as distinguished [*165] from its dealers, had any significant share of that market, much less that it was using its monopoly at the manufacturing level to extend such a share." _543 F.2d at 1030_.

375. Statements of Commission counsel regarding a symbiotic relationsip between GM and its dealers notwithstanding (CPF 441), GM, any specific dealer, and the dealers as a group, are separate entities. Their actions in furthering their separate and mutual interests, as shown in the record, do not equate to a horizontal boycott, constituting either a per se or rule of reason violation of the Sherman Act or a spirit-or-intent violation of § 5 of the FTCA.

376. The fact that GM is a very large corporation (Findings 620 and 65) has been considered. But size in itself does not create an unlawful monopoly and successful business operation doesn't either. To hold otherwise would frustrate the principal purpose of the antitrust laws, which is to preserve a system of free competitive economic enterprise and to protect the public against the evils of monopoly and monopoly power which unreasonably suppress of restrain interstate trade or commerce. _Kansas City Star Company v. United States, 240 F.2d 643, 658 (8th Cir. 1957), [*166]_ citing 58 CJS, Monopolies § 18. However, as well as assuring to the consumer the benefits flowing from free competition, another significant purpose of the antitrust laws is to protect the individual businessman. See Judge Bazelon's dissent in _Packard Motor Car Co. v. Webster Motor Car Co., 243 F.2d 418, 422 (D.C. Cir. 1957)._

377.  Insofar as the system GM uses for distributing crash parts is concerned, no persuasive evidence has been introduced of either a predatory intent or substantially adverse effect on competition attributable to the refusal to sell new GM crash parts to anyone other than GM dealers. The evidence does indicate that GM uses its system to sell crash parts exclusively through its dealers because of their mutual interest in crash parts being readily available (Findings 59 and 94), and that GM does not set or monitor the prices at which crash parts are sold (Finding 198).

378.  Contrary to Commission counsel's view, I do not believe *The Peelers Co., 65 F.T.C. 794*, aff'd in part, sub. nom. *La Peyre v. F.T.C., 366 F.2d 117 (5th Cir. 1966)*, is precedential.  In that case **[*167]** respondent engaged in deliberate and obvious price discrimination between two groups of customers (processors on the west coast and those on the southern coast), in the leasing of shrimp peeling equipment based on the customers' location, clearly with the goal of protecting its own canning interests at one of the locations.  *65 F.T.C. at 839*.  The predatory motives found in that case are not present here.

379.  I also believe that *FTC v. Texaco, 393 U.S. 223, (1968)*, *Atlantic Refining Co. v. FTC, 381 U.S. 357 (1965)*, and *Shell Oil Co. v. FTC, 360 F.2d 470 (5th Cir. 1966)*, the so-called TBA cases, are not dispositive.  The Supreme Court and the Fifth Circuit stated that certain marketing arrangements for tires, batteries, and accessories were illegal because the oil companies received commissions from leading tire companies for coercing the oil companies' franchised gasoline stations into buying their stock of those products from the tire companies.  The analogy between the practices found in the TBA cases and GM's wholesale compensation plan to induce dealers to sell to IBSs at dealer net is too tenuous **[*168]** to support a coercion theory here.  I am convinced, however, of the illegal nature of the wholesale compensation plan as distinguished from GM's (1) monopoly power over its crash parts as well as (2) the distribution system itself.

## DOES GM'S RELATIONSHIP WITH ITS DEALERS CONSTITUTE A "CONTRACT, COMBINATION OR CONSPIRACY" IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT?

380.Commission counsel contends that GM reached a "... mutual understanding and agreement with its dealers, that GM would refuse to sell service GM crash parts to IWs and IBSs [and that this agreement] violates Section 1 of the Sherman Act and Section 5 of the Federal Trade Commission Act under either a vertical combination analysis, rule of reason analysis, or horizontal combination analysis [citations omitted] (CCPF 398).  But, as pointed out by counsel to GM, there is no evidence of any agreement, tacit or formalized, between GM and its dealers that would restrict GM from selling its service crash parts to nondealers, and there is no persuasive evidence in the record indicating that GM's refusal to do so resulted in any way from dealer pressure (RB 21).

381.  In support of the claim of a vertical combination **[*169]** in violation of Section 1 of the *Sherman Act Klor's Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207 (1959)* and Hershey Chocolate Corp., 28 F.T.C. 1057 (1939), aff'd, *121 F.2d 968 (3d Cir. 1941)*, are cited by Commission counsel, but they are inapplicable to this case.

382.  In Klor's, respondents were a chain of department stores and ten national manufacturers and their distributors.  The evidence established that a conspiracy existed and that action was taken to keep the manufacturers from selling to Klor's, or to make such sales only at discriminatory prices and with highly unfavorable terms.  *359 U.S. at 208*.  Justice Black found that Broadway-Hale used its "monopolistic" buying power to induce the manufacturers to agree to its plan.  *359 U.S. at 209*.  In addition, he expressly distinguished the plan from a situation where a manufacturer and a dealer agree to an exclusive distributorship.  *359 U.S. at 212*.  No analogous situation -- of GM bowing to dealer's clout -- was shown in this case.  TO THE CONTRARY, @GM did offer, in its settlement proposal of July 11, 1975, to sell directly **[*170]** to IBSs, despite strong dealer opposition (Findings 299 and 300) (RPF 229-239).  Commission counsel's reliance on Hershey, also does not support his position.  In that case, Hershey agreed to sell vending machine size bars of its product only to the three largest vending machine companies in order to keep their business.  There is no evidence in this record showing that GM dealers possessed the buying power to induce GM to act involuntarily.  *Hershey Chocolate, 121 F.2d at 970. (RB 21)*.

383.  In selling service crash parts only through franchised dealers, GM has not shown the intent to limit competition which was present in the situations described in the cases referred to on pages 72 and 73.  Nor has GM in any way restricted the freedom of its dealers to do business with any customers with whom they might wish at whatever

price they select.  On the contrary, the wholesale compensation plan was created to encourage and to induce francised dealers to sell to IBSs, who are, in essence, the dealers' competition (Finding 35).

384.   Under the Sherman Act, contracts and combinations which are an unreasonable restraint of trade are prohibited and violations [*171] of that act have long been held to be violations of the *Federal Trade Commission Act.  F.T.C. v. Cement Institute, 333 U.S. 683, 691-92 (1948)*.  Certain practices "... because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the harm they have caused or the business excuse for their use." *Northern Pacific Railway Co. v. United States, 356 U.S. 1, 5 (1958)*.  Price fixing agreements, divisions of markets, group boycotts, and tying arrangements are practices which are illegal per se.  *Northern Pacific, 356 U.S. at 5*.  However, the actions of GM and its dealers clearly neither rise to a group boycott, nor are they otherwise "pernicious"9 GM's actions have therefore been examined under the "rule of reason", i.e, whether the negative effects of GM's system of crash parts distribution outweigh any positive benefits to competition.  Commission counsel suggests that GM's system provides no benefits to competition (CCPF 406).

385.   Vertical restrictions are usually justified on the basis of the [*172] stimulation of interbrand competition even as they may work to reduce intrabrand competition.  Commission counsel contends that because GM, for all practical purposes, has a 100% share of the relevant product market, interbrand competition does not exist and therefore cannot be benefitted by the vertical restraints GM has included in its system of distribution (CCPF 403).

386.  Counsel to GM responds, and I agree, that the object of the system, to provide optimum serviceability for GM automobiles so that owners will be favorably disposed to buying another one, is another benefit to be weighted when considering the negative effect of such restrictions (RB 19, 20).

387.  The Supreme Court has recognized the existence of other "redeeming virtues" derived from the use of vertical restraints which enable one manufacturer to compete more effectively against another.  Such restraints can be used to

"induce retailers to engage in promotional activities or to provide service and repair facilities necessary to the efficient marketing of their products. Service and repair are vital for many products, such as automobiles and major household appliances.  The availability and quality of  [*173]  such services affect a manufacturer's good will and the competitiveness of his product.  Because of market imperfections such as the so-called free rider effect these services might not be provided by retailers in a purely competitive situation, despite the fact that each retailer's benefit would be greater if all provided the services than if none did.  [Emphasis added]."

*GTE/Sylvania, supra, 433 U.S. at 55*.

388.  As the Supreme Court stated in GTE/Sylvania, a manufacturer generally will prefer a competitive market situation, because this will: (1) lower retail prices by lessening the margin between the price to dealers and the dealers' resale price; and (2) increase sales and revenues to the manufacturer.  *GTE/Sylvania, supra, 433 U.S. at 56, n.24*.

389.  In addition, the fact that GM's system is the one in use by all domestic and foreign competitors (RPF 102-105, 111-119), indicates that the automobile manufacturing industry adopted the system because it believed it to be the most efficient one.

390.  I am not persuaded by Commission counsel's argument that GM, "secure in its position as a monopolist," would sacrifice [*174] efficiency in its crash parts distribution system merely to build dealer loyalty and thus increase new car sales.  Loyalty to GM is not the major incentive for dealers to maximize new car sales.  The financial benefit to dealers who sell additional cars is more than sufficient.  In addition, and as noted above, an efficient system of repair of products is a substantial lure for prospective buyers.  It is difficult to believe that GM would conspire with its dealers to the detriment of its own sales of new automobiles.

391.  Counsel to GM points out that if any "joint action" can be found between GM and its dealers, it was for the purpose of influencing the government, and thus protected under the "Noerr-Pennington doctrine" (RB 22).  *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961)* and *United Mine Workers of America v. Pennington, 381 U.S. 657 (1965)*.  The court in Noerr-Pennington established that no violation of the Sherman Act will be found where parties have merely attempted to influence the enforcement or passage of laws, even if the result is to injure their competitors.  *365 U.S. at 139.*  **[*175]**

392.  Commission counsel contends that the fact that GM and NADA have discussed crash parts distribution for many years (CCPF 281, 282) indicates that settlement proposals to the FTC were not a factor, and therefore Noerr-Pennington is not applicable (CCRB at 117).  Obviously GM and its dealers, in the relationship of franchisor and franchisees, have many common interests which require communications concerning a great many matters not the least of which, no doubt, is crash parts.  The fact that they have had discussions on this topic is insufficient evidence of a conspiracy to convince me that a violation of the antitrust laws resulted.  GM's submission of proposals to the FTC which called for sales by GM to IBSs, which the dealers oppose very strongly (Finding 300) is further evidence that no conspiracy existed.

393.  The importunings of GM and its dealers addressed to the FTC are protected by the Noerr-Pennington doctrine.  *Mt. Hood Stages, Inc. v. Greyhound Corp., 555 F.2d 607 9*th Cir. 1977), vacated and remanded on other grounds, *437 U.S. 322 (1978)*.  Other cases cited by Commission counsel limiting this doctrine are inapposite.  **[*176]**  On the basis of the evidence here, GM and its dealers should not be faulted insofar as their actions oriented toward mutual interests are concerned.

IS THE WHOLESALE COMPENSATION PLAN GM USES ILLEGAL?

394.  The answer to the question in the caption is "Yes".  GM's wholesale compensation plan is unfair.  "The essence of unfairness in an exclusive arrangement as a marketing tactic is the actual foreclosure of business rivals from consuming markets, thereby denying them opportunity to compete on even terms.  [emphasis added]."  Attorney General's Committed Report, supra, at 148.  The key words are "denying them opportunity to compete on even terms," in other words, discrimination.  The quotation is not on all fours with the instant situation because the business rivals in question are those of the dealers rather than of GM.  Even so, the "denial" IBSs suffer stems from GM's wholesale compensation plan and thus violates § 5 FTCA.

395.  Counsel to GM takes the position that the Complaint does not charge that the wholesale compensation plan brings about discrimination. I do not agree.  Paragraph 13, in essence, sets forth a charge that Ibs/s frequently pay more **[*177]** for new service GM crash parts than do GM dealers, and paragraph 16(e) alleges that GM uses "disparate" wholesaling incentives in distributing such parts.  In addition, the "Notice of Contemplated Relief" on the last page of the Complaint should have alerted counsel to GM to the fact that if the Commission concluded from the record developed that GM is in violation of Section 5, it might order such relief as is supported by the record and is necessary and appropriate, including, but not limited to the "Notice Order".

396.  Furthermore, there is no requirement that a complaint in an administrative proceeding must enumerate precisely every event to which an administrative law judge may initially or the Commission may thereafter attach significance.  The purpose of the administrative complaint is to give the responding party notice of the charges against him.  1 Davis Administrative Law Treatise §§ 8.04-8.05 and cases cited therein.  The complaint is adequate if "... the one proceeded against be reasonably apprised of the issues in controversy, and any such notice is adequate in the absence of a showing that a party was misled."  *Cella v. United States, 208 F.2d 783, 789 (7th Cir. 1953), [*178]* cert. denied, *347 U.S. 1016, 1954)*; *Swift & Co. v. United States, 393 F.2d 247, 252 (7th Cir. 1968)*.

397.  As the Commission case unfolds there must be "... reasonable opportunity to know the claims of the opposing party and to meet them."  *Morgan v. United States, 304 U.S. 1, 18 (1938)*.  There is no question here whether GM knew the claims of Commission counsel or that GM had ample opportunity to meet them.  GM did know and did address them.

1982 FTC LEXIS 39, *178

398.   The plan GM uses for distributing crash parts, regardless of whether a part is eligible for wholesale compensation, results in dealers as a class paying GM less for a crash part than IBSs as a class pay the dealer for the part, even though they may be competitors in repairing crash damaged vehicles.  Dealers' final costs for parts vary because: (1) the part may be used in the dealer's body shop rather than resold (Finding 77); (2) a dealer may stock parts and have certain expenses which another dealer does not; or (3) a dealer may not stock and he will have a different set of expenses (Finding 79).   No doubt there are other significant factors, but without having **[*179]** detailed information regarding the operations of particular dealers and IBSs it is not possible to determine precisely what the expenses to each in <u>particular</u> competitive situations are, and what the final cost of a <u>particular</u> part is.  Such precise data is not needed to support the conclusion that generally IBSs pay more than GM dealers and otherwise are disadvantaged and discriminated against.

399.   Dealers buy for 40% off GM's list price (Finding 119).   They can get an additional discount depending on whether they order a part on the PAD (Findings 120 and 190(1)) or are entitled to a rebate because they resold the part in a way qualifying for wholesale compensation (Finding 76).   They also may have freight prepaid by GM on routine orders (Finding 190(1)(2)(3)) and inevitably enjoy faster delivery service than do IBSs.

400.   In conteast, IBSs buy parts at 25% to 40% off GM's list price, averaging about 32% (Finding 124).   They cannot get the additional (PAD) discount for the way in which they order or a rebate for a particular type of resale.  They often must pay for delivery and there is an inherent delay factor in the time required for delivery (Finding 131).
 **[*180]**

401.   To the extent that a dealer actually performs real wholesaling functions in doing business with IBSs, <u>i.e.</u>, maintaining an inventory, taking orders, ordering from GM, receiving parts and delivering them, extending credit etc., a particular dealer's final cost for a part may be increased or decreased, but there is very little uniformity amongst dealers in performance of these functions.  Some stock, many don't (Finding 102).  Some have special order taking and placing facilities, others don't.  (Finding 132).  Thus, there may be significant variations in the ultimate "cost" of a part to a particular dealer, but there is no variation in the price <u>he</u> pays GM: 40% off list plus on routine orders the PAD discount, freight prepaid, and the rebate for wholesaling in accordance with the plan (Findings 119, 120, 190(1)(2)(3) and 77).   The result is that dealers, in general, are favored and IBSs are discriminated against.

402.   The plan also discriminates among GM dealers, because those who sell or who may wish to sell a crash part for a make of GM automobile other than the one or more for which they are franchised (Finding 104) are not eligible to claim wholesale compensation.   **[*181]** No doubt this prohibition inhibits most dealers from selling crash parts across franchise lines.  If a dealer <u>does</u> cross his franchise (lines) his cost for the crash part is higher than the cost to any competing franchised dealer. (Finding 77).

403.   Discrimination of this sort insofar as the antitrust laws are concerned, <u>i.e.</u>, the Sherman and Clayton Acts, is not clearly illegal.  The prevention of such disfavoring/discriminating, however, is within the spirit of those laws, because it creates an undue impediment to the competition IBSs can offer to GM dealers and to competition among some GM dealers. The wholesale compensation plan makes it impossible for IBSs, as a class, to be on equal footing with GM dealers as a class.  The same is true of franchise-crossing dealers and those GM dealers against whom they compete.  Such situations may be appraised by the Commission and ultimately by the courts simply as being fair or unfair.  *FTC v. Gratz, 253 U.S. 421 427 (1920)*.

404.   The Commission has broad powers to declare trade practices unfair.   That power is particularly well established with regard to trade practices which conflict with the basic **[*182]** policies of the Sherman and Clayton Acts, even though such practices may not actually violate those laws.  *FTC v. Brown Shoe Co., 384 U.S. 316, 321 (1965)*.

405.   In its Statement of Basis and Purpose of Trade Regulation Rule 408, "Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking", the Commission described the factors it would consider in evaluating what constitutes unfair or deceptive practices.  These, in essence, were: (1) whether the practice, regardless of legality, offends public policy, <u>i.e.</u>, is within the penumbra of some common-law,

statutory, or other established idea of fairness; (2) whether the practice is immoral, unethical, oppressive or unscrupulous; and (3) whether it causes substantial injury to consumers, or competitors or other businessmen. *29 Fed. Reg. 8324, 8355 (1964).* The wholesale compensation plan GM uses, among other things, (1) is within the penumbra of trade regulation and antitrust law to the effect that commercial discrimination is not fair; (2) is unduly oppressive to IBSs; (3) injures consumers by contributing to rises in price; (4) injures IBSs by discriminating **[\*183]** against them; and (5) by paying wholesale compensation to nonstocking dealers, who do not perform that warehousing function in distributing crash parts, discriminates against stocking dealers. See also *F.T.C. v. Sperry & Hutchinson Co., 405 U.S. 233, 239-245 (1972)* and *Gratz, supra, 253 U.S. 421, 427*.

GM'S NO PUBLIC INTEREST DEFENSE

406.  In its Answer to the Complaint, counsel to GM denied that the Commission had reason to believe that use of GM's crash parts distribution system is a violation of the law and denied that these proceedings were in the public interest (Answer, par. I).  The Commission has said, however, that such defenses go to the mental processes of the Commissioners and will not be reviewed by the courts.  Once the Commission has resolved these questions and issued a complaint, the issue to be litigated is not the adequacy of the Commission's pre-complaint information or the diligence of its study of the material in question but whether the alleged violation has in fact occurred.  *Exxon Corporation, 83 F.T.C. 1759 at 1760 (1974)* (order denying respondents' motions for reconsideration of Commission's **[\*184]**  prior denial of respondents' motion to dismiss complaint).

407.  It also should be mentioned that in *Herbert R. Gibson, Sr., 90 F.T.C. 275 (1977)* (order denying respondents' motion to dismiss for lack of public interest), the Commission held that administrative law judges lack authority to rule on "... questions pertaining to the Commission's exercise of administrative discretion." In that case, the existence of public interest was questioned as part of a motion to dismiss.  The <u>Exxon</u> decision, noted above, and a number of other cases were cited.  <u>THE COMMISSION'S POWER TO CHARGE ONLY ONE RESPONDENT AND TO EFFECT REMEDIES</u>

408.  The fact that the Commission chose to issue a complaint only against GM when all the other vehicle manufacturers doing business in the United States use the same system (Finding 34) is not significant. The Commission has the power to enter an order against one firm that is using an industry-wide illegal trade practice.  *F.T.C. v. Universal Rundle Corp., 387 U.S. 244 (1967)*; *Standard Oil Co. of California v. United States, 337 U.S. 293 (1949)*; *Moog Industries Inc. v. F.T.C., 355 U.S. 411 (1958). **[\*185]***

409.  There have been no instances where a Commission order has been set aside simply because it was directed against a single violator in the face of industry-wide violations.  *Rabiner & Jontow, Inc. v. F.T.C., 386 F.2d 667, 669 (2d Cir. 1967).* However, the Commission's orders must serve a remedial and not a punitive purpose.  *F.T.C. v. Ruberoid Co., 343 U.S. 470 (1952)*; *Niresk Industries, Inc. v. F.T.C., 278 F.2d 337 (7th Cir.)*, <u>cert.</u> <u>denied,</u> *364 U.S. 883 (1960).* Further the Commission may not issue orders which would arbitrarily destroy one of many violators in the market.  *Universal-Rundle, supra, 387 U.S. at 251.* A "reasonable evaluation" of the competitive situation must be made to ascertain whether a particular order would be contrary to the purpose of the laws sought to be enforced. *387 U.S. at 251-52.*

CONCLUSIONS

410.   GM is engaged in commerce and affects commerce as "commerce" is defined in the Federal Trade Commission Act.

411.   GM has not abused its monopoly in, and monopoly power over, the distribution of new GM crash parts, as defined **[\*186]** in the Complaint.

412.   GM's refusal to sell crash parts directly to anyone other than GM dealers is lawful.

413.   Due to the disfavoring of and discrimination against IBSs and some GM dealers, and in violation of Section 5 of the Federal Trade Commission Act, the wholesale compensation plan GM uses unfairly hinders and injures competition in the distribution of new GM crash parts.

THE REMEDY

414.  The order attached is intended to be remedial and is not contrary to the purpose of the Federal Trade Commission Act.  It is not punitive, certainly will not destroy GM, and I believe it to be just.  It is in harmony with both the Federal Trade Commission Act and the antitrust laws.

415.  Latitude is necessary in framing orders for "... the Commission alone is empowered to develop that enforcement policy best calculated to achieve the ends contemplated by Congress and to allocate its available funds and personnel in such a way as to execute its policy efficiently and economically." *Moog Industries, supra, 355 U.S. at 413*. But the latitude and the broad authority which the Commission has in framing orders effectively ends "to the interest of the  **[*187]**  public" ( *15 U.S.C. 45(b)*) which the Congress contemplated when the FTC Act was passed.  The circumstances under which the wholesale compensation plan GM uses was implemented (Findings 29-55) and the unforeseen results of its implementation (Finding 417 below) emphasize the need for great care.

416.  The evidence establishes that GM's use of the wholesale compensation plan must be stopped because it illegally discriminates against IBSs and discriminates between stocking and nonstocking GM dealers and may do so with regard to wholesaling GM dealers who cross franchise lines.

417.  The plan has not achieved the price parity between GM dealers and IBSs which was the objective when it was made applicable to crash parts in 1968 (Finding 54).  Most importantly it has increased costs to consumers and has not lowered prices to IBSs (Finding 54).  It is expensive to administer, requires auditing, is susceptible to fraud, and does not reward volume buyers for the costs they save GM (Tr. 14002-03; 14013-14) (CCPF 307, 310-14, 352).

418.  Although these adverse effects are clear, there is insufficient evidence in this record regarding the provisions best suited **[*188]** for a nondiscriminatory plan for distribution of crash parts.  I am not convinced that the relief Commission counsel advocates in the Complaint, (in essence, opening GM's warehouses to everyone except individual owners of vehicles) would be the proper remedy.  For example, allowing anyone to buy from GM warehouses at nondiscriminatory prices may cause more problems than it solves.  On the other hand it might solve all the problems.  Or, the definitions of crash parts and components and applicability of the plan may be too limited.  It may be unwise to define "auto" and "light trucks".  Perhaps crash parts for more vehicles should be included in the plan or the definitions Commission counsel proposes may be too restrictive.  There may or may not be a justification for continuing to categorize crash parts into compensable and noncompensable groupings.  No doubt there are other possible problems.

419.  The order below, in practical effect, calls for a GM-Commission staff, cooperatively devised plan to bring about compliance with the Federal Trade Commission Act.  It will enable GM, which has the best information about its needs in crash parts distribution, and the Commission and its **[*189]** staff, to see to it that an effective and lawful plan is devised.  There was Commission staff involvement in GM's adoption of the wholesale compensation plan it uses now (Findings 29-55).  However, the plan in operation has proven to be neither lawful nor to the interest of the public.  Commission oversight with the benefit of the record of an adjudicative hearing is the added factor which was not present before and will lead to the necessary changes.

420.  Accordingly, and pursuant to authority contained in Commission Rules 3.42(c) and 3.51(b) the following order is entered.

ORDER

I

IT IS ORDERED that GM is to submit a detailed report to the Commission within 30 days of the date on which this Order becomes final describing a nondiscriminatory plan which it proposes to use for distributing new GM crash parts.

II

IT IS FURTHER ORDERED that within 30 days of the date of approval by the Commission of the new plan GM is to implement its use.

III

IT IS FURTHER ORDERED that annually within the ten days prior to the anniversary of the date this Order becomes final, for a period of five years, GM is to submit in writing to the Commission a report setting forth in **[*190]** detail the manner of GM's compliance with this Order.

IV

IT IS FURTHER ORDERED that Commission approval of the Plan does not relieve GM of the obligation to comply fully, and in the future, and with respect to any changes in practices which GM may from time to time implement in connection with its sales of service GM crash parts, with all of the requirements of Paragraph I of this Order. After the Commission has approved it, GM is not to change any of the terms or conditions of sale set out in the Plan (excluding prices) without first (a) giving 30 days' prior written notice of each such change to the Commission, (b) to all GM customers who purchase new GM crash parts, and (c) publishing a description of each such change in Automotive News or a similar (publications) with wide circulation among independent wholesalers and independent body shops.

## Action

 **[*1]**

DISMISSAL ORDER, ETC., IN REGARD TO ALLEGED VIOLATION OF SEC. 5 OF THE FEDERAL TRADE COMMISSION ACT

## Opinion

OPINION OF THE COMMISSION

By Bailey, Commissioner:

This case presents the question of whether General Motors Corporation (GM) has violated _Section 5_ of the Federal Trade Commission Act, as amended ( _15 U.S.C. § 45_), by its use of a selective distribution system for new crash parts for GM automobiles **[*191]** and light trucks (hereinafter "crash parts"). Crash parts, which will be described in more detail below, are a type of automobile replacement part: true to their name, they are used to restore those parts of the car body most commonly damaged in accidents, such as feders, doors, and hoods.GM is the sole source for new crash parts compatible with GM vehicles; it has a long-standing policy of selling its new crash parts only to its franchised dealers. As a result of this policy, any person who wants a new GM crash part for installation or resale purposes must get it from a GM franchised dealer.

Particularly disadvantaged by GM's policy are the independent body shops (IBS), specialists in automobile body work, whose business depends upon a supply of crash parts. IBS are supplied new GM crash parts by GM-franchised dealers, who are also the IBS' competitors for collision repair business. Despite GM's efforts to encourage its dealers to resell crash parts to the IBS at cost, the record clearly shows that IBS as a class pay more for crash parts than do their rival dealer-installers.

GM's selective distribution system for crash parts also disadvantages another class of businesses, **[*192]** but in this case the disadvantage is purely theoretical. The businesses in question are the independent wholesale parts distributors (IWs) who currently sell automobile replacement parts which are available from more than one

1982 FTC LEXIS 39, *192

manufacturer. Examples of these multisource parts are spark plugs, shocks and glass. There is some evidence in the record that IWs would be interested in wholesaling GM crash parts, thereby introducing competition to a business which is presently the sole domain of GM.

This appeal reaches us with a lengthy history: three investigations from the mid-1960's until issuance of the Complaint on March 22, 1976, two years of discovery, and 82 days of hearings which produced a bulky record in no little state of disarray. [1] In any proceeding as long and involved as this one, it is possible to pick away at the details and find numerous flaws and inconsistencies. Both respondent and complaint counsel have been quick to explore every one. But in appellate review our function is broader. We look to the entire record.

**[*193]**

The primary difficulty with this case is not in perceiving that GM's selective distribution system disadvantages IBS in the business of installing crash parts or disadvantages IWs in the business of wholesaling crash parts. The problem is, rather, whether these disadvantages translate into the sort of injury to competition which is cognizable under the antitrust laws. The difficulty in arriving at a determination on that question can be seen in the fact that complaint counsel argued at trial and on appeal that the system amounts both to a vertical and a horizontal boycott, several types of attempted monopoly, and an abuse of monopoly power. The Administrative Law Judge (ALJ) rejected all of complaint counsel's arguments as to the illegality of the system as a whole. (IDF 380, 411, 412) [2]

---

[1] The record contains approximately 8,400 exhibits and the testimony of 84 witnesses, running to approximately 16,285 pages of transcript. It does not contain any sort of document list, much less any table referencing testimony authenticating, identifying or explaining a given document. Moreover, many documents were received piecemeal -- part as respondent's exhibit, part as complaint counsel's exhibit, sometimes part as the ALJ's exhibit -- without any clue as to where the remaining portions of an exhibit could be found. This disarray created no little problem in reviewing this case.

[2] The following abbreviations will be used in this opinion:

| | |
|------|----------------------------------------------------|
| IDF | Initial Decision Finding Number |
| Tr. | Transcript Page Number, preceded by witness' name |
| ALJX | Administrative Law Judge's Exhibit Number |
| CX | Complaint Counsel's Exhibit Number |
| CAd | Complaint counsel's Admissions |
| CPF | Complaint Counsel's Proposed Finding |
| CRF | Complaint Counsel's Reply Finding |
| CB | Complaint Counsel's Post Trial Brief |
| CRB | Complaint Counsel's Post Trial Reply Brief |
| CAB | Complaint Counsel's Appeal Brief |
| CAAB | Complaint Counsel's Appellate Answering Brief |
| CARB | Complaint Counsel's Appellate Reply Brief |
| CASB | Complaint Counsel's Appellate Supplemental Brief on the Reuben Donnelley decision |
| RX | Respondent's Exhibit Number |
| RAd | Respondent's Admissions |
| RPF | Respondent's Proposed Finding |

However, he did, sua sponte, find that one component of the crash part distribution system, known as the Wholesale Compensation Plan (WCP), was unfair and a violation of § 5. (IDF 413)

**[*194]**

We affirm the ALJ's reasoning and conclusions of law that GM has neither attempted to monopolize distribution of crash parts, nor engaged in vertical or horizontal boycotts effecting limitations on crash parts distribution. Like the ALJ, we conclude that GM has not abused its monopoly power over crash parts distribution, but we reach our holding by a different and more complex process. The ALJ interpreted the precedents as giving every supplier, even one having monopoly power in the relevant market, an unassailable right to refuse to deal with willing customers. Since he found that GM has no predatory or monopolistic purpose in its choice of distribution system, his analysis began and ended at this point. Our approach is to determine if this case presents one of those rare situations where a supplier with monopoly power over an essential product has a duty to deal with all customers. This requires a rule of reason analysis which weighs the injury to competition against the supplier's business justification for its actions. In making such an analysis our first step is to determine the extent of harm caused by the refusal to deal. Only substantial injury to competition compels **[*195]** us to look further and assess the business justification for the refusal to deal. The economic self-interest of the monopolist is always an important consideration, but becomes particularly compelling when the harm shown to competition is not clearly and directly traceable to the refusal to deal, or can just barely be characterized as substantial. In this case, although we find injury to independent bodyshops caused by the effects of General Motors' selective distribution system for crash parts, we cannot say that that system causes any enduring weakness to the IBS as a class of competitors or that GM's choice of distribution system is arbitrary or without substantial business justification. Finally, we conclude that the WCP merely reflects and does not add in any way to the inequities which the selective distribution system imposes on the IBS and IWs. We reverse the ALJ in his finding that the WCP, as distinguished from the selective

---

RRF     Respondent's Reply Finding

RB      Respondent's Post Trial Brief

RRB     Respondent's Post Trial Reply Brief

RAB     Respondent's Appeal Brief

RAAB    Respondent's Appellate Answering Brief

RARD    Respondent's Appellate Reply Brief

RASB    Respondent's Appellate Supplemental Brief,

        on the Reuben Donnelley decision

INX     Intervenor NADA's Exhibit Number

INPF    Intervenor NADA's Proposed Finding

INRF    Intervenor NADA's Reply Finding

INB     Intervenor NADA's Post Trial Brief

INRB    Intervenor NADA's Post Trial Reply Brief

IAB     Intervenor ASC's Post Trial Brief

IARN    Intervenor ASC's Post Trial Reply Brief

IAAB    Intervenor ASC's Appeal Brief

IAASB   Intervenor ASC's Appellate Supplemental

        Brief on the Reuben Donnelley decision

distribution system, injures competition in the distribution of new GM crash parts. Accordingly, the case is dismissed.

We adopt such of the ALJ's findings and conclusions as are consistent with the findings and conclusions set forth in this **[*196]** opinion.

I.  BACKGROUND

A.  General Motors Corporation

Respondent General Motors Corporation needs little introduction. Since its organization in the early years of this century, it has grown to be the largest manufacturer of automobiles and light trucks in the United States. (IDF 56, 65) In addition, GM manufactures a variety of products within the automotive and transportation fields; but the primary interest of both GM and its franchised dealers is in selling cars and trucks. (IDF 57, 58) In 1976, GM-manufactured automobiles accounted for approximately 45.5% of total U.S. automobile registrations and GM trucks for 42% of total truck registrations. (IDF 62) GM manufactures and sells in the U.S. five "lines" or principal makes of automobiles: Chevrolet, Pontiac, Oldsmobile, Buick, and Cadillac. (IDF 57) There are 12 different body sizes available for GM-manufactured automobiles as a whole, and within each line a multiplicity of body models, which often change from year to year. (IDF 62) This stylistic variety significantly influences both the demand for new crash parts and the structure of the distribution system which answers that demand.

B.  Crash Parts

Crash **[*197]** parts are a type of automobile replacement part. They constitute the cosmetic, visible, outer parts of a car which give it its distinctive style, and are expected to last the lifetime of the car under normal conditions. They are generally replaced only as a result of collision damage. They are thereofre distinguishable from electrical or mechanical parts which are installed in the internal functional system of the car and, as a result of either wear or failure, are replaced on a maintenance basis. (IDF 145) The Complaint lists as crash parts:

... any one or all of the following products: Fenders, grilles, bumpers, hoods, deck lids, doors, quarter panels, rear and panels, rocker panels, lamps assemblies, wheel opening panels, fenders and rear end caps, tail gates, radiator supports and shrouds, and mouldings, including inner and outer panels and all components of these products as well as all parts necessary to attach the aforesaid to the bodies of automobiles and light trucks. (Complaint, Par. 1(d))

Crash parts are non-standard parts tailored to fit specific cars, by model and year. Thus a crash part for a Ford car will not fit a GM car; nor are crash parts generally interchangeable **[*198]** among GM automotive lines; nor among different models within a line; nor even, at times, between different years of the same model. (IDF 71, 144) Small wonder, then, that the GM Parts Division carries about 32,000 crash parts numbers. (IDF 167) Crash parts as a class are bulky and require considerably more space for storage than mechanical or electric replacement parts. Crash parts also require especially careful treatment during distribution as they are easily marred and hard to handle. (IDF 74)

All GM crash parts are produced, either by GM or by independent manufacturers to whom GM has subcontracted the work, from tooling owned by GM. (IDF 68) Crash parts sales, although only a small portion of GM's total revenue, are significant: GM computed the gross dollar value of domestic shipments in 1975 as approximately $314 million (CX 7407A) and complaint counsel's undisputed calculations for 1977 produced a figure of approximately $548.8 million. (CPF 15, 46, 306)

Although GM has made no efforts to inhibit others from entering the crash parts manufacturing business, none have done so.(IDF 151) This requires some explanation. The total demand for crash parts is high. (IDF **[*199]** 152) Demand for individual crash parts is fairly inelastic, being stimulated by the vagaries of collisions. (Benston Tr. 16070; Murphy Tr. 10286) The demand for each individual part is generally quite modest. This is due to the low probability that a vehicle will require replacement of a particular crash part during its lifetime. (IDF 152, 153) GM usually starts production of a half year's supply of crash parts for automobiles before introducing the new model,

and keeps sufficient inventories of crash parts for each model for 7 to 12 years.  (IDF 80, 84) It is not economically feasible for GM to produce total anticipated crash parts needs in one production run, much less store such a mass of parts.  (IDF 154) Thus, the bulk of replacement crash parts are built over the lifetime of the vehicle as warranted by inventory needs and warehouse space.  This process requires that dies used in manufacture of new cars be retrieved, steam cleaned, reconditioned -- in some cases partially rebuilt -- and then inserted into presses to run the required supply of crash parts.  This is an expensive process because the runs are short-term and the technology is labor intensive.  (IDF 156)

Therefore,  [*200]  expensive as it is for GM, the process would be prohibitively expensive for anyone else.  Tooling to manufacture GM crash parts can run to tens of millions of dollars.  (IDF 149) However, the same dies which are required for service parts are used in the production of original equipment, enabling GM to spread the costs associated with crash part manufacture.  (By GM's estimate, crash parts manufacturing costs amount to less than 15% of total tooling cost).  (ALJX 9T) It is not difficult to understand why other manufacturers have shown no inclination to incur such large tooling costs simply to produce crash parts.  In this market, GM's ownership of the dies used in the manufacture of new cars gives it a wholly natural and decisive competitive advantage over potential manufacturers of crash parts.  (IDF 148)

In sum, considerations of scale economies and demand, rather than monopolizing conduct, explain the lack of competition in crash parts manufacturing.

C.  General Motors Parts Distribution Systems

General Motors has two systems for distributing the automotive parts which it manufactures.  (IDF 157) About 60,000 "maintenance type" parts, which can be used on both GM and non-GM **[*201]** cars, are sold to the independent aftermarket by GM's AC-Delco division.  (IDF 158, 183-185) About 300,000 sheet metal and engine parts, which are applicable solely to GM cars, are sold exclusively to GM-franchised dealers by the General Motors Parts Division (GMPD).  (IDF 158, 167) Crash parts, with only a very few exceptions, are not AC Delco parts, and are distributed solely through GMPD.  (IDF 158, 165, 186)

To evaluate GM's business rationale for its choice of crash parts distribution system, the following points must be made.  Of the total number of parts distributed by GMPD only 32,000 (approximately 10%) are crash parts.  (IDF 167).  GMPD makes no distinction between crash parts and all the other sole source parts which it distributes.  (Id.) Moreover, all U.S. auto manufacturers and all foreign automobile companies that have been seeling cars in the U.S. since the early 1960's distribute their crash parts in the same way that GM distributes its crash parts.  (IDF 94) GMPD seems to specialize in the distribution of low demand, slow moving parts.  75% of its total inventory fits this description (IDF 175) as do from 65% to 77% of all crash parts, depending upon which **[*202]** GM study one reads. (Compare RX 20 with CX 7006D) As we shall see, many GM franchised dealers wholesale crash parts, but they tend to inventory only the fastest-moving parts applicable to their franchise line.  Accordingly, most IBS complaints concern the difficulty of getting the low-demand, slow-moving parts, which must be specially ordered by the GM dealer from GMPD inventory and routed through the GM dealer for delivery to the IBS.  (IDF 177, 178)

D.  Crash Parts Installers: GM Franchised Dealers and the Independent Body Shops

The complexities of actual and potential systems for wholesaling crash parts are more easily understood after a brief review of the retail end of the distribution chain.  Almost all body repair work on GM cars and trucks is done by GM dealers or the independent body shops.  (IDF 100) In 1976 there were approximately 12,000 car and truck dealerships franchised by GM in the United States.  (IDF 2) The primary business of these dealerships, like that of GM, is selling cars and trucks. (IDF 58) Each dealership has ready access to the crash parts applicable to its line, and at least 80% find it expedient to install crash parts as part of the ongoing **[*203]** service they offer on the cars they sell.  (IDF 59, 69, 100; Bentson Tr. 15770) They do so for two reasons.  First, body work on cars, including crash part installation, can be a profitable sideline.  (Perkins Tr. 9916) Second, availability of parts and service, in an incondite way, affects a customer's decision to buy a new car.  While the record contains no evidence that

prospective new car purchasers specifically ask about crash parts availability, much less cost, [3] it does support the general proposition that dealers feel that the reputation of their body shops helps make a sale.  (Perkins Tr. 9914; Bentson Tr. 15751-52, 15793) GM has apparently also concluded that parts availability can affect new car sales, but that the precise correlation is peculiar to each dealership. The standard GM franchise agreement requires the dealer to carry in stock parts and accessories "adequate to meet customer demands," but specifies neither dollar amounts nor number of items to be inventoried.  (IDF 95)

In 1972 there were over 32,000 IBS **[*204]** in the United States.  (RX 38, 39) IBS are generally smaller operations than GM dealer body shops, often being one or two man operations.  (IDF 264) While GM dealers tend to specialize in repairing the models they sell, IBS to body work on all types of vehicles.  (IDF 100) The record does not show what portion of IBS revenues are provided by sales and installation of GM crash parts; our rough estimate is around 20%. [4] IBS purchase their new GM crash parts from GM dealers, generally for more than these dealers pay GM for the identical parts.  It was IBS complaints about the wholesale cost discrepancy on crash parts which launched this case.  (IDF 29)

Both the IBS and GM dealers were represented in this proceeding.  The Automotive Service Counsel, which had over 2,000 IBS members in 1978, filed briefs.  (IDF 15) The National Automobile Dealers Association (NADA) to which 70% of all GM dealers belong, participated in the trial and filed briefs.  (IDF 14)

E.  GM Franchised Dealers as Crash Parts Wholesalers; the Wholesale Compensation Plan

GM dealers, as far as the record shows, have always been free to sell the crash parts which they purchase **[*205]** from GM.  GM has not and does not attempt to control its dealers' crash parts sales with respect to price, customer or territory.  (IDF 198) GM does suggest wholesale prices for crash parts.  (IDF 197)

GM has intruded upon its dealers' wholesaling freedom to the extent of providing incentives for the sale of crash parts to IBS.  Under the Wholesale Compensation Plan (WCP) adopted in 1968, GM rebates voluntarily to participating dealers a percentage of the cost of crash parts sold to IBS. [5] The purpose of this plan which was worked out after discussions with the Commission staff and adopted also by Ford and Chrysler (ALJX 17-5) was to overcome the crash parts wholesale price disadvantage faced by the IBS.  Under the plan, dealers are supposed to wholesale crash parts at cost, making their profits wholly from the rebate, and thus putting the IBS at parity with GM dealers on crash part cost.  (IDF 34, 76) Unfortunately, many GM dealers eschew such altruism, seeing in the plan an opportunity for "double dipping" -- taking the WCP rebate from GM while selling crash parts at a markup to the IBS.

**[*206]**

The extent and effect of the wholesale cost variance between dealers and IBS will be explored in detail later in this opinion.  For now it is important to note that GM cannot force its dealers to wholesale crash parts at cost, or any other price, without laying itself open to a charge of resale price maintenance.  Therefore, the dealers' exploitation of the WCP is of the same nature as their basic freedom to dispose of goods which they own in any matter they see fit.  It does not interfere with a dealer's freedom to decide whether or not to wholesale. (IDF 103) There is a conflict

---

[3] Most car buyers count upon insurance to cover damage expenses, and so devote little thought to future repair costs at time of purchase.  (IDF 60)

[4] See infra note 74.

[5] The technical ins and outs of the WCP and dealer ordering methods for crash parts are exceedingly complex.  They will be highlighted as necessary in this opinion, but the reader is referenced to IDFs 75-79, 82, 104-112, 190-196 for a complete description of the plan's operation.

in the record as to the number of GM dealers who engage in "meaningful" wholesaling, [6] but no indication that the WCP has changed this percentage in any way, or altered the geographic disperson of crash parts throughout the United States. In short, the WCP did not introduce into GM's crash parts distribution system any fundamental new disadvantages to the IBS.

II. LEGAL ANALYSIS

A. CONSPIRACY THEORIES

Complaint counsel argue that GM's exclusion of the IBS and IWS from its crash parts distribution system is the result of a conspiracy between GM and its dealers. [*207] That conspiracy, Janus-like, is alleged to be either horizontal, with GM a willing co-conspirator, or vertical, with GM a coerced partner. Thus, before considering whether any agreement exists we must determine whether GM and the GM dealers share the same niche in the crash parts distribution chain.

1. Horizontal Theories

(a) Presence through the Motors Holding Division

The horizontal conspiracy theory is easily disposed of. It is uncontested that currently [7] GM's only formal presence at the automobile and light truck dealership level (and consequently at the crash parts installation and retailing level) is through its Motors Holding Division (MHD). (IDF 87)

 [*208]

Since 1929 the MHD has administered a Dealer Investment Plan under which it provides interim capital financing for a small number of new dealerships. Under this plan the prospective dealer is required to make an initial investment of at least 25% of the total required capital by purchase of nonvoting stock in a dealership company. MHD provides the balance by purchase of voting stock and issuance of long-term notes. The dealer is paid a salary and shares equally in the dealership's profits on a per-share basis. The dealer conducts the day-to-day operations of the dealership. (IDF 91) While MHD owns all the voting stock in the dealerships which it finances, there is no evidence in the record that it uses its voting power to become actively involved in the daily management and direction of these corporations. Cf. *Chisholm Bros. Farm Equip. Co. v. International Harvester Co., 498 F.2d 1137, 1142-1143 (9th Cir., 1974)*; cert. denied, *419 U.S. 1023 (1974)*; *United States v. Sealy, Inc., 388 U.S. 350, 353 (1967)*. Thus, as regards any given MHD dealership, GM functions as a financier rather than an operator.

Moreover, under **[*209]** the Dealer Investment Plan the dealer has the right and is expected to increase his capital stock interest by purchasing the MHD-held stock. (IDF 91; CX 7029C-E) Between 1970 and 1977 the average length of MHD financing for a dealership was 5 to 6 years. (CX 34) Consequently, the MHD interest in any dealership is temporary.

Nor does the total number of dealerships operating under the Dealer Investment Plan change the nature or degree of GM's involvement with crash parts installation and retailing.There is not the slightest suggestion in the record that GM's crash parts policies were shaped by a desire to benefit the MHD dealerships, and it would be surprising if there were. Between 1929 and 1964 there were only 1,139 MHD dealerships. (IDF 91) The record shows that the

---

[6] See infra note 91.

[7] In 1974 GM owned and operated a very small number (23) of automobile dealerships. (RAD. 763) These were phased out by 1976. (IDF 87) Historically, of course, none of the Big Three auto manufacturers has ever seriously attempted to utilize the agency form of distribution as a marketing device. See generally Schmitt, Antitrust and Distribution Problems in Tight Oligopolies: The Automobile Industry, 24 Hastings L.J. 849, 871 (1973); E. Cray, Chrome Colossus: General Motors and Its Times 30 (1980).

1982 FTC LEXIS 39, *209

MHD dealerships never accounted for more than 3% of the total GM dealerships between 1964 and 1977, [8] and that their number has declined since 1970. [9] There is also no evidence that the MHD dealerships conduct an abnormally large portion of the overall dealer bodyshop business. To the contrary: in 1977, MHD dealerships accounted for an estimated 4.3% of total GM dealer wholesale parts sales and an estimated **[*210]** 5.3% total GM dealer body shop sales. (RX 34; CX 38, 40)


In determining whether a business relationship is horizontal or vertical we must "seek the central substance of the situation, not its periphery." _United States v. Sealy, Inc., 388 U.S. 350, 353 (1967)_. In central substance, GM's relation to its dealers is that of franchisor and supplier; it is simply not sufficiently integrated forward to be classified as their competitor.[10]

 **[*211]**

(b) "Symbiotic" relationship

Complaint counsel also argue, albeit weakly, that GM has a meaningful presence at the wholesaling and installation level due to a "symbiotic relationship" with its dealers. This relationship amounts to nothing more that the general interest every supplier of consumer goods has in seeing that its products are ultimately sold to the public. To equate this community of interest to functional horizontality does total violence to the normally understood meanings of horizontal and vertical in the distributional context.

In conclusion, the ALJ correctly found that the essentially vertical relationship between GM and its dealers precludes a finding of horizontal conspiracy in this case. (IDF 373-375)

2. Vertical Theory

The scenario becomes much more complex under this approach. The issue is not the nature of the relationship between GM and its dealers -- it is clearly vertical -- but what in fact was their course of conduct and whether it amounts to a vertical boycott at law. Specifically, complaint counsel urge that GM seriously considered two different ways of opening its crash parts distribution system, but that each time dealer pressure, **[*212]** largely through the offices of their national trade association NADA [11], forced GM to change its plans and keep the system closed to all but franchised dealers. Proof of these allegations is extremely delicate, since the denouement involves no clear-cut action by GM, but rather a continuation of its previous course of conduct as evidenced by what it did not offer the FTC in the shifting terms of three GM settlement proposals [12] during the ongoing staff investigation

---

[8] The ratio of MHD dealerships to total dealerships was, for 1964, 306:13,395 (2.3%); for 1974, 379:11,894 (3%); for 1977, 345:11,660 (3%). (RX 34; CX 38, 40, 2079C)

[9] MHD Dealer Equity Records and Financial Statements show 449 MHD dealerships in 1970, 379 in 1974, and 345 in 1977. (RX 34)

[10] On an apparently similar factual pattern, Ford's temporary ownership interest in an unspecified number of its franchised dealerships for financing purposes was held not sufficient to permit a finding that Ford had any significant share of the dealer-level market. _FLM Collision Parts, Inc. v. Ford Motor Co., 406 F. Supp. 224, 246 (S.D.N.Y.)_; rev'd in part, aff'd in part, _543 F.2d 1019, 1030 (2d Cir., 1976)_, cert. denied, **429 U.S. 1097 (1977)**.

[11] As noted previously the National Automobile Dealers Association (NADA) represents about 70% of all GM dealers and is an intervenor on behalf of GM in this case. Its organizational structure and that of GM's dealer advisory bodies are described at IDFs 289-291. Throughout this section of the opinion "NADA" and "dealers" are used interchangeably.

[12] A word of explanation about the multiplicity of citations to a mere three settlement offers. Unfortunately, the jigsaw nature of this record reaches its apotheosis in the piecemeal admission of these proposals. The First Proposal (July 11, 1975) is found scattered throughout CX 7010, 7012, 7350; ALJX 11, 13C-D, 15. The Second Proposal (February 5, 1976) is found at CX 7012, 7350; ALJX 13B, 13H, 15. The ALJ rejected direct proof that GM made a third formal settlement proposal. However, the record

which culminated in the issuance of this complaint.  Also relevant are the terms of settlement urged by NADA as an interested third party, contemporaneously with GM's second settlement proposal.  (CX 7327; ALJX 2)

**[*213]**

The actions of GM and its dealers in the years preceding the 1975-1976 negotiations with the Commission staff are our only source from which to infer whether GM's settlement proposals were actually dictated by its dealers.  Accordingly, that course of conduct is chronicled at some length here, as a prologue to application of the relevant legal principles.  For clarity's sake, even though the cast of characters and some events are the same, we give two histories: first, the line of events relating to a proposal to open GM's warehouses to IBS, which was offered in GM's first settlement proposal, withdrawn in its second, and indirectly reoffered in its third; second, the line of events relating to the more elusive "miniwarehouse plan" which was not offered to the FTC in any of the settlement proposals.

(a) Unsuccessful Settlement Proposals

The critical time period of this history is July 1975 - March 1976.  It was during this time that the dealers became seriously concerned that GM might be planning to stop dealing crash parts exclusively to them and start selling directly to their IBS competitors. [13]  The dealers' fears were not unfounded.  Almost since its inception in 1968 **[*214]** the Wholesale Compensation Plan was an obvious failure at creating crash parts price parity between dealers and IBS.  (IDF 44)  GM felt (rightly as it turned out) that unless it could remedy the situation in some other way the FTC was likely to challenge the distribution system as an unfair act under § 5.  (IDF 45)  Accordingly, on July 11, 1975, GM submitted a three-point settlement proposal to the FTC (hereinafter the "First Proposal").  (CX 7010; ALJX 11)  It offered

(1)  **[*215]**  To publish the suggested general trade (i.e., wholesale) price on crash parts as defined by the FTC. [14]

(2)  To include subcompacts and trucks in the Wholesale Compensation Plan (WCP), provided the FTC could either persuade or compel GM's competitors, including foreign competition, to do likewise.

(3)  To sell to IBS from GM warehouses at dealer price.

NADA was given no advance warning of this proposal.  (CX 7321; McCarthy Tr. 3560)  Dealer reaction was instant and, as GM's counsel had stipulated, "vehemently" in opposition to Point 3, which came to be known as the "open warehouse" issue.  (Tr. 3376)  NADA organized to fight the proposal.  (McCarthy Tr. 3564)  During the next four months NADA continually urged its views to the public, [15] to GM, [16] and to its members. [17]  The members

---

does contain indirect proof of this offer, by means of testimony of both GM representatives and the Director of the Bureau of Competition before the Consumer Subcommittee of the Senate Committee on Commerce, on March 12, 1976.  (RX 28J; ALJX 14, 17)

[13] Even before 1975 dealers were opposed to the possibility of changes in the crash parts distribution system, but any pre-1975 meetings seem to consist of general exchanges of views -- nothing specific enough to mark the beginning of a coercive NADA compaign or a GM-NADA conspiracy.  (McCarthy Tr. 3518; Pohanka Tr. 4690, 4769).  Significantly, in these pre-1975 meetings GM expressed sympathy but would not commit to the dealers' position, carefully keeping open its options for change.   "I know that on more than one occasion Mack Worden [GM's Vice President for Marketing] would say: This is how we feel about it now, but, of course, we can change our minds tomorrow.  I remember that." (Pohanka Tr. 4698)

[14] This was to allow IBS to tell if a GM dealer was cheating on the WCP by marking up a part he was supposed to be selling at cost.  (ALJX 2C)

[15] CX 7301 (July 25, 1975 NADA Press Release); CX 7354 (11/20/75 NADA letter to various Congressmen and Senators).

responded by sending "a considerable number of letters... to General Motors saying that they thought these actions served neither the dealers nor the consumers." [18] (Pohanka Tr. 4721)

**[*216]**

Yet NADA had no confidence that all this activity was paying off. GM appears to have expressed sympathy for the dealers' position (CX 7305), but NADA was unsuccessful in getting a commitment to withdraw (McCarthy Tr. 3518, 3565-66) or even compromise (CX 7305) on the controversial proposal. Indeed, by early December 1975 the President of NADA's GM Line Group, Walter Stillman, believed that GM's position had actually hardened:

They have already indicated a willingness to open the warehouses to independents at a Price as stated in their Proposal of July 1975. Thus it is not a question of will they open them, it is purely a question of at what Price, and it is for sure if the Dealers are to be the Sacrificial Lamb they will not hesitate long. (CX 7303C)

NADA Executive Vice President McCarthy feared matters might get even worse, that GM might accept an FTC counterproposal to open its warehouses to IWs as well as IBS. [19] (McCarthy Tr. 3573-75). Accordingly, NADA started working on a new tactic: rather than rely on letters and phone calls to prod GM into recognizing the dealers' plight, it decided to represent dealers itself before the FTC, by means of a "4 Point Program" to **[*217]** be considered as an alternative to GM's still outstanding First Proposal. (McCarthy Tr. 3573-74) (CX 7303A)

The program was essentially worked out by December 17, 1975, (McCarthy Tr. 3526) when GM and NADA officials had the last meeting which is documented in this record. As will be seen, NADA's 4 Point Program submitted to the FTC on February 5, 1976, was essentially the same as GM's second proposed settlement offer (hereinafter "Second Proposal"), also submitted on February 5, 1976. Both eliminate the third point of GM's First Proposal: sales to IBS from GM's warehouses. Therefore, if any agreement took place between GM and NADA on the IBS question, it happened at the December 17, 1975, meeting.

NADA attendees who testified were Frank McCarthy, **[*218]** Executive Vice President and Kevin Tighe, Legislative Counsel, who however, attended the meeting only briefly and sporadically. (Tighe Tr. 9505) Both also made notes of the meeting, which are in evidence as CX 7316 (McCarthy) and CX 7324 (Tighe). Also present were, for NADA: Jack Pohanka, President-Elect; Walter present were, for NADA: Jack Pohanka, President-Elect; Walter Stillman, Chairman of the Industrial Relations Committee's (IRC) GM Line Group; Paul Herzog, Director of Research and Dealership Operations; and Jay Ferrand, Assistant Director of Research; for GM, Michael Meehan, Executive in Charge of Service Parts Operation, and Jim Melican, attorney. (McCarthy Tr. 3519-20) The purpose of the meeting was to discuss the latest developments in the FTC investigation. (Tighe Tr. 9506) McCarthy, as might be expected, testified that while NADA representatives did tell GM what "we thought would be the proper approach to solve the

---

[16] "We were very distressed when General Motors made the offer.... And every opportunity I had to tell General Motors about that, I told them." (Pohanka Tr. 4718)

"I know all the [NADA] councils were fighting GM on it, or doing everything they could in recommending to them that they back off of it." (Vernon Tr. 3361)

CX 7319 (undated Mailgram, see Tr. 3363, 3373-74); CX 7303A; McCarthy Tr. 3563, 3564; CX 7305; Stillman Tr. 8177-78.

[17] CX 7314 (August 8, 1975 circulation to NADA members).

[18] CX 7310 may be an example of the type of letter that was written, although it was sent to the FTC, not GM. The record contains no examples of dealer letters to GM nor any better estimate of their number than Pohanka's testimony cited above. Thus it is impossible to evaluate the coercive tone or power of this phase of NADA's campaign.

[19] The record reflects that loss of their entire wholesaling business to IWs or the insurance companies was a far greater threat to dealers than the spectre of the IBS achieving price parity in crash parts. There is even some evidence that NADA felt it could live with opening warehouses to IBS (as opposed to IWs) if that were the outer bound of expanding GM's direct distribution system. (CX 7303E, I; McCarthy Tr. 3529-30)

1982 FTC LEXIS 39, *218

crash parts program" (i.e., the Four Points) they did not ask for GM's opinion of or concurrence in their proposed program.  (McCarthy Tr. 3525-27, 3570-71) (See generally Pohanka Tr. 4768-69)

Against these statements must be set out sentence [*219] from Tighe's notes: "What can GM and dealers do together to keep independent distributors out of crash parts area????" (CX 7324B) Tighe's explanation of the sentence, constantly repeated in his testimony without change, is that it was a paraphrase of what Melican reported as being the FTC's concern at that time.  In other words, Tighe thought he was told that the FTC was thinking of issuing a complaint which included a conspiracy count.

[A]ccording to Mr. Melican, as far as crystal ball gazing, if you will, FTC would probably come forth with some form of a complaint which would involve the issue of GM, its dealers, doing something in the area of conspiring to keep independents out.  That is why the asterisk is at the top [20] and it reflects FTC has never answered, and then it picks up later on with Melican's, as I stated, analysis and his opinion of what would perhaps be forthcoming at a later date from the FTC.  (Tighe Tr. 9518; see also Tr. 9509-10, 9520-21)

McCarthy stated flatly that this portion of Tighe's notes is inaccurate.  [*220]  (Tr. 3522)

Despite Tighe's uncooperative conduct as a witness we are inclined to accept his explanation for the following reasons.  The sentence does appear in the context of a summary of the FTC's position.  Tighe's area of expertise was "work on Capitol Hill"; he was unfamiliar with the FTC crash parts matter which was handled by outside counsel.  (Tighe Tr. 9507) That, plus his sporadic attendance of the meeting, could explain his misunderstanding Melican.

The record is silent with regard to any actions by either NADA or GM after December 17, 1975, until February 5, 1976, when each sent a separate settlement proposal to the FTC.  [21] The proposals were later described by NADA official Cecil Vernon as "essentially the same." (CX 7353B; Vernon Tr. 3389-90) Both advocated improving crash parts distribution by increasing the dealers' opportunities under the WCP:

[*221]

| NADA Proposal | GM Proposal |
|---|---|
| 1.  Increase WCP to 30% (CX 7327E) n22 | 1.GM states that it has already raised WCP to 30% in October, 1975. (ALJX 13G) |
| 2.  Publish wholesale prices of crash parts (CX 7327E) n23 | 2.  GM will publish wholesale prices of crash parts (ALJX 13A-B) n23 |
| 3.  Require GM to offer WCP on all models, including subcompacts and compacts (CX 7327G; ALJX 2D) n24 | 3.  GM will make WCP available on subcompacts and light-duty trucks on a trial basis, with the option of withdrawing at the end of six months if principal competitors, including the |

[20] This is a reference to the position of the key sentence on the document, from which both parties attempted to infer special meaning.

[21] The record does not reveal the reasons behind GM's timing of the Second Proposal.  It does show that NADA perceived growing FTC pressure on GM in the new year, and so made haste to file its proposal before it was too late.  (McCarthy Tr. 3574-75; CX 7324B) This does not, of course, explain the fact of contemporaneous filing.

| NADA Proposal | GM Proposal |
|---|---|
| | foreign competition, fail |
| | to implement a similar |
| | plan.(ALJX 13I) n24 |
| 4. Require GM to offer the | 4. GM will pay wholesale compensation |
| WCP across division | across division |
| lines. (CX 7327F) n25 | lines, for sales to |
| | IBS. n25 (ALJX 13G) |

22232425 **[*222]**

It is obvious that the key differences between GM's First Proposal and these two proposals are the absence of the provision on direct sales by GM to IBS and the appearance of the provision on extending WCP to cross division lines sales. Both February proposals make it clear that broadened WCP is an alternative which negates the need for direct sales to IBS.

[I]n lieu of opening up the 27 General Motors Parts Division's field warehouses for direct sales to the independent auto body repair shops, General Motors would be willing to agree to broaden the Wholesale Compensation Plan.... (ALJX 13G) (emphasis in original)

[O]pening the manufacturers' warehouses... is also a prime example of governmental overkill. Any dealer overpricing can be simply and effectively by-passed by adoption of points 1 and 2 of NADA's proposal. (ALJX 2D)

The convergence of timing and content in these two February proposals is certainly remarkable, but before considering whether it shows a conspiracy, we must consider GM's action just a month later.

On March 1, 8, and 12, 1976, the Consumer Subcommittee of the Senate Commerce Committee held hearings on the cost of automobile crash parts. **[*223]** [26] In his testimony on March 1, 1976, the Director of the Bureau of Competition described the First and Second Proposals, suggesting that the change on the sales to IBS provision was the result of successful dealer pressure on GM. (ALJX 17, Johnson p. 8) In response, by letter of March 5, 1976, to the Director of the Bureau of Competition (CX 7013, rejected [27]) and by the March 12, 1976, testimony of Michael Meehan, General Motors added a fourth element to the Second Proposal:

---

[22] NADA realized that GM had already taken this step (ALJX 2C) but apparently felt that it needed to be ratified by the FTC. The increase to 30% was supposed to take away the pressure to overcharge to IBS, due to inadequate wholesale compensation. (ALJX 2C)

[23] This provision also appeared in GM's First Proposal.

[24] This is a slight variation on the second point in GM's First Proposal.

[25] The WCP did not and still does not offer rebates on resales of crash parts used on a brand of automobile which the dealer is not franchised to sell. Thus, under this proposal a Pontiac dealer, who previously received wholesale compensation solely for resale of Pontiac crash parts, would be eligible for wholesale compensation on the sale of Chevrolet, Oldsmobile, Buick and Cadillac crash parts as well.

[26] The complete transcript of the hearings is entered in the record as ALJX 17; portions of the testimony from the hearings are also available as RX 288 ALJX 14.

[27] CX 7013 is the letter of March 5, 1976, from GM's General Counsel to Owen Johnson, Director of the Bureau of Competition. Complaint Counsel sought to introduce it, post trial, in response to respondent's proposed reply findings. By order of September 6, 1979, the ALJ rejected CX 7013 as being "unnecessary" to his decision. We disagree. Though not vital, it is certainly helpful to an evaluation of GM's continuing interaction with NADA. Meehan's March 12, 1976, testimony does not have the weight of the actual formal offer itself. Accordingly we have included CX 7013 in the record.

**[\*224]**

Last week, we added a fourth element to our proposal.

Fourth: If an independent body shop is unable to buy crash parts from any one of the GM dealers in its vicinity at the dealer price, GM would agree to sell these parts to the independent dealer at dealer net price directly from its field warehouse. (ALJX 17, Meehan testimony p. 122)

This "safety valve" approach to IBS buying from GM warehouses is very close to GM's First Proposal. [28]

Although it is too late to test the degree of good faith lying behind this Third Proposal (and it smacks not a little of a last minute grandstand ploy), nevertheless it does show that GM could slip out from under NADA's thumb whenever its purposes suited it. **[\*225]**

(b) The Miniwarehouse Plan

Complaint counsel argue that at least one of GM's settlement proposals should have contained an offer to restructure the crash parts distribution system by adoption of a "miniwarehouse plan." They argue that GM had such a plan on the drawing board, perhaps even in limited test operation, but aborted the program, at dealer insistence. (CAB 36)

The first problem with this theory is that there is no definitive explanation of the "miniwarehouse plan" in the record. Three dealer witnesses (none of whom was ever a GM employee) testified as to their general understanding of its elements. (Stillman Tr. 8060, 8071-72; Pohanka Tr. 4692, 4695-96; McCarthy Tr. 3490-91) From their often conflicting accounts it appears that the "plan" envisioned General Motors Parts Division (GMPD) setting up franchisees for the purpose of wholesaling crash parts. The franchisees could be, but were not limited to, GM dealers. The miniwarehouses were to supplement, not replace, GMPD's then twenty-seven (possibly thirty-six) parts warehouses. It represented a limited opening up of the crash parts distribution system at the warehouse level.

The record, which is extremely **[\*226]** skimpy on the whole issue, [29] shows that this "plan" was never significantly operational and although GM management may have been dimly aware of the concept, it did not endorse miniwarehousing in either theory or fact; dealers, to the extent they were even aware of the plan, considered it no threat, and forbore from lobbying GM concerning it. There is simply no boycott case arising out of the miniwarehouse scenario.

The origins of the miniwarehouse program are obscure. Complaint counsel root it in the early 1970's, by virtue of an experimental dealer warehousing program in Phoenix, Arizona. (CPF 285) [30] However, the record **[\*227]**

---

[28] In the Second Proposal GM stated that its first offer to sell to IBS had been intended to apply "only in those instances in which the independent operator was unable to negotiate what he considered to be a fair price.... [T]he warehouses would constitute an alternative source, a safety valve...." (ALJX 13D) However, the First Proposal, both as presented to the FTC and as described to dealers by GM, nowhere makes such a limitation. (ALJX 11G, CX 7010E, ALJX 16A, CX 7321)

[29] Complaint counsel's testimonial case rests entirely on four hostile witnesses, each a GM dealer or NADA official during the time of events they testified to. Having dared this much, their failure to call GMPD's General Manager Lewis Kalush -- an equally hostile witness, but one infinitely more knowledgeable on the subject -- weakens an already weak case. With no reliable documents showing that the miniwarehouse plan had any official status at GM, we are forced to rely upon the testimony of these dealers, despite its obvious self-serving nature.

[30] Complaint counsel also rely on CX 7217, a document which from internal evidence was written between 1972 and 1975, to give the miniwarehouse program historical authority. However, the document appears to be the product of GM's Service Section (CX 7217A), a GM unit which has nothing to do with the distribution, warehousing or selling of GMCP. (Meehan Tr. 2191, 2225)

contains only the barest rumor about this experiment as the only witness called to testify about it had no personal knowledge on the subject. He could give no details about the Phoenix set-up, dates of operation (even to the nearest year) or success, if any. (Stillman Tr. 8070-72, 8142) Even allowing for the witness' bias towards GM [31] we cannot see in his testimony the picture which complaint counsel paints of a viable, operational miniwarehouse program.

Dealers first became systemically aware of miniwarehousing in the second half [*228] of 1974, when the idea was floated before them by Lewis Kalush, General Manager of GMPD, an offfice which does not carry the authority to change GM's distribution system. (Meehan Tr. 2227-29) Four witnesses either attended or heard of a meeting or meetings [32] where the concept was discussed. However these meetings were not called solely or even chiefly to discuss miniwarehousing. GMPD was then in its second year as a separate division of GM. (IDF 162) The witnesses characterized the gathering(s) as get-acquainted sessions organized by Kalush to air dealer complaints about the GMPD distribution system and discuss generally alternatives for improvement. (Faulkner Tr. 11803-11804)

Significantly, the miniwarehouse alternative was not presented as a firm plan.

This was a concept that they [*229] had. They weren't saying whether they [were] going to establish it or not. This was a concept, a discussion that was going on about parts distribution. (Stillman Tr. 8068-69)

The dealers perceived it as a pet project of Lewis Kalush, lacking in support from GM management [33] and of no threat to their exclusive wholesaling rights in crash parts. This was made abundantly clear by NADA officials' reaction to an unexpected pitch for miniwarehousing by Kalush at a meeting with select NADA officials on April 2, 1975. [34] The meeting was intended to be a briefing on the FTC investigation, but Kalush saw an opportunity to promote his project. As Frank McCarthy, [35] Executive Vice President of NADA recalled:

**[*230]**

It was my reasonably clear recollection that even at the outset - but it became clear, because of the nature of the discussion - that the comments of Mr. Kalush were his comments as an individual, and did not reflect the opinion of even other members of the GM parts division. (Tr. 3581)

---

No witness was called to identify the author of the document or show that program advanced in CX 7217 was either considered or adopted by GM management.

31 Walter Stillman, a Buick dealer, was a former chairman of the GM Line Group of NADA's Industrial Relations Committee.

32 It is unclear whether each witness refers to the same meeting, or whether some are recalling different ones of a series of meetings. Witness Stillman implies the latter (Tr. 8068), but his testimony is the only support for complaint counsel's assertion that the miniwarehouse plan was proposed several times to groups of dealers between mid-1974 and early 1975. (CPF 286; CAB 36)

33 There is some conflict over whether GM -- as opposed to GMPD -- officers attended the(se) first miniwarehouse meeting(s). Witness Faulkner recalls GM president Cole being at the August, 1974 meeting (Tr. 11792); the three other witnesses mentioned only GMPD officers, most notably Kalush. (Stillman Tr. 8071; Pohanka Tr. 4692; McCarthy Tr. 3490-91)

34 The 1974 meeting(s) do not seem to have involved any dealers holding office in NADA. (Faulkner Tr. 11798-99) By contrast, the April 2, 1975, meeting was initiated and attended only by NADA officers: Jack Pohanka, President of the Industry Relations Committee; George Erwin, possibly Chairman of the Service and Parts Committee; Walter Stillman, Chairman of the GM Line Group; Paul Herzog, Director of Research and Dealer Operations; and Frank McCarthy, Executive Vice President of NADA. Representing GM were Lewis Kalush and Jim Melican, Attorney in Charge of Trade Regulation. (McCarthy, Tr. 3486, 3580-81)

35 Neither Stillman nor Faulkner testified to this meeting; Pohanka recalled it only in the most general outline. (Pohanka, Tr. 4696-97) Thus McCarthy's testimony is the only detailed data in the record on this subject.

1982 FTC LEXIS 39, *230

I mean, it was just very clear that Mr. Kalush, because of the parts distribution system, the way it is in General Motors, wanted the miniwarehouse concept, dealer stocking concept, implemented, because that would come under the General Motors [P]arts [D]ivision and it would come under him. And as part of selling that idea to dealers, this is my clear impression, that he was trying to sell dealers on the mini-warehouse proposal as a solution to the crash parts problem. (Tr. 3582)

Complaint counsel assert, without any citations to the record, that the April 2, 1975, meeting crystalized NADA's opposition to the miniwarehouse plan. However, McCarthy's testimony shows neither a hostile nor defensive dealer reaction to Kalush's plan. Though the consensus was that more dealers would be made unhappy than happy by the plan (McCarthy Tr. 3492), NADA never considered the program a real enough **[*231]** threat to warrant polling its membership for reactions. (McCarthy Tr. 3495) Again, allowance must be made for the witness' obvious bias in favor of respondent, but the record does not contain any testimony or documents [36] which refute Mr. McCarthy.

**[*232]**

The final time of significance in this history is May 1975. GM's President Estes and four other officials (none from GMPD) met with NADA's President of the Industrial Relations Committee, Pohanka, and Chairman of the GM Line Group, Stillman, to discuss "several items that GM dealers were interested in." (Pohanka Tr. 4691) Complaint counsel claim a major purpose of the meeting was for NADA to outline its objections to the miniwarehouse plan. However it is clear that many other topics were to be covered at that meeting. (Stillman Tr. 8143-44) Moreover, although as we have noted NADA was opposed to a totally open crash parts distribution system, it had not yet taken a position against the less sweeping mini-warehouse proposal. (Stillman Tr. 8145)

Nevertheless one of fourteen items on the pre-meeting agenda presented to Estes was "Mini Warehouses". (CX 7205C) The record does not indicate whether Estes had knowledge in detail of the subject, [37] but he managed to convince the NADA officials of his disinterest:

**[*233]**

I remember using the word "mini-warehouse," and was surprised that Mr. Estes said, "what's a miniwarehouse?"

We had to tell him.

---

[36] Complaint counsel's sole support for the statement that the day after April 2, 1975, NADA officials held a meeting to oppose the miniwarehouse program is CX 7346A-F. We can only surmise that the document was admitted in order to give us the pleasure of reacquainting ourselves with that bane of law school evidence examinations, of triple hearsay. The document consists of handwritten notes of Lee Beaudry, a member of the NADA Parts Committee, which happened to be meeting in NADA headquarters on April 3, 1975, in order to revise the parts operations manual. (Beaudry Tr. 2750) If Beaudry's notes are to be believed, Pohanka stopped by and told the Committee what Kalush and Melican had told the five NADA executives the day before. Neither Beaudry nor Pohanka has any independent recollection of the April 3, 1975, meeting.

To admit these notes for the truth of what Pohanka stated was NADA's position, or, still worse, what was GM's position with regard to any subject goes beyond even the wide latitude accorded hearsay under the Commission's Rule of Practice § 43(b).

Moreover, even if the document has any evidentiary weight it does not prove what complaint counsel state. Rather, it confirms that the mini-warehouse plan was perceived as Kalush's alone (CX 7346B), that some dealers liked the idea (CX 7346C) and is silent on the matter of NADA opposition to mini-warehousing.

[37] The single line on CX 7205C listing "Mini Warehouse" as a topic of discussion is the only documentary proof linking the plan with upper echelon GM management. The document was entered in the record without benefit of explanatory testimony from either its author, GM Vice President Worden or its recipient, GM President Estes. The document on its face is merely a list of topics NADA wished to discuss; it does not indicate that GM management had any independent information on these topics. Thus even if GM President Cole attended a meeting where mini-warehousing was discussed in 1974 (see n. 33, supra) is entirely possible that official awareness of the concept did not carry over to President Estes' administration.

Q.  You mentioned that Mr. Estes was unaware of that term. After you informed him of the term, was there a discussion of miniwarehouses?

A.  As I recall, it was a completely new idea to him.  I didn't see any point in pursuing it any further.

Q.  So you just laid it on the table and left?

A.  As I recall.  (Pohanka Tr. 4694, 4698)

After this date the record is silent on dealer opposition to the mini-warehouse program.

Given this history, it is hardly surprising that GM's July 11, 1975, settlement proposal to the FTC made no mention of the miniwarehouse plan.  At its strongest the plan appears merely to have been the pet project of a division head, who sought dealer aid in promoting it to GM management as he was powerless to implement it without endorsement by GM's executive committee.  (Meehan Tr. 2227-29) To the extent that the plan was tried out in Phoenix, it was dropped for causes other than dealer pressure.  The record does not show that the miniwarehouse plan was either operational on July 11, 1975, or being seriously considered **[*234]** by GM at that time.  Nor does the record show that NADA launched any specific lobbying effort against the mini-warehouse proposal.

(c) Legal Analysis

Whether known as boycotts or concerted refusals to deal, [38] collective efforts to exclude a party from the marketplace are illegal per se under Section 1 of the Sherman Act.  Northern Pacific Ry. Co. v. United States, 356 U.S. 1 (1958); Klors, Inc. v. Broadway-Hale Stores, 359 U.S. 207 (1959). Even the Supreme Court, however, has recently acknowledged that the decisions on what constitutes necessary elements of a boycott in violation of the Sherman Act "reflect a marked lack of uniformity in defining the term." St. Paul Fire & Marine Ins. Co. v. Barry, 438 U.S. 531, 543 (1978). Although the finding of a boycott or concerted refusal to deal invariably turns on the facts in the cases, no conclusive fact-pattern has emerged which spells out precisely what a boycott is.  As a consequence the cases in this area are often confused.  Grouping them under the categories of primary and secondary boycott [39] provides an analytical framework which helps to identify useful **[*235]** precedent for the matter at hand.

**[*236]**

The first type of case deals with a "primary" boycott, where a number of economic actors at one level of the productive or distributive process either discontinue economic relations with an actor or actors at another level, or predicate continuance of economic relations only on certain terms.  Paramount Famous Lasky Corp. v. United States, 282 U.S. 30 (1930). A distinguishing feature of a primary boycott is that the resultant economic harm is suffered by businesses which are not competitors of the members of the combination.  The case before us is not a

---

[38] Scholars of this issue have debated whether the draconian foreclosure of inquiry which is the hallmark of per se analysis should be applied to every concerted refusal to deal.  In particular, their concern is that market effects and specific purpose should be weighed when the group exercising concerted power is noncommercial; or when the main purpose and effect of the boycott are not protection of the conspirators' profits.  See, e.g., Bird, Sherman Act Limitations on Noncommercial Concerted Refusals to Deal, 1970 Duke L.J. 247; Barber, Refusals to Deal Under the Antitrust Laws 103 U. Pa. L. Rev. 847 (1955); L. Sullivan, Handbook of the Law of Antitrust 256-259 (1977).  To clarify when the use of per se analysis is appropriate, some commentators have proposed mutually exclusive definitions of the terms "boycott" and "concerted refusal to deal".  Sullivan, supra, 258; Note, Boycott: A Specific Definition Limits the Applicability of the Per Se Rule, 71 Northwestern U.L. Rev. 818 (1977). However, the case before us alleges a classic exercise of concerted power by traders at one level of the distribution process to protect themselves from competition or potential competition at that level.  Therefore, we will use the terms "boycott" and "concerted refusal to deal" interchangeably; we express no opinion as to the merit of any of the limiting definitions.

[39] The terms are derived from Bird, Sherman Act Limitations on Noncommercial Refusals to Deal, 1970 Duke L.J. 247 (1970). Professor Bird also describes a third variety of concerted refusals to deal where a group establishes a joint facility or a trade association and limits access to it.  This situation is far removed from the case before us and therefore need not be considered here.

primary boycott situation, since GM and its dealers do not occupy the same level of the productive process, and the victim group (IBS) is competitive with some of the members (dealers) of the alleged combination.

In a secondary boycott, a group threatens an economic actor or actors at another level of the productive or distributive process to force them to refuse to deal with someone else -- usually a competitor of the boycotting group. A distinguishing feature of a secondary boycott is that the resultant economic harm is directly caused by a conscripted neutral, not the boycotters.

Secondary boycotts may **[*237]** be further divided into two subgroups, depending upon whether the coerced neutral stands above or below the boycotters in the distribution chain. _United States v. Parke, Davis and Co., 362 U.S. 29 (1960)_, is an example of a Sherman Act § 1 violation found in coercion flowing down the distribution chain. There a pharmaceutical company refused to deal with wholesalers in order to elicit their willingness to deny its products to retailers and thereby help force the retailers' adherence to its suggested minimum retail prices. Such cases are not analogous to our situation, where the alleged pressure rose from the distributor level to the manufacturer.

We must look, then, for precedent in cases dealing with pressure by entities at a lower level of the distribution chain upon their supplier.

Turning to such cases, we find none where coercion was found solely on the basis of such a blustering, but ultimately toothless course of conduct as the GM dealers engaged in during 1974-1976. NADA never once (on this record at least) threatened GM with the one sanction which would be significant to it: loss of new car sales. Cf. _U.S. v. General Motors, 384 U.S. 127 (1966). [*238]_ As the ALJ noted, our situation is a long way from the naked wielding of buying power in Hershey Chocolate Corp., 28 F.T.C. 1057 (1939), aff'd, _121 F.2d 968 (3rd Cir. 1941)_.

However, complaint counsel are also correct when they argue that direct proof of the wielding of such power is not a necessary element of a violation of § 1 of the Sherman Act. (CAB 37) There have indeed been cases where a response to "mere complaints" was held to be an act under compulsion. What complaint counsel miss, however, is the fact that in these cases the courts, finding the complaint did not constitute an obvious threat, inferred the existence of the iron hand inside the velvet glove from the fact that the target suddenly and completely capitulated to the boycotter's will. These cases also indicate that the more irrational the changed business pattern, from the viewpoint of the target, the more suspect is its motivation.

In this matter, GM never committed itself to do what the dealers wished. GM's constant brush-off of its dealers' complaints contrasts sharply with the situation in _Ford Motor Co. v. Webster Auto Sales, 361 F.2d 874, 877 (1st Cir. 1966), [*239]_ where, in response to a dealer's complaints, Ford sent letters to its dealers requesting them not to bid on "company cars" for the purpose of wholesaling them. Another contrast may be found in _Bowen v. New York News Inc., 522 F.2d 1242 (2d Cir. 1975)_, cert. denied, 425 U.S. 936 (1976), where, in response to franchise dealer complaints the newspaper publisher harassed and terminated supply of its papers to franchisees who sold those papers to independent dealers in competition with the franchised dealers; and in _U.S. v. General Motors Corp., 384 U.S. 127 (1966)_, where within two months of receiving complaints about dealers who had business dealings with discounters, GM elicited from each such dealer a promise to discontinue the practice, and set up a system to police compliance with the agreements.

Complaint counsel argue hotly, and with some logic, that since what the dealers requested of GM was inaction, compliance with dealer "requests" cannot possibly be shown by any affirmative response -- all GM had to do to acquiesce was follow the course it had been following already and keep its crash parts distribution system closed **[*240]** to all but franchised dealers. However, this argument infers too much. Even in cases where direct action is taken by the supplier, and such action is precisely what is requested by complaining distributors, the inference of concerted action, "a conscious commitment to a common scheme," is not made automatically. _Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105 (3rd Cir. 1980)_, cert. denied, 451 U.S. 911 (1981). In Sweeney, the defendant gasoline supplier could show that it had its own reasons for terminating a dealer, and did not object to his pricecutting practices which had caused competing Texaco retailers to complain. Consequently, there was no concerted action, even though the result was the same as if the threat had been heeded.

1982 FTC LEXIS 39, *240

When no change to a pattern of business conduct is the gravamen of the complaint, it is particularly difficult to overcome the inference that the manufacturer's choice not to move is based on those same unilateral business reasons which led it to adopt the system in the first place. [40] Thus, in *Aviation Specialties Inc. v. United Technologies Corp., 568 F.2d 1186 (5th Cir. 1978) [*241]* a would-be distributor of repair parts for the Pratt-Witney P-T6 airplane turbine engine challenged Pratt-Witney's refusal to deal with him as a violation of Section 1 of the Sherman Act. In affirming summary judgment for the defendants, in part because plaintiff failed to prove a conspiracy between Pratt-Witney and its distributors, the court stressed:

ASI bears a particularly heavy burden because Pratt-Witney set up its distribution system in 1964, long before ASI began operations, and the structure of the system has not changed perceptibly since its inception. *568 F.2d at 1192*.

In Aviation Specialities, the plaintiff had absolutely no evidence of dealer pressure on the supplier to keep the distribution system closed, whereas in this case we have a history of dealer efforts to influence the supplier. Nonetheless, **[*242]** the burden of showing collusive conduct is still particularly heavy when the challenged action is a decision to maintain a long-established distribution system.

(d) Conclusion

Here, by looking at the total course of conduct rather than merely the final moment, we are persuaded that GM acted in its own self-interest, rather than at dealer behest. The Tighe notes and similarity of the February proposals raise a question of conspiracy. But against these must be set the entire pattern of conduct between GM and NADA during 1975 through March 1976. That pattern reveals that GM, like any manufacturer, preferred to have its dealers' good will. Accordingly, when it cost GM nothing to placate the dealers it did so: giving general expressions of sympathy during various 1975 meetings and changing the First Proposal after the FTC showed no sign of accepting it. On the other hand, GM was quite ready to ignore the dealers when there was advantage in doing so. Hence, the First and Third Proposals offered without consulting the dealers; the constant refusal, during those 1975 meetings, by GM to commit itself to any hard and fast position. Moreover, NADA, in our opinion, read the pattern **[*243]** the same way. Throughout 1975 dealers were in uncertainty and despair over GM's intentions towards them. They did not threaten GM with economic reprisals. Instead they argued and pled and tried to enlist allies in Congress and the FTC. These are not the actions of successful boycotters.

B. ABUSE OF MONOPOLY POWER THROUGH LEVERAGING

Complaint counsel advance several theories under which GM's distribution system is an abuse of monopoly power. Two of these theories, "leveraging" monopoly power and "extension" of monopoly power, are virtually identical and not applicable to this case due to the same fact which caused the horizontal boycott theory to founder: GM's minuscule presence in the dealership level of the crash parts distribution chain.

The courts have long held that it is an abuse of monopoly power for a monopolist to use its monopoly power in one market to extend or leverage that power into another market. *Otter Tail Power Co. v. United States, 410 U.S. 366 (1973)*; *United States v. Griffith, 334 U.S. 100 (1948)*; *Berkey Photo Inc. v. Eastman Kodak Co., 603 F.2d 263 (2d Cir. 1979)*, cert. denied, *444 U.S. 1093 (1980)*; **[*244]** *Sargent Welch Scientific Co. v. Ventron Corp., 567 F.2d 701 (7th Cir. 1977)*, cert. denied, *439 U.S. 822 (1978) United States v. Aluminum Co. of America, 148 F.2d 416 (2d Cir. 1945) United States v. Klearflax Linen Looms, Inc., 63 F. Supp. 32 (D. Minn. 1945)*. However, the majority of these cases arose from situations which supported a finding of attempt to monopolize as well as abuse of monopoly power by leveraging activities. They therefore have limited guidance to analysis of the facts in this case, where attempt to monopolize was never an element of the case and cannot be proven. Two closely intertwined requisites

---

[40] A manufacturer's good faith choice of a distribution system may still be an arbitrary one. A later section of this opinion discusses the objective reasonableness of GM's commitment to a selective distribution system for crash parts; at this time, however, we are concerned only with divining whether that decision was unilateral or not.

1982 FTC LEXIS 39, *244

for an attempt offense are totally lacking: (1) specific intent to control prices or destroy competition, *United States v. Aluminum Co. of America, 148 F.2d 416 (2d Cir. 1945)*, and (2) dangerous probability of success, *United States v. Swift & Co., 196 U.S. 375 (1905)*. To illustrate this we need do no more than refer to facts already summarized concerning GM's historical presence at the dealership level through its MHD financial arrangements.

As noted, General **[*245]** Motors' only presence at the retail and installation level of crash parts distribution is its financial interest in the MHD dealerships. Even assuming this financial interest amounted to functional control, a market presence which has not risen above 3% in 13 years does not remotely suggest that GM is moving progressively closer to monopoly power at the dealership level. [41]

**[*246]**

On the question of intent, again we note that the record is devoid of evidence that General Motors' crash parts distribution policies are established or maintained in order to benefit the MHD dealerships. [42] Nor is the mere choice of a selective distribution system, even by a manufacturer who is also a distributor, in itself the sort of invidious conduct which supports an inference of intent to prevail over competitors by improper means. [43]

**[*247]**

Nevertheless we must still determine if General Motors' conduct fits within that line of cases which holds that leveraging monopoly power can violate the antitrust laws even when it does not amount to an attempt to monopolize. Complaint counsel rely heavily upon *Berkey Photo Inc. v. Eastman Kodak Co., 603 F.2d 263 (2d Cir. 1979)*, cert. denied, *444 U.S. 1093 (1980)* and *Sargent Welch Scientific Co. v. Ventron Corp., 567 F.2d 701 (7th Cir. 1977)*, cert. denied, *439 U.S. 822 (1978)*.

Both cases differ from this one in terms of mode, impact and especially purpose of the leverage. In the matter of mode the difference is least and the analogy strongest. While neither Berkey nor Sargent-Welch involved a refusal to deal, each did concern a mode of leverage which was not pernicious on its face, but instead could have been a reasonable business act. In Berkey, defendant Kodak introduced new products; in Sargent-Welch a manufacturer terminated a dealer, ostensibly because of the dealer's failure to represent the manufacturer adequately.

In neither Berkey or Sargent-Welch did the monopolist **[*248]** have as small a share of the leveraged market as GM does in the crash parts installation (dealer bodyshop) market. Moreover, in both cases the leverage affected a new segment of a market, such that the resultant distortion in favor of defendant might be expected to grow. By

---

[41] By contrast, in Otter Tail, the defendant wholesaler of electrical power had achieved a 91% share of the leveraged market for retail power. *410 U.S. at 370.* In Griffith the dangerous probability standard was not specifically discussed, as the case was remanded for proof of effects. However, the court noted that defendant film exhibitors had increased their share of singletheatre towns from 51% to 62% over a five year period. *334 U.S. at 102.* It was during this period that defendants exercised their pooled buying power to ensure that members of the circuit got exclusive rights to first run films, to the detriment of their competitors. *Id. at 104.* Finally, in Alcoa, the defendant used its monopoly power in aluminum ingot to impose a price squeeze on purchasers which competed with it in the manufacture of aluminum sheet; by this means Alcoa, already the largest maker of aluminum sheet, eliminated half the companies competing with it in that market. *148 F.2d at 436.*

[42] By contrast, in Klearflax the defendant rug manufacturer and distributor took several clearly predatory steps such as refusing to fill orders for a rival distributor, Floor Products, after learning that Floor Products had underbid it for a government contract, and asking its distributors not to undercut it by selling to Floor Products. Moreover, Klearflax's General Manager specifically announced "My plan is definitely to squeeze Floor Products out of this government business...." *63 F. Supp. at 36.*

[43] As we noted in *E.I. DuPont de Nemours & Co., 96 F.T.C. 653 (1980)*, the degree of market power which indicates a dangerous probability of success may vary with the nature of the challenged conduct. Id. at 725 n.16. Here however, GM's choice of a selective distribution system is so innocuous in nature that the question of applying the sliding scale does not arise.

contrast, GM's share of the bodyshop market has remained static for a long time.  Thus impact on competition was potentially [44] more severe in Berkey and Sargent-Welch than here.

This fact is closely allied to the purpose element of these cases.  Although the specific attempt to monopolize standard has been diluted to a general intent to gain a competitive advantage in the downstream market, even this lesser intent cannot be found in General Motors' choice of a distribution system. It would be an example of the tail wagging the dog to infer that GM chose to distribute crash parts selectively in order to protect its MHD dealerships' bodyshops from the competition of the IBS.

## C.  ABUSE OF [*249]  MONOPOLY POWER THROUGH REFUSAL TO DEAL

### 1.  Legal Analysis

Complaint counsel are on firm ground at last when they turn to the line of cases which concern abuse of monopoly power over a scarce resource which other firms are under a commercial compulsion to use.  *Otter Tail Power Co. v. United States, 410 U.S. 366 (1973)*; *Silver v. New York Stock Exchange, 373 U.S. 341 (1963)*; *Associated Press v. United States, 326 U.S. 1 (1945)*; *United States v. Terminal R.R. Assn., 224 U.S. 383 (1912)*; *Fulton v. Hecht, 580 F.2d 1243 (5th Cir. 1978)*; *Hecht v. Pro-Football, Inc., 570 F.2d 982 (D.C. Cir. 1977)*, cert. denied, *436 U.S. 956 (1978)*; *Gamco Inc. v. Providence Fruit & Product Bldg., 194 F.2d 484 (1st Cir. 1952)*, cert. denied, *334 U.S. 817 (1952)*; *Lake Carriers Assn. v. United States, 399 F. Supp. 386 (N.D. Ohio 1975)*. *Grand Caillou Packing Co., 65 F.T.C. 799*, aff'd sub nom. *La Peyre v. FTC, 366 F.2d 117 (5th Cir. 1966)*. [45] In each of these cases monopolistic control [*250]  over a unique or essential product or facility caused significant competitive harm when coupled with a refusal to deal with a portion of that class of persons who were under a commercial compulsion to use the product.  In other words, the monopolist's refusal to deal was judged illegal because it created a "haves" vs. "have nots" situation in the downstream market.

In some of the cases the monopolist itself, in its secondary distribution function, was in the downstream [*251] "haves" group, and so benefited from the selective refusal to deal.  Thus, some of these cases appear to fit under the rebric of "leverage" where, as we have seen, an abuse of monopoly power is found when the facts show that the monopolist intended to bolster its downstream market position by use of its upstream monopoly power.However, the rationale of these "essential product cases" goes beyond that of the leverage cases.  In essential product cases the abuse of monopoly power lies in the failure to make a scarce resource available to all potential users on nondiscriminatory terms, not merely in any incidental benefit to the monopolist's position in the secondary or downstream market.  The courts' focus in such cases has been on the unlawful harm to competition, not the gain to the monopolist. Similarly, the fact that in some of the cases the competitive injury was caused by a joint refusal to deal does not weaken their precedential value to this case.  It has long been established that "the existence of a combination" is not an "indispensible ingredient" of an unfair method of competition under Section 5 of the *FTC Act.  FTC v. Cement Institute, 333 U.S. 683 (1948). [*252]* The Commission, proceeding under Section 5, may properly draw upon the policies expressed in the sherman Act's prohibition of joint refusals to deal.  Those policies mirror the concerns of the scarce resources cases: monopolistic power should not be used to discriminate among competitors in an adjacent market, if that discrimination is arbitrary and causes substantial competitive

---

[44] It was never actually measured in either Berkey or Sargent-Welch -- both cases were remanded for further findings on exactly this issue and settled out of court before findings could be taken.

[45] Also part of this line of cases is the Commission's decision in *The Reuben H. Donnelley Corp., 95 F.T.C. 1*, rev'd sub nom. *Federal Trade Commission v. Official Airline Guides, Inc., 630 F.2d 920 (2d Cir. 1980)*, cert. denied, **101 S. Ct. 1362 (1981)**. The Commission's position is that the Second Circuit's reversal of Donnelley was erroneous.  Nevertheless, we do not rely upon the Donnelley decision in this case; but until and unless it is repudiated by the Supreme Court we hold to our interpretation of the case law on arbitrary refusals to deal by monopolists, which has been espoused by the *Fifth Circuit in La Peyre, supra.*

injury. Again, the emphasis is primarily upon the competitive dislocations caused by the discrimination, and only secondarily upon the benefits accruing to the discriminating party or parties.

The earliest of these cases makes this abundantly clear. *Terminal R.R., supra*, concerned a group of railroad companies that controlled all rail access to St. Louis by virtue of owning all the bridges into that city. There was no showing that the monopolist association had used this power in any way against rival railroads. The Supreme Court fashioned the bottleneck theory out of concern for potential abuse of monopoly power by a future denial of access to the essential facility. The Court's concern was not that the Association would contribute to its member railroad companies' power, but **[*253]** rather that non-member railroad companies would suffer from lack of access to the facility.

We fail to find in either of the contracts referred to any provision abrogating the requirement of unanimous consent to the admission of other companies to the ownership of the Terminal Company, though counsel say that no such company will now find itself excluded from joint use or ownership upon application. That other companies are permitted to use the facilities of the Terminal Company upon paying the same charges paid by the proprietary companies seems to be conceded. But there is no provision by which any such privilege is accorded.

It cannot be controverted that, in ordinary circumstances, a number of independent companies might combine for the purpose of controlling or acquiring terminals for their common but exclusive use. In such cases other companies might be admitted upon terms or excluded altogether. If such terms were too onerous, there would ordinarily remain the right and power to construct their own terminals. But the situation at St. Louis is most extraordinary, and we based our conclusion in this case, in a large measure, upon that fact. The "physical or topographical **[*254]** condition peculiar to the locality," which is advanced as a prime justification for a unified system of terminals, constitutes a most <u>obvious</u> reason why such a unified system is an obstacle, a hinderance and a restriction upon interstate commerce, unless it is the impartial agent of all who, owing to conditions, are under such compulsion, as here exists, to use its facilities. *224 U.S. at 400, 405*.

It requires a close reading of *Gamco, supra*, to discover that the corporate owners of defendant Providence Building were actually wholesaler competitors of the plaintiff. The Court's emphasis is not on the joint activity, but rather on the essential nature of the facility and the substantial harm suffered by Gamco in being denied access to it.

But it is only at the Building itself that the purchasers to whom a competing wholesaler must sell and the rail facilities which constitute the most economical method of bulk transportation are brought together. To impose upon plaintiff the additional expenses of developing another site, attracting buyers, and transshipping his fruit and produce by truck is clearly to extract a monopolist's advantage. *194 F.2d at 487.* **[*255]**

In the <u>LaPeyre</u> case, the LaPeyre family enjoyed a lawful monopoly in certain machinery used in shrimp canning; this machinery was so efficient that its use became essential to compete in the shrimp canning business. The Commission challenged the family's practice of leasing its machines at twice the rental rate in the Pacific Northwest as in the Gulf Coast, and found that the discriminatory excess rental charge was the cause of many West Coast wholesalers and packers operating at a loss, sometimes to the point of being driven out of business. *Grand Caillou Packing Co., 65 F.T.C. at 841-845*. The appellate court emphasized that this practice did not involve "Robinson-Patmantype discrimination," but concerned a much broader, more farreaching issue: "the duty of a lawful monopolist to conduct its business in such a way as to avoid inflicting competitive injury on a class of customers." *366 F.2d at 120*. The court clearly held that the leasing practice of a single company constituted an unfair method of competition because it involved "the utilization of monopoly power in one market resulting in discrimination and the curtailment of competition in **[*256]** another." *Id. at 121*. Respondents in the case before us mentioned that the LaPeyre family had shrimp canning operations on the Gulf Coast; thus their motive for leasing machinery at discriminatory rates could have been to cripple growing competition from the West Coast. However, the decision of the Fifth Circuit rests on broader grounds, as the above quotation demonstrates. Moreover, the Fifth Circuit subsequently explained its own decision in <u>LaPeyre</u> as holding that the exercise of monopoly power to injure competition in an adjacent market itself violates Section 5. *Fulton v. Hecht, 580 F.2d at 1249 n.2*.

1982 FTC LEXIS 39, *256

The concern in these cases that competition will be harmed by the refusal to deal with a class of competitors is very strong. Accordingly, the product or service need not be utterly indispensible, *Hecht, 580 F.2d at 992*, or completely incapable of substitution, *Gamco, 194 F.2d at 992*; and a Sherman Act violation has been found even where customers are not totally excluded from the market, but merely placed at a competitive disadvantage. *Associated Press, 326 U.S. at 13*. Where an essential **[*257]** product or facility is involved, courts may even require procedural and substantive guarantees of fairness to justify exclusion or discriminatory treatment of customers. *Silver, 373 U.S. at 361*; *Gamco, 194 F.2d at 487*.

The foregoing discussion of the significance of harm to competition in the line of precedent does not mean that a monopolist has an absolute duty to deal whenever some such harm is shown. On the contrary the demonstration of substantial injury to competition is merely the trigger which sets off a rule of reason analysis of the monopolist's reasons for refusing to do business with all. Because of the nature of this inquiry the duty to deal arises rarely, and only after an exacting balance of the equities. A supplier's general right to choose its customers, enunciated in *United States v. Colgate & Co., 250 U.S. 300 (1919)*, [46] will not be questioned unless and until the harm shown is substantial, and affects existing competition. When that degree of harm is established, the monopolist must show that its decisions which cause the harm to competition were made for substantial business reasons, not arbitrarily. And **[*258]** even if the decisions were made arbitrarily, the Commission will not impose a duty to deal if the order would require the Commission or enforcing courts to assume a continuing role in supervising business discretion.

**[*259]**

2. Monopoly Power

Whether GM is a monopolist is the threshold question under this theory. To answer it we must determine the relevant product market. [47] Because there are no close substitutes for new GM crash parts, and therefore GM has nearly unfettered pricing discretion, the ALJ found the market to be new GM crash parts for GM automobiles and light trucks. (IDF 338-392) We agree with this finding. In this market GM has a 100% share, since it is the sole producer of all new GM crash parts. (IDF 68) Respondent contends that the ALJ wrongly excluded salvage (used) parts as reasonably interchangeable substitutes for crash parts. [48] Our review of the record convinces us that the ALJ was correct in his analysis of the interplay between the two products: while there is limited interchangeability, it does not amount to any degree of effective competition. Salvage parts are very imperfect substitutes for new crash

_____

[46] The seller's freedom to trade enunciated in Colgate does have limits. It is only a general right, "neither absolute nor exempt from regulation." *Lorain Journal Co. v. U.S., 342 U.S. 143, 155 (1951)*. The circumstances under which a company's refusal to deal is not protected by this general right have been and still are being exhaustively explored on a case-by-case basis since Colgate.

In the monopoly context it is well to remember that Colgate in no way repudiated the essential facility doctrine enunciated in Terminal Railroad, decided seven years earlier. The market affected by Colgate's alleged practices was the manufacture of soap and toilet articles, a market totally different from that in Terminal Railroad. The railroad terminal was an essential facility; by contrast alternatives to Colgate's products were readily available. The importance of this distinction was later emphasized in *United States v. Arnold, Schwinn & Co., 388 U.S. 365 (1967)*. There, the Supreme Court restricted a manufacturer's right to confine his sales to selected dealers to situations where "competitive products are readily available to others" or where "other and equivalent brands... are readily available in the market." *Id. at 376*. See also *Elder-Beerman Stores Corp. v. Federated Department Stores, Inc., 459 F.2d 138 (6th Cir. 1972)*. Where an essential product is involved, therefore, the Colgate doctrine provides the monopolist no protection.

[47] It is clear that the relevant geographic market is the United States as a whole. (IDF 330-336)

[48] Respondent also seems to argue that the proper market is new automobiles. (RAAB 28) It does not explain in any detail why the (crash) part is inextricable from the whole for purpose of product market definition. Certainly the price of crash parts has little, if any, effect on competition in the sale of new automobiles. Nor are GM crash parts interchangeable with crash parts for other manufacturers' cars. In this regard we note that in *FLM Collision Parts, supra*, both the District Court and Second Circuit accepted that Ford had a monopoly on crash parts manufactured exclusively by Ford for Ford cars. *543 F.2d at 1030*; *406 F.Supp at 227-28, 246*.

parts. Availability is extremely limited in the early years of any type of crash part. Moreover, salvage parts cannot be used as easily as new crash parts: the used parts generally have to be repaired and are often not as good a "fit" to the car. Prices of the **[*260]** two types of parts appear to be highly independent. The fact that limited substitution is observed does not disaffirm the existence of monopoly power. At monopoly or exclusionary prices, we would expect to see some substitution, if at all possible. We therefore endorse the ALJ's classification of General Motors crash parts as a separate market on the basis of five of the Brown Shoe criteria: (1) specialized vendors; (2) peculiar characteristics and uses; (3) industry and public recognition; (4) distinct prices; and (5) lack of mutual price sensitivity. We incorporate by reference here IDFs 219-242 and 306-329. See also *United States v. Aluminum Company of America, 148 F.2d 416, 425 (2d Cir. 1945)*; *Avnet Inc. v. Federal Trade Commission, 511 F.2d 70 (7th Cir. 1975)*; *United States v. CBS, Inc., 459 F. Supp. 832, 838-39 (C.D. Cal. 1978)*.

**[*261]**

3. Harm

(a) Locus of Competition in Crash Parts

The question of whether a monopolist has arbitrarily refused to deal cannot be answered without first determining the nature and extent of harm caused by that refusal to deal. The more grave the effects on competition, the more substantial must be the monopolist's justification for its actions.

Thus, our second step in constructing the balance is to find the locus of competition in crash parts. To do so requires a clear understanding of the functions performed with regard to crash parts by the only entities currently involved as conduits in the intermediate (post-manufacturer, pre-retail) stage of crash parts distribution: GM and its franchise dealers. Below the manufacturing level GM has only one function, that of warehousing or primary wholesaler (through GMPD). The dealers are in a more complex situation. While most dealers install crash parts in their own bodyshops, only some dealers both wholesale at a secondary level and install a dealership's crash parts. Keeping a firm conceptual distinction between the wholesaling and installing functions is essential. For the remainder of the opinion we will refer to dealer-installers **[*262]** and dealer-wholesalers in order to help clarify this vital functional distinction. [49]

All relevant business transactions with the IBS are performed by dealers in their role as dealer-wholesalers.[50] It is in this capacity, as suppliers of crash parts to the IBS, that dealers receive wholesale compensation from GM.

The second function a dealer may perform is to operate a dealer body shop where crash parts are installed. It is in this bodyshop operation which, as an installer and retailer of crash parts, a dealer competes with the IBS in collision repair work. Dealers do not receive wholesale compensation for crash parts which are used in their own body shops.

It is helpful to keep in mind that every individual crash part must be handled by a dealer before it is installed by either a dealer-installer **[*263]** or by an IBS in a consumer's vehicle. However, crash parts which are installed by an IBS are only handled by dealers in their capacity as dealer-wholesalers. That is, any individual part purchased by an IBS from a dealer-wholesaler is never handled by a dealer in its capacity as dealer-installer. While this distinction may seem obvious and somewhat trivial, failure to make it resulted in the ALJ's erroneous determination that the wholesale compensation plan, rather than the selective crash parts distribution system, is what gives

---

[49] We reserve the word "dealership" for occasions when distinction between distribution functions is unnecessary.

[50] As described at IDF 76, dealer-wholesalers may also supply crash parts to customers other than IBS, and such transactions may or may not qualify for wholesale compensation under the WCP. These transactions have no bearing upon the present discussion.

dealer-installers a competitive edge over the IBS. This framework also makes it clear that wholesale compensation should not be subtracted from GM's warehouse price in computing the cost to a dealer of crash parts which will be installed in his body shop, as opposed to used by IBS. [51] The WCP rebate is simply irrelevant to a comparison of the prices which IBS and dealer-installers pay on crash parts to be used in their respective body shops.

On the point of competitive injury, complaint counsel argue that two functionally distinct groups of **[*264]** businesses are affected: the independent body shops (IBS) and the independent wholesalers (IWs). We agree that both are adversely affected (though to different degrees) by GM's refusal to deal, but only in the case of the IBS does the lost opportunity to buy crash parts directly from GM also translate into harm to competition.

1. Independent Wholesalers

IWs play a large role in the automotive aftermarket. (See generally, Nelson Tr. 13719-20, 13758-13761; IDF 49, 129-140) They may be either warehouse distributors (redistributing wholesalers) or "jobbers", who sell directly to repair outlets. For the purposes of this analysis it is not necessary to distinguish between jobbers and warehouse distributors. [52] The key factor is that neither currently handles crash parts. General Motors is the only entity currently engaged in primary wholesaling or warehousing of crash parts.

If GM sold crash parts to IWs they would replace **[*265]** or rival GM's thirty-six GMPD warehouses and seven parts plants. They are, to borrow a term from merger law, potential entrants [53] into the business of crash parts wholesaling. There is no actual competition at this distribution level: GM by forward integration has pushed its monopoly over the production of crash parts into the first level of crash parts distribution.

Forward vertical integration by a manufacturer can be implemented for legitimate competitive reasons, such as distribution efficiencies and profit maximizing based on lower prices and higher output. Accordingly, it is condemned under the antitrust laws only when it has the collateral purpose or effect of achieving some anticompetitive advantage for the integrating company. For example, a manufacturer may not integrate forward if that action amounts to an attempt to monopolize the downstream distribution level. E.g., _Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359 (1927)_; and commentators have suggested that forward **[*266]** vertical integration should not be allowed when it is a device for maintaining monopoly at the manufacturing level by raising entry barriers to would-be manufacturing competitors who could not independently distribute their goods efficiently. See Areeda and Turner, III Antitrust Law P726d3, P726d5 (1980). However, as we have already acquitted GM of any anticompetitive purpose in its choice of a distribution system, the examples above are not relevant to our analysis.

We do not think the duty to deal requires a monopolist to set up rivals to itself; the duty merely requires the monopolist not to discriminate arbitrarily between existing classes of competitors. Similarly, the duty to deal does not require a monopolist to create competition in a subjacent market where none exists. Thus, the IWs' position as mere potential competitors of dealer-wholesalers does not entitle them to the advantages of a place in GM's distribution system. Even a monopolist has a general right unilaterally to decide with whom it will deal in the first instance, absent any improper purpose. _United States v. Colgate & Co., 250 U.S. 465 (1919)_. Certainly if failure to

---

[51] Those portions of IDFs 119-128, 401, 405 which state or imply otherwise are specifically rejected.

[52] More precise definitions are given at Abston Tr. 12489-90; Nelson Tr. 13719-20; see also Davisson, The Marketing of Automotive Parts, Michigan Business Studies, Vol 12. No. 1 at 956-958 (Ann Arbor: University of Michigan Press, 1954).

[53] We do not need to resolve the conflict in the record over whether IWs have the desire as well as the capability to enter into crash parts wholesaling.

1982 FTC LEXIS 39, *266

expand [*267] a distribution network of a fixed number of primary distributors were illegal, every selective distribution system would be in jeopardy. *Aviation Specialities, Inc. v. United Technologies Corp., 568 F.2d 1186, 1192 n.10 (5th Cir. 1978)*. We do not think that the duty to deal sweeps this broadly. Only when the monopolist's refusal to deal creates disequalities among existing competitors will be monopolist have to justify its choice of a selective distribution system.

2. Independent Body Shops

IBS are actual, not potential competitors of dealer body shops in the retail and installation of crash parts. Accordingly, we develop the harm side of the equation by analyzing the extent to which GM's refusal to deal retards the IBS' competitive strength.

(b) The IBS' Competitive Position

1. What the IBS Pay

The record is uncompromising on the fact that the IBS pay significantly more for crash parts than GM dealer-installers. General Motors sells all crash parts -- whether or not eligible for wholesale compensation -- to its dealers for list less at least [54] 40%. (IDF 119, 248) In contrast to this dealer-installer cost [55] every one of 26 IBS witnesses [56] [*268] from seven trade areas testified that his invoice cost on crash parts during the last six-to-seven years averaged between 22% and 31% off list price. (Neibling Tr. 2533, 2534, 2538; Craft Tr. 2910; Perschall Tr. 3086; Clouatre Tr. 3635; Trepagnier Tr. 3845; Lakatos Tr. 4008-4009; Clark Tr. 4218; Swerwacki Tr. 4811, 4840; Whitman Tr. 4991, 4992; Barney Tr. 5231; Baker Tr. 6183, 6184; Hershey Tr. 6569; Weatherford Tr. 6712, 6715, 6716; Newman Tr. 5713, 5714; Crigger Tr. 5785; Brokaw Tr. 5977; Smith Tr. 7353, 7354; Rouse Tr. 6929, 6930; Albertin Tr. 8241; Finkle Tr. 9324) Seven GM dealers and parts managers testified that their selling price (wholesale price) to IBS was generally within the range of 22%-31% off list. (Schaeffer Tr. 10665; Sutliff Tr. 11019-020; Tribo Tr. 10847-848; Bogard Tr. 10489-490; Mehaffey, Tr. 11222; Boyd Tr. 11853-854; Denton Tr. 12011-012) This testimony is confirmed by a stipulated summary of some 5,000 invoices [57] issued by 82 GM dealers to the IBS witnesses. The summary, reproduced below, shows average crash parts discounts for the seven trade areas over three years:

[*269]

## AVERAGE DISCOUNT

### (% off list price)

| TRADE AREA | 1974 | 1975 | 1976 |
|---|---|---|---|

----

[54] Approximately 50% of dealers' orders are routine stock orders (PAD orders) and so are eligible for an additional 5% discount. This brings the price down to 43% off list. (IDF 120, 122, 190(1), 195, 248)

[55] In this opinion we follow standard accounting terminology whereby "cost" means the amount a buyer pays for a product, and "price" means the amount for which a seller sells a product. Although GM dealers commonly refer to their list-less-40% cost of crash parts as "dealer price", we will avoid using that description, in the (perhaps vain) hope of avoiding confusion.

[56] Twenty-four witnesses actually testified; the testimony of two additional witnesses was stipulated as being cumulative. (Tr. 15445-46)

[57] The invoices appear in the record as CX 2 through CX 5373. The record also contains two sets of documents which organize the data from CX 2 through CX 5373 as follows: (1) summaries of each IBS' dealings with each GM dealer, showing the specific crash part purchased, its list price and dealer wholesale price, and the discount the IBS received, expressed as a percentage off list price (Revised CX 5374 through Revised CX 5699); (2) summaries of total yearly crash parts purchases by each IBS, showing the volume of crash parts purchases in terms of GM's list price and at the dealer's wholesale price, and calculating an average discount, expressed as a percentage off list price. (CX 5700 - CX 5701, Second Revision; CX 5702 - CX 5705, Revised)

1982 FTC LEXIS 39, *269

### AVERAGE DISCOUNT

**(% off list price)**

| TRADE AREA | 1974 | 1975 | 1976 |
|---|---|---|---|
| Buffalo, N.Y. | | 28 | 29 |
| Mansfield, Ohio | | 26 | 27 |
| Cleveland, Ohio | 26 | 28 | 28 |
| New Orleans, La. | 27 | 30 | 29 |
| St. Louis, Mo. | | 27 | 28 |
| Spokane, Wash. | 26 | 25 | 25 |
| Tucson, Ariz. | 28 | 31 | 26 |

(CX 5706, Second Revision; IDF 118)

Respondent argues that this summary of average discounts does not accurately reflect the real world of crash parts discounts. GM urges us instead to look at the summary it has compiled of a few instances where some of the IBS witnesses were able to get slightly higher discounts on individual crash parts or certain lines of creash parts. (RABr. 9-10) GM lists thirty-two instances where an IBS testified to receiving a discount equal to or in excess of the discounts shown on CX 5706, Second Revision. What respondent does not reveal, however, is that these instances of "excess" discounts were all taken from the very invoices which are the basis for the averages shown in CX 5706, Second Revision. The "excesses" are part of the average, just as are the many instances in these invoices of a sale for far less than 27% off list. [58] Thus respondent has in no way impugned **[*270]** the methodology of complaint counsel's calculations on the average crash parts discounts received by IBS.

**[*271]**

Respondent next argues that the testimony and documentary evidence reflected in CX 5706, Second Revision, even if internally consistent, should not be extrapolated to represent public injury, but should be used to show only the private woes of the twenty-six IBS witnesses. (RAAB 11) We do not agree that complaint counsel's sampling technique inherently gives an unreliable picture of the IBS situation nationwide.

First, as a matter of proof, it would be an intolerable burden to require complaint counsel to survey the universe of IBS. They are entitled to present examples of the situation obtaining with regard to crash parts discounts rather than having to paint the whole picture. We note that this procedure was followed in *Associated Press v. U.S., 326 U.S. 1 (1944)*, in which twenty-six cities were illustrative of a national situation. See also, *The Coca Cola Co., 91 FTC 517, 617-18 (1978)*. Respondent can then challenge the validity of these examples by showing them to be either inherently unreliable or else not representative. As noted above, respondent has failed to show internal

---

[58] For example, respondents got IBS witness Britvic to "admit" that he received an average discount of 32.1% on Chevrolet crash parts during 1975. For an on-the-stand mental calculation of thirteen invoices this is not too inaccurate. (CX 1485-89, 1491-93, 1495-98, 1503, 1505-07) In actuality, his average discount on Chevrolet crash parts during that time was 30.2%, but that is still undeniably higher than the overall Cleveland average discount of 28% for 1975, as shown in CX 5706, Second Revision.However, complaint counsel did not ignore the Britvic Chevrolet crash parts average when computing the Cleveland all-crash parts discount. (CX 5706, Second Revision) Britvic's discount on Chevrolet crash parts is scrupulously factored into his total crash parts average discount of 28.2%, which is also made up of his other average discounts of 25% on Buick, Oldsmobile and Cadillac line crash parts and 36% on Pontiac line crash parts. Averaged all-crash parts discounts for three other IBS were developed in the same way as Britvic's and all factored into the final Cleveland figure.

inconsistenties in the data for the seven trade [*272] areas; as for the matter of non-representativeness, GM states this to be the fact, but has not backed up this statement with any comparable evidence of its own. [59]


Moreover, there is some support in the record for a nationwide extrapolation of the IBS situation from complaint counsel's seven trade areas. Most important, of course, is the already-noted testimony of seven GM dealers and parts managers as to their standard level of discount. These witnesses [*273] represent five locations beyond complaint counsel's chosen trade areas. [60] To a lesser, but not insignificant degree, support may be found in the testimony of representatives of three national automobile insurance companies and of three large regional wholesalers, who opined that the average discount received by IBS on GM crash parts ranged from 25-30%. (CPF 109) [61] While not direct proof of the terms of any dealer-IBS sales, this third party testimony is independently corroborative of the statistics previously compiled. Its reliability stems from the fact that both insurance companies and independent wholesalers made these observations for business purposes. In particular, the insurance companies in part adjust their businesses relations to IBS according to their perceptions of the IBS' materials costs. Insurance company service representatives constantly visit both IBS and dealer bodyshops. In the context of what discount the insurance company can get, the topic of the cost of crash parts often arises:

 [*274]

They have gripes, sir. They like to get things off their chests, the body shops especially.... Some things you have to take withl a grain of salt but we check into some things.Sometimes it goes as far as they want to demonstrate what they are doing and actually show you an invoice or something. (Rhoads Tr. 1203, 12100. See also Holschen Tr. 1669, 1672, 1684; Durbin Tr. 1355-58, 1407-09.)

The IWs' observations were made with an eye towards the profits available in crash parts distribution could they enter, and general performance comparisons between the IW and the dealer-wholesaler. (Frank Tr. 6400-01; Jordan Tr. 7793-97)

2. What Dealer-Installers Pay

---

[59] Without listing all the ways in which GM could show that complaint counsel's choice of trade areas was a gerrymandered one, we note that GM produced no IBS witnesses from trade areas of its own chosing to testify that they consistently paid 40% off list on an average of all lines of crash parts. Nor did GM produce invoices from which such a conclusion could be drawn. Instead, GM's rebuttal consisted of scattershot testimony, almost entirely from GM dealers or parts managers, referring to occasional pricing variations on one line of crash parts, or even one type of crash part. (RPF 141; CRF 141) This testimony is not of like nature to and cannot outweigh the carefully constructed case presented by complaint counsel.

[60] The additional locations represented by GM dealers and parts managers are: "Harrisburg, Pennsylvania, (Sutliff); Memphis, Tennessee, (Schaeffer, Tribo and Bogard); Akron, Ohio, (Mehoffey); Indianapolis, Indiana, (Boyd); and Phoenix, Arizona, (Denton).

[61]  The representatives of the national automobile insurance companies and regional wholesalers and their testimony appear in the record as: (1) R. Holschen, Claims Consultant, State Farm Mutual Insurance Company. Based on his experience in his assigned areas of Illinois, Wisconsin, Minnesota, Colorado, Utah, Wyoming, Alaska, Washington, Oregon, Idaho, and Montana, Holschen testified that discounts on the relevant parts to IBSs range from 12% to 30%, averaging about 25%. (Tr. 1667, 1689) (2) W. Rhoads, Home Office Property Claims Director, Allstate Insurance Company. Rhoads testified to an average discount of 25%-30%. (Tr. 1206) (3) R. Durbin, Manager of Material Damage, The Reliance Insurance Company. Dubin testified to an average of 30%. (Tr. 1347, 1354, 1407-1408) (4) H. Franck, Owner, Abrasive Supplies, Long Beach, California. Franck is an IW currently serving the states of Nevada and California who has previously sold in Washington and Oregon. The best discount he has observed is 25%. (Tr. 6396-97, 6400) (5) D. Fort, Owner, Fort's Exports, Charleston, South Carolina. Fort testified to an average discount of 25% in Southeast Florida, an area where he conducts business.(Tr. 9002-03) (6) J. Jordan, President, Keystone Uatomotive Plating, Pamona, California. Jordan testified to an average discount of 25% on GM bumpers nationwide, but with with three metropolital areas (Newark, Baltimore, Philadelphia) currently having somewhat greater discounts. (Tr. 7797-98)

1982 FTC LEXIS 39, *274

In contrast to the average IBS cost of list less 27% or 28%, GM dealers can purchase any crash part for a cost of list less 40%. (IDF 399) Parts purchased by stock order (PAD order) receive an additional 5% discount (IDF 119, 190(1), 248), bringing their cost down to 43% of list. A significant number of crash part are ordered "on the PAD" and so are subject to the greater discount. [62] Thus, on average there is a 17.7% cost differential between IBS and GM dealer-installers, to the IBS' disadvantage. (Nelson Tr. **[\*275]** 14536, 14561-62; IDF 398) This is more clearly seen with a part having a hypothetical $100 list price: the IBS' cost is $72 to $73 (28-27% off list) while the dealer-installer's cost is $57 to $60 (43-40% off list), depending on method of ordering.


Respondent argues that invoice cost is not a proper basis for comparison.GM would have us take into account the costs which dealers incur in performing a wholesaling function for their own body shops. Since there is no record evidence of the real economic costs of transferring a crash part from a dealership's "front office" to its bodyshop, GM would have us do as the majority of its dealers do and use its suggested transfer price of 25% of the dealer's cost. [63] Doing so raises a dealer's **[\*276]** total parts accounting cost to 25% off list, which shows to no advantage against the average IBS cost of 27-28% off list. Put in terms of our crash part with the hypothetical $100 list price we see:

| | |
|---|---|
| List | $100 |
| Dealer cost | $ 60 (40% off list) |
| Transfer cost | $ 15 (25% of dealer cost) |
| Total accounting cost | $ 75 (25% off list) |

All this amounts to, however, is a piece of accounting legerdemain, designed to lodge a portion of the profits from a crash parts sale in a dealership's parts and accessories profit center [64] rather than in its bodyshop profit center. The assigned markup figure could just as well be 10% or 40% of the dealer cost, since it is admittedly not an accurate picture of a dealer's transaction cost. (Vasquez Tr. 11421-11422; Nelson Tr. 14016; Benston Tr. 16173-78) Indeed, before GM started recommending the use of a 25% transfer cost in 1976, dealers used a transfer cost of the actual retail **[\*277]** sales price charged by their body shop, i.e., took all their profits at the "front office." [65]

---

[62] GM parts specialists hold that a well-run dealership will order 80% of its crash parts "on the PAD". (IDF 192) However, in actual practice dealerships, especially those near GMPD warehouses, tend to rely more on ad hoc orders, which qualify only for the basic discount of 40% off list. (IDF 192, 195). The ALJ endorsed complaint counsel's expert's estimate that approximately 50% of crash part orders are "on the PAD". (IDF 122)

[63] The manager of GM's Dealer Business Management Department testified that 60% to 65% of all GM dealers use GM's recommended transfer price of 25% of dealer price. Some use an equally artificial transfer price of 30% of dealer cost. (Vasquez Tr. 11424)

[64] The major functions of P&A Departments are wholesaling, sales of warranty parts, internal transfers to service departments, internal transfers to body shops and over-the-counter sales. (RX 40)

[65] Q Parts and accessories buys the part for $60. Sends it over to the mechanical shop. Mechanical shop installs it and charges the customer $100. Now, what would be the setup on the books of the parts and accessories department for the sale price and purchase price of that part?

A When did this happen?

Q Prior to January 1, 1976.

A The parts department would have a sale of $100 with a cost of sixty.

Q Fine.

A Nothing would happen in the body shop.

1982 FTC LEXIS 39, *277

**[*278]**

The artificiality of GM's suggested transfer cost is also apparent from the disparate patterns of new crash parts and salvage crash parts purchases by IBS as opposed to dealer-installers. Despite the higher total cost of new crash parts to the dealer-installer (once the transfer cost is counted), dealer-installers do not turn to the imperfect but cheaper substitute of salvage crash parts, as do their IBS competitors. Since GM does not require that dealer-installers use only new crash parts, [66] it is obvious that the transfer cost is merely an accounting fiction: it plays no role in a dealership's decision-making.

As a final point we note that some portion of the dealership's 25% transfer cost may represent real costs associated with administration of crash parts ordering. [67] Even so, for a valid comparison we would need to know an IBS' administrative costs. As these are not available, the invoices remain that most even-handed method of comparing what IBS and dealer-installers pay for **[*279]** crash parts. The conclusion is inescapable: IBS as a class pay much more.

3. Services

GM's selective distribution system for crash parts also puts the IBS under some non-price disadvantages in comparison to dealer-installers. The major one is speed of delivery. Dealer-installers have five methods of ordering crash parts from their assigned GMPD warehouse, four of which provide shipment of the part immediately or within 36 hours after the order is placed. (IDF 190, 191, 193) By contrast, IBS, even if located next door to a GMPD warehouse, must obtain the part from the appropriate franchise dealer. If the part is in stock at the dealer's, an IBS may be able to have it in a few hours; **[*280]** but the normal delivery time, even when the part is in the dealer's inventory, is 24 hours. (See, e.g., Daniels Tr. 2451-52; Niebling Tr. 2517-18; Clouatre Tr. 3773-75, Trepagnier Tr. 3841-42)

The wait is much longer, however, when the dealer must order the part, which happens frequently. When this happens, even in the GMPD warehouse cities of Buffalo, St. Louis, Cleveland and New Orleans, IBS commonly experienced delays of three days to a week in receiving parts ordered on their behalf by a dealer-wholesaler from the local warehouse. (Daniels Tr. 2277-78); Clark Tr. 4151-52; Britvic Tr. 7503; Trepagnier Tr. 3841-43) Moreover, the IBS does not receive the part directly from the GM warehouse, as does the GM dealer; the part going to the IBS must be routed through the dealer-wholesaler.

IBS may also be disadvantaged on ordering and supply convenience. A GM dealer generally goes to one source for all his crash part needs. If his assigned GMPD does not have the needed part in stock, it undertakes to find and arrange for delivery of the part through computer link-ups with all other GM warehouses and, if need be, GM itself. (IDF 176, 180) By contrast, since dealers tend **[*281]** to wholesale only the crash parts applicable to their franchise, [68] an IBS has to contact many different suppliers: the Buick dealer for Buick crash parts, the Cadillac

---

Q Then after January 1, 1976, how would it show up on the books of the two departments?

A You would have a sale in the parts and accessories department. If they were recording the sales in accordance with our recommendations of $75 with a cost of $60. And then you would have a sale of the part in the body shop for $100 with a cost of... $75. So you have $15 gross profit in one department and $25 in the other, a total of $40. (Vasquez Tr. 11498-11499)

[66] The Dealer Sales and Service Agreement (RX 2) contains no requirement that GM dealers install only new crash parts; nor do we find any testimony in the record of such a requirement.

[67] According to complaint counsel's expert, the only administrative costs associated with a dealer's ordering parts for his own body shop are the minor cost of looking up the part number and filling out the order form. This amounts to, at most, 2% of the dealer's sales price. (Nelson Tr. 14017-18, 14020, 14559) One parts manager for a GM dealership stated that filling out crash part orders is probably the easiest administrative task of a dealer's parts department. (Denton Tr. 12033-34)

dealer for Cadillac crash parts, etc. Not having a "one stop supplier" means increased delay and administrative expenses in ordering crash parts, as well as decreased ability to bargain for the best price or establish credit terms.

Q. I would like you to compare the advantages and/or disadvantages of being able to purchase products for all makes of car as opposed to having to go to various sources of supply for each make of vehicle.

A. I would think it would be an advantage, deliverywise. I would have less calling. I make anywhere from 20 to 50 calls a day calling various dealers in supplying myself, where I could limit that down to maybe 5 calls instead of 20 to 50. I think it would be a lever in getting better service if one man had all my business in your GM line. (Latakos **[*282]** Tr. 4034-35) (See also Perschall Tr. 3164-65; Frank Tr. 6413; Niebling Tr. 2594)

However, when it comes to delivery terms, IBS and dealer-installers seem to be on roughly equal ground. GM routinely prepays freight expenses on the majority of its dealers' orders. (IDF 190) There is no such nationwide uniformity of easy credit terms on delivery for IBS; on the other hand, it appears that many dealer-wholesalers provide free delivery, at least locally. (Rhoads Tr. 1200, Bogard Tr. 10477-78, Mack Tr. 11570-71, Denton Tr. 12003-04, Tribo Tr. 10827, Baker Tr. 6193-94, Daniels Tr. 2277, Barney Tr. 5240, Serwacki Tr. 4902) Some even absorb freight charges on wide-area deliveries, if the order is average-sized or larger. (IDF 117)

Return policies show a similar lack of major disadvantage to the IBS. A dealership's parts return privileges allow returns for any reason, up to certain financial limits. [69] The IBS have no such assurance, and the record does show that some dealer-wholesalers charge a fee for returns. (Wicker Tr. 5560; Hershey Tr. 6563; Weatherford Tr. 6789-90) On the other hand many other dealers provide liberal return privileges, some even without charge. (Smith **[*283]** Tr. 7419; Britvic Tr. 7506; Neal Tr. 7937-38; Finkle Tr. 9434) In sum, the record does not show that IBS consistently receive less accommodation on delivery terms than do their competitors, the dealer-installers.

Finally, we conclude that GM's selective distribution system for crash parts does not withhold from IBS any vital technological assistance. In the first place, no great amount of technological expertise is necessary for performing body repair work, as compared, for instance, to the repair of a vehicle's emissions control system. Secondly, GM dealers themselves receive almost no technical assistance from GM concerning crash parts installation. (Murray Tr. 10019, 10021, 10030)

(c) Effects

1. Insurance Work

The record does not show precisely **[*284]** how IBS businesses are affected by any nonprice disadvantages on crash parts delivery. There is of course testimony confirming the obvious fact that easy availability and comparable delivery costs are important to an IBS' ability to compete in crash parts installation. (See e.g., Perschall Tr. 3273; Serwacki Tr. 4875; Clark Tr. 4176; Smith Tr. 7474-75) The price discrepancy, however, is clearly key to the problems IBS face in getting insurance-paid business.

Approximately 90% to 95% of all crash repair business done by bodyshops, independent and dealer, is paid for by insurance companies. (IDF 200) In the interest of cost control, most major insurance companies have adopted a

---

[68] The Wholesale Compensation Plan is not, as might be suspected, responsible for this tendency. Even before 1968 dealers generally wholesaled only their line of crash parts. (RPF 34; Sutliff Tr. 11025-26; Perkins Tr. 9871-74)

[69] Dealers can return parts for credit and without charge up to an amount called the Maximum Return Reserve. The Maximum Return Reserve is earned by the dealer at the rate of eight percent of stock ("PAD") orders (and initial orders and "qualified special merchandising orders") and four percent of supplemental stock orders. Dealers are charged a penalty of 20% for returns in excess of the Maximum Return Reserve. (RPF 33)

system or recompense which allows the insured to go to the repair shop of his or her choice, but sets upper limits on the amount of the claim. If the cost of repair exceeds the insurance company's limits, the claimant must pay the excess. (IDF 201; Holschen Tr. 1690; Hershey Tr. 6666-67; Rouse Tr. 7026; Britvic Tr. 7547; Albertin Tr. 8286-87) Obviously then, car owners have great incentive to go to body shops which can meet the insurance company's appraisal for repair of crash-damaged vehicles. **[*285]** This incentive is reinforced by the fact that most insurance companies provide their claimants with lists of "preferred", "one-stop" or "competitive" bodyshops, meaning shops which have agreed in advance to accept the insurance company's estimate of repair cost. [70] (IDF 205) A very large portion (40%-80%) of insurance-paid work is performed by bodyshops to which the claimant is referred in this manner by the insurance company. (Weatherford Tr. 6862-63; Rhoads Tr. 1217; Hoschen Tr. 1690)

Getting on the "preferred" list, or at least being able to do repair work within the limits of an insurance company's estimate, can therefore be crucially important to a bodyshop's ability to stay in business. There are three elements of a repair appraisal **[*286]** which can be adjusted by a bodyshop to bring the overall final cost of the job within the estimate: time, labor rate and crash parts discount. The last is by far the most significant.

Insurance company appraisers use standard "crash manuals" to determine the time needed for each type of repair job. (Durbin Tr. 1449) Payment is made on estimated rather than actual work time. Thus, if a bodyship can consistently "beat the book", _i.e._ do the job in less time, it can use all or a portion of the amount recompensed for unnecessary hours to provide leeway for adjustments on the other two elements. (Whitman Tr. 5017) However, both the natural bounds of labor efficiences and the shop's desire to do quality work limit how much time can be shaved on any job. (Whitman Tr. 5016) Witnesses uniformly spoke in terms of lopping "an hour or two" per job. (See, e.g., Serwacki Tr. 4836; Whitman Tr. 5016-18; Hershey Tr. 6629-30) This does not translate into particularly high savings.For example, at a $15.00 per hour labor rate, [71] a heroic 25% reduction in time on an eight hour job [72] produces only a $30.00 saving.

**[*287]**

This brings us to the second means of meeting an estimate -- discounting the stated labor rate. Insurance companies use the "prevailing" or "going" labor rate for the area in writing estimates. (Tr. 1450-51) Theoretically, a bodyshop could offer a lesser rate to balance higher parts costs or longer than average time per job. Unfortunately, in many areas labor rates are simply not adjustable, being negotiated by unions and generally followed by even non-union shops, IBS and dealer-installers alike. (Durbin Tr. 1440; Clark Tr. 4185-86) [73] More importnatly, given their relative importance as components of the overall claim, it would take a massive adjustment in the labor rate to offset a minor discount on crash parts. Several IBS witness gave variations on this example: to replace a front end takes 8-10 hours of labor; reducing a typical $14.00 per hour labor rate by 10% results in a saving of $11.20 to $14.00 on a front-end job; but since the aggregate cost of the relevant crash parts (headlights, grille, bumper, fenders, hood radiator support) ranges from $1200 (Chevrolet) to $2200 (Cadillac), a reduction of 10% on parts produces a savings of $120-$220. (Serwacki Tr. 4836, **[*288]** 4841; Barney Tr. 5364-65; Whitman Tr. 5013)

---

[70] This is a "gentleman's agreement" rather than a formal contract; adjustments in the final figure can be negotiated. However, such negotiations generally take place after repairs have begun and are limited to items overlooked by the adjustors. It is not surprising, therefore, that one insurance company representative estiated that 75% to 80% of all estimates are accepted without change by "preferred" shops. (Rhoads Tr. 1221-22, 1322)

[71] This was a 1978 rate referenced by Buffalo witnesses. In the other trade areas labor rates for 1978-1979 ranged from $11.00 to $15.00. Tucson: $11 (Brokaw Tr. 6029), New Orleans: $12 (Trepagnier Tr. 3978-79), Spokane: $14 (Rouse Tr. 7026) Mansfield, Ohio: $14 (Hershey Tr. 6611-12), St. Louis: $15 (Daniels Tr. 2346).

[72] The time required for a full front-end replacement (Serwacki Tr. 4836). Many other jobs require less extensive repairs, and consequently offer less scope for savings through speed.

[73] We doubt that any body shop owner would dare deny the prevailing labor rate to his "heavy hit man". (Serwacki Tr. 4829)

This shows why the third means of meeting the estimate, discounting crash parts, is paramount. Insurance companies uniformly demand a sizeable discount on crash parts. Such is their buying power -- as the ALJ noted, insurance companies are the real consumers of almost all crash parts (IDF 200) -- that no body shop can get on a preferred list without acceding to the crash parts discount prevailing in his locality. (IDF 206)

In each of complaint counsel's seven trade areas we are presented with a picture of GM dealer-installers consistently giving at least a 10% discount on all crash aprts and frequently more, up to as much as 25% on certain parts. (IDF 208, 209) In contrast, the IBS often cannot give any discount, rarely manage more than 10%, and that only with difficulty. The following chart summarizes the testimony on comparative crash parts discounts in the seven trade areas:

|  | GM Dealer- | | |
| Area | Installer Discount | IBS Discount | Source |
| Buffalo, N.Y. 10-25% | 0-10% | IDF 209 | |
| Cleveland, Ohio | 10-25% | no more | CPF 138; |
|  |  | than 10% | IDF 208 |
| Mansfield, Ohio | ? | ? | CPF 139; |
|  |  |  | IDF 209 |
| New Orleans, La. | 10-20% | 0-10% | IDF 209 |
| St. Louis, Mo. | 10-25% | no more | CPF 138; |
|  |  | than 10% | IDF 208 |
| Spokane, Wash. | 10-20% | 0-10% | IDF 209 |
| Tucson, Ariz. | 10-25% | no more | CPF 138 |
|  |  | than 10% | IDF 208 |

 **[*289]**

The overall amount of insurance-paid business lost by reason of the IBS' failure to match dealer-installer crash parts discounts is not quantified, and being in the nature of an "if only" probably cannot be. [74] However, the record is replete with testimony that such business is so lost; the witnesses include insurance company representatives as well as IBS operators. (IDF 211-212) The following are typical:

 **[*290]**

Our margin of profit is determined by two things: labor and price discount. The price discount is what gives us our lifeblood, and when they take some of that away from you, they're taking some blood away.... If they gave me 10 percent, I would have still been in business today. I still want to fix cars. I love cars. It's everything I've ever done all my life. I couldn't fight it anymore. I can't work until 3:30 in the morning anymore. I don't want to be found dead at 2:00 in the morning alongisde one of my cars. (Serwacki Tr. 4869-70)

---

[74] We know that 36-54% of IBS revenues come from sale of all makes of crash parts. (CPF 122) We also know that in the crash part universe the ratio of GM crash parts to other types of crash parts corresponds to the ratio of GM cars on the road as compared with other makes: in 1976 that ratio was 45.5%. (CPF 123) Thus, if IBS could get all the GM crash parts they need, we would expect GM crash parts to account for 16.38%-24.57% of IBS revenues from parts sales. A lower percentage would indicate inability to get GM crash parts. However, we cannot make such calculations because the record nowhere breaks out the percentage of IBS revenues attributable to sale of new GM crash parts.

However, we should also note that a showing that IBS achieved 16.38%-24.57% revenues from sales of new GM crash parts would not necessarily prove lack of discrimination. The starting figure for these calculations (36-54% revenues from sales of all makes of crash parts) has a built-in bias, reflecting a world where no major car manufacturer will sell its crash parts directly to IBS.

I am talking about the one and two-man shops that work many hours a day, a lot of evenings and have the highschool kids or whatever coming in and helping them evenings and on Saturdays. A lot of those disappear and go away. (Daniels Tr. 2310)

The examples in the record are sufficient to support the proposition that the IBS are substantially harmed by the cost discrepancies which stem from GM's selective distribution system for crash parts.

2. Statistical Proof

To go beyond the examples cited above of the IBS' lost insurance work in search of statistical proof of harm to the IBS is to labor in a barren field. Whittier summed up **[*291]** the problem: "For all sad words of tongue or pen, the saddest are these: 'it might have been!'" More prosaically: it is impossible to gauge the amount of business lost due to a refusal to deal which has not been preceded by a course of dealing. There is no yardstick against which to measure the loss, no before and after, [75] no minuend from which to subtract.

**[*292]**

If this were a private cause of action for damages resulting from a refusal to deal, the inability to quantify harm could be fatal. [76] However, even in private cases where damages are too speculative to support recovery, courts have acknowledged that proof of the fact of injury is an entirely different matter from proof of the quantum of damage. See, e.g., *Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100 (1969)*; *Fleer Corp. v. Topps Chewing Gum, Inc., 501 F. Supp. 485 (E.D. Pa. 1980).* [77] Section 4 of the Clayton Act, which requires proof of private injury as a prerequisite to a damage recovery, is of course not imposed upon the government, which generally proceeds to enforce the antitrust laws by suits in equity, undertaken in the public interest. Thus in all the cases previously discussed which produced a duty to deal order, nowhere did the government have to measure the injury to competition with statistical precision. For example, in *Otter Tail Power Company Co. v. United States, 373 U.S. 341 (1963)*, the refusal to deal, on its face, supported equitable relief. The Court inferred that municipalities **[*293]** that could not obtain vital supplies for independent power systems were injured by the ensuing lack of competition in power retailing.

---

[75] The terms "yardstick" and "before and after" are borrowed from the jargon of computing lost profits in private damage actions. The yardstick theory relies on an analogous class of unharmed competitors whose sales during the damage period can be used to approximate what the plaintiff could have achieved. The before and after theory looks to the plaintiff's own sales history just before the supplier began to refuse to deal and extrapolates from that. Neither theory can be used here. The IBS have never been able to buy crash parts directly from GM; consequently, they can furnish no prior sales history. The dealer bodyshops are the IBS' only competitors, and while they are similarly situated enough to allow the crash parts invoice cost comparisons described earlier, their position as a part of a much larger business precludes meaningful comparisons to the IBS on profits, growth and failures.

[76] In the private action arena extensive debate exists over what degree of proof is necessary to measure the degree of harm caused by an antitrust violation. See, e.g., Harrison, The Lost Profits Measure of Damages in Price Enhancement Cases, 64 Minn. L. Rev. 751 (1980); L. Sullivan, Handbook of the Law of Antitrust § 251 at 785 (1977); Gibson, The "Market Share" Theory of Damages in Private Enforcement Cases, 18 Antitrust Bull. 743 (1973); Guilfoil, Damage Determination in Private Action Suits, 42 Notre Dame Law. 647 (1967). The underlying issue is, of course, how to achieve a balance between a strong judicial policy against speculative damages, and a disinclination to favor the wrongdoer whose wrong doing is the most effective and complete -- the latter premised upon the knowledge that the marketplace usually denies us sure knowledge of what the plaintiff's position would have been absent the defendant's antitrust violation.

[77] Of course, even in the private arena, when damages are either unavailable or not the most effective remedy, equitable relief is sometimes available. See Areeda, Antitrust Violations Without Damage Recoveries, 89 Harv. L. Rev. 1127, 1139 (1976). See also *Berkey Photo, Inc. v. Eastman Kodak Co., 603 F. 2d 263, 292-93 (2d Cir. 1979)*, cert. denied, **444 U.S. 1093 (1980)**, where plaintiff photofinisher sought only equitable relief for disadvantages stemming from Kodak's policy of selling only limited runs of color paper (a vital photofinishing supply) to its competitor-photofinisher. Kodak had a 60+% share of the color paper production market, but only 10% of the photofinishing market. The court quickly concluded: "given Kodak's monopoly power in color paper, this refusal to deal would, unless justified by a valid business reason, appear to violate § 2 and form the basis for equitable relief." *Id. at 292.* The case was remanded for further findings on this issue but settled without findings.

**[\*294]**

Otter Tail relied upon *United States v. Terminal R.R. Ass'n, 224 U.S. 383 (1912)*, which went even further: fear of potential injury to competition motivated the court's equitable decree. There was no showing that the Association had yet used its monopoly of approaches to St. Louis to impose discriminatory rates upon non-members; the court merely noted that the possibility was "inherent in the situation", "plain", "undeniable" and "obvious". *224 U.S. at 397, 400, 401, 405*.

In *Associated Press v. U.S., 326 U.S. 1 (1944)*, the By-Laws of the major U.S. news agency prohibited members from selling news to non-members and granted each member powers to block its non-member competitors from membership. The Court, without requiring any data on lost business, [78] held that the By-Laws obviously hindered and restrained the growth of competing news agencies and non-member newspapers:

**[\*295]**

It is apparent that the exclusive right to publish news in a given field, furnished by AP and all of its members, gives many newspapers a competitive advantage over their rivals. Conversely, a newspaper without AP service is more than likely to be at a competitive disadvantage. *326 U.S. at 17-18*.

In *Grand Calliou Packing Co., 65 F.T.C. 799 (1964)*, the fact that West Coast canners were injured by respondent's discriminatory leasing system was determined by the Commission on the basis of (1) calculating the cost differential between Gulf and West Coast canners and (2) accepting testimony of individual West Coast wholesalers and processors that they were losing money trying to match the Gulf Coast prices, but could have matched these prices had their lease terms been equal. *65 F.T.C. at 835-36*, 841-845. The opinion did not utilize statistical comparisons of the overall growth of West and Gulf Coast canners as a class. In affirming La Peyre, the Fifth Circuit was even more spartan in its determination of competitive injury, relying wholly upon the rental rate differential. *La Peyre v. F.T.C., 366 F.2d 117, 120 (5th Cir. 1966).* **[\*296]**

In our recent decision in Reuben Donnelley, continuing injury to the commuter and connecting carriers as a class was premised upon an inference of lost business, [79] rather than proof of the exact amount lost, down to the last decimal point. *In re The Reuben H. Donnelley Corp., 95 F.T.C. 1 (1980)*, rev'd on other grounds, *630 F.2d 920 (2d Cir. 1980)*. [80]

**[\*297]**

Finally, even in the private action of *Gamco, Inc. v. Providence Fruit & Produce Bldg., Inc., 194 F.2d 484 (1st Cir. 1952)*, the fact of plaintiff's exclusion from business opportunities associated with the best-situated market in town,

---

[78] Indeed the Court gave only one "illustration" of how the By-Laws worked to block new entry and growth by non-member competitive newspapers, noting that in 26 cities of the U.S. existing newspapers already had contracts for AP news and had contracts with reival news services which severely limited any new paper's access to the news. *326 U.S. at 13*.

[79] [S]eventy percent of commuter carriers passengers are connecting to or from certificated carriers. Thus the failure to list connecting flight information for commuter carriers deprived them of a primary marketing tool with respect to a large portion of their business. *95 F.T.C. at 55*.

[M]ost users of the OAG read the listings of the flights between a city-pair from top to bottom and pick the first convenient flight; therefore, listing the flights of certificated carriers before the flights of noncertificated carriers often results in users picking a certificated flight without even looking at the listings for noncertificated carriers. *95 F.T.C. at 83*.

[80] Indeed, the Second Circuit specifically endorsed the Commission's methodology of determining injury and the conclusions based thereon. *630 F.2d at 924-25*.

without more, was enough to impel the Court to order that equitable relief be awarded on remand. _194 F.2d at 489_. See also _Zenith Radio Corp., supra, 395 U.S. at 132-133_.

The conclusion is inescapable. Certain antitrust violations, usually those particularly susceptible of correction by government action, create a situation where the most effective relief is at equity not law. When such cases involve an ongoing refusal to deal, harm to competition can be proven by testimony about the experience of representative members of the discriminated-against class of competitors. Statistical surveys of the class' competitive strength, if closely related to the marketplace affected by respondent's actions, would be a welcome supplement. However, if the statistical proofs cannot be finely enough drawn, their absence is not fatal to the case. With this in mind, we review the statistical evidence **[*298]** available on the record.

A vast portion of this record is taken up with argument concerning the proper measure of the IBS' competitive strength. Their numbers, exits, sales, and profits are measured by means of at least five different data bases over various time spans [81] and compared with the same attributes of dealer body shops, "all service industries," or selected retail business, as the advocate's convenience dictates. In these comparisons, respondent attempts to show that the IBS are better off than assorted other businesses; complaint counsel of course attempts to prove the obverse. Generally speaking, respondent favors the numbers and sales data which show a growth trend in the overall class of IBS. Respondent argues that the increased numbers are a guarantee of increased competition. Complaint counsel rely more on exits and profitability data, which show that many individual IBS are unsteady competitors. Complaint counsel argue that competition must be assessed in terms of quality, not merely quantity.

 **[*299]**

(a) Growth in Numbers

There is no question but that, overall, the number of IBS increased between 1963 and 1977. Various subgroups of that class have been measured over various periods of time in that fourteen-year span by four methods of varying accuracy. [82] The bottom line, however, is always growth -- by at least 40% over the 1967-1977 decade. At the same time, GM records show a slight decline (4.2%) in the estimated total number of dealer body shops. (RX 38) [83]

_____

[81] One quarrel which touches each set of statistics concerns the correct time period to examine. Generally speaking (for neither side scruples to be inconsistent for the sake of a momentary advantage), complaint counsel focus on the years 1972-1976 whereas respondent starts its trending in the mid-sixties. Nearly every measure shows the IBS entering upon leaner times in the early 1970's; respondent naturally wants to raise the average by adding in the more prosperous earlier years, while complaint counsel wants to cut those same years out, both to keep the picture as grim as possible and to avoid any implication that the IBS reached the natural limits of their growth before 1972. To us both starting points seem equally capricious and dictated more by the choice of data base than any defined relationship to crash parts availability.

[82] (1) _Census Data:_ The number of IBS (SIC Code 7531) reporting to the U.S. Census Bureau increased by 28.5% (4,621) between 1963 and 1967 and by 52.7% (10,982) between 1967 and 1972. (IDF 265, 266) No Census data are available for years after 1972, which curtails the usefulness of this set of statistics.

(2) _IRS Data:_ This data is limited to IBS partnerships and proprietorships. It shows a numerical increase, in percentage terms, of 51% from 1967-1972. Between 1972 and 1976 the growth levels off abruptly, showing an incremental increase is only 2.9%; but this still provides a growth of 55.3% for the years 1967-1977, during which dealer body shops declined in number by 4.2%. (IDF 268) Since IBS corporations account for approximately 10% of the total number of IBS businesses (Nelson Tr. 13789, 13796), their exclusion probably does not skew this data unduly (it will be a different story on sales and profit trends derived from IRS data).

(3) _Telephone Directory Listings:_ One of respondent's employees prepared a tabulation (RX 41) purporting to show the number of IBS in each of complaint counsel's selected trade areas (except Mansfield, Ohio) for the years 1967, 1972 and 1977. The numbers were arrived at by the simple process of counting the listings under the "Automobile Body Repairing and Painting" heading in the classified ad section of the phone books for the greater metropolitan areas of each city, in each year. Although the ALJ seems to find that such surveys can be accurate (IDF 278) we conclude that this survey, at least, is riddled with methodological errors. For example, respondent made no attempt to verify that each listed company was actually in business,

1982 FTC LEXIS 39, *299

[*300]

A simple comparison of growth rates, however, does not translate into an accurate comparison of competitive strength. There are too many different factors affecting the ease of growth for IBS and dealer body shops. The "independent" in the term Independent Body Shop is truly descriptive: an IBS can be started with a minimum of equipment and space and is often a one or two person enterprise. (IDF 264) By contrast, a dealer body shop is always an adjunct of a GM car franchise, [84] and establishing a car dealership involves capital outlay, personnel commitment and other requirements -- not the least of which is filling a need in GM's automobile marketing plan -- unknown to the independents. The numbers indicate only, therefore, that entry into the independent body shops business is perceived as desirable and is relatively easy; they tell nothing of the level of competition offered once the low entry barriers are breached or the ability of individual IBS to stay in the business they so easily entered. For these purposes we must look to the statistics on exits.

[*301]

(b) Exits

Respondent maintains that IBS have a low failure rate in contrast to many other retail lines of business, relying on Dun and Bradstreet reports which state that the IBS failure rate has declined from 32 per 10,000 in 1972 to 15 per 10,000 in 1977. (RX 303B) This represens the next-to-lowest failure rate for any of the twenty-three retail lines of business for which D&B keeps failure rates. (RX 303A) However, the D&B reports are so flawed as to IBS that cross-industry comparisons, even if valid, [85] are impossible. As noted in note 82, *supra p. 64*, the D&B universe of IBS is not representative of the overall IBS universe. Moreover D&B's definition of "failure" is too limited: it excludes all firms which cease business but leave no unpaid bills, e.g., IBS which operate on a C.O.D. basis, or which simply become discouraged at continuing low profits and wind up the business honorably. Finally, D&B's collection of failure information misses all personal bankruptcies, a course of action open to the 90% of IBS which are proprietorships. (Nelson Tr. 13774-75; Wyant Tr. 12236-41)

[*302]

In contrast, complaint counsel's statistics, based upon Census data for 1972 seem fairly reliable. They show a failure rate of 1,140 per 10,000, the fifth highest of the 24 retail lines of business. The Census universe is more

---

was engaged primarily in body work (as opposed to paint work, mechanical repairs or salvage work), or generally worked on GM vehicles (as opposed to foreign autos). (Stocker Tr. 11334-36, 11345-46, 11351-55, 11369, 11376-77). Even more serious is respondent's failure to see if the companies listed in the earlier phone books were still listed in the later years of the tabulation. By complaint counsel's calculations, fully 28%-45% of the companies listed in 1972 did not appear in the 1977 Yellow Pages.(CRF 167)

(4) Dun and Bradstreet Data: the number of IBS surveyed by D&B grew from 11,644 in 1972 to 17,864 in 1977 (+53%). Since D&B surveys only those body shops for which it has been requested to furnish a credit report (Barry Tr. 12141-145) this sample does not tell us anything about the overall growth in numbers of IBS, but merely pictures the rise in numbers of IBS whose credit rating was of interest to a D&B client.

[83] The GM franchise agreement requires dealers to submit a Trial Balance Form (Financial Statement) containing variety of accounting data to the Dealer Business Management Department; about 90% of the dealers do so. (Vasquez Tr. 11410-13, 11432) The Trial Balance Form shows sales from the body shop and thus how many of the reporting dealerships have body shops. Of the 10% who did not report, GM estimated that the percentage of nonreporting dealers with body shops exactly corresponded to the percentage of reporting dealers with body shops. (Vasquez Tr. 11433-34) Complaint counsel claims this "blowup" method of determining the universe of DBS is unreliable, but we think a 10% or less error is acceptable in this context. We note that we sanctioned "blowup" methodology in *Retail Credit Co., 92 F.T.C. 131, 140 (1978)*.

[84] Significantly, the 1967-1977 decline in dealer body shops is slightly outpaced by a decline in dealerships (RX 38), indicating that the decline in dealer body shops may be the result of overall franchise matters, rather than competition in body work.

[85] The free-floating variables which complicate comparisons between IBS and dealer body shops are even more numerous when comparing IBS to "Department Stores" or "Lumber & Building Materials" -- and the nexus to crash parts is even more tenuous.

truly comprehensive, as is its definition of exit from business. [86] While the cross-industry failure rate comparisons remain as tenuous under Census-based calculations as under D&B statistics, and for the same reasons, the Census figures do have limited uses. First, the Census data casts further doubt on the reliability of D&B statistics.Second, for one year at least it corroborates the IBS witnesses' testimony about their difficulty surviving. The necessary link between crash parts and business failures is provided by that same testimony, which shows that the cost of crash parts is a crucial variable in a body shop's profit picture.

**[*303]**

(c) <u>Sales</u>

The record contains a welter of fragmented sales statistics for dealer body shops and IBS in three distinct time periods between 1963 and 1977. Owing to the use of three disparate data bases, only for 1967-1972 do we have data covering the complete universe of IBS and dealer body shops. [87] That data shows that aggregate sales of IBS increased by 116% while aggregate sales of dealer body shops increased by only 40%-48%.[88]

**[*304]**

The fact that IBS aggregate gross sales increased at over twice the pace of dealer body shop sales does suggests that the IBS are strong competitors in repair of crash - damaged GM vehicles. However, it is important to note that "sales" includes, for the IBS especially, far more than auto collision repair work: as described more fully under the "Profitability" subheading, <u>infra</u>, over the years, due in part to inability to compete in body work, the IBS have diversified into other lines of repair work. A significant, though unquantifiable portion of the IBS increased volume of business is generated by these sideline operations. (IDF 282)

(d) <u>Profitability</u>

The record does not permit any comparisons of IBS and dealer body shop profitability, [89] since it lacks any information on dealer body shop profits. IBS partnership and proprietorship earnings as reported to the IRS for

---

[86] The Census Survey of Selected Service Industries publishes the number of business which were in business during the year but have ceased business by the end of the year. The exit data (<u>i.e.,</u> "are you in business") is requested by the survey form, which must be answered under oath.(Nelson Tr. 13765-67) The form of the question may lead to a slight overstatement of failure rate, as it picks up IBS discontinuences for other than total failure, notably change in legal form of the organization (<u>i.e.,</u> from a partnership or proprietorship to a corporation). However, since only 10% of IBS are corporations (Nelson Tr. 13796) we are inclined to think the bias is slight.

[87] For 1963-1967 we have Census data on the aggregate sales of both IBS partnerships and proprietorships and IBS corporations (<u>i.e.,</u> the complete universe of IBS) (IDF 269), but no data on dealer body shop sales. For 1967-72, we have GM estimates on its dealer body shops' aggregate sales (IDF 270) and both Census data on all IBS sales (IDF 270) and IRS data on aggregate sales of IBS proprietorships and partnerships (<u>i.e.,</u> IBS corporations excluded). (CX 7818-7819) For 1972-1977 we continue to have GM's estimates on aggregate sales by dealer body shops (RX 322) and IRS data on aggregate sales by IBS proprietorships and partnerships (CX 7818-7819), but the lack of continuing Census data means there is no direct proof of corporate IBS sales. The question of whether such proof can be reached by an estimating process known as 'linking' was battled hotly throughout the trial and appeal. (<u>See</u> IDF 272-273) Since we conclude that the gross sales figures are not sufficiently focussed on crash parts to be of use in this analysis, we do not need to consider the issue. We do note however, that even under the incomplete set of data most favorable to complaint counsel, the growth in IBS sales volume for 1972-76 was only minutely less than growth in dealer body shop sales (IBS partnerships and proprietorships: up 37.1%; dealer body shops: up 37.9%). (CX 7819)

[88] Complaint counsel argue that GM's estimates on dealer body shop sales are understated by 20% because five categories of dealer body shop revenues were systematically excluded. (CRF 157-161) Even if this 20% is factored back in, however, the contrast between IBS and dealer body shop aggregate sales growth is still great.

[89] Once again, we resist the invitation -- this time respondent's -- to use these statistics to make cross-industry comparisons -- here of IBS with General Auto Repair Shops. (RAAB 21) General Auto Repair Shops specialize in electrical and mechanical

1982 FTC LEXIS 39, *304

1967-76 are summed up at CX 7818-20. The data is, like the other IRS statistics, incomplete, as it does not include IBS corporations. This definitely skews the low profit averages which complaint counsel draw, since IBS corporations, being generally the largest, most profitable IBS businesses, produce **[*305]** about 32% of total IBS business receipts. (Nelson, Tr. 14301) Nevertheless, since IBS corporations represent only about 10% of IBS businesses by number, the IRS statistics are accurate as to approximately 34,561 IBS partnerships and proprietorships (1976 figures - CX 7819; 7820) -- a subgroup of no little size. As a class, non-corporate IBS did fairly well from 1967-72 with aggregate net income increasing by 54%. (RX 314A) (We have already noted the increase in IBS sales during this period.) However, in the years 1972-76 non-corporate IBS aggregate net income increased by only 3.3%, while the percentage of non-corporate IBS losing money jumped from 7.2% in 1967 to 19.9% in 1976. (Derived from RX 315B; RX 320) On a per shop basis and in stark dollar terms this means that the average net income of an IBS proprietorship/partnership was $5,256 in 1967 -- and only $ 5,410 nine years later. With the consumer price index for all services increasing by 180.4% during those nine years, these IBS needed to be making $9,482 in 1976 just to stay even in real income with their 1967 earnings. (CX 7820)

**[*306]**

The profitability statistics are derived from IRS Schedule C, a form which is filed to obtain a variety of deductions allowed in the tax code. Accordingly, Schedule C filers have an incentive to overstate expenses and, possibly, understate revenues on the form; such inaccuracies would be reflected in the aggregate numbers. (Bentson Tr. 15841-43) Respondent's expert was unable to quantify or even guess at the extent of this bias. (Id.)

On the other hand, the record contains testimony which supports the inference drawn from these statistics: that many IBS have faced decreasing profits in more recent years. Witnesses observed that IBS owners often cut corners by paying themselves low salaries, [90] working extraordinarily long hours, and employing their families at little or no remuneration. (IDF 280; CPF 155, 161, 176-179) Even so, many of the IBS witnesses from the seven trade areas, testifying as to the years 1976-1977, told of experiencing losses or significant decrease in profits. Moreover, some portion of the small profits which these IBS were able to eke out comes from increasing diversification into non-crash work such as towing, office furniture and cabinet repair, **[*307]** mechanical and radiator repair, frame straightening, customizing and specialized (non-car) collision repair. (IDF 281-283) IBS are doing less work on GM vehicles, as a percentage of total business, than formally. (IDF 247, 282) Even as to the GM work remaining, some is sublet work from dealers. (IDF 284)

(e) Conclusion

Our conclusion, after a careful examination of the statistics in this record is that the parties have pretty much battled to a stand off. None of the four proposed measures of competition performance allows us to make direct comparisons between IBS and dealer body shops: the difference between a body shop dedicated solely to repair work and one which is part of a new car selling operation introduces too many variables into comparisons in **[*308]** terms of growth in numbers and profits and exits; also, the uncertainty of what products are included in sales records obscures that comparison. Moreover, both complaint counsel's and respondent's chosen data bases suffer the same fundamental flaw with regard to the focus of this case. Each yields some inference about the competitive vitality of GM dealerships or the IBS, but in no case is there a measurable correlation between the availability of crash parts and the overall competitive condition shown.

---

work, for which no crash parts are required and for which parts are readily available from a multitude of suppliers. General Auto Repair Shops GARS are analogous to dealers' mechanical shops, not dealer body shops. (Nelson Tr. 15224-26, 14390-91)

[90] See, e.g., Daniels Tr. 2292, 2293: yearly salary of $17,000 over a number of years for 60-65 hours of work a week; Lakatos Tr. 4010-11: yearly salary of approximately $15,000 during 1972-1976. Similarly, former IBS owner Edward Serwacki observed (Tr. 4841-42, 4859) owners of "many newer shops" working "all kinds of hours" for $100-$150 a week in order to stay in business. (Serwacki Tr. 4841-42, 4859)

The most we can use these data for is to examine the IBS' competitive health, standing alone. Here we think that the statistics on failure rates and profits for non-corporate IBS enlarge on the testimony about individual IBS' difficulties in maintaining their businesses. The data therefore confirm that the seven trade areas are fairly representative of national trends. When these data are read with the testimony and documents described earlier it becomes apparent that a major cause of this IBS weakness is the fact that they pay, on the average, 17.7% more for GM crash parts than their competitors, the dealer-installers. On the other hand, respondent's statistics on overall growth **[*309]** of IBS open up a dimension which was only hinted at in the testimony: the fact that, if exits are common in the IBS business, entry is even more so, and that, in the aggregate, IBS have shown a significant net growth in the last decade.

In short, the record in this proceeding does not establish a clear and direct link between GM's selective distribution policy for crash parts and any weakness of the IBS, as a class. It is clear, at the same time, that in general IBS are at a substantial competitive disadvantage with GM dealer-installers, due to the near impossibility of the IBS overcoming or otherwise compensating for their significant price disadvantage on GM crash parts. It is also clear that on any local basis the shifting crowd of IBS is generally powerless to shake the stabilized GM dealer's position in auto body repair work, which is buttressed by favorable prices on crash parts. Overall, we believe the IBS are competitively injured by GM's distribution system and that legally that injury meets, if barely, the required showing of substantial injury to competition.

4. Substantial Business Justification

General Motors argues that there are two reasons to resist change **[*310]** in its selective distribution system for crash parts: i.e., the system encourages new car sales and the system would be extremely costly to revise. The second argument is particularly persuasive.

The relationship of selectively distributed crash parts to new car sales is tenuous. We note that GM has not made the argument that its selective distribution for sole source parts is designed to ensure that crash parts get into the hands of only qualified installers. There ae no product quality or safety issues here. Cf. *United States v. Bausch & Lamb Optical Co., 321 U.S. 707, 728-729 (1944)*; *Tripoli Co. v. Wella Corp., 425 F.2d 932 (3rd Cir. 1970)*. Crash parts are not items which require much special knowledge to install, and the record contains no suggestion that the IBS do not do at least as good a job as the dealer-installers. Nor is a crash parts "exclusive" required to reward a dealership for expanding its promotional efforts in order to stimulate demand for crash parts. These items are not the sort of new or complex product for which the consumer has to be wooed into spending discretionary dollars. Cf. *Sandura Co. v. FTC, 339 F.2d 847 (6th Cir. 1964). [*311]*

GM argues generally however that by selling crash parts exclusively to its dealers it ensures their loyalty to GM and their increased efforts in selling new cars. A common sense evaluation of the relative importance of crash part sales vis-a-vis new car sales in a dealership's profit picture supports the ALJ's findings that a dealer has sufficient incentive to sell GM's new cars without the extra inducement to loyalty of a crash parts monopoly, and that GM's crash parts policies do not add significantly to that incentive. (IDF 58, 390) Moreover, GM produced no testimony or documentary evidence to show that it is having trouble attracting competent dealers, and can only persuade them to take on a franchise by adding the inducement of a crash parts exclusive.

On the other hand, GM is probably correct in its claim that a consumer's decision to buy a new car, particularly on repeat purchases, is influenced by the consumer's perception that crash parts will be widely available should the car ever need body repair work.

Availability must be distinguished from cost. Consumers look to their insurers to pay accident repair costs (CX 7815P) and rarely, if ever, inquire about **[*312]** cost of crash parts when negotiating the purchase of a new car. (See, e.g., the testimony of dealers Bogard, Tr. 10564-65; Durbin, Tr. 1382; Shaeffer, Tr. 10729-30) Consequently the wholesale cost disparity between dealer-installers and IBS is probably unknown to consumers. In determining which car a consumer selects, such factors as car styling, car price, gas mileage, cr resale value and even the reliability of engine parts assume a greater importance than the cost of crash parts. (Sutliff Tr. 11068-71) We are

convinced that most consumers are unaware of their dealer's priority rights to crash parts, and so few, if any, new car buying decisions are influenced by that aspect of GM's crash parts distribution system.

However, whether GM's distribution system assures general availability of crash parts does concern the consumer. And here, at first glance, it seems that GM could only benefit by getting crash parts into the hands of IBS as quickly as possible and at non-discriminatory costs. The IBS could handle a large percentage of GM vehicle crash repairs. If there is any validity to the argument that unavailable crash parts would cause a car owner to switch to another **[*313]** make of vehicle the next time, then it is reasonable to conclude that the same buyer will be unhappy if she or he experiences delay in getting the car repaired by an IBS.

This leads us to GM's second line of argument. It concerns the risks of change. In our analysis of this question we have relied considerably upon the testimony of Paul R. Murphy, comptroller and principal financial officer of General Motors Parts Division (GMPD). Starting with the proposition that GM's goals are to distribute crash parts efficiently and to gain consumer goodwill with easy availability of crash parts, Mr. Murphy emphasizes that "the system works" in achieving those goals. (Tr. 10069, 10071) Although GM's distribution system for crash parts is selective, it extends to a nationwide network of dealerships, and would produce a reasonable degree of availability even if none of the dealers wholesaled crash parts on the side. (IDF 116; Murphy Tr. 10077) Availability is of course improved when dealers wholesale, and GM from past experience can expect between 20% and 40% of its dealerships to redistribute crash parts. [91]

   **[*314]**

As we noted before, we do not think that this level of availability is the highest possible: inclusion of IBS in the direct GM distribution system might improve it. However, there would be significant costs associated with opening up the system.

GM's present customers for crash parts, the dealers, are also customers for the other 265,000 sole source parts which GMPD distributes. (IDF 159, 167) These other parts are not much described in the record but appear to include chassis parts, interior trim parts and engine parts, most of which, like crash parts, are uniquely configured to the various GM cars. (IDF 165; Murphy Tr. 10177-81) GMPD makes no distinction between crash parts and all other parts required for servicing a GM vehicle. (IDF 167) When GMPD was set up to provide centralized parts supply to the dealers, inclusion of crash parts within its distribution system was both logical and efficient. Also, the fact that these crash parts customers have an ongoing business relationship with GM for the purchase of parts, not to mention new cars, means that GM has significant leverage in exacting prompt payment for crash parts. GM would not have that leverage with the IBS. **[*315]** If the system were opened, GM would undoubtedly face a significant administrative burden in checking the creditworthiness of and attempting to collect payments from a potentially vast number of new customers. Other costs could be expected, chiefly those associated with handling more and smaller orders. Not only are the IBS generally smaller operations than dealerships, which leads us to expect smaller order size from them, but the size of dealership orders would also shrink, as dealers let GM take back all or a portion of their wholesaling function. When the order size decreases, the cost per ordered item increases. As Mr. Murphy put it, "just almost every thing in the entire process is going to... require more resources." (Murphy Tr. 10079; Bentson Tr. 15811, 15829-30) Unfortunately, the only estimate of the extent of these added distribution costs seems to us to be inflated. [92] Nevertheless, we recognize that such costs would not be

---

[91] GM has no records from which one can compute precisely how many GM dealers wholesale parts, much less how many routinely stock parts in amounts greater than their own body shop needs and still less how many of these parts re crash parts. (Murphy Tr. 10293) GMPD comptroller Paul Murphy estimated that 40% of GM's dealers are "active" wholesalers. (Murphy Tr. 10074) However, as Mr. Murphy did not quantify what he meant by active wholesaling, and as an internal GM document indicates that it takes a yearly $500,000 parts volume to engage in significant wholesaling (CX 7254S), we agree with both complaint counsel's and respondent's expert witnesses that a yearly volume of $100,000 or more in parts sales indicates meaningful wholesaling efforts. (Nelson Tr. 15148; Benston Tr. 16104) Using the $100,000 annual sales cut off point, in 1976 approximately 22% of all GM dealers accounted for approximately 80% of all dealer wholesale sales of parts. (RX 30) GM has no data, nor does the record contain data from other sources which shows how many dealers stock crash parts, or the degree to which they stock. (Murphy Tr. 10294)

insignificant and to some degree would occur on a continuing basis. We also note that other car manufacturers, who presumably have the same incentives as GM for finding the most efficient crash parts distribution system, all use systems similar **[*316]** to GM's. (IDF 94)


This situation, therefore, presents a more difficult balance than we faced in Donnelley. In Donnelley we stated," In examining the question of business justifications, the economic self interest of the monopolist would be the major but not the exclusive consideration. Where there is little justification for a business policy, the antitrust laws can require that the monopolist take into account the effect on competition of its actions in the line of commerce made up of [those] wishing to deal with it." 95 F.T.C. at 82. In that case respondent offered "no explanation whatsoever" for its refusal to deal. Id. Moreover, it knew that rescinding its refusal (to list commuter connecting flights) would cost only $6000, and when the actual change in policy occurred it was accomplished "with apparent ease and no ill effects." Id. Commissioner Pertschuk seems **[*317]** to suggest that since transaction costs will always be associated with imposition of a duty to deal, they should be given small weight as a business justification. We disagree. De minimis or reasonable projections of significant changeover costs must be heeded. In this case GM has shown that a course of selective dealing gives it satisfactory market penetration with as lean a distribution system as possible. It has also shown that sizeable costs would accompany an expansion of the system, without any offsetting gain to GM. 93 Certainly if system-wide distribution costs were to increase, consumers would soon face higher repair costs on crash-damaged vehicles.


Finally, we are concerned **[*318]** that any order restructuring GM's distribution system would involve the Commission in ongoing supervision of the system. For example, since we found injury to competition only at the installation level of competition, our order would not require that GM deal with all potential customers, but merely deal on equal terms with all crash parts installers. However it would be difficult to arrive at a clear definition of "crash parts installer" for purposes of the order: would it include an IW who opened a small body shop adjacent to its warehouse? We foresee that we would have to commit extensive resources to reviewing GM's interpretations of to whom and at what price it should sell crash parts.

In sum, although there is a troubling degree of injury to competition shown in this case, a reasonable degree of business rationale for the situation has also been shown. On balance, while we are not convinced by this record that GM would be burdened to the extent it has argued by opening its warehouses to IBS, we cannot say that its refusal to do so is arbitrary and without business justification.

III. PROCEDURAL ISSUES


A. NOERR-PENNINGTON

Having decided that GM and NADA did **[*319]** not engage in a combination to restrain trade, we need not reach the question, raised by respondent in its appeal, of whether the Noerr-Pennington doctrine protects the efforts of GM or its dealers to get the FTC to settle the crash parts controversy.


B. STRUCK TESTIMONY

---

92 Mr. Murphy, without elaboration, stated it would cost GMPD $40 million more annually to handle an additional 10,000 customers. (Tr. 10079) This amounts to $4000 per customer, which seems high, given that GMPD's warehouse system is fully computerized. (Murphy Tr. 10090-97).

93 It must be remembered that, owing to the static demand for crash parts, a change in distribution systems will not significantly increase the actual number of parts GM sells in any year. Of course there could be a shift in inventory from the dealers who are now wholesaling back to GMPD, and GM could raise the warehouse price of crash parts to cover its increased wholesaling costs, but this would be a reallocation of existing expenses and profits rather than any real gain to GM.

1982 FTC LEXIS 39, *319

By "Order Modifying Order Granting Motion of General Motors Corporation for Production of Interview Reports" dated October 31, 1978, the ALJ ordered the testimony of four GM witnesses struck from the record, because GM's counsel refused to give complaint counsel written reports of pre-trial interviews with Arthur H. Cann, parts manager of Courtesy Chevrolet in San Jose, California; Joan Mack, parts manager of Tom Parsell Chevrolet in Charleston, South Carolina; David W. Vulbrook of the National Association of Independent Insurers from Des Plaines, Illinois; and Henry Faulkner, an Oldsmobile dealer from Philadelphia, Pennsylvania. These reports were all made by GM attorneys. GM objects to the striking of the testimony on three grounds. First, GM claims that the obligation to turn over interview reports derives from the Jencks Act, which imposes such an obligation on complaint counsel but not on a respondent. [*320] Secondly, GM argues that absent such obligation, a respondent's interview reports are "attorney work product" which is privileged from disclosure unless some extraordinary need is shown. Such extraordinary need, GM claims, has not been established. Lastly, GM states that the struck testimony was "materially responsive to the assertions of complaint counsel in this proceeding" and its striking was, therefore, prejudicial to respondent. (RAB 27-30) Complaint counsel reply first, that substantial authority as well as fairness compels the adoption of a policy which requires both sides to produce relevant, previously recorded statements of witnesses. Secondly, complaint counsel argue that these reports are verbatim witness statements and so are not shielded by the attorney work product doctrine. Finally, complaint counsel deny that GM has suffered any prejudicial injury from the ALJ's action, and argue that even if it did, such injury would be entirely proper in order to prevent a partial view of issues.(CAAB 59)

1. Procedural History

Respondent started an avalanche of motions and orders on this subject by a small snowball, requesting copies of complaint counsel's witnesses, [*321] to be delivered one week before the witnesses were scheduled to testify. In response to this motion the ALJ ordered both sides to exchange witness interview reports in advance of scheduled testimony. (Order Granting Motion of General Motors Corporation for Production of Interview Reports, April 10, 1978, hereinafter Order of April 10, 1978). Complaint counsel moved for reconsideration, on the grounds that interview reports are producable only after testimony, but the ALJ denied this motion and reaffirmed the Order of April 10, 1978. Making the best of, in their opinion, a bad business, complaint counsel then moved for production of respondent's interview reports. Counsel for GM replied that he had nothing in his files that was not exempted from disclosure by either the attorney-client priviledge or the attorney work product doctrine.

Matters came to a head at a hearing on September 27, 1978, where the ALJ reviewed reports respondent was withholding, which related interviews with the four witnesses named above. After literally blue penciling out certain portions which he deemed attorney work product, the ALJ ordered that the remainder of the reports be produced for complaint [*322] counsel forthwith. This counsel for GM continued to decline to do. Complaint counsel thereafter moved to strike the testimony of the four witnesses, although subsequently entered into a stipulation that the testimony of Cann, Mark and Faulkner could stand. (It appears that complaint counsel were actually present at respondent's counsel's interviews with these witnesses.) The ALJ decided, nevertheless, that the better course would be to apply the sanction to all four witnesses, and so ordered on October 31, 1978.

2. Applicability of Jencks Act Procedures

A "Jencks Act" statement is defined, _18 U.S.C. § 3500(e)_, as a written pretrial statement made by a witness for the United States and signed or otherwise adopted or approved by the witness; or a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral pretrial statement made by such a witness and recorded contemporaneously with the making of the oral statement. (Statements made to grand juries are also included but not relevant here.) The Jencks Act proper applies only to criminal prosecutons. We have held, however, [*323] as a matter of our discretion, that its principle should be applied in Commission proceedings to require production of certain prior statements by complaint counsel's witnesses after they have testified. See _US Life Credit Corp., 91 F.T.C. 984, 1037 (1978)_, and cases cited therein. Complaint counsel now urge that we apply the Jencks Act principle to respondent's witnesses to uphold the ALJ's action in striking the testimony at issue here. We decline to do so for the reasons set forth below.

1982 FTC LEXIS 39, *323

At the outset, we wish to make clear to both counsel and the administrative law judges that our reliance on the Jencks Act "principle" rather than the Act itself (whose limitation to criminal cases we have already noted) is not an invitation to ignore the other salutary limitations incorporated in the Act to protect the principle's integrity.  In particular, we reiterate that (1) the safeguards of the accuracy of the statement (i.e., the requirement that the witness have unequivocally adopted it or that it be substantially verbatim and complete) must be strictly observed, US Life, supra; and (2) production will be required only after the witness [*324] has testified 94 *Interstate Builders, Inc., 69 F.T.C. 1152, 1165-67 (1966)*.

So far as appears from the record before us, neither of these limitations was honored in the series of rulings which led up to the striking of the testimony at issue.  95 However, although the point is not entirely free of ambiguity 96 it appears that the ALJ disclaimed reliance on or limitation by the Jencks principle in the rulings under consideration. 97 In these circumstances we need not and do not decide whether the application of the Jencks Act principle can or should [*325] include prior statements by respondent's witnesses as well as those of complaint counsel.  98 What we must decide is whether the ALJ's order has some sufficient basis other than the Jencks Act principle.

[*326]

3.  Attorney Work Product

As we said in *Interstate Builders, supra, 69 F.T.C. at 1172*, "[i]n view of the limited nature of the Jencks rule, it is clear that the policy considerations underlying the work product rule which were so emphatically stressed by the *Supreme Court in Hickman v. Taylor [329 U.S. 495 (1947)]* are still operative whenever Jencks statements are not involved."

---

94 As we indicated in Interstate Builders, this procedure is designed to protect against a chilling effect on the willingness of persons with information useful to law enforcement to make statements in the course of an investigation although they might not be willing to testify at trial, and considers the limited purpose of the Jencks Act, i.e., enabling the defendant/respondent to make use of a prior inconsistent statement in conducting cross-examination.  The Act has never been intended as a tool of discovery, since a respondent is free to conduct his own interviews of potential or planned witnesses.

95 See our discussion in *US Life, 91 F.T.C. at 1038-39*, of the rigorous tests which must be applied to qualify statements either as adopted by the witnesses or as substantially verbatim recitals, in particular our observation, quoting from *Palermo v. United States, 360 U.S. 343, 352 (1959)*, that "the legislation was designed to eliminate the danger of distortion and misrepresentation inherent in a report which merely selects portions, albeit accurately, from a lengthy oral recital."

96  The ALJ's Order Denying Motion For Reconsideration Of Order Granting Motion of General Motors Corporation For Production of Interview Reports, April 20, 1978, speaks in terms of requiring complaint counsel to "hand over Jencks statements," and involved the ALJ's initial decision on this subject in US Life (subsequently overturned in this respect by the Commission in the passage cited above).

97  In his Order Denying Motion For Reconsideration Of Order Of September 27, 1978, Requiring the Production of Interview Reports, dated October 13, 1978, the ALJ asserted that "my Order is neither predicated on the Jencks Act nor on the Commission's expressions regarding its adoption of the principles inherent in Jencks." He added that while statements covered by the Act would clearly be included in the larger class of statements subject to the order, that order "need not be and was not intended to be limited to Jencks Act principles."

98  In *US Life, supra, 91 F.T.C. at 1037 n.34*, we observed that we had not theretofore been called upon to resolve that issue, simply noting the Supreme Court's decision in *United States v. Nobles, 422 U.S. 225 (1975)*. Complaint counsel urged reliance on that case here.  We observe, however, that in that criminal prosecution the proof substantially consisted of two eyewitness identifications of Nobles, that the statements at issue which purportedly undermined the witnesses' credibility had been taken by a defense investigator whom defense counsel sought to put on the stand to testify to the substance of the statements, and that the decision seems to have turned on the proposition that this attempt waived any work-product privilege which attached to the statements.  *422 U.S. at 236-240*.

1982 FTC LEXIS 39, *326

In the seminal case of Hickman v. Taylor, the Supreme Court granted qualified immunity from discovery to an attorney's work product described as private memoranda, written statements of witnesses, and mental impressions or personal recollections prepared by an attorney in contemplation of possible litigation. From the onset, the Supreme Court, and the Commission likewise, have recognized that the work product rule is not absolute but may yield on a showing of substantial need. *Hickman v. Taylor, supra, 329 U.S. at 509*; see, e.g., *Warner-Lambert Company, 83 F.T.C. 485 (1973)*; *Graber Manufacturing Company, Inc., 68 F.T.C. 1235 (1965)*. In both F.T.C. cases, the Commission emphasized that before **[*327]** respondent could receive documents considered to be the attorney's work product, strong showing of special circumstances, good cause or necessity must be demonstrated. 99

The work-product rule has now been formally incorporated in the Commission's rules governing discovery, at § 3.31(b)(3). Although the Commission rule did not become effective until after the issuance of the rulings in question, it is nonetheless expressive of the work-product rule as derived from Hickman and as expressed since 1970 in *Rule 26(b)(3) of the Federal Rules of Civil Procedure*. As such, it embodies the principles appropriate for application to the present question. Rule 3.31(b)(3) provides in pertinent part that:

a party may obtain discovery of documents... otherwise discoverable under subdivision (b)(1) of the rule and prepared in anticipation of litigation **[*328]** or for hearing by or for another party or by or for that other party's representative (including his attorney, consultant, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the Administrative Law Judge shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party.

First, there seems to be no question that the witness statements or interview reports or attorneys' notes in question are within the class of documents "prepared in anticipation of litigation" and covered by this section and the case-law doctrine. Indeed, the Hickman decision itself concerned just such pretrial statements or reports. Second, it must be noted that the rule (and the doctrine) apply what might be characterized as two layers of protection. Any document which falls within the coverage of the section is to be ordered produced only upon a **[*329]** showing of "substantial need" and "undue hardship." It is only when that showing has been made that the further admonition to "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party" comes into play. Thus, the task of an administrative law judge faced with a request to compel production of work product or hearing preparation materials consists of more than simply excising mental impressions, etc., and turning over the residue. The ALJ must first consider whether substantial need for the materials has been demonstrated, which need cannot be substantially met from other sources without undue hardship. See Order Upon Application for Interlocutory Review, In re The Gillette Co., FTC Docket No. 9152 (December 1, 1981).

In the present case, this analysis does not appear to have been carried out. Rather, the ALJ essentially grounded his rulings on his view that Commission precedent requires that "each side should maximally provide the other with information as to the positions each will take and the evidence each will use to prove its case." Order of October 13, 1978, supra. **[*330]** While we have no quarrel with this statement as a charactertization of the policy underlying our discovery rules and practice, it must obviously be qualified in practical application by reference to those rules and to our rulings in such cases as US Life and Interstate Builders. Further, we note that the relationship between this stated principle and the specific disclosure ordered by the ALJ here is not clearcut; that is, disclosure of witnesses' prior statements is not especially well-targeted to reveal a party's "position" or "the evidence [it] will use to prove its case." Other devices, far less intrusive and better aimed, are available to serve these purposes. The only end

---

99 The fact that both Warner-Lambert Company and Graber concerned the work product of complaint counsel does not diminish their precedential value in view of our endorsement of the principle of even-handedness in discovery. *Allstate Industries, 72 F.T.C. 1020 (1967)*.

which disclosure of such statements can uniquely serve is that of cross-examination, and only then when the safeguards of the Jencks Act principle are observed.

We are constrained to conclude that the ALJ's disclosure rulings upon which he based his order to strike testimony were not properly grounded either on the Jencks Act principle or on a due consideration of the work-product doctrine. We are not of a mind to search the record in an attempt to determine if the orders might have been justifiable **[*331]** upon proper analysis, particularly in view of the fact that complaint counsel themselves stipulated that the testimony of three of the four witnesses need not be struck, and gave no compelling reason why they needed to see interview reports for the fourth. Under the circumstances, we believe that the ends of justice are best served by reinstating the testimony of the four witnesses and considering it in reaching our decision on the merits, and we have done so. Thus, respondent has not been prejudiced by the ALJ's Order of October 31, 1978, or the series of orders which led up to it.

June 25, 1982

# Administrative Law Judge-Decision

DUFRESNE

**Concur By:** CLANTON

**Concur:**

CONCURRING STATEMENT OF COMMISSIONER CLANTON

I concur in the Commission's decision in this matter, but I have some observations about the rationale used to reach the legal standard in Part II.C. of the opinion. That standard, which is articulated on pp. 36 and 39, is identical to the approach adopted in our decision in *The Reuben H. Donnelley Corp., 95 F.T.C. 1*, rev'd sub nom. *Federal Trade Commission v. Official Airline Guides, Inc., 630 F.2d 920 (2d Cir. 1980)*, cert. denied, *101 S.Ct. 1362 (1981).* **[*332]** Nevertheless, while applying the substance of the *Donnelley* standard, the Commission's opinion in this case suggests that the precedent of *Donnelley* is unnecessary to the decision here since there is an adequate independent basis in prior case law for performing the same analysis and reaching the same result, i.e., *Associated Press v. United States, 326 U.S. 1 (1945)*; *United States v. Terminal Railroad Assn., 224 U.S. 383 (1912)*; *Grand Caillou Packing Co., 65 F.T.C. 799*, aff'd sub nom. *LaPeyre v. Federal Trade Commission, 366 F.2d 117 (5th Cir. 1966)*.

Presumably, the Commission's analysis is designed, at least in part, to avoid direct conflict with the Second Circuit's ruling in Official Airline Guides. I have two problems with that approach. In the first place, applying the Donnelley theory without calling it by that name is highly unlikely to change the outcome of judicial review in future cases. Certainly, such an approach will not succeed in the Second Circuit. Whether another court of appeals will agree with our Donnelley analysis is unknown, [1] but it is **[*333]** doubtful that the manner in which we characterize the rule will influence the end result. My second concern is that the analysis in this opinion seems to suggest a closer link between prior precedent and the Commission's present legal theory than we acknowledged in Donnelley. In Donnelley, the Commission recognized that the imposition of an obligation on lawful monopolists to deal fairly (or not arbitrarily) with firms seeking access to the monopolist's products or services fell outside the mainstream of monopolization law. Although in Donnelley the Commission felt that it was a "small step" from analogous case law to the standard enunciated in that case, it was clear that the rule developed there did involve an extension of existing law, or at least the first clearly exclusive reliance on such an approach by either agency or court. [2] I agreed

---

[1] It is possible that the Fifth Circuit Court of Appeals might reach a conclusion different from that of the Second Circuit. See *Fulton v. Hecht, 580 F.2d 1243 (5th Cir. 1978)*; *LaPeyre v. Federal Trade Commission, 366 F.2d 117 (5th Cir. 1966)*.

with that analysis and continue to do so.  To the extent, however, that the Commission's opinion here suggests a different reading of the legal duty imposed upon non-colluding monopolists by the cases relied upon in Donnelley, I would disagree.

 [*334]

Dissent By: PERTSCHUK

Dissent:

DISSENTING STATEMENT OF COMMISSIONER PERTSCHUK

I dissent from my fellow Commissioners' decision to dismiss the complaint in this matter.  I would have found liability on the part of General Motors for a violation of Section 5 and would have voted to issue an order requiring GM to deal on non-discriminatory terms with independent body shops. [1]

As I understand the majority's opinion, the Commission does not retreat from the position it took in Reuben Donnelley, [2] where [*335] we stated that a monopolist has a duty to deal fairly under certain circumstances with those seeking to deal with it.  Nor does the Commission fail to find adequate harm to competition to constitute a violation.  To the contrary, the majority concludes that there is "a troubling degree of injury to competition shown in this case." (Majority op. at 75) The Commission chooses to dismiss the complaint, however, on the basis that there is adequate business justification for GM's refusal to deal with independent body shops. I disagree with this conclusion.

In assessing GM's argued justification, it is useful to review the standard set out in Reuben Donnelley for an adequate business justification for refusing to deal with certain classes of customers. There the Commission stated that a duty to deal arises only if a failure to do so results "in a substantial injury to competition and lacks substantial business justification." [3] (emphasis added)  [*336]  Thus, we are not concerned with only minimal or speculative harm to competition, but, in the event that substantial harm is found, the justification, similarly, must not be minimal or speculative, but must be substantial.  Moreover, the burden of proof on this issue is the respondent's.

The injury to competition from GM's refusal to sell crash parts to independent body shops is that these suppliers of repair services are disadvantaged in competing with GM dealers because they must pay substantially greater costs

---

[2] While language in LaPeyre described a "duty of a lawful monopolist to conduct its business in such a way as to avoid inflicting competitive injury on a class of customers," _366 F.2d at 120_, that dictum did not describe the issue squarely before the court and it was not necessary to its holding.

[1] Any order to GM to deal on a non-discriminatory basis would have to include certain qualifications.  First, I agree with the majority that GM has no duty to deal with independent wholesalers directly since it has chosen to assume the "first tier" wholesaling function itself and there is no duty on the part of a monopolist under the theory of Reuben Donnelley to create rivals to itself.  (Majority op. at 43) In addition, there are legitimate reasons for GM to refuse to deal with any customer under particular circumstances, including high risks of granting credit, poor payment histories, etc., which would have to be acknowledged exceptions to a duty to deal requirement.

[2] _The Reuben H. Donnelley Corp., 95 F.T.C. 1_, rev'd sub nom. _FTC v. Official Airline Guides, Inc., 630 F.2d 920 (2d Cir. 1980)_, cert. denied, **101 S. Ct. 1362 (1981)**.

[3] _95 F.T.C. at 82_.

for parts than their dealer competitors. A part of this differential is theoretically accounted for by the second level "wholesaling" function of dealers -- ordering and storing parts. The only record evidence of the costs of ordering parts is that it constitutes 2% of the dealers' sales price. (Majority op. at 52, fn. 67) The record is silent on the percentage of dealers who store parts in large quantities, either for their own use or for resale to others. Many dealers, who receive the maximum discount, apparently order crash parts only on an "as needed" basis, however.

The "premium" paid by independents, that is, the price [*337] paid for crash parts over and above the price paid by dealers, amounted to $41.6 million in 1977. [4] If the 2% cost attributed to the wholesaling function is subtracted, this premium, caused by the refusal of GM to deal directly, amounted to $36.9 million in 1977 alone.

Moreover, this price differential is not the only advantage dealers have from GM's system. For every part GM sells to a dealer who in turn resells it at wholesale to an independent, [*338] GM pays the dealer 30% of the wholesale list price of the part under GM's wholesale compensation plan. While this system no doubt encourages dealers to resell parts -- the reason it was urged by the Commission at its inception in 1968 -- it is also costly to GM. In addition, there is a not insignificant amount of "errroneous claims" and abuse accompanying the system, including claims for wholesale compensation by dealers who sell to other GM dealers. (IDF 111-112)

Against this competitive harm to independents and the losses to GM from the wholesale compensation plan, GM offers two justifications for its refusal to deal with independent body shops: 1) the system encourages new car sales by acting as an inducement to dealers to affiliate with GM initially and to sell additional new cars; and 2) opening up the distribution system to independents would be costly and entail some uncertainty. The majority specifically rejects the argument that incentives to dealers are significant to the degree necessary to constitute adequate justification for refusing to deal with independents. (Majority op. at 71-72) The majority, however, does accept the second argument as adequate justification. [*339]

We should be wary of justifying a monopolist's refusal to deal with a class of customers where competition is harmed substantially on the grounds that there are transaction costs in dealing with additional customers. A challenge to a monopolist's refusal to deal, by its nature, involves refusing to deal with a class of customers. Consequently, it will always be possible to posit that the transaction costs of dealing with additional customers justifies selective distribution. While it is certainly true that a more extensive distribution system is more expensive to manage, and should not be ignored in assessing net competitive effects, our focus must be on whether it outweighs substantial harm to competition.

The only record estimate of the extent of these added distribution costs was provided by Mr. Murphy, who estimated that it would cost $40 million to deal with 10,000 additional customers, or $4,000 per customer. (Tr. 10079) The majority concedes this estimate is "inflated." (Majority op. at 74) Moreover, the testimony was given without explanation as to the components of the costs, nor without a clear explanation of whether the costs are one-time start up costs or [*340] recurring. Against this apparently rather speculative estimate, which the majority concedes is inflated, the record showed excess prices of almost $37 million in 1977 on an annual basis. [5]

---

[4] It is, of course, difficult to estimate aggregate excess prices paid by the disadvantaged dealers from the record. In 1977 GM paid approximately $98.8 million to dealers for crash parts under the wholesale compensation plan. (Tr. 16277-80) This amounts to 30% of the dealer price of qualified sales to wholesale customers. (IDF 73) Consequently, the aggregate dealer (or wholesaler list) price for parts sold to wholesale customers was approximately $327 million and the actual amount paid by these customers was about $235 million, assuming they received a 28% off list discount. (See majority op. at 49) Consequently, if the dealer price is reduced 17.7% from the independents, the total premium paid is about $41.6 million.

[5] If independents were allowed to buy GM crash parts directly from GM, we would expect to see not only a reduction in prices charged by independents, due to lower costs, but an increase in volume done by them as people took advantage of lower prices, and a decrease in prices charged by the dealers as they responded to the competition. Consequently, the total spent by consumers could be reduced by more than the excess amount for crash parts paid by independents. We should keep in mind that GM's sale of crash parts is no small enterprise. Complaint counsel estimate that the dollar value of domestic shipments of these parts was about $549 million in 1977. (Majority op. at 6)

I cannot agree that GM has carried its burden in showing that the additional transaction costs of dealing with independent body shops outweighs the substantial harm to competition shown by complaint counsel. The record falls far short of proof adequate to justify a system which clearly raises prices to independents **[*341]** by millions of dollars and which, no doubt, drives up significantly the costs we all pay for dented fenders and crushed bumpers. For these reasons I dissent from the dismissal of the complaint.

## Order

FINAL ORDER

This matter has been heard by the Commission upon the appeals of complaint counsel and respondent from the initial decision and upon briefs and oral argument in support of and in opposition to the appeals. For the reasons stated in the accompanying Opinion, the Commission has determined to sustain respondent's appeal. Complaint counsel's appeal is denied. Accordingly,

IT IS ORDERED, That the complaint is dismissed.

By the Commission, Chairman Miller not participating; Commissioner Pertschuk dissenting.

June 25, 1982

ATTACHMENTS: Concurring Statement of Commissioner Clanton

Dissenting Statement of Commissioner Pertschuk

End of Document

Exhibit 3

Case: 3:25-cv-50017 Document #: 149-1 Filed: 05/28/25 Page 122 of 193 PageID #:2904

SaurikIT, LLC v. Apple, Inc., Not Reported in Fed. Rptr. (2023)

🚩 KeyCite Yellow Flag

Distinguished by  Yelp Inc. v. Google LLC,  N.D.Cal.,  April 22, 2025

2023 WL 8946200

Only the Westlaw citation is currently available.

United States Court of Appeals, Ninth Circuit.

SAURIKIT, LLC, Plaintiff-Appellant,

v.

APPLE, INC., Defendant-Appellee.

No. 22-16527
|
Argued and Submitted December
14, 2023 San Francisco, California
|
FILED DECEMBER 28, 2023

Appeal from the United States District Court for the Northern District of California, Yvonne Gonzalez Rogers, District Judge, Presiding, D.C. No. 4:20-cv-08733-YGR

**Attorneys and Law Firms**

David Michael Cooper Attorney, Quinn Emanuel Urquhart & Sullivan, LLP, New York, NY, Adam Wolfson Attorney, Quinn Emanuel Urquhart & Sullivan, LLP, Los Angeles, CA, for Plaintiff-Appellant.

Theodore J. Boutrous Attorney Jr., Esquire, Jagannathan Srinivasan, Gibson, Dunn & Crutcher, LLP, Los Angeles, CA, Dana Lynn Craig, Julian Kleinbrodt Attorney, Gibson, Dunn & Crutcher, LLP, San Francisco, CA, Cynthia Richman, Gibson, Dunn & Crutcher, LLP, Washington, DC, for Defendant-Appellee.

Before: KOH, H.A. THOMAS, and DESAI, Circuit Judges.

Partial Dissent by Judge DESAI.

MEMORANDUM [*]

**\*1**  SaurikIT, LLC ("SaurikIT") appeals the district court's dismissal of its antitrust suit against Apple, Inc. ("Apple"). We have jurisdiction under 28 U.S.C. § 1291. We review de novo a district court's dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6). *In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 317 (9th Cir. 2017). We affirm.

1. The district court dismissed SaurikIT's claims premised on Apple's warranty agreements because SaurikIT's complaint, filed in 2020, alleged injury based on conduct that occurred in 2008, and SaurikIT's pleadings did not allege new conduct within the four-year statute of limitations. SaurikIT argues that Apple engages in an overt act that resets the statute of limitations every time it sells a new iOS device with a warranty agreement that requires iOS users to use only the App Store. But, as the district court found, the warranty term in question existed in 2008, and SaurikIT does not allege that the term has changed since. SaurikIT has thus failed to allege that the new warranty agreements constitute anything more than "a reiteration or extension of" prior ones. *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1204 (9th Cir. 2014) (holding that plaintiffs had sufficiently alleged a new overt act where defendants met and adopted an anticompetitive contract which expanded the scope of the alleged anticompetitive conspiracy and stating that "the typical antitrust continuing violation occurs ... when conspirators continue to meet to fine-tune their cartel agreement" (cleaned up)). And permitting new unchanged warranty agreements to establish continuing violations would vitiate the purpose of the statute of limitations.

2. SaurikIT also maintains that Apple's contracts with iOS app developers constitute continuing antitrust violations within the statute of limitations period. But its complaint offers only conclusory allegations that the developer contracts "have not stayed static over the years," were "modified" to "shore up perceived holes," and that these "ever-more-restrictive changes" occurred within the limitations period. These conclusory statements do not meet the pleading requirements set forth in Rule 8 of the Federal Rules of Civil Procedure. See *Ashcroft v. Iqbal*, 556 U.S. 662, 677–79 (2009) (noting that a complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' ... Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice"); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–60 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true." (cleaned up)). The district court therefore did not err in dismissing this claim. Nor did the court err in concluding that SaurikIT had not pled adequate facts to allege that Apple steered customers away from Cydia through enforcement of its developer agreements, as SaurikIT makes only a conclusory allegation that it was harmed by such enforcement. See *Pace Indus., Inc. v. Three*

*Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987) ("[A]n overt act which will restart the statute of limitations ... must inflict new and accumulating injury on the plaintiff.").

**\*2 AFFIRMED.**

DESAI, Circuit Judge, dissenting in part:

I respectfully dissent from Section 2 of the memorandum disposition. The majority's holding imposes a pleading burden beyond what is required to survive a statute of limitations defense. I would hold that SaurikIT's allegations about Apple's app developer agreements state a "continuing" antitrust violation within the statute of limitations period. *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014).

This court may uphold a dismissal on statute of limitations grounds only if, construing the allegations in the light most favorable to the plaintiff, "it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim." *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1207 (9th Cir. 1995); *see also Syed v. M-I, LLC*, 853 F.3d 492, 507 (9th Cir. 2017). And we must reverse a dismissal when the timeliness of the claim depends on "factual questions not clearly resolved" on the face of the complaint. *Supermail Cargo*, 68 F.3d at 1207. We should do so here.

SaurikIT alleges that Apple's developer agreements "have not stayed static over the years," but have been updated with "ever-more-restrictive changes" to "shore up perceived holes in, and add new restrictions on, developers' ability to use alternative app stores and[ ] payment processing services." The majority rebuffs these allegations as "conclusory," but

SaurikIT need not detail each specific change to the developer agreements to satisfy Rule 8. *See Shields v. Credit One Bank, N.A.*, 32 F.4th 1218, 1226 (9th Cir. 2022) ("*Iqbal* did not require [the plaintiff] to include more granular details about the exact nature" of her allegations); *cf. Benavidez v. County of San Diego*, 993 F.3d 1134, 1145 (9th Cir. 2021) (explaining that, even under a heightened Rule 9(b) standard, "a complaint need not allege 'a precise time frame,' 'describe in detail a single specific transaction' or identify the 'precise method' used to carry out the fraud." (quoting *United States v. United Healthcare Ins.*, 848 F.3d 1161, 1180 (9th Cir. 2016))).

Beyond that, SaurikIT alleges that Cydia previously operated since 2008 as the "second-most successful iOS app distribution channel" for iOS users "despite all the roadblocks that Apple threw its way." And "Apple only really succeeded in excluding all competing iOS app distribution and payment processing services from the App Store in 2019 and 2020." That is, SaurikIT contends that Apple's more restrictive developer agreements, combined with recent technological updates, have finally "result[ed] in complete exclusion" of App Store alternatives like Cydia. These allegations are sufficient at the pleading stage to show that Apple engaged in overt acts during the statute of limitations period, including by "fine-tun[ing]" its developer agreements to stave off competition. *Samsung*, 747 F.3d at 1204 (quoting *Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 269 (8th Cir. 2004)).

**\*3** For these reasons, I would reverse the district court's dismissal of SaurikIT's claims. I respectfully dissent.

**All Citations**

Not Reported in Fed. Rptr., 2023 WL 8946200

---

**Footnotes**

\*      This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

---

**End of Document**        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 4



Neutral
As of: May 28, 2025 9:28 PM Z

## *United States v. Agri Stats, Inc.*

United States District Court for the District of Minnesota

May 28, 2024, Decided; May 28, 2024, Filed

Civil No. 23-3009 (JRT/JFD)

**Reporter**
2024 U.S. Dist. LEXIS 94142 *; 2024 WL 2728450

UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF NORTH CAROLINA, STATE OF TENNESSEE, STATE OF MINNESOTA, STATE OF TEXAS, and STATE OF UTAH, Plaintiffs, v. AGRI STATS, INC., Defendant.

**Prior History:** *United States v. Agri Stats, Inc., 2023 U.S. Dist. LEXIS 186803, 2023 WL 6876960 (D. Minn., Oct. 18, 2023)*

## Core Terms

turkey, broiler, pork, chicken, antitrust, venue, Plaintiffs', subscribers, witnesses, convenience of the parties, motion to dismiss, producers, interest of justice, anticompetitive, convenience, quotation, antitrust statute, injunctive relief, processors, courts, deference, argues, meat, district court, stare decisis, injury-in-fact, allegations, conspiracy, parties, restart

**Counsel:** [*1] Mark Henry Michael Sosnowsky and William Friedman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Liles Harvey Repp, UNITED STATES ATTORNEY'S OFFICE, Minneapolis, MN; Sarah Doktori, OFFICE OF THE MINNESOTA ATTORNEY GENERAL, St. Paul, MN; Robert Brian McNary, CALIFORNIA DEPARTMENT OF JUSTICE, Los Angeles, CA, for Plaintiffs.

Justin Bernick and Liam Phibbs, HOGAN LOVELLS US LLP, Washington, D.C.; Peter H. Walsh, HOGAN LOVELLS US LLP, Minneapolis, MN, for Defendant.

**Judges:** JOHN R. TUNHEIM, United States District Judge.

**Opinion by:** JOHN R. TUNHEIM

## Opinion

## MEMORANDUM OPINION & ORDER DENYING DEFENDANT'S MOTION TO TRANSER AND MOTION TO DISMISS

The United States and six individual states bring this antitrust action against Defendant Agri Stats, Inc. for an alleged information-exchange conspiracy with major U.S. broiler chicken, pork, and turkey processors. Agri Stats filed a motion to transfer venue pursuant to *28 U.S.C. § 1404* or, alternatively, a motion to dismiss for lack of subject matter jurisdiction and failure to state a claim pursuant to *Federal Rules of Civil Procedure 12(b)(1)* and *12(b)(6)*. Because the convenience of the parties and witnesses and the interests of justice do not strongly favor transfer, the Court will deny Agri Stats's motion to transfer. Because Plaintiffs' [*2] pork and turkey claims meet the requisite standing and pleading requirements under Article III and the antitrust statutes and because the Court declines to justify dismissal of the broiler chicken claim under stare decisis, the Court will deny Agri Stats's motion to dismiss.

### BACKGROUND

### I. FACTS

Agri Stats is an Indiana corporation that operates a subscription and consulting service in numerous U.S. meat processing industries. (2nd Am. Compl. ¶ 12, Nov. 15, 2023, Docket No. 50.) Its employees work in the company's single office in Fort Wayne, Indiana, or remotely—no employees live or regularly work in Minnesota. (Def.'s Mem. Supp. Mot. Transfer, Ex. 1 ("1st Scholer Decl.") ¶ 3, Nov. 8, 2023, Docket No. 44.)

Through its subscription service, Agri Stats collects detailed information from its subscribers about their operations, including information about sales, live

2024 U.S. Dist. LEXIS 94142, *2

production, processing, and profits, which is not available elsewhere. (2nd Am. Compl. ¶¶ 16-18, 28-29.) Then, Agri Stats audits the data to ensure its reliability, compiles it into written reports, and distributes those reports back to subscribers. (*Id.* ¶¶ 19-21.) The reports provide subscribers with detailed information about where the **[*3]** subscriber stands in comparison to the rest of the industry in terms of sales and live production. (*Id.* ¶¶ 33-34, 37-39, 41, 43-44.) Agri Stats also provides sales consulting services to its subscribers, through which it advises subscribers how to use the information it collects from the industry. (*Id.* ¶¶ 48, 50.)

The reports that Agri Stats produces are comprehensive, with some being hundreds of pages long and replete with company- and facility-level information. (*Id.* ¶ 21.) Agri Stats anonymizes company data in the reports, but subscribers have access to participating companies and facilities. (*Id.* ¶¶ 3, 25.) Agri Stats only shares its reports with subscribers. (*Id.* ¶ 9.)

Agri Stats's subscribers include meat processers in the broiler chicken, pork, and turkey industries. (*Id.* ¶ 14.) The company began offering benchmarking reports and services to broiler chicken producers in 1985 and to turkey and pork producers in 2001 and 2007, respectively. (1st Scholer Decl. ¶¶ 5-6.) Turkey and pork producers withdrew their subscriptions to Agri Stats's reports after *In re Broiler Chicken Antitrust Litigation*, No. 16-8637, was filed in the Northern District of Illinois, and Agri Stats stopped offering **[*4]** turkey and pork reports in 2019. (*Id.* ¶ 8; 2nd Am. Compl. ¶ 15.) Agri Stats still produces and distributes reports to broiler chicken subscribers. (1st Scholer Decl. ¶ 5.)

The parties dispute the reason behind Agri Stats's change in pork and turkey reports. Agri Stats represents that it stopped producing pork and turkey reports because "there were not enough subscribers to maintain" those reports, not because of any litigation risk to Agri Stats from those reports. (Decl. Eric Scholer ("2nd Scholer Decl.") ¶¶ 3-5, Jan. 5, 2024, Docket No. 80.) Essentially, Agri Stats claims that without the input from the meat industries it cannot produce the reports. (2nd Scholer Decl. ¶¶ 6, 8.) Plaintiffs, however, allege that Agri Stats's "executives have stated that they want to resume reporting in these industries once that litigation concludes." (2nd Am. Compl. ¶ 15.)

Plaintiffs allege that Agri Stats's reports and counseling services constitute anticompetitive conduct in the broiler chicken, pork, and turkey industries. (*Id.* ¶¶ 2-11.) Specifically, Plaintiffs describe Agri Stats's reports as

negating the need to communicate directly with other processors. (*Id.* ¶ 5.) Instead, the reports' forecasting **[*5]** of competitor action encourages processors to raise total industry profits on a collective scale. (*Id.*) As a result, Plaintiffs contend that this behavior not only stifles competition, but also harms consumers as they are forced to pay higher prices for staple food items like broiler chicken, pork, and turkey. (*Id.* ¶¶ 6, 11, 72, 115, 160.)

## II. PROCEDURAL HISTORY

The United States initiated this action against Agri Stats in September 2023, and California, Minnesota, North Carolina, Tennessee, Texas, and Utah (the "Plaintiff States") subsequently joined the suit. (Compl., Sept. 28, 2023, Docket No. 1; Am. Compl., Nov. 6, 2023, Docket No. 30; 2nd Am. Compl.) Pursuant to *Section 4 of the Sherman Act, 15 U.S.C. § 4*, and *Section 16 of the Clayton Act, 15 U.S.C. § 26*, Plaintiffs bring three counts under *Section 1 of the Sherman Act, 15 U.S.C. § 1*, for managing anticompetitive information exchanges in the broiler chicken, pork, and turkey markets. (2nd Am. Compl. ¶¶ 152-53, 162-67.)

Agri Stats is a defendant in three other antitrust matters as well. *See In re Pork Antitrust Litig., 495 F. Supp. 3d 753 (D. Minn. 2020)* ("*Pork*"); *In re Broiler Chicken Antitrust Litig.*, No. 16-8637 (N.D. Ill.) ("*Broilers*"); *In re Turkey Antitrust Litig.*, No. 19-8318 (N.D. Ill.) ("*Turkey*"). *Broilers* and *Turkey* are both pending in the Northern District of Illinois but before different judges and on different timelines. **[*6]** *Broilers* completed summary judgment motions but summary judgment motions in *Turkey* are scheduled for 2025. (Def.'s Mem. Supp. Mot. Transfer at 13.)

Agri Stats filed a motion to transfer venue to the Northern District of Illinois or to the Northern District of Indiana. (Def.'s Mot. Transfer/Change Venue, Nov. 8, 2023, Docket No. 42.) Alternatively, Agri Stats filed a motion to dismiss Plaintiffs' Second Amended Complaint ("Complaint") for lack of subject matter jurisdiction and failure to state a claim. (Def.'s Mot. Dismiss, Jan. 5, 2024, Docket No. 77.)

## DISCUSSION

## I. DEFENDANT'S MOTION TO TRANSFER VENUE

Agri Stats has moved to transfer venue to the Northern District of Illinois, the location of the pending *Broilers* and *Turkey* litigation, or, alternatively, to the Northern District of Indiana, its primary place of business, pursuant to *28 U.S.C. § 1404(a)*. Because the convenience of the parties and witnesses and the interests of justice do not strongly favor transfer, the Court will deny the motion.


**A. Standard of Review**

*28 U.S.C. § 1404(a)* provides that "a district court may transfer any civil action to any other district or division where it might have been brought" "[f]or the convenience of parties and witnesses, [and] in **[*7]** the interests of justice." The purpose of *§ 1404(a)* is to "prevent the waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack, 376 U.S. 612, 616, 84 S. Ct. 805, 11 L. Ed. 2d 945 (1964)* (internal quotations omitted). When deciding a motion to transfer under *§ 1404(a)*, courts consider (1) the convenience of the parties, (2) the convenience of the witnesses, and (3) the interests of justice, and may balance other case-specific factors. *Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29-30, 108 S. Ct. 2239, 101 L. Ed. 2d 22 (1988)*. Courts give "considerable deference" to a plaintiff's forum choice, and the moving party bears the burden of demonstrating that transfer is warranted under *§ 1404(a)*. *Terra Int'l, Inc. v. Mississippi Chem. Corp., 119 F.3d 688, 695 (8th Cir. 1997)*. Ultimately, the decision to transfer a case is committed to the discretion of the district court. *Id. at 697*.


**B. Venue in the District of Minnesota**

Agri Stats argues its place of residence and the fact that a substantial part of the events or omissions giving rise to the claim did not occur in Minnesota support its motion for transfer. The Court does not find these arguments compelling.

The general venue statute, *28 U.S.C. § 1391*, provides that venue is proper (1) where "any defendant resides, if all defendants are residents of the State in which the district is located," (2) where "a substantial part of the events or omissions **[*8]** giving rise to the claim occurred," or (3) where "any defendant is subject to the court's personal jurisdiction with respect to such action" where the action cannot otherwise be brought in any

other district. But *Section 12 of the Clayton Act*, which applies in this antitrust action, provides that "[a]ny suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business." *15 U.S.C. § 22*. The venue analysis under *Section 12* is thus a less restrictive venue analysis than that under *§ 1391*. See *Campos v. Ticketmaster Corp., 140 F.3d 1166, 1173 (8th Cir. 1998)* ("*[Section]* 12 was intended to make the practical, everyday business or commercial concept of doing or carrying on business of any substantial character the test of venue.") (cleaned up) (quoting *United States v. Scophony Corp. of Am., 333 U.S. 795, 807, 68 S. Ct. 855, 92 L. Ed. 1091 (1948)*). The broad language of *Section 12* "was designed to aid plaintiffs by giving them a wider choice of venues, and thereby to secure a more effective, because more convenient, enforcement of antitrust prohibitions." *United States v. Nat'l City Lines, 334 U.S. 573, 586, 68 S. Ct. 1169, 92 L. Ed. 1584 (1948)*.

While Agri Stats is incorporated and has its principal place of business in Indiana, it sufficiently conducts business in Minnesota to support venue in the District of Minnesota. The appropriate inquiry is not if a substantial **[*9]** part of the events giving rise to the claims occurred in Minnesota but rather whether Agri Stats transacts business in Minnesota to an extent that would make venue proper in this District.

Agri Stats transacts business in Minnesota as it distributes reports to processors across the country, including Minnesota-based processors of broiler chicken, pork, and turkey. (2nd Am. Compl. ¶¶ 156-157 (discussing Minnesota-based subscribers Hormel, Jennie-O, Gold'n Plump, and Pilgrim's).) Plus, Agri Stats's consulting managers travel to processors' facilities—including those in Minnesota—and instruct them on how to use information provided by Agri Stats. (*Id.* ¶¶ 10, 48-50, 159.) Because at least one processor in each relevant industry has operated in Minnesota, Agri Stats transacts business in Minnesota to an extent that makes venue proper in this District.


**C. Convenience of the Parties and Witnesses**

Turning next to the convenience of the parties and witnesses, Plaintiffs favor maintaining venue in the District of Minnesota, while Agri Stats requests transfer to the Northern District of Illinois or Northern District of Indiana.

In general, courts give "considerable deference" to a plaintiff's forum [*10] choice. *Terra Int'l, Inc., 119 F.3d at 695*. That choice is particularly entitled to deference when government enforcers bring federal antitrust claims, *see United States v. Brown Univ., 772 F. Supp. 241, 242 (E.D. Pa. 1991)*, and when a plaintiff resides in the selected forum, *Voss v. Johnson & Johnson, No. 06-3728, 2008 U.S. Dist. LEXIS 19860, 2008 WL 697474, at *2 (D. Minn. Mar. 12, 2008)*. Courts assess "(1) the convenience of the parties, (2) the convenience of the witnesses—including the willingness of the witnesses to appear, the ability to subpoena witnesses, and the adequacy of deposition testimony, (3) the accessibility to records and documents, (4) the location where the conduct complained of occurred, and (5) the applicability of each forum state's substantive law." *Terra Int'l, Inc., 119 F.3d at 696*. The transferee forum must be a more convenient forum rather than "a forum likely to prove equally convenient or inconvenient." *Graff v. Qwest Commc'ns Corp., 33 F. Supp. 2d 1117, 1121 (D. Minn. 1999)*. Therefore, a transfer should not be granted "if the effect is simply to shift the inconvenience" from one party to the other. *Id.* (citing *Van Dusen, 376 U.S. at 646*). Agri Stats must establish that its "inconvenience substantially outweighs the inconvenience that plaintiff would suffer if venue were transferred." *Nelson v. Soo Line R.R. Co., 58 F. Supp. 2d 1023, 1026 (D. Minn. 1999)*. Courts assume that employees of the parties will voluntarily appear in a foreign forum and focus on the convenience to non-party witnesses. *Advanced Logistics Consulting, Inc. v. C. Enyeart LLC, No. 09-720, 2009 U.S. Dist. LEXIS 50603, 2009 WL 1684428, at *5 (D. Minn. June 16, 2009)*; *see also Luckey v. Alside, Inc., No. 15-2512, 2016 U.S. Dist. LEXIS 51752, 2016 WL 1559569, at *5 (D. Minn. Apr. 18, 2016)*.

Under the current circumstances of this case, the convenience [*11] of the parties and witnesses does not strongly favor transfer. Convenience factors that weigh in favor of transfer to either Indiana or Illinois include the fact that Agri Stats is incorporated in Indiana and has its principal place of business in Fort Wayne, which is a three-hour drive from Chicago versus a nine-hour drive to Minneapolis; that the reports giving rise to Plaintiffs' claims are created in Fort Wayne; that Agri Stats's employee witnesses are in Fort Wayne; that the company has no office or employees in Minnesota; and the existence of the ongoing litigation involving Agri Stats as a defendant in Illinois. However, convenience factors that weigh against transfer include the fact that the State of Minnesota is a plaintiff in this action; that some of Agri Stats's subscribers are Minnesota-based;

and that some of non-party witnesses reside in Minnesota. Further, "the location of the Defendants' employee-witnesses is not enough to overcome the deference given to Plaintiffs' choice of forum." *Luckey, 2016 U.S. Dist. LEXIS 51752, 2016 WL 1559569, at *5*. Plus, Agri Stats remains a defendant before this Court as part of the *Pork* litigation, and so is already required to participate in discovery, dispositive motion briefing, and potentially [*12] trial in this District. On balance, the convenience of the parties and witnesses is therefore neutral and does not strongly favor transfer.

## D. Interests of Justice

In analyzing transfer, courts weigh the interest of justice factor heavily. *In re Monies on Deposit in Accts. at Stearns Bank Nat'l Ass'n, No. 06-542, 2006 U.S. Dist. LEXIS 94065, 2006 WL 3841518, at *2 (D. Minn. Dec. 29, 2006)*; *see also I-T-E Circuit Breaker Co. v. Regan, 348 F.2d 403, 405 (8th Cir. 1965)*. When considering the interest of justice, the Court may take into account a broad range of factors, such as "(1) judicial economy, (2) the plaintiff's choice of forum, (3) the comparative costs to the parties litigating in each forum, (4) each party's ability to enforce a judgment, (5) obstacles to a fair trial, (6) conflict of laws, and (7) the advantages of having a local court determine questions of local law." *Terra Int'l, 119 F.3d at 696*. The parties most hotly contest judicial economy.

Agri Stats bases its judicial economy argument primarily on *Broilers*. It argues that *Broilers* more adequately encompasses the dispute here than *Pork*, so the case should be transferred to the Northern District of Illinois. Specifically, Agri Stats indicates that Plaintiffs' case must necessarily focus on broiler chicken reports because those are the only reports still being produced. Alternatively, Agri Stats reminds the Court that *Turkey*, which is also pending in the Northern District [*13] of Illinois, supports transfer as two of the three meat industries involved in this case (broiler chicken and turkey) are already in that district. The Court disagrees.

The plaintiffs in *Broilers* accused chicken producers of using Agri Stats's reports in a price-fixing conspiracy such that Agri Stats's information exchange was anticompetitive and violated the *Sherman Act*. *In re Broiler Chicken Antitrust Litig., No. 16-8637, 702 F. Supp. 3d 635, 2023 U.S. Dist. LEXIS 196869, 2023 WL 7220170, at *2 (N.D. Ill. Nov. 2, 2023)*. The plaintiffs described Agri Stats's reports as establishing and enforcing the alleged conspiracy because chicken

producers were able to "deanonymize" the data. *2023 U.S. Dist. LEXIS 196869, [WL] at \*25*. At summary judgment, the Court concluded however that "[j]ust because Agri Stats provided a convenient form to transmit the information [did] not mean that Agri Stats itself joined the conspiracy." *2023 U.S. Dist. LEXIS 196869, WL[] at \*26*. In other words, the Court found insufficient evidence that Agri Stats conspired with chicken producers to restrict supply and increase the price of broiler chicken and dismissed the claims against Agri Stats. *2023 U.S. Dist. LEXIS 196869, [WL] at \*27*.

Despite the similarities between the claims against Agri Stats in this action and in *Broilers*, judicial resources and efficiency would not be furthered by transferring this action. *Pork*, *Broilers*, *Turkey*, and this action all allege that Agri Stats participated **[*14]** in a price-fixing conspiracy and anticompetitive information exchange, such that there is overlap between all four actions. *In re Pork Antitrust Litig., 495 F. Supp. 3d at 766-67*; *In re Broiler Chicken Antitrust Litig., 2023 U.S. Dist. LEXIS 196869, 2023 WL 7220170, at \*1*; *In re Turkey Antitrust Litig., 642 F. Supp. 3d 711, 717-18 (N.D. Ill. 2022)*. The fact that the plaintiffs in *Pork* seek damages for alleged past conduct, whereas here Plaintiffs seek an injunction against Agri Stats' pork, turkey, and broiler chicken reports, is of little matter, because both cases allege a price-fixing conspiracy and anticompetitive information exchange against Agri Stats. *Compare id. at 765*, with (2nd Am. Compl. ¶ 169.). Discovery in this case therefore will overlap with that in *Pork*, which Agri Stats is defending in this Court. *See Newman v. Stryker Sales Corp., No. 09-2866, 2010 U.S. Dist. LEXIS 105168, 2010 WL 3926200, at \*6 (D. Minn. Sept. 30, 2010)* (denying a transfer motion where discovery was subject to coordination with other actions that defendant was defending before the court). And Agri Stats's attempts to minimize Plaintiffs' pork and turkey claims because Agri Stats ceased its pork and turkey reporting are inconsequential, as the Court may still consider claims for injunctive relief on challenged conduct that terminated before litigation commenced. *Fed. Trade Comm'n v. Accusearch Inc., 570 F.3d 1187, 1201 (10th Cir. 2009)* (A "court's power to grant injunctive relief survives the discontinuance of the illegal conduct.") (quoting *United States v. W.T. Grant Co., 345 U.S. 629, 633, 73 S. Ct. 894, 97 L. Ed. 1303 (1953)*).

Moreover, though the information exchange claim against Agri Stats was dismissed **[*15]** in *Broilers*, allowing Plaintiffs to litigate this claim would not countenance the inefficiency and risk of inconsistent outcomes that *Section 1404(a)* aims to prevent. The

same purported risk of inconsistent outcomes against the information exchange claims will remain whether this action continues in this District or is transferred to the Northern District of Illinois because of this Court's jurisdiction over *Pork*. Finally, and very importantly, Plaintiffs' forum choice deserves "considerable deference." *Terra Int'l, 119 F.3d at 695*. That choice is especially entitled to deference in this case given that the United States chose to bring antitrust claims against Agri Stats in this forum, and the State of Minnesota is a Plaintiff State. *See Brown Univ., 772 F. Supp. at 242* ("[M]any courts, pointing to the liberal venue requirements for the government bringing an antitrust suit, have held that in such suits, plaintiffs' choice of forum is entitled to heightened respect."); *Voss, 2008 U.S. Dist. LEXIS 19860, 2008 WL 697474, at \*2* (noting that courts generally afford less deference to the plaintiff's choice of forum when the plaintiff does not reside in the forum). Given the above considerations, Agri Stats has not met its burden of showing that the interests of justice warrant transfer.

\* \* \*

Weighing all the transfer factors **[*16]** in this case, the Court concludes that the convenience of the parties and witnesses and the interests of justice do not strongly favor transfer. Accordingly, the Court will deny Agri Stats's motion to transfer and maintain the action in this forum.

## II. DEFENDANT'S MOTION TO DISMISS

Alternatively, Agri Stats has moved to dismiss Plaintiffs' Complaint for lack of subject matter jurisdiction and failure to state a claim. Agri Stats challenges Plaintiffs' claims on different grounds. Agri Stats's arguments against the pork and turkey claims are based in jurisdiction, and its arguments against the broiler chicken claim are based on stare decisis. Because the pork and turkey claims meet the requisite standing and pleading requirements under Article III and the antitrust statutes and the Court is not bound by the summary judgment decision in *Broilers*, the Court will deny the motion.

### A. Standard of Review

In reviewing a motion to dismiss under *Federal Rule of Civil Procedure 12(b)(6)*, the Court considers all facts alleged in the complaint as true to determine if the

complaint states a "claim to relief that is plausible on its face." *Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009)* (quoting *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*). At the motion to dismiss stage, the Court may consider the allegations in the complaint as well as **[*17]** "those materials that are necessarily embraced by the pleadings." *Schriener v. Quicken Loans, Inc., 774 F.3d 442, 444 (8th Cir. 2014)*.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal, 556 U.S. at 678*. The Court construes the complaint in the light most favorable to the plaintiff, drawing all inferences in the plaintiff's favor. *Ashley Cnty. v. Pfizer, Inc., 552 F.3d 659, 665 (8th Cir. 2009)*. Although the Court accepts the complaint's factual allegations as true and construes the complaint in a light most favorable to the plaintiff, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986)*. In other words, a complaint "does not need detailed factual allegations" but must include more "than labels and conclusions, and a formulaic recitation of the elements" to meet the plausibility standard. *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*.

## B. Pork and Turkey Claims

Agri Stats challenges the pork and turkey claims on three separate grounds: (1) Article III standing, (2) the availability of injunctive relief under the antitrust statutes, and (3) antitrust standing. The Court will analyze each in turn.

## 1. Article III Standing

First, Agri Stats argues that Plaintiffs' pork and turkey claims allege no Article III case or controversy and must be dismissed **[*18]** for lack of subject matter jurisdiction. Article III of the Constitution limits federal jurisdiction to actual cases and controversies. *U.S. Const. art. III, § 2*; *Steger v. Franco, Inc., 228 F.3d 889, 892 (8th Cir. 2000)*. A case or controversy must exist for each claim Plaintiffs bring. *Davis v. Fed. Election Comm'n, 554 U.S. 724, 734, 128 S. Ct. 2759, 171 L. Ed. 2d 737 (2008)* (internal quotation marks and quotation omitted). Sovereign entities as plaintiffs are not immune

from the traditional standing requirements. *See W.T. Grant Co., 345 U.S. at 633-34*; *California v. Am. Stores, 495 U.S. 271, 277, 110 S. Ct. 1853, 109 L. Ed. 2d 240 (1990)*. To show Article III standing, Plaintiffs bear the burden of proving: (1) they suffered an "injury-in-fact," (2) their injury was caused by the challenged conduct, and (3) their injury likely will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)*.

Agri Stats challenges the first element: injury-in-fact. Because Plaintiffs seek injunctive relief, the "injury-in-fact" element requires a showing that they face "a threat of ongoing or future harm." *Park v. Forest Serv. of U.S., 205 F.3d 1034, 1037 (8th Cir. 2000)*. The threat of future harm cannot be abstract, but rather "must be both real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons, 461 U.S. 95, 102, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983)* (cleaned up). "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158, 134 S. Ct. 2334, 189 L. Ed. 2d 246 (2014)* (cleaned up). Exposure to past illegal conduct does not establish a present case or controversy, "if unaccompanied by any continuing, present adverse effects." **[*19]** *Park, 205 F.3d at 1037* (quotation omitted); *see also Lyons, 461 U.S. at 102*.

Agri Stats rests on its cessation of pork and turkey reports in 2019 as evidence that Plaintiffs fail to allege an injury-in-fact. Further, Agri Stats argues the Complaint is devoid of any indication that Agri Stats will or even can restart such reports. To restart pork and turkey reports, Agri Stats would need subscribers to provide their information to Agri Stats and subsequently purchase any resulting reports. But, Agri Stats contends, such conduct is speculative and depends on the actions of third parties, which is insufficient to create an injury-in-fact. *See Clapper v. Amnesty Int'l USA, 568 U.S. 398, 414 n.5, 133 S. Ct. 1138, 185 L. Ed. 2d 264 (2013)*. The Court disagrees.

Though Agri Stats is not currently producing pork and turkey reports and declares it "has no current plans to resume its production of the turkey and pork-related reports," a "sparse declaration" regarding no current plans to resume the challenged conduct and the passage of multiple years since the conduct ceased are insufficient bases for dismissal. (2nd Scholer Decl. ¶ 8.); *FBI v. Fikre, 601 U.S. 234, 239-44, 144 S. Ct. 771, 218 L. Ed. 2d 162 (2024)*. Agri Stats can restart such reports when/if requested. *See Accusearch Inc., 570 F.3d at*

_1201_ (affirming injunction regarding conduct that had ceased because defendant "remained in the information brokerage business" and "had the **[\*20]** capacity to engage in similar unfair acts or practices in the future"). Though Plaintiffs cannot rely on "speculation about the unfettered choices made by independent actors not before the court," _Clapper, 568 U.S. at 414 n.5_ (quotation omitted), they have alleged enough at this stage to suggest that subscribers intend to subscribe to such reports in the future. (_See, e.g._, Decl. William M. Friedman ("Friedman Decl.") ¶ 9, Ex. 7, Jan. 26, 2024, Docket No. 89.) Plus, Agri Stats continues to advertise on its website that it "service[s] customers in the chicken, turkey, commercial egg, and swine industries." (_Id._ ¶ 11, Ex. 9.)

Additionally, Plaintiffs have provided sufficient expressions of intent by Agri Stats to restart pork and turkey reports in the future. Plaintiffs allege that Agri Stats intends to resume pork and turkey reports once the litigation that spurred the cessation terminates. (2nd Am. Compl. ¶ 15; _see also id._ ¶ 104; Friedman Decl. ¶¶ 5-10, Exs. 3-8.) Though "[s]ome day" intentions "without any description of concrete plans, or indeed even any specification of when the some day will be" are insufficient to establish Article III standing, the Plaintiffs allege a more specific "some day"—after the conclusion **[\*21]** of _Pork_ and _Turkey. Lujan, 504 U.S. at 564_. Further, the fact that Agri Stats insists that its information-sharing is lawful reinforces the likelihood that it will resume that activity absent relief. _See SEC v. First Am. Bank & Tr. Co., 481 F.2d 673, 682 (8th Cir. 1973)_. To be sure, the Complaint could have included more specific details about Agri Stats's intent to restart its pork and turkey reports, but it has alleged just enough to establish a "substantial risk" of future harm for injury-in-fact. _Driehaus, 573 U.S. at 158_. It remains to be seen what discovery may yield but as of now, the Court will not grant Agri Stats's motion to dismiss the pork and turkey claims on this ground.

## 2. Injunctive Relief

Next, Agri Stats argues that Plaintiffs' pork and turkey claims fail to allege facts warranting prospective relief under the antitrust statutes. Plaintiffs bring this action pursuant to _Section 4 of the Sherman Act_ and _Section 16 of the Clayton Act_. (2nd Am. Compl. ¶¶ 152-53.) Both statutes empower district courts with jurisdiction to authorize injunctions against prospective anticompetitive conduct. _See 15 U.S.C. §§ 4, 26_. To meet their burden, Plaintiffs must establish "that there exists some

cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." _W.T. Grant Co., 345 U.S. at 633_; _see also Zenith Radio Corp. v. Hazeltine Rsch., Inc., 395 U.S. 100, 130, 89 S. Ct. 1562, 23 L. Ed. 2d 129 (1969)_ ("[Plaintiffs] need only demonstrate a significant **[\*22]** threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur."). "In assessing the likelihood of recurrence, a court may consider all the circumstances, including the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations." _Accusearch Inc., 570 F.3d at 1201_ (internal quotation marks and quotation omitted).

Like its arguments regarding Article III standing, Agri Stats claims that Plaintiffs failed to allege a concrete threat of competitive harm from future resumption of the pork and turkey reports as required under the antitrust statutes. But as the Court previously noted, Plaintiffs have alleged just enough to establish a substantial risk of future harm from future Agri Stats pork and turkey reports for Article III standing. Plaintiffs have provided sufficient expressions of intent by Agri Stats to restart its pork and turkey reports once litigation in _Pork_ and _Turkey_ conclude. And the fact that Agri Stats remains in the information sharing business and has the capacity to produce pork and turkey reports in the future indicates there is a cognizable danger of recurrent **[\*23]** violation that is more than a mere possibility. _W.T. Grant Co., 345 U.S. at 633_; _Accusearch Inc., 570 F.3d at 1201_. Plaintiffs have thus sufficiently alleged a threat of injury from an impending antitrust violation. Accordingly, for similar reasons that the Court declined to dismiss the pork and turkey claims for lack of Article III standing, the Court declines to dismiss the pork and turkey claims on this ground.

## 3. Antitrust Standing

Lastly, Agri Stats challenges whether the Plaintiff States have alleged an antitrust injury, an element of antitrust standing, for the pork and turkey claims. Agri Stats argues that the Plaintiff States have not alleged a concrete, actionable threat of antitrust injury to themselves involving a resumption of pork and turkey reports. The Court disagrees.

To establish antitrust standing, the Plaintiffs States must allege an "injury of the type the antitrust laws were designed to prevent and that flows from that which

makes defendants' acts unlawful." *Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 113, 107 S. Ct. 484, 93 L. Ed. 2d 427 (1986)* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977)*). The Court must consider whether "the injury was of a type that Congress sought to redress with antitrust laws." *McDonald v. Johnson & Johnson, 722 F.2d 1370, 1374 (8th Cir. 1983).*

In this case, Plaintiffs allege that Agri Stats and its coconspirators have harmed the competitive process in the broiler chicken, pork, and turkey **[*24]** markets, which ultimately overcharges consumers at the bottom of those markets' supply chains. (2nd Am. Compl. at 1-2.) The Complaint alleges that Agri Stats's reports encourage and facilitate its processor-subscribers "to increase and stabilize prices and reduce the supply of meat." (*Id.* ¶¶ 51, 116-17.) As a result of Agri Stats's alleged anticompetitive conduct, Plaintiffs allege harm to "the United States markets for broiler chicken, pork, and turkey, which includes harm in Minnesota, as well as California, North Carolina, Tennessee, Texas, and Utah." (*Id.* ¶ 160.) Additionally, Agri Stats's and its coconspirators' agreement to exchange "competitively sensitive information regarding prices, output, and costs" have "unreasonably restrained trade, suppressed competition, and had the actual and likely effect of stabilizing and increasing prices and reducing output" in the broiler chicken, pork, and turkey markets. (*Id.* ¶¶ 163, 165, 167.)

These allegations align with the type of harm that Congress sought to redress. *Cf. In re Cattle & Beef Antitrust Litig., No. 22-3031, 687 F. Supp. 3d 828, 2023 U.S. Dist. LEXIS 143942, 2023 WL 5310905, at *6 (D. Minn. Aug. 17, 2023)* (finding deprivation of fair price competition at the top of the supply chain and overcharging of customers at the bottom of the supply chain "highly suggestive of the **[*25]** type of injury Congress sought to redress" with the antitrust statutes). The Plaintiff States seek prospective injunctive relief to prevent anticompetitive conduct that harms their general economies, which is sufficient to confer antitrust standing. *See, e.g., Burch v. Goodyear Tire & Rubber Co., 554 F.2d 633, 634-35 (4th Cir. 1977)* (allegations of injury to general economy of state of Maryland were sufficient to confer standing upon its Attorney General in an antitrust suit filed in parens patriae capacity). Agri Stats's conduct could continue to cause the Plaintiff States' citizens harm unless injunctive relief is granted. This is surely the kind of harm the antitrust laws were intended to prevent and the type of injury that state attorneys general have standing to challenge.

Therefore, the Plaintiff States have sufficiently alleged harm from the pork and turkey reports to confer antitrust standing.

* * *

Agri Stats challenges the pork and turkey claims under Article III standing, injunctive relief, and antitrust standing theories, but none are successful. Because the Court concludes that Plaintiffs' pork and turkey claims have satisfied the requisite standing and pleading requirements under Article III and the antitrust statutes, the Court will deny Agri Stats's motion to dismiss **[*26]** the pork and turkey claims.

## C. Broiler Chicken Claim

Agri Stats argues that the broiler chicken claim has already been resolved in *Broilers* on the same evidence alleged in the Complaint and is therefore barred under the doctrine of stare decisis. While the Court agrees that uniformity in the law should be encouraged where possible, it declines to dismiss Plaintiffs' broiler chicken claim because of the summary judgment ruling in *Broilers.*

Stare decisis encourages "uniformity in the law . . . wherever reasoned analysis will allow." *United States v. Auginash, 266 F.3d 781, 784 (8th Cir. 2001)* (quotation omitted). However, a district court's ruling "cannot be used as stare decisis because '[a] district court decision binds no judge in any other case, save to the extent that doctrines of preclusion (not stare decisis) apply.'" *Reid v. BCBSM, Inc., 787 F.3d 892, 895 n.2 (8th Cir. 2015)* (quotation omitted); *accord Se. Stud & Components, Inc. v. Am. Eagle Design Build Studios, LLC, 588 F.3d 963, 967 (8th Cir. 2009)* ("[O]ne district court is not bound by the holdings of others, even those within the same district."). In addition, the Northern District of Illinois is in a different circuit than the District of Minnesota. Agri Stats concedes that neither res judicata nor collateral estoppel bars Plaintiffs' broiler chicken claim because they were not parties in *Broilers.* Thus, the Court is not bound by *Broilers* **[*27]** , and instead need only give it the same consideration as it would any other district court ruling.

The broiler chicken claims here are like those that *Broilers* found insufficient, but summary judgment rulings necessarily rely on the evidence before the specific judge. Here, Plaintiffs allege that Agri Stats's reports contain information that encouraged meat processors to conspire to reduce the output and

increase the price of meat, much like the private plaintiffs in *Broilers*. *Broilers, 2023 U.S. Dist. LEXIS 196869, 2023 WL 7220170, at \*25*. However, the *Broilers* summary judgment order necessarily depended on the set of evidence and arguments offered before the Court at summary judgment. While the *Broilers* opinion will certainly be helpful to the Court's own analyses, and maybe even persuasive, the Court declines, at this earlier stage of litigation, to deprive itself the opportunity to consider the evidence and arguments that will be developed during discovery in this highly complex antitrust action brought by the United States. Accordingly, the Court will deny Agri Stats's motion to dismiss the broiler chicken claim.

**CONCLUSION**

This action arises out of alleged anti-competitive conduct by Agri Stats in its reporting in the broiler chicken, turkey, **[\*28]** and pork industries. While this case is similar to other litigation pending in the Northern District of Illinois, the Court finds it proper to keep the case here and to allow all claims to proceed.

The convenience of the parties and witnesses and judicial economy does not strongly favor transfer to the Northern District of Illinois or the Northern District of Indiana because of the overlap between this case and *Pork*, which Agri Stats is defending in this Court. Transfer therefore is not warranted, so the Court will deny Agri Stats's motion to transfer. Further, Plaintiffs' pork and turkey claims meet the requisite standing and pleading requirements under Article III and the antitrust statutes, and the Court declines to dismiss the broiler chicken claim because of the summary judgment decision in *Broilers* in the Northern District of Illinois. Accordingly, the Court will deny Agri Stats's motion to dismiss.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion to Transfer [Docket No. 42] is **DENIED**; and

2. Defendant's Motion to Dismiss [Docket No. 77] is **DENIED**.

DATED: May 28, 2024

at Minneapolis, Minnesota.

/s/ John R. Tunheim

JOHN **[\*29]** R. TUNHEIM

United States District Judge

---

**End of Document**

Exhibit 5

2025 WL 1132012
Only the Westlaw citation is currently available.
United States District Court, E.D. Virginia,
Alexandria Division.

UNITED STATES of America, et al., Plaintiffs,

v.

GOOGLE LLC, Defendant.

1:23-cv-108 (LMB/JFA)
|
Signed April 17, 2025

**Synopsis**
**Background:** United States and several states filed action against operator of search engine and other Internet-based services for violations of the Sherman Act, alleging that operator monopolized digital advertising markets and tied its products together in those markets. The matter proceeded to a bench trial.

**Holdings:** The District Court, Leonie M. Brinkema, J., held that:

[1] publisher ad servers for open-web display advertising was "relevant product market," for claim that operator monopolized that market, in violation of Sherman Act;

[2] ad exchanges for open-web display advertising was "relevant product market," for claim that operator monopolized that market, in violation of Sherman Act;

[3] worldwide market was "relevant geographic market" for both ad server market and ad exchange market, for claim that operator of search engine monopolized those markets, in violation of Sherman Act;

[4] operator had monopoly power in market for publisher ad servers for open-web display advertising;

[5] operator had monopoly power in market for ad exchange for open-web display advertising;

[6] operator tied its publisher ad server to its ad exchange, in violation of prohibition against restraint of trade under Sherman Act; and

[7] operator's tying of its ad publisher server to its ad exchange violated prohibition against monopolization, under Sherman Act.

Judgment for plaintiffs in part and for defendant in part.

**Procedural Posture(s):** Motion for Sanctions (Discovery).

West Headnotes (64)

**[1]    Antitrust and Trade Regulation** 🔗 Protection of competition rather than competitors

The purpose of the Sherman Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. Sherman Act § 1, 15 U.S.C.A. § 1 et seq.

**[2]    Antitrust and Trade Regulation** 🔗 Elements in General

The offense of monopolization under the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. Sherman Act § 2, 15 U.S.C.A. § 2.

**[3]    Antitrust and Trade Regulation** 🔗 Presumptions and burden of proof

Plaintiffs bear the burden of proving each element of a claim of monopolization under the Sherman Act. Sherman Act § 2, 15 U.S.C.A. § 2.

**[4]    Antitrust and Trade Regulation** 🔗 Relevant Market

The relevant market is the area of effective competition, for a claim of monopolization under the Sherman Act. Sherman Act § 2, 15 U.S.C.A. § 2.

**[5]**  **Antitrust and Trade Regulation** 🔑 Product market

A relevant product market is one that includes reasonably interchangeable products from the perspective of the consumers of those products, for a claim of monopolization under the Sherman Act. Sherman Act § 2, 15 U.S.C.A. § 2.

**[6]**  **Antitrust and Trade Regulation** 🔑 Relevant Market

Determining the relevant market should be grounded in commercial realities and involves a pragmatic, factual analysis, not a formal, legalistic one, for a claim of monopolization under the Sherman Act. Sherman Act § 2, 15 U.S.C.A. § 2.

**[7]**  **Antitrust and Trade Regulation** 🔑 Product market

**Antitrust and Trade Regulation** 🔑 Geographic market

Delineating the bounds of the relevant market necessarily involves considering the relevant product market and the relevant geographic market, for a claim of monopolization under the Sherman Act. Sherman Act § 2, 15 U.S.C.A. § 2.

**[8]**  **Antitrust and Trade Regulation** 🔑 Computer and internet

Publisher ad servers for open-web display advertising was "relevant product market," for claim that operator of search engine monopolized that market, in violation of Sherman Act; publisher servers were uniquely suited for managing advertisement inventory for publishers and for performing advertising-serving functions for websites, servers were priced differently than other advertising technology tools, servers were recognized as distinct product by industry participants, other advertising tools were not reasonably interchangeable with servers, and commercial realities of server market suggested that monopolist could engage in anticompetitive

conduct by raising prices or degrading product quality without seeing significant diminution in customer base. Sherman Act § 2, 15 U.S.C.A. § 2.

More cases on this issue

**[9]**  **Antitrust and Trade Regulation** 🔑 Computer and internet

Ad exchanges for open-web display advertising was "relevant product market," for claim that operator of search engine monopolized that market, in violation of Sherman Act; exchanges played distinct role in advertising technology by connecting publishers with advertisers, exchanges had unique ability to collect and rank advertisement bids from multiple buying tools in milliseconds, making exchanges involved in most programmatic open-web display transactions, exchanges were recognized as distinct product by industry participants, exchanges were priced differently from other advertising technology tools, there was no reasonable interchangeability with other advertising technology tools, and monopolist could profitably raise prices significantly above competitive levels. Sherman Act § 2, 15 U.S.C.A. § 2.

More cases on this issue

**[10]**  **Antitrust and Trade Regulation** 🔑 Computer and internet

Advertiser ad networks for open-web display advertising was not "relevant product market," for claim that operator of search engine monopolized that market, in violation of Sherman Act; term was not common in digital advertising industry, term excluded publisher-facing side of two-sided ad networks, segmentation of advertiser ad networks for open-web display advertising as its own market was inconsistent with substitution that occurred from perspective of advertisers between open-web display advertisements and other types of display advertisements, and considering only advertiser-facing portion of ad network ignored that ad networks intermediated between two groups,

benefited from indirect network effects, and competed for transactions with other two-sided platforms. Sherman Act § 2, 15 U.S.C.A. § 2.

More cases on this issue

**[11]    Antitrust and Trade Regulation** 👈 Relevant Market

Interchangeability is assessed from the perspective of the consumer, when defining a relevant market for a claim of monopolization under the Sherman Act. Sherman Act § 2, 15 U.S.C.A. § 2.

**[12]    Antitrust and Trade Regulation** 👈 Computer and internet

Advertising technology ecosystem was not one two-sided market of buy-side tools for advertisers and sell-side tools for publishers, in defining relevant product market, for claim that operator of search engine monopolized that market, in violation of Sherman Act; distinct products were not reasonably interchangeable, advertiser buying tools, ad exchanges, and publisher ad servers served distinct functions and were priced differently, advertisers which were customers of buy-side tools were largely distinct from publishers which were customers of sell-side tools, and there were distinctions between direct deals, ad network advertising, programmatic advertising, and "walled-garden" advertising as channels through which transactions occurred. Sherman Act § 2, 15 U.S.C.A. § 2.

More cases on this issue

**[13]    Antitrust and Trade Regulation** 👈 Product market

The nature of commercial competition requires courts to avoid classifying products as part of two-sided transaction platforms merely because they help customers on one side of a transaction-facilitating industry improve their capacity to transact, when defining a relevant product market for a claim of monopolization under the Sherman Act. Sherman Act § 2, 15 U.S.C.A. § 2.

**[14]    Antitrust and Trade Regulation** 👈 Product market

Just because two-sided transaction platforms reside at the heart of an industry that matches buyers and sellers does not mean that every industry product that helps facilitate those matches must be analyzed within an industry-wide, two-sided market, when defining a relevant product market for a claim of monopolization under the Sherman Act; rather, products that serve economic actors on one side of the industry and can be sustainably sold by firms that specialize only in that side of the industry—such as publisher ad servers that serve publishers and demand-side platforms that serve advertisers—are to be analyzed in markets that consist of reasonably interchangeable products on that side of the industry. Sherman Act § 2, 15 U.S.C.A. § 2.

**[15]    Antitrust and Trade Regulation** 👈 Geographic market

To determine the relevant geographic scope of a market, courts consider the area within which the defendant's customers can practicably turn to alternative supplies if the defendant were to raise its prices, for a claim of monopolization under the Sherman Act. Sherman Act § 2, 15 U.S.C.A. § 2.

**[16]    Antitrust and Trade Regulation** 👈 Geographic market

The commercial realities considered when defining the relevant geographic market for a claim of monopolization under the Sherman Act include: where the parties market their products, the size, cumbersomeness, and perishability of the products, regulatory requirements impeding the free flow of competing goods into or out of the area, shipping costs and limitations, the area within which the defendant and its competitors view themselves as competing, and other factors bearing upon where customers

might realistically look to buy the product. Sherman Act § 2, 15 U.S.C.A. § 2.

**[17]     Antitrust and Trade Regulation** 🔑 Geographic market

Worldwide market was "relevant geographic market" for both ad server market and ad exchange market, for claim that operator of search engine monopolized those markets, in violation of Sherman Act; globally networked nature of Internet resulted in worldwide competition among advertising technology providers, United States-based advertisers targeted international Internet users, international advertisers targeted United States-based users, technology providers built global infrastructure and managed, sold, and tracked performance of their products globally and viewed themselves as competing globally, operator's customers for its advertising products competed for global audience and advertising dollars, and ad servers and exchanges were globally marketed. Sherman Act § 2, 15 U.S.C.A. § 2.

More cases on this issue

**[18]     Antitrust and Trade Regulation** 🔑 Antitrust and Foreign Trade

The Sherman Act does not authorize federal courts to regulate the competitive conditions of other nations' economies. Sherman Act § 1, 15 U.S.C.A. § 1 et seq.

**[19]     Antitrust and Trade Regulation** 🔑 Antitrust and Foreign Trade

The foremost concern of federal antitrust law is the protection of Americans.

**[20]     Antitrust and Trade Regulation** 🔑 Market Power; Market Share

Monopoly power is the power to control prices or exclude competition, for a claim of monopolization under the Sherman Act. Sherman Act § 2, 15 U.S.C.A. § 2.

**[21]     Antitrust and Trade Regulation** 🔑 Monopolization or attempt to monopolize

A plaintiff can show that a defendant had monopoly power in a relevant antitrust market either directly or indirectly, for a claim of monopolization under the Sherman Act. Sherman Act § 2, 15 U.S.C.A. § 2.

**[22]     Antitrust and Trade Regulation** 🔑 Monopolization or attempt to monopolize

Direct proof of monopoly power includes evidence that a defendant profitably charged supracompetitive prices, for a claim of monopolization under the Sherman Act. Sherman Act § 2, 15 U.S.C.A. § 2.

**[23]     Antitrust and Trade Regulation** 🔑 Monopolization or attempt to monopolize

Indirect proof of monopoly power is derived from the structure and composition of the relevant market, for a claim of monopolization under the Sherman Act. Sherman Act § 2, 15 U.S.C.A. § 2.

**[24]     Antitrust and Trade Regulation** 🔑 Presumptions and burden of proof

The existence of monopoly power ordinarily may be inferred from the predominant share of the market, for a claim of monopolization under the Sherman Act. Sherman Act § 2, 15 U.S.C.A. § 2.

**[25]     Antitrust and Trade Regulation** 🔑 Market Power; Market Share

The true measure of monopoly power lies not in a firm's high market share, but in its ability to maintain that share, for a claim

of monopolization under the Sherman Act. Sherman Act § 2, 15 U.S.C.A. § 2.

**[26]** **Antitrust and Trade Regulation** 🔑 Computer and internet

Operator of search engine had monopoly power in market for publisher ad servers for open-web display advertising, as element of claim of monopolization under the Sherman Act; operator had between 91% and 93.5% share of worldwide publisher server market and between 86.5% and 92.3% share of United States market, market had high barriers to entry and expansion, making operator's market share durable, building publisher server was complex, resource-intensive process, it was challenging to gain customers, to gain market share from operator, rival would have to convince publishers to stop using operator's server and switch to rival's server, publisher servers were sticky products with high switching costs, and there were no meaningful alternatives to operator's server. Sherman Act § 2, 15 U.S.C.A. § 2.

More cases on this issue

**[27]** **Antitrust and Trade Regulation** 🔑 Computer and internet

Operator of search engine had monopoly power in market for ad exchange for open-web display advertising, as element of claim of monopolization under the Sherman Act; operator charged durable supracompetitive price of 20% take rate for its exchange for over decade, it demonstrated unwillingness to lower its prices even as market matured and other exchanges reduced their prices, despite not lowering prices, customers did not leave operator's exchange due to operator's substantial market power, market had high barriers to entry that resulted from operator's scale and network effects across display advertising ecosystem, and operator's exchange was exchange for between 63% and 71% of worldwide transactions among exchanges, and it handled between 54% and 65% of market's transactions. Sherman Act § 2, 15 U.S.C.A. § 2.

More cases on this issue

**[28]** **Antitrust and Trade Regulation** 🔑 Illegal Restraints or Other Misconduct

A plaintiff cannot prevail on a monopolization claim under the Sherman Act if the defendant acquired its monopoly power through conduct that is procompetitive and thus increases consumer welfare, such as by having developed a superior product or grown due to business acumen, or if the defendant's monopoly power has resulted from other valid business reasons, or historical accident. Sherman Act § 2, 15 U.S.C.A. § 2.

**[29]** **Antitrust and Trade Regulation** 🔑 Illegal Restraints or Other Misconduct

The possession of monopoly power will not be found unlawful under the Sherman Act unless it is accompanied by an element of anticompetitive conduct. Sherman Act § 2, 15 U.S.C.A. § 2.

**[30]** **Antitrust and Trade Regulation** 🔑 Illegal Restraints or Other Misconduct

In determining whether a company's conduct is anticompetitive, for a claim of monopolization under the Sherman Act, courts consider the conduct's effect on competitors, its impact on consumers, and whether it has impaired competition in an unnecessarily restrictive way. Sherman Act § 2, 15 U.S.C.A. § 2.

**[31]** **Antitrust and Trade Regulation** 🔑 Illegal Restraints or Other Misconduct

Some common forms of anticompetitive conduct are tying, exclusive dealing, predatory pricing, and defrauding regulators or consumers.

**[32]** **Antitrust and Trade Regulation** 🔑 Illegal Restraints or Other Misconduct

A monopolist may offer procompetitive justifications for seemingly anticompetitive

conduct, but may still be liable for monopolization under the Sherman Act if the plaintiff can demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit. Sherman Act § 2, 15 U.S.C.A. § 2.

[33] **Antitrust and Trade Regulation** ⬦ Illegal Restraints or Other Misconduct

Anticompetitive conduct comes in many different forms that cannot always be categorized.

[34] **Antitrust and Trade Regulation** ⬦ Illegal Restraints or Other Misconduct

When a court is faced with allegations of a complex or atypical exclusionary campaign, the alleged anticompetitive conduct must be considered as a whole instead of in manufactured subcategories, for a claim of monopolization under the Sherman Act. Sherman Act § 2, 15 U.S.C.A. § 2.

[35] **Antitrust and Trade Regulation** ⬦ Illegal Restraints or Other Misconduct

A holistic assessment of whether a monopolist's conduct harmed the competitive process and thereby harmed consumers is the touchstone for determining whether a monopolist alleged to have engaged in an exclusionary campaign violated the Sherman Act. Sherman Act § 2, 15 U.S.C.A. § 2.

[36] **Antitrust and Trade Regulation** ⬦ Computer and internet

Acquisition of operator of ad publisher server by operator of search engine was not anticompetitive conduct, for claim that operator of search engine was liable for monopolization under Sherman Act; acquisition occurred at time when multiple firms were vigorous participants in market, acquisition was reviewed and cleared by Federal Trade Commission (FTC) after determination that it was unlikely to substantially

lessen competition, and it was not shown that search engine operator had monopoly power in any relevant markets at time of acquisition. Sherman Act § 2, 15 U.S.C.A. § 2.

More cases on this issue

[37] **Antitrust and Trade Regulation** ⬦ Computer and internet

Acquisition of advertising network yield manager by operator of search engine was not anticompetitive conduct, for claim that operator was liable for monopolization under Sherman Act, although yield manager threatened operator's strategy to control which advertising demand sources were used to monetize inventory for publishers; operator did not buy manager to sideline it, but, rather, operator bought manager to fill gap in its portfolio, it drew on manager's engineers and technology to rebuild capabilities within operator's advertising technology architecture, and acquisition provided operator with skill set and knowledge needed to make its ad exchange more compelling. Sherman Act § 2, 15 U.S.C.A. § 2.

More cases on this issue

[38] **Antitrust and Trade Regulation** ⬦ Illegal Restraints or Other Misconduct

Acquiring technology and talent to offer customers a more flexible, affordable, and effective product is not anticompetitive when motivated by valid business reasons, for an antitrust claim.

[39] **Antitrust and Trade Regulation** ⬦ Economic power

The vice of tying arrangements lies in the use of economic power in one market to restrict competition on the merits in another, in the antitrust context.

[40] **Antitrust and Trade Regulation** ⬦ Economic power

The essential characteristic of unlawful tying, for an antitrust claim, is the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.

**[41]** **Antitrust and Trade Regulation** 🖙 Tying Agreements

Tying suppresses competition in two ways: first, the buyer is prevented from seeking alternative sources of supply for the tied product; second, competing suppliers of the tied product are foreclosed from that part of the market which is subject to the tying arrangement.

**[42]** **Antitrust and Trade Regulation** 🖙 Tying Agreements

Tying is per se unlawful under Section 1 of the Sherman Act, which prohibits unreasonable restraints on trade. Sherman Act § 1, 15 U.S.C.A. § 1.

**[43]** **Antitrust and Trade Regulation** 🖙 Tying Agreements

To prove a tying claim under the Sherman Act, a plaintiff must establish four elements: (1) the existence of two separate products, (2) an agreement conditioning purchase of the tying product upon purchase of the tied product (or at least upon an agreement not to purchase the tied product from another party), (3) the seller's possession of sufficient economic power in the tying product market to restrain competition in the tied product market, and (4) a not insubstantial impact on interstate commerce. Sherman Act § 1, 15 U.S.C.A. § 1 et seq.

**[44]** **Antitrust and Trade Regulation** 🖙 Tying Agreements

**Antitrust and Trade Regulation** 🖙 Tying Agreements

Although tying under the section of the Sherman Act prohibiting restraint of trade does not require that the defendant have a monopoly in the market for a tying product, tying by a monopolist can satisfy the anticompetitive conduct element under the section of the Sherman Act prohibiting monopolization. Sherman Act §§ 1, 2, 15 U.S.C.A. §§ 1, 2.

**[45]** **Antitrust and Trade Regulation** 🖙 Economic power

When a defendant facing a tying claim is a monopolist, courts consider whether the tie contributed significantly to the maintenance or creation of monopoly power even though it was unilaterally imposed, for a claim of monopolization under the Sherman Act. Sherman Act § 2, 15 U.S.C.A. § 2.

**[46]** **Antitrust and Trade Regulation** 🖙 Computer and internet

**Commerce** 🖙 Particular products or lines of commerce

Operator of search engine tied its publisher ad server to its ad exchange, in violation of prohibition against restraint of trade under Sherman Act; servers and exchanges were two separate products with different functions and pricing structures, making them not reasonably interchangeable, operator condition purchase of its exchange upon purchase of its server through policy and technology restrictions, operator's monopoly power in market for open-web display ad exchanges and its restriction of unique advertising demand offered by exchange gave it sufficient economic power to restrain competition in that market, and tying of server and exchange facilitated billions of dollars of revenue that exchange generated annually, making a large and substantial impact on interstate commerce. Sherman Act § 1, 15 U.S.C.A. § 1.

More cases on this issue

**[47]** **Antitrust and Trade Regulation** 🔑 **Federal and state issues**

**Commerce** 🔑 **Monopolies and Anti-Trust Laws in General**

Wholly apart from market characteristics, a prerequisite to application of the Sherman Act is an effect on interstate commerce. Sherman Act § 1, 15 U.S.C.A. § 1 et seq.

**[48]** **Antitrust and Trade Regulation** 🔑 **Computer and internet**

Search engine operator's tying of its ad publisher server to its ad exchange violated prohibition against monopolization, under Sherman Act; value of each product was less than connections across all products, and operator artificially handicapped its buy-side to boost attractiveness of its sell-side ad exchange by limiting its programmatic advertisers in buy-side to bidding for inventory from publishers that used operator's exchange and publisher server, which expanded operator's dominance in publisher server market, with rival servers exiting market and operator maintaining more than 90% market share, even though customers did not think that operator had best server, making tying of server and exchange have substantial anticompetitive effect in publisher ad server market. Sherman Act § 2, 15 U.S.C.A. § 2.

More cases on this issue

**[49]** **Antitrust and Trade Regulation** 🔑 **Computer and internet**

Refusal-to-deal doctrine did not protect search engine operator from liability for violations of Sherman Act; operator engaged in tying that effectively compelled its ad publisher customers to use its ad publisher server if they wanted to use operator's ad exchange and receive real-time bids from advertisers, which had anticompetitive effect of limiting operator's publisher customers' choice of ad server for reasons other than competition on merits, tie increased operator's scale, decreased rivals' scale, caused some rivals to exit market, and harmed competition, customers, and Internet users, operator's advertising technology business did not operate in highly regulated industry, and operator sacrificed short-run benefits to reduce competition over long-run by harming competitors. Sherman Act § 1, 15 U.S.C.A. § 1 et seq.

More cases on this issue

**[50]** **Antitrust and Trade Regulation** 🔑 **Refusals to Deal**

**Antitrust and Trade Regulation** 🔑 **Tying Agreements**

Even if the refusal to sell a product to rivals could be characterized as a unilateral refusal to deal, the sale of a tying product to third parties on the condition that they buy a tied product does not fit within the ambit of the refusal to deal exception to antitrust liability.

**[51]** **Antitrust and Trade Regulation** 🔑 **Refusals to Deal**

**Antitrust and Trade Regulation** 🔑 **Tying Agreements**

A tying claim in an antitrust case does not fail as a matter of law simply because it was implemented by refusing to deal with an intermediary.

**[52]** **Antitrust and Trade Regulation** 🔑 **Illegal Restraints or Other Misconduct**

A defendant shown to have engaged in exclusionary conduct to maintain a monopoly may avoid liability under the Sherman Act by proving that the conduct was done for valid business reasons. Sherman Act § 2, 15 U.S.C.A. § 2.

**[53]** **Antitrust and Trade Regulation** 🔑 **Tying Agreements**

Procompetitive rationales may justify a tying arrangement that is otherwise per se illegal under the Sherman Act's prohibition against restraint of trade. Sherman Act § 1, 15 U.S.C.A. § 1.

**[54]  Antitrust and Trade Regulation ◈ Illegal Restraints or Other Misconduct**

A court must assess the validity and sufficiency of each claimed procompetitive justification that a defendant makes to avoid liability under the Sherman Act. Sherman Act § 1, 15 U.S.C.A. § 1 et seq.

**[55]  Antitrust and Trade Regulation ◈ Weight and Sufficiency**

Because pretextual and unsubstantiated justifications are not valid, courts may give greater weight to the contemporaneous statements contained in the company's internal records, than to later trial testimony in which its employees declined to ratify those statements, when determining if procompetitive justifications avoid a defendant's liability under the Sherman Act. Sherman Act § 1, 15 U.S.C.A. § 1 et seq.

**[56]  Antitrust and Trade Regulation ◈ Computer and internet**

**Antitrust and Trade Regulation ◈ Computer and internet**

Procompetitive justification of reduced quality issues did not justify search engine operator's tying of its ad publisher server with its ad exchange, to avoid liability under Sherman Act for monopolization and restraint of trade; buy-side of operator's advertising technology internally advocated for buy-side to buy on other ad exchanges, because they had acceptable levels of spam and fraud that were comparable to spam and fraud on operator's ad exchange, but sell-side of operator's technology did not allow bidding on other exchanges for fear that it would undermine operator's dominance among publishers, tie weakened buy-side's position in market to entrench operator's ad exchange and server as dominant, and operator did not have lower levels of spam or fraud than other providers. Sherman Act §§ 1, 2, 15 U.S.C.A. §§ 1, 2.

More cases on this issue

**[57]  Antitrust and Trade Regulation ◈ Computer and internet**

**Antitrust and Trade Regulation ◈ Computer and internet**

Procompetitive justifications for search engine operator's policy requiring publishers using operator's ad server to offer operator's ad exchange right of first refusal were pretextual, and, thus, were insufficient for operator to avoid liability under Sherman Act for monopolization and restraint of trade; operator's preferencing its ad exchange over other exchanges within operator's ad server, which operator argued increased revenue and inventory for its customers, actually resulted in less revenue for ad publishers, enhanced market power for operator's exchange, and reduced competition in ad exchange market, and, thus, was anticompetitive. Sherman Act §§ 1, 2, 15 U.S.C.A. §§ 1, 2.

More cases on this issue

**[58]  Antitrust and Trade Regulation ◈ Computer and internet**

**Antitrust and Trade Regulation ◈ Computer and internet**

Procompetitive justifications of search engine operator's policy permitting it to bid in its ad exchange after knowing what winning bid was, including that policy was procompetitive, because publishers could choose not to request bid from operator, were pretextual, and, thus, operator could not avoid liability for restraint of trade and monopolization, in violation of Sherman Act; policy was implemented after operator had established dominance in ad exchange and ad server markets, policy enabled operator to win auctions despite offering less than its advertisers were willing to pay, and policy reduced publisher revenue, decreased rivals' scale, and dampened ad exchange price competition, and, given operator's monopoly power in markets, it was not financially viable for

ad publishers to forgo using exchange. Sherman Act §§ 1, 2, 15 U.S.C.A. §§ 1, 2.

More cases on this issue

**[59]** **Antitrust and Trade Regulation** 🔑 Computer and internet

**Antitrust and Trade Regulation** 🔑 Computer and internet

Procompetitive justifications of search engine operator's dynamic revenue share policy were pretextual and were not sufficient for operator to avoid liability for restraint of trade and monopolization, in violation of Sherman Act, although operator argued that policy helped create matches for ad impressions that would not have sold without it; primary purpose for policy was to outbid rival ad exchanges by using operator's anticompetitive policy that permitted it to bid in its ad exchange after knowing what winning bid was. Sherman Act §§ 1, 2, 15 U.S.C.A. §§ 1, 2.

More cases on this issue

**[60]** **Antitrust and Trade Regulation** 🔑 Computer and internet

**Antitrust and Trade Regulation** 🔑 Computer and internet

Search engine operator's product and policy changes that entrenched its monopoly power were not product design choices for operator to avoid liability under Sherman Act for monopolization and restraint of trade for tying its ad publisher server to its ad exchange products; tying two separate products and subsequent decisions that operator made to manipulate auction rules in ad exchanges and to restrict customer choice in markets in which operator had monopoly power was not product design choice, and tie had effect of significantly reducing usage of rivals' products by discouraging, deterring, and preventing publisher customers from using alternatives to operator's ad server. Sherman Act §§ 1, 2, 15 U.S.C.A. §§ 1, 2.

More cases on this issue

**[61]** **Antitrust and Trade Regulation** 🔑 Illegal Restraints or Other Misconduct

Courts must avoid unduly divvying up a complex or atypical exclusionary campaign into manufactured subcategories and justify the actions using specific conduct tests, for a defendant to avoid liability to anticompetitive conduct under the Sherman Act. Sherman Act § 1, 15 U.S.C.A. § 1 et seq.

**[62]** **Antitrust and Trade Regulation** 🔑 Illegal Restraints or Other Misconduct

Judicial deference to product innovation does not mean that a monopolist's product design decisions are per se lawful under the Sherman Act. Sherman Act § 2, 15 U.S.C.A. § 2.

**[63]** **Antitrust and Trade Regulation** 🔑 Illegal Restraints or Other Misconduct

Product redesign is anticompetitive when it coerces consumers and impedes competition, for purposes of the Sherman Act. Sherman Act § 1, 15 U.S.C.A. § 1 et seq.

**[64]** **Federal Civil Procedure** 🔑 Failure to Comply; Sanctions

District court would not sanction search engine operator for spoliation of evidence, in action on claims of restraint of trade and monopolization in violation of the Sherman Act, where court found operator liable under both restraint-of-trade and monopolization sections of Sherman Act based on trial testimony and admitted evidence, including documents that were preserved. Sherman Act §§ 1, 2, 15 U.S.C.A. §§ 1, 2; Fed. R. Civ. P. 37(e)(2)(A).

More cases on this issue

**Attorneys and Law Firms**

Aaron Michael Sheanin, Brent Nakamura, DOJ-Atr, Antitrust Division, San Francisco, CA, Aaron Teitelbaum, David Michael Teslicko, Jr., Alvin Ho Chu, Amanda Morrow Strick, Chase Pritchett, Craig Louis Briskin, Daniel S. Guarnera, Isabel Agnew, James Ryan, Julia Tarver Mason Wood, Timothy Longman, Victor Kuanling Liu, Andrew W. Chang, Andrew DeLaney, David Allan Geiger, Katherine E. Clemons, Kelly Dodge Garcia, Matthew R. Huppert, Michael Wolin, Nicholas Steven Cheolas, Rachel S. Hansen, Mark Henry Michael Sosnowsky, Sean Carman, Jeffrey Grant Vernon, United States Department of Justice-Atr, Antitrust Division, Washington, DC, Michael Joseph Freeman, Jimmy S. McBirney, DOJ-United States Attorney's Office, Washington, DC, Kaitlyn Barry, Matthew Gold, DOJ-Atr, Antitrust Division, Chicago, IL, Milosz Gudzowski, Department of Justice, New York City, NY, Gerard J. Mene, LRM: Law, Katy, Alexandria, VA, for Plaintiff United States of America.

Steven G. Popps, Tyler Timothy Henry, Jonathan Mark Harrison, II, Kevin Michael Gallagher, Office of the Attorney General, Richmond, VA, Aaron Michael Sheanin, DOJ-Atr, Antitrust Division, San Francisco, CA, Julia Tarver Mason Wood, Michael Wolin, DOJ-Atr, Antitrust Division, Washington, DC, Michael Joseph Freeman, DOJ-United States Attorney's Office, Washington, DC, for Plaintiff Commonwealth of Virginia.

Andrew N. Ferguson, Tyler Timothy Henry, Jonathan Mark Harrison, II, Office of Attorney General Office of the Solicitor General, Richmond, VA, Aaron Michael Sheanin, DOJ-Atr, Antitrust Division, San Francisco, CA, Brian Dingting Wang, Pro Hac Vice, Carolyn Danielle Jeffries, Pro Hac Vice, Lauren Jessica Pomeroy, Pro Hac Vice, Paula L. Blizzard, Pro Hac Vice, Office of the Attorney General, San Francisco, CA, Elliott Edgar Dionisio, Pro Hac Vice, Office of the California Attorney General, Los Angeles, CA, Julia Tarver Mason Wood, Michael Wolin, DOJ-Atr, Antitrust Division, Washington, DC, Michael Joseph Freeman, DOJ-United States Attorney's Office, Washington, DC, for Plaintiff State of California.

Andrew N. Ferguson, Tyler Timothy Henry, Jonathan Mark Harrison, II, Office of Attorney General Office of the Solicitor General, Richmond, VA, Aaron Michael Sheanin, DOJ-Atr, Antitrust Division, San Francisco, CA, Bryn Anderson Williams, Pro Hac Vice, Jan Michael Zavislan, Pro Hac Vice, Steven Kaufmann, Pro Hac Vice, Colorado Department of Law, Denver, CO, Michael Joseph Freeman, DOJ-United States Attorney's Office, Washington, DC, Michael Wolin, Julia Tarver Mason Wood, DOJ-Atr, Antitrust Division, Washington, DC, for Plaintiff State of Colorado.

Andrew N. Ferguson, Tyler Timothy Henry, Jonathan Mark Harrison, II, Office of Attorney General Office of the Solicitor General, Richmond, VA, Aaron Michael Sheanin, DOJ-Atr, Antitrust Division, San Francisco, CA, Julia Tarver Mason Wood, Michael Wolin, DOJ-Atr, Antitrust Division, Washington, DC, Nicole Demers, Pro Hac Vice, States of Connecticut, Office of the Attorney General Antitrust Department, Hartford, CT, Michael Joseph Freeman, DOJ-United States Attorney's Office, Washington, DC, for Plaintiff State of Connecticut.

Andrew N. Ferguson, Tyler Timothy Henry, Jonathan Mark Harrison, II, Office of Attorney General Office of the Solicitor General, Richmond, VA, Aaron Michael Sheanin, DOJ-Atr, Antitrust Division, San Francisco, CA, Julia Tarver Mason Wood, Michael Wolin, DOJ-Atr, Antitrust Division, Washington, DC, Yale Alexander Leber, Pro Hac Vice, New Jersey Office of the Attorney General, Newark, NJ, Michael Joseph Freeman, DOJ-United States Attorney's Office, Washington, DC, for Plaintiff State of New Jersey.

Andrew N. Ferguson, Tyler Timothy Henry, Jonathan Mark Harrison, II, Office of Attorney General Office of the Solicitor General, Richmond, VA, Aaron Michael Sheanin, DOJ-Atr, Antitrust Division, San Francisco, CA, Elinor Rose Hoffman, Pro Hac Vice, Morgan Jessen Feder, Pro Hac Vice, New York State Office of the Attorney General, New York, NY, Michael Joseph Freeman, DOJ-United States Attorney's Office, Washington, DC, Julia Tarver Mason Wood, Michael Wolin, DOJ-Atr, Antitrust Division, Washington, DC, for Plaintiff State of New York.

Andrew N. Ferguson, Tyler Timothy Henry, Jonathan Mark Harrison, II, Office of Attorney General Office of the Solicitor General, Richmond, VA, Aaron Michael Sheanin, DOJ-Atr, Antitrust Division, San Francisco, CA, Michael Joseph Freeman, DOJ-United States Attorney's Office, Washington, DC, Julia Tarver Mason Wood, Michael Wolin, DOJ-Atr, Antitrust Division, Washington, DC, Nicholas Stephan Provazza, Pro Hac Vice, State of Rhode Island, Office of the Attorney General, Providence, RI, for Plaintiff State of Rhode Island.

Andrew N. Ferguson, Tyler Timothy Henry, Jonathan Mark Harrison, II, Office of Attorney General Office of the Solicitor General, Richmond, VA, Aaron Michael Sheanin, DOJ-

Atr, Antitrust Division, San Francisco, CA, John David McDowell, Pro Hac Vice, Scott Ethan Bowers, Pro Hac Vice, Tyler Timothy Corcoran, Pro Hac Vice, Office Tennessee Attorney General, Nashville, TN, Michael Joseph Freeman, DOJ-United States Attorney's Office, Washington, DC, Michael Wolin, Julia Tarver Mason Wood, DOJ-Atr, Antitrust Division, Washington, DC, for Plaintiff State of Tennessee.

Tyler Timothy Henry, Jonathan Mark Harrison, II, Office of the Attorney General, Richmond, VA, Aaron Michael Sheanin, DOJ-Atr, Antitrust Division, San Francisco, CA, Jon Michael Woodruff, Pro Hac Vice, Zach Biesanz, Pro Hac Vice, Office of the Attorney General, Saint Paul, MN, Michael Joseph Freeman, DOJ-United States Attorney's Office, Washington, DC, Julia Tarver Mason Wood, Michael Wolin, DOJ-Atr, Antitrust Division, Washington, DC, for Plaintiff State of Minnesota.

Tyler Timothy Henry, Jonathan Mark Harrison, II, Office of the Attorney General, Richmond, VA, Aaron Michael Sheanin, DOJ-Atr, Antitrust Division, San Francisco, CA, Douglas Lee Davis, Pro Hac Vice, Office of the West Virginia Attorney General, Charleston, WV, Michael Joseph Freeman, DOJ-United States Attorney's Office, Washington, DC, Julia Tarver Mason Wood, Michael Wolin, DOJ-Atr, Antitrust Division, Washington, DC, for Plaintiff State of West Virginia.

Tyler Timothy Henry, Jonathan Mark Harrison, II, Office of the Attorney General, Richmond, VA, Aaron Michael Sheanin, DOJ-Atr, Antitrust Division, San Francisco, CA, Colin Price Snider, Pro Hac Vice, Joseph Marcus Conrad, Pro Hac Vice, Nebraska Office of Attorney General, Lincoln, NE, Michael Joseph Freeman, DOJ-United States Attorney's Office, Washington, DC, Julia Tarver Mason Wood, Michael Wolin, DOJ-Atr, Antitrust Division, Washington, DC, for Plaintiff State of Nebraska.

Tyler Timothy Henry, Jonathan Mark Harrison, II, Office of the Attorney General, Richmond, VA, Aaron Michael Sheanin, DOJ-Atr, Antitrust Division, San Francisco, CA, Brandon Harris Garod, Pro Hac Vice, James Romeyn Davis, Pro Hac Vice, Office of the New Hampshire Attorney General, Concord, NH, Michael Joseph Freeman, DOJ-United States Attorney's Office, Washington, DC, Michael Wolin, Julia Tarver Mason Wood, DOJ-Atr, Antitrust Division, Washington, DC, for Plaintiff State of New Hampshire.

Tyler Timothy Henry, Jonathan Mark Harrison, II, Office of the Attorney General, Richmond, VA, Aaron Michael Sheanin, DOJ-Atr, Antitrust Division, San Francisco, CA, Jason Robert Evans, Pro Hac Vice, Jonathan Scott Comish, Pro Hac Vice, Scott A. Mertens, Pro Hac Vice, Michigan Department of Attorney General, Lansing, MI, Michael Joseph Freeman, DOJ-United States Attorney's Office, Washington, DC, Julia Tarver Mason Wood, Michael Wolin, DOJ-Atr, Antitrust Division, Washington, DC, for Plaintiff State of Michigan.

Tyler Timothy Henry, Jonathan Mark Harrison, II, Office of the Attorney General, Richmond, VA, Aaron Michael Sheanin, DOJ-Atr, Antitrust Division, San Francisco, CA, Jayme Louise Weber, Pro Hac Vice, Arizona Attorney General's Office, Tuscon, AZ, Julia Tarver Mason Wood, DOJ-United States Attorney's Office, Washington, DC, Michael Joseph Freeman, Michael Wolin, DOJ-Atr, Antitrust Division, Washington, DC, for Plaintiff State of Arizona.

Tyler Timothy Henry, Jonathan Mark Harrison, II, Office of the Attorney General, Richmond, VA, Aaron Michael Sheanin, DOJ-Atr, Antitrust Division, San Francisco, CA, Amy Nicole Linscheid Hanson, Pro Hac Vice, Brooke Howlett Lovrovich, Pro Hac Vice, Tyler W. Arnold, Pro Hac Vice, Washington State Attorney General's Office, Seattle, WA, Michael Joseph Freeman, DOJ-United States Attorney's Office, Washington, DC, Michael Wolin, Julia Tarver Mason Wood, DOJ-Atr, Antitrust Division, Washington, DC, for Plaintiff State of Washington.

Tyler Timothy Henry, Jonathan Mark Harrison, II, Office of the Attorney General, Richmond, VA, Aaron Michael Sheanin, DOJ-Atr, Antitrust Division, San Francisco, CA, Elizabeth Louise Maxeiner, Pro Hac Vice, Jennifer Marie Coronel, Pro Hac Vice, Office of the Illinois Attorney General, Chicago, IL, Michael Joseph Freeman, DOJ-United States Attorney's Office, Washington, DC, Michael Wolin, Julia Tarver Mason Wood, DOJ-Atr, Antitrust Division, Washington, DC, for Plaintiff State of Illinois.

Tyler Timothy Henry, Jonathan Mark Harrison, II, Office of the Attorney General, Richmond, VA, Aaron Michael Sheanin, DOJ-Atr, Antitrust Division, San Francisco, CA, Jasmine Spring McGhee, Pro Hac Vice, Kunal Janak Choksi, Pro Hac Vice, Jonathan Richard Marx, Pro Hac Vice, North Carolina Department of Justice Attorney General's Office, Raleigh, NC, Michael Joseph Freeman, DOJ-United States Attorney's Office, Washington, DC, Julia Tarver Mason Wood, Michael Wolin, DOJ-Atr, Antitrust Division, Washington, DC, for Plaintiff State of North Carolina.

Tyler Timothy Henry, Jonathan Mark Harrison, II, Office of the Attorney General, Richmond, VA, Aaron Michael

Craig Crandall Reilly, Law Office of Craig C. Reilly, Alexandria, VA, Karen Leah Dunn, Pro Hac Vice, Jeannie Rhee, Pro Hac Vice, Jessica E. Phillips, Pro Hac Vice, Joseph Bial, Pro Hac Vice, Kannon K. Shanmugam, Pro Hac Vice, Martha Goodman, Pro Hac Vice, Amy Mauser, Pro Hac Vice, Bryon Patrick Becker, Erica Spevack, Pro Hac Vice, William Isaacson, Pro Hac Vice, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, DC, Allison Vissichelli, Pro Hac Vice, David Rudolph Pearl, Pro Hac Vice, James Hunsberger, Pro Hac Vice, Kenina Lee, Pro Hac Vice, Bradley Justus, Axinn Veltrop & Harkrider, LLP, Washington, DC, Claire Linda Leonard, Pro Hac Vice, Eric Johnson Mahr, Julie S. Elmer, Pro Hac Vice, Justina Kahn Sessions, Pro Hac Vice, Sara Leann Salem, Pro Hac Vice, Scott Andrew Eisman, Pro Hac Vice, Tyler Garrett, Andrew John Ewalt, Pro Hac Vice, Lauren Kaplin, Pro Hac Vice, Freshfields U.S. LLP, Washington, DC, Caroline Puckowski Boisvert, Pro Hac Vice, Axinn, Veltrop & Harkrider, LLP, Hartford, CT, Carter Greenbaum, Pro Hac Vice, Erin J. Morgan, Pro Hac Vice, Paul, Weiss, Rifking, Wharton & Garrison LLP, New York, NY, Christopher Erickson, Pro Hac Vice, Axinn Veltrop & Harkrider LLP, New York, NY, Jeanette Bayoumi, Pro Hac Vice, Freshfields U.S. LLP, New York, NY, Daniel Shalom Bitton, Pro Hac Vice, Axinn, Veltrop & Harkrider LLP, San Francisco, CA, Meredith Dearborn, Pro Hac Vice, Paul, Weiss, Rifkind, Wharton & Garrison LLP, San Francisco, CA, for Defendant.

MEMORANDUM OPINION

Leonie M. Brinkema, United States District Judge

**\*1** The federal government and seventeen states ("Plaintiffs") have brought this antitrust action against Google LLC ("Google" or "Defendant"), in which they claim that Google has monopolized three digital advertising technology markets in violation of Section 2 of the Sherman Act, and has tied its products in these markets together in violation of Sections 1 and 2 of the Sherman Act.

With the benefit of a three-week bench trial and extensive post-trial filings, the Court finds that Plaintiffs have failed to prove that there is a relevant market for open-web display advertiser ad networks, but have proven that Google has violated Section 2 of the Sherman Act by willfully acquiring and maintaining monopoly power in the open-web display publisher ad server market and the open-web display ad exchange market, and has unlawfully tied its publisher ad

server (DFP) and ad exchange (AdX) in violation of Sections 1 and 2 of the Sherman Act. Having found Google liable, the Court will set a briefing schedule and hearing date to determine the appropriate remedies for these antitrust violations.

**I. Procedural History**

On January 24, 2023, the United States and eight states—California, Colorado, Connecticut, New Jersey, New York, Rhode Island, Tennessee, and Virginia—filed a five-count Complaint against Google under Section 4 of the Sherman Act, 15 U.S.C. § 4, and Section 16 of the Clayton Act, 15 U.S.C. § 26,[1] [Dkt. No. 1] at 135, alleging monopolization of the publisher ad server market (Count I), monopolization or attempted monopolization of the ad exchange market (Count II), and monopolization of the advertiser ad network market (Count III), all in violation of Section 2 of the Sherman Act. Id. at 136–42. They also alleged unlawful tying in violation of Sections 1 and 2 of the Sherman Act (Count IV), and claimed that the United States had suffered monetary damages from Google's violations of antitrust law under 15 U.S.C. § 15a (Count V). Id. at 142–43. Based on this claim for damages, the Complaint sought a jury trial. Id. at 144. For remedies, in addition to seeking monetary damages, the Complaint sought an order requiring the divesture of Google's publisher ad server and ad exchange products, enjoining Google from engaging in anticompetitive practices, providing such relief as necessary to restore competitive conditions in the markets affected by Google's conduct, and awarding costs and reasonable attorneys' fees. Id. at 143–44.

On February 17, 2023, Google moved to transfer the case to the Southern District of New York under 28 U.S.C. § 1404(a), [Dkt. No. 44] at 1, alleging that transfer was in the interest of justice because nineteen civil antitrust actions brought against Google for its advertising technology practices had been transferred to that district and consolidated under a single district judge by the Judicial Panel on Multidistrict Litigation in August 2021. [Dkt. No. 44-2] at 7. The Court denied the Motion to Transfer because 28 U.S.C. § 1407(g) exempts antitrust suits brought by the United States and state governments from multidistrict litigation. [Dkt. No. 60] at 12–13, 18–19. The Court also found that "the strong public policy and congressional intent evinced in § 1407(g) to prioritize expeditious enforcement of antitrust laws by federal and state governments and the balance of the remaining § 1404(a) factors" counseled against transfer. Id. at 18–19.

**\*2** Plaintiffs filed an Amended Complaint on April 17, 2023, solely to add nine additional states—Arizona, Illinois, Michigan, Minnesota, Nebraska, New Hampshire, North Carolina, Washington, and West Virginia—as plaintiffs. [Dkt. No. 120] at 1–3, 146–56. On April 28, 2023, the Court heard and denied Google's Motion to Dismiss for Failure to State a Claim. See [Dkt. No. 163]. The parties engaged in extensive fact and expert discovery from March 27, 2023 to March 15, 2024. See [Dkt. No. 69]; [Dkt. No. 546].

On June 11, 2024, Google's Motion to Dismiss the United States' Damages Claim as Moot and to Strike the Jury Demand was granted after the Court found that Google had mooted the damages claim in Count V by tendering a cashier's check for $2,289,751.00, which was the full amount of monetary damages that the United States claimed it had suffered due to Google's alleged anticompetitive conduct, trebled with prejudgment interest. See [Dkt. No. 748] at 20–21; [Dkt. No. 749] at 1. The Court therefore dismissed Count V and, because the remaining claims only requested equitable relief, struck Plaintiffs' demand for a jury trial. See [Dkt. No. 748] at 23.

After Google's Motion for Summary Judgment was denied without prejudice, [Dkt. No. 773], a bench trial was held. The evidence presented during the three-week trial included testimony of thirty-nine live witnesses, deposition excerpts from an additional twenty witnesses, and hundreds of exhibits. Based on this evidence, the Court makes the following findings of fact and conclusions of law.

## II. The Emergence of Digital Advertising

Successful advertising has long been essential for businesses. Since the days of merchants marketing their wares on papyrus billboards and colorful storefront signs in ancient civilizations, advertisements have been used to expand brand awareness and increase sales. See, e.g., Fred K. Beard, The Ancient History of Advertising, 57 J. of Advertising Rsch. 3, 239–40 (2017). The professionalization of the advertising industry, however, did not begin in earnest until the founding of newspapers and other periodical print publications, which served as timely and efficient means to present sought-after content. See Frank Presbrey, The History and Development of Advertising 35–139 (1929). Their frequency of publication provided significant opportunities for businesses to advertise their latest products and services, as well as for publishers to generate revenue by selling ad space in their publications. Id. at 35–70.

Advertising agencies formed in mid-nineteenth century America to match advertisers to newspaper ad spaces. See Stephen R. Fox, The Mirror Makers: A History of American Advertising and Its Creators 14 (1984). These agencies initially served as brokers between advertisers and newspapers by facilitating the placement of advertisements in available ad spaces. See id. Eventually, they evolved into more holistic service providers by combining creativity and business acumen to run advertising campaigns across multiple print publications, thereby helping their clients achieve marketing objectives. See id. at 33–44.

Over the course of the twentieth century, advertising campaigns came to be delivered through increasingly diverse media. As the development of radio and television enabled the mass distribution of audio and video content, radio jingles and TV commercials emerged as core advertising methods. See id. at 47, 303–18. The continuous nature and geographic segmentation of these broadcasting media helped advertisers target consumers with greater frequency and specificity.

**\*3** Little more than half a century after the first television commercial aired, the media and advertising industries were revolutionized by the Internet. The rapid and widespread adoption of the Internet over the past three decades has resulted in a paradigm shift in the way content is created, viewed, and monetized. See Andrew McStay, Digital Advertising 14–15 (2d ed. 2016). The Internet placed a vast and indefinitely growing amount of information at individuals' fingertips. The ease of uploading text, audio, and video content to websites—such as blogs, message boards, forums, question-and-answer pages, and, more recently, social media platforms—has dramatically expanded the amount of information that can be consumed and monetized, and has greatly diversified the sources of its creation. See Defendant's Trial Exhibit ("DTX") 173 at -173. At the same time, search engines and web-based applications have made online content widely accessible to a global audience, empowering anyone with an Internet connection to explore the World Wide Web and find content that matches their needs and interests. See id.

This explosion of the Internet as the world's primary communications channel, combined with the ability to collect granular data about those who search for and access information online, has made the Internet a gold mine for

advertisers. With nearly five billion people carrying Internet-connected smartphones and more than thirty websites receiving over a billion visits per month, never before have advertisers been able to reach such broad audiences. See The State of Mobile Internet Connectivity Report 2024, GSMA (Oct. 2024), https://www.gsma.com/r/somic; Most Visited Websites in the World, Semrush, https://www.semrush.com/website/top (last visited Mar. 27, 2025). Moreover, the data-rich nature of the digital environment has made it easier than ever for publishers to monetize their content. See, e.g., Plaintiffs' Trial Exhibit ("PTX") 792 at -665, -674; Trial Transcript ("Tr.") Sept. 9 AM 107:22–108:16 (Casale (Index Exchange)). [2] Digital advertisers can target Internet users based not only on what content they are viewing, but also on who they are, where they are located, what they are interested in, what they have purchased, and with whom they interact, among a plethora of other attributes. See PTX792 at -665; PTX904 at -543; PTX1674 at -040; Tr. Sept. 13 AM 52:22–53:17 (LaSala (Google)); Tr. Sept. 25 PM 125:25–126:11 (Borgia (Google)). Digital advertisers employ this personalized understanding to place specific advertisements in front of specific users at specific times to maximize their return on advertising expenditures. See PTX792 at -665; PTX904 at -543; Tr. Sept. 11 PM 99:11–22, 105:21–106:15 (Dederick (The Trade Desk)). By 2016, global digital ad spending had surpassed global television ad spending, in large part due to the breadth and depth of consumer targeting available online. See Emanuel Bayer et al., The Impact of Online Display Advertising, 4 Int'l J. of Rsch. in Mktg. 37 (2020) at 789.

Digital advertising has, in turn, fueled the Internet's growth. Some of the world's most popular websites, such as Bing, Facebook, Google, Instagram, MSN, Pinterest, Reddit, Spotify, TikTok, Twitch, Weather.com, WhatsApp, and X, allow users to access much or all of their content and services at no financial cost. See, e.g., The Weather Channel, https://www.weather.com. The revenue that these popular websites generate from selling ad space to advertisers has not only made their owners' free-to-use models sustainable, but has also provided millions and, in some cases, billions of dollars each year for the maintenance and development of these websites. See, e.g., PTX792 at -693; Tr. Sept. 9 AM 53:12–54:12 (Wolfe (Gannett)); Tr. Sept. 18 AM 151:1–20 (Wheatland (Daily Mail)). Smaller online websites have also largely kept their content freely accessible by monetizing it with advertisements, thereby establishing an open digital ecosystem of information. See DTX76 at -477; DTX506 at -306; Tr. Sept. 20 PM 102:6–103:6 (Sheffer (Google)).

*4 Alternative revenue models have also supported the proliferation of online content. Many traditional print media publishers, such as The New York Times, The Wall Street Journal, and The Washington Post, use a hybrid model of subscriptions and advertisements, placing much of their content behind paywalls—digital barriers that limit access to online content to paying customers. See Tr. Sept. 9 AM 53:19–53:21 (Wolfe (Gannett)); Tr. Sept. 10 AM 18:20–20:9 (Layser (News Corp)) (discussing The Wall Street Journal's paywall). Creators of production-quality video content that is expensive to make, such as Disney, HBO, and Netflix, primarily rely on paid subscriptions. See, e.g., Choose Your Plan, HBO Max, https://auth.max.com/product (last visited Mar. 27, 2025). Meanwhile, e-commerce websites such as Nike and Target function much like physical storefronts, recouping their web infrastructure expenses by selling physical goods and services online. See, e.g., Nike, https://www.nike.com (last visited Mar. 27, 2025). And a small minority of large websites have no revenue models at all, including those funded by government, such as healthcare.gov, or by nonprofit donations, such as Wikipedia. See, e.g., Wikipedia, https://en.wikipedia.org (last visited Mar. 27, 2025). Yet despite these alternative approaches, digital advertising has been the lifeblood of the Internet, funding much of its development while providing free access to an extraordinary quantity of content and services.

### III. **Digital Advertising Stakeholders**

Digital publishers ("publishers") are the organizations and individuals that control websites and publish content on them. See [Dkt. No. 1309] ("Joint Glossary") at 7. Most sophisticated publishers view selling advertising space on their websites as a major source of income. See Tr. Sept. 9 AM 53:12–54:8 (Wolfe (Gannett)); Tr. Sept. 18 AM 130:11–24 (Wheatland (Daily Mail)). [3]

Digital advertisers ("advertisers") are the organizations and individuals that pay to place advertisements on publishers' websites to promote their goods or services or to present their messages to Internet users. Advertisers vary in size and include small businesses, large corporations, government agencies, charitable organizations, political campaigns, and public interest groups. See Tr. Sept. 10 AM 130:17–131:1 (Friedman (Goodway Group)); Tr. Sept. 25 PM 73:19–25 (Stewart (Google)). [4] More sophisticated advertisers with larger marketing budgets often contract with advertising

agencies that specialize in running multi-channel advertising campaigns to buy advertisements on their behalf. See Tr. Sept. 9 PM 54:25–55:7 (Lowcock (IPG)); Tr. Sept. 10 AM 130:11–22 (Friedman (Goodway Group)); Tr. Sept. 13 PM 26:2–12 (Lambert (OMD)); Tr. Sept. 23 PM 71:12–18, 101:4–6 (Oliphant (U.S. Census Bureau)). [5]

Advertising technology providers are the organizations that develop digital products and services to help match publishers' ad spaces with advertisers' ads. See Tr. Sept. 9 AM 53:12–54:25, 84:1–84:5 (Wolfe (Gannett)). These products and services, and the companies that develop and operate them, are discussed at greater length in the next section.

#### IV. The Technology Behind Digital Advertising

Underpinning the rapid rise of digital advertising is an assortment of web-based technologies that help place advertisements on webpages so that online publishers can monetize their content and advertisers can promote their goods, services, and messages. See Tr. Sept. 9 AM 53:12–54:25, 84:1–5 (Wolfe (Gannett)). These technologies match publishers selling ad space to advertisers buying ad space so that the right advertisement can be placed on the right website in front of the right user at the right time. See PTX581 at -980–83; Tr. Sept. 11 PM 12:6–18 (Ravi (Pls. Expert)). The ad tech industry is best described as having "buy-side" tools used by advertisers to buy digital ads, and "sell-side" tools used by publishers to sell digital ad space. Joint Glossary at 5, 8 (defining buy-side and sell-side); PTX581 at -980–83; Tr. Sept. 11 PM 12:6–18 (Ravi (Pls. Expert)).

#### A. The Rise of Programmatic Advertising

 **\*5** In the early days of the Internet, online advertisements were typically sold through "direct deals." See PTX792 at -667; PTX1031 at -527; Joint Glossary at 6. Buyers employed by major brands or the advertising agencies that represented them would negotiate directly with the sales teams of established publishers, such as national newspapers, to place digital ads on the publishers' websites. See Joint Glossary at 6; PTX792 at -670 (stating direct sales are "[i]nventory bought at fixed prices directly from media owners through in-house or external sales teams"). In this way, monetization of publishers' digital content on the early Internet, much of which was text-based, reflected the advertising industry's

roots in newspaper and print advertising. See PTX792 at -670; PTX1031 at -527.

Advertisers and publishers soon realized, however, that the direct-deal approach left much value on the table. See PTX792 at -670; Tr. Sept. 9 AM 63:10–64:2 (Wolfe (Gannett)); Tr. Sept. 10 AM 34:25–36:9 (Layser (News Corp)). Negotiations between sales teams were cumbersome, and the "three martini lunches" that Madison Avenue executives had long relied upon to make ad deals could not keep pace with the instantaneous interactions between publishers and consumers online. PTX1814 at -743; see also Tr. Sept. 9 AM 63:10–64:2 (Wolfe (Gannett)); Tr. Sept. 10 PM 74:6–22 (Lipkovitz (Google)); Sept. 27 AM 64:2–10 (Wheatland (Daily Mail)). Millions of businesses sought to advertise on the Internet, but they did not have anywhere close to the time or resources needed to negotiate individual contracts with each publisher. See Tr. Sept. 9 AM 63:10–19 (Wolfe (Gannett)); Tr. Sept. 9 AM 129:22–13 (Casale (Index Exchange)); Tr. Sept. 9 PM 54:3–55:10 (Lowcock (IPG)); Tr. Sept. 19 PM 9:23–10:25 (Bradbury (GSD&M)). The dynamic nature of the digital domain also posed significant challenges to anticipating how many visits a website would receive, making it difficult for publishers to scope direct deals appropriately. See Tr. Sept. 9 AM 63:10–64:2 (Wolfe (Gannett)). The selling of publisher ad space solely via direct deals therefore resulted in much ad space going unsold. See Tr. Sept. 9 AM 63:10–64:6 (Wolfe (Gannett)); Tr. Sept. 10 AM 34:25–36:9 (Layser (News Corp)). Another disadvantage of direct deals, which involved buying bulk ad space at fixed prices, was that they often made little use of the significant data about Internet users that publishers, advertisers, and intermediaries possessed—leaving one of the largest sources of value of digital advertising, personalized targeting, largely untapped. See DTX1514 at -922–23; PTX792 at -670, -674; PTX1031 at -527.

To address these deficits, advertising technology providers created "programmatic advertising," which automated the matching of advertisers' ads to publishers' webpages. See PTX792 at -669 ("Programmatic advertising is the automation of [the] buying and selling of digital advertising."); Tr. Sept. 10 PM 74:6–22 (Lipkovitz (Google)); Tr. Sept. 17 PM 120:8–13 (Helfand (Disney)). Programmatic advertising, also referred to as "indirect advertising," dramatically improved the effectiveness of digital advertising by allowing publishers to auction the ad space on their websites in real-time to a wide swath of advertisers. Joint

Glossary at 5, 7; DTX1514 at -922–23; Tr. Sept. 12 PM 58:25–59:15 (Goel (PubMatic)).

In automating the matchmaking process, programmatic advertising vastly reduced the time that digital advertising professionals spent inking deals with individual publishers, freeing them to devise higher-level campaign strategies. See Tr. Sept. 19 PM 9:23–10:25 (Bradbury (GSD&M)); Tr. Sept. 23 PM 104:11–23 (Oliphant (U.S. Census Bureau)). Programmatic advertising also enabled publishers to sell their ad space (i.e., "inventory") to a much broader range of advertisers, including small and medium-sized businesses, by eliminating the need for direct negotiations and dealmaking. See PTX579 at -509; Tr. Sept. 19 PM 9:23–10:25 (Bradbury (GSD&M)). Moreover, programmatic advertising helped advertisers place ads on a broader array of publisher websites, including on niche pages that catered to users interested in specific products and services. See Tr. Sept. 23 PM 104:11–23 (Oliphant (U.S. Census Bureau)). In addition to improving the matching of ad buyers and ad sellers, programmatic advertising enhanced the matching of advertisements to consumers by greatly increasing advertisers' ability to target specific Internet users. See Tr. Sept. 20 PM 78:4–25 (Sheffer (Google)).

**\*6** As advertising technology matured, programmatic advertising became more and more effective. Advertisers refined their ability to estimate the value of each impression —each opportunity for a publisher to place a given ad in a given ad space in front of a given user at a given time— based on factors such as publisher quality, ad space quality, user attributes, and ad relevance. See Joint Glossary at 6–7 (defining "impression"); PTX792 at -665, -674; PTX904 at -543; PTX1674 at -040; Tr. Sept. 9 AM 59:24–60:23 (Wolfe (Gannett)); Tr. Sept. 10 PM 56:15–57:6 (Friedman (Goodway Group)). Publishers developed a deeper understanding of what the impressions they were selling were worth to advertisers, and they became adept at estimating advertisers' willingness to pay for a particular impression. See Tr. Sept. 9 AM 136:1–21 (Casale (Index Exchange)). The net result was that programmatic advertising has enabled advertisers to better reach targeted consumers, and publishers to better monetize their content and earn more advertising revenue. See PTX792 at -665, -674; Tr. Sept. 9 AM 130:14–22 (Casale (Index Exchange)); Tr. Sept. 12 PM 84:25–85:4 (Goel (PubMatic)).

**B. Ad Networks and The Ad Tech Stack**

A few core digital advertising tools enabled the rise of programmatic advertising and the increased monetization of online content. At first, publishers and advertisers primarily used "ad networks," third-party software products that sign up advertisers and publishers as their customers, and then match their advertisers' ads with their publishers' inventory. See DTX1514 at -924; PTX579 at -509; Tr. Sept. 9 AM 109:24–110:2 (Casale (Index Exchange)). The advertiser side, or buy-side, of an ad network gave advertisers the ability to create or upload an advertisement's visuals and any accompanying audio, to specify how much the advertiser was willing to pay for the advertisement to be placed on websites of publishers within the ad network, and to control the scope of the advertising campaign. See Joint Glossary at 5–6. The network would, in turn, match these ads to inventory that publishers had placed in the network. DTX1514 at -924. On the publisher side, or sell-side, the ad network gave publishers the ability to specify where and how ads appear on their websites, as well as to select types of ads based on quality and relevance. See id. Google's ad network was called the Google Content Network. [6] Tr. Sept. 13 AM 10:21–11:5 (Bender (Google)); Tr. Sept. 9 AM 129:1–6 (Casale (Index Exchange)). AdWords is the advertiser-facing side of the Google Content Network, i.e., the Google product through which advertisers buy inventory from publishers that are in the network. [7] See DTX549 at -188; PTX939 at -993; PTX1096 at -609. AdSense is publisher-facing side of the Google Content Network, i.e., the Google product through which publishers sell their inventory to advertisers that are in the network. See DTX549 at -186, -218; PTX939 at -993; PTX1096 at -608–09. [8]

Ad networks provide a simple way to connect advertising demand with publisher inventory, and are now primarily used by smaller advertisers and publishers. See PTX579 at -509; PTX1031 at -484; Tr. Sept. 11 PM 104:25–105:20 (Dederick (The Trade Desk)); Tr. Sept. 12 PM 76:10–77:16 (Goel (PubMatic)). Larger, more sophisticated advertisers and publishers have generally moved away from ad networks and turned to modern ad tech products that facilitate large-scale advertising campaigns and increase their control over where, how, when, and to whom ads are shown. See PTX1031 at -484; Tr. Sept. 10 AM 140:11–141:24, 145:9–19 (Friedman (Goodway)); Tr. Sept. 13 PM 101:5–11 (Boland (Meta)); Tr. Sept. 19 PM 99:6–14 (Lee (Pls. Expert)). These more modern

programmatic advertising products are collectively referred to as the "ad tech stack." See, e.g., PTX0551 at -048.

**\*7** On the buy-side, sophisticated advertisers and their ad agencies have reduced their reliance on ad networks and started using two primary tools to buy ads and execute their advertising campaigns: "advertiser ad servers" and "demand-side platforms." See Joint Glossary at 5; PTX1031 at -483; Tr. Sept. 23 PM 5:11–22 (Stefaniu (Google)). Advertiser ad servers help advertisers manage digital advertising campaigns, serve ads, and track ad performance. For example, advertiser ad servers enable advertisers to see how their ads perform across different publishers, track user activity after interacting with ads (e.g., determine if the user visited the advertiser's website or made a purchase), and adjust their advertising campaigns based on user behavior. See Tr. Sept. 23 PM 5:11–22 (Stefaniu (Google)) (discussing functionality of Google's advertiser ad server); Tr. Sept. 25 PM 49:11–50:3 (Stewart (Google)). Google's advertiser ad server is called Campaign Manager 360, or CM360. See Tr. Sept. 23 PM 5:11–22 (Stefaniu (Google)).

Demand-side platforms provide large advertisers with significant control over the sources of inventory from which they purchase impressions and how they bid on those impressions. See Joint Glossary at 5; PTX1031 at -483; Tr. Sept. 11 PM 104:25–105:20 (Dederick (The Trade Desk)). Demand-side platforms do this, in part, by providing a single interface for advertisers to manage programmatic and direct ad buying, to synthesize data about publisher inventory and users, and to bid into ad exchanges. See Joint Glossary at 5; DTX1514 at -903, -929, -952; Tr. Sept. 10 AM 140:11–141:19 (Friedman (Goodway Group)); Tr. Sept. 11 PM 104:1–107:2 (Dederick (The Trade Desk)); Tr. Sept. 25 PM 83:19–25 (Stewart (Google)). A demand-side platform lets an advertiser control where and when its ads appear and to which user they are displayed. PTX1031 at -483. Given the complexity of demand-side platforms, advertisers typically delegate day-to-day management of the campaigns they run through these platforms to ad agencies or, for some of the largest advertisers, to in-house teams of digital advertising professionals. See DTX1514 at -947; Tr. Sept. 25 PM 83:3–11 (Stewart (Google)). Google's demand-side platform is known as Display & Video 360, or DV360, and was previously called DoubleClick Bid Manager, or DBM. See Joint Glossary at 6; PTX939 at -991; PTX1031 at -483; DTX1514 at -929, -950– 953; Tr. Sept. 12 AM 18:17–21 (Srinivasan (Google)). [9]

"Ad exchanges" serve as the critical intermediary between advertisers' ads and publishers' inventory by facilitating real-time auctions in which advertisers can bid on inventory. See Joint Glossary at 5; PTX1031 at -480–81, -501–02; Tr. Sept. 9 AM 67:8–18 (Wolfe (Gannett)). Ad exchanges do this by aggregating available inventory from publishers, flagging impressions as they become available (i.e., as users visit webpages), integrating with buy-side tools to solicit advertisers' bids for each impression, and evaluating those bids within a fraction of a second to determine auction winners. See PTX1031 at -480, -501–02; Tr. Sept. 9 AM 67:8–18 (Wolfe (Gannett)). As the central transaction platforms for connecting sophisticated advertisers with sophisticated publishers, ad exchanges are involved in much of the world's programmatic advertising. See PTX847; PTX1242; Tr. Sept. 9 AM 63:1–64:6 (Wolfe (Gannett)); Tr. Sept. 19 PM 54:13–22 (Lee (Pls. Expert)). Google's ad exchange is called AdX. Joint Glossary at 5. [10]

**\*8** On the sell-side, most sophisticated publishers stopped using ad networks and started using "publisher ad servers" to manage and sell their ad inventory. See Joint Glossary at 8. When a user visits a website, a publisher ad server instantaneously alerts sources of advertising demand that it has an impression for sale, decides in real-time which ad to show the user, and runs the back-end processes to display the ad. See id.; Tr. Sept. 9 AM 68:16–69:25 (Wolfe (Gannett)); Tr. Sept. 9 AM 121:1–16 (Casale (Index Exchange)). Publisher ad servers make it easier for publishers to place multiple sources of advertising demand in competition against each other, as well as to run advertisements pursuant to direct deals with large advertisers. See DTX1016 at -503. Publisher ad servers also enable sophisticated publishers to manage inventory across multiple web pages, set inventory price floors, and create detailed reports on inventory performance. See Tr. Sept. 9 AM 66:1–8 (Wolfe (Gannett)); Tr. Sept. 19 PM 61:18–25 (Lee (Pls. Expert)); Tr. Sept. 23 AM 30:9– 31:9 (Korula (Google)). As such, publisher ad servers are "mission-critical" tools for large publishers, Tr. Sept. 20 PM 78:4–25 (Sheffer (Google)), which "couldn't really manage their display advertising revenue without" them. Tr. Sept. 16 AM 22:12–14 (Mohan (Google)). Google's publisher ad server is called DoubleClick for Publishers, or DFP. [11] Joint Glossary at 6; Tr. Sept. 16 AM 27:24–28:7 (Mohan (Google)). [12]

These products in the ad tech stack work together to place advertisers' ads on publishers' websites. When a user visits a website, one or more ad exchanges receive a bid request

from a publisher ad server that contains information about the impression and provides the amount of time that the exchange has to respond. See PTX1031 at -501–02; Tr. Sept. 9 AM 68:16–69:16 (Wolfe (Gannett)). During this time, which is usually a fraction of a second, each ad exchange that received the bid request runs an auction for the impression, soliciting bids from demand-side platforms, such as DV360, and the advertiser side of ad networks, such as AdWords. See Joint Glossary at 8 (defining "real-time bidding"); PTX1031 at -501–02; Tr. Sept. 9 AM 73:10–25 (Wolfe (Gannett)); Tr. Sept. 12 PM 160:20–161:18 (Kershaw (Magnite)). The ad exchange helps these ad buyers formulate their real-time bids by sharing information about the impression, including the website on which the impression appears, attributes about the user who is visiting the site, and the pricing information that the ad exchange has received from the publisher ad server. See PTX1031 at -480, -486, -501–02; Tr. Sept. 9 AM 68:16–70:13 (Wolfe (Gannett)). Within the extremely short amount of time that it has to respond to the publisher ad server, the ad exchange collects all buy-side bids, determines the highest bid, and shares that bid with the publisher ad server. See PTX1031 at -502; Tr. Sept. 9 AM 68:16–70:13 (Wolfe (Gannett)).

The publisher ad server, in turn, selects the winning bid for the impression based on the bids it has received. See Joint Glossary at 7–8; PTX1031 at -532; Tr. Sept. 9 AM 121:1–16 (Casale (Index Exchange)). Bids that do not meet or exceed the publisher's floor price—the minimum amount of money that the publisher is willing to accept for the impression—are screened out. See PTX1096 at -605; Tr. Sept. 9 AM 148:12–150:24 (Casale (Index Exchange)); Tr. Sept. 9 PM 34:6–11 (Casale (Index Exchange)). Publisher ad servers originally selected the winning bid for an impression in a process called the waterfall, but have since evolved to pitting exchanges' bids against each other in real-time auctions. See Joint Glossary at 8; PTX520 at -388; PTX1031 at -501–03; PTX1096 at -605; PTX1650 at -042; PTX1677 at -694; PTX1710 at -407; Tr. Sept. 9 AM 148:3–150:12 (Casale (Index Exchange)); Tr. Sept. 12 PM 60:19–62:14 (Goel (PubMatic)). Once a winning bid is selected by the publisher ad server, the advertisement associated with it is served on the publisher's webpage and displayed to the user. See Joint Glossary at 8. If no eligible buyer is found for the impression, the ad space may go unfilled. See Tr. Sept. 17 PM 51:1–15 (Cadogan (OpenX)).

**\*9** For every programmatic advertising transaction, the companies that develop and operate these ad tech tools extract fees. See PTX794 at -738. Publisher ad servers, ad exchanges, demand-side platforms, advertiser ad servers, and ad networks typically each collect fees from the revenue-generating transactions in which they are involved, which means that ad exchanges and buy-side tools only collect fees when they submit a winning bid and place an ad in front of a user. See id.; Tr. Sept. 9 AM 142:21–143:18 (Casale (Index Exchange)); Tr. Sept. 16 PM 17:15–18:10 (Weintraub (Pls. Expert)). Industry participants often assess the total cost of these fees based on their percentage of the price paid by the advertiser to obtain the underlying impression, and refer to an ad tech tool's percentage-based fees as its "take rate." See PTX1031 at -514; Tr. Sept. 13 AM 59:19–60:6 (LaSala (Google)); Tr. Sept. 9 AM 111:1–12 (Casale (Index Exchange)). Typically, between $20 to $40 of every $100 spent on digital advertising goes to the ad tech companies that develop and operate these tools. See PTX794 at -738; Tr. Sept. 13 AM 59:23–60:1 (LaSala (Google)).

Programmatic digital advertising is remarkable in its speed, frequency, and complexity. Most of the world's popular websites are monetized with programmatic advertisements. Every time a user visits any webpage that runs programmatic advertisements, the bidding process described above occurs for each advertisement on the page. From start to finish, the process takes no more than the time it takes the webpage to load, which is often well under half a second. See Tr. Sept. 12 PM 160:20–161:16 (Kershaw (Magnite)); Tr. Sept. 12 PM 61:13–62:14 (Goel (PubMatic)); Tr. Sept. 17 PM 54:6–14 (Cadogan (OpenX)). This bidding process occurs many billions of times per day across the Internet. See PTX208 at -544 (stating major ad exchanges represented more than one trillion monthly impressions as of 2014); PTX657 at -351; Tr. Sept. 12 PM 160:20–161:9 (Kershaw (Magnite)) ("We had 250 milliseconds to [run the auction]; so you had to do it quite quickly, and we did it billions of times an hour."). For each impression sold, the ad tech stack examines information about the impression and the associated user, aggregates bids from various advertising sources, places those bids in competition with each other, employs complex bidding and selling strategies, and ultimately causes an ad to be displayed on a webpage for a user.

A simplified visualization of the three ways that advertisers purchase ad inventory from publishers—(1) direct deals, (2) ad networks, and (3) the ad tech stack—is shown below. The major tools that comprise the ad tech stack are placed on a spectrum between advertisers on the buy-side and publishers on the sell-side. The three areas which Plaintiffs

claim that Google has monopolized—publisher ad servers, ad exchanges, and the advertiser-facing side of ad networks—are highlighted in orange. The names of the associated Google products are abbreviated in parentheses.



**C. Types of Digital Advertisements**

These advertising technologies are used to run "display ads": online ads that engage users with text or image-based marketing content, link to the advertiser's webpage, and often appear in rectangular spaces on publishers' websites. See Joint Glossary at 6 (defining "display advertising"); Tr. Sept. 9 AM 56:17–59:20 (Wolfe (Gannett)); Tr. Sept. 9 AM 113:1–8 (Casale (Index Exchange)) (explaining that display ads are often called banner ads); Tr. Sept. 17 PM 122:17–123:1 (Helfand (Disney)). Users view display ads when they visit websites using web browsers on both personal computers and mobile devices. See Tr. Sept. 9 AM 64:7–19 (Wolfe (Gannett)). Although these ads are often shown as static images, they can include animations or video clips. See Tr. Sept. 19 PM 15:16–16:10 (Cox (Google)). Display ads that include video content are sometimes referred to as outstream video ads. See id.

Those in the digital advertising industry often draw a distinction between display ads that run on the open web and display ads that run on "walled gardens." See Tr. Sept. 9 PM 60:13–61:1 (Lowcock (IPG)); Tr. Sept. 12 PM 70:25–72:23 (Goel (PubMatic)); Tr. Sept. 19 PM 51:11–21 (Lee (Pls. Expert)). Open-web display ads are display ads that run on websites that use third-party ad tech infrastructure to match advertisers' ads to publishers' inventory. See Tr. Sept. 9 PM 60:13–20 (Lowcock (IPG)); Tr. Sept. 18 AM 136:12–24 (Wheatland (Daily Mail)). Most publishers that run advertisements on their websites, including the vast majority

of newspapers and other traditional media organizations, use third-party ad tech tools to sell open-web display inventory because it is cost-prohibitive to build an in-house ad tech stack, particularly for entities whose primary competencies do not involve software engineering. See Tr. Sept. 9 AM 73:1–8 (Wolfe (Gannett)); Tr. Sept. 18 AM 132:7–17 (Wheatland (Daily Mail)); Tr. Sept. 26 PM 141:15–142:13 (Glogovsky (New York Times)).

**\*10** Walled gardens, conversely, are publishers that control the infrastructure through which advertisers buy and place advertisements on their websites. See Tr. Sept. 9 PM 60:13–20 (Lowcock (IPG)); Tr. Sept. 12 PM 70:25–72:23 (Goel (PubMatic)). Walled-garden publishers maintain their own in-house ad tech and require advertisers to use those tools to buy and place advertisements on the publishers' owned-and-operated web properties. See Tr. Sept. 9 PM 60:13–20 (Lowcock (IPG)); Tr. Sept. 12 PM 70:25–72:23 (Goel (PubMatic)). Large digital technology firms like Amazon, Google, Meta, and Microsoft are more likely to operate their websites as walled gardens, as they possess the rare combination of commercial scale and technical sophistication to make the development and maintenance of in-house advertising tools feasible. See Tr. Sept. 9 AM 73:1–8 (Wolfe (Gannett)); Tr. Sept. 9 AM 114:7–115:25 (Casale (Index Exchange)); Tr. Sept. 11 AM 160:22–161:3 (Dederick (The Trade Desk)); Tr. Sept. 18 AM 132:7–17, 136:18–22 (Wheatland (Daily Mail)); Tr. Sept. 19 PM 62:1–19, 64:18–25 (Lee (Pls. Expert)).

Although walled-garden publishers sell display ads, they more often focus on alternative digital advertising formats, including social media ads, search ads, and instream video ads. See Tr. Sept. 9 AM 112:1–118:22 (Casale (Index Exchange)) (differentiating display ads on the open web from social, mobile app, and instream video ads); Tr. Sept. 10 AM 157:22–158:19 (Friedman (Goodway Group)); Tr. Sept. 17 PM 138:7–140:23 (Schiekofer (GroupM)). Meta, for example, sells social media ads in a walled-garden environment, requiring advertisers to use Meta's in-house technology to place ads on Facebook and Instagram. See Tr. Sept. 19 PM 62:1–19 (Lee (Pls. Expert)). Search engines including Google Search and Microsoft Bing sell ad space within their respective walled gardens for search ads, which allow advertisers to place ads alongside search results. See PTX764 at -251, -254. Digital streaming providers like Amazon Prime, Google's YouTube, and Disney also use in-house technology to sell space for instream video or connected TV ads, which play before, during, or after video

content and are akin to television commercials. Tr. Sept. 19 PM 15:16–16:10 (Cox (Google)); See Tr. Sept. 17 PM 122:9–16, 131:24–132:3, 133:11–13 (Helfand (Disney)); Tr. Sept. 17 PM 138:14–139:11 (Schiekofer (GroupM)).

Social, search, instream video, and other alternatives to open-web display advertising are not limited to walled gardens. For example, open-web publishers that deliver video-based content to their users will often use instream video ads to monetize that content. See, e.g., CNN Videos, CNN, https://www.cnn.com/videos (last visited Mar. 27, 2025). Publishers additionally use native ads, which consist of sponsored content that appears in the style and format of the content that surrounds it, to increase user engagement. See PTX764 at -259; Tr. Sept. 9 PM 68:20–70:21 (Lowcock (IPG)). Larger open-web publishers often have mobile applications for sharing content with smartphone and tablet users which they monetize using mobile app ads. See PTX764 at -251–52, -260; PTX904 at -549–51.

## V. Google's Activities in Programmatic Advertising

Google evolved from a garage-based startup to a multitrillion dollar company in little more than twenty years. Much of that growth was funded by digital advertising. In keeping with its professed mission to "organize the world's information and make it universally accessible and useful," Google provides many of its key services at no financial cost to Internet users. Tr. Sept. 23 AM 7:22–8:3 (Korula (Google)). These free services include Google's search engine (Google Search), web browser (Chrome), email service (Gmail), mapping tools (Google Maps and Waze), file storage and collaboration service (Google Drive), word processor (Google Docs), translation service (Google Translate) and video sharing platform (YouTube). See DTX527 at -159; Google Products, Google, https://about.google/intl/ALL_us/products/#all-products (last visited Mar. 27, 2025). In exchange, Google collects data from and about the users of these free services, and monetizes that data by selling advertisements targeted to these users. See DTX76 at -479; Tr. Sept. 11 PM 99:11–100:5, 105:21–106:15 (Dederick (The Trade Desk)); Tr. Sept. 13 AM 52:18–53:17 (LaSala (Google)). Over the past two decades, Google has established increasingly detailed knowledge about the billions of people who have used its products, including by collecting data pertaining to their web browsing, search activity, physical location, demographic characteristics, app usage, communications, shopping activity, and device and

network information. See DTX76 at -479; Tr. Sept. 11 PM 99:11–100:5, 105:21–106:15 (Dederick (The Trade Desk)) (asserting that "Google arguably sits on the most valuable data asset in the world"); Tr. Sept. 13 AM 52:18–53:17 (LaSala (Google)). Google uses this data to improve the matching of advertisements to users, thereby increasing its advertiser customers' return on ad expenditures. See DTX76 at -479; Tr. Sept. 11 PM 99:11–100:5, 105:21–106:15 (Dederick (The Trade Desk)); Tr. Sept. 13 AM 52:18–53:17 (LaSala (Google)). As these targeted advertisements provide the company with much of its revenue, Google is fundamentally in the business of advertising. See United States v. Google LLC, 747 F.Supp.3d 1, 35 (D.D.C. 2024) ("Google Search") ("The vast majority of [Google parent company] Alphabet's revenues (nearly 80%) come from digital advertisements.").

### A. The Google Content Network

**\*11** Google's evolution into the data-driven digital advertising enterprise it is today has been powered by its flagship product, Google Search ("Search"). See Tr. Sept. 13 AM 52:18–53:17 (LaSala (Google)); Tr. Sept. 11 PM 153:9–19 (Dederick (The Trade Desk)); Tr. Sept. 19 PM 99:18–100:2 (Lee (Pls. Expert)). Since its introduction in 1998, Search has rapidly become the world's most popular tool for retrieving information. See Google Search, 747 F.Supp.3d at 55–56. With that rise came significant advertiser demand, because Search offered a unique opportunity for advertisers to place digital ads that matched precisely what an Internet user was looking for at that moment. See Tr. Sept. 11 PM 98:19–99:7 (Dederick (The Trade Desk)) (stating that placing ads alongside Search results "really is the most sought-after ad placement"); Tr. Sept. 13 AM 52:18–53:17 (LaSala (Google)); Tr. Sept. 19 PM 99:18–100:2 (Lee (Pls. Expert)). In 2000, to meet this demand, Google launched AdWords, which originated as a self-service advertising platform for buying search ads. Tr. Sept. 20 PM 49:1–10 (Sheffer (Google)); Google Launches Self-Service Advertising Program, News from Google (Oct. 23, 2000), https://googlepress.blogspot.com/2000/10/google-launches-self-service.html.

AdWords grew rapidly, gaining over 100,000 advertiser customers by 2003. See Google Expands Advertising Monetization Program for Websites, News from Google (Jun. 18, 2003) https://googlepress.blogspot.com/2003/06/google-expands-advertising-monetization.html. Although the platform first offered only text-based keyword advertising

that appeared alongside Search results, it quickly expanded to offer ads across both Google's owned-and-operated websites and third-party websites. See id.; DTX1514 at -939 (describing how Google's ad platform "[i]ncludes ads on Google search results pages, our network of partner sites, YouTube, Gmail, Maps, Discovery Feed, and apps"); Tr. Sept. 20 PM 49:23–51:4 (Sheffer (Google)).

Google expanded the number of publishers with which its advertisers could place ads by forming strategic partnerships with popular websites such as AOL, CNN, MapQuest, and The New York Times. [13] Google also launched AdSense, a self-service platform on which publishers could serve ads tailored to the content of their webpages. See PTX904 at -549; Tr. Sept. 20 PM 50:16–51:4 (Sheffer (Google)); Google Expands Advertising Monetization Program for Websites, News from Google (Jun. 18, 2003), https://googlepress.blogspot.com/2003/06/google-expands-advertising-monetization.html.

By 2007, Google's advertiser-facing AdWords and publisher-facing AdSense, which together comprised the Google Content Network, constituted the largest digital ad network in the world. See Tr. Sept. 16 AM 21:17–22:4 (Mohan (Google)); Tr. Sept. 20 PM 50:16–51:4 (Sheffer (Google)). That year, over one million advertisers used AdWords, with many placing display advertisements on a vast multitude of AdSense publishers' websites. See Miguel Helft, Google: 1 Million Advertisers in 2007, More Now, N.Y. Times (Jan. 8, 2009), https:// bits.blogs.nytimes.com/2009/01/08/google-1-million-advertisers-in-2007-more-now.

Google worked to increase its growing ad network's functionality by offering advertisers the ability to insert videos into display ads, as well as to create text-based display ads customized for mobile device-friendly websites. [14] Google also improved its advertisers' ability to run digital advertising campaigns by creating a reporting system that showed where ads were being placed, how often they were being viewed, and how they were driving advertiser page visits and sales. See DTX1514 at -922; Tr. Sept. 20 PM 53:15–23, 112:22–113:12 (Sheffer (Google)); Tr. Sept. 24 AM 33:24–35:3 (Milgrom (Def. Expert)).

### B. DoubleClick Acquisition

**\*12**  In 2008, Google purchased a company called DoubleClick for $3.1 billion to improve Google's ad serving

capabilities and to prevent Microsoft from acquiring "the leading ad serving company" and thus becoming "a major competitive threat" to Google's publisher-facing ad tech business. See PTX15 at -990–91 (an email from Google's General Counsel and SVP for Corporate Development to Google's Board explaining that "Google's Rationale for Acquiring DoubleClick" included "accelerat[ing] time to market for our own advertiser and publisher ad serving products" and preventing the "major competitive threat to [ ] AdSense" posed by a "Microsoft-owned DoubleClick"); PTX1507 at -416. With DoubleClick, Google significantly expanded the third-party publisher base on which it could run its advertisers' ads. See PTX15 at -990–91. DoubleClick's flagship product was the market's leading publisher ad server, DoubleClick For Publishers ("DFP"). PTX14 at -246–48. DFP had a 60% share of the publisher ad serving market, and counted nine of the top ten U.S. websites among its customers. Id. at -246. By acquiring DFP, Google was able to keep the sell-side control that DFP offered out of the hands of Microsoft, Yahoo, and other digital advertising rivals. See PTX15 at -990–91 (stating that "[a]ccess [to indirect] inventory from Double[C]lick's publisher ad server customer base" would help Microsoft "quickly scale its ad network"); PTX41 at -005. Indeed, Google understood that DFP was the "must-call" publisher ad server, PTX611 at -801, and that owning it was critical to winning the "most strategic battle" in the emerging open-web ad tech ecosystem. PTX41 at -005.

Google's bolstering of its publisher-facing business through the DoubleClick acquisition helped it establish a dominant position on both sides of the ad tech stack. Google's ad tech business thus benefited from network effects, as the more advertiser customers Google had, the more publishers wanted to use DFP, and the more publisher customers Google had, the more advertisers wanted to use Google's buy-side services, thereby creating a self-reinforcing positive feedback loop. Tr. Sept. 20 PM 159:10–160:14 PM (John (Microsoft)) (discussing the importance of network effects in open-web display ad tech); see also Tr. Sept. 19 PM 75:3–76:8 (Lee (Pls. Expert)). In the DoubleClick acquisition, Google also obtained a nascent ad exchange, AdX, that connected the two sides of the ad tech stack by matching advertiser bids with publisher inventory. See Tr. Sept. 16 AM 14:21–15:4 (Mohan (Google)); PTX51 at -723–26.

### C. Connection of AdWords, AdX, and DFP

After acquiring DoubleClick, Google implemented two policies that incentivized both advertisers and publishers to use AdX. First, with limited exceptions, Google made AdX the only ad exchange into which AdWords advertising demand was permitted to bid. See PTX110 at -009; PTX882 at -719; Tr. Sept. 13 PM 67:16–21 (Creput (Equativ)). [15] Second, Google required publishers to use DFP as their ad server if they wanted to access real-time bids from AdX. See PTX116 at -462–63; PTX555 at -115; PTX1031 at -500, -797; Tr. Sept. 9 PM 144:7–145:1 (Avery (Kevel)); Tr. Sept. 13 PM 67:11–15 (Creput (Equativ)). [16]

*13 Through these two policies, AdX became the "glue that seal[ed] DFP" inventory to AdWords demand. PTX41 at -006. AdWords was a singularly powerful source of digital advertising demand. See PTX624 at -169; PTX639 at -965; PTX719 at -004–05; PTX759 at -751. Its ease of use, association with a preeminent Internet company, and ability to place targeted advertisements alongside Search results attracted millions of unique advertisers, including countless small and medium-sized businesses. See PTX624 at -169; PTX719 at 004–05; Tr. Sept. 9 AM 129:22–130:22 (Casale (Index Exchange)); Tr. Sept. 10 AM 121:3–12 (Layser (News Corp)); Tr. Sept. 11 PM 153:6–154:20 (Dederick (The Trade Desk)). Although publishers could offer their impressions on non-Google ad exchanges, large publishers were greatly attracted to the unique advertising demand offered by AdWords, and as a result viewed using DFP as essential because it was the only publisher ad server that could effectively access AdX and, consequently, AdWords demand. See PTX551 at -048. Google recognized the unique attractiveness of its extensive advertiser demand, and its employees understood that limiting access to AdWords demand in this way "compel[led] publishers" to use AdX and DFP. Dep. 108:18–109:3 (Rowley (Google)); see also Tr. Sept. 16 PM 128:21–129:5 (Abrantes-Metz (Pls. Expert)).

### D. First Look

Google used its control of DFP, the world's most popular ad server for large publishers, to implement additional policies that benefited its ad tech products. With a feature called "First Look," Google required publishers using DFP to offer AdX a first right of refusal for each impression. See PTX551 at -048. In other words, a publisher using DFP had to give AdX the opportunity to buy the publisher's impression before any rival exchanges were permitted to bid for that impression. See Tr. Sept. 12 PM 99:14–22 (Goel

(PubMatic)); Tr. Sept. 16 PM 135:19–136:20 (Abrantes-Metz (Pls. Expert)); Tr. Sept. 16 PM 21:23–22:4 (Weintraub (Pls. Expert)). In addition to giving AdX the opportunity to bid before other exchanges, DFP permitted AdX to bid in real-time, whereas other exchanges were required to make static bids that were set in advance and could not account for contemporaneous information about the value of the specific impression. See PTX373 at -092; PTX1539 at -105; Tr. Sept. 10 AM 39:4–40:24 (Layser (News Corp)); Tr. Sept. 11 AM 104:6–105:13 (Ravi (Pls. Expert)); Tr. Sept. 12 PM 98:19–99:13 (Goel (PubMatic)). AdX received a First Look at DFP impressions even if the publisher preferred other exchanges and wanted to rank them first. Tr. Sept. 10 AM 40:25–41:3 (Layser (News Corp)).

The First Look functionality benefited AdX advertisers, as they could win the auction even when advertisers using rival ad exchanges were willing to pay a higher price for the impression (i.e., when bids from other exchanges offered publishers more revenue for the impression). See PTX551 at -048; Tr. Sept. 10 AM 40:18–24 (Layser (News Corp)). For example, if AdX offered $1.07 CPM [17] for an impression, and that amount met or exceeded the publisher's floor price for the impression, AdX would win the auction before any other exchanges' bids were examined, even if other exchanges were offering $1.10 CPM and $1.08 CPM for the same impression. Tr. Sept. 11 AM 99:24–101:2 (Ravi (Pls. Expert)); see also PTX368 at -315; PTX468 at -551. Thus, under First Look, advertisers using AdX could win the auction even if they did not offer the highest revenue for the impression. See Tr. Sept. 11 AM 99:24–101:2 (Ravi (Pls. Expert)). This inherent inefficiency limited the ability and incentive for advertisers using other ad exchanges to compete on price, and resulted in publishers not obtaining the maximum value for their impressions. See PTX368 at -315; PTX551 at -048; PTX1539 at -105; Tr. Sept. 10 AM 42:13–21 (Layser (News Corp)); Tr. Sept. 12 PM 86:2–16, 99:14–100:6 (Goel (PubMatic)); Tr. Sept. 16 PM 135:16–137:2 (Abrantes-Metz (Pls. Expert)). The "unfair advantage" that First Look offered Google was built into the software that controlled the auction logic within DFP, and publishers could not toggle it off. PTX1710 at -497; see also PTX1099 at -865–66; PTX1539 at -105.

*14 By giving AdX "an advantage in winning the transaction," Dep. 106:1–21 (Lipkovitz (Google)), First Look "made it difficult" for other exchanges "to compete on a level playing field with AdX," PTX308 at -243, thereby impeding their ability to enter the market, grow, and compete. See Tr. Sept. 16 PM 137:3–12 (Abrantes-Metz (Pls. Expert)). In

addition to providing a revenue advantage, First Look also gave Google a data advantage that helped the AdX team train its auction bidding models more effectively. See Dep. 106:1–21 (Lipkovitz (Google)).

Some large publishers expressed frustration with Google policies that benefited Google and its advertiser customers at its publisher customers' expense, but the vast majority of them continued using DFP as their sole publisher ad server. See PTX254 at -238–39; PTX551 at -048; PTX587 at -794; Tr. Sept. 10 AM 10:16–13:2, 26:22–24, 51:19–52:3, 55:6–56:3 (Layser (News Corp)). DFP remained the "defacto, [sic] preferred ad server of choice for 90% of publishers," PTX254 at -238, because of its guaranteed access to the unique AdWords demand sourced through AdX, the high switching costs associated with changing to another publisher ad server, and the lack of competitive alternatives. See PTX110 at -009; Tr. Sept. 10 AM 10:16–13:2, 26:22–24, 51:19–52:3, 55:6–56:3 (Layser (News Corp)).

### E. Admeld Acquisition

Google continued to pursue strategic opportunities to increase its power and scale in the open-web ad tech ecosystem. In 2011, Google acquired Admeld, a yield manager that helped publishers decide which ad networks and other demand sources to transact with based on supply, demand, and pricing data. See PTX112 at -975, -979; Tr. Sept. 16 AM 46:24–47:1 (Mohan (Google)). Before acquiring Admeld, Google viewed it as a direct competitor that could "disintermediat[e]" Google's control over advertiser-publisher relationships, PTX56 at -783, that risked "break[ing]" Google's ability to enforce policies such as First Look, PTX88 at -597, and that offered a "better publisher base" and improved audience data integration. PTX112 at -981; see also PTX56 at -780, -788–790.

After acquiring Admeld, Google incorporated some of Admeld's features, such as its network yield management functionality, into AdX and DFP to improve Google's sell-side ad tools. See DTX101 at -109; DTX126 at -563–64, -575; Dep. 86:20–87:23 (O'Kelley (Xandr)). But Google also shut down some of Admeld's features, including its ability to pass real-time AdX pricing into non-DFP publisher ad servers. See PTX141 at -448; PTX159 at -002–04; Tr. Sept. 18 AM 47:3–12 (Abrantes-Metz (Pls. Expert)). Google did so, even though some believed that maintaining this functionality would have required "[m]inimal effort," because allowing

AdX to submit real-time bids to publishers using non-Google ad servers would have "[t]ake[n] away a key differentiator for DFP." PTX113 at -804; see also Tr. Sept. 18 AM 47:3–23 (Abrantes-Metz (Pls. Expert)). The deprecation of Admeld features was consistent with Google's pre-acquisition plan to "pick[ ] up the [yield manager] with the most traction and park[ ] it somewhere." PTX58 at -800.

### F. Header Bidding and Open Bidding

By early 2014, AdX had emerged as the world's leading ad exchange and was winning 53% of publisher inventory that DFP made available for auction. PTX174 at -635. Publishers, concerned about Google's dominance, sought to improve competition between AdX and other exchanges by negating Google's First Look advantage. See PTX587 at -794; PTX1710 at -407; Tr. Sept. 9 AM 152:9–153:7 (Casale (Index Exchange)); Tr. Sept. 9 PM 136:12–19 (Avery (Kevel)). Working together, non-Google industry members and open-source advocates formed an organization called Prebid which developed header bidding, a technical solution that allowed publishers using DFP to solicit real-time bids from multiple ad exchanges. See Joint Glossary at 6; PTX284 at -290; PTX587 at -794; Tr. Sept. 9 PM 136:12–19 (Avery (Kevel)). Specifically, header bidding was a workaround that involved a publisher inserting a string of code into the header of its webpage to solicit bids from multiple ad exchanges and hold fair auctions for the publisher's inventory outside of Google's technical architecture. See Joint Glossary at 6; PTX1677 at -692–93; Tr. Sept. 9 PM 136:12–19 (Avery (Kevel)); Tr. Sept. 12 PM 97:8–98:7 (Goel (PubMatic)). The winning bid in a header bidding auction would often be placed into DFP as a floor price against which AdX would compete. See Tr. Sept. 23 AM 34:23–36:19 (Korula (Google)). Header bidding rapidly gained popularity and achieved widespread adoption by large publishers in 2015. See DTX2085; PTX507 at -218; Tr. Sept. 9 AM 74:24–75:5 (Wolfe (Gannett)); Tr. Sept. 10 AM 45:6–21 (Layser (News Corp)). By introducing head-to-head competition among ad exchanges, header bidding "dramatically increase[d]" publisher revenue. PTX507 at -218; see also PTX587 at -794.

**\*15** Google was wary of header bidding, seeing it as a risk to its revenue model that relied upon AdX having a real-time First Look at publisher inventory. See PTX234 at -236; PTX433 at -601; PTX587 at -794 (Google email recognizing that header bidding "gives many publishers better yield, so it's a no-brainer for a publisher to adopt it"). Google declined

to have AdX participate in header bidding, thereby avoiding direct head-to-head competition between AdX and other ad exchanges, such as Index Exchange, Magnite, OpenX, and PubMatic. See Tr. Sept. 11 AM 112:19–113:12 (Ravi (Pls. Expert)); Tr. Sept. 13 AM 31:2–21 (Kershaw (Magnite)).

Instead, Google implemented new features and policy changes to counteract the growing threat of header bidding. In 2018, Google developed Open Bidding—a tool that mimicked the functionality of header bidding but occurred within DFP—with the goal of creating a "slightly better" version of header bidding, PTX1543 at -604; Tr. Sept. 9 AM 158:15–159:10 (Casale (Index Exchange)); Tr. Sept. 19 AM 148:8–12 (Bellack (Google)), so that rival exchanges would conduct their bidding within Google's ad tech ecosystem. See Tr. Sept. 19 PM 23:22–24:23 (Levitte (Google)); Tr. Sept. 23 AM 38:19–39:16 (Korula (Google)). In moving rival ad exchanges' bidding to Open Bidding, Google sought to mitigate the competitive pressure those rival exchanges could exert on AdX and DFP. See Tr. Sept. 13 AM 10:19–12:8 (Kershaw (Magnite)). But Open Bidding was not a substitute for header bidding because it discriminated against non-AdX exchanges, including by extracting a 5% fee from their bids, by prohibiting them from submitting any bids that originated from their own demand-side platforms or ad networks, and by requiring them to share their bid data with Google. See Tr. Sept. 9 AM 160:4–23 (Casale (Index Exchange)); Tr. Sept. 13 AM 11:9–12:9 (Kershaw (Magnite)); Tr. Sept. 19 PM 21:21–22:20, 24:9–25:19 (Levitte (Google)).

### G. Last Look

Through a process called Last Look, AdX was able to outbid the winner of the header bidding auction for every impression in DFP. See Tr. Sept. 11 AM 111:18–112:18 (Ravi (Pls. Expert)); Tr. Sept. 11 PM 143:14–22 (Dederick (The Trade Desk)). DFP publishers that wanted to place the winning bid of a header bidding auction in competition with AdX's bids were required to incorporate that winning bid as a price floor in DFP. See Tr. Sept. 16 PM 24:18–25:1 (Weintraub (Pls. Expert)). AdX would then have the unique opportunity to adjust its bid in response to the highest bid from rival ad exchanges. See id.; Dep. 123:6–126:19 (O'Kelley (Xandr)). In what was otherwise a sealed auction, Last Look let AdX "open the envelope for the winning bid, know what the winning bid [wa]s, and be able ... to bid after everybody else." Tr. Sept. 18 AM 37:7–38:1 (Abrantes-Metz (Pls. Expert)). Being able to view its competitors'

bids provided Google and its advertising customers with a "significant informational advantage," PTX816 at -161, that "significantly disadvantage[d] other competitors" in the ad exchange space. PTX1709 at -934; see also Tr. Sept. 11 AM 121:17–21 (Ravi (Pls. Expert)); Tr. Sept. 12 PM 101:24–102:15 (Goel (PubMatic)). Last Look also harmed publishers using DFP, who were not compensated as much as they would have been for their inventory had Google's AdX demand been required to compete with third-party exchanges (i.e., non-Google exchanges) on a level playing field. See Tr. Sept. 11 AM 120:23–121:16 (Ravi (Pls. Expert)). Because AdX could "see all the other bids" with Last Look, it could "just bid 1 cent more," which "harm[ed] publishers" by reducing their revenue in comparison to a situation in which AdX had to bid without knowledge of competing bids. Tr. Sept. 12 PM 101:13–23 (Goel (PubMatic)).

### H. Sell-side Dynamic Revenue Share

**\*16** Google further expanded AdX's Last Look advantage by using a pricing model called sell-side dynamic revenue share. This dynamic pricing model allowed AdX to adjust its take rate—the percentage fee it charged—on an impression-by-impression basis to "exploit the last look advantage." PTX542 at -335. Although AdX maintained an overall take rate of around 20%, it would lower its take rate below 20% on competitive impressions that had received relatively high offers from third-party exchanges via header bidding. Tr. Sept. 11 AM 114:5–116:16 (Ravi (Pls. Expert)). Selectively lowering its take rate on competitive impressions made AdX's advertisers more likely to win auctions for those impressions, as publishers ranked bids by the revenue they offered net of fees. See id. AdX would compensate for such temporary losses in revenue by charging a take rate above 20% for impressions where its advertisers faced less competition from third-party exchanges. Id. For example, AdX would charge a 15% or lower take rate for competitive impressions, and a 25% or higher take rate for less competitive impressions, all the while maintaining an average take rate of around 20%. See id. This dynamic approach helped AdX advertisers win more auctions, and caused advertisers using third-party exchanges, including those exchanges that participated in header bidding, to win fewer auctions. See id. Because third-party exchanges did not have Last Look to "see all the bids" and vary their take rate accordingly, they lost scale and revenue from AdX's use of sell-side dynamic revenue share. Dep. 163:9–165:11 (O'Kelley (Xandr)); see also PTX1328; PTX1329; Tr. Sept. 16 PM 28:9–29:3 (Weintraub (Pls. Expert)). Through the

advantages provided by Last Look and sell-side dynamic revenue share, Google helped mitigate the risk that header bidding posed to its ad tech products, and enabled AdX to remain the world's largest ad exchange. See PTX819 at -318; PTX1258; PTX1326; Tr. Sept. 16 PM 28:9–29:8 (Weintraub (Pls. Expert)).

## I. Project Poirot

In 2017, while Google was still facing what some of its employees viewed as "the existential threat posed by Header Bidding" and the concomitant growth of third-party ad exchanges, Google launched Project Poirot. PTX433 at -601; see also PTX284 at -290; PTX545 at -115; PTX786 at -716; PTX1545 at -142. With Project Poirot, Google "shaded," or lowered, bids from its demand-side platform DV360 on impressions offered for sale on non-AdX exchanges. See Tr. Sept. 11 AM 125:24–126:4 (Ravi (Pls. Expert)); Tr. Sept. 17 AM 84:12–86:13 (Jayaram (Google)). Publishers more frequently rejected these shaded bids from non-AdX exchanges, which offered them less revenue, and increasingly accepted bids from AdX. See PTX545 at -115; PTX734 at -596 (stating Project Poirot "generate[d] margins by shifting inventory to AdX"); Tr. Sept. 17 AM 84:12–86:13 (Jayaram (Google)). The first version of Project Poirot resulted in advertisers that used DV360 spending an average of 9% more on AdX and 10% less on non-AdX exchanges. See PTX545 at -115; PTX587 at -794. In late 2018, after the second version of Project Poirot was launched, DV360 bids on non-AdX exchanges decreased in value by as much as 90%, resulting in DV360 advertisers dedicating an even higher proportion of their advertising spending to AdX. See Tr. Sept. 16 PM 32:18–33:5 (Weintraub (Pls. Expert)). AdX's main competitors, meanwhile, saw their revenue from DV360 advertisers decrease by an average of 15%. See PTX860 at -683–84. One main ad exchange competitor, OpenX, experienced a 40% decrease in revenue from DV360, which "damaged" the company "very severely" and contributed to 45% of its staff being laid off. Tr. Sept. 17 PM 66:15–67:25 (Cadogan (OpenX)); see also PTX860 at -684; PTX1600 at -011.

## J. Unified Pricing Rules

By 2019, Google was facing pressure from publishers to improve the transparency and fairness of its advertising auction processes. There was also an increasing belief within

Google that its size in the ad tech space and the policies it had implemented to benefit its products across the ad tech stack posed regulatory and "competition concerns." PTX816 at -161. In response, Google agreed to remove Last Look. See id.; Tr. Sept. 23 AM 152:3–153:13 (Korula (Google)). But Google simultaneously introduced Unified Pricing Rules, a policy that prohibited publishers using DFP from setting higher price floors for AdX than for other exchanges. See PTX762 at -291; Tr. Sept. 10 AM 60:3–14 (Layser (News Corp)); Tr. Sept. 18 AM 149:1–8 (Wheatland (Daily Mail)). Unified Pricing Rules also prohibited DFP publishers from setting higher price floors for Google AdWords demand than for demand from other ad networks or demand-side platforms. See Tr. Sept. 10 AM 119:9–120:2 (Layser (News Corp)).

Google advertised Unified Pricing Rules as consistent with the removal of Last Look, positing that both policy changes would make auctions safer and simpler. See Tr. Sept. 23 AM 93:24–94:9 (Korula (Google)); Sept. 24 AM 134:8–21 (Milgrom (Def. Expert)). Google knew, however, that many publishers using DFP had been setting higher pricing floors for AdX than for other exchanges so that they could reduce their high dependence on Google's ad tech stack. See PTX609 at -146; PTX611 at -792, -802; PTX698 at -021; Tr. Sept. 10 AM 49:16–50:9 (Layser (News Corp)). Google recognized that publisher "revenue diversity" was beneficial, and that publishers were willing to "tolerate some revenue loss in exchange for reduced dependance" on Google. PTX609 at -146; see also PTX469 at -512. Publishers also set higher floor prices on AdX to screen out low-quality ads, which were more likely to originate from smaller advertisers using AdWords. See PTX534 at -306; PTX609 at -146; Tr. Sept. 10 AM 49:25–50:3, 119:9–21 (Layser (News Corp)). Despite its name, Unified Pricing Rules did not require a level playing field between exchanges, as it permitted publishers to set higher price floors on third-party exchanges than on AdX. See Tr. Sept. 10 AM 60:7–14 (Layser (News Corp)); Tr. Sept. 18 AM 149:1–8 (Wheatland (Daily Mail)); Tr. Sept. 23 AM 157:8–158:20 (Korula (Google)).

*17 Some of Google's largest publisher customers were disgruntled with the implementation of Unified Pricing Rules, which reduced their ability to control ad pricing, maintain ad quality, and diversify their sources of revenue. See PTX751 at -120–21; PTX763 at -165–66; PTX1854 at 25:1–6, 55:1–56:20. But these same publishers continued using DFP as their sole publisher ad server, believing that they had "very little" ability to switch given DFP's tie to the unique advertising demand from AdX and AdWords. Tr. Sept. 18 AM 147:1–

12, 150:20–151:9 (Wheatland (Daily Mail)); see also PTX754 at -321; Tr. Sept. 10 AM 51:14–52:7, 53:8–10, 55:6–57:25, 109:23–110:9 (Layser (News Corp)).

Unified Pricing Rules increased the number of impressions AdX won and the revenue it received, while decreasing impressions won and revenue received by third-party exchanges. See DTX768 at -933; PTX819 at -318; Tr. Sept. 12 AM 20:16–20 (Srinivasan (Google)); Tr. Sept. 18 AM 41:20–42:11, 43:8–17 (Abrantes-Metz (Pls. Expert)). For at least one major publisher, The Daily Mail, Unified Pricing Rules also resulted in lower revenue per impression. See PTX1633 at -123. The overall result of Unified Pricing Rules was that Google's ad tech products continued to gain scale in the display advertising space while rival ad tech products lost scale. See PTX1035 at -360; PTX1331; PTX1621 at -158; Tr. Sept. 16 PM 29:18–25, 31:8–15 (Weintraub (Pls. Expert)). This was consistent with what one Google employee said was the "primary objective" of the 2019 changes to DFP: "to help the buyside" of Google's ad tech products, namely AdWords and DV360. PTX763 at -165.

### K. Google's Ad Tech Today

Since Unified Pricing Rules were implemented in 2019, Google has remained the dominant force in open-web display advertising. On the sell-side, DFP has remained the leading publisher ad server, and AdX has continued to be the leading ad exchange. See PTX1236; PTX1236A; PTX1237; PTX1237A; PTX1238; PTX1238A; PTX1258; PTX1277; PTX1277A; PTX1278; PTX1278A; PTX1314. On the buy-side, DV360 has remained one of the leading demand-side platforms, see Tr. Sept. 12 PM 11:13–21 (Dederick (The Trade Desk)), and AdWords has remained the leading source of small and medium-sized online advertisers, having benefited greatly from being the platform through which advertisers purchase Search ads. See PTX1243; PTX1243A; Tr. Sept. 9 AM 129:18–130:22 (Casale (Index Exchange)); Tr. Sept. 11 PM 153:6–154:11 (Dederick (The Trade Desk)) (describing the pool of advertisers that use AdWords to purchase Search ads as the "greatest source of demand in the history of advertising").

Google's unparalleled scale in programmatic advertising has given it significant advantages over rival firms. Scale is a crucial factor for ad tech companies' ability to compete because of the importance of big data analytics for optimizing ad tech services and the significant network effects that exist in programmatic advertising. See Tr. Sept. 9 AM 144:20–147:17 (Casale (Index Exchange)); Tr. Sept. 11 PM 110:21–25 (Dederick (The Trade Desk)); Tr. Sept. 12 PM 103:2–21 (Goel (PubMatic)); Tr. Sept. 16 PM 7:9–16:7 (Weintraub (Pls. Expert)). The unmatched scale that Google has achieved across the open-web ad tech stack helps the company test products more quickly and make higher-quality matches between advertisers and publishers. See Tr. Sept. 13 PM 74:13–75:6 (Creput (Equativ)); Tr. Sept. 16 PM 9:15–16:7 (Weintraub (Pls. Expert)); Tr. Sept. 23 PM 136:7–137:2 PM (John (Microsoft)). As ad tech products continue to integrate artificial intelligence and machine learning capabilities, Google's vast repositories of data about advertisers, publishers, and Internet users, combined with the company's scale and technical sophistication, will further benefit its open-web display advertising business. See Tr. Sept. 9 AM 146:4–147:17 (Casale (Index Exchange)); Tr. Sept. 11 AM 138:7–139:8 (Ravi (Pls. Expert)); Tr. Sept. 11 PM 95:18–96:7 (Dederick (The Trade Desk)); Tr. Sept. 12 PM 137:9–19 (Goel (PubMatic)); Tr. Sept. 13 PM 75:7–20 (Creput (Equativ)); Tr. Sept. 20 PM 160:13–161:8 (John (Microsoft)); Tr. Sept. 23 AM 48:13–49:15 (Korula (Google)); Tr. Sept. 23 PM 32:8–12 (Stefaniu (Google)); Tr. Sept. 24 PM 49:15–50:6 (Bjorke (Google)).

### VI. Monopolization Claims

**\*18** **[1]** Plaintiffs contend that Google violated Section 2 of the Sherman Act by monopolizing three markets within the open-web display advertising technology ecosystem: the publisher ad server market, the ad exchange market, and the advertiser ad network market. See Amended Complaint at 136–42. Section 2 of the Sherman Act, in relevant part, makes it unlawful to "monopolize, or attempt to monopolize, ... any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. Considering the purpose of the Sherman Act and its use of broad language, the Supreme Court has determined that it was "enacted for 'the protection of competition, not competitors.' " Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 338, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)); see also Nat'l Collegiate Athletic Ass'n v. Alston, 594 U.S. 69, 73, 141 S.Ct. 2141, 210 L.Ed.2d 314 (2021) ("In the Sherman Act, Congress tasked courts with enforcing a policy of competition."); N. Pac. Ry. Co. v. United States, 356 U.S. 1, 4, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). Accordingly, "[t]he purpose of the Act is not to protect businesses from

the working of the market; it is to protect the public from the failure of the market." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 458, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993); see also Reiter v. Sonotone Corp., 442 U.S. 330, 343, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) (suggesting Congress intended the Sherman Act to be a "consumer welfare prescription").

**[2]** **[3]** The offense of monopolization "has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)); accord E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 441 (4th Cir. 2011) ("Kolon"). Plaintiffs bear the burden of proving each element. Kolon, 637 F.3d at 441.

Google disagrees with Plaintiffs' contention that it has willfully acquired and maintained monopoly power in three distinct product markets, and instead claims that the entire digital ad tech ecosystem—which includes publisher ad servers, ad exchanges, ad networks, and other tools that facilitate transactions between advertisers and publishers—should be analyzed as a single, two-sided market. Google also disputes Plaintiffs' focus on open-web display advertising, arguing that ad technology which facilitates the buying and selling of other types of digital ads, such as mobile app ads, social media ads, and instream video ads, should be included in the relevant market. Plaintiffs and Google further clash over the geographic scope of the relevant market, with Plaintiffs arguing that a worldwide market is most appropriate and Google arguing that only the U.S. market should be considered.

Because the scope of the relevant market is central to this litigation, the Court's analysis of Plaintiffs' claims starts "with a preliminary inquiry into market definition, which serves as a tool to determine the defendant's market power." Kolon, 637 F.3d at 441. Defining the relevant market first is crucial here because "without a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition." Ohio v. Am. Express Co., 585 U.S. 529, 543, 138 S.Ct. 2274, 201 L.Ed.2d 678 (2018) ("Amex") (internal quotation and brackets omitted).

## A. Market Definition

**[4]** **[5]** **[6]** **[7]** The relevant market is "the area of effective competition." Id. (internal citation omitted). This is often the "arena within which significant substitution in consumption or production occurs." Id. (quoting Phillip E. Areeda & Herbert Hovenkamp, Fundamentals of Antitrust Law § 15.02[B] (4th ed. 2017)). In other words, a relevant product market is one that includes "reasonably interchangeable" products from the perspective of the consumers of those products. It's My Party, Inc. v. Live Nation, Inc., 811 F.3d 676, 683 (4th Cir. 2016) (quoting United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395, 76 S.Ct. 994, 100 L.Ed. 1264 (1956)); accord Kodak, 504 U.S. at 482, 112 S.Ct. 2072. Determining the relevant market should be grounded in "commercial realities," Kodak, 504 U.S. at 482, 112 S.Ct. 2072, and involves a "pragmatic, factual" analysis, "not a formal, legalistic" one. Brown Shoe, 370 U.S. at 336, 82 S.Ct. 1502. As such, courts often consider "practical indicia" of the relevant market, such as "industry or public recognition of the [market] as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." Id. at 325, 82 S.Ct. 1502; see, e.g., Regeneron Pharm., Inc. v. Novartis Pharma AG, 96 F.4th 327, 339 (2d Cir. 2024). Delineating the bounds of the relevant market necessarily involves considering "the relevant product market and the relevant geographic market." Kolon, 637 F.3d at 441; accord Brown Shoe, 370 U.S. at 324, 82 S.Ct. 1502.

### 1. Product Markets

#### a. Publisher Ad Server Market

**\*19** **[8]** The Court finds that publisher ad servers for open-web display advertising constitute a distinct relevant product market. Publisher ad servers for open-web display advertising are uniquely suited for managing ad inventory for large web publishers, are priced differently than other ad tech tools, and are recognized as a distinct product by ad tech industry participants. Consequently, other ad tech tools are not reasonably interchangeable with publisher ad servers. The lack of substitutability between publisher ad servers and alternative tools is evidenced by how successful Google's publisher ad server has been in maintaining dominant market

share among the largest open-web publishers. Indeed, the commercial realities of the publisher ad server market suggest that a monopolist could engage in anticompetitive conduct by raising prices or degrading product quality without seeing significant diminution of its customer base. For these reasons, publisher ad servers for open-web display advertising constitute the area of effective competition and form a relevant antitrust market.

Publisher ad servers for open-web display advertising have a distinct purpose: they help publishers manage and monetize their web ad inventory. Tr. Sept. 9 AM 119:9–21 (Casale (Index Exchange)); Tr. Sept. 16 AM 22:5–14 (Mohan (Google)) ("By definition, publishers couldn't really manage their display advertising without an ad server."). Publisher ad servers do this by offering a number of unique product features to publishers, such as allocating ad inventory between direct sales and programmatic sales; placing ad exchange bids in competition with bids from header bidding, programmatic direct sales,[18] and other ad exchanges; rendering an advertisement on the publisher's webpage for each impression; billing for ads rendered; and providing inventory and revenue analytics. See DTX376 at -940, -943; PTX1572 at -693; Tr. Sept. 9 AM 119:9–121:16 (Casale (Index Exchange)); Tr. Sept. 19 PM 61:18–65:20 (Lee (Pls. Expert)); Tr. Sept. 20 PM 78:4–25 (Sheffer (Google)).

Publisher ad servers, which charge publishers a flat fee per impression sold, are priced differently than ad exchanges, which charge publishers a percentage-based fee per impression sold, and demand-side platforms, which charge advertisers a percentage-based fee per impression purchased. See PTX188 at -963; Tr. Sept. 26 AM 120:20–121:3 (Israel (Def. Expert)). Moreover, publisher ad servers are much less expensive than other ad tech tools. For large open-web publishers, publisher ad server fees typically average about 1% to 2% of the revenue generated by the sale of the impression, which is significantly lower than the double-digit percentage take rate charged by ad exchanges —the other primary ad tech tool that large publishers use for open-web display advertising. See DTX1977; PTX188 at -963; Tr. Sept. 20 PM 79:13–18 (Sheffer (Google)); Tr. Sept. 26 AM 121:10–16, 132:22–25 (Israel (Def. Expert)) (stating that DFP fees equate to a "take rate[ ]" of "1.7 percent to 1.3 percent," whereas take rates are around 20% "for an auction run on AdX").

The unique purpose, features, and pricing of the publisher ad server has resulted in its being recognized as a distinct product

within the ad tech industry. In the ordinary course of business, Google regularly identified its publisher ad server, DFP, as being a unique product, and the firm has assessed its market share in display web publisher ad serving. See, e.g., PTX15 at -990–91; PTX847 at -261 (identifying DFP alongside other publisher ad servers in a "display ads landscape" chart); PTX946 at -807 (differentiating between AdX and DFP revenue). Google marketed DFP as a distinct product until it rebranded DFP as part of the Google Ad Manager product suite in 2018. See, e.g., PTX847 at -261; PTX993 at -310; see also Tr. Sept. 9 AM 121:20–122:10 (Casale (Index Exchange)). Other technology firms that participate in the ad tech ecosystem, including AppNexus, Equativ, Index Exchange, Meta, and Microsoft, also recognize the publisher ad server as a unique product. See, e.g., DTX1487 at -850–51; PTX580 at -802–05; PTX1709 at -937; Tr. Sept. 9 AM 119:9–122:10 (Casale (Index Exchange)); Tr. Sept. 13 PM 62:11–63:1 (Creput (Equativ)); Tr. Sept. 20 PM 131:5–21 (John (Microsoft)). As do publishers, such as Gannett and News Corp. Tr. Sept. 9 AM 66:1–67:7 (Wolfe (Gannett)); Tr. Sept. 10 AM 30:17–32:7 (Layser (News Corp)). Even Dr. Mark Israel, Google's market definition expert who contended that there was not a relevant market for publisher ad servers, agreed that publisher ad servers are "components" of the ad tech stack that "serve different purposes" from buy-side tools, ad exchanges, and in-house ad tech used by social media companies. See Tr. Sept. 26 PM 45:9–19, 47:18–48:3 (Israel (Def. Expert)).

**\*20** Moreover, the commercial realities of the publisher ad server market support the conclusion that a monopolist could engage in anticompetitive conduct without realizing significant customer loss. Dr. Robin Lee, an economics professor and Plaintiffs' market definition expert, provided credible testimony that a hypothetical monopolist of publisher ad servers for open-web display advertising could profitably increase price or degrade quality without the risk of significant substitution due to the lack of close alternative products available to publishers. Tr. Sept. 19 PM 55:10–57:15, 60:4–67:17 (Lee (Pls. Expert)). Indeed, although Google decreased DFP's quality by "plac[ing] restrictions on how publishers could work with rival ad exchanges" (e.g., giving AdX advantages over third-party exchanges with First Look and Last Look) and by removing features that its publishers used (e.g., eliminating variable price floors with Unified Pricing Rules), DFP still maintained 99 of its top 100 publisher customers in the ensuing years. Tr. Sept. 19 PM 66:7–67:11, 68:21–70:1 (Lee (Pls. Expert)); see Sections V(C–G) and V(J), supra. Moreover, Google

estimated internally that it could increase net revenue by at least $40 million by raising DFP prices by 20%. PTX611 at -798. Both Google's dominant grip on the publisher ad server market even after ill-received product changes and its internal estimates indicating a lack of customer sensitivity to price increases support the Court's conclusion that publisher ad servers constitute a distinct relevant product market.

Google nevertheless contends that Plaintiffs' focus on publisher ad servers for open-web display advertising is too narrow because publisher ad servers can be used to manage other ad types. For example, Google points out that DFP helps publishers manage not only display ads shown on the open web, but also mobile app and instream video ads. Google also observes that companies operating walled-garden websites with integrated ad tech stacks, such as Amazon and Meta, show display ads on their websites using in-house technology that offers much of the functionality of publisher ad servers.

Although digital advertising is not limited to open-web display advertising, the evidence in the record supports the conclusion that publisher ad servers for open-web display advertising constitute a distinct, relevant market because they are uniquely capable of performing ad-serving functions for websites, which are essential components of news, media, and other online publishers' businesses. Organizations that publish primarily text-based news content online, such as The New York Times or The Wall Street Journal, cannot monetize the primary content on their websites with instream video ads. See Tr. Sept. 10 AM 31:1–17 (Layser (News Corp)); Tr. Sept. 19 PM 59:16–60:3, 62:1–15, 64:4–65:3, 72:1–17 (Lee (Pls. Expert)). Nor can they feasibly forgo monetizing their websites and publish revenue-generating content only through alternative digital channels, such as via mobile apps or social media pages. See Tr. Sept. 27 AM 59:20–60:18 (Wheatland (Daily Mail)); Tr. Sept. 10 AM 31:1–33:2 (Layser (News Corp)); Tr. Sept. 20 PM 78:4–25 (Sheffer (Google)); Tr. Sept. 26 PM 47:18–49:3 (Israel (Def. Expert)) (agreeing that publishers cannot use social media platforms to sell display ad inventory on their websites).

Unlike on the open web, publishers using apps and social media are subject to content regulation and revenue sharing with the large technology firms that control mobile app stores and social media platforms, such as Apple, Google, Meta, and TikTok. See Tr. Sept. 12 PM 71:18–72:10 (Goel (PubMatic)); id. at 72:24–73:21 (explaining how "the app environment tends to be controlled by a

couple of large [operating system and mobile device] providers, like Apple or Google"); Tr. Sept. 27 AM 66:11–17 (Wheatland (Daily Mail)); see, e.g., Community Guidelines, YouTube, https://www.youtube.com/howyoutubeworks/policies/community-guidelines (last visited Mar. 27, 2025). Monetizing their websites, instead of just their content on app and social media pages, is therefore crucial for publishers who wish to retain a greater degree of editorial independence. The economic sustainability of publishers' open-web properties also benefits those Internet users who would prefer not to have much of the information that they consume online directly captured and regulated by a few large corporations.

It is also infeasible for publishers to shift their users away from their websites to apps or social media pages. See Tr. Sept. 27 AM 59:20–60:18, 65:6–21 (Wheatland (Daily Mail)). Many web publishers rely on users reaching their content via search engines or hyperlinks from other websites, and would only have a fraction of their current users if they required users to download mobile apps or follow them on social media in order to access their content. See id. at 66:2–66:5 ("[I]t is hugely difficult to convert a web user to be a loyal app user ... 2 percent of our ... readership is on [our] apps."); Tr. Sept. 10 AM 31:20–33:2 (Layser (News Corp)); Tr. Sept. 19 PM 76:21–77:11 (Lee (Pls. Expert)). Open-web display ads are therefore not reasonably interchangeable with social media, in-app, and instream video ads from the perspective of news, media, and other online publishers. Accordingly, publisher ad servers for social media, in-app, or instream video advertising are not reasonably interchangeable with, or significantly substitutable for, publisher ad servers for open-web display advertising. See Amex, 585 U.S. at 543, 138 S.Ct. 2274; Kodak, 504 U.S. at 482, 112 S.Ct. 2072 (explaining that interchangeability is assessed from the perspective of the consumer); It's My Party, Inc., 811 F.3d at 683.

*21 Nor are in-house technologies developed by publishers to serve display ads on their websites reasonably interchangeable with publisher ad servers. Building an in-house ad server is "incredibly sophisticated and incredibly complex," and is not within the "core competencies" of most organizations that publish news or other content online. Tr. Sept. 9 AM 73:1–8 (Wolfe (Gannett)); see also Tr. Sept. 9 AM 125:2–25 (Casale (Index Exchange)); Tr. Sept. 18 AM 132:7–17 (Wheatland (Daily Mail)). The "extremely major investment" required to develop a publisher ad server makes doing so infeasible for companies that do not specialize in enterprise software development. Tr. Sept. 13 PM 82:6–17, 91:8–15 (Creput (Equativ)); see also Tr. Sept. 18 AM 132:7–

17 (Wheatland (Daily Mail)). Once built, maintaining an in-house publisher ad server is also difficult given the significant "operational support," "infrastructure[, and] capital resources required" for both day-to-day maintenance and continuous evolution to keep apace with third-party publisher ad servers. Tr. Sept. 26 PM 141:15–142:5 (Glogovsky (New York Times)); see also PTX174 at -633. As a result, very few publishers have successfully developed and used an in-house publisher ad server, and almost all of those publishers are large digital technology companies. See Tr. Sept. 19 PM 65:4–20 (Lee (Pls. Expert)); Tr. Sept. 26 AM 126:5–127:19 (Israel (Def. Expert)) (identifying Amazon, Google, Meta, Reddit, Snapchat, and TikTok as companies that "have their own ad tech, including their own ad server"). Even fewer publishers use their in-house publisher ad servers for open-web display advertising. Instead, they more often use in-house servers to meet site-specific needs, such as serving customized, native ad formats like social media ads or sponsored listings. See Tr. Sept. 9 PM 66:11–67:24 (Lowcock (IPG)); Tr. Sept. 17 PM 122:3–16, 123:12–14, 131:24–132:3, 133:11–13 (Helfand (Disney)); Tr. Sept. 19 PM 68:21–70:1 (Lee (Pls. Expert)); Tr. Sept. 26 AM 66:2–22, 126:5–129:16 (Israel (Def. Expert)). For example, Meta uses in-house ad serving technology to show ads that are "blended well into the experience of Instagram," and Amazon's in-house ad serving technology lets brands pay to "move their [product] listing[s] higher" in Amazon.com's shopping search results. Tr. Sept. 9 PM 128:8–25 (Avery (Kevel)).

Lastly, other technologies capable of serving display ads on open-web publishers' websites are not reasonably interchangeable with—and cannot serve as effective substitutes for—publisher ad servers. For example, the publisher-facing side of an ad network, such as Google AdSense, is not a reasonable alternative for large publishers because an ad network cannot place a variety of advertising demand sources in competition with each other for each impression; instead, an ad network is limited to sourcing bids from advertisers who have signed up for the network. See PTX88 at -603; Tr. Sept. 16 AM 92:24–93:14 (Mohan (Google)); Tr. Sept. 18 AM 202:18–203:16 (Pappu (Google)); Tr. Sept. 27 AM 58:2–6 (Wheatland (Daily Mail)); see also Sections IV(B) and V(A), supra. Therefore, a publisher relying on an ad network alone cannot use that network to display ads sold via direct deals, which remain a significant proportion of large publishers' ad revenue. See Tr. Sept. 10 AM 29:8–30:10 (Layser (News Corp)); Tr. Sept. 20 PM 110:23–111:5 (Sheffer (Google)).

*b. Ad Exchange Market*

**[9]** The Court also finds that ad exchanges for open-web display advertising constitute a distinct relevant product market. Ad exchanges play a distinct role in the open-web display ad tech stack by connecting publishers using publisher ad servers with advertisers using programmatic buying tools such as demand-side platforms and ad networks. Due to their unique ability to collect and rank ad bids from multiple buying tools in mere milliseconds, ad exchanges are involved in most programmatic open-web display transactions, are recognized as a distinct product by industry participants, and are priced differently than other ad tech tools. Accordingly, there is no other ad tech tool that is reasonably interchangeable with ad exchanges. The lack of substitutability between ad exchanges and alternative tools means that a monopolist could profitably raise prices significantly above competitive levels, as Google determined in a study that showed its ad exchange price changes had limited effect on its customers' behavior. For these reasons, ad exchanges for open-web display advertising constitute "the area of effective competition" and form a relevant antitrust market. Amex, 585 U.S. at 543, 138 S.Ct. 2274.

The ad exchange is the only ad tech tool through which publishers can auction their ad inventory at scale and in real-time to the largest sources of programmatic advertising demand. Advertisers and their ad agencies use demand-side platforms like DV360 and The Trade Desk, or advertiser-facing sides of ad networks like AdWords, to purchase open-web display advertising programmatically. See Joint Glossary at 5–6; PTX1231; Tr. Sept. 11 PM 104:25–105:17 (Dederick (The Trade Desk)); Tr. Sept. 19 PM 30:2–3 (Kim (Google)). These buying tools bid into ad exchanges, which run real-time auctions to rank sources of advertising demand and select winning bids to be sent to a publisher ad server. Joint Glossary at 5; PTX1031 at -480; Tr. Sept. 9 AM 67:8–18 (Wolfe (Gannett)). Although there are ways for advertising demand to circumvent ad exchanges, such as only buying ads from a closed ad network, the majority of programmatic ad spending flows through ad exchanges. See Tr. Sept. 9 AM 63:1–64:6 (Wolfe (Gannett)) (stating that most of Gannett's programmatic inventory is sold via ad exchange auctions); Tr. Sept. 19 PM 54:13–22 (Lee (Pls. Expert)).

**\*22** Industry participants consider ad exchanges to be a distinct product that they categorize separately from other ad tech tools. See Tr. Sept. 19 PM 81:11–19 (Lee (Pls.

Expert)). Google regularly identifies ad exchanges as a distinct product that differs from publisher ad servers, ad networks, and demand-side platforms. See, e.g., DTX435 at -062; PTX847 at -261; PTX1031 at -478–84; PTX1646 at -469–71. Publishers similarly view ad exchanges as a distinct product. See, e.g., Tr. Sept. 9 AM 67:8–18 (Wolfe (Gannett)). As do third-party ad tech developers, including companies that specialize in creating ad exchanges. See, e.g., Tr. Sept. 9 AM 109:22–111:12, 122:23–123:6 (Casale (Index Exchange)).

The discrete nature of the ad exchange market is reflected in the distinct prices that ad exchanges charge publishers. Ad exchanges typically charge publishers a percentage of the total winning bid for each impression, while publisher ad servers typically charge publishers a flat fee per impression sold and demand-side tools charge advertisers directly. See Section VI(A)(1)(a), supra. Moreover, given the unique role that ad exchanges play in holding real-time auctions to identify the highest advertiser bids, ad exchanges charge much higher fees than publisher ad servers do, often taking between 10% and 20% of revenue from the winning bid. See Tr. Sept. 13 AM 43:7–17; Tr. Sept. 26 AM 120:20–121:16, 132:17–25 (Israel (Def. Expert)).

Because ad exchanges have unique functionality—as reflected by their distinct pricing structure and the industry's recognition of them as a distinct product—other ad tech tools are not reasonably interchangeable or substitutable with ad exchanges. Although ad networks are another tool for connecting advertisers to publishers, the sophisticated publishers who receive the majority of open-web display advertising revenue do not view ad networks as substitutes for ad exchanges because ad networks offer very limited control and are unable to place bids from disparate demand sources in competition with each other. See PTX88 at -603; PTX1646 at -469–71; Tr. Sept. 18 AM 202:18–203:16 (Pappu (Google)); Tr. Sept. 20 PM 110:23–25 (Sheffer (Google)); Tr. Sept. 27 AM 58:4–6 (Wheatland (Daily Mail)). [19]

Direct deals with advertisers are also not reasonable substitutes for ad exchanges, given the distinct advantages of programmatic advertising. See Section IV(A), supra. As an internal Google document observes, it would be "highly unlikely" for programmatic advertising to shift to direct deals, in part due to the "[e]fforts required to make and maintain direct connections." PTX978 at -625; see also Tr. Sept. 10 AM 33:5 –36:9 (Layser (News Corp)); Tr. Sept. 18 AM 135:15–

136:3 (Wheatland (Daily Mail)); Tr. Sept. 19 PM 78:1–21 (Lee (Pls. Expert)).

The conclusion that ad exchanges lack reasonable substitutes is bolstered by economic analysis suggesting that a monopolist of open-web display ad exchanges could charge anticompetitive prices without significant substitution. For example, an internal Google study projected that a 25% decrease in the price AdX charged would have limited impact on AdX's market share, indicating customer stickiness and inelastic demand. See PTX188 at -979, -012–17; see also Tr. Sept. 19 PM 82:22–85:15 (Lee (Pls. Expert)) (stating PTX188 shows that for "publishers representing over 70 percent of AdX's gross revenue," Google calculated that "their elasticity or expected elasticity is one or less," meaning those publishers would be unlikely to switch away from AdX due to an increase in price). Publishers have particularly inelastic demand for ad exchanges given their inability to turn to alternative tools for placing demand sources in competition with each other and for maximizing the monetization of their web inventory. See Tr. Sept. 19 PM 73:24–74:22, 82:22–85:15 (Lee (Pls. Expert)); see also Tr. Sept. 18 PM 36:14–19 (Simcoe (Pls. Expert)). Therefore, a monopolist for open-web display ad exchanges could likely charge supracompetitive prices [20] without seeing customers switch to rival products in sufficient numbers to constrain the monopolist's prices. See Tr. Sept. 18 PM 7:13–8:3 (Simcoe (Pls. Expert)); Tr. Sept. 19 PM 81:20–82:14, 85:1–89:12 (Lee (Pls. Expert)).

**\*23** Google contends that Plaintiffs' expert Dr. Lee drew the ad exchange market too narrowly by focusing only on exchanges that facilitate the sale of open-web display inventory. But just as with publisher ad servers, ad exchanges that facilitate the sale of only instream video, mobile app, or social media ads are not helpful for publishers seeking to monetize their open-web display inventory. See PTX764 at -251–54, -259–61 (Google document categorizing its "display web" business as distinct from its "display app," "search," "native web," and "video instream" businesses); Tr. Sept. 9 AM 112:1–118:22 (Casale (Index Exchange)). For example, a publisher of a text-based website that does not host video content cannot use an ad exchange that runs auctions solely for instream video ads to monetize the ad inventory on its website, because instream video ads are akin to television ads and designed to run inside a website's video player. See Tr. Sept. 9 AM 117:12–118:22 (Casale (Index Exchange)); Tr. Sept. 19 PM 53:4–18, 64:23–25 (Lee (Pls. Expert)). To monetize its display ad inventory, the publisher must instead use an ad exchange that facilities the sale of open-web

display ads. See Tr. Sept. 9 AM 117:12–118:22 (Casale (Index Exchange)); Tr. Sept. 19 PM 53:4–18, 64:23–25 (Lee (Pls. Expert)). And so the only other products that are reasonably interchangeable with an ad exchange that facilitates the sale of open-web display ads are other ad exchanges that facilitate the sale of open-web display ads.

### c. Advertiser Ad Network Market

[10] The Court finds that Plaintiffs have failed to show that advertiser ad networks for open-web display advertising constitute a relevant product market. In proposing a market for "advertiser ad networks," Plaintiffs use a term that is not common in the digital advertising industry and unduly exclude the publisher-facing side of two-sided ad networks. Moreover, the segmentation of advertiser ad networks for open-web display advertising as its own market is inconsistent with the substitution that occurs from the perspective of advertisers between open-web display ads and other types of display ads, including in-app and walled-garden display ads.

Ad networks were created to connect publishers' inventory with advertisers' ads by aggregating advertisers and publishers within a single, two-sided platform. See Sections IV(B) & V(A), supra; Tr. Sept. 10 PM 28:8–21, 29:5–7 (Friedman (Goodway Group)); Tr. Sept. 16 PM 47:15–25 (Weintraub (Pls. Expert)). In performing this connection, ad networks "typically represent[ ] both the interests of the publisher or media, as well as the marketer or the advertisers." Tr. Sept. 9 AM 109:22–110:8 (Casale (Index Exchange)). Considering solely the advertiser-facing portion of an ad network, which is Plaintiffs' position, would unduly ignore that ad networks intermediate between two groups, benefit from indirect network effects, and compete for transactions with other two-sided platforms. See Amex, 585 U.S. at 534– 46, 138 S.Ct. 2274.

In accordance with their two-sided nature, "ad networks" are typically referred to as a single product by industry participants, who generally do not draw a distinction between "advertiser ad networks" and the publisher-facing side of ad networks. See, e.g., Tr. Sept. 9 AM 109:22–110:8 (Casale (Index Exchange)); Tr. Sept. 10 AM 139:23–140:6 (Friedman (Goodway Group)); Tr. Sept. 11 PM 102:24–104:24, 105:21– 106:15, 156:21–157:19 (Dederick (The Trade Desk)); Tr. Sept. 20 PM 54:4–13 (Sheffer (Google)). For example, industry participants generally consider AdWords, which

is the advertising-facing side of Google's ad network, and AdSense, the publisher-facing side of its ad network, to be the two components of Google's ad network— the Google Content Network. See DTX259 at -090, -092; Tr. Sept. 12 PM 14:3–24 (Dederick (The Trade Desk)). Plaintiffs' expert Dr. Weintraub recognized that each ad network has a buy-side component that serves the network's advertisers and a sell-side component that serves the network's publishers. See Tr. Sept. 16 PM 47:15–25, 110:21–24 (Weintraub (Pls. Expert)). And Dr. Lee, who selected the term "advertiser ad networks" in setting out his proposed market definitions, testified that he had not heard the term before this litigation. Tr. Sept. 20 AM 137:12–15 (Lee (Pls. Expert)).

As previously discussed, in the modern programmatic advertising business, the closed two-sided ad network has faded from prominence. See Tr. Sept. 10 PM 33:14–34:14 (Friedman (Goodway Group)) (quoting Friedman for the proposition that ad networks have been obsolete since 2012). Sophisticated digital advertisers and publishers have "moved more towards programmatic versus ... a more simple transactional network model." Tr. Sept. 17 PM 126:13–17 (Helfand (Disney)); see also Section IV(A–B), supra. The rise of programmatic advertising has resulted in large and sophisticated advertisers using demand-side platforms like Google's DV360 instead of advertiser-facing sides of ad networks as their primary buying tools. See DTX1508 at -876; PTX579 at -509; Tr. Sept. 10 AM 141:20–24 (Friedman (Goodway Group)); Tr. Sept. 11 AM 24:6–13, 40:5–41:2 (Bender (Google)). [21] Large and sophisticated open-web publishers, similarly, have used ad exchanges like AdX and publisher ad servers like DFP, instead of the publisher-facing sides of ad networks like AdSense, to source and place ads on their websites. See PTX88 at -603; Tr. Sept. 18 AM 202:18–203:16 (Pappu (Google)); Tr. Sept. 20 PM 110:23– 25 (Sheffer (Google)); Tr. Sept. 27 AM 58:4–6 (Wheatland (Daily Mail)). Small and medium-sized advertisers and publishers, conversely, primarily use ad networks like the Google Content Network. See PTX1235; Tr. Sept. 19 PM 99:6–12 (Lee (Pls. Expert)).

*24 This evolution has resulted in AdWords emerging as open-web publishers' primary source of small and medium-sized businesses' advertising. Over four million advertisers use only AdWords to purchase open-web display advertising. See PTX1231. Instead of confining these advertisers to AdSense websites, AdWords bids into Google's ad exchange, AdX, and places ads on websites that operate outside of the Google Content Network (i.e., websites that use publisher ad

servers to manage their inventory). See PTX333 at -486. In doing so, AdWords provides large publishers with a unique source of revenue from smaller advertisers that lack the scale and sophistication to use demand-side platforms as their ad buying tools. See PTX290 at -983; PTX624 at -169; Tr. Sept. 18 AM 121:21–122:12 (Abrantes-Metz (Pls. Expert)).

Plaintiffs, through their market expert Dr. Lee, contend that this evolution means that a relevant market exists for "advertiser ad networks." Plaintiffs observe that small and medium-sized advertisers lack the sophistication to operate a demand-side platform or the means to hire an ad agency to operate one on their behalf. Therefore, according to Plaintiffs, the advertiser side of ad networks—principally, the AdWords side of the Google Content Network—provides the only place for these less sophisticated advertisers to reach users with open-web display ads. And because the Google Content Network no longer operates as a closed network, they argue that it would ignore commercial realities to place AdWords within a two-sided market instead of viewing it primarily as a buying tool that participates in programmatic advertising and reaches publishers' inventory across the open web.

These arguments have some merit. But even if the buy-side of ad networks were categorized as constituting a distinct market, that does not explain why such a market should be limited to open-web display advertising. Substantial trial evidence showed that advertisers reallocate resources among different digital advertising channels based on perceived return on advertising expenditures. See, e.g., Tr. Sept. 23 PM 117:25–119:8 (Hardie (U.S. Census Bureau)) ("Ultimately, advertisers are following eyeballs. They are trying to reach people wherever they are."). Advertisers are often "agnostic" as to particular platforms or channels, id. at 118:15–119:21, and focus more on how "the audience [i]s responding to the ad" rather than on through what method or format the advertisement is delivered. Tr. Sept. 23 PM 83:11–84:7, 85:3–86:11, 92:6–10 (Oliphant (U.S. Census Bureau)). When one ad format or channel shows better return on investment, advertisers and the ad agencies that represent them will shift ad spending to that different format or channel to optimize performance. See id. at 92:11–14; Tr. Sept. 9 PM 93:1–21 (Lowcock (IPG)); Tr. 10 PM 6:11–7:7 (Friedman (Goodway Group)) (stating marketers "should not be biased toward one medium or another"); Tr. Sept. 27 AM 24:21–27:7, 29:14–30:2 (Bumpers (Zulily)). Moreover, the data-rich nature of the digital environment allows advertisers to measure the outcomes of their campaigns and quickly reallocate resources

across channels to maximize effectiveness. See DTX439 at -414; Tr. Sept. 25 PM 28:6–30:1 (Stewart (Google)).

Cross-channel optimization is not limited to large advertisers; smaller advertisers that use AdWords reallocate advertising spending across channels. For example, Courtney Caldwell, the owner of a beauty tech start-up, testified that she shifted ad spending from AdWords to Instagram based on the relative user engagement and campaign performance that she experienced on each platform. See Tr. Sept. 25 PM 9:9–10:11 (Caldwell (ShearShare)). In addition to smaller advertisers having easy access to social media and other channels, automated tools are increasingly facilitating the reallocation of advertising budgets across channels without manual involvement. For example, AdWords' Performance Max uses artificial intelligence to buy ads across multiple channels—including open-web display ads, walled-garden display ads on Google's owned-and-operated properties, in-app ads, and instream video ads. See DTX1248 at -406–07; Tr. Sept. 25 PM 34:12–22 (Stewart (Google)). Although advertisers using Performance Max may opt out of channels, Google has warned that doing so "will limit performance." DTX1248 at -420. Meta offers a similar automated cross-channel buying tool, which typically outperforms campaigns that run on only one of its available channels. See DTX498 at -913. Given the ease and benefits of allocating advertising spending across channels, Plaintiffs' assertion that advertiser ad networks for open-web display ads constitute a relevant market is unpersuasive.

**\*25** **[11]** By contrast, as discussed above, the market for publisher ad servers and the market for ad exchanges are each properly limited to tools that facilitate open-web display transactions. In those two markets, the publisher is the primary consumer of the ad tech tools and is focused on monetizing channel-specific inventory; whereas in the proposed market for advertiser ad networks, the advertiser is the consumer and is focused on reaching users regardless of which channel they are using. As the Supreme Court has held, interchangeability is assessed from the perspective of the consumer. See Kodak, 504 U.S. at 482, 112 S.Ct. 2072. It is therefore appropriate to find that the proper scope of the proposed advertiser ad network market should include other buying tools that enable advertisers to purchase digital advertisements in reasonably interchangeable formats, including walled-garden display ads, in-app ads, and social media ads. Because Plaintiffs have failed to consider ad networks that facilitate buying ads in these alternative

channels in their market definition, they have failed to properly define the ad network market.[22]

### d. Google's Contention that the Entire Ad Tech Ecosystem Fits within a Two-Sided Market

**[12]** Relying heavily on Amex, a Supreme Court decision that stated that "in two-sided transaction markets," such as the market for credit-card networks, "only one market should be defined," 585 U.S. at 546, 138 S.Ct. 2274, Google claims that the digital ad tech ecosystem constitutes a single two-sided market. In Amex, the Supreme Court held that American Express, Discover, MasterCard, and Visa compete with each other in a single two-sided market because it found that credit-card networks are two-sided transaction platforms that can only compete with other two-sided transaction platforms. Id. at 544–46, 138 S.Ct. 2274. Google invokes Amex to contend that all ad tech tools should be placed in a single market for the purposes of this litigation because all of them exist to facilitate matches between advertisers and users viewing ads on digital platforms. In support of this position, Google cites its market expert Dr. Israel, who testified that any analysis of competition within the ad tech industry should be conducted using a single two-sided market. See Tr. Sept. 26 AM 37:13–38:18, 42:11–20 (Israel (Def. Expert)).

The Court finds this argument unpersuasive. Distinct products should not be grouped into a single omnibus market simply because they work together to achieve the same overarching purpose. Although Google correctly argues that, under Amex, both sides of a two-sided transaction platform should be considered in defining a market, many of the ad tech products at issue in this trial do not fit within Amex's definition of two-sided transaction platforms. Defining an omnibus market to include buy-side tools built for advertisers that compete with other buy-side tools built for advertisers—and sell-side tools built for publishers that compete with other sell-side tools built for publishers—would ignore commercial realities and contradict the bedrock principle of antitrust law that any Sherman Act inquiry must focus on the protection of competition, not competitors.

As previously explained, the distinct products that comprise the ad tech ecosystem are not reasonably interchangeable. A publisher cannot use a demand-side platform to render ads on its website. See Joint Glossary at 5; Tr. Sept. 9 AM 131:3–23 (Casale (Index Exchange)); Tr. Sept. 25 PM 75:23–25 (Stewart (Google)). An advertiser cannot use a publisher ad server to bid into ad exchanges and purchase ad inventory. See Joint Glossary at 8; Tr. Sept. 20 PM 78:4–25 (Sheffer (Google)); Tr. Sept. 9 AM 66:1–8 (Wolfe (Gannett)). Uncontroverted trial testimony established that advertiser buying tools, ad exchanges, and publisher ad servers each serve distinct functions, are priced differently, and cannot be substituted for each other. See Section VI(A)(1)(a–c), supra. And the advertisers who are the customers of buy-side tools such as demand-side platforms are largely distinct from the publishers who are the customers of sell-side tools such as publisher ad servers.

**\*26** Dr. Israel's assessment that the digital advertising tools at issue must be considered as part of a single market disregards Amex's explicit limitation of its holding to two-sided *transaction* platforms, as opposed to two-sided platforms more broadly. Compare 585 U.S. at 546, 138 S.Ct. 2274 ("[I]n two-sided transaction markets, only one market should be defined.") with id. at 544, 138 S.Ct. 2274 ("To be sure, it is not always necessary to consider both sides of a two-sided platform."). The Supreme Court was clear that "[t]he key feature of transaction platforms is that they cannot make a sale to one side of the platform without simultaneously making a sale to the other." Id. at 535, 138 S.Ct. 2274; see also id. at 545, 138 S.Ct. 2274.[23] The Supreme Court explicitly differentiated credit-card networks from "[n]ontransaction platforms" such as "newspaper[s] that sell[ ] advertising" in determining that the former should be assessed as a two-sided market and the latter as a one-sided market; it stated that credit-card platforms "are different" because they "facilitate a single, simultaneous transaction between participants." Id. at 545 & 546, 138 S.Ct. 2274 n.9. In other words, "whenever a credit-card network sells one transaction's worth of card-acceptance services to a merchant it also must sell one transaction's worth of card-payment services to a cardholder. It cannot sell transaction services to either cardholders or merchants individually." Id. at 545, 138 S.Ct. 2274. The Court in Amex accordingly found that "[e]valuating both sides of a two-sided transaction platform is ... necessary to accurately assess competition" because "[o]nly other two-sided platforms can compete with a two-sided platform for transactions." Id. at 546, 138 S.Ct. 2274.

In contrast to credit-card networks, most of the core ad tech products at issue in this litigation do not fit within this definition of a two-sided transaction platform. For example, a publisher ad server sells transaction-related services, such as inventory management, bid evaluation, ad rendering, and sales performance tracking, only to publishers, and does not simultaneously sell any services to advertisers. Cf. id. 545,

138 S.Ct. 2274 (Two-sided transaction platforms "cannot make a sale unless both sides of the platform simultaneously agree to use their services."). And unlike in the credit-card network market, it is not "[o]nly other two-sided platforms [that] can compete with" publisher ad servers "for transactions." Id. at 546, 138 S.Ct. 2274. Google's primary competitors in the open-web publisher ad server space, such as Equativ and Kevel, do not operate two-sided transaction platforms, but rather specialize in serving only publishers and do not offer buy-side advertising tools. See, e.g., Tr. Sept. 13 PM 62:11–14, 62:22–63:1 (Creput (Equativ)); Tr. Sept. 9 PM 116:19–23, 119:6–21 (Avery (Kevell)). Cf. Amex, 585 U.S. at 546, 138 S.Ct. 2274 ("A credit-card company that processed transactions for merchants, but that had no cardholders willing to use its card, could not compete with Amex.").

The same is true for demand-side platforms, which Google contends are part of a broader two-sided market for digital advertising. Demand-side platforms are not two-sided transaction platforms because they "sell transaction services," such as ad inventory search, audience targeting, centralized ad buying, and real-time bidding, "to [advertisers] individually," and do not simultaneously sell any services to publishers. Amex, 585 U.S. at 545, 138 S.Ct. 2274. Moreover, demand-side platforms do not "compete" "for transactions" with "[o]nly other two-sided platforms." Id. Rather, demand-side platforms serve only advertisers and compete with other advertiser-facing tools. See Joint Glossary at 5; Tr. Sept. 10 AM 140:11–18 (Friedman (Goodway Group)). For example, one of the largest demand-side platforms, The Trade Desk, is run by a company that does not serve publishers and does not operate its own two-sided network. See, e.g., Tr. Sept. 11 PM 87:21–88:13, 105:12–14 (Dederick (The Trade Desk)) ("[O]ur company exclusively represents the interests of advertisers and ad buyers.").

The Court recognizes that there are aspects of the digital advertising ecosystem, such as ad exchanges, that resemble two-sided transaction platforms. Despite sometimes being referred to as "supply-side platforms" in the industry, the core function of ad exchanges is to match advertiser demand with publisher inventory. See Joint Glossary at 5 (defining ad exchange as "[a] tool that connects owners of digital content where people see ads ('publishers'), who have ad inventory to sell, with advertisers looking to place ads."); PTX1031 at -480–81 (explaining how the term supply-side platform refers to the publisher-facing tools within an ad exchange, even though "both names are used interchangeably" as industry

shorthand); Tr. Sept. 9 AM 67:8–18 (Wolfe (Gannett)). Unlike publisher ad servers and demand-side platforms, ad exchanges "cannot make a sale unless both sides of the platform [i.e., the publishers selling impressions and the advertisers buying impressions] simultaneously agree to use their service." Id. at 545, 138 S.Ct. 2274. Moreover, "[o]nly other two-sided platforms can compete with" ad exchanges "for transactions." Id. at 546, 138 S.Ct. 2274. For these reasons, in analyzing whether Google has monopoly power, the Court will "[e]valuat[e] both sides" of the ad-exchange market. Id.[24]

**\*27** Antitrust analysis of the digital advertising industry is thus conducted much the same way as is antitrust analysis of the consumer payments industry. In each industry, a diverse set of products exist to match (i.e., enable transactions between) buyers and sellers. The shared high-level purpose of these products, however, is far too broad for defining an antitrust market. Rather, courts delineate the "the area[s] of effective competition" to define the relevant markets within an industry. Amex, 585 U.S. at 543, 138 S.Ct. 2274; see also FTC v. Staples, Inc., 970 F. Supp. 1066, 1075 (D.D.C. 1997) ("The mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes.").

One consideration for defining areas of effective competition is the channels through which transactions occur. In analyzing the consumer payments industry, courts have found that there is a credit-card market that does not include debit cards, private-label credit cards, checks, or digital payment apps, even though each is "an option for payment to consumers." United States v. Visa U.S.A., Inc., 163 F. Supp. 2d 322, 337–38 (S.D.N.Y. 2001); see also Amex, 585 U.S. at 547, 138 S.Ct. 2274 ("[W]e will analyze the two-sided market for credit-card transactions."); In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., 729 F.Supp.3d 298, 321 (E.D.N.Y. 2024) ("[C]redit-card transactions and other payment methods (e.g., cash or checks) are not reasonable substitutes for debit-card transactions."). In digital advertising, there are similar distinctions between direct deals, ad network advertising, programmatic advertising, and walled-garden advertising, even though each is a channel through which advertisers purchase ad space on publishers' websites. Two recent opinions have defined relevant antitrust markets in the digital advertising industry with significant channel specificity. Google Search, 747 F.Supp.3d at 136 (holding that "general

search text advertising [i]s a relevant product market"); Fed. Trade Comm'n v. IQVIA Holdings Inc., 710 F. Supp. 3d 329, 356 (S.D.N.Y. 2024) (finding that healthcare professional programmatic advertising is a relevant market).

Google has recognized the importance of not unduly placing all its digital advertising products at issue into a single market. In another federal court, Google argued that combining the "distinct" products in the ad tech ecosystem into one market would be improper given that some products such as demand-side platforms "are used only by advertisers," whereas others such as publisher ad servers "are used only by publishers." Mot. to Dismiss, In re Google Digital Advertising Antitrust Litig., 5:20-cv-3556, 2021 WL 7083558, at *6 (N.D. Cal. Jan. 15, 2021). In Google's own words, "[a]lthough business practices impacting the products and services offered to *publishers* surely could have important consequences for *advertisers*, that is not sufficient, absent other allegations not made here, to support the broad overarching services market." Id. at *5 n.2 (emphases in original). [25]

**\*28** **[13]** **[14]** The nature of commercial competition also requires courts to avoid classifying products as part of two-sided transaction platforms merely because they help customers on one side of a transaction-facilitating industry improve their capacity to transact. Courts have found that buy-side consumer payments products that facilitate credit-card transactions—such as checking accounts, consumer loan services, bill splitting apps, and digital wallets—are not reasonably interchangeable with credit-card networks and are not to be analyzed within the credit-card network market. See Amex, 585 U.S. at 537, 138 S.Ct. 2274 (stating "Amex, Visa, MasterCard, and Discover are the four dominant participants in the credit-card market" and identifying the four firms as controlling 100% of the market); see also Visa, 163 F. Supp. 2d at 327 (defining the "U.S. credit and charge card industry" as only including these "four significant network services competitors"). The same is true on the sell-side of the consumer payments industry. Courts have not included merchant-facing products such as point-of-sale terminals and digital payment gateways from companies like Fiserv, Shopify, Square, and Stripe in the two-sided credit-card network market because they are not reasonably interchangeable with credit-card networks. See 585 U.S. at 537, 138 S.Ct. 2274; see also Brown Shoe, 370 U.S. at 325, 82 S.Ct. 1502 ("[W]ithin [a] broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes."). This case law makes clear that just because two-sided transaction

platforms reside at the heart of an industry that matches buyers and sellers does not mean that every industry product that helps facilitate those matches must be analyzed within an industry-wide, two-sided market. Rather, products that serve economic actors on one side of the industry and can be sustainably sold by firms that specialize only in that side of the industry—such as publisher ad servers that serve publishers and demand-side platforms that serve advertisers —are to be analyzed in markets that consist of reasonably interchangeable products on that side of the industry.

Because Plaintiffs have shown that there are two relevant product markets, one for publisher ad servers for open-web display advertising and another for ad exchanges for open-web display advertising, the geographic scope of these markets must be determined.

### 2. Geographic Market

**[15]** **[16]** To determine the relevant geographic scope of a market, courts consider the "area within which the defendant's customers ... can practically turn to alternative supplies if the defendant were to raise its prices." It's My Party, 811 F.3d at 682 (quoting Kolon, 637 F.3d at 441) (ellipses in original). "The commercial realities considered when defining the relevant geographic market include: where the parties market their products; the size, cumbersomeness, and perishability of the products; regulatory requirements impeding the free flow of competing goods into or out of the area; shipping costs and limitations; the area within which the defendant and its competitors view themselves as competing; and other factors bearing upon where customers might realistically look to buy the product." Kolon, 637 F.3d at 442–43.

**[17]** **[18]** **[19]** Although Plaintiffs and Google agree that the United States is a suitable geographic market, Plaintiffs contend that a worldwide [26] market is optimal for assessing Google's conduct, which "crosse[d] country boundaries and affect[ed] customers worldwide." Tr. Sept. 19 PM 126:13–127:3 (Lee (Pls. Expert)). The Sherman Act does not authorize federal courts to "regulate the competitive conditions of other nations' economies." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 582, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, the "foremost concern" of federal antitrust law is the "protection of Americans"— here, American publishers, advertisers, and Internet users. Pfizer, Inc. v. Gov't of India, 434 U.S. 308, 314, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978). But to meet this concern, courts

frequently look beyond our nation's shores in delineating the competitive boundaries of increasingly globalized markets. See, e.g., United States v. Eastman Kodak Co., 63 F.3d 95, 109 (2d Cir. 1995) (affirming district court's definition of a worldwide geographic market for film). Considering global markets is particularly common in cases involving software products that can be distributed around the world with a single click. See, e.g., United States v. Microsoft, 253 F.3d 34, 52 (D.C. Cir. 2001) (en banc); In re Google Play Store Antitrust Litig., 2024 WL 4438249, at *4 (N.D. Cal. Oct. 7, 2024); United States v. Oracle Corp., 331 F. Supp. 2d 1098, 1164 (N.D. Cal. 2004).

The Court finds that the worldwide market as defined by Dr. Lee is the relevant geographic market for both the open-web display publisher ad server market and open-web display ad exchange market. The globally networked nature of the Internet has resulted in worldwide competition among ad tech providers, with the speed of light serving as a primary impediment to intercontinental ad serving. See Tr. Sept. 11 AM 124:18–22 (Ravi (Pls. Expert)). "[C]ustomers interact across country boundaries" and "supplier competition is global." Tr. Sept. 19 PM 126:13–127:3 (Lee (Pls. Expert)). Many U.S.-based advertisers target international Internet users, and many international advertisers target U.S.-based users, including by advertising on U.S.-based publishers' webpages. See id. at 123:7–124:22; PTX904 at -553. Similarly, advertisers bid to target international users who visit U.S.-based publishers' pages, and Americans consume digital content from international publishers. See PTX904 at -553; Tr. Sept. 9 AM 111:15–25 (Casale (Index Exchange)); Tr. Sept. 19 PM 123:7–124:22 (Lee (Pls. Expert)). Ad tech providers, in turn, have built global infrastructure and often manage, price, sell, and track performance of their products globally. See DTX1524 at 5–6; PTX946 at -807; Tr. Sept. 9 AM 111:17–25, 142:6–21 (Casale (Index Exchange)); Tr. Sept. 9 PM 117:19–118:1 (Avery (Kevel)); Tr. Sept. 19 AM 119:25–120:5 (Bellack (Google)); Tr. Sept. 19 PM 126:13–127:3 (Lee (Pls. Expert)). Google, for example, charges consistent ad exchange fees worldwide, and often tests and implements product and policy changes, including much of the conduct at issue in this litigation, on a global basis. See PTX326 at -837; PTX1099 at -866–67; PTX1199; Tr. Sept. 16 PM 20:21–21:10 (Weintraub (Pls. Expert)); Tr. Sept. 19 PM 126:13–127:3 (Lee (Pls. Expert)).

  **\*29** Google disagrees that a worldwide market is applicable, curiously contending that the "smallest relevant market principle" should govern in the same filing in which it claimed

that there is an omnibus product market for the entire ad tech ecosystem. See [Dkt. No. 1375] (Google's Proposed Findings of Fact – Redacted Version) at 359 (quoting Tr. Sept. 20 AM 98:15–99:6) (Lee (Pls. Expert)). Google observes that over 70% of U.S. sell-side revenue comes from U.S. advertisers, and points to regulatory, cultural, and language differences between global regions. See DTX358 at -010–11; PTX904 at -553; Tr. Sept. 20 AM 99:7–24 (Lee (Pls. Expert)); Tr. Sept. 25 AM 19:23–20:18 (Chevalier (Def. Expert)); Tr. Sept. 26 AM 110:1–18 (Israel (Def. Expert)). In part due to these distinctions, Google structures some of its ad tech business units regionally, and its strategy teams have considered the United States as a distinct market in their competitive analyses. See, e.g., DTX399 at -465; DTX733 at -396; DTX758 at -024; PTX657 at -328–30.

Google's arguments are unpersuasive in light of the global nature of digital advertising. The World Wide Web publishers that are Google's customers for these two products compete for global audiences and advertising dollars. See, e.g., Tr. Sept. 18 AM 125:9–12 (Wheatland (Daily Mail)). Publisher ad servers and ad exchanges are "market[ed]" globally. Kolon, 637 F.3d at 442. They are not "cumbersome[ ]" or "perishab[le]" physical products with high "shipping costs." Id. at 442–43. Moreover, despite some variance in regulatory regimes, the balance of evidence at trial did not establish that supply-side competitors face substantially different "regulatory requirements impeding" the sale of their publisher ad servers and ad exchanges across countries within the worldwide market as defined by Dr. Lee. Id. at 442; see Tr. Sept. 9 PM 117:19–118:1 (Avery (Kevel)); Tr. Sept. 13 PM 63:3–7 (Creput (Equativ)); Tr. Sept. 16 PM 20:21–21:6 (Weintraub (Pls. Expert)). Although publisher-facing ad tech providers sometimes break down their sales numbers by region, they often view themselves as competing globally. See, e.g., Tr. Sept. 9 AM 116:15–20 (Casale (Index Exchange)); Tr. Sept. 20 PM 153:17–24 (John (Microsoft)); see also Consul, Ltd. v. Transco Energy Co., 805 F.2d 490, 495 (4th Cir. 1986) (citing Justice Frankfurter for the proposition that the relevant geographic market is "the area in which buyers or sellers of the relevant product effectively compete"). Therefore, under the factors set out by the Fourth Circuit in Kolon, the Court finds that the relevant geographic market for both publisher ad servers for open-web display advertising and ad exchanges for open-web display advertising is worldwide. 637 F.3d at 442–43.

### B. Monopoly Power

 **[20]** **[21]** **[22]** **[23]** "Monopoly power is the power to control prices or exclude competition." Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co., 748 F.3d 160, 173 (4th Cir. 2014) ("Kolon II" (quoting United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956)). A plaintiff can show that a defendant had monopoly power in a relevant antitrust market either directly or indirectly. See Epic Games, Inc. v. Apple, Inc., 67 F.4th 946, 998 (9th Cir. 2023); Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 307 (3d Cir. 2007); Geneva Pharms. Tech. Corp. v. Barr Labs. Inc., 386 F.3d 485, 500 (2d Cir. 2004); Microsoft, 253 F.3d at 51. Direct proof of monopoly power includes evidence that a defendant profitably charged supracompetitive prices. See Microsoft, 253 F.3d at 51. Indirect proof is derived "from the structure and composition of the relevant market." Broadcom, 501 F.3d at 307; see, e.g., Grinnell, 384 U.S. at 571, 86 S.Ct. 1698.

 **[24]** One factor often cited as indirect proof of monopoly power is market share. "The existence of [monopoly] power ordinarily may be inferred from the predominant share of the market." Grinnell, 384 U.S. at 571, 86 S.Ct. 1698; see also United States v. Swift & Co., 286 U.S. 106, 116, 52 S.Ct. 460, 76 L.Ed. 999 (1932) (Cardozo, J.) ("[S]ize carries with it an opportunity for abuse that is not to be ignored when the opportunity is proved to have been utilized in the past."). But case law varies as to what percentage is dispositive. Compare, for example, the following: defendants found to possess monopoly power typically control at least 70% of the market, Kolon, 637 F.3d at 451 (citing White Bag Co. v. Int'l Paper Co., 579 F.2d 1384, 1387 (4th Cir. 1974)); there is "no minimum percentage" necessary to prove monopoly power indirectly, Google Search, 747 F.Supp.3d at 119; although a "market share of less than 60% during the relevant period does not necessarily foreclose a finding of monopoly power," it does "weigh heavily against such a finding," Kolon II, 748 F.3d at 174; and "absent special circumstances, a defendant must have a market share of at least fifty percent before he can be guilty of monopolization," Domed Stadium Hotel, Inc. v. Holiday Inns, Inc., 732 F.2d 480, 489 (5th Cir. 1984). The Supreme Court has held, however, that a market share of "87% ... leaves no doubt that the ... defendant[ ] ha[d] monopoly power." Grinnell, 384 U.S. at 571, 86 S.Ct. 1698.

 ***30** **[25]** Courts are more willing to infer monopoly power from high market share when there are "high barriers to

entry." Kolon II, 748 F.3d at 174; see Lenox MacLaren Surgical Corp. v. Medtronic, Inc., 762 F.3d 1114, 1123–26 (10th Cir. 2014). This is because the true measure of monopoly power lies not in a firm's high market share, but in its ability to maintain that share. United States v. Syufy Enters., 903 F.2d 659, 665–66 (9th Cir. 1990); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 591 n.15, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In assessing barriers to entry that enhance "durability of the defendant's market power," Kolon, 637 F.3d at 451, courts have considered "factors, such as regulatory requirements, high capital costs, or technological obstacles, that prevent new competition from entering a market." Broadcom, 501 F.3d at 307. In the digital services context, the network effects begot by scale and the previous failed entry of a well-resourced rival have been cited as additional indicators of high barriers to entry. See, e.g., Microsoft, 253 F.3d at 55–56; Klein v. Facebook, Inc., 580 F. Supp. 3d 743, 780–81 (N.D. Cal. 2022); In re Google Play Store, 2024 WL 4438249, at *6; Google Search, 747 F.Supp.3d at 120–121, 161–164.

### 1. Publisher Ad Server

 **[26]** Plaintiffs have proven that Google possesses monopoly power in the publisher ad server for open-web display advertising market. Google's publisher ad server DFP has a durable and "predominant share of the market" that is protected by high barriers both to entry and expansion. Grinnell, 384 U.S. at 571, 86 S.Ct. 1698. This conclusion is reinforced by evidence that Google has acted to degrade DFP's features without fear that its customers would switch to alternative publisher ad servers.

Dr. Lee's market calculations showed that in 2022, Google had a 91% market share of the worldwide publisher ad server market for open-web display advertising as measured by the number of impressions served. PTX1278; PTX1278A; see also PTX1236; PTX1236A. From 2018 through 2022, Google's share of this worldwide market held steady between 91.0% and 93.5%, and its U.S. market share stayed between 86.5% and 92.3%. PTX1278; PTX1278A. Dr. Lee's analysis is relatively consistent with Google's internal estimates, which assessed DFP to have between 84% and 90% market share at different points over the past decade. See PTX254 at -238 ("[W]e are the defacto, [sic] preferred ad server of choice for 90% of publishers."); PTX604 at -314; PTX767 at -775; PTX946 at -807. Industry participants perceive DFP to be the "dominant" publisher ad server, Tr. Sept. 9 PM 150:4–

11 (Avery (Kevel)); Tr. Sept. 19 PM 39:18–20 (Shaughnessy (Kargo)), with some even referring to Google as having a monopoly in the publisher ad server market. PTX758 at -946; PTX1709 at -933–34. Within Google, a DFP engineering manager speculated that "losing some market share" would have the "positive" effect of "demonstrating to regulators that viable alternatives exist / we're not a monopoly." PTX949 at -481.

The significant barriers to entry and expansion that exist in the publisher ad server market make DFP's high market share durable. As multiple witnesses testified, including those from Gannett, Index Exchange, The Daily Mail, and The New York Times, building a publisher ad server is a complex, resource-intensive process, even for a large corporation. See Section VI(A)(1)(a), supra (citing witnesses); see also PTX581 at -977, -983; PTX1572 at -699–700; Tr. Sept. 19 PM 68:25–70:1 (Lee (Pls. Expert)); Tr. Sept. 20 PM 23:18–25:4 (Lee (Pls. Expert)). Perhaps more importantly, it is very challenging to gain publisher ad server customers. Publishers almost always use a single ad server for open-web display ads because operating two or more publisher ad servers would not be practical due to challenges with forecasting, integration, and latency (i.e., the delay in an ad being displayed to a user, which is increased by data having to be sent between multiple publisher ad servers). See PTX949 at -481–82; Tr. Sept. 10 AM 14:8–11, 15:16–17:24 (Layser (News Corp)); Tr. Sept. 17 PM 133:2–10 (Helfand (Disney)); Tr. Sept. 18 AM 138:20–139:23 (Wheatland (Daily Mail)); Tr. Sept. 20 PM 151:7–152:22 (John (Microsoft)). To gain market share from DFP, a rival would have to convince publishers to stop using DFP and switch to the rival's publisher ad server. This, however, is very difficult to do. As the evidence showed, publisher ad servers are "sticky" products that take "a lot of work" to change. Dep. 216:1–13, 305:14–20 (Lipkovitz (Google)); see also PTX114 at -049. In the words of a former Google and DoubleClick executive, switching publisher ad servers "[t]akes an act of God to do" and is a "nightmare" because "[n]othing has such high switching costs." PTX1814 at -745. A publishing executive described his experience switching ad servers as a year-long process that was "akin to ... changing the tires on the race car mid race." Tr. Sept. 9 AM 70:20–71:25 (Wolfe (Gannett)). These assessments are consistent with general industry sentiment. See, e.g., DTX404 at -134; PTX114 at -049; PTX1572 at -694; Tr. Sept. 10 AM 27:11–28:20, 108:2–20 (Layser (News Corp)); Tr. Sept. 13 AM 89:3–22 (LaSala (Google)); Tr. Sept. 16 AM 13:2–14 (Mohan (Google)).

**\*31** The large difficulties that publishers face in switching ad servers are exacerbated by the lack of meaningful alternatives to DFP. See Tr. Sept. 9 AM 70:20–23 (Wolfe (Gannett)); Dep. 305:14–20 (Lipkovitz (Google)). It is no wonder, then, that open-web publishers very rarely switch from DFP to another ad server, even when Google makes product changes with which they disagree. See PTX882 at -717; PTX1854 at 25:1–11, 36:5–37:20, 44:1–14, 52:11–16; Tr. Sept. 9 PM 122:19–123:12; 135:19–136:2 (Avery (Kevel)); Tr. Sept. 10 AM 51:24–55:3, 109:23–110:16 (Layser (News Corp)); Tr. Sept. 17 PM 46:25–50:3 (Cadogan (OpenX)); Tr. Sept. 19 PM 66:7–70:1 (Lee (Pls. Expert)). Recognizing this dynamic, many once-large rival ad servers have either left the ad serving business entirely (e.g., OpenX), or sought to compete in channels other than open-web display advertising (e.g., Kevel). See PTX758 at -945; Tr. Sept. 9 PM 120:21–122:18, 126:5–128:22 (Avery (Kevel)) (describing Kevel's pivot to native ads and sponsored listings due to its inability to compete with DFP in open-web display); Tr. Sept. 17 PM 46:4–48:16, 51:18–52:20 (Cadogan (OpenX)). Even Meta shut down its project to build a publisher ad server due to the significant barriers to gaining scale in a market dominated by Google. See PTX1709 at -934; Tr. Sept. 13 PM 100:20–24, 128:21–129:21 (Boland (Meta)).

Google has acted in accordance with its dominant market position and these high barriers to entry and expansion. For example, Google degraded some DFP features, such as by removing publishers' ability to set a higher price floor on AdX as part of its Unified Pricing Rules update, despite negative publisher feedback. See PTX1854 at 25:1–11, 36:5–37:20, 44:1–14, 52:11–16; Tr. Sept. 10 AM 51:24–55:3, 109:23–110:16 (Layser (News Corp)); Tr. Sept. 19 PM 66:7–20 (Lee (Pls. Expert)). In estimating the impact of this change, Google was not concerned about whether publishers would switch away from DFP, and publishers did not switch despite other publisher ad servers allowing variable price floors. See PTX1035 at -360; Tr. Sept. 9 PM 135:19–136:9 (Avery (Kevel)); Tr. Sept. 10 AM 52:23–53:7 (Layser (News Corp)). Moreover, although Google has not exercised its monopoly power to raise DFP's prices, the company has internally estimated that the "market w[ould] bear" a price increase and projected that a 10% to 20% increase in DFP fees "could have a substantial positive impact on ... overall profitability." PTX712 at -648.

Google contests that Unified Pricing Rules and other actions that allegedly degraded DFP's product quality constitute direct evidence of monopoly power, arguing that Dr. Lee

did not show what DFP's quality would have been in a but-for competitive world and therefore failed to provide a way to measure whether Google's alleged degradations rendered DFP's quality below a competitive level. See Tr. Sept. 20 AM 146:4–23 (Lee (Pls. Expert)); Tr. Sept. 26 AM 117:15–118:1 (Israel (Def. Expert)). The Court agrees that examples of customer-disfavored product changes, without evidence that overall product quality decreased, are insufficient direct evidence of monopoly power. But the lack of airtight direct evidence is immaterial here. DFP's 91% share of the worldwide market "leaves no doubt" as to Google's monopoly power, particularly when viewed in light of the high barriers to entry and expansion in the publisher ad server market. Grinnell, 384 U.S. at 571, 86 S.Ct. 1698. Plaintiffs' evidence that Google exercised this market power to harm its publisher customers, while not definitive in isolation, only reinforces this conclusion.

### 2. Ad Exchange

 **[27]**  Plaintiffs have proven that Google possesses monopoly power in the ad exchange market for open-web display advertising. Google's AdX has long been the dominant exchange for facilitating open-web display advertising. For over a decade, Google has charged durable supracompetitive prices for AdX—taking 20% of each open-web display transaction—and has exhibited an unwillingness to lower AdX's take rate even as the market matured and other ad exchanges reduced their prices. Despite the availability of lower priced exchanges, customers generally have not left AdX due to Google's substantial market power in the ad exchange market. That market power has been fortified by high barriers to entry that resulted from Google's scale and network effects across the open-web display ecosystem. Accordingly, Google has maintained a high share of the open-web display ad exchange market, with AdX having a market share roughly nine times greater than that of its next-largest competitor.

 **\*32**  AdX's charging a durable 20% take rate for well over a decade is direct evidence that Google has possessed monopoly power in the open-web display ad exchange market. See PTX1199; Tr. Sept. 13 AM 42:16–21, 43:15–17 (LaSala (Google)); Tr. Sept. 19 PM 81:20–82:9 (Lee (Pls. Expert)). Google employees recognized that AdX's 20% take rate was higher than that of rival ad exchanges like IndexExchange, Magnite, and Xandr, which often charged closer to 10%. See PTX188 at -013; PTX686 at -044; PTX712 at -646; PTX719 at -004–05; Tr. Sept. 18 AM 220:7–221:3

(Pappu (Google)); Dep. 165:21–167:5 (O'Kelley (Xandr)). But Google has profitably maintained AdX's 20% take rate, even when other exchanges further decreased their take rates. See PTX1199; Tr. Sept. 18 AM 134:3–12 (Wheatland (Daily Mail)) (explaining that AdX's "20 percent" take rate was "around double" the take rate that The Daily Mail paid to other exchanges); Tr. Sept. 18 AM 220:7–221:3 (Pappu (Google)). At the same time, Google has refused to negotiate AdX's take rate with almost all of its customers, only offering minimal discounts to a handful of very large publishers. PTX549 at -079, -086 (showing that only six of AdX's 3,815 largest publisher customers received discounts); Tr. Sept. 10 AM 150:8–23, 152:7–19 (Friedman (Goodway Group)) (testifying that Google refused to negotiate take rates, unlike rival exchanges); Tr. Sept. 13 AM 42:25–43:17, 67:1–13 (LaSala (Google)); Tr. Sept. 27 AM 6:24–7:25 (Pauley (Vox)).

Google employees have recognized the durability of AdX's pricing by describing how the exchange's market power left both publishers and advertisers with very little choice but to keep using it. See PTX188 at -979, -013–17; Tr. Sept. 19 PM 82:15–84:25 (Lee (Pls. Expert)). For example, in 2014, an internal Google study projected that a 25% decrease in AdX's take rate would have limited impact on its customer retention. See PTX188 at -979, -013–17; see also Tr. Sept. 19 PM 82:15–84:25 (Lee (Pls. Expert)). A few years later, after a non-Google industry consortium embraced header bidding to mitigate Google's dominance across the ad tech stack, Google considered reducing AdX's 20% take rate. See PTX421 at -227; PTX423 at -043–44; Dep. 258:16–21 (Lipkovitz (Google)). But an internal study showed that reducing the take rate "d[id]n't win many queries compared to the profit lost," and the sales team "d[id] not think" such a reduction would "help them win deals." PTX417 at -758; see also PTX421 at -227; PTX423 at -043–44. This study proved prescient. Google has never reduced its overall 20% take rate and has continued to deny discount requests, yet AdX's customers have not left and AdX has not lost market share. See PTX639; PTX1258; Tr. Sept. 13 AM 49:15–20 (LaSala (Google)). As further evidence of Google's power in the ad exchange market, a competing ad exchange conducted experiments over the years to reduce its take rate, including at one point setting its take rate to zero, but found only a "nominal, at best, effect on win rate." Tr. Sept. 9 AM 138:8–139:17 (Casale (Index Exchange)). Competitors' "inability to constrain [AdX's] pricing" constitutes direct evidence of Google's monopoly power in the ad exchange market. McWane, Inc. v. FTC, 783 F.3d 814, 832 (11th Cir. 2015).

Broader industry dynamics also support the conclusion that Google's maintenance of AdX's 20% take rate required monopoly power. As programmatic advertising emerged in the late 2000s through mid-2010s, firms in the space could command a substantial premium for their innovative products due to the significant advantages programmatic advertising offered over direct deals and the complex technology infrastructure required to run billions of real-time auctions each day. See Section IV(A–B), supra. But by 2017, a Google product director observed that ad exchange "margins [we]re coming down, way down, because the technology, demand and supply that [ad exchanges] offer ha[d] been commoditized to a large extent." PTX562 at -259–61. Google employees repeatedly questioned the viability of AdX's take rate, often stating that the product was no longer worth 20%. See, e.g., PTX612 at -035 (Google publisher-side executive stating "I don't think there is 20% of value in comparing two bids" and questioning whether AdX should "continu[e] to extract irrationally high rent"); see also PTX198 at -703; PTX562 at -259–60; PTX639 at -965; Tr. Sept. 18 AM 220:13–221:3, 228:11–229:12 (Pappu (Google)). Nevertheless, Google has maintained AdX's 20% take rate for over a decade and has kept a relatively steady share of the ad exchange market. See PTX1199A; PTX1199B; PTX1258; Tr. Sept. 13 AM 42:16–21, 43:15–17 (LaSala (Google)). Google's ability to maintain AdX's 20% take rate under these market conditions is further direct evidence of the firm's sustained and substantial power in the open-web display ad exchange market. Tr. Sept. 19 PM 81:20–82:14 (Lee (Pls. Expert)).

 *33 Google and its market expert Dr. Israel contest this conclusion. They maintain that Google's long-standing 20% take rate originated well before the firm had any alleged monopoly power, and that Google's decision not to raise prices is indicative of a lack of monopoly power. They also criticize Dr. Lee for not defining what prices would have been in a competitive market, and for not factoring in the quality of AdX versus the quality of other exchanges when comparing their respective prices.

None of Google's arguments undermines the Court's conclusion that AdX's durable 20% take rate constitutes direct evidence of monopoly power. The steadiness with which Google has charged a 20% fee in a rapidly maturing market involving transactions with minimal variable costs, the repeated recognition by Google employees that the services AdX provided were no longer worth 20% of

publisher revenue, and the strong evidence that customers were unable to switch from AdX even when other ad exchanges lowered their prices all support the finding that AdX charged supracompetitive prices. See Tr. Sept. 19 PM 81:20–84:25 (Lee (Pls. Expert)). As other courts have found, prices that remain consistent or fall over time may still indicate monopoly power, so long as those prices are supracompetitive. See Allen-Myland, Inc. v. Int'l Bus. Machs. Corp., 33 F.3d 194, 211 (3d Cir. 1994); Red Lion Med. Safety, Inc. v. Ohmeda, Inc., 63 F. Supp. 2d 1218, 1229 (E.D. Cal. 1999).

Another direct sign of monopoly power is that Google has used its market power in adjacent segments of the ad tech ecosystem to make it more difficult for customers on both sides of the ad exchange market to switch to rival exchanges. See Tr. Sept. 18 AM 121:10–122:12 (Abrantes-Metz (Pls. Expert)). On the buy-side, Google's policies made AdX the only ad exchange that had "exclusive access to [AdWords]," PTX290 at -983, which publishers highly valued as "a large and unique demand source." Tr. Sept. 16 PM 128:21–129:5 (Abrantes-Metz (Pls. Expert)). Google has largely limited AdWords' exchange bidding to AdX despite internal recognition that allowing AdWords to bid on other exchanges would be valuable for AdWords' advertiser customers. See PTX198 at -703; Tr. Sept. 18 AM 13:5–14:1 (Spencer (Google)). By so limiting AdWords, Google has ensured that publishers would view AdX as a "must call" exchange. Dep. 220:12–16, 222:4–17, 226:24–227:4 (Lipkovitz (Google)); see also Tr. Sept. 9 AM 76:9–77:7, 104:9–23 (Wolfe (Gannett)); Tr. Sept. 10 AM 62:12–18 (Layser (News Corp)); Tr. Sept. 12 AM 43:7–12 (Srinivasan (Google)). The unique advertising demand from AdWords has helped Google maintain the power to keep charging AdX publishers a 20% take rate. See PTX639 (Google sell-side executive stating that "[i]f [AdWords] bought liberally through all 3PEs [i.e., third-party exchanges], I think the 20% would crater.").

On the sell-side, Google's power in the two-sided ad exchange market and its power in the publisher ad server market have been mutually reinforcing. See PTX551 at -048. For example, Google limited AdX to send real-time bids only to DFP, thereby forgoing a desirable AdX feature for non-DFP publishers to entrench the firm's monopoly power in the publisher ad server market. See PTX128 at -045–47; PTX1031 at -500. Google did so despite requests by customers of other publisher ad servers to access AdX's real-time bids. See, e.g., Tr. Sept. 9 PM 139:13–140:24

(Avery (Kevel)). This was one of the reasons why publishers felt they had to use DFP to obtain effective access to AdX and, consequently, to AdWords' unique demand. See Section VI(B)(1), supra; see also Tr. Sept. 9 AM 104:9–23 (Wolfe (Gannett)); Tr. Sept. 10 AM 12:19–13:2 (Layser (News Corp)). Once DFP had obtained near-total market share, Google combined DFP and AdX under a single publisher-facing product, Google Ad Manager, which further intertwined DFP and AdX. See PTX1031 at -500 ("Google Ad Manager is the only way to access [AdX] as a publisher."). These practices on both the advertiser buy-side and publisher sell-side are evidence that Google could set its terms of dealing with its customers "without considering rivals[,]" and constituted behavior that is "difficult to explain unless" Google had monopoly power. Microsoft, 253 F.3d at 57–58.

**\*34** AdX's relatively high and durable market share is consistent with the Court's conclusion that Google has monopoly power in the open-web display ad exchange market. Dr. Lee found that, from 2018 to 2022, AdX was the exchange for 63% to 71% of the worldwide open-web display transactions among the ad exchanges that produced data for this litigation, and he estimated that AdX handled between 54% and 65% of the market's total transactions. See PTX1258; Tr. Sept. 19 PM 90:14–92:19 (Lee (Pls. Expert) (discussing PTX1258)). AdX's market share has remained durable over time. See PTX1258; PTX1314; Tr. Sept. 16 PM 12:5–24 (Weintraub (Pls. Expert)). Moreover, AdX's share of the worldwide ad exchange market was roughly nine times larger than the share held by Google's next-largest competitor, which had only 6% of the market. See PTX1237; PTX1237A; PTX1238; PTX1238A; Tr. Sept. 13 PM 72:9–18 (Creput (Equativ)); Tr. Sept. 19 PM 94:3–94:22 (Lee (Pls. Expert)); see also United States v. Dentsply Int'l, Inc., 399 F.3d 181, 187 (3d Cir. 2005) (stating "the size and strength of competing firms" is a key consideration in evaluating monopoly power). It is no surprise, then, that numerous industry participants testified that AdX had the dominant position in the ad exchange market. See, e.g., Tr. Sept. 9 AM 135:8–12 (Casale (Index Exchange)); Tr. Sept. 10 AM 156:18–157:4 (Friedman (Goodway Group)); Tr. Sept. 13 AM 20:3–16 (Kershaw (Magnite)); Tr. Sept. 13 PM 72:9–18 (Creput (Equativ)); Tr. Sept. 17 PM 87:17–21 (Cadogan (OpenX)); Tr. Sept. 27 AM 7:8–25 (Pauley (Vox)).

Google argues that AdX's market share is insufficiently high to establish monopoly power, particularly given that its market share is lower when calculated by its percentage of total fees received instead of by its percentage of transactions processed, or when based on U.S.-only instead of worldwide data. See PTX1258, PTX1259. This argument fails because, as previously explained, worldwide, not U.S., market share is the appropriate geographic market for measuring the area of competition. See Section VI(A)(2), supra. Moreover, transactions processed (i.e., the number of impressions sold on the exchange), not fees received, are the best measure of market share and power because they "speak to scale advantages" from data and indirect network effects "that different exchanges have." Tr. Sept. 19 PM 91:3–19 (Lee (Pls. Expert)); see also Amex, 585 U.S. at 537, 138 S.Ct. 2274 (using transaction volume to assess market share).

The Court recognizes that Google's relatively high market share alone is not dispositive of whether the firm has monopoly power in the ad exchange market. Indeed, in different circumstances, a market share between 50% and 70% would not necessarily suggest that a firm had monopoly power. See Kolon II, 748 F.3d at 174. But here, the direct evidence of AdX charging durable and supracompetitive prices, in combination with its maintaining a market share nine times that of its next closest rival, provides strong support for the conclusion that Google has possessed and still possesses monopoly power in the open-web display ad exchange market.

This conclusion is buttressed by the evidence of AdX's high barriers to entry and expansion. Scale and network effects are crucial for ad exchanges because these exchanges exist to create matches between publisher inventory and advertiser demand. See Tr. Sept. 9 AM 143:19–145:13 (Casale (Index Exchange)); Tr. Sept. 16 PM 8:25–19:9 (Weintraub (Pls. Expert)); Tr. Sept. 19 PM 75:3–76:8 (Lee (Pls. Expert)). Ad exchanges benefit not only from having large groups of customers on both sides of the platform, but also from processing a high number of transactions. See Tr. Sept. 9 AM 135:17–137:21, 145:14–147:17, 160:24–161:4 (Casale (Index Exchange)); Tr. Sept. 16 PM 8:25–19:9 (Weintraub (Pls. Expert)). Such economies of scale help mitigate the significant capital expenditures required to build an ad exchange. See Tr. Sept. 17 PM 55:25–56:8 (Cadogan (OpenX)); Tr. Sept. 16 PM 17:15–18:21 (Weintraub (Pls. Expert)). Large groups of customers also provide exchanges with auction and targeting data that can be used to run rapid experiments on the effects of price and quality changes, to train machine learning algorithms, and to improve publisher-advertiser matching. See Tr. Sept. 9 AM 135:19–139:17, 145:14–147:17 (Casale (Index Exchange)); Tr. Sept. 13 PM 74:13–75:6 (Creput (Equativ)); Tr. Sept. 16 PM 13:2–16:16

(Weintraub (Pls. Expert)); Tr. Sept. 23 PM 136:7–137:2 PM (John (Microsoft)) (stating scale is necessary for match quality). In sum, the high barriers to entry and expansion that protect AdX's dominant position in the open-web display ad exchange market are further evidence of its monopoly power.

**\*35** The Court therefore agrees with Dr. Lee that "the totality of evidence is consistent with substantial and sustained market power on the part of AdX." Tr. Sept. 20 AM 111:20–22 (Lee (Pls. Expert)). Direct pricing evidence shows that Google "could profitably price significantly above competitive levels because enough customers would keep buying those products and not go elsewhere." Tr. Sept. 19 PM 50:2–6 (Lee (Pls. Expert)). Trial evidence also shows that Google placed limitations on AdX and adjacent products' functionality in ways that indicated it had substantial market power. Moreover, AdX's relatively high market share, viewed in conjunction with the high barriers to entry and expansion that exist for ad exchanges, supports the conclusion that Google has had and continues to maintain monopoly power.

Having found that Google has monopoly power in two relevant markets within the open-web display advertising ecosystem, the worldwide market for publisher ad servers and the worldwide market for ad exchanges, the next issue is whether Google willfully acquired and maintained this monopoly power.

### C. Willful Acquisition or Maintenance of Monopoly Power

 **[28]**  **[29]**  For Google to be found liable under Section 2 of the Sherman Act, Plaintiffs must prove that the company engaged in "the willful acquisition or maintenance of [monopoly] power." Kodak, 504 U.S. at 481, 112 S.Ct. 2072 (quoting Grinnell, 384 U.S. at 570–71, 86 S.Ct. 1698). Plaintiffs cannot prevail if Google acquired its monopoly power through "conduct [that] is procompetitive and thus increases consumer welfare," such as by having developed "a superior product" or grown due to "business acumen," Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC, 111 F.4th 337, 353 (4th Cir. 2024), or if Google's monopoly power has resulted from other "valid business reasons," Kodak, 504 U.S. at 483, 112 S.Ct. 2072, or "historic[al] accident." Duke Energy, 111 F.4th at 353 (quoting Grinnell, 384 U.S. at 571, 86 S.Ct. 1698). Rather, "the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." Verizon Commc'ns Inc.

v. Law Offs. of Curtis V. Trinko, LLP, 540 U.S. 398, 407, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004) (emphasis in original).

 **[30]**  **[31]**  **[32]**  In determining whether a company's conduct is anticompetitive, courts consider the conduct's effect on competitors, its "impact on consumers," and "whether it has impaired competition in an unnecessarily restrictive way." Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 605 & n.1, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). "Some 'common forms' of anticompetitive conduct are tying, exclusive dealing, predatory pricing, and defrauding regulators or consumers." Chase Mfg., Inc. v. Johns Manville Corp., 84 F.4th 1157, 1170 (10th Cir. 2023) (quoting Novell, Inc. v. Microsoft Corp., 731 F.3d 1064, 1072 (10th Cir. 2013)). A monopolist may offer procompetitive justifications for seemingly anticompetitive conduct, but may still be liable under Section 2 of the Sherman Act if the plaintiff can "demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit." Microsoft, 253 F.3d at 59.

 **[33]**  **[34]**  **[35]**  Anticompetitive conduct "comes in many different forms that cannot always be categorized." Duke Energy, 111 F.4th at 354; see also Novell, 731 F.3d at 1072; In re EpiPen Mktg., Sales Pracs. & Antitrust Litig., 44 F.4th 959, 982 (10th Cir. 2022). For some forms of anticompetitive conduct, such as "predatory pricing, refusing to deal, price fixing, or dividing markets," courts have "developed tests for analyzing such claims." Duke Energy, 111 F.4th at 354. But "when a court is faced with allegations of a complex or atypical exclusionary campaign," the "alleged anticompetitive conduct must be considered as a whole" instead of "in manufactured subcategories." Id. 354–55; see also Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 698–99, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962) ("[P]laintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."). A holistic assessment of whether a monopolist's conduct "harm[ed] the competitive *process* and thereby harm[ed] consumers" is thus the touchstone for determining whether a monopolist alleged to have engaged in an exclusionary campaign violated Section 2 of the Sherman Act. Duke Energy, 111 F.4th at 355 (quoting Microsoft, 253 F.3d at 58) (emphasis in original); see also NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 135, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998); Viamedia, Inc. v. Comcast Corp., 951 F.3d 429, 453 (7th Cir. 2020).

**\*36** Plaintiffs allege that Google engaged in a series of anticompetitive acts to acquire and maintain its monopoly power. These acts generally fall into three categories: (1) establishing a dominant position across the ad tech stack through the acquisitions of DoubleClick and Admeld; (2) tying DFP to AdX to lock publishers into exclusively using Google's sell-side ad tech tools rather than those offered by competitors; and (3) leveraging its tied ad tech tools to engage in a series of acts that diminished rivals' scale, thwarted their ability to compete, and harmed customers. The Court takes each in turn, while recognizing that the ultimate conclusion of whether Google violated Section 2 turns on whether the company's conduct, when considered as a whole, harmed competition and therefore harmed consumers. See Duke Energy, 111 F.4th at 354–55; Microsoft, 253 F.3d at 58.

### 1. Acquisitions of DoubleClick and Admeld

The Court finds that Plaintiffs have failed to show that the DoubleClick and Admeld acquisitions were anticompetitive. Although these acquisitions helped Google gain monopoly power in two adjacent ad tech markets, they are insufficient, when viewed in isolation, to prove that Google acquired or maintained this monopoly power through exclusionary practices.

 **[36]** The 2008 acquisition of DoubleClick gave Google the largest publisher ad server, DFP, and provided the company with a nascent ad exchange for matching DFP publishers with AdWords advertisers. See PTX14 at -246; PTX15 at 7; PTX41 at -006; Dep. 69:15–70:9, 72:13–74:15 (O'Kelley (Xandr)). Google knew that acquiring DFP and connecting it to AdWords using an ad exchange would increase Google's scale, network effects, and power across the ad tech ecosystem. See PTX14 at -278; PTX41 at -006; PTX51 at -726; PTX551 at -048; Tr. Sept. 13 AM 7:21–8:4 (Kershaw (Magnite)). According to Plaintiffs, Google paid $1 billion more than its corporate strategy team's valuation of DoubleClick to secure sell-side infrastructure and to prevent another large technology company from standing between Google's buy-side business and publishers. Compare PTX15 at 11 (Google's estimation that acquiring DoubleClick would provide the company with $1.5 billion to $2.2 billion in net present value) with PTX1507 at -414 (stating Google paid $3.1 billion for DoubleClick); See also PTX41 at -005 (discussing how DoubleClick acquisition mitigated risk that Google's buy-side business would be "disintermediated" by a non-Google publisher ad server).

Even assuming Plaintiffs are correct in their assessment of Google's strategy, they have not shown that the acquisition of DoubleClick was anticompetitive. Plaintiffs do not assert that Google had monopoly power in any of the relevant markets when it acquired DoubleClick. Indeed, the DoubleClick acquisition occurred at a time when Magnite (then known as Rubicon), Microsoft, OpenX, and Yahoo were vigorous participants in open-web display advertising markets. See PTX22 at 14. The acquisition was reviewed and cleared by the Federal Trade Commission by a four to one vote after a determination that "Google's proposed acquisition of DoubleClick is unlikely to substantially lessen competition." [27]

 **\*37** **[37]** Nor did the 2011 acquisition of Admeld constitute anticompetitive conduct. Plaintiffs argue that the Admeld acquisition was problematic because Google intentionally acquired a "key competitor[ ]," PTX88 at -597, and then terminated its core yield management functionality, thereby ending a competitive threat to Google's sell-side businesses. See Section V(B), supra. According to Plaintiffs' expert Dr. Abrantes-Metz, the Admeld acquisition reduced competition in both the ad exchange and publisher ad server markets for open-web display advertising. Tr. Sept. 18 AM 46:4–48:22 (Abrantes-Metz (Pls. Expert)).

 **[38]** It is true that Admeld, along with Magnite and PubMatic, was one of the three leading yield managers in 2011, and that Google had identified Admeld as being its "largest concern," PTX88 at -597, because it had a "stronger product offering" and "better publisher base" than its competitors. PTX112 at -981; see also PTX85 at -717. As a leading yield manager, Admeld threatened to undermine Google's strategy to "own the tag," i.e., to control which advertising demand sources would be used to "monetize [indirect] inventory for a publisher." PTX56 at -788. But evidence shows that Google did not merely buy Admeld to sideline it; rather, Google sought to fill a gap in its portfolio and drew upon Admeld's engineers and technology to rebuild some of Admeld's capabilities within AdX and other aspects of Google's ad tech architecture. See DTX126 at -572–75; PTX60 at -489; PTX112 at -979; Tr. Sept. 16 AM 108:23–109:17, 112:14–113:24 (Mohan (Google)). In doing so, Google at least partially improved the effectiveness of AdX, which before the Admeld acquisition "was struggling to win business" due to being "very expensive," "inflexible," and "[not] great at optimizing for yield." Dep. 86:20–87:23 (O'Kelley (Xandr)). The Admeld acquisition also provided

Google with "the skill set and the knowledge [it] needed to make the AdX value proposition more compelling." Id. Acquiring technology and talent to offer customers a more flexible, affordable, and effective product is not anticompetitive when motivated by "valid business reasons." Kodak, 504 U.S. at 483, 112 S.Ct. 2072. That may be one reason why the Antitrust Division of the U.S. Department of Justice chose not to pursue legal action against Google for its Admeld acquisition after conducting an investigation that "obtained extensive information from Google, Admeld and a wide range of market participants." [28]

Because Plaintiffs have not shown that Google's acquisitions of DoubleClick and Admeld constituted anticompetitive conduct, the Court next examines Plaintiffs' claim that Google tied DFP to AdX, and then used its power in the products' two adjacent markets to harm competition at consumers' expense.

## 2. Tying DFP to AdX

**\*38** **[39]** **[40]** **[41]** "[T]he vice of tying arrangements lies in the use of economic power in one market to restrict competition on the merits in another." N. Pac. Ry. Co., 356 U.S. at 11, 78 S.Ct. 514. Accordingly, "the essential characteristic" of unlawful tying is "the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 12, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984); see also It's My Party, 811 F.3d at 684. "Tying suppresses competition in two ways: First, the buyer is prevented from seeking alternative sources of supply for the tied product; second, competing suppliers of the tied product are foreclosed from that part of the market which is subject to the tying arrangement." It's My Party, 811 F.3d at 684 (internal quotation omitted).

**[42]** **[43]** **[44]** **[45]** Tying is per se unlawful under Section 1 of the Sherman Act, which prohibits unreasonable restraints on trade. Serv. & Training, Inc. v. Data Gen. Corp., 963 F.2d 680, 683 (4th Cir. 1992). To prove a tying claim, a plaintiff must establish four elements: "(1) the existence of two separate products, (2) an agreement conditioning purchase of the tying product upon purchase of the tied product (or at least upon an agreement not to purchase the tied product from another party), (3) the seller's possession of sufficient economic power in the tying product market

to restrain competition in the tied product market, and (4) a not insubstantial impact on interstate commerce." Id. (citing Hyde, 466 U.S. at 12–16, 104 S.Ct. 1551). Although tying under Section 1 "do[es] not require that the defendant have a monopoly" in "the market for a tying product," U.S. Steel Corp. v. Fortner Enter., Inc., 429 U.S. 610, 620, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977), tying by a monopolist can satisfy the anticompetitive conduct element under Section 2 of the Sherman Act. See Viamedia, 951 F.3d at 468–69 (citing Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 777, at 325 (4th ed. 2015)); Microsoft, 253 F.3d at 84–85 (considering tying allegations under both Section 1 and Section 2); Md. & Va. Milk Producers Ass'n, Inc. v. United States, 362 U.S. 458, 463 & n.8, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960) (stating that Sections 1 and 2 "closely overlap, and the same kind of predatory practices may show violations of all"). When a defendant facing a tying claim is a monopolist, courts consider whether the tie "contribute[d] significantly to the maintenance or creation of monopoly power ... even though it [wa]s unilaterally imposed." Viamedia, 951 F.3d at 469.

**[46]** Here, Plaintiffs allege that Google tied DFP, its publisher ad server, to AdX, its ad exchange. Specifically, Plaintiffs cite to Google's technical and policy restrictions that prohibited publishers from receiving real-time bids from AdX (the tying product) unless they also used DFP (the tied product). These restrictions, according to Plaintiffs, compelled publishers to use DFP, not because they viewed it as a superior product, but rather due to Google's exploitation of its control over AdX's preeminent position in the open-web display ad exchange market. Partly as a result, Plaintiffs claim that DFP became, and has remained, the dominant publisher ad server for open-web display advertising.

Plaintiffs have proven the four elements of their tying claim. First, publisher ad servers and ad exchanges are "two separate products" that are not reasonably interchangeable. Serv. & Training, 963 F.2d at 683; see Section VI(A)(1–2), supra. Publisher ad servers and ad exchanges serve different functions, use different pricing structures, and are recognized as different products by industry participants. See Section VI(A)(1–2), supra. Moreover, there is "sufficient demand for the purchase of [publisher ad servers] separate from [ad exchanges]" such that there is a "distinct product market" for publisher ad servers. Serv. & Training, 963 F.2d at 684 (quoting Hyde, 466 U.S. at 121–22, 104 S.Ct. 1652); see Section VI(A)(1–2), supra (identifying a product market for publisher ad servers and a distinct product market for ad

exchanges). Google's rebranding DFP and AdX under a unified name, Google Ad Manager, cannot overcome these "market realities." Alston, 594 U.S. at 93, 141 S.Ct. 2141.

**\*39** Second, the policy and technology restrictions that Google has placed within AdX "condition[ed] purchase of the tying product [AdX] upon purchase of the tied product [DFP]." Serv. & Training, 963 F.2d at 683. The function of an ad exchange is to match publishers with advertisers by facilitating real-time auctions for publishers' inventory. See Section IV(B), supra. An ad exchange does this by aggregating advertisers' bids for each available impression, then submitting the best of those bids to the publisher ad server with the goal of outbidding competing bids from other ad exchanges. See id. Access to real-time bids from AdX is considered particularly valuable by publishers because of the unique advertising demand that AdX receives from the millions of advertisers who exclusively use AdWords. See Sections V(A) & VI(B)(2), supra. By restricting AdX's submission of real-time bids only to DFP, and by not allowing AdX to provide real-time bids to other publisher ad servers, Google made AdX ineffective at its core function when used by publishers who did not also use DFP. See Section IV(B), supra. In practice, therefore, Google's restriction of AdX's real-time bidding to DFP required Google's publisher customers who wanted to use AdX's core feature to use DFP. This coercive policy made purchasing DFP, the tied product, together with AdX, the tying product, "the only viable economic option" for publishers who wanted to gain effective real-time access to AdWords, which they could only accomplish by using AdX. Nobel Sci. Indus., Inc. v. Beckman Instruments, Inc., 670 F. Supp. 1313, 1324 (D. Md. 1986); see also Tire Sales Corp. v. Cities Serv. Oil Co., 637 F.2d 467, 473 (7th Cir. 1980); Philip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 1752b (4th ed. 2020) (defining a tie as the improper imposition of "conditions that explicitly *or practically* require buyers to take the second product if they want the first one") (emphasis added).

As discussed previously, overwhelming evidence has established that it is not economically feasible for publishers to use multiple publisher ad servers. See Section VI(B)(1), supra. For all practical purposes, then, Google's tying DFP to AdX communicated to publishers that if they used a rival publisher ad server, they would be shut out of AdX's core functionality. This coercive pressure was akin to a "threat[ ] to stop selling needed products to its customers if they bought from a new market entrant offering a superior product for

less money"—conduct a court found to be anticompetitive in Chase Mfg. 84 F.4th at 1173; see also Lorain Journal Co. v. United States, 342 U.S. 143, 154, 72 S.Ct. 181, 96 L.Ed. 162 (1951) (deeming anticompetitive a local newspaper's refusal to sell advertising space to customers who advertised on a local radio station); Viamedia, 951 F.3d at 471 (finding monopolist's "refusing to deal with [its customers'] chosen intermediary had the [anticompetitive] effect of forcing them into much less desirable relationships" with the monopolist).

Google staff understood the coercive power of the AdX-DFP tie. For example, a Google sell-side manager told his leadership that "AdX can serve as a tool to pull publishers onto [D]FP." PTX114 at -049. Google decided against "giv[ing] AdX to non-[D]FP partners," and instead worked to " 'lock in' impressions by offering [D]FP to publishers with full AdX dynamic allocation" (i.e., real-time bidding), id., so that Google could maintain "a key differentiator for DFP." PTX113 at -804; see also PTX159 at -003 (Google employee stating that he was "more of the mindset of getting folks to flip to DFP" to access real-time AdX bids as opposed to offering such bids on third-party exchanges). Google made this decision despite acquiring Admeld's technology for offering real-time bids to publishers using third-party ad servers, PTX159 at -002–04, which was a capability that Google had beta tested and which some at the company believed would have taken "[m]inimal effort" to implement at scale. PTX113 at -804; see also Tr. Sept. 18 AM 47:3–12 (Abrantes-Metz (Pls. Expert)). By tying DFP to AdX, Google took advantage of its "owning the platform, the exchange, and a huge network" of advertising demand, which a senior Google manager analogized to "Goldman or Citibank own[ing] the NYSE [i.e., the New York Stock Exchange]." PTX367 at -464.

Google's publisher customers similarly understood the coercive power of the AdX-DFP tie. They "felt locked-in by dynamic allocation in DFP, which only gave AdX [and not other exchanges the] ability to compete" with real-time bids. PTX587 at -794. That is why industry participants worked together to create header bidding, a technical workaround that partially diminished the power of the AdX-DFP tie. See id.; PTX1710 at -407; Dep. 111:7–114:2 (O'Kelley (Xandr)); see also Section V(F), supra. But header bidding has failed to erode DFP's dominance because subsequent Google product changes such as Last Look enhanced the power of the AdX-DFP tie. See Sections V(G) and VI(B)(1), supra. Open-web publishers were therefore stuck using DFP, even if they would have preferred to use a different publisher ad server.

**\*40** Google argues that publishers who used AdX were free to use a publisher ad server other than DFP, and those that used DFP did not necessarily have to use AdX. But by prohibiting publishers that used a non-DFP ad server from having access to the essential AdX feature of real-time bidding by AdWords advertisers, Google effectively has "coerce[d] the abdication of [publishers'] independent judgment as to the 'tied' product's merits and insulate[d] it from the competitive stresses of the open market." Hyde, 466 U.S. at 13, 104 S.Ct. 1551 (quoting Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 605, 73 S.Ct. 872, 97 L.Ed. 1277 (1953)). The unique value of real-time access to AdWords through AdX has essentially forced Google's publisher customers "into the purchase of a tied product that the[y] either did not want at all, or might have preferred to purchase elsewhere on different terms." It's My Party, 811 F.3d at 684 (quoting Hyde, 466 U.S. at 12, 104 S.Ct. 1551). The high degree of effort that Google has used to insulate DFP from the competitive stresses of the open market is sufficient to satisfy the second element of the tying test, particularly as the central focus of the overall inquiry is whether Google's actions harmed competition and therefore harmed consumers.

Third, Google has possessed "sufficient economic power in the tying product market to restrain competition in the tied product market." Serv. & Training, 963 F.2d at 683. The Court has found that Google has monopoly power in the open-web display ad exchange market because AdX charges supracompetitive prices, is nine times larger than the next largest ad exchange, and is protected by high barriers to entry and expansion. See Section VI(B)(2), supra. Such proof of monopoly power in the tying product market is more than sufficient to show that Google has had the requisite level of economic power to establish the third element of a tying claim. See U.S. Steel, 429 U.S. at 620, 97 S.Ct. 861; In re Deere & Co. Repair Serv. Antitrust Litig., 703 F. Supp. 3d 862, 909 (N.D. Ill. 2023).

A primary source of Google's monopoly power in the ad exchange market is AdWords' uniquely large and diverse array of advertising demand. See Sections V(A, C) & VI(B) (2), supra. Google has been able to amass this unparalleled group of mostly small and medium-sized advertisers in large part due to the dominance of Search, which another district court has found to be the source of Google's monopoly power in the markets for general search services and general search text ads. See Google Search, 747 F.Supp.3d at 117–118, 135–138(D.D.C. 2024); see also Tr. Sept. 11 PM 153:6–

154:20 (Dederick (The Trade Desk)); Tr. Sept. 13 AM 7:21-8:4 (Kershaw (Magnite)); Tr. Sept. 19 PM 99:18–100:2 (Lee (Pls. Expert)). By effectively restricting the unique advertising demand offered by AdWords advertisers to AdX, Google has ensured that publishers would lose significant revenue if they did not use AdX. See Section VI(B)(2), supra; Dep. 108:19–109:3 (Rowley (Google)) (admitting AdWords demand "compel[led] publishers to work with" Google's sell-side products). Google's monopoly power in the open-web display ad exchange market, bolstered by its significant Search-derived power on the buy-side of the digital advertising industry, constitutes "sufficient economic power in the tying product market to restrain competition in the tied product market." Serv. & Training, 963 F.2d at 683.

**[47]** Fourth and finally, the tying of AdX and DFP has had a "not insubstantial impact on interstate commerce." Serv. & Training, 963 F.2d at 683. "Wholly apart from market characteristics, a prerequisite to application of the Sherman Act is an effect on interstate commerce." Hyde, 466 U.S. at 37 n.5, 104 S.Ct. 1551 (O'Connor, J., concurring). Like in Hyde, "[i]t is not disputed that such an impact is present here." Id. AdX and DFP are used by publishers across the United States and worldwide. See Section VI(A)(2), supra. And the AdX-DFP tie, which facilitates the billions of dollars of revenue that AdX generates annually, has a large and substantial impact on interstate commerce. See PTX1710 at -407. Cf. It's My Party, Inc. v. Live Nation, Inc., 88 F. Supp. 3d at 490 (suggesting $200,000 is a "not insubstantial" amount of interstate commerce). Because they have established these four elements, Plaintiffs have shown that Google has engaged in unlawful tying under Section 1 of the Sherman Act.

**\*41** **[48]** Google's tying of DFP to AdX also violates Section 2 of the Sherman Act because it "contribute[d] significantly to the maintenance or creation of monopoly power ... even though it [wa]s unilaterally imposed." Viamedia, 951 F.3d at 469. As Google employees recognized, the "value of Google's ad tech stack is less in each individual product, [than] in the connections across all of them." PTX551 at -048 (emphasis omitted). To deepen these connections, Google "artificially handicap[ped] [its] buyside ([AdWords]) to boost the attractiveness of [its] sellside (AdX)," PTX110 at -009, by effectively limiting its programmatic open-web advertisers in AdWords to bidding for inventory from publishers that used AdX and DFP. Google did this despite knowing that its advertiser customers would benefit from AdWords' bidding for open-web display ad inventory on non-Google exchanges. See PTX198 at

-703. Indeed, the leadership of Google's buy-side team "want[ed AdWords] to buy into all auctions regardless of what the AdX margin is." Id. But Google limited where its advertisers could bid to "[p]rotect [DFP's] position" as the dominant "operating system for publishers globally" and to disincentivize publishers from switching away from DFP. DTX76 at -477; see also Section VI(B)(1), supra.

The limitations on AdWords and AdX expanded Google's dominance in the publisher ad server market, with rival publisher ad servers exiting the market and DFP maintaining more than 90% market share from 2018 through 2022. See Section VI(B)(1), supra; Tr. Sept. 11 PM 153:6–154:11 (Dederick (The Trade Desk)). Even though some industry participants thought Google's DFP "wasn't the best ad server," almost "every other publisher ad server either went out of business or was sold for scrap" because Google has "destroyed all competition" in the ad server market through its AdX-DFP tie and associated activities. Dep. 74:17–75:21 (O'Kelley (Xandr)); see also PTX758 at -946 (Kevel founder and CEO James Avery stating in a 2019 email that "[a]lmost every [publisher] ad server has gone out of business because of this integration between AdX and [DFP]. [P]ublishers may want to use another ad server but they would end up giving up a chunk of revenue from AdX. It turns out monopolies are pretty effective.").

By forcing Google's publisher customers to use a product they would not necessarily have otherwise used, by making it difficult for rival publisher ad servers to compete on the merits, and by significantly reducing rivals' market share, the tying of DFP to AdX has had a substantial anticompetitive effect in the publisher ad server market for open-web display advertising. Accordingly, the AdX-DFP tie has violated both Section 1 and Section 2 of the Sherman Act. See Viamedia, 951 F.3d at 471–75; LePage's Inc. v. 3M, 324 F.3d 141, 154–57, 159–63 (3rd Cir. 2003) (en banc); Microsoft, 253 F.3d at 64–67, 78–80.

### 3. Entrenching Monopoly Power
### with Anticompetitive Actions

Google's monopolies in the publisher ad server and ad exchange markets, enhanced by the AdX-DFP tie, have enabled Google to introduce a series of anticompetitive policies, practices, and technology changes to its sell-side ad tech tools that were not in its publisher customers' best interests. These changes decreased product quality

and harmed competition by further entrenching Google as the dominant company in open-web display advertising. Google made these changes, despite customer complaints, by exploiting its durable monopoly power in the open-web display ad exchange and publisher ad server markets. The changes are further evidence that Google has engaged in "anticompetitive conduct," Trinko, 540 U.S. at 407, 124 S.Ct. 872, by its "willful acquisition or maintenance of [monopoly] power." Kodak, 504 U.S. at 481, 112 S.Ct. 2072.

The first of these anticompetitive policies was First Look, which required publishers using DFP to offer AdX a first right of refusal for each impression. See Section V(D), supra (citing PTX551 at -048). First Look exacerbated the anticompetitive effect of the unlawful AdX-DFP tie by artificially advantaging AdX within DFP's auction logic at the expense of Google's publisher customers. See id. If Google did not have monopoly power in the ad exchange or publisher ad server markets, then running a fundamentally unfair auction process to preference its own ad exchange over third-party ad exchanges might have been a permissible design choice. But Google's use of its monopoly power to impose artificial technical limitations that made it harder for customers to do business with rivals, instead of competing on the merits by "making [its ad exchange] more attractive to customers," constituted anticompetitive conduct. Microsoft, 253 F.3d at 65. Moreover, Google's "bundling of its [AdX and DFP] products ... reinforced the exclusionary effect" of First Look. LePage's, 324 F.3d at 162.

**\*42** Google's Last Look was another anticompetitive policy that entrenched Google's monopoly power, disadvantaged Google's publisher customers, and harmed the competitive process. This DFP feature, which gave AdX the ability to see competing exchanges' bids in an otherwise sealed auction before AdX would bid, harmed publishers, rival ad exchanges, and advertisers using non-Google ad buying technologies. See Section V(G), supra. That is why three experts testified that Last Look was anticompetitive. See Tr. Sept. 11 AM 120:23–121:21 (Ravi (Pls. Expert)) (testifying Last Look created inefficiencies, reduced publisher revenue, and reduced the amount of impressions non-Google exchanges were able to win); Tr. Sept. 18 AM 39:4–14, 40:2–41:3 (Abrantes-Metz (Pls. Expert)) (testifying Last Look was exclusionary); Tr. Sept. 20 PM 7:1–8 (Lee (Pls. Expert)) (testifying Last Look involved Google using its market power in the publisher ad server market to diminish the competitiveness of rivals in the ad exchange market).

The anticompetitive effects of Last Look have been compounded by Google's sell-side dynamic revenue share. See Section V(H), supra. By using the Last Look informational advantage to vary AdX fees and win impressions that it would have lost in a fair auction, Google has further enhanced AdX's market power at the expense of rivals, thereby reducing competition and harming its publisher customers' ability to diversify their revenue sources away from Google. See id.[29]

In an environment of increased regulatory and "competition concerns," PTX816 at -161, Google eventually eliminated its Last Look advantage. See Section V(J), supra. But in implementing Unified Pricing Rules, Google simultaneously took away publishers' ability to set higher price floors on AdX than on third-party exchanges, which was a primary tool that publishers had used to maintain revenue diversity and to mitigate Google's dominance in the ad exchange market. See id. Publishers viewed Unified Pricing Rules as not in their best interests, but felt stuck using DFP given its tie to AdX. See PTX1854 at 25:1–11, 36:5–37:20, 44:1–14, 52:11–16; Tr. Sept. 10 AM 51:24–55:3, 109:23–110:16 (Layser (News Corp)). Unified Pricing Rules is another example of Google exploiting its monopoly power and tying arrangement to restrict its customers' ability to deal with its rivals, thereby reducing its rivals' scale, limiting their ability to compete, and further compounding the harm to customers. Under these circumstances, Unified Pricing Rules constituted anticompetitive conduct because it involved Google using its coercive monopoly power to deprive its publisher customers of a choice that they had previously exercised to promote competition. See New York ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 652–54 (2d Cir. 2015); Lorain Journal, 342 U.S. at 154, 72 S.Ct. 181.

### 4. Google's Contention that Refusal to Deal Precedent Precludes Liability

[49] One of the primary legal defenses that Google has raised in this litigation is that its actions to build and shape an integrated ad tech infrastructure, including the tying of DFP to AdX and the subsequent use of that tie to preference Google products over rival products, cannot result in antitrust liability under the "refusal to deal" doctrine articulated by the Supreme Court in Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 409, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004), and reaffirmed in Pacific Bell Telephone Co. v. LinkLine Communications, Inc., 555

U.S. 438, 448, 129 S.Ct. 1109, 172 L.Ed.2d 836 (2009). In Trinko, the Supreme Court held that, "as a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.' " 540 U.S. at 408, 124 S.Ct. 872 (quoting United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919)) (alteration in original). The Court provided three reasons for this rule. First, firms should be incentivized to "establish[ ] infrastructure that renders them uniquely suited to serve their customers," even if doing so causes them to gain monopoly power. Id. at 407, 124 S.Ct. 872. Second, "[e]nforced sharing also requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited." Id. at 408, 124 S.Ct. 872. Third, "compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion." Id.

*43 The Supreme Court also recognized in Trinko that "the right to refuse to deal with other firms" is not "unqualified." Id. (quoting Aspen Skiing, 472 U.S. at 601, 105 S.Ct. 2847). It identified Aspen Skiing as "[t]he leading case for § 2 liability based on refusal to cooperate with a rival," id., and described how the evidence in that case supported the conclusion that the defendant forwent the "short-run benefits" of dealing with a rival "because it was more interested in reducing competition ... over the long run by harming its smaller competitor." Id. at 409, 124 S.Ct. 872 (quoting Aspen Skiing, 472 U.S. at 608, 105 S.Ct. 2847). Yet the Trinko decision described Aspen Skiing as being "at or near the outer boundary of § 2 liability," and warned that courts should exercise caution in recognizing exceptions to the general rule that firms have no obligation to deal with rivals. Id. at 408–09, 124 S.Ct. 872. When it decided LinkLine four years later, the Supreme Court stated that "[a]s a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing," although in doing so, the Court reacknowledged the "limited circumstances in which a firm's unilateral refusal to deal with its rivals can give rise to antitrust liability." 555 U.S. at 448, 129 S.Ct. 1109 (citing Aspen Skiing, 472 U.S. at 608–11, 105 S.Ct. 2847). In a recent Sherman Act Section 2 case, the Fourth Circuit identified an "important distinction" between Trinko and Aspen Skiing: Trinko involved assessing the defendant's conduct in a regulated market, where courts should apply antitrust laws more cautiously given "the existence of a regulatory structure designed to deter and remedy anticompetitive harm," whereas Aspen Skiing did not

involve a regulated market. Duke Energy, 111 F.4th at 363 (quoting Trinko, 540 U.S. at 412, 124 S.Ct. 872).

 **[50]** **[51]** The refusal to deal doctrine in Trinko does not apply to Google's conduct at issue. Courts have declined to "extend[ ] a refusal-to-deal-with-rivals analysis" to anticompetitive restraints that a monopolist places on its customers, as opposed to its competitors. Chase Mfg., 84 F.4th at 1173; see also Kodak, 504 U.S. at 463 n.8, 112 S.Ct. 2072; Lorain Journal, 342 U.S. at 152–53, 72 S.Ct. 181. Courts have also "contrast[ed]" the "[r]efusal to deal doctrine" from "a monopolist's more direct interference with rivals," such as "limit[ing] the abilities of third parties to deal with rivals (exclusive dealing)" or "requir[ing] third parties to purchase a bundle of goods rather than just the ones they really want (tying)." Novell, 731 F.3d at 1072, 1076. Here, Google has engaged in tying that effectively has compelled its publisher customers to use DFP if they want to use AdX and receive real-time bids from AdWords advertisers. See Section VI(C)(2), supra. This tying has had the anticompetitive effect of limiting Google's publisher customers' choice of publisher ad server for reasons other than competition on the merits. See id. Moreover, the tie increased Google's scale, decreased rivals' scale, caused some rivals to exit the publisher ad server market, and harmed competition, customers, and Internet users. See id. Although such tying, like other anticompetitive and restrictive conditions on customers, can be conceptualized as a "conditional refusal[ ] to deal," that does not mean it should be assessed as a "simple refusal to deal" with rivals, which was the alleged harm in Trinko. Viamedia, 951 F.3d at 453. Rather, as the Supreme Court reasoned in Kodak, even if the refusal to sell a product to rivals could "be characterized as a unilateral refusal to deal," the sale of a tying product to "third parties" on the "condition that they buy" a tied product does not fit within the ambit of the refusal to deal exception to antitrust liability. 504 U.S. at 463 n.8, 112 S.Ct. 2072. That is why a tying claim "does not fail as a matter of law simply because it was implemented by refusing to deal with an intermediary." Viamedia, 951 F.3d at 472.

Beyond the unsuitability of the refusal to deal doctrine to Google's tying of DFP to AdX, two other aspects of Google's conduct differ significantly from the conduct at issue in Trinko. Unlike in Trinko, Google's ad tech business has not operated in a highly regulated industry in which state and federal regulators require the leading firms to share access to capital-intensive infrastructure. Cf. 540 U.S. at 402–04, 124 S.Ct. 872. Rather, Google's ad tech products operate

in markets where there is no industry-specific "regulatory structure designed to deter and remedy anticompetitive harm" or otherwise "perform[ ] the antitrust function." Id. at 412, 124 S.Ct. 872. Moreover, like in Aspen Skiing but unlike in Trinko, Plaintiffs presented evidence that Google sacrificed "short-run benefits because it was more interested in reducing competition ... over the long run by harming its smaller competitor[s]." Trinko, 540 U.S. at 409, 124 S.Ct. 872 (quoting Aspen Skiing, 472 U.S. at 608, 105 S.Ct. 2847) (ellipses in original). For example, after acquiring Admeld, Google shut down its feature of providing real-time bids to third-party exchanges. See Section V(E), supra. Google's decision to shut down this feature was consistent with the strategy to "pick[ ] up the [yield manager] with the most traction and park[ ] it somewhere." PTX58 at -800. Google also refused to implement real-time bidding outside of its ad tech infrastructure despite its buy-side team emphasizing the benefits that doing so would have for its advertiser customers. See Section VI(C)(2), supra.

 **\*44** Given all these significant differences, the Court finds that the refusal to deal doctrine articulated in Trinko does not protect Google from antitrust liability in this civil action. As established above, Google conducted anticompetitive tying to maintain its monopoly power, and thereafter engaged in a series of exclusionary acts that compounded harms to customers and competition in the two ad tech markets at issue.

### 5. Google's Contention that Its Conduct is Protected by Procompetitive Justifications

Google also contends that the actions Plaintiffs have challenged were procompetitive product design choices made for valid business reasons, and therefore cannot serve as a basis for subjecting the firm to antitrust liability. Specifically, Google claims that its challenged actions improved safety and privacy, countered fraud, reduced latency, promoted investment, and decreased prices.

 **[52]** **[53]** **[54]** **[55]** A defendant shown to have engaged in exclusionary conduct to maintain a monopoly may avoid Section 2 liability by proving that the conduct was done for "valid business reasons." Kodak, 504 U.S. at 483, 112 S.Ct. 2072; see LePage's, 324 F.3d at 163. Accordingly, procompetitive rationales may justify "an otherwise per se illegal tying arrangement." Mozart Co. v. Mercedes-Benz of N. Am., Inc., 833 F.2d 1342, 1348 (9th Cir. 1987). A court must assess the "validity and sufficiency of each claimed

[procompetitive] justification." Kodak, 504 U.S. at 483, 112 S.Ct. 2072; see also Duke Energy, 111 F.4th at 362, 365; Viamedia, 951 F.3d at 464; Microsoft, 253 F.3d at 66. Because pretextual and unsubstantiated justifications are not "valid," Kodak, 504 U.S. at 483, 112 S.Ct. 2072; see Actavis, 787 F.3d at 658; McWane, 783 F.3d at 841–42, courts may give "greater weight to the contemporaneous statements contained in the company's internal records, than [to] later trial testimony in which [its] employees declined to ratify those statements." Google Search, 747 F.Supp.3d at 77 n.2; see also United States v. U.S. Gypsum Co., 333 U.S. 364, 395–400, 68 S.Ct. 525, 92 L.Ed. 746 (1948). In assessing whether proffered procompetitive justifications are "sufficient," Kodak, 504 U.S. at 483, 112 S.Ct. 2072, courts frequently "balance the restriction's anticompetitive harms against its procompetitive benefits." Epic Games, 67 F.4th at 994; see Alston, 594 U.S. at 96–97, 141 S.Ct. 2141; Microsoft, 253 F.3d at 59, 66; FTC v. Qualcomm Inc., 969 F.3d 974, 991 (9th Cir. 2020).

 [56] Google has failed to proffer a sufficient procompetitive justification for its AdX-DFP tie, as each procompetitive benefit it alleged was either invalid or significantly outweighed by the tie's anticompetitive effects. Google contends that the integration of its products across the ad tech stack, including the AdX-DFP tie, reduced spam, fraud, malware, latency, and other quality issues; however, Google documents show that the buy-side AdWords team, which was responsible for ensuring its advertiser customers had their ads published without undue latency on high-quality websites that were not fraudulent, Tr. Sept. 13 AM 73:6–8 (LaSala (Google)), internally advocated for AdWords to buy on most other ad exchanges because those exchanges had "acceptable levels" of spam and fraud, PTX199 at -240–41, that were "comparable" to the spam and fraud levels on AdX, PTX835 at -867. See also Tr. Sept. 17 PM 24:1–20 (Jayaram (Google)). These other exchanges submitted real-time bids to third-party publisher ad servers, just as AdX would have if AdX and DFP were not tied. And so Google's buy-side team "d[id] not like the idea of AdWords being given a disadvantage compared to the other buyers in order to strengthen the publisher pitch (e.g. uphold the 20% margin [on AdX])." PTX198 at -703. But the sell-side managers within Google shut down the plan to let AdWords bid on third-party exchanges for fear that it would undermine AdX and DFP's dominance among publishers. See PTX116 at -462–63. Google therefore "artificially handicapp[ed] [its] buyside ([AdWords]) to boost [its] sellside (AdX)." PTX110 at -009; see also PTX41 at -005–06 (stating bundling DFP, AdX, and AdWords was to obtain "access to [publisher

inventory" and to win "the most strategic battle [which wa]s about the publisher platform"); PTX183 at -717 (stating AdWords' exclusivity on AdX was "purely [a] decision to hold back a set of advertisers ([AdWords] customers) in order to promote [AdX]"); Tr. Sept. 17 AM 21:3–16 (Jayaram (Google)). Instead of reducing spam, fraud, and malware for its customers, the AdX-DFP tie "greatly weaken[ed] [AdWords'] position in the market," PTX110 at -009, to entrench AdX as the dominant ad exchange and DFP as the dominant publisher ad server. See DTX85 at -539 (documenting internal Google projection that permitting AdWords to bid on rival exchanges would cause "AdX [to] lose 20% to 30% of its publishers" and "DFP [to] lose 20% of its publishers").

 *45 Nor were any security or quality concerns on the sell-side sufficient to justify the AdX-DFP tie. Numerous industry participants and customers testified that Google did not have lower levels of spam, fraud, or malware than other reputable ad tech providers. See Tr. Sept. 9 AM 157:1–9 (Casale (Index Exchange)) (stating header bidding posed no greater risk of fraud or malware than bidding within Google's ad tech stack); Tr. Sept. 10 AM 46:13–47:13 (Layser (News Corp)) (stating AdX was not better than other ad exchanges at preventing fraud, malware, or spam, and that publishers used third-party software to mitigate malware and spam); Tr. Sept. 10 AM 153:23–154:16 (Friedman (Goodway Group)) (stating all large ad exchanges provide "similar quality inventory to ... any of the other ones"); Tr. Sept. 27 AM 74:5–75:1 (Wheatland (Daily Mail)). This evidence, therefore, showed that the proffered spam, fraud, latency, and other quality justifications of the AdX-DFP tie were either pretextual or, at best, incidental to the primary purpose of the tie, which was to acquire and maintain market power in the open-web ad exchange and publisher ad server markets. To the extent these quality justifications have any validity, they were significantly outweighed by the anticompetitive effect of the AdX-DFP tie, through which Google has driven nearly all competitors out of the publisher ad server market and secured a durable market share of over 90%.

 [57] Google's procompetitive justifications for the actions it took to entrench its monopoly power and strengthen the AdX-DFP tie similarly fall short. Google claims that First Look and Last Look increased revenue for Google's publisher customers and gave advertisers more opportunities to bid on inventory. Some aspects of "Dynamic Allocation," such as the addition of AdX as a new source of advertiser demand to publisher customers and the "process that allow[ed]

AdX to provide real-time bids," did increase publishers' revenue substantially. Tr. Sept. 18 AM 53:3–54:12 (Abrantes-Metz (Pls. Expert)); see also Tr. Sept. 24 AM 58:14–62:5 (Milgrom (Def. Expert)) (citing DTX117 at -415 and DTX80 at -322). But Plaintiffs have not argued that these aspects of Dynamic Allocation were anticompetitive. See Tr. Sept. 18 AM 53:3–54:12 (Abrantes-Metz (Pls. Expert)). Rather, the anticompetitive aspect of Dynamic Allocation was First Look, i.e., Google's preferencing AdX over non-Google ad exchanges within DFP, which resulted in less revenue for publishers, fewer impressions going to the advertisers who were willing to pay the most for them, enhanced AdX market power, and reduced competition in the ad exchange market. See Sections V(D) and VI(C)(3), supra; see also Tr. Sept. 11 PM 71:18–23 (Ravi (Pls. Expert)) ("[T]he advertiser willing to pay the highest price may not get [an impression] as a result of first look."); Tr. Sept. 16 PM 135:16–139:1 (Abrantes-Metz (Pls. Expert)) (describing how First Look was exclusionary and harmed publishers).

 **[58]** Last Look, which was implemented after Google had established dominance in the ad exchange and publisher ad server markets, similarly did not provide publishers with as much revenue as they would have received in a fair auction. The advantage that Last Look provided to AdX enabled AdX to win auctions despite offering less than its advertisers were willing to pay. See Section V(G), supra (citing Tr. Sept. 12 PM 101:13–23 (Goel (PubMatic))). For example, if an AdX advertiser was willing to bid $1.50 CPM for an impression but non-AdX advertisers were only offering $1.00 CPM, then in a fair auction, AdX would win the auction and pay the publisher $1.50 CPM. See id. But because Last Look let AdX "open the envelope for the [highest bid [among the non-AdX advertisers], know what the winning bid [wa]s, and be able ... to bid after everybody else," AdX could bid $1.01 CPM and still win the auction, resulting in the publisher receiving $0.49 CPM less than it would have in a fair auction. Tr. Sept. 18 AM 37:7–38:1 (Abrantes-Metz (Pls. Expert)). This advantage, which Google was only able to implement because of AdX and DFP's market power, reduced publisher revenue, decreased rivals' scale, dampened ad exchange price competition, and further entrenched Google's market power in the two adjacent product markets. See PTX438 at -478; PTX1709 at -934; Sept. 18 AM 39:4–41:3 (Abrantes-Metz (Pls. Expert)).

Google contends that Last Look was procompetitive because publishers using header bidding could choose not to request a bid from AdX, and so they would only activate Last

Look if doing so increased their revenue. See Tr. Sept. 24 AM 74:18–25 (Milgrom (Def. Expert)). But given AdX's monopoly power in the ad exchange market, this offer was a "Hobson's choice;" it was not financially viable for large publishers to forgo using AdX and the access it offered to the unique advertising demand from AdWords. Viamedia, 951 F.3d at 435. Google therefore did not establish any valid and sufficient procompetitive justifications for Last Look.

 **\*46** **[59]** The exclusionary nature of sell-side dynamic revenue share similarly cannot be shielded by the proffered procompetitive justifications. Google argues that sell-side dynamic revenue share helped create matches for impressions that would not have sold to any advertisers without it. See DTX212 at -484. But the primary purpose of sell-side dynamic revenue share was to outbid rival exchanges by using AdX's anticompetitive Last Look advantage. See Sections V(H) and VI(C)(3), supra. That is why a Google engineer stated that sell-side dynamic revenue share was "just yet another way for AdX to exploit the last look advantage," and observed that "AdX gets to pay high and win whenever AppNexus [another ad exchange] is present with a high CPM, and can pay low when AppNexus bids low. AppNexus in contrast can't reliably save money on queries where AdX bids low, because it doesn't know AdX bids." PTX542 at -335. Therefore, just as with Last Look, Google's proffered procompetitive justification for sell-side dynamic revenue share was pretextual.

Google contends that its Unified Pricing Rules established a level playing field for advertisers, simplified the ad tech bidding landscape for publishers, improved matches, and increased publisher revenue. Google knew that publishers were "rational[ ]" when they decide to diversify their source[s] of revenue[ ]" by setting higher price floors for bids coming through AdX than for bids coming through other ad exchanges, because doing so "help[ed] them to keep Google at bay and put pressure on [Google] (similar to any industry)." PTX469 at -512. Google also knew that some publishers set higher price floors on AdX to "protect" their businesses, as they had "the perception that undesirable ads on AdX (primarily from AdWords unclassified advertisers) [were] correlated with low" revenue and posed quality issues. PTX609 at -146; see also PTX611 at -802; PTX715 at -429-001; Tr. Sept. 10 AM 49:25–50:3, 119:9–21 (Layser (News Corp)) (stating that setting higher floors on AdX resulted in higher quality ads). Nevertheless, Google imposed Unified Pricing Rules—which prohibited publishers using DFP from setting higher price floors for bids coming through

AdX—at the request of the "Ad[X] team," who wanted to use the termination of Last Look "as an opportunity to significantly limit the ability of publishers to set floor prices per buyers." PTX762 at -291; see Section V(J), supra. This is strong evidence that Google implemented Unified Pricing Rules to enhance the AdX-DFP tie, and not for its proffered justifications of helping its publisher customers simplify their decision-making, receive better matches, and increase revenue. Moreover, despite its name, Unified Pricing Rules did not stop publishers from setting higher price floors for third-party exchanges than for AdX. See Tr. Sept. 10 AM 60:7–14 (Layser (News Corp)); Tr. Sept. 18 AM 149:1–8 (Wheatland (Daily Mail)); Tr. Sept. 23 AM 157:8–158:20 (Korula (Google)). Unified Pricing Rules was targeted at enhancing AdX's control over DFP publishers' revenue streams, as opposed to simplifying publishers' decision-making. That is why Google's publisher customers concluded that Unified Pricing Rules was not in their best interest and challenged its implementation. See PTX751 at -120–24; PTX1854 at 25:1–11, 55:1–13; Tr. Sept. 10 AM 50:17–52:7 (Layser (News Corp)).

 **[60]** **[61]** **[62]** **[63]** In addition to proffering procompetitive justifications for individual product and policy changes, Google makes the overarching argument that all of these changes are shielded from antitrust liability because they involved product design choices. See Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP, 592 F.3d 991, 998–99 (9th Cir. 2010) ("Design change that improves a product by providing a new benefit to consumers does not violate Section 2 absent some associated anticompetitive conduct."); Microsoft, 253 F.3d at 65 ("As a general rule, courts are properly very skeptical about claims that competition has been harmed by a dominant firm's product design changes."). Google's decade-long campaign of exclusionary conduct, however, is not properly characterized as a series of product design choices. As the Fourth Circuit made clear in Duke Energy, courts must avoid unduly divvying up a "complex or atypical exclusionary campaign" into "manufactured subcategories" and justify the actions using "specific conduct tests." 111 F.4th at 354–55; see also Alston, 594 U.S. at 101, 141 S.Ct. 2141 (stating a defendant is not permitted to "relabel a restraint [on trade] as a product feature and declare it immune from" antitrust scrutiny). It would not be accurate to classify the tying of two separate products, or the subsequent decisions that Google made to manipulate auction rules and restrict customer choice in markets in which the firm had monopoly power, as mere choices of product design. What is more, "[j]udicial deference

to product innovation ... does not mean that a monopolist's product design decisions are per se lawful." Microsoft, 253 F.3d at 65. Indeed, "product redesign is anticompetitive when it coerces consumers and impedes competition," which Google's actions did here. Actavis, 787 F.3d at 652; accord Allied Orthopedic Appliances, 592 F.3d at 998. The AdX-DFP tie, for example, "ha[d] the effect of significantly reducing usage of rivals' products" (i.e., publisher ad servers) by "discouraging," "deterring," and "preventing" publisher customers from using alternatives to DFP. Microsoft, 253 F.3d at 65–66; see also In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig., 383 F. Supp. 3d 187, 230 (S.D.N.Y. 2019) (holding that product design combined with "associated conduct," including "tying agreements" and "product disparagement," can be exclusionary because its "overall effect" is "to coerce consumers to purchase [the defendant's product] over [competitors' products], rather than to compete on the merits").

 **\*47** In sum, Plaintiffs have shown that Google engaged in "willful acquisition or maintenance of [its monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident" by tying DFP to AdX and committing a series of exclusionary and anticompetitive acts to entrench its monopoly power in two adjacent product markets. Kodak, 504 U.S. at 481, 112 S.Ct. 2072 (quoting Grinnell, 384 U.S. at 570–71, 86 S.Ct. 1698). The procompetitive justifications that Google proffers for its anticompetitive conduct are both invalid and insufficient, and any procompetitive benefits of this conduct were far outweighed by its anticompetitive effects. Therefore, Google cannot evade liability under Sections 1 and 2 of the Sherman Act.

## VII. Plaintiffs' Request for Sanctions

 **[64]** Plaintiffs have alleged that Google should be sanctioned under Federal Rule of Civil Procedure 37(e) because it failed to take reasonable steps to preserve internal communications, resulting in the systemic spoilation of potentially relevant evidence. Specifically, Plaintiffs ask the Court to infer that deleted internal communications were unfavorable to Google on factual issues that were in dispute in this litigation, including market definition, monopoly power, Google's intent, the anticompetitive nature of Google's conduct, and the harm Google's conduct caused to its competitors and customers. See Fed. R. Civ. P. 37(e)(2)(A) (stating that, in certain circumstances, a court may presume

that electronically stored information lost by a party was unfavorable to that party).

Google's internal messaging application deleted records of chats between employees unless an employee explicitly turned on "chat history," and the application's user interface made it difficult for employees to turn on chat history for every conversation they had. See Tr. Sept. 11 AM 33:1–12, 88:13–89:17 (Bender (Google)); Tr. Sept. 13 AM 121:23–124:3 (LaSala (Google)). Chat deletions occurred when employees discussed substantive topics at issue in this litigation and continued after the federal government began an antitrust investigation into Google's conduct. See, e.g., Tr. Sept. 17 AM 103:11–20 (Jayaram (Google)). Cf. Gerlich v. U.S. Dep't of Justice, 711 F.3d 161, 171 (D.C. Cir. 2013) (holding that the "duty of preservation" was "triggered ... by a reasonably foreseeable Department [of Justice] investigation"). Some employees who received litigation holds failed to turn on their chat history despite being instructed to, resulting in their communications being deleted. See Tr. Sept. 13 AM 131:24–133:19 (LaSala (Google)) (discussing PTX992, in which a Google executive under a litigation hold agreed with his subordinate that a topic was "too sensitive for email" and thus should be discussed via auto-deleted chats). Indeed, Google employees regularly used this "off the record" chat functionality, PTX1777 at 14, for discussions of "legally sensitive" topics that they did not want to be preserved, PTX1033 at -656. See also PTX851 at -549; Tr. Sept. 11 AM 33:1–12, 88:13–89:17 (Bender (Google)).

Google employees and executives also misused the attorney-client privilege. For example, Kent Walker, an attorney who served as Google's President of Global Affairs and oversaw the company's legal team, marked an email in which he asked his colleagues for reactions to a New York Times article as "privileged." PTX864 at -424; see Tr. Sept. 13 AM 76:23–77:16 (LaSala (Google)). Other Google executives and employees routinely labeled emails as attorney-client privileged even though the emails clearly did not involve privileged communications. See, e.g., PTX864 at -422–25; PTX884 at -249; PTX997 at -389; Tr. Sept. 12 AM 151:2–152:16 (Srinivasan (Google)); Tr. Sept. 13 AM 71:18–72:2, 76:23–78:13 (LaSala (Google)); Tr. Sept. 19 AM 128:10–129:7, 129:17–130:22 (Bellack (Google)) (discussing PTX719 and PTX1507).

**\*48** Google's systemic disregard of the evidentiary rules regarding spoliation of evidence and its misuse of the attorney-client privilege may well be sanctionable. But because the Court has found Google liable under Sections 1 and 2 of the Sherman Act based on trial testimony and admitted evidence, including those Google documents that were preserved, it need not adopt an adverse inference or otherwise sanction Google for spoliation at this juncture. As in Google Search, the Court's decision not to sanction "should not be understood as condoning Google's failure to preserve chat evidence." 747 F.Supp.3d at 188.

## VIII. Conclusion

Plaintiffs have proven that Google has willfully engaged in a series of anticompetitive acts to acquire and maintain monopoly power in the publisher ad server and ad exchange markets for open-web display advertising. For over a decade, Google has tied its publisher ad server and ad exchange together through contractual policies and technological integration, which enabled the company to establish and protect its monopoly power in these two markets. Google further entrenched its monopoly power by imposing anticompetitive policies on its customers and eliminating desirable product features. In addition to depriving rivals of the ability to compete, this exclusionary conduct substantially harmed Google's publisher customers, the competitive process, and, ultimately, consumers of information on the open web. Accordingly, Google is liable under Sections 1 and 2 of the Sherman Act.

For the foregoing reasons, by an Order to be issued with this Memorandum Opinion, Count III (monopolization of the advertiser ad network market) will be dismissed, and the parties will be ordered to submit a joint proposed schedule for briefing and arguing their positions as to the remedies that should be imposed in light of Google have been found liable for monopolization of the publisher ad server market (Count I), monopolization of the ad exchange market (Count II), and unlawful tying of AdX and DFP (Count IV).

### All Citations

--- F.Supp.3d ----, 2025 WL 1132012

---

### Footnotes

1    15 U.S.C. § 4 authorizes the U.S. Department of Justice to institute proceedings in equity to prevent and restrain violations of the Sherman Act. 15 U.S.C. § 26 allows any person, firm, corporation, or association to obtain injunctive relief against threatened loss or damage from a violation of federal antitrust law. States may bring civil actions under 15 U.S.C. § 26 on behalf of their citizens. See California v. Am. Stores Co., 495 U.S. 271, 282–83, 110 S.Ct. 1853, 109 L.Ed.2d 240 (1990).

2    For ease of reference, citations to trial and deposition transcripts contain the last name of the witness and the organization with which they are associated.

3    Publishers whose employees provided testimony in this litigation include Buzzfeed, Gannett / USA Today, News Corp / The Daily Mail, The New York Times, The Walt Disney Company, and Vox Media. See Designated Deposition Transcript ("Dep.") 78:24–79:19 (Blom (Buzzfeed)); Tr. Sept. 9 AM 49:10–50:7 (Wolfe (Gannett)); Tr. Sept. 10 AM 8:18–23 (Layser (News Corp)); Tr. Sept. 17 PM 114:8–104:23, 129:25–130:5 (Helfand (Disney)); Tr. Sept. 18 AM 125:3–18 (Wheatland (Daily Mail)); Tr. Sept. 26 PM 123:7–22 (Glogovsky (New York Times)); Tr. Sept. 27 AM 5:24–6:9; 9:19–10:2 (Pauley (Vox)).

4    Advertisers whose employees provided testimony in this litigation include the U.S. Census Bureau and Zulily. Tr. Sept. 23 PM 65:3–66:14 (Oliphant (U.S. Census Bureau)); Tr. Sept. 27 AM 22:22–23:11 (Bumpers (Zulily)).

5    Advertising agencies whose employees provided testimony in this litigation include Goodway Group, GroupM, GSD&M, IPG / Universal McCann, and OMD. Tr. Sept. 9 PM 53:6–17 (Lowcock (IPG)); Tr. Sept. 10 AM 130:11–16 (Friedman (Goodway Group)); Tr. Sept. 13 PM 25:4–5, 49:3–22 (Lambert (OMD)); Tr. Sept. 17 PM 137:5–138:3 (Schiekofer (GroupM)); Tr. Sept. 19 PM 6:11–20 (Bradbury (GSD&M)).

6    The Google Content Network, or GCN, is also called the Google Display Network, or GDN. See PTX1096 at -609; Tr. Sept. 20 PM 52:22–53:5 (Sheffer (Google)).

7    Although this opinion will use "AdWords" to describe the advertiser-facing side of GCN, Google rebranded AdWords as Google Ads in 2018. See PTX1096 at -609.

8    Other ad network providers whose employees testified in this litigation are Criteo and Meta, which operated the Facebook Audience Network. DTX376 at -975; DTX1257 at 4, 10; Tr. Sept. 13 AM 97:13–98:15 (Boland (Meta)); Tr. Sept. 13 PM 158:1–20 (Parsons (Criteo)).

9    Microsoft and The Trade Desk are other companies offering demand-side platforms whose employees testified in this litigation. Tr. Sept. 11 PM 87:21–22, 105:12–14 (Dederick (The Trade Desk)); Tr. Sept. 20 PM 129:12–17 (John (Microsoft)).

10   Other organizations with ad exchanges whose employees testified in this litigation include Index Exchange, Kargo, Magnite, Microsoft (formerly Xandr and AppNexus), OpenX, and PubMatic. Tr. Sept. 9 AM 106:16–107:3 (Casale (Index Exchange)); Tr. Sept. 12 PM 56:8–57:8 (Goel (PubMatic)); Tr. Sept. 13 AM 5:8–5:21 (Kershaw (Magnite)); Tr. Sept. 17 PM 45:2–46:6 (Cadogan (OpenX)); Tr. Sept. 19 PM 38:11–39:1, 39:15–17 (Shaughnessy (Kargo)); Tr. Sept. 20 PM 121:2–14, 129:9–17; 136:10–12 (John (Microsoft)).

11   DFP has since been combined with Google's ad exchange, AdX, under a single brand called Google Ad Manager, or GAM. Tr. Sept. 9 AM 66:19–67:3 (Wolfe (Gannett)). Google employees, testifying witnesses, and other industry participants nevertheless refer to Google's publisher ad server as DFP and identify it as

a separate product from AdX, as each product serves its own distinct functions. See id.; Joint Glossary at 5; PTX847; PTX1242; PTX1392.

12   Other organizations with publisher ad servers whose employees testified in this litigation include Equativ, Kevel, and Microsoft. Tr. Sept. 9 PM 116:19–23 (Avery (Kevel)); Tr. Sept. 13 PM 62:11–63:14 (Creput (Equativ)); Tr. Sept. 20 PM 129:12–17 (John (Microsoft)).

13   See, e.g., Google Expands Advertising Monetization Program for Websites, News From Google (Jun. 18, 2003), https://googlepress.blogspot.com/2003/06/google-expands-advertising-monetization.html; MapQuest Selects Google to Provide Sponsored Links, News from Google (Jun. 23, 2003), https://googlepress.blogspot.com/2003/06/mapquest-selects-google-to-provide.html; CNN.com Inks Multi-Year Advertising Agreement with Google, News From Google (Aug. 28, 2007), https://googlepress.blogspot.com/2007/08/cnncom-inks-multi-year-advertising_28.html.

14   See Google opens new content distribution channel on AdSense, News from Google (Oct. 9, 2007), https://googlepress.blogspot.com/2007/10/google-opens-new-content-distribution_09.html; Google AdSense for Mobile unlocks the potential of the mobile advertising market, News from Google (Sept. 17, 2007), https://googlepress.blogspot.com/2007/09/google-adsense-for-mobile-unlocks_17.html.

15   Beginning in 2015, Google allowed some AdWords demand to bid into non-Google ad exchanges through a program called AWBid. Because AWBid focused on a small set of impressions related to specialized advertising campaigns, AdX remained the "nearly exclusive" source of AdWords demand. PTX639 at -965; PTX1247; see PTX278 at -613; Tr. Sept. 16 PM 132:20–133:16 (Abrantes-Metz (Pls. Expert)) ("[F]rom 2015, approximately only on average 3 percent of impressions transacted from [AdWords] were placed outside of AdX."); Tr. Sept. 13 AM 8:9–19 (Kershaw (Magnite)); Tr. Sept. 10 PM 87:3–7 (Lipkovitz (Google)).

16   Google offered publishers not using DFP a way to access AdX demand via "AdX Direct," but this product was not an "economically viable substitute to accessing AdX through DFP" because it had rudimentary functionality, did not show the price that AdX was offering, did not provide access to real-time bids, increased latency, and did not permit publishers to place bids from AdX into real-time auctions with bids from other exchanges. Tr. Sept. 27 AM 70:9–24 (Wheatland (Daily Mail)); see also DTX555 at -115; PTX758 at -945; PTX933 at -183 (Google employee suggesting AdX Direct exists in part as a "concept for antitrust"); Tr. Sept. 10 AM 11:23–12:18 (Layser (News Corp)); Tr. Sept. 16 PM 124:5–18 (Abrantes-Metz (Pls. Expert)); Tr. Sept. 17 PM 50:4–51:20 (Cadogan (OpenX)); Tr. Sept. 18 AM 137:2–138:6 (Wheatland (Daily Mail)); Tr. Sept. 23 AM 139:8–17 (Korula (Google)). As a result, AdX Direct generated less than two percent of AdX's revenue. Tr. Sept. 16 PM 124:19–25 (Abrantes-Metz (Pls. Expert)) (stating AdX Direct was "not effective" and "not widely used").

17   Display ads purchased programmatically sell, on average, for significantly less than one cent per impression. See Tr. Sept. 19 PM 78:12–13 (Lee (Pls. Expert)). At trial, the parties and witnesses followed the industry convention of discussing prices in cost per thousand impressions (CPM), even when discussing the price of an individual impression. See, e.g., Tr. Sept. 19 PM 21:11–20 (Levitte (Google)).

18   Programmatic direct sales are a type of programmatic advertising in which a certain amount of a publisher's inventory is reserved for a specific advertiser. See Joint Glossary at 7; Tr. Sept. 10 PM 22:2–14 (Friedman (Goodway Group)).

19   "Supply path optimization" tools also offer a way to bypass ad exchanges by connecting advertiser buying tools and publisher ad servers directly. See DTX1544 at -698; Tr. Sept. 19 PM 78:22–79:19 (Lee (Pls. Expert)). But, unlike ad exchanges, these tools do not conduct auctions, are not focused on open-web display advertising, serve many fewer customers, and are not focused on serving publishers' interests. See Tr. Sept.

11 PM 117:6–118:14 (Dederick (The Trade Desk)); Tr. Sept. 19 PM 78:22–79:19 (Lee (Pls. Expert)). That is why the leading developers of supply path optimization tools do not consider them to be viable alternatives to ad exchanges for bidding on open-web display ads. See Tr. Sept. 11 PM 118:5–14 (Dederick (The Trade Desk)); Tr. Sept. 12 PM 154:12–24 (Goel (PubMatic)).

20    Supracompetitive prices are prices above those that could be sustained in a competitive market. Tr. Sept. 16 PM 129:22–130:2 (Abrantes-Metz (Pls. Expert)).

21    Although large advertisers use demand-side platforms, which offer them more customization of and control over their ad campaigns, as their primary buying tools, see Section IV(B), supra, many large advertisers also use AdWords as a secondary buying tool because of its ability to predict when users will click on ads, its proprietary sell-side data that enables audience targeting, and its ability to manage campaigns that combine open-web display ads with Search, YouTube, and Gmail ads. See DTX1514 at 950–53; Tr. Sept. 19 PM 101:23–103:4 (Lee (Pls. Expert)); Tr. Sept. 26 PM 85:22–87:13 (Israel (Def. Expert)).

22    Other courts have segmented digital ad buying tools by the types and formats of ads that they transact. See, e.g., Fed. Trade Comm'n v. IQVIA Holdings Inc., 710 F. Supp. 3d 329, 367–68 (S.D.N.Y. 2024) (defining demand-side platforms for health care professional programmatic advertising as a relevant market, and excluding social media and healthcare-focused websites as not reasonably interchangeable); Google Search, 747 F.Supp.3d at 107 ("The court finds that Plaintiffs have established two relevant markets—search advertising and general search text advertising."). The weight of the evidence presented in this trial, however, clearly supports the conclusion that walled-garden display ads, in-app display ads, and social media ads are reasonably interchangeable with open-web display ads for many AdWords advertisers.

23    More specifically, in the credit card context, when an American Express cardholder uses the card to purchase a product from a merchant, the cardholder is billed by American Express for the price of the product, and the merchant is paid by American Express the price of the product minus a service charge. See id. at 533, 138 S.Ct. 2274.

24    Although they resemble two-sided transaction platforms, ad exchanges differ somewhat from the credit-card networks at issue in Amex because ad exchanges do not merely provide technology to facilitate transactions between buyers and sellers, but also function as auction houses by evaluating multiple potential buyers and selecting the buyer with the highest willingness to pay. See Joint Glossary at 5; Section IV(B), supra. Indeed, ad exchanges primarily exist to place multiple buyers in competition with each other for available inventory, whereas credit-card networks primarily exist to make it easier for a buyer to pay a seller after the two parties have independently found each other and decided to conduct a transaction.

25    Google made this argument in its motion to dismiss a putative antitrust class action brought by advertisers who used Google's services to purchase display and search ads. See In re Google Digital Advertising Antitrust Litig., 5:20-cv-3556, 2021 WL 7083558, at 6 (N.D. Cal. Jan. 15, 2021); id. [Dkt. No. 52] at 2–3. The district court granted the motion to dismiss with leave to amend, in part due to its agreement with Google that plaintiffs' proposed relevant market "improperly include[d] services for both advertisers and publishers." In re Google Digital Advertising Antitrust Litig., 5:20-cv-3556, 2021 WL 2021990, at *3 (N.D. Cal. May 13, 2021). Before an amended complaint was filed, the civil action was consolidated by the Judicial Panel on Multidistrict Litigation and transferred to the Southern District of New York. See id. [Dkt. No. 157] at 8–9.

26    The term "worldwide," as used by Dr. Lee and adopted in this opinion, excludes countries where the operation of ad tech companies is substantially restricted by government censorship of the Internet (e.g., China) or U.S. economic sanctions (e.g., Iran). See Tr. Sept. 19 PM 122:6–9 (Lee (Pls. Expert)).

**United States v. Google LLC, --- F.Supp.3d ---- (2025)**

27    Fed. Trade Comm'n Closes Google/DoubleClick Investigation, FTC (Dec. 20, 2007), https://www.ftc.gov/news-events/news/press-releases/2007/12/federal-trade-commission-closes-googledoubleclick-investigation. This conclusion can be challenged with the benefit of hindsight, as it has been by one of the FTC commissioners who initially reached it. See Steve Lohr, This Deal Helped Turn Google Into an Ad Powerhouse. Is That a Problem?, N.Y. Times (Sept. 21, 2020), https://www.nytimes.com/2020/09/21/technology/google-doubleclick-antitrust-ads.html. But it would be a substantial step to find that an acquisition violated the Sherman Act after it was reviewed and approved by federal antitrust regulators.

28    See Statement of the Dep't of Justice's Antitrust Div. on Its Decision to Close Its Investigation of Google Inc.'s Acquisition of Admeld Inc., U.S. Dep't of Justice (Dec. 2, 2011), https://www.justice.gov/opa/pr/statement-department-justices-antitrust-division-its-decision-close-its-investigation-google. In a pre-trial order, the Court prohibited Google from introducing "evidence or argument about antitrust enforcers' review, comments, and decisions not to challenge Google's acquisitions" of DoubleClick and Admeld so that the parties would focus their arguments at trial on the merits of these acquisitions, [Dkt. 1303] at 1; however, the Court has taken judicial notice of the fact that the acquisitions were approved by antitrust regulators. See United States v. Garcia, 855 F.3d 615, 621 (4th Cir. 2017) (stating that courts "routinely take judicial notice of information contained on state and federal government websites"). That such approval was given when the acquisitions occurred does not prohibit a finding that the use of these acquisitions over time has resulted in violations of the Sherman Act.

29    Project Poirot also enhanced AdX's market power by adjusting some of DV360's bids in a way that preferred AdX over third-party ad exchanges. See Section V(I), supra. But Project Poirot occurred within DV360, a Google ad buying tool which is not within any of the relevant antitrust markets, and the evidence suggests that Project Poirot was a reasonable method for protecting Google's advertiser customers from third-party ad exchanges that were running unfair auctions. See Tr. Sept. 11 PM 53:2–54:4 (Ravi (Pls. Expert)); Tr. Sept. 19 AM 137:14–138:5 (Bellack (Google)); Tr. Sept. 24 AM 115:16–25 (Milgrom (Def. Expert)). Therefore, the Court does not consider Project Poirot as part of the anticompetitive conduct through which Google willfully acquired and maintained its monopoly power.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.