## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| Federal Trade Commission, et al., | |
| Plaintiffs, | Case No.: 25-cv-50017 |
| v. | Judge Iain D. Johnston |
| Deere & Co., | |
| Defendant. | |

### MEMORADUM OPINION AND ORDER

Sequels so rarely beat their originals that even the acclaimed Steve Martin couldn't do it on three tries. *See Cheaper by the Dozen II*, *Pink Panther II*, *Father of the Bride II*.[1] Rebooting its earlier production, Deere sought to defy the odds. To be sure, like nearly all sequels, Deere edited the dialogue and cast some new characters, giving cameos to veteran stars like *Humphrey's Executor*. But ultimately the plot felt predictable, the script derivative. *Deere I* received a thumbs-down, and *Deere II* fares no better. The Court denies the Motion for judgment on the pleadings.

***

**Background**[2]

The "largest manufacturer of agricultural equipment in the United States," Deere "dominat[es]" the large tractor and combines market. Dkt. 138 ¶ 35. This

---

[1] *But see Terminator II.*
[2] The Court accepts the following allegations as true to decide this Motion.

equipment, costing hundreds of thousands of dollars, is indispensable to the production of numerous staple crops. *Id.* ¶ 33. When purchasing new equipment, farmers can't "calculate lifecycle pricing—that is fully determine in advance the total cost" for repairs and parts over the machine's lifetime. *Id.* ¶ 75.

Today's farm equipment relies on devices called Electronic Control Units ("ECUs"), essentially "small computers that monitor and control particular functions." *Id.* ¶ 88. So, what happens when a farmer's tractors aren't working right? Once upon a time, the farmer could repair her machines on her own or take them to local technicians (Independent Repair Providers or "IRPs"). *Id.* ¶ 89. But, today, even Spicoli's old man's ultimate set of tools couldn't fix it. Instead, to diagnose and fix problems, the equipment requires an "interactive software" that can communicate with the equipment's onboard ECUs. *Id.* ¶ 7.

Deere developed such a tool, which it calls "Service ADVISOR." *Id.* The software can perform diagnostic tests, identify and clear error codes, and access Deere's troubleshooting database. *Id.* ¶ 49. The device is "critical" in fully diagnosing problems and completing repairs. *Id.* ¶ 51. Indeed, some repairs—what the Governments[3] call "restricted repairs"—can *only* be completed with the Service ADVISOR software. *Id.* ¶ 71.

---

[3] Unless otherwise noted, the Court refers to the FTC and the State Plaintiffs collectively as "Governments."

But not everyone gets that Service ADVISOR tool. *Id.* ¶ 8. Deere licenses the product only to its "Authorized Dealers."[4] *Id.* These Authorized Dealers sell tractors and parts, and provide repair services. *Id.* ¶ 3. Deere doesn't sell its equipment directly to farmers. *Id.* ¶ 38. Though not formally related, "Deere appoints dealers to act as its authorized dealers, oversees changes to its dealers' ownership and business structures, and has contractual rights to terminate any Deere dealer." *Id.* ¶ 3.

In addition to selling and repairing equipment, the Authorized Dealers also sell replacement parts, including Deere-branded parts, which Deere Dealers are required to "actively and aggressively promote." *Id.* ¶ 3. These Dealers source "the vast majority" of their parts from Deere. *Id.* ¶ 84. And, in repairing equipment, Dealers rely "almost exclusively" on Deere-branded parts. *Id.* ¶ 85. That's in contrast to many DIY Farmers and IRPs, who use generic, cheaper alternatives. *Id.* ¶¶ 95–99. Deere and its Dealers reap "massive profits" from these sales. *Id.* ¶ 86–87.

\*\*\*

The Governments say there's a throughline between Deere's practices: Farmers have no alternatives because of the system created by Deere, which charges supracompetitive prices because of the lack of any alternatives. In technologizing its equipment, Deere makes farmers reliant on Deere's own ADVISOR software. And, in only licensing that software to its Authorized Dealers, Deere forces farmers to visit

---

[4] Deere offers its "Customer Service ADVISOR," a tool with "limited" functionalities to non-Dealers, but farmers and IRPs "do not consider [it] as a reasonable substitute" for the fully functional ADVISOR. *See id.* ¶¶ 48–54.

those shops instead of using closer, cheaper options. Once in the door, Deere Dealers sell Deere parts, which are comparable to other brands in quality but higher in price. And those parts sales, in turn, significantly boost Deere's profits.

In January 2025, the FTC and co-Plaintiff States, Arizona, Illinois, Michigan, Minnesota, and Wisconsin sued, alleging unlawful monopolistic behavior under Section 2 of the Sherman Act, 15 U.S.C. § 2, and related state statutes. The FTC also brings unfair competition claims under Section 5 of the FTC Act, 15 U.S.C. § 45(a).

In 2022, a group of agricultural crop farms and farmers filed an MDL action in this Court. E.C.F. 22-cv-50188, dkt. 85. That complaint centered on essentially the same underlying conduct, but invoked more legal theories. This Court denied Deere's motion for judgment on the pleadings in that case.

**Analysis**

When challenging the sufficiency of a complaint, a motion for judgment on the pleadings under Rule 12(c) is governed by the same standard as a motion to dismiss under Rule 12(b)(6). *Pisciotta v. Old Nat'l Bancorp.*, 499 F.3d 629, 633 (7th Cir. 2007). The complaint must contain only a "short and plain statement of the claim showing that the pleader is entitled to relief." F.R.C.P. 8(a)(2). The complaint must give the defendant fair notice of what the claim is and the grounds upon which it rests. *Piscotta*, 499 F.3d at 633. Factual allegations must be enough to raise a right to relief above the speculative level. *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The court draws all reasonable inferences and facts in the nonmovant's favor. *Wagner v. Teva Pharms. USA, Inc.*, 840 F.3d 355, 358 (7th Cir. 2016). The movant

4

bears the burden of establishing a complaint's insufficiency. *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 806 (7th Cir. 2020).

Deere argues that the Governments' monopolization and unfair competition claims are insufficient, both factually and legally. Deere also challenges the FTC's constitutional structure, the States' standing, and the timeliness of the States' claims. The Court addresses each argument in turn.

    *(a)*    *Section 2 Claim*

Section 2 of the Sherman Antitrust Act imposes liability on "[e]very person who shall monopolize . . . any part of the trade or commerce among the several states." 15 U.S.C. § 2. A firm violates Section 2 only when it "both (1) possesses monopoly power in the relevant market, *and* (2) engages in the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 451 (7th Cir. 2020) (citing *Verizon Comms., Inc. v. Law Off. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004)); *United States v. Grinell Corp.*, 384 U.S. 563, 570–71 (1966).[5]

Before further analysis, the Court will address the Parties' textual arguments. Both Deere and the Governments say Section 2's text supports their positions. *Compare* dkt. 110 at 12–13 (Deere focusing on "monopolize") *with* dkt. 138 at 10 (the Governments emphasizing "any part of"). The Court always appreciates textual

---

[5] Deere asserts and the States don't contest that the States' respective antitrust laws mirror the Sherman Act, so the Court doesn't separately analyze those statutes.

arguments. But totaling a few words and offering no definitions, the Sherman Act's text provides courts with little guidance. Indeed, if it did, cases interpreting those sentences wouldn't fill so many reporters. For better or worse, the Court must look beyond the text.

### (1)    Monopoly Power in the Relevant Market

The Court considers whether the Governments adequately plead (i) a cognizable aftermarket, and (ii) that Deere possesses monopoly power in that aftermarket.

### (i)    Aftermarket

"The relevant market for antitrust purposes can be an *aftermarket*—where demand for a good is entirely dependent on the prior purchase of a durable good in a *foremarket*." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 976 (9th Cir. 2023); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992). The Governments allege cognizable aftermarkets for "fully functional repair tools and restricted repair services." Dkt. 138 at 4. A plaintiff must only plausibly plead a market's "rough contours." *See In re Deere & Co. Repair Servs. Antitrust Litig.*, 703 F. Supp. 3d 862, 890 (N.D. Ill. 2023) ("*Deere MDL*").

Deere, like it did in its MDL motion, argues that the Governments fail to plead a *Kodak*-qualifying aftermarket. Dkt. 110 at 8–11. And again, the Court "questions" whether *Kodak* even applies in this situation. *Deere MDL*, 703 F. Supp. 3d at 896. "[T]he issue presented to the Supreme Court [in *Kodak*] was whether a defendant's *lack of market power* in the primary equipment market precludes—as a matter of

law—the possibility of market power in derivative aftermarkets." *Id.* at 891. The Governments, however, allege that Deere is the "leading manufacturer" and holds a "dominant" position in the tractor (*i.e.* fore) market. Dkt. 44 ¶ 3. As the Governments note, at least one other court similarly believes *Kodak* doesn't apply in these scenarios. *See Lambrix v. Tesla, Inc.*, 737 F. Supp. 3d 822, 840 (N.D. Cal. 2024). Deere says *Tesla*'s just a "single out-of-circuit district court decision." Dkt. 149 at 5. But *Tesla* is in addition to *this* Court's decision in the MDL case, identically analyzing *Kodak*.

Regardless, the Governments adequately plead a *Kodak* aftermarket. As a refresher, under *Kodak*, the aftermarket analysis focuses on "two interrelated circumstances," either of which can create a cognizable aftermarket. *Deere MDL* at 892. The first is a "bait-and-switch" scenario, in which a company sells an expensive product in the foremarket and then changes its repair policies. *See id.* The second "involves the inability of the customer to determine [the] 'all in cost' or 'life cycle' cost for the product." *Id.* A change in policy is "*one way*" to satisfy *Kodak*, but it's not the "exclusive means of doing so." *Id.* at 899.

The Governments allege that, at the initial purchase time, "Deere's customers cannot calculate lifecycle pricing—that is, fully determine in advance the total cost of ownership over the life of the equipment, which includes the costs of repairs and parts over time." Dkt. 44 ¶ 75. Nor does Deere "make the lifecycle pricing information that it has available to customers." *Id.* Various factors, the Governments say, make it impossible to "estimate with certainty" repair costs and service requirements. *Id.*

7

Deere says "[t]hose allegations do not plausibly demonstrate a lack of 'awareness regarding Deere's aftermarket restrictions.'" Dkt. 149 at 4 (citing *Deere MDL* at 899). That's especially the case, Deere says, because the Governments allege that Deere's practices have "persisted 'for decades.'" Dkt. 110 at 9. Indeed, the first two words in the Governments' complaint are "For decades." So, "[t]here can be no customer lock-in, and no single-brand aftermarket," Deere asserts, when "customers purchased their equipment with full knowledge of Deere's repair practices." *Id.* Deere effectively made the same argument in the MDL case, arguing that "everybody knew" about Deere's policies. *See Deere MDL* at 894.

The Court understands and recognizes Deere's argument—especially in light of the Governments' own allegations—but disagrees these allegations are dispositive of the whole action, entitling Deere to judgment on the pleadings. Even if some farmers knew about the restrictions (a fact question), they might not be aware of or appreciate at the purchase time how those restrictions will affect them. For example: How often will repairs require Deere's ADVISOR tool? How far will they need to travel to find an Authorized Dealer? How much extra will they need to pay for Deere parts? And, in any event, "[f]rom a practical perspective, the relevance of information costs, switching costs, and general knowledge of restrictions is reduced where a defendant has market power in the foremarket." *Tesla, Inc.*, 737 F. Supp. 3d at 841.

Taking the allegations as true and drawing inferences in the Governments' favor, the Governments sufficiently plead a cognizable aftermarket.[6]

>    (ii)    Market Power

Next, the Court addresses whether the Governments adequately plead that Deere holds sufficient market power in the identified repair tools/services markets. Deere argues that "settled law holds that a firm" can't monopolize a market in which it doesn't compete." Dkt. 110 at 11–12 (citing out-of-circuit cases). Deere tried essentially the same argument in the MDL action, saying it didn't have power in the repairs market "because the [d]ealerships—not it—perform the repairs." *See Deere MDL* at 911. First, without clearly defining "compete" or "participate," Deere's cited cases offer little help. To the extent that a firm must "compete" or "participate" in a market to monopolize it, what do those terms mean and how do they apply in this case? As discussed more below, the Governments argue that, through its conduct, Deere *effectively* participated in—and monopolized—the alleged markets. Perhaps discovery shows that Deere wasn't sufficiently involved so that it didn't "participate" or "compete" as those terms are used in antitrust law. But those terms suggest complex fact questions unresolvable at the pleading stage.

Deere's cases fall short for other reasons, too. First, like this Court, the Second Circuit in *Discon* recognized that "due to the complexity of modern business transactions . . . easy labels do not always supply ready answers." 93 F.3d 1055, 1059

---

[6] The Court folds Deere's argument that "there can be no aftermarket under *Kodak* where the defendant does not participate in the aftermarket" into the next section on aftermarket monopoly power. Both arguments involve what it means to "participate" in a market, so it makes sense to tackle them together.

2d. Cir. 1996) (citing *Broadcast Music Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 8 (1979)).   Moreover, though the Second Circuit affirmed the monopolization dismissal, it reversed on the "Conspiracy to Monopolize" theory.   *Discon*, 93 F.3d at 1062.   In other words, it found a plausible Section 2 violation, albeit on a different legal theory.   As discussed more below, this Court doesn't believe that the Governments must include a "conspiracy" label to survive dismissal.

Next, *Intergraph Corp. v. Intel Corp.*, which involved a more distant relationship but broadly supports Deere's position, was vacated on a preliminary injunction standard.   195 F.3d 1346 (Fed. Cir. 1999).   A "*likelihood* of success" is a higher bar than mere plausibility.   *Ushery v. Antonelli*, 21-cv-611, 2022 U.S. Dist. LEXIS 77531, at *5 (M.D. Fla. Apr. 27, 2022) ("That Plaintiff *may* have stated a plausible claim against one or more Defendants does not mean he has demonstrated a likelihood of success on the merits of such a claim."); *see also Ill. Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020).   Finally, the defendant in *Aquatherm Indus., Inc. v. Fl. Power & Light Co.*, 145 F.3d 1258 (11th Cir. 1998) bears no resemblance to Deere.   In that case, a defendant energy provider encouraged the public to use swimming pool heaters, "sole[ly] . . . to increase the use of electrical power."   *Id.* at 1260.   Unlike Deere, who allegedly benefits substantially from and holds contractual relationships with its Dealers, the *Aquatherm* defendants was not involved at all in the heater market.   *Id.*

Those distinguishable cases aside, this Court still believes that the "the issue is not whether Deere is a seller of Repair Services.   Instead, the issue is whether

Deere has monopoly power in the relevant market. This is determined by showing that Deere could control prices or exclude competition." *Id.* (citing *Grinnell Corp.*, 384 U.S. at 571). Like the MDL plaintiffs, the Governments "easily" allege sufficient power. "Through its limited distribution of the repair tool," the Governments allege, "Deere controls entry into, and limits output in, the provision of such services. Dkt. 44 ¶ 11. Consequently, "Deere's dealers are able to maintain a 100% market share and charge supracompetitive prices for restricted repairs." *Id.*; *see also id.* ¶¶ 8–11, 110–12.

Nevertheless, Deere says the Court must dismiss the Complaint, because unlike the MDL plaintiffs, these Plaintiffs don't explicitly allege a conspiracy, so there's no "participation." Dkt. 110 at 13–14. The Court doesn't believe magic words are relevant—let alone determinative—in antitrust analysis. As the Court stressed last time, "[c]ourts should look at substance over labels," because "labels and antitrust law don't mix." *Deere MDL* at 903 (citing *Siva v. Am. Bd. of Radiology*, 38 F. 4th 569, 572 (7th Cir. 2022). Functionally, the market power analysis focuses on whether the defendant has the "power to control prices or exclude competition." *Grinnell Corp.*, 384 U.S. at 571. So long as a plaintiff plausibly alleges such control, how the defendant exerts it isn't meaningful at this stage under Section 2.

Defining "participate" too formally, Deere's theory isn't persuasive. It's true that Deere leaves repair services and parts sales to Authorized Dealers (whom Deere "oversees" and may "terminate," dkt. 44 at 3). But, accepting the allegations as true, Deere "reaps massive profits" from its parts business, which relies on those

Authorized Dealers' repairs. And because only Deere can create and license the ADVISOR tool, it entirely controls who (and how many) Dealers may perform restricted repairs and, by extension, how much the Dealers can charge. All that control is irrelevant, Deere essentially says, as long as Deere keeps its Dealers at some nominal distance.

Maybe not in the same words or even the same number of words, but in substance, the Governments and the MDL plaintiffs advance identical theories supporting their respective claims—setting aside the fact that theories aren't need at this stage. Both assert that Deere, via its Authorized Dealers, holds enough power to control prices and exclude competition. And they both allege that Deere financially benefits from its arrangements with the Dealers. So, the Governments functionally—although not formally—allege the same market participation.

All of this leads to a related question: What's the goal? Say the Court dismisses because the Governments' complaint failed to use the word "conspiracy." Such a dismissal would surely be without prejudice. *See Foster v. DeLuca*, 545 F.3d 582, 584 (7th Cir. 2008) ("[District courts] generally dismiss the plaintiff's complaint without prejudice and give the plaintiff at least one opportunity to amend her complaint."); *see also Zimmerman v. Bornick*, 25 F. 4th 491, 493–94 (7th Cir. 2022) ("What most concerns us is the district court's failure not to allow Zimmerman an opportunity to try again by filing an amended complaint."). Under Deere's theory, the Governments need only adopt the MDL plaintiffs' vocabulary to similarly survive a motion to dismiss. That's an illogical result at odds with antitrust law's focus on substance over

12

form. Because the Governments, like the MDL plaintiffs, assert that Deere can control prices and exclude competition, it adequately alleges that Deere holds market power.

### (2) Anticompetitive Conduct

The Court now considers whether the Governments adequately allege that Deere engages in anticompetitive conduct by limiting access to its fully functional repair tool. To avoid the result in the MDL case, Deere again focuses on labels, contenting that the Governments must slot its theory into a recognized antitrust category. For the same above reasons—essentially that function beats form in antitrust matters—the Court rejects Deere's arguments.

Section 2 bars monopolists from using their monopoly power to foreclose competition, gain competitive advantage, or destroy competitors. *See Kodak*, 504 U.S. at 482–83. Courts have developed "categories," such as "refusal to deal," "predatory pricing," and "tying," to help illustrate how monopolists unlawfully wield their power. But remember pleading "categories"—like pleading theories—isn't required. *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("[W]e have stated repeatedly (and frequently) that a complaint need not plead legal theories. . ."); *see Whitaker v. Milwaukee County*, 772 F.3d 897, 808 (7th Cir. 2014). "Rule 8(a) does not require plaintiffs to 'pin' their claim for relief to any particular legal theory at the pleading stage." *Zimmerman*, 25 F. 4th at 493. Indeed, even specifying an incorrect legal theory is not fatal. *Rabe v. United Airlines, Inc.*, 636 F.3d 866, 872 (7th Cir. 2011).

What's more, the Seventh Circuit explained that "[a]t bottom, the purpose of identifying these categories . . . is to help determine the presence or absence of harmful effects, which are both the reason for any antitrust concern and often the simplest element to disprove." *Viamedia*, 951 F.3d at 453 (citations omitted). So, though courts may start by assessing how conduct fits within a recognized category, they "should stay focused on the *effect*" the conduct has on competition. *Id.* (emphasis added); *accord Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337 (4th Cir. 2024) ("Section 2 focuses on anticompetitive conduct, not on court-made subcategories."); *Deere MDL* at 903 ("[L]ooking at substance over form is a consistent theme in antitrust and prevents the broad prohibitions imposed by the antitrust laws from being circumvented.") (quoting Daniel A. Hanley, *Per Se Illegality of Exclusive Deals and Tyings with Fair Competition*, 37 Berkeley Tech. L.J. 1057, 1067 n.47 (2022)).

Just as a certain conduct could fit within multiple categories, it's unsurprising that anticompetitive conduct "cannot always be categorized" at all. *Duke Energy*, 111 F.4th at 354. As the Supreme Court long ago recognized, "there is no limit to business ingenuity and legal gymnastics." *Atl. Refining Co. v. F.T.C.*, 381 U.S. 357, 367 (1965). "Thus, when a court is faced with allegations of a complex or atypical exclusionary campaign, the individual components of which do not fit neatly within pre-established categories, its application of such specific conduct tests would prove too rigid." *Duke Energy*, 111 F.4th at 354. "[T]he scheme or conduct must be considered as alleged, not in manufactured subcategories." *Id.* at 355.

14

The Governments and the MDL plaintiffs allege substantively identical anticompetitive conduct. Both assert that, to fully repair Deere equipment, farmers require the Deere ADVISOR tool. Deere, however, only makes that tool available to its Authorized Dealers, forcing customers to a single source for repairs. That arrangement drives Deere's profits and sustains its monopoly power, while leading to higher prices and fewer options. On those allegations, the Court found that the MDL plaintiffs plausibly alleged anticompetitive behavior. Without elevating form over substance (which is inappropriate at this stage), the Court can't reach the opposite conclusion on this Motion.

The Court rejects Deere's argument that the Governments must slot Deere's behavior into a certain antitrust category at this stage. So, it doesn't decide whether the allegations meet a particular definition. However, Deere seems to skip some steps in the refusal to deal analysis. As a "general rule . . . even monopolists are free to choose the parties with whom they will deal." *Viamedia*, 951 F.3d at 454 (citing *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919) (cleaned up)). First, as the Governments note, Deere might owe some duty to its farmer–customers, if not its rivals. Deere, in Reply, says the Governments unfairly treat the farmers as competitors for some purposes and customers for others. Perhaps. More importantly, however, the *Colgate* Court qualified its general rule, prefacing it with "*In the absence of any purpose to create or maintain a monopoly*." *See Viamedia*, 951 F.3d at 454 (emphasis in *Viamedia*) (cleaned up). In other words, if the monopolist acts with the intent to maintain a monopoly, then the general rule doesn't apply and courts may

15

examine the refusal to deal. The Court, at this stage, can't possibly ascertain Deere's intent in limiting its ADVISOR tool. It may only accept the Governments' version as true and make reasonable inferences based on it. When it does so, the Governments sufficiently allege either via a refusal to deal theory or otherwise that Deere acts unlawfully.

***

"[E]ven after *Iqbal* and *Twombly*, the purpose of a complaint is to put the defendant on notice of the claims against it, not to prove its case." *Deere MDL* at 910. (citing *Bausch v. Stryker Corp.*, 630 F.3d 546, 559 (7th Cir. 2010)). Notice pleading requires fair notice to defendants. It can't be reasonably argued that Deere is scratching its metaphorical head and muttering, "I wonder what the Governments are complaining about?" If Deere's position is that it knows what the Governments are complaining about but that those complaints are not legally cognizable, the Court disagrees, as it has already found. The Court could be wrong in this regard but redressing any error in this regard is for either a later stage or a different court. The Governments likely need to sharpen their theories—and, of course, present admissible evidence supporting those theories—to survive summary judgment, but the Complaint plausibly raises a Section 2 violation.

    *(b)    FTC Act Claim*

The FTC also alleges that Deere violated Section 5(a) of the FTC Act, prohibiting unfair methods of competition. 15 U.S.C. § 45(a). The Court found a plausible Sherman Act violation, so the FTC necessarily alleges a plausible Section

5(a) violation, too. *FTC v. Actavis*, 570 U.S. 136, 145 (2013) (Section 5 "encompasses" the Sherman Act). In this case, the analyses also merge into one another, both turning on whether the Governments, at this stage, must slot Deere's conduct into a particular category (no) and alternatively whether Deere may refuse to deal under the circumstances (plausibly no).

In any event, as Deere concedes, the FTC Act is at least "in limited respects" broader than the Sherman Act. Dkt. 110 at 22. As the Supreme Court explained, "[i]n a broad delegation of power the [FTC Act] empowers the Commission, in the first instance, to determine whether a method of competition or the act or practice complained of is unfair." *Atl. Refining*, 381 U.S. at 367. "While the final word is left to the courts," *id.*; *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), courts give "great weight to the Commission's conclusion." *Atl. Refining*, 381 U.S. at 368.

The FTC adequately alleges an "unfair" competition claim, when it plausibly suggests (1) market power, (2) exercise of that power, and (3) that anticompetitive effects result from that exercise. *See F.T.C. v. Texaco*, 393 U.S. 223, 226 (1968). In this case, the FTC alleges that Deere holds monopoly power in the repair tools and services aftermarkets, that it exercises that power by limiting access to repair tools and services, and that higher prices and fewer options result. The FTC further alleges that Deere's practices benefit its bottom line.[7] So, the FTC alleges a plausible Section 5(a) violation.

---

[7] Deere cites a Second Circuit Case, *Off. Airline Guides, Inc. v. FTC*, 630 F.2d 920 (2d Cir. 1980), that found no duty to deal. For the above reasons—both that the FTC doesn't need to slot its allegations into a particular category at this stage and that the "no duty" rule

*(c)    FTC's Constitutionality*

The Court next considers whether the FTC can constitutionally bring this suit. The FTC is (usually) led by five commissioners, all nominated by the President and confirmed by the Senate.  15 U.S.C. § 41.  Under the statute, a President may remove commissioners only for "inefficiency, neglect of duty, or malfeasance."  *Id.*   The Supreme Court upheld that removal restriction in *Humphrey's Executor*, 295 U.S. 602 (1935).  "Rightly or wrongly, the [*Humphrey's Executor*] Court viewed the FTC (as it existed in 1935) as exercising 'no part of the executive power.'"  *Seila Law LLC v. Cons. Fin. Prot. Bureau*, 591 U.S. 197, 215 (2020) (citing *Humphrey's*, 295 U.S. at 628).  Instead, the *Humphrey's* Court said the FTC was an "administrative body," exercising only "quasi-legislative or quasi-judicial powers."  *Seila Law*, 591 U.S. at 216 (citing *Humphrey's*, 295 U.S. at 628).

In 1973, Congress vested the FTC with more, non-legislative, non-judicial powers, allowing it to seek injunctive relief in any federal court.  FTC Act § 13(b), 15 U.S.C. § 53(b); "Section 13(b)."  The ability to bring a lawsuit, the Supreme Court has indicated, is a uniquely executive function.  *See United States v. Texas*, 599 U.S. 670, 679 (2023) (citing *Buckley v. Valeo*, 424 U.S. 1, 138 (1976) ("A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to 'take Care that the laws be faithfully executed.'")).  Over the past fifty years, the FTC has invoked its Section

---

only applies "in the absence of any" anticompetitive purpose—the Court doesn't find this case persuasive.

13(b) powers at least hundreds of times.[8]  All of those, Deere seems to say, were "void ab initio."  Dkt. 149 at 17.

In the past decade or so, the Supreme Court has held that the President must be able to freely remove certain agency officials who exercise executive power.  *See Free Ent. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010); *Seila Law*, 591 U.S. at 216.  Though nominally preserving *Humphrey's Executor*, those recent decisions have largely "repudiated almost every aspect of [it]."  *Seila Law*, 591 U.S. at 239 (Thomas, J., concurring).  *Humphrey's Executor* may not be deader than Elvis, but it seems to have at least one foot in the grave.  *See Trump v. Wilcox*, No. 24A966, 2025 U.S. LEXIS 1984 (May 22, 2025) (granting stay because the government "is likely to show" that the removal provision of the NLRB—a similar agency—violates the Constitution).

But even assuming the removal restrictions are unlawful, Deere's argument that the proper remedy is to strike down Section 13(b) doesn't follow.[9]  As the Governments note, "[s]ettled precedent . . . confirms that the unlawfulness of [a] removal provision does not strip the officer of the power to undertake the . . . responsibilities of his office."  *Collins v. Yellin*, 594 U.S. 220, 257–58 (2021).  No Parties argue that the Commissioners were unlawfully *appointed*, so "[a]lthough the

---

[8] *See, e.g.*, *F.T.C. v. Rhinechem Corp.*, 459 F. Supp. 785 (N.D. Ill. 1978); *F.T.C. v. Univ. Health, Inc.*, 938 F.2d 1206 (11th Cir. 1991); *F.T.C. v. Swedish Match*, 131 F. Supp. 2d 151 (D.D.C. 2000); *F.T.C. v. Pukke*, 123 F.4th 162 (4th Cir. 2024); *see also* FTC, *Legal Library: Cases and Proceedings*, FTC.gov.

[9] Deere doesn't argue that the removal restrictions, on their own, are unconstitutional. Rather, it contends that the removal restrictions combined with the additional executive powers creates an unconstitutional product.  Still, the underlying question remains: What's the appropriate remedy?

statute unconstitutionally limit[s]" the President's removal power, "there is no reason to regard any of the actions taken by the [FTC] . . . as void." *Id.* at 257–58; *see also Nat'l Lab. Rels. Bd. v. Starbucks Corp.*, 125 F.4th 78, 87 (3d Cir. 2024) ("The Supreme Court instructs that where an official's removal protections are unconstitutional, he can still carry out his duties, which does not hold true if his appointment was unconstitutional.").

And even if the removal restrictions created constitutional problems, they haven't injured Deere, so Deere likely wouldn't have standing to challenge them. "[A]fter *Collins*, a party challenging agency action must show not only that the removal restriction transgresses the Constitution's separation of powers but also that the unconstitutional provision caused (or would cause) them harm." *Bhatti v. Fed. Hous. Fin. Agency*, 97 F.4th 556, 559 (8th Cir. 2024) (citing *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. Consumer Fin. Prot. Bureau*, 51 F.4th 616, 632 (5th Cir. 2022)); *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 756 (10th Cir. 2024); *Collins*, 594 U.S. at 264 ("The mere existence of an unconstitutional removal provision . . . generally does not automatically taint government action by an official unlawfully insulated.") (Thomas, J. concurring). In this case, the FTC initially voted to commence litigation under then-President Biden, and Deere doesn't assert that he disagreed with the Commissioners' judgment. And the current FTC, which believes its Commissioners are removable at-will, are proceeding with this litigation—at least for now. So, Deere can't challenge the removal regime because the provision doesn't harm it.

Deere didn't contend with *Collins* in its opening brief. In Reply, it proposes a conclusory distinction with no meaningful difference, asserting that *Collins* doesn't apply because that case didn't involve an amendment that was "void ab initio." Despite *Collins*, Deere asks this Court to void the Section 13(b) amendment and thereby this action. It says two cases show that's the proper remedy. In *Bowsher v. Synar*, Congress created the Comptroller General position to assist Congress in budgetary matters. 478 U.S. 714 (1986). Under the governing statute, Congress retained the power to remove the Comptroller. *Id.* at 728. Decades later, Congress vested the Comptroller with new executive powers, including the "ultimate authority to determine budget cuts to be made." *Id.* at 733. The Supreme Court rejected requests to invalidate the earlier removal provision, striking down the later executive-power-conferring amendment instead.

Deere says this Court should do the same: Retain the for-cause removal restriction and merely excise the FTC's Section 13(b) enforcement powers, apparently "limit[ing] the solution to the problem." Dkt. 110 at 27 (citing *Barr*, 591 U.S. at 625). But, as the FTC notes, the *Bowsher* Court struck the later amendment because Congress "explicitly" told it do so, enacting a "fallback" provision to preserve the original Comptroller General statute. *Id.* at 736. No such clear instruction exists in this case. It's true that Congress enacted a severability provision, which Deere says functions as a command to strike Section 13(b). But as another court in this district observed "the constitutional problem at issue centers on the interaction of the Commissioners' removal protections with the subsequent litigation authority given

to the agency, not an unconstitutional amendment to an earlier law." *F.T.C. v. Walmart Inc.*, 664 F. Supp. 3d 808, 845 (N.D. Ill. 2023) (rejecting an identical argument and relying on *Collins*). "In other words, the grant of executive power to the FTC, standing on its own, isn't unconstitutional: executive agencies often have power to sue for penalties or injunctive relief." *Id.* So, the severability clause doesn't provide any guidance.

Deere also relies on *Barr v. Am. Ass'n of Pl. Consultatnts, Inc.*, 591 U.S. 631 (2020). In that case, which doesn't implicate presidential powers, Congress initially enacted legislation to bar all robocalls. *Id.* at 614. In a later amendment, Congress exempted robocalls that were aimed at collecting government debt. The Court struck down the Amendment—but not the initial statute—finding that it constituted content-based discrimination and therefore subject to heightened scrutiny. In other words, unlike the Section 13(b) amendment, the provision in *Barr* itself violated the Constitution.

Further, both *Bowsher* and *Barr* involved constitutionally infirm amendments to otherwise healthy legislation. So, it made sense to amputate those parts. It's the reverse in this case: No one questions that an agency, under proper removal regimes, may bring a Section 13(b)-like enforcement action. But the FTC, Deere, and (likely) the Supreme Court all believe that the FTC's removal structure is highly suspect, if not unconstitutional. So, it makes no sense to strike down the enforcement mechanism under these circumstances.

For the past fifty years, the FTC has brought Section 13(b) cases hundreds of times. Deere points to no court that found the Section unconstitutional. The Court declines the invitation to be the first.

(d)     *States' Standing*

Deere also contests the States' standing, "both in their sovereign capacities and under a *parens patriae* theory." Dkt. 110 at 28. In their Response, the States defend only their *parens patriae* standing. *See* dkt. 138 at 35.

According to the Seventh Circuit, a state will have standing to sue as *parens patriae* "where it can 'articulate an interest apart from the interests of particular private parties' and 'express a quasi-sovereign interest.'" *LG Display Co., Ltd. v. Madigan*, 665 F.3d 768, 771 (7th Cir. 2011) (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel Barez*, 458 U.S. 592, 607 (1982)). Understandably, Deere argues the States failed on both prongs of this seemingly two-part test. Dkt. 110, at 36–37; Dkt. 149, at 25. The States primarily respond to the quasi-sovereign interest aspect. Dkt. 138, at 35-36. As to the aspect that the States' interest must be apart (meaning different) from "the interests of particular private parties," the States simply cite to *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 261 (1972), which isn't particularly helpful in this context.

If a court were to read *LG Display* as requiring states to show both that their interests are separate and distinct from private parties (in this case, the MDL Plaintiffs) *and* an express quasi-sovereign interest, Deere has a good point, particularly in light of the States' weak response and minimal allegations. But the

23

Court has a slightly different reading of *LG Display* because it specifically relies on *Snapp & Son Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592 (1982).

In *Snapp*, the Supreme Court ruled that for a state to bring a *parens patriae* action, "the State must articulate an interest apart from the interests of particular private parties, *i.e.*, the State must be more than a nominal party. The State must express a quasi-sovereign interest." 458 U.S. at 607. So, these aspects—an interest apart from private parties and a quasi-sovereign interest—are not separate, independent requirements. Instead, the later is a way of establishing the former. Expressing a quasi-sovereign interest is simply *a* way a state can show that its interests are separate and distinct from private parties, *i.e.*, that it's not just a nominal party.

States have quasi-sovereign interests in the "health and well-being—both physical and economic—of its residents in general." *Snapp*, 458 U.S. at 607. An "alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as *parens patriae* [if] the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers." *LG Display Co.*, 665 F. 3d at 771 (quoting *Snapp*, 458 U.S. at 607).

As the States note, each of them "has enacted antitrust laws mirroring the federal antitrust laws." Dkt. 138 at 28 fn. 7 (collecting statutes). In other words, not only *could* the state attempt to address an antitrust injury, they *did*. That "counsels in favor of finding" that the states have *parens patriae* standing. *Texas v. Google LLC*, No. 4:20-957, 2025 U.S. Dist. LEXIS 15071, at *58–59 (E.D. Tex. Jan. 28, 2025)

(finding *parens patriae* standing in antitrust case). That's also why *Missouri ex. rel. Koster v. Harris* is inapposite. In that case, the States didn't sue under an antitrust theory, and therefore couldn't point to their own legislative attempts to combat uncompetitive practices. 847 F.3d 646 (9th Cir. 2017). In this case, all of the states have their own antitrust statutes, indicating that they find violations harmful enough to require legislation. Deere's right that an identical antitrust statute *alone* can't create standing without circumventing Article III, but the States also include some (albeit few) allegations.

In assessing *paren patriae* standing, courts must consider the "direct and indirect effects of the alleged injuries." *LG Display*, 665 F.3d at 771. Accepting the States' allegations as true *and drawing inferences in their favor*—as the Court must— the States plausibly allege unique harms sufficient to survive the pleadings stage. For example, they assert that Deere's conduct prevents farmers from "maximiz[ing] crop yield," which can harm the states' food supply, economy, and health outcomes. *See* dkt 44 ¶ 12; dkt. 138 at 28–29. So, those allegations, combined with their own statutes attempting to remedy the antitrust injuries, allow the States to eke out standing. At later stages, the States will need to establish more. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter in which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the

successive stages of the litigation."). Deere can raise standing again at a later stage if it believes the States have failed in this regard.

    *(e)*    *Statute of Limitations*

"Now is not the time" to decide statute of limitations issues. *Deere MDL* at 888 n. 20. The Seventh Circuit "applie[s] a demanding standard to dismissals on timeliness grounds at the pleading stage of antitrust cases, asking whether 'the plaintiff pleads itself out of court.'" *Vasquez v. Ind. Univ. Health, Inc.*, 40 F.4th 582, 588 (7th Cir. 2022) (citing *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 902 (7th Cir. 2004)). An affirmative defense, timeliness is normally "not properly resolved at the Rule 12[(c)] stage." *Vasquez*, 40 F.4th at 588.

Deere says the States' civil penalties claims are time-barred, noting that each state imposes a four (or six) year limitations period. Dkt. 110 at 29. The States allege that Deere's monopolistic conduct has been ongoing "for decades," so Deere concludes that their claims are untimely. *Id.* Deere's right that "[a]n antitrust cause of action accrues and the statutes begin to run when a defendant commits an act that injures a plaintiff's business." *Id.* (citing *Vasquez*, 40 F.4th at 588). But the limitations period "runs from the most recent injury caused by the defendants' activities, rather than from the violation's inception." *Xechem, Inc.*, 372 F. 3d at 902. As the *Xechem* Court explained, "[t]hat it may be too late to complain" about decades-old injuries, "does not imply that it is too late to complain about" more recent—or continuing— ones. *Id.*

The States allege that Deere *continues* to violate antitrust laws, charging supracompetitive prices and unlawfully restricting access to repair services. Dkt. 138 at 30 (citing dkt. 44 ¶¶ 11, 12, 117). Assuming that's true, the States' claims aren't barred, because "[e]ach discrete act with fresh adverse consequences starts its own period of limitations." *Xechem, Inc.*, 372 F.3d at 902. So, the States don't plead themselves out of court, and the Court won't dismiss the claims as time-barred. Deere is free to assert a statute of limitations defense later if necessary and appropriate.

**Conclusion**

For the reasons above, the Court denies Deere's Motion for judgment on the pleadings.

Entered: June 9, 2025

By:_____

Iain D. Johnston
U.S. District Judge